**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS**

LEAGUE OF WOMEN VOTERS OF
MASSACHUSETTS, LEAGUE OF WOMEN
VOTERS LOTTE E. SCHARFMAN
MEMORIAL EDUCATION FUND, LEAGUE
OF WOMEN VOTERS OF THE UNITED
STATES, LEAGUE OF WOMEN VOTERS
EDUCATION FUND, ASSOCIATION OF
AMERICANS RESIDENT OVERSEAS, U.S.
VOTE FOUNDATION, OCA-ASIAN PACIFIC
AMERICAN ADVOCATES, DELTA SIGMA
THETA SORORITY, INC.,

Case No. _____

*Plaintiffs*,

v.

**COMPLAINT**

DONALD J. TRUMP, in his official capacity as
President of the United States, UNITED STATES
POSTAL SERVICE, UNITED STATES POSTAL
SERVICE BOARD OF GOVERNORS, DAVID
STEINER, in his official capacity as Postmaster
General, DOUGLAS A. TULINO, in his official
capacity as Deputy Postmaster General, AMBER
F. MCREYNOLDS, in her official capacity as
Chairwoman of the Board of Governors of the
United States Postal Service, DEREK T. KAN, in
his official capacity as the Vice Chairman of the
Board of Governors of the United States Postal
Service, RONALD A. STROMAN, in his official
capacity as a member of the Board of Governors
of the United States Postal Service, DANIEL M.
TANGHERLINI, in his official capacity as a
member of the Board of Governors of the United
States Postal Service, DEPARTMENT OF
HOMELAND SECURITY, MARKWAYNE
MULLIN, in his official capacity as the Secretary
of the Department of Homeland Security,
SOCIAL SECURITY ADMINISTRATION,
FRANK J. BISIGNANO, in his official capacity
as Commissioner of the Social Security
Administration, U.S. CITIZENSHIP AND
IMMIGRATION SERVICES, JOSEPH B.
EDLOW, in his official capacity as Director of
U.S. Citizenship and Immigration Services,

*Defendants*.

**INTRODUCTION**

1. This case challenges an extraordinary and abusive assertion of executive power over the administration of federal elections. The U.S. Constitution assigns authority over federal elections to the states and Congress—not the President. Yet President Trump's March 31, 2026, Executive Order, "Ensuring Citizenship Verification and Integrity in Federal Elections," ("Executive Order" or "Order") unilaterally imposes sweeping changes to election procedures nationwide. Plaintiffs' members—among potentially millions of eligible U.S. citizens—will be excluded from the franchise if this Executive Order is implemented and will thus be irreparably harmed.

2. This is not the first time the President has unlawfully attempted to usurp power over federal elections. He issued the instant Executive Order notwithstanding injunctions from three separate federal courts, each blocking implementation of a 2025 executive order that likewise attempted a power grab over the federal elections process. That order was unconstitutional. So is this one.

3. The Executive Order targets the transmission and receipt of mail-in ballots, seeking to commandeer and displace state election laws by executive fiat. It directs federal agencies to develop unreliable federal citizenship-verification mechanisms and transmit such information to the states. It further improperly directs the independent United States Postal Service ("USPS") to create its own list of approved mail voters and to treat certain ballots as ineligible for delivery based on whether voters are included in this federally created list of enrolled voters.

4. In effect, the Order seeks to interpose a federal screening regime between voters and the ballot box by empowering a federal mail carrier to withhold certain voters' ballots. In

doing so, the Order displaces the roles that the Constitution and federal law assign to the states and Congress to regulate elections and to USPS as a neutral, nondiscriminatory carrier of the mail.

5.      The President lacks authority to issue such directives, and USPS and the other Defendants lack authority to carry them out. Presidential power must come from the Constitution itself or an act of Congress. The Constitution does not grant the President power to regulate federal elections or USPS, and Congress has not delegated any such authority to him. To the contrary, Congress enacted a detailed statutory framework governing both federal elections and the operations of USPS—and nowhere authorized the President to issue anything like the directives set forth in the Executive Order.

6.      Under the Constitution, the states retain the power to set their own rules and procedures for absentee and mail-in voting,[1] subject to superseding federal law passed by Congress. Though all states have clear requirements that only U.S. citizens may vote, states have otherwise exercised this authority in many ways. Some allow absentee voting only in specific circumstances or for specific categories of voters, while others allow all eligible citizens to vote by mail, and still others conduct their elections primarily via mail ballot. States also have differing deadlines and procedures for voter registration, requesting a mail or absentee ballot, and returning mail-in and absentee ballots. These diverging approaches reflect a long history of thoughtful deliberation in the laboratories of democracy. Overlaying these state regimes are federal statutes that provide for mail voting for armed service members and their families and other U.S. citizens living abroad. The President attempts to supplant this regulatory scheme with a vacuous appeal to his inherent authority, but he has none in this area.

---

[1] Unless noted otherwise—for instance, when describing distinct procedures under state law— "absentee voting," "mail voting," "vote-by-mail," and "mail-in voting" are used interchangeably herein.

3

7.    The Executive Order's directives to USPS are doubly unlawful. Not only does the President lack power over elections, but Congress, pursuant to its authority in the Postal Clause, U.S. Const. art. I, § 8, has established USPS as an independent entity charged with providing reliable and neutral mail delivery. In passing the Postal Reorganization Act of 1970, Congress required USPS to provide "prompt, reliable, and efficient services to patrons in all areas and . . . all communities." 39 U.S.C. § 101(a). In doing so, it stated that USPS must be operated "as a basic and fundamental service provided to the people," providing services to "patrons in all areas and . . . to all communities." *Id*. USPS has no authority to refuse to carry otherwise lawful election mail based on executive directives purporting to dictate voter eligibility; doing so would contravene Congress's direct instructions. The Executive Order would violate this statutory mandate by transforming USPS from a neutral mail carrier into the ultimate arbiter of who may cast a ballot.

8.    The Constitution forbids this attempted usurpation of power. The President's role is to execute the laws enacted by Congress—not to create new ones. Because the Executive Order exceeds the President's constitutional and statutory authority and intrudes upon powers reserved to the states and Congress, it is unlawful and must be set aside.

9.    Plaintiffs are the League of Women Voters of Massachusetts, League of Women Voters Lotte E. Scharfman Memorial Education Fund, League of Women Voters of the United States, League of Women Voters Education Fund, the Association of Americans Resident Overseas, the U.S. Vote Foundation, OCA-Asian Pacific American Advocates, and Delta Sigma Theta Sorority, Inc., all of whom are nonpartisan, nonprofit organizations dedicated, *inter alia*, to protecting the right to vote. Each Plaintiff organization helps educate and facilitate absentee voting

as one of its core activities, and each has members who rely on absentee voting and would be harmed by the Order.

10.    Plaintiffs challenge the Executive Order on six grounds, each of which threatens Plaintiffs and their members with irreparable harm.

11.    *First*, the Executive Order violates the constitutional separation of powers. The Constitution gives the states and Congress—not the President—the power to regulate elections. Nothing in the Constitution authorizes the President to set or change the rules for federal elections or to coerce states to alter their election procedures. The President may not strongarm states—into changing their mail-in ballot envelopes or notifying USPS in advance of an election that it intends for mail-in or absentee ballots to be transmitted by USPS—under threat of not delivering their voters' mail-in ballots.

12.    *Second*, the Executive Order is ultra vires. The Constitution gives Congress—not the President—power over USPS. Congress established USPS pursuant to its Postal Clause power as an independent entity charged with a mandate of neutrality in its mail delivery. The President has no power to regulate USPS nor to decide which users' mail can be transmitted through it. Even if the President could exercise some control over USPS, he cannot do so to override the Congress's mandate of USPS neutrality which this Executive Order violates.

13.    *Third*, the Executive Order intrudes on state sovereignty in violation of the Tenth Amendment and bedrock federalism principles. The Constitution reserves the authority to regulate elections to the states, subject to constitutional restraints and laws passed by Congress. By attempting to force states to alter how they exercise this power, including by changing their mail-in ballot envelopes and notifying USPS in advance of elections for which they intend to rely on

5

USPS to transmit mail-in or absentee ballots, the Executive Order unlawfully disrupts the balance of power between the federal government and the states.

14.    *Fourth*, the Executive Order unlawfully imposes an undue burden on the right to vote. In directing USPS to refuse to deliver lawful mail ballots, the Order threatens to disenfranchise eligible voters, including Plaintiffs' members.

15.    *Fifth*, the Executive Order violates Section 11(a) of the Voting Rights Act, which prohibits government officials from acting under color of law to deny any qualified citizen the right to vote. By directing USPS to refuse to transmit the ballots of certain voters who are not enrolled in at least one of several ill-defined lists enumerated in the Executive Order, the Order denies the right to vote to scores of qualified citizens who will be excluded from those lists.

16.    *Sixth*, the Executive Order instructs the Department of Homeland Security ("DHS") to compile and transmit a list of U.S. citizens to each state before every federal election—in a manner that squarely violates the Privacy Act and risks disenfranchising eligible voters. The Privacy Act governs federal agencies' collection, maintenance, use, and dissemination of personal information. It unambiguously requires that the intended uses of data be published in the Federal Register, as well as a System of Records Notice whenever a new system is being established or revised, to provide an opportunity for public notice and comment. Under the Privacy Act, federal agencies must also ensure that their records contain accurate and complete data before either making determinations based on those records or disseminating those records to other recipients. The Executive Order, however, requires DHS to quickly compile and distribute inaccurate and incomplete information about millions of individuals' residence and citizenship status, in direct contravention of the Privacy Act's requirements.

17.     Although the Executive Order is at times ambiguously worded—particularly regarding the interplay among and full-impact of the several lists specified in Sections 2 and 3— its legal deficiencies are plain as a matter of black-letter law. To the extent Plaintiffs' allegations reflect reasonable inferences about the Order's operation, any ambiguity is of the President's own making.

18.     To prevent the Order's imminent irreparable harm, Plaintiffs respectfully request that the Court (1) declare that the President may not override state rules for mail-in voting; (2) declare that the President may not compel USPS action; (3) declare that the Executive Order is unlawful because it coerces states to change their mail-in voting rules, and (4) enjoin Defendants from enforcing the Executive Order.

**PARTIES**

19.     Plaintiffs League of Women Voters of Massachusetts and the League of Women Voters Lotte E. Scharfman Memorial Education Fund (together, "LWVMA") comprise the two branches of the Massachusetts affiliate of the League of Women Voters ("LWV"). LWVMA and its members are members of LWV. LWVMA is a nonprofit, nonpartisan political membership organization committed to protecting the right to vote and promoting informed participation in the democratic process. It was founded on May 27, 1920. League of Women Voters of Massachusetts is a 501(c)(4) social welfare organization incorporated in Massachusetts, and League of Women Voters Lotte E. Scharfman Memorial Education Fund is a 501(c)(3) organization incorporated in Massachusetts that supports a variety of voter education and civic engagement programs.

20.     LWVMA's core mission is to empower voters and strengthen democracy for all in Massachusetts.

21.     LWVMA has been and is currently dedicated to protecting and promoting democratic government through public service, civic participation, and robust voter education and

registration. To further its mission, LWVMA's approximately 3,000 members frequently conduct voter registration drives throughout the Commonwealth, and its members and leadership are familiar with the nuances of voter registration and voting in Massachusetts.

22.    LWVMA volunteers and members also provide education and resources to Massachusetts voters regarding how to vote by mail. Because it is the core mission of LWVMA to encourage as many eligible voters as possible to participate in elections, they promote mail-in voting as an option and provide information to the public about the process for voting by mail. League of Women Voters of Massachusetts, *Vote By Mail*, https://lwvma.org/vote-by-mail/ (last accessed Apr. 1, 2026). Indeed, LWVMA currently promotes vote-by-mail as a potential option as part of its work pursuant to grants it has received for the 2026 election cycle to encourage more voter participation. Per Massachusetts law and the policies of election officials in Massachusetts, the vote-by-mail process in Massachusetts is not burdensome—no excuse is required and the Secretary of the Commonwealth office sends a postcard application for a mail ballot to all registered voters 45 days before each statewide election. *See id.*

23.    As part of this core mission to empower voters, LWVMA maintains the Massachusetts-specific version of VOTE411.org, an award-winning, nonpartisan online resource that provides voters the information they need to successfully participate in every election—local, state, and federal. This includes providing information and education about the process for voting by mail in Massachusetts. *See* VOTE411, *Voting in My State: Massachusetts*, https://www.vote411.org/massachusetts (last visited Apr. 1, 2026).

24.    LWVMA has members who are or will be registered voters and are eligible to vote absentee or by mail under the laws and rules of Massachusetts, have voted absentee or by mail in

the past, and plan to do so in the future. This includes members 65 and older and members with health concerns that require them to vote by mail.

25.     Plaintiffs League of Women Voters Education Fund ("LWVEF") and League of Women Voters of the United States ("LWVUS") comprise the League of Women Voters ("LWV") (with its state and local Leagues, "the League"), a nonprofit, nonpartisan, grassroots, community-based membership organization headquartered in Washington, D.C., that promotes political responsibility by encouraging Americans to participate in the electoral process. Founded in 1920 as an outgrowth of the struggle to win voting rights for women, the League now has more than a million members and supporters and is organized in more than 800 communities, and in every state and Washington, D.C. LWVUS encourages informed and active participation in government, works to increase understanding of major public policy issues, and influences public policy through education, and advocacy. LWVUS is a 501(c)(4) social welfare organization. LWVEF is a 501(c)(3) organization and works to register and provide voters with election information through its election resource VOTE411.org, candidate forums, and debates.

26.     As part of its mission, LWV—with its state and local Leagues—operates one of the longest-running and largest nonpartisan voter registration efforts in the nation. The League's core mission is to empower voters and defend democracy. The League works to protect a democracy where every eligible person has the desire, right, knowledge, and confidence to participate. Through its work, the League registers many thousands of voters every election cycle and is instrumental in ensuring access to voter registration for all eligible voters, including for newly naturalized citizens.

27.     The League encourages all eligible U.S. citizens to vote in ways that are accessible to them, including by actively encouraging and educating voters about all the available options to

vote by mail in their state. LWV maintains—with its state and local Leagues—VOTE411.org, an award-winning nonpartisan, online resource to provide voters the information they need to successfully participate in every local, state and federal election, including providing information about the option for voting by mail in every state where it is available.

28.    LWV has members who are or will be registered voters and are eligible to vote by mail pursuant to the laws and rules of their states of residency, have voted by mail in the past, and plan to vote by mail in the future. This includes members who are over the age of 65 and with health concerns that require them to vote by mail and restrict their ability to vote in person.

29.    Plaintiff Association of Americans Resident Overseas ("AARO"), founded in 1973 and headquartered in Paris, is a global association that works to build awareness of the issues affecting Americans overseas and seeks fair treatment by the U.S. government for Americans abroad. AARO's advocacy in voting led to the promulgation of the Overseas Citizens Voting Rights Act of 1975, which then led to the enactment of the Uniformed and Overseas Citizens Absentee Voting Act ("UOCAVA") in 1986. AARO assists U.S. citizens living overseas in the voting process in every federal election and continues to advocate for the removal of the remaining barriers to overseas voting.

30.    AARO has U.S. citizen members in over 45 countries. Many of AARO's members are among the hundreds of thousands of U.S. citizens who vote by mail from abroad in every election. These members vote by mail under the laws of their home states subject to federal protections. Voting by mail is the only option for many of these voters, and in each election their participation is subject to lengthy mail times and potentially unexpected delays.

31.    Plaintiff U.S. Vote Foundation ("US Vote") is a civic technology and voter assistance organization dedicated to making it easier for all U.S. citizens to register to vote and

stay active in the electoral process. With a core mission to ensure that every U.S. citizen can participate in their democracy regardless of location, US Vote serves as a vital resource for voters facing challenges due to their geographic circumstances. Its Overseas Vote Initiative provides easily accessible, nonpartisan voting tools, services, and election information for overseas citizens and military voters who vote under the protections of UOCAVA.

32.    The Overseas Vote Initiative includes several programs that assist U.S. citizens with requesting and casting mail ballots. It provides state-specific voting guides, an overseas voting FAQ that breaks down requirements and deadlines, and a "Voter Journey Map" to help overseas voters visualize the process. US Vote also maintains a Voter Help Desk to provide individual, personalized answers to voting questions, which can be particularly valuable to overseas and military voters who must navigate tricky international mail processes without the ability to go to an election office and resolve issues in person.

33.    Plaintiff OCA-Asian Pacific American Advocates ("OCA") is a nonprofit, nonpartisan, grassroots, community-based membership organization headquartered in Washington, D.C. OCA's mission is to advance the sociopolitical and holistic well-being of Asian Americans, Native Hawaiians, and Pacific Islanders ("AANHPIs") in the United States in a variety of areas, including civic engagement. OCA was founded in 1973 as the Organization of Chinese Americans with the purpose—like many membership associations before it—of providing a unified voice for Chinese Americans in the civil rights movement. As the AANHPI population of the United States continued to grow and diversify following the elimination of most race-based restrictions on immigration, the Organization of Chinese Americans also changed to reflect that growing diversity. In 2013, it renamed itself "OCA-Asian Pacific American Advocates" to reflect its work on behalf of all AANHPIs. Today, OCA and its 35 chapters serve as their local

11

communities' trusted voice and resource. They host cultural events; hold food and clothing drives; conduct community clean-ups; provide programming for AANHPI youth, professionals, and elders; conduct voter outreach and undertake other civic engagement work; and provide other resources to their communities, including information about COVID-19, small business support, and naturalization and citizenship application support.

34.     Defending the voting rights of and reducing barriers to voting for AANHPI U.S. citizens is core to OCA's mission, as well as to its national and state priorities. OCA—through its state and local affiliates—regularly conducts nonpartisan voter registration, education, and mobilization efforts across the nation. OCA also serves as a resource hub for its chapters conducting civic engagement work to provide print and digital materials, research support, and technical support where needed. This includes creating state-level voter guides and connecting them to youth volunteers for voter outreach work. OCA also hosts an annual virtual voter outreach event called "DJ the Vote" during which OCA members nationwide participate in text and phone banking to engage registered voters and eligible potential voters. These activities and resources are often provided in language-minority voters' native or preferred language (or "in-language").

35.     OCA has approximately 200,000 members in 45 states, including Massachusetts, two U.S. territories, and Washington, D.C.

36.     OCA has members who are or will be registered voters and are eligible to vote by mail pursuant to the laws and rules of their states of residency, have voted by mail in the past, and plan to vote by mail in the future. This includes members who have limited English proficiency who rely on voting by mail and the language assistance they can receive in doing so. OCA also includes youth members in college who need to vote by mail to vote in their home states. Finally, OCA has members who are naturalized citizen voters or are eligible to naturalize.

12

37.     Plaintiff Delta Sigma Theta Sorority, Incorporated is an international, nonpartisan, not-for-profit membership service organization comprised predominantly of Black women that was founded in 1913 on the campus of Howard University and incorporated under the laws of Washington, D.C. Six weeks after the organization was initially formed in 1913, its 22 founding members marched in the historic Woman's Suffrage Procession of 1913 under the Delta Sigma Theta Sorority, Inc. banner—its first public act. Civic engagement has remained a core tenet of the organization's mission since its founding, as democracy and justice can only be achieved through full and equal participation in the electoral process. Delta Sigma Theta Sorority, Inc. has over 350,000 initiated members, including voters throughout the United States, including in Massachusetts, and maintains more than 1,050 chartered chapters worldwide in over 10 countries and across the United States.

38.     Consistent with its mission, Delta Sigma Theta Sorority, Inc. has long worked to eliminate racial discrimination through democratic processes and through the enactment and enforcement of federal, state, and local laws securing civil rights, including laws governing voter registration and access to the ballot. The organization conducts robust, nonpartisan voter registration and voter education efforts nationwide, which are central to its mission. Through this work, it registers many thousands of voters for each election cycle and plays a vital role in ensuring access to voter registration for all eligible voters, including newly naturalized citizens. The organization encourages all eligible U.S. citizens to participate in the democratic process by voting, including by educating voters about and promoting the use of vote-by-mail options available under applicable state laws.

39.     Delta Sigma Theta Sorority, Inc. includes members who are registered voters, or will be registered voters, and who are eligible to vote by mail pursuant to the laws of their

13

respective states of residence. Many of these members have voted by mail in the past and intend to do so in the future. This includes members who are older or who have health conditions that limit their ability to vote in person, as well as members who join the organization shortly after becoming U.S. citizens and are therefore newly eligible to vote by mail. It also includes members who are overseas citizens and military voters who cast ballots under the protection of UOCAVA.

40.     Defendant Donald J. Trump is President of the United States. He is named in his official capacity.

41.     Defendant United States Postal Service is an independent agency of the executive branch of the United States. 39 U.S.C. § 401(1).

42.     Defendant United States Postal Service Board of Governors directs the exercise of the power of USPS. 39 U.S.C. § 202(a)(1).

43.     Defendant David Steiner is the Postmaster General, the chief executive of USPS. In that role, he is a member of the Board of Governors of USPS. He is named in his official capacity.

44.     Defendant Douglas A. Tulino is the Deputy Postmaster General. In that role, he is a member of the Board of Governors of USPS. He is named in his official capacity.

45.     Defendant Amber F. McReynolds is the Chairwoman of the Board of Governors of USPS. She is named in her official capacity.

46.     Defendant Derek T. Kan is the Vice Chairman of the Board of Governors of USPS. He is named in his official capacity.

47.     Defendant Ronald A. Stroman is a member of the Board of Governors of USPS. He is named in his official capacity.

48.     Defendant Daniel M. Tangherlini is a member of the Board of Governors of USPS. He is named in his official capacity.

49.     Collectively, the Board of Governors of USPS directs the exercise of the powers of the Postal Service, directs and controls its expenditures, reviews its practices, and sets policies on all postal matters.

50.     Defendant Department of Homeland Security is an agency of the federal government within the meaning of the Privacy Act, 5 U.S.C. § 552a(a)(1), and the Administrative Procedure Act ("APA"), 5 U.S.C. § 551(1).

51.     Defendant Markwayne Mullin is the Secretary of DHS. He is named in his official capacity.

52.     Defendant Social Security Administration ("SSA") is an agency of the federal government within the meaning of the Privacy Act, 5 U.S.C. § 552a(a)(1), and the APA, 5 U.S.C. § 551(1).

53.     Defendant Frank J. Bisignano is the Commissioner of SSA. He is named in his official capacity.

54.     Defendant U.S. Citizenship and Immigration Services ("USCIS") is an agency of the federal government within the meaning of the Privacy Act, 5 U.S.C. § 552a(a)(1), and the APA, 5 U.S.C. § 551(1).

55.     Defendant Joseph B. Edlow is the Director of USCIS. He is named in his official capacity.

## JURISDICTION AND VENUE

56.     This Court has jurisdiction under 28 U.S.C. §§ 1331 (federal question) and 1343(a)(4) (civil rights and elective franchise) because this action arises under the Constitution

15

and laws of the United States and Plaintiffs seek to secure equitable and other relief under an Act of Congress providing for the protection of the right to vote.

57.    Venue is proper in this District under 28 U.S.C. § 1391(e)(1)(C) because some Defendants are federal officers acting in their official capacities and Plaintiffs League of Women Voters of Massachusetts and League of Women Voters Lotte E. Scharfman Memorial Education Fund reside in this District and no real property is involved in the action.

58.    This Court is authorized to issue declaratory and injunctive relief under 28 U.S.C. §§ 2201–02, Rules 57 and 65 of the Federal Rules of Civil Procedure, and the Court's inherent equitable powers.

## **ALLEGATIONS**

### I.    THE CONSTITUTION RESERVES THE AUTHORITY TO REGULATE ELECTIONS TO THE STATES AND CONGRESS.

59.    The Elections Clause vests states with the authority to regulate the "'Times, Places and Manner'" of federal elections, subject to constitutional limits and to Congress's power to make or alter such regulations. *Arizona v. Inter Tribal Council of Ariz., Inc.*, 570 U.S. 1, 7–8 (2013) (quoting U.S. Const. art. I, § 4, cl. 1). The ability to set qualifications for voting falls outside the power conferred on the federal government by the Elections Clause. *Id.* at 17. Instead, the power to prescribe voter qualifications for federal elections, subject to constitutional limits, resides with the states. *Id.*; U.S. Const. art. I, § 2, cl. 2.

60.    "The Constitution vests none of these powers in the President, leaving election regulation solely to the States and to Congress." *League of United Latin Am. Citizens v. Exec. Off. of the President* ("*LULAC*"), 808 F. Supp. 3d 29, 73 (D.D.C. 2025).

61.    Presidential power must stem either from an "act of Congress or from the Constitution itself." *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 585 (1952). Where

the President acts contrary to the will of Congress—express or implied—he operates at the "lowest ebb" of his authority, constrained by Congress's own constitutional powers over the matter. *Id*. at 637 (Jackson, J., concurring).

62. The states and Congress have exercised their authority to regulate elections to permit voters to cast mail-in and absentee ballots in several circumstances.

63. Congress has authorized overseas and military voters to cast mail-in ballots under UOCAVA, which requires states to permit covered service members and U.S. citizens residing abroad to register and vote by mail in federal elections and to transmit ballots in a timely manner. UOCAVA sets these federal protections and baseline procedures, but it leaves the specific administration, processing, and counting of those ballots to the individual states under their own election laws and procedures.

64. All fifty states have enacted laws that allow at least some of their voters to cast mail-in or absentee ballots from within the United States. *See* Nat'l Conf. of State Legislatures, *Voting Outside the Polling Place: Absentee, All-Mail and Other Voting at Home Options* (Aug. 1, 2025), https://www.ncsl.org/elections-and-campaigns/voting-outside-the-polling-place. States have adopted diverse mail or absentee voting regimes: some conduct elections primarily by mail, some allow any eligible voter to cast a mail or absentee ballot without excuse, and others restrict mail or absentee voting to voters who meet specified statutory criteria. *See* U.S. Election Assistance Comm'n, *How Do I Vote By Mail?* (Dec. 23, 2025), https://www.eac.gov/how-do-i-vote-by-mail [https://perma.cc/7FXE-NRTD].

65. Mail voting is a fundamental part of the election process throughout the United States. In 2024, mail voting comprised 30.3% of the turnout for the 2024 election. U.S. Election Assistance Comm'n, *EAVS 2024 Comprehensive Report* at ii, (June 2025),

https://www.eac.gov/sites/default/files/2025-07/2024_EAVS_Report_508.pdf

[https://perma.cc/U6RU-8UY9]. There were over 47 million mail ballots returned in the 2024 general federal election. *Id.* at 34–35 (Overview Table 1: Mail Voting in the 2024 General Election).

66.     U.S. elections have included mail voting since 1813. Smithsonian Snapshot, *A History of Voting by Mail* (Sept. 19, 2024), https://www.si.edu/collections/snapshot/history-voting-mail.

67.     Hundreds of thousands of U.S. citizens living overseas, including active military and their families, vote by mail by necessity because they are not able to vote in person. U.S. Election Assistance Comm'n, *EAVS 2024 Comprehensive Report* at 204. In 2024, election offices in 49 states, four U.S. territories, and Washington, D.C., reported transmitting 1,327,324 ballots to UOCAVA voters. *Id*. at 201. Seven states transmitted 50,000 or more UOCAVA ballots: Alabama, California, Colorado, Florida, New York, Texas, and Washington. *Id*. at 218–19. States reported 806,743 regular absentee ballots being returned and submitted for counting by UOCAVA voters for the 2024 election. *Id*. at 204.

**II.     THE PRESIDENT'S UNLAWFUL EXECUTIVE ORDER.**

68.     President Trump signed the Executive Order, titled "Ensuring Citizenship Verification and Integrity in Federal Elections," on March 31, 2026. The Executive Order mandates (or purports to mandate) several actions.

69.     The Executive Order directs the Secretary of DHS to create and transmit to each state a "list of individuals confirmed to be United States citizens who will be above the age of 18" by the next federal election and who reside in that state ("State Citizenship List[s]"). Exec. Order § 2(a). The Order specifies that these State Citizenship Lists must be derived from federal

citizenship and naturalization records, Social Security Administration records, SAVE data,[2] and

"other relevant federal databases." *Id.* The Order further requires that these lists be updated and

sent to state officials "no fewer than 60 days before each regularly scheduled Federal election." *Id.*

The Order further requires the Secretary of DHS to "establish procedures to (i) allow individuals

to access their individual records as well as to update or correct them in advance of elections; and

(ii) enable States to routinely supplement and provide *suggested* modifications or amendments to

the State Citizenship List." *Id.* (emphasis added).

70.    The Executive Order then directs the Postmaster General "to initiate a proposed

rulemaking pursuant to 39 U.S.C. 401 and other applicable authority within 60 days of the date of

this order." *Id.* § 3(b). The Executive Order states that "[t]he notice of proposed rulemaking *shall*

*include*, at minimum," several proposed provisions, *id.* (emphasis added), including that:

- "all outbound ballot mail must be mailed in an envelope that . . . is automation-compatible and bears a unique Intelligent Mail barcode, or successor USPS technology, that facilitates tracking," *id.* § 3(b)(i)(B);

- any state that intends to rely on USPS for mail-in or absentee ballots may provide USPS a list no fewer than 60 days before an election of eligible voters to whom the state will send mail ballots via USPS ("State Intended Mail Ballot List"), *id.* § 3(b)(ii);

- the Postmaster General must create a process by which individuals can be "enrolled" on a list USPS maintains ("Mail-In and Absentee Participation List"), which includes "unique ballot envelope identifiers, such as bar codes, for mail-in or absentee ballots provided to such individuals," *id.* § 3(b)(iv); and

- USPS may not transmit a mail ballot to any voter who is not on the Mail-In and Absentee Participation List, *id.* § 3(b)(iii).

71.    The Executive Order specifies that the final rule promulgated by USPS "shall be

issued no later than 120 days from the date of this order." *Id.* § 3(d). The Executive Order also

---

[2] Systematic Alien Verification for Entitlements ("SAVE") is a system operated by USCIS that provides citizenship information; as explained below, it frequently contains inaccurate information and mislabels U.S. citizens as noncitizens.

requires that USPS "coordinate with the USPS Office of Inspector General and the Department of Justice for investigation of suspected unlawful use of the mail involving Federal election materials." *Id.* § 3(c).

72.    The Executive Order directs the DHS Secretary, SSA Commissioner, and Postmaster General to "coordinate with the Secretary of Commerce in effectuating" the Order. *Id.* § 4(a). In particular, the Order requires the DHS Secretary to, within 90 days of the order, "establish the infrastructure necessary to compile, maintain, and transmit the State Citizenship List," to each state's election officials, described *supra*, and to "designate a point of contact within DHS to receive and process requests from individuals and State election officials" regarding that list. *Id.* § 4(c). The Order mandates that the SSA Commissioner "shall provide all necessary citizenship and identity data to the" DHS Secretary to effectuate this part of the Order. *Id.*

73.    The Executive Order directs the Attorney General to prioritize the investigation and prosecution of state and local election officials who issue federal ballots to claimed "ineligible" individuals, as well as any persons or entities involved in printing, producing, shipping, or distributing ballots to those voters. *See id.* § 2(b). It further directs the Attorney General and agency heads to "take all lawful steps to deter and address noncompliance with Federal law, including withholding Federal funds from noncompliant States and localities where such withholding is authorized by law." *Id.* § 5. And it mandates that states and localities preserve for five years "all records and materials—excluding ballots cast—evidencing voter participation in any Federal election." *Id.*

III.    **THE EXECUTIVE ORDER THREATENS IMMEDIATE AND CONCRETE HARM TO PLAINTIFFS AND PLAINTIFFS' MEMBERS.**

74.    The Executive Order threatens immediate, concrete, and irreparable harm to Plaintiffs and to Plaintiffs' individual members by unduly burdening members' right to vote—and

potentially disenfranchising them—and by burdening Plaintiffs themselves, impairing their core missions.

### A. Burdens on Voters Who Rely on Absentee Voting or Vote-by-Mail

75.    Millions of U.S. citizens have voted by mail in recent elections. Approximately 30% of voters cast ballots by mail in 2024, totaling roughly 45 million of the nearly 157 million ballots cast.[3]

76.    The option to vote by mail is essential for many U.S. citizens living overseas or temporarily located out of state, including active-duty military, military families, and civilians. For many, it is their only plausible means of casting a ballot. There are around an estimated 2.2 million eligible U.S. citizens living overseas.[4] There are also around 1.3 million active-duty service members, around three-quarters of whom are eligible to vote by mail,[5] and around 1.4 million active-duty military family members, including hundreds of thousands of spouses and adult dependents.[6]

---

[3] U.S. Election Assistance Comm'n, *EAVS 2024 Comprehensive Report* at ii; *see also* Charles Stewart III, *How we Voted in 2024: A Topical Look at the Survey of the Performance of American Elections*, MIT Election Data & Science Lab, https://electionlab.mit.edu/sites/default/files/2025-07/HowWeVotedIn2024.pdf [https://perma.cc/7JCN-722V]; Univ. of Fla., *2024 General Election Turnout*, Election Lab, https://election.lab.ufl.edu/2024-general-election-turnout/ (last accessed Apr. 2, 2026), [https://perma.cc/Z4C8-YBHM].

[4] Fed. Voting Assistance Program, *Post-Election Voting Survey: Overseas Citizen Population Analysis (OCPA) Technical Report 2024* at 11 (2024), https://www.fvap.gov/uploads/FVAP/Reports/2024_OCPA-Technical-Report.pdf#page=11 [https://perma.cc/Q6BT-T9RV].

[5] Fed. Voting Assistance Program, *Post-Election Voting Survey: Active Duty Military (ADM) Technical Report 2023* at 5, https://www.fvap.gov/uploads/FVAP/Reports/2022-PEVS-ADM-Tech-Report-Final-20230823.pdf (last accessed Apr. 2, 2026), [https://perma.cc/58C4-MWGV].

[6] U.S. Dep't of Def., *2023 Demographics: Profile of the Military Community* at 87, 116, 155, https://download.militaryonesource.mil/12038/MOS/Reports/2023-demographics-report.pdf (last accessed Apr. 2, 2026), [https://perma.cc/H2AK-2CRL].

77.     These are taxpaying U.S. citizens[7] who serve our country in the military or foreign service, and include those who study, teach, or work as missionaries, across the world. Many cannot leave their posts or jobs to return to the United States to vote in person, and it would be prohibitively expensive for many of those voters to make that trip for election after election.

78.     Overseas and military voters already face significant hurdles to vote. A Federal Voting Assistance Program ("FVAP") Report to Congress estimated only 11% of eligible overseas citizens voted in the 2024 election, compared to 76.2% of eligible domestic citizens.[8] The low turnout is not solely a lack of interest: 89% of overseas citizens who did not return a ballot in the 2024 election indicated "couldn't complete process" as the reason why, while only 11% reported that they did not want to vote.[9] As to military members, in 2020, 43% of eligible nonvoters reported that they wanted to vote or tried to vote but were unable to do so.[10]

79.     To register, an overseas voter either fills out the form for their applicable jurisdiction or a Federal Post Card Application ("FPCA"), a protection that Congress provided for in UOCAVA. A voter who registers with the FPCA is automatically sent a mail ballot 45 days

---

[7] Indeed, the United States is one of only two countries that requires citizens and residents living abroad to file tax returns. *See* Internal Revenue Serv., *U.S. citizens and residents abroad – Filing requirements*, https://www.irs.gov/individuals/international-taxpayers/us-citizens-and-residents-abroad-filing-requirements (last visited Apr. 2, 2026), [https://perma.cc/B6JE-HV8F].

[8] Fed. Voting Assistance Program, *2024 Post-Election Report to Congress*, https://www.fvap.gov/uploads/FVAP/Reports/2024_RTC.pdf (last accessed Apr. 2, 2026), [https://perma.cc/ZG4C-B3T3].

[9] *Id.*

[10] Fed. Voting Assistance Program, *Post-Election Voting Survey: Active Duty Military Technical Report 2020* at 2, 37, 39, https://www.fvap.gov/uploads/FVAP/Reports/FVAP_ADM-Technical-Report-2020_FINAL_20210831.pdf (last accessed Apr. 2, 2026), [https://perma.cc/TVD6-DHD6].

22

before the next election.[11] But in some states, the FPCA itself must be returned by mail.[12] For U.S. citizens spread across the globe, mail can take weeks or even months to reach their home county in which they are registered to vote, meaning they effectively have to send in their voter registration months before an election to ensure time for receipt, processing, and the mailing of a ballot.

80.    For overseas voters who register using their home-jurisdiction form, they must request a mail ballot pursuant to that jurisdiction's rules. These ballots, too, are subject to mail delays that may prevent a voter from having their ballot count. 49% of active-duty military reported having trouble requesting a mail ballot in 2022 and 39% reported their ballot did[13]t arrive at all. Military families in Japan [14]eight weeks to arrive from the United States.[15]

81.    Mail delays are also an issue for overseas and military voters when they return their ballots to their home jurisdictions. FVAP recommends that military members stationed abroad mail their ballots back at least 30 days before an election.[16]

82.    If a military or overseas voter does not receive their state absentee ballot in time, the voter may use the Federal Write-In Absentee Ballot ("FWAB") as a backup, another key

---

[11] 52 U.S.C. § 20302(a)(8)(A).

[12] Fed. Voting Assistance Program, https://www.fvap.gov/fpca-privacy-notice *Voter Registration and Absentee Ballot Request: Federal Post Card Application (FPCA)*, https://www.fvap.gov/uploads/fvap/forms/fpca.pdf (last accessed Apr. 2, 2026), [https://perma.cc/4YRV-HBCE].

[13] Fed. Voting Assistance Program, *Post-Election Voting Survey: Active Duty Military (ADM) Technical Report 2023* at 44.

[15] Comm. on House Admin., 119th Cong., *Why the Wait? Unpacking California's Untimely Election Counting Process*, at 30 (Apr. 29, 2025), https://www.congress.gov/119/chrg/CHRG-119hhrg60223/CHRG-119hhrg60223.pdf [https://perma.cc/MKT4-L3PN].

[16] Fed. Voting Assistance Program, *2024-25 Voting Assistance Guide* at  10 (Aug. 2023), https://www.fvap.gov/uploads/FVAP/States/eVAG.pdf [https://perma.cc/9EKK-JRTF].

protection Congress instituted through UOCAVA. Indeed, this happens to thousands of voters in each election: In the 2024 general election, 28,140 FWABs were received.[17] But FWABs must still be mailed and are subject to similar potential delays.

83.    On top of all these challenges, it is more difficult for military members, their families, and overseas civilians to receive assistance from election officials. They cannot physically visit a local office to sort out issues, may have to contest with differing time zones to communicate with that office, and may have to wait weeks for an updated mail if something needs to be corrected.

84.    Especially against this backdrop, the Executive Order harms AARO and US Vote, and their members, in several ways.

85.    If, as the Executive Order intends, the failure of a state to provide the list contemplated in Section 3(b)(ii) of the Order means that its mail-in or absentee ballots will not be transmitted via USPS, states will need to transmit their State Intended Mail Ballot List to USPS 60 days before an election. This means anyone seeking to vote by mail must, as a practical matter, request a mail ballot from their state *more than* 60 days before an election. As discussed, requesting a mail ballot can be a significant hurdle for military and overseas voters, [18]living at sea, or members of religious organizations living in rural areas. Now, they will need to request ballots even earlier, and adding additional hurdles to the process increases the number of voters who will be unable to complete the process.

---

[17] Fed. Voting Assistance Program, *FVAP 2024 Post-Election Report to Congress* at 52.
[18] Camilla Rodriguez Guzman, *Serving in the Military Shouldn't Mean It's Harder to Vote*, Nat'l Conf. of State Legislatures (Aug. 26, 2025), https://www.ncsl.org/state-legislatures-news/details/serving-in-the-military-shouldnt-mean-its-harder-to-vote [https://perma.cc/K7L6-FXSP] (recounting how a Navy parent tried to send her son his ballot, but it never arrived and "he wasn't able to cast his ballot in the presidential election").

86.    The 60-day minimum could then be a complete bar for active-duty military members who are often moved or deployed at short notice. Anyone who is transferred or deployed within 60 days of an election will be unable to receive a mail ballot and thus be disenfranchised while actively serving our country.

87.    The Executive Order directs USPS not to transmit a ballot unless the voter is "enrolled" on the USPS-created Mail-In and Absentee Participation List. This would add yet another requirement for military and overseas voters who already face unique and disproportionate challenges to register and vote.

88.    To the extent that the failure of a state to provide the State Intended Mail Ballot List 60 days before the election means that its mail-in or absentee ballots will not be transmitted via USPS, this is particularly burdensome for voters who register with the FPCA. Voters who rely on that registration form to double as their mail ballot application will be excluded from any such list of voters, as the states necessarily would not be aware of those voters until after the dual registration and mail ballot application request is received. This would eliminate the FPCA's main purpose of making it easier for military and overseas voters to get a ballot by collapsing registration and ballot request into one form.

89.    This would also be troubling for voters who rely on the FWAB. Voters who did not receive their ballot and fill out the FWAB will similarly have to take additional steps to ensure their FWABs are transmitted to the appropriate official. This undercuts UOCAVA's requirement that state officials accept valid FWABs, removing what Congress designed to be a backup ballot for military and overseas voters.

90.    Section 3(b)(iii) of the Executive Order requires that USPS "shall not transmit mail-in or absentee ballots" unless it has confirmed that the ballot was from an individual on the Mail-

in and Absentee Participation List. The only way USPS can comply with this requirement is by using the envelope design changes mandated in Section 3(b)(i) to confirm if the ballot is from a voter on the Mail-in and Absentee Participation List before sending it to election officials. Upon information and belief, many state and local election officials do not currently have sufficiently sophisticated printing systems to meet this requirement. And upon information and belief, four months into the 2026 federal election cycle, there is insufficient time for states to implement such systems for any federal elections this year, including the general election in November 2026.

91.    Some eligible voters will not be included on DHS's "State Citizenship List[s]." None of the Order's listed sources—federal citizenship and naturalization records, SSA records, and other data retrievable via the SAVE program—are sources of comprehensive citizenship databases. SAVE is not itself a database but is instead a service managed by USCIS that accesses data contained in various federal databases, including those maintained by USCIS and SSA.[19] Those databases, however, contain outdated and incorrect citizenship and residence information and therefore cannot generate a comprehensive list of U.S. citizens in each state. SSA, for instance, contains information for an individual at the time that they applied for a Social Security number— but such individuals may not have had a reason to update their SSA records if they subsequently obtained U.S. citizenship or moved. *See* Privacy Act of 1974, System of Records, 90 Fed. Reg. 50879, 50880–81 (Nov. 12, 2025). Furthermore, SSA did not systematically track citizenship information for all applicants until 1978 at the earliest, which means that the citizenship of older

---

[19] U.S. Citizenship & Immigr. Servs., *Voter Registration and Voter List Maintenance Fact Sheet* (Feb. 2, 2026), https://www.uscis.gov/save/current-user-agencies/guidance/voter-registration-and-voter-list-maintenance-fact-sheet [https://perma.cc/U6JG-WECY].

voters will be less likely to be verified.[20] USCIS itself acknowledges that SAVE results are not conclusive determinations of citizenship status and that a failure to verify citizenship status via SAVE is not a sufficient basis to deny a voter registration application or remove someone from the voting rolls; rather, the prospective voter must be given "an opportunity to correct their records with the appropriate Federal agency (e.g., SSA, DoS, or DHS) and/or present proof of citizenship in accordance with federal and state law" before they can be denied the ability to vote.[21] Similarly, USCIS acknowledges that a failure to confirm citizenship status based solely on a search of the voter's Social Security number "is not a final SAVE response and cannot be used to deny registration or remove someone from a voting roll." *Id.*

92.     The foreseeable consequence of the Order is that at least some states will only include, and/or USPS will only process, mail ballots for individuals who are both on the USPS Mail-In and Absentee Participation List and the DHS State Citizenship List. This creates a substantial additional risk of disenfranchisement for eligible voters erroneously excluded from the DHS State Citizenship List. And, as set forth *infra*, several provisions of the Executive Order indicate that this may very well be the President's intent.

93.     Section 2(a) of the Executive Order, for one, mandates that DHS shall update its State Citizenship List and transmit it "to State election officials no fewer than 60 days before each regularly scheduled Federal election, or promptly upon request by a State in connection with any special Federal election." It also requires the DHS Secretary to establish procedures allowing

---

[20]   *See* Soc. Sec. Admin., *Social Security Number Chronology*, https://www.ssa.gov/history/ssn/ssnchron.html (last accessed Apr. 2, 2026) [https://perma.cc/JS3B-RQDW].

[21] U.S. Citizenship & Immigr. Servs., *Voter Registration and Voter List Maintenance Fact Sheet*.

"individuals to access their individual records as well as to update or correct them in advance of elections." Exec. Order § 2(a)(i).

94.    Additionally, Section 4(c) of the Executive Order mandates that the DHS Secretary "shall" not only "establish the infrastructure necessary to compile, maintain, and transmit the State Citizenship List described in section 2(a) of this order," but also "designate a point of contact within DHS to receive and process requests from individuals and State election officials regarding the relevant State Citizenship List." Exec. Order § 4(c).

95.    If the DHS State Citizenship list were merely advisory, there would be no reason to mandate processes for state election officials and individual voters to update it—states could just send USPS their own list without any concern about the DHS list or need to update it. The most reasonable inference from the Executive Order, even if not explicit, is that the President intended that the DHS State Citizenship List be used by USPS or state election officials to screen all mail ballots.

96.    Regardless, the logical consequence of the DHS State Citizenship List, when read in conjunction with the criminal penalties threatened against state and local officials, is that many such officials will predictably only include on their lists sent to USPS—i.e., the State Intended Mail Ballot Lists—their registered voters who are also on the DHS State Citizenship List.

### B.    Burdens on Recently Naturalized Citizens and The Elderly

97.    The Executive Order will also impair the ability of recently naturalized citizens—including Plaintiffs' recently naturalized members and members who are eligible and likely to naturalize and register—to vote by mail and will likely prevent some from voting entirely.

98.    As noted above, the most reasonable reading of the Executive Order's unclear text regarding the use of the DHS State Citizenship Lists is that they will be used to screen eligible, registered voters from the USPS Mail-In and Absentee Participation List if they do not appear on

the former list. And yet, the DHS State Citizenship List will likely exclude some recently naturalized citizens.

99.    In October of 2025, for example, DHS itself disclosed that there was a risk that, through SAVE, "U.S. Citizenship and Immigration Services may share inaccurate information with registered agencies, which could in turn impact a registered user agency's eligibility determination for an individual . . . due to misspelling of names, transposed numbers, or incomplete information"—a risk that it could only partially mitigate. Dep't of Homeland Sec., *Privacy Impact Assessment for the Systematic Alien Verification for Entitlements "SAVE" Program* at 19 (Oct. 31, 2025), https://www.dhs.gov/sites/default/files/2025-10/Systematic%20Alien%20Verification%20for%20Entitlements%20Program%20-%20October%202025.pdf [https://perma.cc/55ZV-X3MF]. Additionally, any data in SSA databases likely only reflect a person's citizenship status or residence at the time they applied for a Social Security number. Plaintiffs are not aware of any subsequent point at which SSA updates a person's citizenship designation in their records other than through the individual themselves initiating contact with SSA to report that they have naturalized.

100.    For these reasons, recently naturalized citizens—including Plaintiffs' recently naturalized members and members of OCA who are eligible to naturalize—will likely be deprived of their ability to vote by mail despite their entitlement to do so under state law.

101.    Moreover, the DHS State Citizenship List will also likely exclude elderly U.S.-born citizens, some of whom are disabled voters. Until DHS recently added records from SSA, the SAVE program could not verify citizenship status for U.S.-born individuals.[22] And even SSA did

---

[22] *See, e.g.*, 90 Fed. Reg. 48948, 48950 ("[T]he user agency must always enter the individual's first and last name, date of birth, and at least one enumerator, which may *now* include a full 9-digit or partial Social Security number." (emphasis added)).

not begin to consistently maintain citizenship information until 1978 at the earliest, and therefore does not have that information for all individuals who have been issued a Social Security number, especially those who are elderly.[23] DHS itself acknowledges that SSA data allows verification of U.S. citizenship "of *many*" but not all "U.S. citizens *by birth*[.]"[24]

102.   For these reasons, elderly citizens—including Plaintiffs' members—will likely be deprived of their ability to vote by mail, and possibly of their right to vote entirely.

### C.  Burdens on Organizations That Serve Voters

103.   The Executive Order's provisions that make it harder to vote by mail will directly impair Plaintiffs' core activities of educating members and the public about the steps needed to register to vote and ensuring that they can cast effective ballots. Adding complications to voting by mail will interfere with Plaintiffs' missions and cause them to divert resources in ways that will cause them irreparable harm.

104.   US Vote's Overseas Vote website provides easily accessible, nonpartisan voting tools, services and election information for overseas citizen and military voters. It also provides access to the federal voter registration form and FPCA, as well as the FWAB. If states are required to send USPS the State Intended Mail Ballot List 60 days before an election—and, therefore, anyone registering for a mail ballot with their state must do so more than 60 days before an election—US Vote will have to change its website to prioritize communicating to its constituents that they need to complete all registration and ballot request steps more than two months before an election. As many eligible citizens do not think about requesting ballots so far ahead of time, US Vote will also need to increase other communications well before election season to maximize the number of voters it can alert.

---

[23] *See* Soc. Sec. Admin., *Social Security Number Chronology*.
[24] 90 Fed. Reg. 48948, 48950 (Oct. 31, 2025) (emphasis added).

105. Some states may choose not to submit State Intended Mail Ballot Lists to USPS. The Order does not purport to (and could not) require states to do so. To the extent that the failure of a state to provide the State Intended Mail Ballot Lists to USPS means that its mail-in or absentee ballots will not be transmitted via USPS, this could lead to state-by-state variation that Plaintiffs would have to assess and respond to with potentially dozens of individualized plans in the weeks leading up to an election. Such a result would create confusion among those who rely on US Vote tools. Educating voters about mail voting under the Executive Order's provisions will be a burdensome task that will impair US Vote's core activities such as providing voter information and require it to divert resources as a result.

106. US Vote's website also enables all eligible U.S. citizens—whether residing in the U.S. or abroad—to generate registration and absentee ballot request forms. Under the provision that only an "enrolled" voter on the USPS Mail-In and Absentee Participation List receives a ballot, US Vote will have to change its website to provide notice to voters regarding the USPS Mail-In and Absentee Participation List. To the extent that only USPS may add voters to the Mail-In and Absentee Participation List, this stymies US Vote's core mission of providing these absentee ballot services to voters.

107. US Vote also maintains a Voter Help Desk to provide all eligible U.S. citizens, including overseas citizens and members of the military, with individual, personalized answers to voting questions. The Help Desk offers answers for both domestic and overseas voting. If the Executive Order's provisions that make it harder to vote by mail go into effect, Help Desk staff will likewise need to be able to provide information about registration and voting by mail for every state. Running the Help Desk and answering voters' questions may become so burdensome that US Vote may no longer be able to provide this service to domestic and overseas voters alike.

108.   Educating Americans living abroad about how to register to vote and to vote by mail is a core activity of AARO's mission. This includes online and in-person educational seminars on voting, a regular email newsletter, and an "Ask an AARO Expert" feature on its website. If the Executive Order's provisions that make it harder to vote by mail go into effect, AARO will have to expend resources to update its website and evaluate ways it can provide voter registration information to overseas citizens with residency in states across the U.S. It will also have to run these programs more frequently and longer before elections so military and overseas voters have sufficient time to be on a state mail voting list. These will be burdensome tasks that will require AARO to divert resources away from its other core activities, such as educating U.S. citizens living abroad about other issues including citizenship, taxation, banking, financial reporting, Social Security and Medicare.

109.   This Executive Order burdens LWV's and LWVMA's core mission. Their core mission is to ensure that every eligible voter actually votes, to achieve maximum participation in the electoral process. Voting by mail is a method of accessible voting that makes it possible for many individuals to actually vote and is an option LWV and LWVMA promote to encourage participation in elections. If this option is not viable, LWV and LWVMA will be less successful in achieving their core mission of ensuring maximum participation in the electoral process.

110.   In particular, LWVMA's core mission of ensuring maximum participation in the electoral process will be impaired given its past reliance on the straightforward vote-by-mail process promoted by Massachusetts law and election officials in Massachusetts.

111.   This Executive Order also creates a burden on LWV and LWVMA resources. Educating the public about how to vote by mail is core to the League's mission to make sure every eligible voter can vote. One of the methods LWV uses to accomplish this core mission is

overseeing and maintaining (in cooperation with its state and local Leagues) its nonpartisan, award-winning website, VOTE411.org. Because VOTE411.org provides information about how to vote by mail, LWV will need to update, with its state and local Leagues, that information for every state that provides a vote-by-mail process. LWVMA will also have to update the Massachusetts page of VOTE411.org that it maintains with LWV.

112.    Additionally, the significant changes in the process for voting by mail required by the Executive Order will cause voter confusion, and LWV and LWVMA will be required to provide extensive education to voters about these changes and the new process. This will be a burdensome task that will require LWV and LWVMA to divert resources way from other core activities, such as registering voters and advocacy to improve election procedures.

113.    For the reasons described above, LWV and LWVMA also have members who will likely be injured by the Executive Order because it will prevent them from voting by mail, and for some members over the age of 65 and with disabilities that prevent them from voting in person, they will be unable to vote at all.

114.    This Executive Order creates a burden on OCA's core mission of advancing the sociopolitical and holistic well-being of AANHPIs in the United States in a variety of areas, including civic engagement. Voting by mail is a method of voting that makes it possible for many individuals to actually vote and is an option that allows many limited English proficient voters, including OCA members, to access in-language voter assistance. If this option is not viable, many AANHPI's, over 30% of whom are Limited English Proficient ("LEP"), will be unable to vote. In addition to the harms to its LEP members, OCA's ability to provide in-language voter assistance will be drastically constrained if they are limited to providing assistance at a polling place. As a result, OCA will be less successful in achieving its core mission of advancing the sociopolitical

well-being of AANHPIs, which includes ensuring their ability to participate in the electoral process.

115.    This Executive Order also creates a burden on OCA's resources. Educating AANHPIs and its members about how to vote, including by mail, and providing in-language voter assistance is a core activity of OCA's mission. If voting by mail is restricted pursuant to the Order, OCA's voter education materials will need to be updated on a state-by-state basis, depending on a state's ability to comply with the printing requirements of Section 3, whether it chooses to use USPS, and whether it chooses to provide a list of eligible voters to USPS. In-language assistance to complete ballots will require additional resources, including many more volunteers, if voting by mail is restricted and more LEP voters are forced to go to a polling location. This will be a burdensome task that will divert resources away from OCA's other core activities, such as registering voters and providing naturalization assistance.

116.    Some OCA members will be injured by the Executive Order because it will prevent them from voting by mail, and some members with limited English proficiency will be unable to vote at all if they cannot obtain polling place translators.

117.    This Executive Order creates a burden on Delta Sigma Theta Sorority, Inc.'s core missions. A core mission of Delta Sigma Theta Sorority, Inc. is to achieve democracy and justice through full participation in the electoral process. Voting by mail is a method of voting that encourages civic engagement, allowing many individuals to actually vote and is an option that Delta Sigma Theta Sorority, Inc. uses as a means to encourage voters to participate in elections. If this option is not viable, Delta Sigma Theta Sorority, Inc. will be less successful in advancing civic engagement, and will be less successful in achieving their core mission of achieving democracy and justice through full participation in the electoral process.

118.    This Executive Order also creates a burden on Delta Sigma Theta Sorority, Inc.'s resources. Educating the public about how to vote by mail is a core activity of Delta Sigma Theta Sorority, Inc.'s mission to advance civic engagement. Additionally, the significant change in the process for voting by mail that is required by the Executive Order will cause voter confusion, and Delta Sigma Theta Sorority, Inc. will be required to provide extensive education to voters about these changes and the new process. This will be a burdensome task that will divert resources away from Delta Sigma Theta Sorority, Inc.'s other core activities, including registering voters, advocating for policy change, and otherwise working to eliminate racial discrimination under law.

119.    For the reasons explained above, Delta Sigma Theta Sorority, Inc. also has members who will likely be injured by the Executive Order because it will prevent them from voting by mail. For some members whose age or disabilities prevent them from voting in person, they will be unable to vote at all.

## CLAIMS FOR RELIEF

### COUNT I: Separation of Powers
*Against the President and USPS Defendants*

120.    Plaintiffs incorporate the allegations of the preceding paragraphs by reference.

121.    Private plaintiffs may sue to enjoin unconstitutional actions by state and federal officers. *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 327 (2015). This equitable cause of action reflects a long history of judicial review of illegal executive action. *Id.*

122.    The Supreme Court has recognized that "whenever a separation-of-powers violation occurs, any aggrieved party with standing may file a constitutional challenge." *Collins v. Yellen*, 594 U.S. 220, 245 (2021). The Court has similarly recognized an implied private right of action directly under the Constitution to challenge governmental action on separation-of-powers grounds. *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 491 n.2 (2010).

35

123.    Presidential power must stem either from an "act of Congress or from the Constitution itself." *Youngstown*, 343 U.S. at 585. Where the President acts contrary to the will of Congress—express or implied—he operates at the "lowest ebb" of his authority, constrained by Congress's own constitutional powers over the matter. *Id*. at 637 (Jackson, J., concurring).

124.    The Constitution vests the states and Congress with authority over federal elections (U.S. Const. art. I, § 4) and vests Congress with power to "establish Post Offices and post Roads" (U.S. Const. art. I, § 8, cl. 7). The President has no constitutional authority over either domain. There is no authority to suggest that the Guarantee Clause grants the President the power to regulate elections, especially in light of the explicit conferral of such authority upon Congress. *See* U.S. Const. art. IV, § 4.

125.    Nor does the President have any relevant statutory authority.

126.    Congress has expressed its will on the structure of the postal system through the Postal Reorganization Act, 39 U.S.C. § 101 *et seq.*, and on the administration of federal elections including through the National Voter Registration Act ("NVRA"), Help America Vote Act ("HAVA"), and UOCAVA. The President's attempt to direct postal rulemaking on elections contradicts both comprehensive legislative schemes and therefore represents the weakest possible form of executive action.

127.    The Constitution vests authority to regulate federal elections with the states and Congress. The Elections Clause operates as a default provision, vesting states with responsibility for the mechanics of congressional elections only so far as Congress declines to preempt state legislative choices. *Arizona*, 570 U.S. at 9. Congress has exercised relatively limited authority with respect to voting by mail. *See* Uniformed and Overseas Citizens Absentee Voting Act, 52 U.S.C.

36

§ 20301 *et seq*. But when Congress does not expressly legislate in the elections context, state law governs.

128.    The Executive Order cites HAVA and the NVRA, but neither statute delegates any authority to the President.

129.    HAVA does not grant the President any power to create new federal election policy. Rather, HAVA sets baseline standards for voting systems, voter registration lists, and provisional voting, while making federal funding available to implement the new standards. *See* 52 U.S.C. § 20901 *et seq.*

130.    Likewise, outside the requirement of ensuring Armed Forces recruiting offices provide voter registration opportunities, the NVRA does not contemplate a role for the President. Rather, it establishes voter registration and voter list maintenance policy for federal elections, administered by the states. 52 U.S.C. § 20501 *et seq.*

131.    Notably, neither HAVA nor the NVRA create requirements for mail voting whatsoever.

132.    The Executive Order cites ten criminal prohibitions. These criminal laws enable the Department of Justice to enforce existing federal statutes protecting the integrity of elections and the mail. Congress, in creating these prohibitions, in no way authorized the President to write *new* federal election policy from whole cloth. "In the framework of our Constitution, the President's power to see that the laws are faithfully executed refutes the idea that he is to be a lawmaker." *Youngstown Sheet & Tube Co.*, 343 U.S. at 587. Nothing in the criminal code gives the President any power over elections that the Constitution does not convey.

133.    Congress exercised its Postal Clause authority comprehensively when it established USPS under the provisions of the Postal Reorganization Act of 1970, 39 U.S.C. § 101 *et seq.*, as

amended by the Postal Accountability and Enhancement Act of 2006, *id.* § 501. Congress created USPS as a "basic and fundamental service provided to the people by the Government of the United States, authorized by the Constitution, created by Act of Congress, and supported by the people." *Id.* § 101. It made USPS an "independent establishment of the executive branch." *Id.* § 201. It structured USPS to operate free from direct presidential direction. *Id.* § 502(a); *Nat'l Ass'n of Greeting Card Publishers v. USPS*, 462 U.S. 810, 822 (1983). And it vested rulemaking authority in USPS itself—not the President—providing that USPS shall have the power to make and amend bylaws, rules, and regulations. 39 U.S.C. § 401(2).

134.    The congressional choice to establish USPS as an independent entity reflects a considered policy judgment that the postal system should not be subject to political direction. *See United Va. Bank/Nat'l v. Eaves*, 416 F. Supp. 518, 519–20 (E.D. Va. 1976). The President has no statutory authority to hijack USPS's rulemaking processes to achieve executive policy objectives, including any related to the administration of federal elections.

135.    Section 3 of the Executive Order purports to direct the Postmaster General to "initiate a proposed rulemaking" within 60 days, and to issue a final rule within 120 days, governing the conditions under which USPS will transmit mail-in and absentee ballots. The Order specifies the substantive content that the rulemaking "shall include, at minimum," including mandatory barcode tracking requirements, a list-based ballot transmission system, and restrictions on which voters may receive ballots through the postal system.

136.    By directing the Postmaster General to initiate and complete a rulemaking of specified content on a timetable determined solely by the President, the Order constitutes an exercise of regulatory authority over the postal system. That authority belongs to Congress under

38

the Postal Clause, and to USPS under the authority Congress has delegated to it. It does not belong to the President.

137. The Order cites 39 U.S.C. § 401 as the basis for the directed rulemaking. But that provision confers rulemaking power on USPS—it does not authorize the President to commandeer that power as an executive policy instrument. A presidential direction to an independent entity to exercise its statute-conferred rulemaking authority in a prescribed manner and on a fixed schedule is not an exercise of USPS's independent authority; it is a presidential seizure of that authority.

138. Nor, in any event, does anything in 39 U.S.C. § 401—or any other statute—grant USPS the authority to decline to deliver ballots to certain citizens, as the Executive Order would require. On the contrary, as discussed in further detail below, Congress has specifically required USPS to deliver, as far as practicable, the mail to the entire U.S. population, without any undue or unreasonable distinctions. *See* 39 U.S.C. § 403(a), (c); *see also id.* § 101(a).

139. The Order cannot be saved by Article II's general vesting of executive power in the President. The Constitution does not give the President plenary authority to direct the internal operations of entities whose structure and authority Congress defined by statute. *See LULAC*, 808 F. Supp. 3d at 75–77. The President's residual supervisory authority over executive branch agencies does not allow him to override congressional choices about the governance of an independent entity created under a specific constitutional grant of power to Congress, much less to compel USPS to initiate a rulemaking that is not authorized by statute.

140. Nor can the Order be sustained as a valid exercise of any other presidential power. The President's Article II powers do not include the power to regulate the postal system; that power belongs to Congress. The Order's direction to the Postmaster General is therefore beyond the lawful authority of the President and void.

141.    Officials who comply with an ultra vires presidential directive act beyond their own authority as well. Defendants' implementation of Section 3 of the Order, including any initiation of rulemaking proceedings, issuance of proposed final rules, or modification of USPS operations in compliance with the Order, constitutes action in excess of lawful authority and is subject to invalidation by this Court.

**COUNT II: Ultra Vires**
*Against the President and USPS Defendants*

142.    Plaintiffs incorporate the above paragraphs as if fully set forth herein.

143.    The Executive Order is unlawful because it is contrary to the standards Congress has set for the operation of USPS. The Constitution's Postal Clause confers power on Congress "not merely [for] the designation of the routes over which the mail shall be carried" but also to take "all measures necessary to secure [mail's] safe and speedy transit, and the prompt delivery of its contents." *Ex parte Jackson*, 96 U.S. 727, 728 (1877).

144.    Using this authority, Congress established USPS with a mandate to "operate[] as a basic and fundamental service . . . [and] provide prompt, reliable, and efficient services to patrons in all areas and shall render postal services to all communities." 39 U.S.C. § 101(a). USPS exists "to bind the Nation together" by providing services on equal footing to all its users. *Id.*

145.    Elsewhere, Congress directed USPS to "plan, develop, promote, and provide adequate and efficient postal services." *Id.* § 403(a). Under its broad mandate to serve all communities, Congress directed that USPS must also "serve as nearly as practicable the entire population of the United States." *Id.*

146.    To further these goals, Congress imposed an unambiguous duty of equal treatment among different USPS users: "[i]n providing services . . . the Post Service shall not, except as specifically authorized in this title, make any undue or unreasonable discrimination among users

of the mails, nor shall it grant any undue or unreasonable preferences to any such user." 39 U.S.C. § 403(c). These mandates reflect the central role of USPS as a carrier of ideas: "[T]he use of the mails is almost as much a part of free speech as the right to use our tongues." *Lamont v. Postmaster Gen. of the U.S.*, 381 U.S. 301, 305 (1965) (quoting *United States ex rel. Milwaukee Soc. Democratic Publ'g Co. v. Burleson*, 255 U.S. 407, 437 (Holmes, J., dissenting)).

147.    These statements were not hortatory or merely aspirational. Congress created the right for "[a]ny interested person (including an officer of the Postal Regulatory Commission representing the interests of the general public) who believes the Postal Service is not operating in conformance with . . . [39 U.S.C. §] 403(c)" to lodge an administrative complaint with the Postal Regulatory Commission. 39 U.S.C. § 3662.

148.    The Executive Order directly violates Congress's directives. It calls on USPS to engage in rulemaking "specifying that the USPS shall not transmit mail-in or absentee ballots from any individual unless those individuals have been enrolled on a State-specific list." Exec. Order § 3(b)(iii). In other words, it establishes that ballots are presumptively undeliverable—unless the voter is on an approved list.

149.    That list consists of "individuals . . . who are enrolled with the USPS, pursuant to a process specified in the rulemaking directed by this subsection, for mail-in or absentee ballots provided by such State." *Id.* § 3(b)(iv). The Executive Order provides no further explanation as to what this enrollment process will look like, or how USPS should determine which of its users are entitled to mail their ballots.

150.    This is facial discrimination among different postal users. Nothing in Title 39—or anywhere else in federal law—"specifically authorizes" this discrimination among USPS users. Nor is there any possible explanation as to why limiting ballot mail to only those voters enrolled

41

on these yet-to-be explained lists is due or reasonable. *See* 39 U.S.C. § 403(c); *cf. GameFly, Inc. v. Postal Regul. Comm'n*, 704 F.3d 145, 148 (D.C. Cir. 2013).

151. The Executive Order cites various federal criminal provisions regarding the delivery of mail or elections. *See* Exec. Order § 3(a). However, none of these authorities displaces Congress's plain non-discrimination mandate, nor do they give USPS (or the President) a broad power to deny postal service to new categories of users. 18 U.S.C. § 1341 and § 1708 criminalize mail fraud and mail theft and destruction, respectively. 52 U.S.C. § 10307 and § 20511 prohibit interference with the right to vote and voter intimidation. And 52 U.S.C. § 10307—a provision of the Voting Rights Act—bars voting more than once in one election and making false statements in registering. These statutes do not grant USPS or anyone else the ability to carve out groups of postal users from sending mail through USPS.

152. Rather than authorizing the Executive Order, applicable federal criminal provisions cited in the Order affirmatively prohibit USPS from effectuating it. The Executive Order exposes USPS employees to criminal risk: complying with the Executive Order by removing ballots cast by so-called "unapproved voters" could lead to criminal liability under a suite of federal statutes governing interference with the mail. Federal laws impose criminal liability on a postal official or employee who takes mail from a post office before delivery, 18 U.S.C. § 1708; "quits or deserts" the mail before it is delivered, *id.* § 1700; knowingly "obstructs or retards" the passage of the mail, *id.* § 1701; takes a letter or package from a post office with the "design to obstruct" correspondence, *id.* § 1702; or unlawfully "detains [or] delays" any mail entrusted to them, *id.* § 1703(a). The Executive Order further directs USPS officers, acting under color of law, to refuse to deliver valid absentee and mail-in ballots—conduct that interferes with the right to vote, and thus violates Section 11(a) of the Voting Rights Act. *See* Count V.

153.     Any action that an agency takes outside the bounds of its statutory authority is ultra vires. *City of Providence v. Barr*, 954 F.3d 23, 31 (1st Cir. 2020). An agency's officers must always act in accordance with the law, and when an official acts unlawfully, courts generally have jurisdiction to grant relief. *Am. Sch. of Magnetic Healing v. McAnnulty*, 187 U.S. 94, 108 (1902).

154.     Indeed, the seminal case on the availability—and necessity—of ultra vires review concerned a city postmaster's attempt to stop delivering what he viewed as fraudulent mailings. *Id.* at 108–09. The Supreme Court emphatically rejected this: "His right to exclude letters, or to refuse to permit their delivery to persons addressed, must depend upon some law of Congress, and if no such law exists, then he cannot exclude or refuse to deliver them." *Id.* at 109.

155.     The Executive Order goes further: rather than acting in the absence of a statute, it flies directly in the face of Congress's existing instructions. This is unlawful.

### COUNT III: Federalism
### *Against the President and USPS Defendants*

156.     Plaintiffs incorporate the above paragraphs as if fully set forth herein.

157.     Private plaintiffs may assert injury from government action that exceeds the bounds of federalism. *Bond v. United States*, 564 U.S. 211, 220 (2011).

158.     The Supreme Court has explained that federalism is a central structural feature of the Constitution designed to protect individual liberty. *See New York v. United States*, 505 U.S. 144, 181 (1992). The Constitution divides authority between federal and state governments so that "a healthy balance of power between the States and the Federal Government will reduce the risk of tyranny and abuse." *Gregory v. Ashcroft*, 501 U.S. 452, 458 (1991).

159.     Consistent with this design, the Tenth Amendment confirms that "[t]he powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people." U.S. Const. amend. X.

43

160.    With respect to federal elections, the Elections Clause provides that "[t]he Times, Places and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof," subject to Congress's authority to "make or alter such Regulations." U.S. Const. art. I, § 4, cl. 1. The Clause thus assigns authority over federal election procedures to the states, with Congress empowered to override state regulations.

161.    Neither the Tenth Amendment nor the Elections Clause grants any authority over elections to the President or the Executive Branch.

162.    The Executive Order nevertheless seeks to compel states to alter their election procedures—including by attempting to force them to change their mail-in ballot envelopes and notify USPS in advance of an election that they intend for mail-in or absentee ballots to be transmitted by USPS—by threatening not to deliver mail-in ballots in states that decline to adopt those requirements.

163.    The Constitution prohibits the Executive Branch from commanding states to administer their laws in accordance with federal directives. *See Murphy v. Nat'l Collegiate Athletic Ass'n*, 584 U.S. 453, 472 (2018); *New York*, 505 U.S. at 166. The President therefore lacks authority to compel states to change how they conduct elections.

164.    Nor may the President accomplish indirectly what the Constitution forbids him from doing directly. The Supreme Court has repeatedly recognized that a government official cannot end-run constitutional limitations by doing through indirect means what is barred through direct action. *See NRA v. Vullo*, 602 U.S. 175, 190 (2024).

165.    The same principle applies equally to a state's exercise of sovereign powers reserved by the Constitution. Indeed, the Supreme Court has emphasized that the federal government can never exceed its authority relative to the states, not even by "consent." *New York*,

505 U.S. at 182. Retaliation and punishment violate the constitutional design by seeking to coerce states to "voluntarily" give up their sovereign powers. The Constitution prohibits such retaliatory conduct.

166.    By threatening not to deliver mail-in ballots unless states alter their election procedures, the Executive Order seeks to coerce states into surrendering sovereign authority that the Constitution reserves to them. The Constitution forbids such coercive efforts to compel states to relinquish powers reserved by the federal structure.

167.    If permitted, the President's actions would fundamentally alter the constitutional balance between the states and the federal government by allowing the Executive Branch to wield federal power to pressure states into adopting federal preferences for the conduct of elections.

168.    Because the Executive Order seeks to coerce states into altering their election laws and procedures through threats of adverse federal action, it violates the Tenth Amendment, the Elections Clause, and the Constitution's federal structure.

### COUNT IV: Constitutional Right to Vote
### *Against the President and USPS Defendants*

169.    Plaintiffs incorporate the above paragraphs as if fully set forth herein.

170.    When evaluating constitutional challenges to state action that burden the right to vote, courts balance the character and magnitude of the asserted injury to voting rights against the precise interests put forward by the state as justifications for the burden imposed. *Burdick v. Takushi*, 504 U.S. 428, 434 (1992); *Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983). The same principles apply to challenges to federal action under the Fifth Amendment. *Weinberger v. Wiesenfeld*, 420 U.S. 636, 638 n.2 (1975).

171.    Even a minimal burden on voting rights must be supported by legitimate state interests that are substantial enough to warrant the restriction imposed. *Crawford v. Marion Cty. Election Bd.*, 553 U.S. 181, 191 (2008) (plurality op.) (Stevens, J.).

172.    The Executive Order imposes unjustified and disparate burdens on the right to vote by preventing the delivery of absentee ballots to voters who do not appear on a federally created list and by coercing states to create lists of voters not required under state or federal law under potential threat of not having their mail-in ballots delivered.

173.    Section 3(b)(ii) of the Executive Order mandates that the USPS Rulemaking include provisions for a state to provide advance notice whether it intends for its ballots to be conveyed by USPS, including by providing USPS "no fewer than 60 days before the election" with "a list of voters eligible to vote in a Federal election in such State to whom the State intends to provide a mail-in or absentee ballot to be transmitted via the USPS." To the extent that the failure of a state to provide such a list means that its mail-in or absentee ballots will not be transmitted via USPS, this provision cannot operate in concert with federal law, which allows voters to register up to 30 days before a federal election. 52 U.S.C. § 20507(a)(1). Such voters necessarily could not be included on a list that must be transmitted 60 days prior to the election. Further, the provision can also not operate in concert with many state laws that allow voters to request absentee or mail ballots closer in time to the election than 60 days. *See, e.g.*, Mass. Gen. Laws Ann. ch. 54, § 89 (applications allowed up to 5 business days before the election); Ala. Code § 17-11-3 (applications sent by mail allowed up to 7 days before election); Ariz. Rev. Stat. § 16-542(E) (applications allowed up to 11 days before election); Ohio Rev. Code Ann. § 3509.03 (applications allowed up to 7 days before election).

174.    Section 3(b)(iv) of the Executive Order mandates that the USPS Rulemaking include provisions "specifying that the USPS shall provide each State with a list of individuals (Mail-In and Absentee Participation List) who are enrolled with the USPS, pursuant to a process specified in the rulemaking directed by this subsection, for mail-in or absentee ballots provided by such State, along with unique ballot envelope identifiers, such as bar codes, for mail-in or absentee ballots provided to such individuals."

175.    Section 3(b)(iii) of the Executive Order mandates that the USPS Rulemaking include a provision "specifying that the USPS shall not transmit mail-in or absentee ballots from any individual unless those individuals have been enrolled on a State-specific list described in subsection (b)(iv) of this section [(i.e., each state-specific Mail-In and Absentee Participation List)] with the USPS pursuant to this subsection."

176.    For voters who live in states who do not comply with Section 3(b)(ii) and provide a list of voters to USPS, to the extent that the failure of a state to provide such a list means that its mail-in or absentee ballots will not be transmitted via USPS, all voters would be prevented from casting an effective mail ballot.

177.    Additionally, voters, including Plaintiffs' members, will also be prevented from casting an effective mail ballot because they are not included on the state-specific Mail-In and Absentee Participation List, whether because they have not registered to vote or requested an absentee or vote-by-mail ballot in time to be included, or because they are improperly excluded from this list for any reason, including on the basis of incorrect information from the State Citizenship Lists.

178.    There are states that do not have and will not be able to implement a ballot tracking system that would allow mail ballot envelopes to be marked so that USPS could comply with

47

Section 3(b)(iii) even if USPS compiled and completed an accurate state-specific Mail-in and Absentee Participation List. As a result, Plaintiffs' members will be prevented from casting an effective mail ballot in those states.

179. The right to vote of any eligible voter whose mail or absentee ballot USPS refuses to transmit for any of the reasons listed above would be severely burdened. As such, the Order will prevent eligible voters, including Plaintiffs' members, from casting an effective mail ballot. For some of these individual members—such as those who live overseas, those whose disabilities prevent them from voting in person, and those who are temporarily stationed out of state, among others—this provision will deny them the ability to cast an effective ballot at all.

180. These severe burdens on the right to vote are not justified by any legitimate or sufficiently weighty governmental interest.

### COUNT V: Section 11(a) of the Voting Rights Act
### *Against USPS Defendants*

181. Section 11(a) of the Voting Rights Act mandates in relevant part that "[n]o person acting under color of law shall fail or refuse to permit any person to vote who is entitled to vote under any provision of chapters 103 to 107 of this title or is otherwise qualified to vote." 52 U.S.C. § 10307(a). This provision prohibits public officials from denying any qualified person the right to vote. *United States v. Post*, 297 F. Supp. 46, 50 (W.D. La. 1969).

182. Section 3(b)(iii) of the Executive Order mandates that the USPS Rulemaking include a provision "specifying that the USPS shall not transmit mail-in or absentee ballots from any individual unless those individuals have been enrolled on a State-specific list described in subsection (b)(iv) of this section with the USPS pursuant to this subsection."

183. This section will prevent eligible voters, including Plaintiffs' members, from casting an effective mail ballot. For some of these individual members—such as those who live

overseas, those whose disabilities prevent them from voting in person, and those who are temporarily stationed out of state, among others—this provision will deny them the ability to cast an effective ballot at all.

184.    Because the USPS Defendants are public officials who would be refusing to permit eligible voters their right to vote under color of law by failing to transmit absentee ballots of voters not on the state-specific Mail-in and Absentee Participation List, Section 3(b)(iii) of the Executive Order violates Section 11(a) of the Voting Rights Act and will subject Plaintiffs' members to irreparable harm.

**COUNT VI: Privacy Act and the Administrative Procedure Act**
***Against DHS, USCIS, and SSA Defendants***

185.    Under the Administrative Procedure Act, federal courts shall "hold unlawful and set aside agency action, findings, and conclusions found to be . . . not in accordance with law," "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," or "without observance of procedure required by law." 5 U.S.C. § 706(2). The court shall also "compel agency action unlawfully withheld or unreasonably delayed." *Id*. § 706(1).

186.    The Privacy Act of 1974, 5 U.S.C. § 552a, establishes a comprehensive and detailed framework governing how Executive Branch agencies must manage confidential records. *FAA v. Cooper*, 566 U.S. 284, 287 (2012).

187.    Specifically, the Privacy Act restricts a federal agency's maintenance, collection, use, and dissemination of records, i.e., information pertaining to individuals. 5 U.S.C. § 552a(a)(1)–(4), (e). The statute defines a "record" broadly to encompass any "item, collection, or grouping of information about an individual" maintained by an agency—including data related to a person's education, financial transactions, medical history, and criminal or employment

49

history—so long as it contains the individual's name or another identifying particular, such as a fingerprint, voice print, or photograph. *Id.* § 552a(a)(4).

188.    When an agency establishes or revises a system of records, it must publish a notice of the existence and character of that system in the Federal Register, 5 U.S.C. § 552a(e)(4), known as a System of Records Notice ("SORN"). The Act defines a "system of records" as any group of records under an agency's control from which information is retrieved by an individual's name or by some identifying number, symbol, or other identifying particular assigned to that individual. *Id.* § 552a(a)(5).

189.    The SORN must include the categories of information specified under 5 U.S.C. § 552a(e)(4):

> (A) the name and location of the system;
> (B) the categories of individuals on whom records are maintained in the system;
> (C) the categories of records maintained in the system;
> (D) each routine use of the records contained in the system, including the categories of users and the purpose of such use;
> (E) the policies and practices of the agency regarding storage, retrievability, access controls, retention, and disposal of the records;
> (F) the title and business address of the agency official who is responsible for the system of records;
> (G) the agency procedures whereby an individual can be notified at his request if the system of records contains a record pertaining to him;
> (H) the agency procedures whereby an individual can be notified at his request how he can gain access to any record pertaining to him contained in the system of records, and how he can contest its content; and
> (I) the categories of sources of records in the system.

190.    The Privacy Act also limits a federal agency's ability to disclose records in their possession. An agency shall not disclose "any record which is contained in a system of records . . . except pursuant to a written request by, or with the prior written consent of, the individual to whom the record pertains," unless one of the enumerated exceptions applies. 5 U.S.C. § 552a(b). One of those exceptions is for routine uses, which are disclosures that the agency may define but must be

"for a purpose which is compatible with the purpose for which it was collected." *Id.* § 552a(a)(7), (b)(3).

191.    However, at least 30 days before releasing information pursuant to a routine use, the agency must also "publish in the Federal Register notice of any new use or intended use of the information in the system" and "provide an opportunity for interested persons to submit written data, views, or arguments to the agency." 5 U.S.C. § 552a(e)(11). Notice in the Federal Register is required for "any change in a system which has the effect of expanding the categories of records maintained, the categories of individuals on whom records are maintained, or the potential recipients of the Information." Privacy Act Implementation, 40 Fed. Reg. 28948, 28963 (July 9, 1975); *accord* Office Mgmt. & Budget, Circular A-108 at p.5 (2016) (stating that updated SORNs are "required" when there is a "substantial increase in the number, type, or category of individuals about whom records are maintained in the system").

192.    The Privacy Act also requires the agency to ensure the accuracy and completeness of its records. For instance, an agency must "maintain all records which are used by the agency in making any determination about any individual with such accuracy, relevance, timeliness, and completeness as is reasonably necessary to assure fairness to the individual in the determination." 5 U.S.C. § 552a(e)(5).

193.    Before disseminating any record to any person outside the agency, an agency must "make reasonable efforts to assure that such records are accurate, complete, timely, and relevant for agency purposes." 5 U.S.C. § 552a(e)(6).

194.    The Executive Order instructs the DHS Secretary to undertake actions that violate those mandatory requirements of the Privacy Act.

195.    Section 2 of the Executive Order directs the DHS Secretary to establish a new system of records, specifically to compile and disclose a list of adult U.S. citizens residing in each state, using information from USCIS, SSA, "and other relevant Federal databases." The Secretary is required, under the Executive Order, to create procedures to allow information from the lists to be accessed, retrieved, and updated or corrected by the individuals on the list as well as supplemented by the states. Because the lists are intended to identify U.S. citizens in a searchable manner, the assembled data is expected to contain individual identifiers, such as names, Social Security numbers, or other similar person information and therefore constitutes a new system of records.

196.    Section 2 of the Executive Order requires DHS to provide a list of U.S. citizens to each state "no fewer than 60 days before each regularly scheduled Federal election, or promptly upon request by a State in connection with any special Federal election." Numerous states have upcoming primary elections on various dates from April through September 2026.[25] Compliance with the Executive Order's instruction to provide citizen lists at least 60 days before "each" upcoming federal election is therefore incompatible with the Privacy Act's process for public notice and comment, which requires publication of the system of records' intended uses 30 days before disclosure pursuant to a new or expanded routine use. There is no way to implement the Executive Order on the timeline it calls for, while complying with the procedural requirements of the Privacy Act; violations of the Privacy Act are therefore imminent and almost certain to occur.

---

[25] Nat'l Conf. of State Legislatures, *2026 State Primary Election Dates* (Feb. 27, 2026), https://www.ncsl.org/elections-and-campaigns/2026-state-primary-election-dates.

197.    The immediate creation of a new system of records, without sufficient time to comply with the notice requirements of the Privacy Act, constitutes "final agency action for which there is no other adequate remedy in a court" and "is subject to judicial review." 5 U.S.C. § 704.

198.    No SORN has been published to reflect the creation of the new system of records contemplated by Section 2 of the Executive Order.

199.    No required publication has been made in the Federal Register regarding the intended or routine uses of the information in the new system of records.

200.    Prior SORNs issued by DHS pertaining to immigration and citizenship data do not disclose the creation of lists of citizens or the use of such lists in connection with the delivery or transmittal of mail or absentee ballots.

201.    The Executive Order further directs the Secretary to transmit the compiled lists of citizens to the chief election official of each state, without requiring the consent of individuals whose records are being disclosed or pursuant to a permissible use in 5 U.S.C. § 552a(b).

202.    For the reasons stated above, the lists that the Secretary compiles under Section 2 of the Executive Order will be incomplete and inaccurate, due to the gaps and limitations of the data available to federal agencies.

203.    The non-consensual and previously undisclosed collection and dissemination of inaccurate lists of citizens to state election officials invades rights protected under the Privacy Act and risks erroneous disenfranchisement of eligible voters and will irreparably harm Plaintiffs and their members.

204.    The failure to publish the routine or intended uses of the records at issue also injures Plaintiffs and their members by depriving them of the opportunity "to submit written data, views, or arguments" and have their views considered. 5 U.S.C. § 552a(e)(11).

205.    Section 2 of the Executive Order violates multiple requirements of the Privacy Act and is therefore contrary to law, in excess of statutory authority, and without observance of required procedures under the Administrative Procedure Act. 5 U.S.C. § 706(2). And by failing to maintain complete and accurate records and to publish the notices required by the Privacy Act, Defendants have "unlawfully withheld or unreasonably delayed" agency action, again in violation of the Administrative Procedure Act. *Id*. § 706(1).

**<u>PRAYER FOR RELIEF</u>**

Plaintiffs respectfully request that this Court:

1.    Declare that the Executive Order is unlawful, including that: (a) the President may not override state rules for mail-in voting; (b) the President may not compel USPS action; (c) the Executive may not coerce states in the manner the Executive Order prescribes to change their mail-in voting rules;

2.    Enjoin implementation of the Executive Order;

3.    Declare Section 2 of the Executive Order contrary to law and vacate it under the APA;

4.    Award attorney's fees, costs, and expenses in accordance with law, including the Equal Access to Justice Act, 28 U.S.C. § 2412; and

5.    Grant all such other and further relief as the Court may deem just and proper.

Dated: April 2, 2026

Sophia Lin Lakin*
Theresa J. Lee*
Davin Rosborough*
Ethan Herenstein*
Jonathan Topaz*
Ming Cheung*
William Hughes*
Clayton Pierce*
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
125 Broad St., 18th Floor
New York, NY 10004
(212) 549-2500
slakin@aclu.org
tlee@aclu.org
drosborough@aclu.org
eherenstein@aclu.org
jtopaz@aclu.org
mcheung@aclu.org
whughes@aclu.org
cpierce@aclu.org

Sarah Brannon*
Adriel I. Cepeda Derieux*
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
915 15th St. NW
Washington, DC 20001
(740) 632-0671
sbrannon@aclu.org
acepedaderieux@aclu.org

Leah C. Aden*
Brenda Wright*
John S. Cusick*
NAACP LEGAL DEFENSE &
EDUCATIONAL FUND, INC.
40 Rector Street, 5th Floor
New York, NY 10006
(212) 965-2200
laden@naacpldf.org
bwright@naacpldf.org
jcusick@naacpldf.org

Respectfully submitted,

/s/ Jessie J. Rossman
Jessie J. Rossman (BBO #670685)
Suzanne Schlossberg (BBO #703914)
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION OF MASSACHUSETTS,
INC.
One Center Plaza, Suite 850
Boston, MA 02108
(617) 482-3170
jrossman@aclum.org
sschlossberg@aclum.org

Eliza Sweren-Becker*
Wendy Weiser*
Andrew Garber*
BRENNAN CENTER FOR JUSTICE AT
NYU SCHOOL OF LAW
120 Broadway, Suite 1750
New York, NY 10271
(646) 292-8310
sweren-beckere@brennan.law.nyu.edu
weiserw@brennan.law.nyu.edu
garbera@brennan.law.nyu.edu

Justin Lam*
BRENNAN CENTER FOR JUSTICE AT
NYU SCHOOL OF LAW
777 6th St. NW, Ste. 1100
Washington, DC 20001
(202) 249-7190
lamju@brennan.law.nyu.edu

Niyati Shah*
Noah Baron*
Ejaz Baluch, Jr.*
ASIAN AMERICANS ADVANCING
JUSTICE-AAJC
1620 L Street NW, Suite 1050
Washington, DC 20036
(202) 296-2300
nshah@advancingjustice-aajc.org
nbaron@advancingjustice-aajc.org
ebaluch@advancingjustice-aajc.org

I. Sara Rohani*
NAACP LEGAL DEFENSE &
EDUCATIONAL FUND, INC.
700 14th Street N.W. Ste. 600
Washington, DC 20005
(202) 682-1300
srohani@naacpldf.org

Miranda Galindo*
LATINO JUSTICE PRLDEF
475 Riverside Drive, Suite 1901
New York, NY 10115
(212) 392-4752
mgalindo@latinojustice.org

*Application for admission pro hac vice
forthcoming

Counsel for Plaintiffs League of Women
Voters of Massachusetts, League of Women
Voters Lotte E. Scharfman Memorial
Education Fund, League of Women Voters of
the United States, League of Women Voters
Education Fund, Association of Americans
Resident Overseas, U.S. Vote Foundation,
OCA-Asian Pacific American Advocates, and
Delta Sigma Theta Sorority, Inc.