**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| LEAGUE OF WOMEN VOTERS OF MASSACHUSETTS, *et al.*,<br><br>            *Plaintiffs*,<br>      v.<br><br>DONALD J. TRUMP, in his official capacity as President of the United States, *et al.*,<br><br>            *Defendants*. | Case No. 1:26-cv-11549-IT |

**MEMORANDUM IN SUPPORT OF PLAINTIFFS'**
**MOTION FOR PRELIMINARY INJUNCTION**

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ...................................................................................................... ii

INTRODUCTION ..................................................................................................................... 1

BACKGROUND ........................................................................................................................ 2

    I.  State and Congressional Authority over Mail Voting.................................................. 2

    II.  Congress's Postal Clause Authority and USPS's Independence ................................ 3

    III. The Unlawful Executive Order................................................................................... 4

    IV. The Executive Order's Effects on Plaintiffs and Their Members.............................. 6

ARGUMENT............................................................................................................................. 9

    I.  Plaintiffs Are Likely to Succeed on the Merits of Counts I and II. ............................ 9

        A.  Plaintiffs Are Likely to Succeed on Their Separation-of-Powers Claim
            (Count I)........................................................................................................ 10

        B.  Plaintiffs Are Likely to Succeed on Their Ultra Vires Claim (Count II)........ 14

    II.  Plaintiffs Will Suffer Irreparable Harm Absent a Preliminary Injunction.................. 20

        A.  The Order Will Continue to Interfere with Plaintiffs' Core Activities
            and Frustrate Their Missions. ...................................................................... 21

        B.  Plaintiffs' Members Will Be Irreparably Harmed by the Loss of Mail
            Voting, Some of Whom Will Be Disenfranchised Entirely........................... 26

        C.  Plaintiffs' Claims Are Ripe............................................................................ 27

    III. The Balance of Equities and the Public Interest Weigh Heavily in Plaintiffs'
        Favor. ....................................................................................................................... 28

CONCLUSION........................................................................................................................ 30

## TABLE OF AUTHORITIES

**Cases**

*American Academy of Pediatrics v. Kennedy*,
No. 25-cv-11916-BEM, 2026 WL 733828 (D. Mass. Mar. 16, 2026) .................................. 23

*American School of Magnetic Healing v. McAnnulty*,
187 U.S. 94 (1902) ........................................................................................... 9, 15, 17

*Arizona v. Inter Tribal Council of Arizona, Inc.*,
570 U.S. 1 (2013) ................................................................................................... 10

*Armstrong v. Exceptional Child Center, Inc.*,
575 U.S. 320 (2015) .................................................................................................. 9

*Association of American Universities v. National Science Foundation*,
788 F. Supp. 3d 106 (D. Mass. 2025) ...................................................................... 29

*Bost v. Illinois State Board of Elections*,
146 S. Ct. 513 (2026) ............................................................................................... 28

*California v. Trump*,
786 F. Supp. 3d 359 (D. Mass. 2025) .............................................................. passim

*California v. U.S. Department of Health & Human Services*,
811 F. Supp. 3d 183 (D. Mass. 2025) ................................................................ 28, 30

*Carrington v. Rash*,
380 U.S. 89 (1965) .................................................................................................... 2

*Central Maine Power Company v. Maine Commission on Governmental Ethics &*
*Election Practices*,
144 F.4th 9 (1st Cir. 2025) ........................................................................................ 9

*Chamber of Commerce v. Reich*,
74 F.3d 1322 (D.C. Cir. 1996) ................................................................................ 14

*City & County of San Francisco v. Trump*,
897 F.3d 1225 (9th Cir. 2018) ................................................................................ 26

*Clinton v. City of New York*,
524 U.S. 417 (1998) ................................................................................................ 11

*Collins v. Yellen*,
594 U.S. 220 (2021) .................................................................................................. 9

*Colorado v. DeJoy*,
No. 20-cv-2768-WJM-STV, 2020 WL 5513567 (D. Colo. Sept. 14, 2020) .......... 10

*Common Cause Indiana v. Lawson*,
  937 F.3d 944 (7th Cir. 2019) ......................................................................... 20

*Del Gallo v. Parent*,
  557 F.3d 58 (1st Cir. 2009)........................................................................ 3, 12

*Democratic National Committee v. Wisconsin State Legislature*,
  141 S. Ct. 28 (2020)........................................................................................ 28

*Ex parte Jackson*,
  96 U.S. 727 (1877).................................................................... 3, 11, 16, 17

*Georgia v. Meadows*,
  88 F.4th 1331 (11th Cir. 2023) ..................................................................... 11

*Get Loud Arkansas v. Jester*,
  No. 24-2810, 2026 WL 881736 (8th Cir. Mar. 31, 2026)................................. 20, 25

*Indiana State Conference of NAACP v. Lawson*,
  326 F. Supp. 3d 646 (S.D. Ind. 2018) ........................................................... 20

*League of United Latin American Citizens v. Executive Office of the President*,
  780 F. Supp. 3d 135 (D.D.C. 2025) ........................................................ passim

*League of Women Voters of North Carolina v. North Carolina*,
  769 F.3d 224 (4th Cir. 2014) ......................................................................... 20

*League of Women Voters of New Hampshire v. Kramer*,
  No. 24-cv-73-SM-TSM, 2025 WL 3260024 (D.N.H. Oct. 17, 2025) ........... 22, 26, 29

*League of Women Voters of United States v. Newby*,
  838 F.3d 1 (D.C. Cir. 2016)............................................................. 20, 25, 26, 29

*Mail Order Association of America v. U.S. Postal Service*,
  986 F.2d 509 (D.C. Cir. 1993)....................................................................... 3

*Mancuso v. Taft*,
  476 F.2d 187 (1st Cir. 1973)......................................................................... 29

*Massachusetts v. National Institutes of Health*,
  770 F. Supp. 3d 277 (D. Mass. 2025) ........................................................... 20

*New Hampshire Youth Movement v. Scanlan*,
  No. 24-cv-291-SE, 2026 WL 323171 (D.N.H. Feb. 6, 2026)...................... 28, 29

*National Association of Postal Supervisors v. U.S. Postal Service*,
  26 F.4th 960 (D.C. Cir. 2022)....................................................................... 16

iii

*National Education Association v. U.S. Department of Education*,
    779 F. Supp. 3d 149 (D.N.H. 2025)................................................................. 30

*National Treasury Employees Union v. United States*,
    101 F.3d 1423 (D.C. Cir. 1996)...................................................................... 27

*New York v. Biden*,
    636 F. Supp. 3d 1 (D.D.C. 2022). ................................................................. 16

*New York v. McMahon*,
    784 F. Supp. 3d 311 (D. Mass. 2025) ............................................................ 23

*New York v. U.S. Department of Justice*,
    804 F. Supp. 3d 294 (D.R.I. 2025).................................................................. 23

*Ohio ex rel. Davis v. Hildebrant*,
    241 U.S. 565 (1916)........................................................................................ 13

*Purcell v. Gonzalez*,
    549 U.S. 1 (2006)............................................................................................ 29

*Reynolds v. Sims*,
    377 U.S. 533 (1964)........................................................................................ 27

*Roman Catholic Bishop of Springfield v. City of Springfield*,
    724 F.3d 78 (1st Cir. 2013)....................................................................... 27, 28

*Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*,
    217 F.3d 8 (1st Cir. 2000).............................................................................. 20

*Roudebush v. Hartke*,
    405 U.S. 15 (1972).......................................................................................... 11

*Shelby County. v. Holder*,
    570 U.S. 529 (2013)........................................................................................... 2

*Somerville Public Schools v. McMahon*,
    139 F.4th 63 (1st Cir. 2025)........................................................................... 29

*Susan B. Anthony List v. Driehaus*,
    573 U.S. 149 (2014)........................................................................................ 28

*Tirrell v. Edelblut*,
    747 F. Supp. 3d 310 (D.N.H. 2024)................................................................ 30

*United States v. Freeman*,
    147 F.4th 1 (1st Cir. 2025)........................................................................ 17, 18

*U.S. Postal Service v. American Postal Workers Union, AFL-CIO*,
  736 F.2d 822 (1st Cir. 1984).................................................................................... 15

*U.S. Postal Service v. Council of Greenburgh Civic Association*,
  453 U.S. 114 (1981)...................................................................................... 3, 11, 16

*U.S. Postal Service v. Flamingo Industries (USA) Ltd.*,
  540 U.S. 736 (2004).......................................................................................... 3, 16

*Walters v. Boston City Council*,
  676 F. Supp. 3d 26 (D. Mass. 2023) ........................................................................ 26

*Washington v. Trump*,
  814 F. Supp. 3d 1173 (W.D. Wash. 2026)........................................................... 13, 26

*Winter v. Natural Resources Defense Council, Inc.*,
  555 U.S. 7 (2008)................................................................................................. 28

*Woonasquatucket River Watershed Council v. U.S. Department of Agriculture*,
  778 F. Supp. 3d 440 (D.R.I. 2025).................................................................... 23, 24

*Youngstown Sheet & Tube Co. v. Sawyer*,
  343 U.S. 579 (1952)........................................................................ 10, 11, 12, 13

*Zivotofsky v. Kerry*,
  576 U.S. 1 (2015)........................................................................................... 11, 12

**Constitutional Provisions**

U.S. Constitution Amendment XIV............................................................................... 2

U.S. Constitution Amendment XIX............................................................................... 2

U.S. Constitution Amendment XV ............................................................................... 2

U.S. Constitution Amendment XXIV ........................................................................... 2

U.S. Constitution Amendment XXVI............................................................................ 2

U.S. Constitution Article I, § 4 ............................................................................. 2, 10

U.S. Constitution Article I, § 8 ............................................................................. 3, 11

U.S. Constitution Article II, § 3............................................................................... 11

U.S. Constitution Article IV, § 4 ......................................................................... 12, 13

**Statutes**

18 U.S.C. § 1715 .......................................................................................................... 17

18 U.S.C. § 1716 .......................................................................................................... 17

39 U.S.C. § 101 ................................................................................................... 3, 15, 18

39 U.S.C. § 102 .................................................................................................... 18, 19

39 U.S.C. § 201 ................................................................................................................ 3

39 U.S.C. § 202 ................................................................................................... 3, 4, 12

39 U.S.C. § 3001 ........................................................................................................... 17

39 U.S.C. § 3002 ........................................................................................................... 17

39 U.S.C. § 3005 ........................................................................................................... 17

39 U.S.C. § 3007 ........................................................................................................... 17

39 U.S.C. § 3014 ........................................................................................................... 17

39 U.S.C. § 3622 ........................................................................................................... 12

39 U.S.C. § 3703 ........................................................................................................... 19

39 U.S.C. § 3704 ........................................................................................................... 19

39 U.S.C. § 401 .................................................................................................... 4, 5, 18

39 U.S.C. § 403 ..................................................................................................... 15, 16

39 U.S.C. § 404 ................................................................................................... 4, 18, 19

39 U.S.C. § 501 ................................................................................................................ 4

39 U.S.C. § 502 ................................................................................................................ 4

52 U.S.C. § 20302 ................................................................................................... 2, 18

52 U.S.C. § 20304 ........................................................................................................ 18

52 U.S.C. § 20501 ................................................................................................. 12, 13

52 U.S.C. § 20901 ........................................................................................................ 12

**Other Authorities**

90 Fed. Reg. 48948 (Oct. 31, 2025)................................................................................................. 9

H.R. Rep. No. 91-1104 ..................................................................................................................... 3

**INTRODUCTION**

On March 31, 2026, President Trump issued Executive Order No. 14399, "Ensuring Citizenship Verification and Integrity in Federal Elections" (Executive Order, or Order), an unprecedented and unlawful assertion of presidential power over election administration. He did so despite three courts enjoining key provisions of his prior executive order on voting based on the same bedrock principle that the President has no constitutional authority to regulate elections.

This newest Executive Order targets voting by mail. Mail-in voting is a cornerstone of American elections and an essential and safe way for millions of voters to cast their ballots. Yet the Order directs the United States Postal Service (USPS) to refuse to transmit mail ballots unless the voters sending them appear on the illegal and error-prone gatekeeping lists the Order mandates. At bottom, the Order displaces the roles that the U.S. Constitution and federal law assign to the states and Congress to regulate elections and to USPS as a neutral, nondiscriminatory mail carrier. The Constitution, Congress's comprehensive statutory scheme, reams of caselaw, and longstanding historical practice cement that the President has no power to commandeer USPS—a neutral and universal service—to be the arbiter of who may cast a ballot.

Plaintiffs League of Women Voters of Massachusetts, League of Women Voters Lotte E. Scharfman Memorial Education Fund, League of Women Voters of the United States, League of Women Voters Education Fund, Association of Americans Resident Overseas, U.S. Vote Foundation, OCA-Asian Pacific American Advocates, and Delta Sigma Theta Sorority, Inc. are suffering and will continue to suffer immediate and irreparable harm due to the Order. To protect their and their members' fundamental rights, Plaintiffs seek a preliminary injunction with respect to Counts I and II of their Complaint, which assert that the Executive Order violates the Constitution's separation of powers and commands USPS to take unauthorized and unlawful action. For the reasons given below, that relief should be granted.

1

**BACKGROUND**

I.    **State and Congressional Authority over Mail Voting**

The Framers of the Constitution gave the states responsibility to administer elections, delegating "broad powers to determine the conditions under which the right of suffrage may be exercised," including by setting voter qualifications. *Shelby Cnty. v. Holder*, 570 U.S. 529, 543 (2013) (quoting *Carrington v. Rash*, 380 U.S. 89, 91 (1965)). States exercise this power subject to congressional intervention: Congress may regulate the time, place, and manner of federal elections, U.S. Const. art. I, § 4, cl. 1 (the Elections Clause), and may legislate to enforce voting-related amendments, U.S. Const. amends. XIV, XV, XIX, XXIV, XXVI. Under these provisions, only the states and Congress—not the President—may regulate federal elections.

Under this allocation of authority, all fifty states permit at least some of their voters to cast ballots by mail.[1] Among those are well over a million U.S. citizens who live overseas, including active military servicemembers and their families, who must vote by mail out of necessity.[2] To ensure these voters can cast an effective ballot, Congress enacted the Uniformed and Overseas Citizens Absentee Voting Act (UOCAVA), guaranteeing that covered military servicemembers and U.S. citizens residing abroad may register and vote by mail in federal elections, and requiring states to transmit and receive those ballots in time to ensure meaningful participation. *See* 52 U.S.C. § 20302(a). In 2024, voters cast over forty-seven million mail ballots in the general federal election (including over 1.3 million ballots from UOCAVA voters), comprising 30.3% of total turnout.[3]

---

[1] *See* Nat'l Conf. of State Legislatures, *Voting Outside the Polling Place: Absentee, All-Mail and Other Voting at Home Options* (Aug. 1, 2025), https://www.ncsl.org/elections-and-campaigns/voting-outside-the-polling-place.

[2] U.S. Election Assistance Comm'n, *EAVS 2024 Comprehensive Report* at 204 (June 2025), https://www.eac.gov/sites/default/files/2025-07/2024_EAVS_Report_508.pdf. [https://perma.cc/U6RU-8UY9].

[3] *Id.* at 35–36, 201.

## II.    Congress's Postal Clause Authority and USPS's Independence

As with the federal power over elections, the Constitution grants Congress—not the President—the power to "establish Post Offices and post Roads," U.S. Const. art. I, § 8, cl. 7, a "broad power" that Congress has exercised to "establish[] a detailed statutory and regulatory scheme to govern this country's vast postal system," *USPS v. Council of Greenburgh Civic Ass'n*, 453 U.S. 114, 122, 126 (1981); *accord Ex parte Jackson*, 96 U.S. 727, 728 (1877). Congress has repeatedly reorganized and restructured the Postal Service throughout its history, most recently reconfiguring it as USPS through the Postal Reorganization Act of 1970 (PRA), 39 U.S.C. § 101 *et seq. See USPS v. Flamingo Indus. (USA) Ltd.*, 540 U.S. 736, 739 (2004).

The PRA "marked a dramatic break with the past." *Mail Ord. Ass'n of Am. v. USPS*, 986 F.2d 509, 512 (D.C. Cir. 1993). It made USPS "an independent establishment of the executive branch," 39 U.S.C. § 201, which must "be operated as a basic and fundamental service provided to the people," providing services "in all areas and . . . [to] all communities." *Id.* § 101(a). Congress made this change to address the financial and management problems historically caused by partisan control of the Postal Service. *Council of Greenburgh Civic Ass'ns*, 453 U.S. at 122. It "recognized that partisan political entanglement was one of the foremost problems facing the post office . . . [and] sought to have 'the Post Office . . . taken out of politics and politics out of the Post Office.'" *Del Gallo v. Parent*, 557 F.3d 58, 63 (1st Cir. 2009) (quoting H.R. Rep. No. 91-1104). The PRA did so by "establishing institutional buffers between the President . . . on the one hand, and . . . the Postal Service on the other." *Id.* (quoting H.R. Rep. No. 91-1104).

USPS is now governed by an eleven-member Board of Governors with authority to "exercise . . . the power of the Postal Service." 39 U.S.C. § 202(a)(1). The Board is comprised of nine Governors, the Postmaster General, and the Deputy Postmaster General. The Governors are appointed by the President and confirmed by the Senate to seven-year terms. *Id.* § 202(b). The

3

Governors must be "chosen solely on the basis of their experience in the field of public service, law or accounting or on their demonstrated ability in managing" large organizations. *Id.* § 202(a)(1). They must "represent the public interest generally," no more than five may belong to the same political party, and they are removable only "for cause." *Id*. The Governors appoint the Postmaster General, who together with the Governors appoints the Deputy Postmaster General. *Id.* § 202(c)–(d). Congress vested USPS with independent regulatory authority to "adopt, amend, and repeal" rules necessary to carry out its functions, including those governing "the collection, handling, transportation, delivery, forwarding, returning, and holding of mail." *Id.* §§ 401(2), 404(a)(1). USPS is subject to oversight by another independent agency, the Postal Regulatory Commission (PRC), which is led by five Commissioners appointed based on professional expertise to six-year terms and removable only for cause. *Id.* §§ 501–02.

## III.    The Unlawful Executive Order

President Trump signed the Executive Order on March 31, 2026. *See* Ex. 1 (Exec. Order).[4] The Order purports to mandate several actions. Section 2 directs the Secretary of the Department of Homeland Security (DHS) to create and transmit to each state a "list of individuals confirmed to be United States citizens who will be above the age of 18" by the next federal election and who reside in that state (State Citizenship Lists). Exec. Order § 2(a). Under the Order, these State Citizenship Lists must be derived from federal citizenship and naturalization records, Social Security Administration (SSA) records, Systematic Alien Verification for Entitlements (SAVE) data,[5] and "other relevant federal databases." *Id.* The lists also must be sent to state officials "no

---

[4] All exhibits are attached to the concurrently filed Declaration of Attorney Sophia Lin Lakin in Support of Plaintiffs' Motion for Preliminary Injunction.

[5] SAVE is a program operated by U.S. Citizenship and Immigration Services (USCIS) used to track people who are noncitizens, but, as explained below, it frequently contains inaccurate or outdated information and mislabels U.S. citizens as noncitizens.

fewer than 60 days before each regularly scheduled Federal election," and the DHS Secretary must "establish procedures to (i) allow individuals to access their individual records as well as to update or correct them in advance of elections; and (ii) enable States to routinely supplement and provide *suggested* modifications or amendments to the State Citizenship List." *Id.* (emphasis added).

Section 3 of the Executive Order directs the Postmaster General "to initiate a proposed rulemaking pursuant to 39 U.S.C. § 401 and other applicable authority within 60 days of the date of this order." *Id.* § 3(b). "The notice of proposed rulemaking *shall include*, at minimum," several proposed provisions, *id.* (emphasis added), including that:

- "[A]ll outbound ballot mail must be mailed in an envelope that . . . is automation-compatible and bears a unique Intelligent Mail barcode, or successor USPS technology, that facilitates tracking," *id.* § 3 (b)(i)(B);

- Any state that intends to rely on USPS for mail-in or absentee ballots may provide USPS a list no fewer than 60 days before an election of eligible voters to whom the state will send mail ballots via USPS (State Intended Mail Ballot List), *id.* § 3(b) (ii);

- The Postmaster General must create a process by which individuals can be "enrolled" on a list USPS maintains (Mail-In and Absentee Participation List), which includes "unique ballot envelope identifiers, such as bar codes, for mail-in or absentee ballots provided to such individuals," *id.* § 3(b) (iv); and

- USPS may not transmit a mail ballot to any voter who is not on the Mail-In and Absentee Participation List, *id.* § 3(b) (iii).

The USPS final rule "shall be issued no later than 120 days from the date of this order"—i.e., July 29, 2026. *Id.* § 3(d). The Order also requires that USPS coordinate with "the Department of Justice for investigation of suspected unlawful use of the mail involving Federal election materials." *Id*.

The Executive Order directs the DHS Secretary, within 90 days of the Order, to "establish the infrastructure necessary to compile, maintain, and transmit the State Citizenship List," to each state's election officials, described *supra*, and to "designate a point of contact within DHS to receive and process requests from individuals and State election officials" regarding that list. *Id.*

§ 4(c). The SSA Commissioner "shall provide all necessary citizenship and identity data to the" DHS Secretary to effectuate this part of the Order. *Id*. Although the Executive Order does not explicitly instruct states or USPS on how to use the DHS State Citizenship List, the most reasonable reading is that USPS will not transmit mail ballots of voters who do not appear on that list. If the DHS list were merely advisory, there would be no reason to mandate processes and timing for DHS to transmit it to states, or for individuals and state officials to suggest updates.

The Order also directs the Attorney General to prioritize the investigation and prosecution of state and local election officials who issue federal ballots to claimed "not eligible" individuals, as well as any persons or entities involved in printing, producing, shipping, or distributing ballots to those voters. *See id*. § 2(b). It further directs the Attorney General and agency heads to "take all lawful steps to deter and address noncompliance with Federal law, including withholding Federal funds from noncompliant States and localities where such withholding is authorized by law." *Id*. § 5. And it mandates that jurisdictions preserve for five years "all records and materials—excluding ballots cast—evidencing voter participation in any Federal election." *Id*.

## IV.    The Executive Order's Effects on Plaintiffs and Their Members

Plaintiffs are nonpartisan, nonprofit membership organizations whose core missions and activities are dedicating to empowering voters, safeguarding the right to vote, and promoting political participation through voter education, public outreach, and voter registration. Ex. 2, Decl. of Celia Canavan ¶¶ 5–8; Ex. 3, Decl. of Celina Stewart ¶¶ 2, 4–6; Ex. 4, Decl. of Susan Dzieduszycka-Suinat ¶¶ 5–11, 31; Ex. 5, Decl. of Doris Speer ¶¶ 9, 15–17, 25, 35; Ex. 6, Decl. of Dorcas Washington ¶¶ 6–8, 17–28, 36–37, 42; Ex. 7, Decl. of Thu Nguyen ¶¶ 9–11, 14–21, 23, 26, 30, 37–38. This work includes year-round facilitation of mail voting and education of members and the public about the steps needed to vote by mail. Canavan Decl. ¶¶ 12–17, 19–25; Stewart Decl. ¶¶ 8–11, 19; Dzieduszycka-Suinat Decl. ¶¶ 5–11, 18–19, 31; Speer Decl. ¶¶ 15–17, 25, 35;

Washington Decl. ¶¶ 26, 28–29, 35–37, 42; Nguyen Decl. ¶¶ 14–21, 30. Plaintiffs have many members who regularly use vote-by-mail, Canavan Decl. ¶¶ 24–25, 52; Stewart Decl. ¶ 11; Dzieduszycka-Suinat Decl. ¶¶ 10, 25; Speer Decl. ¶¶ 11–12; Washington Decl. ¶¶ 32–34, including members with limited English proficiency who vote by mail to obtain language assistance, Nguyen Decl. ¶¶ 12, 15. Plaintiffs' members include individuals who cannot vote in person because they live abroad or will be out of state during the voting period, including on college campuses; who lack reliable transportation; and who have disabilities that make in-person voting impossible or burdensome. Canavan Decl. ¶¶ 24–25, 51–52; Stewart Decl. ¶¶ 11, 23; Dzieduszycka-Suinat Decl. ¶¶ 10, 25; Speer Decl. ¶¶ 11–13; Washington Decl. ¶¶ 32–34, 46, 48, 61–62; Nguyen Decl. ¶¶ 31, 43.

Once implemented, the Executive Order will forbid USPS from transmitting mail ballots received from voters unless the voter is on the Mail-In and Absentee Participation List. Exec. Order § 3(b)(iii). Representatives of USPS acknowledge as much: The Postmaster General explained that USPS will "work off of a list that [it is] given" under the Order in determining whether to deliver mail ballots.[6] Likewise, the head of the American Postal Workers Union, which represents over 200,000 USPS employees and retirees, recognized that the Order "would require . . . [USPS] to regulate who can receive ballots based on state-specific . . . lists, created by [DHS]."[7]

Under the Order's terms, DHS must create "State Citizenship Lists" using SAVE and other federal data sources as a gatekeeping mechanism for mail voters. Exec. Order § 2. The Order limits this list to "United States citizens who will be above the age of 18 at the time of an upcoming

---

[6] Ex. 8, Adam Sella, *Postal Service, Already Under Pressure, Now Faces Trump's Mail Ballot Order*, N.Y. Times (Apr. 11, 2026).

[7] Ex. 9, *Statement from President Jonathan Smith on Anti-Voter Executive Order*, Am. Postal Workers Union (Apr. 1, 2026).

Federal election and who maintain a residence in the subject State." *Id*. § 2(a). This can exclude individuals who temporarily do not "reside" in their home state, such as college students and military families stationed out of state, and will exclude the many Americans living overseas who do not maintain a residence stateside. Dzieduszycka-Suinat Decl. ¶¶ 19, 25; Stewart Decl. ¶¶ 11, 23; Washington Decl. ¶¶ 12, 29, 34, 46; Nguyen Decl. ¶¶ 31–32. It can also exclude individuals whose "residence" is not accurately reflected in the "Federal databases" the Order refers to—a problem particularly likely to affect individuals who have moved recently or who move frequently. Exec. Order § 2(a).

Furthermore, the information available through SAVE does not reliably reflect an individual's citizenship status.[8] Indeed, DHS itself disclosed in October 2025 that there is a risk that, through SAVE, "U.S. Citizenship and Immigration Services may share inaccurate information with registered agencies, which could in turn impact a registered user agency's eligibility determination for an individual . . . due to misspelling of names, transposed numbers, or incomplete information," and that it could only partially mitigate that risk.[9] While SAVE now provides access to the SSA database,[10] any data in the SSA database likely only reflects a person's citizenship status or residence at the time they applied for a Social Security number.[11] SSA, moreover, did not begin to maintain consistent citizenship information until 1981, and therefore

---

[8] *See* Ex. 10, Jen Fifield & Zach Despart, *"Not Ready for Prime Time." A Federal Tool to Check Voter Citizenship Keeps Making Mistakes*, ProPublica (Feb. 13, 2026).

[9] Ex. 11, Dep't of Homeland Sec., *Privacy Impact Assessment for the Systematic Alien Verification for Entitlements "SAVE" Program* at 19 (Oct. 31, 2025).

[10] Ex. 12, USCIS, *Optimizing SAVE: New Options to Create Cases with a Social Security Number and by Bulk Upload* (last updated May 22, 2025).

[11] *See, e.g.*, Ex. 13, Social Security Admin., *Programs Operational Manual System: RM 10210.500 - General Information on Evidence of U.S. Citizenship for a Social Security Number (SSN) Card* (2019); 20 C.F.R. § 416.708(a).

8

does not have that information for all individuals who have been issued a Social Security number, especially those born before 1981, including the elderly.[12] DHS itself acknowledges that SSA data allows verification of U.S. citizenship "of *many*" but not all "U.S. citizens *by birth*." 90 Fed. Reg. 48948, 48950 (Oct. 31, 2025) (emphasis added).

Plaintiffs' members and other voters whom Plaintiffs serve are among those who are at substantial risk of being left off these lists due to acknowledged data deficiencies, including naturalized citizens, individuals whose social security records do not accurately reflect their citizenship status because they were born before 1981, and those who live overseas. Canavan Decl. ¶¶ 24–25, 51–52; Stewart Decl. ¶¶ 11, 23; Dzieduszycka-Suinat Decl. ¶¶ 17–19, 25, 27, 30, 33; Speer Decl. ¶¶ 26–27; Washington Decl. ¶¶ 33–34; Nguyen Decl. ¶¶ 36–37, 39, 43.

**ARGUMENT**

Plaintiffs satisfy all four preliminary injunction factors: "(1) . . . likelihood of success on the merits; (2) . . . potential for irreparable harm [absent] an injunction; (3) whether issuing the injunction will burden the defendants less than denying an injunction would burden the plaintiffs and (4) the effect . . . on the public interest." *Cent. Me. Power Co. v. Maine Comm'n on Gov't Ethics & Election Pracs*., 144 F.4th 9, 19 (1st Cir. 2025).

## I.      Plaintiffs Are Likely to Succeed on the Merits of Counts I and II.

Plaintiffs may sue in equity to prevent "violations of federal law by federal officials," *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 327 (2015), including separation-of-powers breaches, *see Collins v. Yellen*, 594 U.S. 220, 245 (2021), and ultra vires action beyond statutory limits, *see Am. Sch. of Magnetic Healing v. McAnnulty*, 187 U.S. 94, 110 (1902). This

---

[12] *See* Ex. 14, Letter from Nancy Morales Gonzalez, Assoc. Gen. Couns. for Gen. L., SSA, to Jon Sherman, Litig. Dir. & Senior Couns., Fair Elections Ctr. (July 13, 2023).

9

authority applies equally to executive orders, which courts have long reviewed for compliance with federal law. *See League of United Latin Am. Citizens v. Exec. Off. of the President*, 780 F. Supp. 3d 135, 172 (D.D.C. 2025) (*LULAC*) (tracing history and tradition of judicial review of executive orders).

No constitutional or statutory provision empowers the President to issue the commands within the Order. Indeed, the Order directly defies the Constitution's allocation of powers and the plain text of statutes governing elections and USPS. Plaintiffs are likely to succeed on the merits of their separation-of-powers and ultra vires claims.

**A. Plaintiffs Are Likely to Succeed on Their Separation-of-Powers Claim (Count I).**

The President's power "to issue the [O]rder must stem either from an act of Congress or from the Constitution itself." *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 585 (1952). Plaintiffs are likely to succeed on their separation-of-powers claim because the President lacks *any* authority, inherent or delegated, to regulate federal elections or the mail.

*1. The President has no authority to regulate federal elections.*

The Elections Clause vests authority over the "Times, Places and Manner" of federal elections in the states, reserving to Congress the power to "make or alter" those rules. U.S. Const. art. I, § 4. Voter qualification rules remain generally with the states. *See Arizona v. Inter Tribal Council of Ariz., Inc.*, 570 U.S. 1, 17 (2013). The Elections Clause assigns no role in election regulation to the Executive Branch—neither to the President nor USPS. *See LULAC*, 780 F. Supp. 3d at 194 ("The Elections Clause provides that Congress—not the President—is the check on States' authority to regulate federal elections"); *Colorado v. DeJoy*, No. 20-cv-2768-WJM-STV, 2020 WL 5513567, at \*2 (D. Colo. Sept. 14, 2020) (explaining that the Constitution does not provide "authority to the Postal Service" to override state election administration).

10

Simply put, "the Constitution empowers only the states and Congress to 'regulate the conduct of federal elections,'" and "spell[s]" no "role for the President in the operation of state voting procedures in federal elections." *Georgia v. Meadows*, 88 F.4th 1331, 1346–47 (11th Cir. 2023) (quoting *Roudebush v. Hartke*, 405 U.S. 15, 24 (1972)), *cert. denied*, 145 S. Ct. 545 (2024). Instead, the President's role is to "take Care that the Laws be faithfully executed," U.S. Const. art. II, § 3, a duty which "refutes the idea that he is to be a lawmaker," *Youngstown*, 343 U.S. at 587. *See also Clinton v. City of New York*, 524 U.S. 417, 438 (1998) ("There is no provision in the Constitution that authorizes the President to enact, to amend, or to repeal statutes").

Nor does the President have any statutory authority over elections. Congress has largely left the regulation of mail ballots in federal elections to the states, and today, all fifty states permit at least some voters to cast ballots by mail. *See supra* Background § I. Congress has acted in limited but important areas, such as guarantees for UOCAVA voters. *See id.* But the President has no role in this constitutional or statutory framework. *See LULAC*, 780 F. Supp. 3d at 194–96.

### 2. The President has no constitutional or statutory authority to regulate the mail.

The President fares no better by attempting to manipulate elections indirectly through USPS. The Constitution grants only Congress the authority to "establish Post Offices and post Roads." U.S. Const. art. I, § 8, cl. 7. That power "embraces the regulation of the entire postal system of the country." *See Ex parte Jackson*, 96 U.S. at 732.

Using this power, "Congress has established a detailed statutory and regulatory scheme to govern this country's vast postal system." *Council of Greenburgh Civic Ass'ns*, 453 U.S. at 122. This includes structuring USPS to ensure it exercises independent regulatory authority to provide a neutral, nondiscriminatory, and universal service. *See* Background § II. The President's attempt to exercise unilateral control over postal administration to interfere with mail ballots is therefore "incompatible with the expressed or implied will of Congress." *Zivotofsky v. Kerry*, 576 U.S. 1,

11

10 (2015) (quoting *Youngstown*, 343 U.S. at 637 (Jackson, J., concurring)). Congress has created a detailed statutory scheme assigning postal administration authority to an independent, multi-member body (i.e., the Board of Governors), with oversight by a second independent, multi-member body (i.e., PRC). *See* 39 U.S.C. §§ 202, 3622. That structure reflects a deliberate choice. *See Del Gallo*, 557 F.3d at 63.

The Executive Order is incompatible with that constitutional and statutory design.

3. *The President's asserted authorities do not authorize the Executive Order.*

Because the President lacks any constitutional and statutory authority here, his power is "at its lowest ebb" and he "can rely only upon his own constitutional powers minus any constitutional powers of Congress over the matter." *Zivotofsky*, 576 U.S. at 10 (citation omitted). To prevail, he must show that his asserted power is "both 'exclusive' and 'conclusive' on the issue." *Id.* (citation omitted). The Executive Order invokes authority supposedly in the Help America Vote Act of 2002 (HAVA), 52 U.S.C. §§ 20901–21145, the National Voter Registration Act (NVRA), 52 U.S.C. §§ 20501–20511, and the Guarantee Clause, U.S. Const., art. IV, § 4. *See* Exec. Order pmbl. These are insufficient to justify the Order's unprecedented assertion of power.

Neither HAVA nor the NVRA addresses mail voting, much less delegates any authority over it to the President. *See LULAC*, 780 F. Supp. 3d. at 196–200. HAVA sets baseline standards for states' voting systems, voter registration lists, and provisional voting, and makes federal funding available as an incentive for states to implement its standards; it does not grant the President any power to create new federal election policy. The NVRA establishes baseline voter registration and voter list maintenance requirements for federal elections, implemented by the states, but does not address mail ballots or delegate any authority over them to the President. *See* 52 U.S.C. §§ 20501–20511.

12

The Constitution's Guarantee Clause, art. IV, § 4, likewise provides no source of presidential authority for the Order's demands. *See* Exec. Order pmbl. The Guarantee Clause affords to every state a republican form of government. The Order, however, identifies no basis to assert that any state now lacks a republican form of government, nor does it explain how its directives would help guarantee one. In any event, the Guarantee Clause does not vest any power in the President. *Ohio ex rel. Davis v. Hildebrant*, 241 U.S. 565, 569–70 (1916). Rather, the Constitution explicitly confers power over elections to Congress, so any presidential power under the Guarantee Clause—and, to be clear, there is none—cannot be "exclusive" or "conclusive" such as to displace Congress's explicit authority. *Youngstown*, 343 U.S. at 637 (Jackson, J., concurring).

In addition to its putative sources of authority, the Order cites at various points federal criminal prohibitions regarding misuse of the mail, including by USPS employees. *See* Exec. Order §§ 1, 3. But in creating these prohibitions, Congress in no way authorized the President to create new federal election law and policy from whole cloth, nor did Congress allow him to create USPS procedures that differ from those in statutes. *See Youngstown*, 343 U.S. at 587. The existence of certain mail-related crimes does not give the President any power over elections that the Constitution does not convey, nor a basis for rewriting the postal statutes.

Finally, Article II's Vesting Clause does not alter this analysis. The President has argued elsewhere that this Clause confers upon him broad authority to direct federal actors to obey his commands, even absent a congressional delegation. Every court to consider the argument has rejected it as "untethered from precedent and unsupported by even a maximalist view of 'the executive Power' under our Constitution." *LULAC*, 780 F. Supp. 3d at 198; *accord California v. Trump*, 786 F. Supp. 3d 359, 381 (D. Mass. 2025); *Washington v. Trump*, 814 F. Supp. 3d 1173 (W.D. Wash. 2026). Even the Department of Justice itself "has rejected the view that the President

13

may direct a predetermined outcome from a notice-and-comment rulemaking process by an independent regulatory commission." *LULAC*, 780 F. Supp. 3d at 199–200 (collecting examples).

\* \* \*

The President has no power, under the Constitution or by statute, to regulate elections or the mail, much less in the expansive and unprecedented way set out in the Executive Order. Plaintiffs are therefore likely to succeed on Count I.

### B.  Plaintiffs Are Likely to Succeed on Their Ultra Vires Claim (Count II).

Even if he had constitutional or statutory authority, the President may not direct an agency—here, USPS—to violate federal law or to act in a manner not authorized by statute. *See Chamber of Comm. v. Reich*, 74 F.3d 1322, 1330 (D.C. Cir. 1996) (noting that executive orders may not "violate[] or cause[] others to violate" the law). The Order directs USPS to do so in several ways, all of which thrust USPS into an unauthorized role running elections. *First*, it directs USPS to perform an illegal gatekeeping function by refusing to transmit the ballots of voters who do not appear on USPS's state-specific Mail-In and Absentee Participation Lists. The Order also appears to condition USPS's ballot transmission on voters' appearance on the DHS State Citizenship Lists—compounding the illegality and ensuring that even more eligible voters will be turned away by lists of uncertain provenance and demonstrated inaccuracy. *Second*, the Order directs USPS not to transmit these voters' ballots—despite the lack of any statutory authorization for USPS to decline to transmit certain types of mail, and a comprehensive statutory scheme explicitly defining all nonmailable materials. *Third*, the Order directs USPS not to transmit the ballots of voters not enrolled on state-specific, Mail-In and Absentee Participation Lists, despite UOCAVA's clear direction to USPS to deliver overseas voters' ballots. And *fourth*, the Order mandates that USPS take an active role in administering state elections, deciding which voters may or may not cast a mail ballot—despite clear procedural and substantive limitations on USPS's providing nonpostal

14

services, none of which are met. Because the Order directs USPS to take ultra vires action in violation of Congress's clear statutory directives, Plaintiffs are likely to succeed on Count II.

> 1. *USPS must provide a universal, non-discriminatory service, but the Executive Order directs it to mail only certain users' ballots.*

Congress has repeatedly and unambiguously required USPS to "operate[] as a basic and fundamental service provided to the people," 39 U.S.C. § 101(a), serving "patrons in all areas and . . . all communities," *id.*, without "undue or unreasonable discrimination among users," *id.* § 403(c). The Order's instruction that USPS may "not transmit mail-in or absentee ballots from any individual unless those individuals have been enrolled on" the "Mail-In and Absentee Participation List," Exec. Order § 3(b)(iii)–(iv), is the type of discrimination Congress has barred.

The universal service mandate is a longstanding and fundamental USPS feature. In a leading, century-old case on ultra vires review, the Supreme Court stopped a local Postmaster's attempt to cease delivering mail he viewed as fraudulent. *See McAnnulty*, 187 U.S. at 109. The Postmaster General's "right to exclude letters, or to refuse to permit their delivery to persons addressed, must depend upon some law of Congress, and if no such law exists, then he cannot exclude or refuse to deliver them." *Id.*

Congress therefore acted in accordance with a long historical tradition when it gave USPS the "obligation to provide postal services to bind the Nation together" and to "provide prompt, reliable, and efficient services to patrons in all areas and . . . to all communities." 39 U.S.C. § 101(a); *see also USPS v. Am. Postal Workers Union, AFL-CIO*, 736 F.2d 822, 825 (1st Cir. 1984) (treating these provisions as binding requirements of law on postal employees). USPS must "serve as nearly as practicable the entire population of the United States." 39 U.S.C. § 403(a). And unless specifically authorized, USPS may not "make any undue or unreasonable discrimination among users of the mails, nor shall it grant any undue or unreasonable preference." *Id.* § 403(c).

Together, these directives reflect Congress's clear intent for USPS: People "liv[ing] in any part of the country" are entitled, by statute, "to receive and deposit their mail at their home or business . . . under the direction and control of the Postal Service." *Council of Greenburgh Civic Ass'ns*, 453 U.S. at 125–26; *see also Flamingo Indus. (USA) Ltd.*, 540 U.S. at 747 (noting USPS's "broad[] obligations, including the provision of universal mail delivery"). Nor are these directives merely hortatory. "Congress effectively mandated certain policies to be followed by the Postal Service, leaving no discretion for the agency to do otherwise." *Nat'l Ass'n of Postal Supervisors v. USPS*, 26 F.4th 960, 971 (D.C. Cir. 2022). Courts have accordingly rejected the argument that "the directives contained in Sections 101 or 403 are unenforceable policy goals." *New York v. Biden*, 636 F. Supp. 3d 1, 24 (D.D.C. 2022).

The Executive Order directs USPS to violate these statutory mandates. It flips the core presumption of USPS—that mail should be delivered promptly and reliably on behalf of all users across the country—on its head: Mail-in and absentee ballots may *not* be delivered, unless the senders have been enrolled on a state-specific, Mail-In and Absentee Participation List. Exec. Order § 3(b)(iii)–(iv). This defies Congress's instructions to provide a universal service to all postal users, across the country, expressed repeatedly in federal statutes.

>   2.  *Congress has comprehensively and explicitly defined the categories of nonmailable material, but the Executive Order directs USPS not to mail valid ballots.*

Just as USPS may not discriminate among users, it may not discriminate among types of mail. Section 3(b)(iii) of the Order—instructing USPS not to transmit ballots from voters who have not enrolled in certain lists—is independently ultra vires because USPS has no statutory authority to define certain mail ballots as nonmailable materials.

"The power possessed by Congress . . . to designate what shall be carried [through the postal system] necessarily involves the right to determine what shall be excluded." *Ex parte*

*Jackson*, 96 U.S. at 732. Congress has created a detailed and comprehensive list enumerating the types of nonmailable materials. *See* 39 U.S.C. §§ 3001–3018; *see, e.g.*, *id.* § 3001(g) (unsealed fragrance samples); *id.* § 3001(f) (products lacking child-safe packaging); *id.* § 3002 (motor vehicle master keys); *id.* § 3014 (plants subject to quarantine); 18 U.S.C. §§ 1715, 1716 (firearms, poisons, and other injurious substances). That list does not include mailed absentee ballots, or anything remotely similar. Nor is there any provision granting USPS the authority to deem additional categories of mail nonmailable. *See* 39 U.S.C. § 3001. Because "no such law exists, then [USPS] cannot exclude or refuse to deliver [voters' ballots]." *McAnnulty*, 187 U.S. at 109.

Instead, the nonmailable material provisions show how seriously Congress takes USPS's obligations to transmit all mail. Congress precisely defined when sweepstakes, lotteries, and charitable solicitations cross the line into nonmailable material, *see* 39 U.S.C. §§ 3001(h)–(k), 3005, and when USPS may initiate proceedings to stop a user from sending such materials, *see id.* § 3007. But even then, USPS must still apply for injunctive relief in federal court to sequester any mail that is subject to the proceedings. *Id.* § 3007(a). Even if such relief is granted, mail must "be delivered as addressed" if it "is not clearly shown to be the subject to proceedings under [§] 3005." *Id.* § 3007(a)(3). That detailed statutory framework would make no sense if USPS could sequester *any* mail—including election mail—at the President's direction.

USPS therefore lacks any authorization to stop delivering selected ballots, as Section 3(b)(iii) of the Order directs it to do. The attempt to force USPS to create a broad new category of nonmailable material, consisting of some of the most important mail USPS handles, is ultra vires. Indeed, the Supreme Court has "particularly scrutinized with suspicion when an agency reverses . . . its long-standing decision not to regulate in a particular field or in a particular manner."

17

*United States v. Freeman*, 147 F.4th 1, 19 (1st Cir. 2025), *cert. denied*, 2026 WL 490587 (U.S. Feb. 23, 2026).

> 3. *USPS must deliver* all *covered overseas voters' ballots consistent with UOCAVA, but the Executive Order directs it to screen ballots.*

The Executive Order also mandates that USPS violate rights, guaranteed in UOCAVA, of military servicemembers, their families, and other Americans residing overseas. UOCAVA requires states to allow these voters to vote by absentee ballot. 52 U.S.C. § 20302(a)(2). It further requires that USPS "provide expedited mail delivery service for *all* . . . absentee ballots" of covered voters that are collected seven days before a general election. 52 U.S.C. § 20304(b)(2) (emphasis added). The Order directs USPS to defy this command: Instead of delivering "all ballots," *id.*, USPS must transmit ballots only from senders enrolled on one of its state-specific, Mail-In Ballot and Absentee Participation lists. *See* Exec. Order § 3(b)(iii)–(iv). This contradicts UOCAVA's unambiguous text and would undermine "the will of Congress . . . to remove procedural roadblocks which had prevented American citizens living abroad from voting," *California*, 786 F. Supp. 3d at 383, making it ultra vires.

> 4. *USPS may only provide nonpostal services under limited conditions, but the Executive Order directs it to engage in a vast election administration program.*

Finally, the Executive Order directs ultra vires action because it demands that USPS take a central role in election administration—reviewing state-provided eligible voter lists, creating their own state-specific lists of enrolled voters, generating ballot envelope identifiers, and screening ballots against enumerated lists to ensure only those from pre-approved voters are transmitted. *See* Exec. Order § 3(b)(ii)–(iv). USPS has no authority to stray so far from its core function to provide postal services. 39 U.S.C. §§ 101, 401, 404.

To ensure that USPS remains focused on its mission, Congress has circumscribed USPS's ability to provide nonpostal services, i.e., services other than "the delivery of letters, printed matter,

18

or mailable packages, including acceptance, collection, sorting, transportation, or other functions ancillary thereto." 39 U.S.C. § 102(5). USPS is not "permit[ted] or require[d] [to] . . . provide nonpostal service," unless such service was offered in 2006 (which does not apply here) or is authorized by the Postal Service Reform Act of 2022. *Id.* § 404(e)(2). Under that law, USPS may provide state and local governments nonpostal services only if such services "provide enhanced value to the public" and performing them provides to USPS a "reimbursement that covers at least 100 percent of the costs." *Id.* § 3703(a); *see also id.* § 3704 (allowing USPS to provide nonpostal services to other executive agencies, provided they are revenue-generating or neutral). A majority of the Board of Governors must also approve any such services. *Id.* § 3703(c).

Yet the Order mandates that USPS engage in significant election administration services far afield from letter delivery. It directs USPS to "provide each State with a list of individuals . . . who are enrolled with the USPS . . . along with unique ballot envelope identifiers, such as bar codes, for mail-in or absentee ballots." Exec. Order § 3(b)(iv). It also instructs USPS to receive state-created lists of voters eligible to vote by mail and to refuse delivery of mail ballots to or from any voter not on a state-specific Mail-In Ballot and Absentee Participation List. *Id*. § 3(b)(ii)–(iii). USPS has no authority to provide these services because they do not meet the conditions of § 3703(a). The ordered actions will not provide any "enhanced value to the public" but rather generate needless screening of ballots, which, based on the unreliability of data identifying citizenship and residence, will predictably disenfranchise voters. Nor will they comply with Congress's fiscal instructions. To the contrary, the Order creates a huge, unfunded mandate. And the Order simply directs USPS to begin this vast, unprecedented exercise of election administration without receiving any authorization from the Board of Governors. This is ultra vires.

*    *    *

19

On its face, the Executive Order directs USPS to act outside the boundaries Congress has set for it in multiple ways. Plaintiffs are therefore likely to succeed on their ultra vires claim.

## II.    Plaintiffs Will Suffer Irreparable Harm Absent a Preliminary Injunction.

An injury is irreparable if it "is not accurately measurable or adequately compensable by money damages." *Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*, 217 F.3d 8, 13 (1st Cir. 2000). Lost opportunities to conduct election-related activities and interference with members' fundamental right to vote are well-established irreparable harms. *See League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 9 (D.C. Cir. 2016); *Get Loud Ark. v. Jester*, No. 24-2810, 2026 WL 881736, at *2 (8th Cir. Mar. 31, 2026); *California*, 786 F. Supp. 3d at 393. When a challenged policy raises "new obstacles [that] unquestionably make it more difficult for [organizations like] the Leagues to accomplish their primary mission" of increasing voter participation, this constitutes "irreparable harm." *Newby*, 838 F.3d at 9; *see also Massachusetts v. NIH*, 770 F. Supp. 3d 277, 322 (D. Mass. 2025), *aff'd,* 164 F.4th 1 (1st Cir. 2026) (irreparable harm due to NIH order interfering with organizations' missions concerning medical research); *Ind. State Conf. of NAACP v. Lawson*, 326 F. Supp. 3d 646, 663 (S.D. Ind. 2018) ("[C]onduct that limits an organization's ability to conduct voter registration activities constitutes an irreparable injury." (citation omitted)), *aff'd sub nom. Common Cause Ind. v. Lawson*, 937 F.3d 944 (7th Cir. 2019). This is because "[o]nce the election occurs, there can be no do-over and no redress." *League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 247 (4th Cir. 2014).

Plaintiffs are longstanding nonpartisan organizations dedicated to increasing voter participation through voter education, outreach, and registration, that each incorporate mail voting as a core part of their work. Because this work happens year-round, Plaintiffs have already sustained irreparable injuries from the Order's interference with their core missions, including the

20

irreversible loss of voter-engagement opportunities and the necessary suspension of some programs because of the Order. Those injuries will compound with the imminent implementation of the Order, which erects new hurdles to USPS's otherwise automatic, reliable delivery of mail ballots. If implemented, the Order will cast doubt on the viability of mail voting, interfering with Plaintiffs' ongoing education and facilitation of mail voting; force Plaintiffs to suspend or overhaul their existing mail voting tools and programs; and jeopardize Plaintiffs' reputations as trusted nonpartisan voter-education organizations. Plaintiffs will have to continue diverting significant resources from other organizational priorities to address these injuries, at best only partially ameliorating the Order's harms. The Order will also irreparably harm Plaintiffs' members, some of whom will be disenfranchised by exclusion from the Executive Order's gatekeeping lists.

### A. The Order Will Continue to Interfere with Plaintiffs' Core Activities and Frustrate Their Missions.

Plaintiffs rely on mail voting as a core tenet of voter education and encouraging civic participation among their members and the public. Canavan Decl. ¶¶ 7, 10, 13–21 (LWVMA incorporates mail voting into all voter education work towards its mission to achieve maximum voter participation); Stewart Decl. ¶¶ 5, 8–10; Dzieduszycka-Suinat Decl. ¶¶ 6–10, 25 ("[v]oting by mail is the only option" for U.S. Vote to facilitate democratic participation of some overseas voters); Speer Decl. ¶¶ 11–13, 15–17; Nguyen Decl. ¶¶ 14–18, 23 (OCA encourages mail voting for limited English proficient voters because of superior translation assistance options); Washington Decl. ¶¶ 26, 28–30, 35, 37, 46 (for college students who reside on campus, mail-in voting "is the only practical means of participating in the electoral process"). Indeed, Plaintiffs' voter education and facilitation of mail voting extend to all fifty states, the District of Columbia, and many countries overseas. *See* Stewart Decl. ¶¶ 2, 5, 8–10 (the League has "ongoing work in every state" and its VOTE411.org tool provides information facilitating mail voting "for every

state and the District of Columbia"); Washington Decl. ¶¶ 22–23 (Delta Sigma Theta's voter education on mail voting occurs "in states throughout the United States"); Dzieduszycka-Suinat Decl. ¶¶ 5–7 (U.S. Vote educates voters "in all 50 states and U.S. territories"); Nguyen Decl. ¶¶ 3, 19–21. Some voters would not receive crucial information about mail voting without Plaintiffs' work, such as overseas voters, elderly voters, recently naturalized citizens, and limited English proficient voters. Canavan Decl. ¶¶ 13, 21–22, 31–34; Stewart Decl. ¶¶ 8–10; Dzieduszycka-Suinat Decl. ¶¶ 6–14, 18–19 (U.S. Vote provides key tools for overseas voters, especially those who are "unfamiliar with the UOCAVA voting process and who must navigate tricky international mail processes" and those who get personalized answers from the Voter Help Desk); Speer Decl. ¶¶ 13–17 (AARO helps overseas voters deal with mail delays and unexpected moves); Nguyen Decl. ¶¶ 14–18, 28, 36–37; Washington Decl. ¶¶ 18, 32–34, 46, 60–62.

In the few weeks since the President signed the Order, it has already upended Plaintiffs' work educating voters and facilitating their participation in vote-by-mail in this year's elections, causing irreparable harm. The Order has disrupted Plaintiffs' ongoing voter education, requiring their staff to spend resources and time responding to fear and confusion from members and partner organizations. *See* Nguyen Decl. ¶¶ 14, 23; Dzieduszycka-Suinat Decl. ¶¶ 29–32; Speer Decl. ¶¶ 23, 30; Canavan Decl. ¶¶ 27–30, 35, 39–43 ("LWVMA has stopped actively disseminating any new voter-education materials about mail voting because of . . . the EO[.]"); Stewart Decl. ¶¶ 13, 14; Canavan Decl. ¶¶ 35, 39, 49; Washington Decl. ¶¶ 42, 44. Where, as here, the Order "increase[s] voter confusion and interfere[s]" with Plaintiffs' missions, that inflicts irreparable harm. *LULAC*, 780 F. Supp. 3d at 201; *see also League of Women Voters of N.H. v. Kramer*, No. 24-cv-73-SM-TSM, 2025 WL 3260024, at *5 (D.N.H. Oct. 17, 2025) ("interference with voting rights" requiring the League to respond with voter education inflicts irreparable harm), *report and*

*recommendation adopted sub nom.*, 2025 WL 3257189 (D.N.H. Nov. 20, 2025); *California*, 786 F. Supp. 3d at 379 (recognizing the tangible harm to States in the costs to "counter confusion" of voters). These existing injuries are not illusory: The Order has forced Plaintiffs to suspend core voter-education and facilitation work tied to mail voting. LWVMA was in the process of translating its Massachusetts-specific voter information, including vote-by-mail information, into Haitian Creole and Portuguese, which is now on hold because of the Order and will likely be delayed until after the midterms. Canavan Decl. ¶¶ 40–45; *see also* Stewart Decl. ¶¶ 15–16, 21. The Order therefore has already stymied the League's ability to conduct outreach to Haitian and Portuguese-speaking voters, causing irreparable harm. *See Am. Acad. of Pediatrics v. Kennedy*, No. 25-cv-11916-BEM, 2026 WL 733828, at *18 (D. Mass. Mar. 16, 2026) (finding irreparable harm because "resource diversion has frustrated both specific initiatives and [plaintiffs'] broader organizational missions"); *Woonasquatucket River Watershed Council v. USDA*, 778 F. Supp. 3d 440, 475 (D.R.I. 2025) (holding disruptions of organizational activities were irreparable harm).

The Order's implementation will compound this irreparable harm in three distinct ways. *First*, it will cast even greater doubt over the viability of mail voting, imposing significant obstacles to Plaintiffs' core mission of helping their members and other voters vote by mail and increase electoral participation. *See* Canavan Decl. ¶¶ 30, 35, 48–50, 53; Stewart Decl. ¶¶ 15–16, 22; Dzieduszycka-Suinat Decl. ¶¶ 27–31; Speer Decl. ¶¶ 23–29; Nguyen Decl. ¶¶ 14, 23; Washington Decl. ¶¶ 21, 25, 52–55, 63–64. This creation of "uncertainty hindering long term planning and undermining [plaintiffs'] mission[s]," and "the confusion and chaos imposed by an overnight change" in law or policy, constitute irreparable harm. *See New York v. McMahon*, 784 F. Supp. 3d 311, 362 (D. Mass. 2025); *New York v. U.S. Dep't of Just.*, 804 F. Supp. 3d 294, 330 (D.R.I. 2025).

*Second*, the Order's changes to election procedure will "render obsolete several of the

23

online tools that the . . . Plaintiffs have developed and routinely use" including LWV's multilingual VOTE411.org resource, which provides essential information to facilitate mail voting based on each state's rules and federal statutes. *See LULAC*, 780 F. Supp. 3d at 189; Stewart Decl. ¶¶ 8, 10; Canavan Decl. ¶¶ 32–35, 38, 43–44. Like the League, U.S. Vote would have to completely "redesign its website" and may need to take some tools such as the "Voter Journey Map" offline entirely. Dzieduszycka-Suinat Decl. ¶¶ 31–35; *see also* Speer Decl. ¶¶ 30–34. OCA and Delta Sigma Theta, in turn, "would need to completely rework" or "revamp" voter-education materials and trainings. Nguyen Decl. ¶¶ 26, 30; Washington Decl. ¶ 57. Plaintiffs will have to undertake wholesale overhauls of their mail voter-education materials—if possible at all—before now-looming primaries as well as subsequent midterm general elections. Stewart Decl. ¶ 20 (primaries LWV must help prepare voters for begin on May 5); Washington Decl. ¶¶ 57–58; Nguyen Decl. ¶¶ 24, 26, 37 (OCA would have "little to no time to create and translate state-specific materials that explain how to vote by mail" in various languages before primaries); Speer Decl. ¶ 33; Canavan Decl. ¶ 30. These are irreparable harms. *California*, 786 F. Supp. 3d at 390–91; *LULAC*, 780 F. Supp. 3d at 201–02.

*Third*, the Order's pall of uncertainty will force Plaintiffs to either give up their missions to inform voters about all voting options or risk providing incorrect information to voters that could result in disenfranchisement and damage the goodwill and reputations as trusted nonpartisan voter-education organizations that Plaintiffs have built over decades. *See Woonasquatucket River Watershed Council*, 778 F. Supp. 3d at 475 (holding "injury to goodwill and reputation" is an irreparable harm); Dzieduszycka-Suinat Decl. ¶¶ 14–15, 31 (it is "essential to U.S. Vote's survival" that it provides accurate information because other voter-services organizations license its information); Stewart Decl. ¶ 19 (the Executive Order risks "undermin[ing] trust that we built

24

over 100 years"); Canavan Decl. ¶¶ 11–12, 38, 50 (LWVMA is currently weighing "removing all instructions about mail voting from [its] educational materials" because of the risk to its public trust); Speer Decl. ¶¶ 25, 29; Washington Decl. ¶¶ 24, 55.

All of the changes to Plaintiffs' voter education and engagement programs precipitated by the Order would siphon significant resources away from Plaintiffs' other time-sensitive organizational priorities, such as organizing candidate forums (LWVMA, OCA, Delta Sigma Theta), Canavan Decl. ¶¶ 33, 39, 43, 49–50; Nguyen Decl. ¶ 14; Washington Decl. ¶ 51, planning for National Voter Registration Day (U.S. Vote), Dzieduszycka-Suinat Decl. ¶¶ 31–38, and providing naturalization assistance (OCA), Nguyen Decl. ¶¶ 14, 25–28, 37, among other core activities, *see* Speer Decl. ¶¶ 30–34 (Voting Committee will need to update materials full-time, undercutting core mission of voter outreach); Washington Decl. ¶¶ 42, 44, 51, 57–58; Stewart Decl. ¶ 21; Nguyen Decl. ¶ 27 (OCA will also need to divert resources from its "AAPI Voter Hotline . . . and phone and text banking reminding community members to register to vote" among other voter-registration work). This loss of voter-engagement opportunities and consequent resource diversions before the election constitute irreparable harm. *See Newby*, 838 F.3d at 8–9 (civic organizations irreparably harmed because defendant's actions "make it more difficult for the Leagues to accomplish their primary mission of registering voters"); *Get Loud Ark.*, 2026 WL 881736, at *2; *California*, 786 F. Supp. 3d at 390–92 ("each of these changes" required by the challenged executive order "would, in turn, divert . . . resources from other key projects" constituting irreparable harm); *LULAC*, 780 F. Supp. 3d at 200–02.

If the Order is not enjoined as elections approach, Plaintiffs will irrevocably lose the opportunity to advance their missions by educating and mobilizing voters who would otherwise vote by mail. *E.g.*, *Newby*, 838 F.3d at 9; *Get Loud Ark.*, 2026 WL 881736, at *2. As all three

courts held in the successful challenges to President Trump's 2025 Executive Order directing the Election Assistance Commission (EAC) to require documentary proof of citizenship with the federal voter registration form, Plaintiffs "have shown a strong likelihood that the implementation of . . . the Executive Order" is already causing them "irreparable harm by interfering with their 'primary mission of registering voters' ahead of upcoming elections." *LULAC*, 780 F. Supp. 3d at 200 (quoting *Newby*, 838 F.3d at 9); *accord Washington*, 814 F. Supp. 3d at 1199, 1206; *California*, 786 F. Supp. 3d at 378–79. And there is little doubt that this will occur absent an injunction. "Because the Executive Order unambiguously commands action, here there is more than a 'mere possibility that some agency might make a legally suspect decision.'" *City & Cnty. of San Francisco v. Trump*, 897 F.3d 1225, 1240 (9th Cir. 2018) (citation omitted). In the Order's signing ceremony statement, the President's Staff Secretary even explained that "it orders the Postmaster General, the US Postal Service, to take bold new measures to verify" ballots.[13]

### B.  Plaintiffs' Members Will Be Irreparably Harmed by the Loss of Mail Voting, Some of Whom Will Be Disenfranchised Entirely.

Plaintiffs' collective millions of members span all fifty states, the District of Columbia, several territories, and dozens of foreign countries, many of whom rely on mail voting. Speer Decl. ¶¶ 6, 8, 11; Nguyen Decl. ¶¶ 3–7, 12, 31–33; Canavan Decl. ¶¶ 6, 24–25; Washington Decl. ¶¶ 12–15, 32–34, 48; Stewart Decl. ¶¶ 3, 11. The Order will irreparably harm many of Plaintiffs' members by removing their only viable option to vote. *See, e.g.*, *Walters v. Boston City Council*, 676 F. Supp. 3d 26, 47 (D. Mass. 2023) ("Courts routinely deem restrictions on fundamental voting rights irreparable injury") (citation omitted); *League of Women Voters of N.H.*, 2025 WL 3260024, at *5 ("interference with [plaintiffs'] voting rights . . . is not compensable and is therefore

---

[13] Ex. 15, *Transcript: President Trump Signs an Executive Order on Elections* (Mar. 31, 2026).

irreparable harm"). Plaintiffs' members live overseas, making in-person voting impossible. Speer Decl. ¶¶ 12, 26; Washington Decl. ¶ 34; Stewart Decl. ¶¶ 11, 23; Canavan Decl. ¶¶ 25, 51. Others "rely on vote by mail" because of disabilities, health issues, and mobility impairments and thus cannot vote in person. Canavan Decl. ¶¶ 25–26; *see* Stewart Decl. ¶¶ 11, 23; Washington Decl. ¶¶ 31–34; Nguyen Decl. ¶ 43. As explained, at least some recently naturalized members, student members, and members born before 1981, among others, will not be captured by the poorly constructed lists the Order contemplates. *See* Nguyen Decl. ¶¶ 12–13, 31–35, 37–42; Canavan Decl. ¶¶ 24–25, 46, 51–52; Stewart Decl. ¶¶ 11, 23; Washington Decl. ¶¶ 29, 46–48. The Order bars USPS from delivering ballots cast by voters who are not on the USPS Mail-In and Absentee Participation Lists and appears to do so for those not on the DHS State Citizenship Lists as well.

Once implemented, the Executive Order will disenfranchise Plaintiffs' members given impending absentee and mail-ballot application deadlines for primary elections. For example, in addition to voters who are unable to vote in person, the Executive Order will also disenfranchise voters who timely request and cast mail ballots that USPS does not transmit due to the Order's requirements, depriving them of a realistic opportunity to vote in person instead. Just as with the now-enjoined 2025 Executive Order, the "likelihood of disenfranchisement is a serious harm because '[t]he right to vote freely for the candidate of one's choice is of the essence of a democratic society, and any restrictions on that right strike at the heart of representative government.'" *California*, 786 F. Supp. 3d at 393 (quoting *Reynolds v. Sims*, 377 U.S. 533, 555 (1964)).

### C. Plaintiffs' Claims Are Ripe.

Plaintiffs have already shown that their threatened injuries are "sufficiently 'imminent' to establish standing," satisfying "the constitutional requirements" of ripeness. *Nat'l Treasury Emps. Union v. United States*, 101 F.3d 1423, 1427–28 (D.C. Cir. 1996). On the "wholly prudential" hardship prong, *Roman Cath. Bishop of Springfield v. City of Springfield*, 724 F.3d 78, 90 (1st Cir.

2013) (citations omitted), the deprivation of constitutional rights and timing of upcoming elections support ripeness as well. "[D]enying prompt judicial review would impose a substantial hardship on" Plaintiffs due to the injuries they are already sustaining and the imminence of federal elections this year. *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 167–68 (2014). The Supreme Court has cautioned against "channel[ing] . . . election disputes to shortly before election day." *Bost v. Ill. State Bd. of Elections*, 146 S. Ct. 513, 521 (2026). Because election "officials must communicate to voters how, when, and where they may cast their ballots through in-person voting on election day, absentee voting, or early voting," such cases must be resolved before the election. *Democratic Nat'l Comm. v. Wisc. State Legis.*, 141 S. Ct. 28, 31 (2020) (Kavanaugh, J., concurring). Plaintiffs and all voters will face major hardships by delaying a decision that implicates these foundational voting rules.

### III.     The Balance of Equities and the Public Interest Weigh Heavily in Plaintiffs' Favor.

The balance of equities and the public interest also weigh heavily in Plaintiffs' favor. "The balance of equities and public interest factors 'merge when the Government is the party opposing the preliminary injunction.'" *California v. HHS*, 811 F. Supp. 3d 183, 213 (D. Mass. 2025) (citation omitted). The court "must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief," and it "should pay particular regard for the public consequences in employing the extraordinary remedy of injunction." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008) (citations omitted).

Denying an injunction will cause significant harm to both Plaintiffs and the public. *First*, an injunction preserves the ability for nonpartisan voter service organizations to conduct their core duties of registering eligible voters and helping voters who cannot vote in person access the ballot to ensure robust political participation in upcoming elections. Without an injunction, Plaintiffs will be "unable to assist many . . . voters through voter outreach efforts," *N.H. Youth Movement v.*

*Scanlan*, No. 24-cv-291-SE, 2026 WL 323171, at *8, 10 (D.N.H. Feb. 6, 2026); *see also LULAC*, 780 F. Supp. 3d at 189, harming Plaintiffs themselves as well as the public.

*Second*, injunctions that respect separation of powers and federal law serve the public interest. "[T]here is generally no public interest in the perpetuation of unlawful agency action." *Somerville Pub. Schs. v. McMahon*, 139 F.4th 63, 76 (1st Cir. 2025) (quoting *Newby*, 838 F.3d at 12); *see also Ass'n of Am. Univs. v. Nat'l Sci. Found.*, 788 F. Supp. 3d 106, 142 (D. Mass. 2025).

*Third*, "the public interest is served by protecting 'the fundamental political right to vote.'" *League of Women Voters of N.H.*, 2025 WL 3260024, at *5 (citations omitted); *see also Mancuso v. Taft*, 476 F.2d 187, 193 (1st Cir. 1973) (recognizing "the public interest in an unhampered, unconditioned vote"); *Newby*, 838 F.3d at 12 ("The public has a 'strong interest in exercising the fundamental political right to vote.'" (quoting *Purcell v. Gonzalez*, 549 U.S. 1, 4 (2006))). The Order directs USPS not to deliver the ballots of individuals who do not appear on a state-specific list generated by USPS; a harm that will be magnified in the likely event that USPS also does not transmit ballots to voters who are not on the inaccurate DHS State Citizenship Lists. This requirement, in practice, will have a significant disenfranchising effect. *See supra* Background, § IV. And because the requirements of the Order "make it substantially more difficult" for Plaintiffs to carry out the core work of assisting voters in registering and accessing the ballot, "the programmatic harm to [Plaintiffs] dovetails with the public interest." *Newby*, 838 F.3d at 12–13; *see supra* Argument § II.

Granting a preliminary injunction, however, would pose little to no hardship for Defendants or the public. *First*, as this Court has recognized, "[i]t is well established that the Government 'cannot suffer harm from an injunction that merely ends an unlawful practice.'" *Ass'n of Am. Universities*, 788 F. Supp. 3d at 142. This motion merely seeks to preserve the longstanding

29

status quo—a scenario that courts in this Circuit have repeatedly determined does not harm the government. *See, e.g.*, *Nat'l Educ. Ass'n v. U.S. Dep't of Educ.*, 779 F. Supp. 3d 149, 200–01 (D.N.H. 2025); *Tirrell v. Edelblut*, 747 F. Supp. 3d 310, 318–19 (D.N.H. 2024); *California*, 811 F. Supp. 3d. at 213. And while courts must consider that "the public and the government have a significant interest in the implementation of duly enacted statutes," *California*, 811 F. Supp. 3d. at 213, that consideration is inapplicable here, as there is no duly enacted statute and the government action is unmoored from constitutional or congressional authorization. *See supra* Argument § I. *Second*, an injunction poses no harm to USPS or its officers. If anything, an injunction benefits USPS Defendants by freeing them from, at least temporarily, the Order's imposition of significant burdens and its infringement on their autonomy as agents of an independent agency.

*Finally*, to the extent Defendants claim that the Executive Order furthers an interest in ensuring that only eligible voters are able to vote, there is no indication or evidence that the Order protects against voting by any ineligible person. The contemplated lists would be generated by agencies that have no relationship to or expertise in determining voter qualifications or eligibility. Indeed, the well-documented gaps in information held by the federal government and the flawed database matching that appears to undergird the Order's plans for determining eligibility, *see supra* Background § IV, make it much more likely that the outcome of the Order going into effect would be the disenfranchisement of eligible U.S. citizens.

## CONCLUSION

The Executive Order unlawfully directs USPS to abandon its role as a neutral mail carrier and take an active role in election administration. Because this causes immediate and irreparable harm to Plaintiffs and all citizens who vote by mail, preliminary relief is necessary.

Dated: April 23, 2026

Respectfully submitted,

/s/ Sophia Lin Lakin
Sophia Lin Lakin*
Theresa J. Lee*
Davin Rosborough*
Ethan Herenstein*
Jonathan Topaz*
Ming Cheung*
William Hughes*
Clayton Pierce*
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
125 Broad Street, 18th Floor
New York, NY 10004
(212) 549-2500
slakin@aclu.org
tlee@aclu.org
drosborough@aclu.org
eherenstein@aclu.org
jtopaz@aclu.org
mcheung@aclu.org
whughes@aclu.org
cpierce@aclu.org

Jessie J. Rossman (BBO #670685)
Suzanne Schlossberg (BBO #703914)
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION OF MASSACHUSETTS,
INC.
One Center Plaza, Suite 850
Boston, MA 02108
(617) 482-3170
jrossman@aclum.org
sschlossberg@aclum.org

Eliza Sweren-Becker*
Wendy Weiser*
Andrew B. Garber*
BRENNAN CENTER FOR JUSTICE AT
NYU SCHOOL OF LAW
120 Broadway, Suite 1750
New York, NY 10271
(646) 292-8310
sweren-beckere@brennan.law.nyu.edu
weiserw@brennan.law.nyu.edu
garbera@brennan.law.nyu.edu

Justin Lam*
BRENNAN CENTER FOR JUSTICE AT
NYU SCHOOL OF LAW
777 6th Street NW, Suite 1100
Washington, DC 20001
(202) 249-7190
lamju@brennan.law.nyu.edu

Niyati Shah*
Noah Baron*
Ejaz Baluch, Jr.*
ASIAN AMERICANS ADVANCING
JUSTICE-AAJC
1620 L Street NW, Suite 1050
Washington, DC 20036
(202) 296-2300
nshah@advancingjustice-aajc.org
nbaron@advancingjustice-aajc.org
ebaluch@advancingjustice-aajc.org

Sarah Brannon*
Adriel I. Cepeda Derieux*
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
915 15th Street NW
Washington, DC 20001
(202) 457-0800
sbrannon@aclu.org
acepedaderieux@aclu.org

Leah C. Aden*
Brenda Wright*
John S. Cusick*
NAACP LEGAL DEFENSE &
EDUCATIONAL FUND, INC.
40 Rector Street, 5th Floor
New York, NY 10006
(212) 965-2200
laden@naacpldf.org
bwright@naacpldf.org
jcusick@naacpldf.org

31

Miranda Galindo*
Latino Justice PRLDEF
475 Riverside Drive, Suite 1901
New York, NY 10115
(212) 392-4752
mgalindo@latinojustice.org

I. Sara Rohani*
NAACP LEGAL DEFENSE &
EDUCATIONAL FUND, INC.
700 14th Street NW, Suite 600
Washington, DC 20005
(202) 682-1300
srohani@naacpldf.org


*Admitted pro hac vice

*Counsel for Plaintiffs League of Women
Voters of Massachusetts, League of Women
Voters Lotte E. Scharfman Memorial
Education Fund, League of Women Voters of
the United States, League of Women Voters
Education Fund, Association of Americans
Resident Overseas, U.S. Vote Foundation,
OCA-Asian Pacific American Advocates, and
Delta Sigma Theta Sorority, Inc.*

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on April 23, 2026, a true copy of the above document was filed via the

Court's CM/ECF system and that a copy will be sent automatically to all counsel of record.

April 23, 2026                                          /s/ *Sophia Lin Lakin*
                                                       Sophia Lin Lakin

33