# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| LEAGUE OF WOMEN VOTERS OF MASSACHUSETTS, *et al.*, | |
| *Plaintiffs*, | |
| v. | Case No. 1:26-cv-11549-IT |
| DONALD J. TRUMP, in his official capacity as President of the United States, *et al.*, | |
| *Defendants*, | |
| STATE OF MISSOURI, STATE OF ALABAMA, STATE OF FLORIDA, STATE OF INDIANA, STATE OF KANSAS, STATE OF LOUISIANA, STATE OF MONTANA, STATE OF NEBRASKA, STATE OF OKLAHOMA, STATE OF SOUTH CAROLINA, STATE OF SOUTH DAKOTA, and STATE OF TEXAS, | |
| *Intervenor Defendants*. | |

## MEMORANDUM OF LAW IN SUPPORT OF INTERVENER STATES' MOTION TO DISMISS AND OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................................................iii

INTRODUCTION.......................................................................................................................... 1

BACKGROUND ............................................................................................................................ 1

ARGUMENT.................................................................................................................................. 3

    I.     **Plaintiffs' Challenges to Section 2 of the Executive Order Should Be Dismissed** ........................................................................................................................3

        A.  **Plaintiffs lack standing to challenge Section 2 of the Executive Order** ..................3

        B.  **Plaintiffs' challenges to Section 2 are not ripe** ........................................................9

        C.  **Plaintiffs lack a cause of action to challenge Section 2 under the APA** ................10

    II.    **Plaintiffs Are Not Entitled to a Preliminary Injunction and Their Challenges to Section 3 Should Be Dismissed**.........................................................................................12

        A.  **Plaintiffs Lack Standing to Challenge Section 3** ........................................................12

        B.  **Plaintiffs' challenges to Section 3 are not ripe** ..........................................................14

        C.  **Plaintiffs cannot show irreparable harm from Section 3** .........................................16

        D.  **Plaintiffs are unlikely to succeed in showing that the President cannot direct USPS to engage in rulemaking** ........................................................................................17

    CONCLUSION ............................................................................................................................ 20

# TABLE OF AUTHORITIES

**Cases**

*Alexander v. Sandoval,*
    532 U.S. 275 (2001) ........................................................................................ 12

*Allen v. Wright,*
    468 U.S. 737 (1984) ................................................................................. 1, 3, 5

*Am. Petroleum Inst. v. E.P.A.,*
    683 F.3d 382 (D.C. Cir. 2012) .......................................................................... 15

*Ass'n of Am. Physicians & Surgeons, Inc. v. Sebelius,*
    901 F. Supp. 2d 19 (D.D.C. 2012) ...................................................................... 5

*Babbitt v. United Farm Workers Nat. Union,*
    442 U.S. 289 (1979) ........................................................................................ 13

*Bennett v. Spear,*
    520 U.S. 154 (1997) ........................................................................................ 10

*Bost v. Ill. State Bd. of Elections,*
    146 S. Ct. 513 (2026) ...................................................................................... 16

*Carney v. Adams,*
    592 U.S. 53 (2020) ............................................................................................ 9

*Center for Democracy & Technology v. Trump,*
    507 F. Supp. 3d 213 (D.D.C. 2020) ................................................................... 11

*Church v. Biden,*
    573 F. Supp. 3d 118 (D.D.C. 2021) ................................................................... 16

*City of Fall River, Mass. v. FERC,*
    507 F.3d 1 (1st Cir. 2007) ................................................................................. 14

*Clapper v. Amnesty Int'l USA,*
    568 U.S. 398 (2013) .......................................................................................... 4

*Cohen v. Rice,*
    992 F.2d 376 (1st Cir. 1993) ............................................................................. 11

*Common Cause v. Trump*,
  506 F. Supp. 3d 39 (D.D.C. 2020)........................................................................ 15

*Conn. Fair Hous. Ctr. v. CoreLogic Rental Prop. Sols., LLC*,
  167 F.4th 605 (2d Cir. 2026) ................................................................................ 8

*Democratic Nat'l Comm. v. Wisc. State*,
  *Legis.*, 141 S. Ct. 28 (2020).............................................................................. 16

*Finca Santa Elena, Inc. v. U.S. Army Corps of Eng'rs*,
  873 F. Supp. 2d 363 (D.D.C. 2012)..................................................................... 16

*Food and Drug Administration v. Alliance for Hippocratic Medicine*,
  602 U.S. 367 (2024) ......................................................................................... 8, 9

*Frank Martin Sons, Inc. v. John Deere Const. & Forestry Co.*,
  542 F. Supp. 2d 101 (D. Me. 2008)..................................................................... 17

*Franklin v. Massachusetts*,
  505 U.S. 788 (1992) .............................................................................. 11, 17, 18

*Frazier v. Fairhaven Sch. Comm.*,
  276 F.3d 52 (1st Cir. 2002) ................................................................................ 12

*Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*,
  561 U.S. 477 (2010) ..................................................................................... 18, 19

*Humphrey's Executor v. United States*,
  295 U.S. 602 (1935) ........................................................................................... 19

*In re Murray Energy Corp.*,
  788 F.3d 330 (D.C. Cir. 2015)....................................................................... 11, 15

*Kennedy v. Braidwood Mgmt., Inc.*,
  606 U.S. 748 (2025) ..................................................................................... 17, 18

*LULAC v. Exec. Off. of President*,
  808 F. Supp. 3d 29 (D.D.C. 2025)....................................................................... 11

*Matos ex rel. Matos v. Clinton Sch. Dist.*,
  367 F.3d 68 (1st Cir. 2004) ................................................................................ 16

iv

*Myers v. United States*,
  272 U.S. 52 (1926) ............................................................................................ 19, 20

*Nat'l Park Hospitality Ass'n v. Dep't of the Interior*,
  538 U.S. 803 (2003) ................................................................................................ 14

*New Hampshire Indonesian Cmty. Support v. Trump*,
  157 F.4th 29 (1st Cir. 2025) ................................................................................... 17

*New Hampshire v. Maine*,
  532 U.S. 742 (2001) .................................................................................................. 7

*Nixon v. Fitzgerald*,
  457 U.S. 731 (1982) ................................................................................................ 17

*Public Citizen, Inc. v. Nat'l Highway Traffic Safety Admin.*,
  489 F.3d 1279 (D.C. Cir. 2007) ............................................................................. 4, 5

*Reno v. Catholic Soc. Servs., Inc.*,
  509 U.S. 43 (1993) .................................................................................................. 14

*Republican Nat'l Comm. v. Aguilar*,
  No. 2:24-CV-00518-CDS-MDC, 2024 WL 4529358 (D. Nev. Oct. 18, 2024) ......................... 9

*Roe v. Healey*,
  78 F.4th 11 (1st Cir. 2023) ........................................................................................ 3

*Seila L. LLC v. Consumer Fin. Prot. Bureau*,
  591 U.S. 197 (2020) ................................................................................................ 20

*Simon v. E. Ky. Welfare Rts. Org.*,
  426 U.S. 26 (1976) .................................................................................................... 1

*Steel Co. v. Citizens for a Better Env't*,
  523 U.S. 83 (1998) .................................................................................................... 3

*Strong Communities Found. of Arizona Inc. v. Richer*,
  No. CV-24-02030-PHX-KML, 2024 WL 4475248 (D. Ariz. Oct. 11, 2024) ........................ 9

*Susan B. Anthony List v. Driehaus*,
  573 U.S. 149 (2014) ................................................................................................ 16

*Texas v. United States,*
  523 U.S. 296 (1998) ..................................................................................................... 9

*TransUnion LLC v. Ramirez,*
  594 U.S. 413 (2021) .................................................................................................. 6, 7

*Trump v. New York,*
  592 U.S. 125 (2020) ...................................................................................... 6, 10, 12, 13

*Trump v. Slaughter,*
  146 S. Ct. 18 (2025)..................................................................................................... 19

*U.S. Postal Serv. v. Flamingo Indus. (USA) Ltd.,*
  540 U.S. 736 (2004) .................................................................................................... 20

*United States v. Arthrex, Inc.,*
  594 U.S. 1 (2021) ........................................................................................................ 19

*United States v. Chem. Found.,*
  272 U.S. 1 (1926) ........................................................................................................ 15

*W.R. Grace & Co. v. EPA,*
  959 F.2d 360 (1st Cir. 1992) ....................................................................................... 14

**Constitutional Provisions**

U.S. Const. art. II .............................................................................................................. 2

U.S. Const. art. II, § 1, cl. 1 ............................................................................................ 18

U.S. Const. art. II, § 3 ..................................................................................................... 18

**Statutes**

5 U.S.C. § 704.................................................................................................................. 15

18 U.S.C. 2(a) .......................................................................................................... 2, 4, 5, 6

18 U.S.C. 241 .................................................................................................................... 2

18 U.S.C. 371 .................................................................................................................... 2

18 U.S.C. 611(a) ............................................................................................................... 2

18 U.S.C. 1001 ......................................................................................................................... 2

18 U.S.C. 1015 ......................................................................................................................... 2

39 U.S.C. § 202 ..................................................................................................................... 18

39 U.S.C. § 401 ............................................................................................................ 2, 15, 18

39 U.S.C. § 501–502 ............................................................................................................ 18

52 U.S.C. 10307 ....................................................................................................................... 2

52 U.S.C. 20511 ....................................................................................................................... 2

52 U.S.C. § 20508(b)(2) .......................................................................................................... 7

Mo. Rev. Stat. § 115.155 ......................................................................................................... 7

**INTRODUCTION**

The Court should reject Plaintiffs' motion for a preliminary injunction and dismiss their claims.[1]  Fundamentally, Plaintiffs' claims are all premature.  There is no final agency action in this case, and Plaintiffs therefore do not even know what they are challenging.  *See, e.g.*, Doc. 1, LWV Compl. ¶ 149 ("The Executive Order provides no further explanation as to what this enrollment process will look like, or how USPS should determine which of its users are entitled to mail their ballots.").  Plaintiffs therefore lack standing and a cause of action to pursue their claims.  That defect infects all of Plaintiffs' claims, which rest on extensive speculation about what final agency actions the EO will lead to and how those actions might be implemented by independent third parties not before the Court.  *Allen v. Wright*, 468 U.S. 737, 757 (1984) (holding that plaintiffs did not have standing where the injury was "highly indirect and 'results from the independent action of some third party not before the court'") (quoting *Simon v. E. Ky. Welfare Rts. Org.*, 426 U.S. 26, 42 (1976)).  The prudential ripeness doctrine also strongly counsels against considering Plaintiffs' constitutional arguments before final agency actions exist.  And finally, Plaintiffs offer no viable statutory authority for their proposed injunctive relief—which would effectively bar the President from ordering a federal agency to initiate rulemaking.  Even if they could, such a statute would violate Article II of the Constitution by intruding on the President's ability to supervise the Executive Branch.

**BACKGROUND**

On March 31, 2026, President Trump issued Executive Order No. 14399, *Ensuring Citizenship Verification and Integrity in Federal Elections*.  The EO recognized the President's

---

[1] Plaintiffs only move to preliminarily enjoin Section 3 of the EO.  Doc. 73.  Intervener States oppose this motion and move to dismiss Plaintiffs' challenges to Sections 2 and 3.

"duty under Article II of the Constitution of the United States to enforce Federal law, which includes preventing violations of Federal criminal law and maintaining public confidence in election outcomes." EO § 1. The EO furthers these ends in three main ways.

First, Section 2(a) of the EO directs federal agencies to create a "State Citizenship List" and to transmit the list to "State election officials." EO § 2(a). The State Citizenship List is simply a list of a State's potentially lawful voters—"individuals confirmed to be United States citizens who will be above the age of 18 at the time of an upcoming Federal election and who maintain a residence in the subject State." *Id.* Under the EO, federal agencies must give States the option "to routinely supplement and provide suggested modifications or amendments to the State Citizenship List" and must allow individuals "to access their individual records as well as to update or correct them in advance of elections." *Id.*

Second, Section 2(b) of the EO directs the Attorney General to "prioritize the investigation" and "prosecution of State and local officials or any others involved in the administration of Federal elections who issue Federal ballots to individuals not eligible to vote in a Federal election, including under 18 U.S.C. 2(a), 18 U.S.C. 241, 18 U.S.C. 371, 18 U.S.C. 611(a), 18 U.S.C. 1001, 18 U.S.C. 1015, 52 U.S.C. 10307, and 52 U.S.C. 20511." *Id.* § 2(b).

Third, Section 3 of the EO requires the U.S. Postal Service to initiate rulemaking under 39 U.S.C. § 401 and other applicable authority to enhance the security mail-in and absentee ballots. *Id.* § 3(b). Section 3(b)(i) provides that "Official Election Mail" shall bear tracking barcodes, which are already ubiquitous for other kinds of mail. Section 3(b)(ii) provides that States "may choose" to provide the USPS "a list of voters eligible to vote" absentee. Section 3(b)(iii) then provides that the USPS "shall not transmit" absentee ballots from unidentified individuals. Section 3(b)(iv) requires the USPS to create a process by which each State receives "a list of individuals

2

. . . for mail-in or absentee ballots provided by such State, along with unique ballot envelope identifiers." The EO also provides that the preparation and transmission of these lists "shall comply with the Privacy Act and all applicable use agreements." EO § 3(b)(iv). Section 3(b)(v) then directs the creation of "procedures enabling each State to routinely supplement and provide suggested modifications or amendments to the State's Mail-In and Absentee Participation List in advance of any Federal election, consistent with applicable State law." Finally, Section 3(d) provides, "Any final rule pursuant to this section shall be issued no later than 120 days from the date of this order." As of the date of this filing, Intervener States are not aware of proposed or final rules for implementing Sections 2 and 3 that have been published.

Plaintiffs sued, challenging the EO almost immediately after it was issued. *See* LWV Compl. (filed April 2, 2026). On April 23, 2026, Plaintiffs moved for a preliminary injunction. Doc. 74.

## **ARGUMENT**

I. **Plaintiffs' Challenges to Section 2 of the Executive Order Should Be Dismissed.**

A. **Plaintiffs lack standing to challenge Section 2 of the Executive Order.**

To establish Article III standing, Plaintiffs must plausibly allege that they suffered a cognizable injury fairly traceable to Defendants, and that the injury is likely to be redressed by a favorable judicial decision. *See Allen,* 468 U.S. at 751. Also, because Plaintiffs seek "forward-looking" relief, they must show they are suffering an ongoing injury or face an immediate threat of injury. *Roe v. Healey*, 78 F.4th 11, 20–21 (1st Cir. 2023). Plaintiffs cannot show either of these.

1. Plaintiffs' alleged harms to voters are speculative and not traceable to Section 2.

To establish standing, Plaintiffs must prove an "injury in fact"—a harm suffered by the plaintiff that is "concrete" and "actual or imminent, not 'conjectural' or 'hypothetical.'" *Steel Co.*

3

*v. Citizens for a Better Env't*, 523 U.S. 83, 103 (1998) (citations omitted).  The threatened injury must be "certainly impending."  *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409–10, 414 n.5 (2013).  A "reasonable likelihood" of future harm is insufficient.  *Id.*

Applying these principles here, Plaintiffs lack standing to challenge Section 2(a).  Plaintiffs allege that Section 2 could "risk[] erroneous disenfranchisement of eligible voters."  LWV ¶ 203.  But that standing theory impermissibly rests upon several layers of speculation.

The first layer of speculation focuses on the allegation that the State Citizenship List will be inaccurate because the SAVE database is purportedly incomplete.  *See* LWV Compl. ¶¶ 99, 202.  But *even* assuming the SAVE database has inaccuracies, Section 2(a) makes clear that the Lists will be based on *other* sources of information, including "Federal citizenship and naturalization records, SSA records, SAVE data, and other relevant Federal databases."  EO § 2(a).  Plaintiffs do not know what these other databases are.  Thus, without knowing all the sources that federal agencies will use, it is completely speculative for Plaintiffs to suggest that the State Citizenship Lists will contain inaccurate data.  At best, Plaintiffs offer a conjectural assertion of an "increase[d] … risk" of inaccuracy, *id.*, which is insufficient.  *See Public Citizen, Inc. v. Nat'l Highway Traffic Safety Admin.*, 489 F.3d 1279, 1297–98 (D.C. Cir. 2007) ("'increased risk' is" not by "itself [a] concrete, particularized, and actual injury for standing purposes"—harm must be "actual" or "imminent," not merely "increased").

Also, even if the Lists do contain some errors, States may "routinely supplement and provide suggested modifications or amendments to the State Citizenship List."  EO § 2(a).  This is another safeguard against mistakes.  Section 2(a) also explicitly states that "[a]n individual's identification on the State Citizenship List does not indicate that the individual has been properly registered to vote in the State."  *Id.*  State and Federal laws and State procedures must still be

4

followed for an individual to be registered to vote." *Id.* Plaintiffs' claimed injury thus assumes that the federal government and States will not collaborate to produce accurate Lists.

The next level of speculation is that States will use the State Citizenship Lists to prevent voters from receiving ballots. However, fatally for Plaintiffs' standing, use of the Lists by the States is *optional*. EO § 2(a). Plaintiffs' proposed injury thus depends on the independent actions of "third part[ies] not before the court." *Allen*, 468 U.S. at 757. Even if States do use the Lists, Plaintiffs' implicit assumption that States will automatically exclude registered voters whose names do not appear on the Lists is implausible. Instead, the List will merely signal a need for verification that a given registered voter is, in fact, a U.S. Citizen and over eighteen years old. In other words, States will not remove voters from the voter registration rules without employing proper, independent verifications.

Notwithstanding all this speculation, Plaintiffs cannot plausibly allege causation or redressability—because other, unchallenged federal programs already provide citizenship data to the States. States already receive this information from the federal government through the Systematic Alien Verification for Entitlements (SAVE) program, which enables them to verify that those registering to vote are eligible. *See USCIS Enhances Voter Verification Systems* (Nov. 3, 2025).[2] The program is administered by USCIS and already must comply with the Privacy Act. Much of the information at issue here is already disclosed to the States; the fact that Section 2 could result in the same information being provided in a more streamlined fashion cannot cause the injury Plaintiffs allege, and invalidating Section 2 cannot redress it. *See Ass'n of Am. Physicians & Surgeons, Inc. v. Sebelius,* 901 F. Supp. 2d 19, 42 (D.D.C. 2012) (finding that relief from challenged agency action was not redressable where "any injuries to referring physicians that

---

[2] https://www.uscis.gov/newsroom/news-releases/uscis-enhances-voter-verification-systems

result from the opt-out requirement are caused by statutes and regulations that pre-date the agency actions plaintiffs[] challenge.").

2. Plaintiffs' alleged privacy injuries are unripe and insufficient for standing.

Plaintiffs also suggest that the transmission of the State Citizenship List to the States violates the Privacy Act of 1974 and therefore injures them. LWV Compl. ¶¶ 185–205. This theory of injury suffers from several problems. *First*, like the disenfranchisement theory discussed above, the alleged injury resulting from the purported violation of the Privacy Act is speculative because no federal agency has yet taken any final action in response to Section 2 of the EO. Also, DHS and SSA have not yet made any known determinations about how they will create the State Citizenship List in compliance with the Privacy Act and other applicable law. Section 2(a), in fact, explicitly makes the creation of the List contingent on the List being "feasible and consistent with applicable law, including but not limited to the Privacy Act of 1974." EO § 2(a); *see Trump v. New York*, 592 U.S. 125, 131 (2020) (rejecting judicial review of presidential directive because challenge was "riddled with contingencies and speculation" where directive was qualified being "feasible" and "practicable"). In light of the EO's explicit mandate to comply with the Privacy Act, any alleged harm due to a Privacy Act violation is highly speculative at best.

*Second*, Plaintiffs offer no precedent suggesting that the sharing of voter information between different parts of the American government constitutes a cognizable injury. Plaintiffs must "identif[y] a close historical or common-law analogue for their asserted injury." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 424 (2021). For standing purposes, therefore, "an important difference exists between (i) a plaintiff's statutory cause of action to sue a defendant over the defendant's violation of federal law, and (ii) a plaintiff's suffering concrete harm because of the defendant's violation of federal law." *Id.* at 426–27. In this case, Plaintiffs allege that they would

6

be injured by federal dissemination of a list of United States citizens to state governments.  But there is no historical or common-law analogue for the notion that citizens may be injured by their own State receiving basic information from the federal government.  *See id.* at 424–25.  Plaintiffs have thus failed to meet their burden of pleading a cognizable injury.  *See id.*

*Third*, Plaintiffs allege no cognizable privacy injury because, by registering to vote, they (or their members) already disclosed personal information and made representations to the States about their citizenship status and eligibility to vote.  Of course, individuals eligible to vote must register with their State and, in doing so, must generally attest that they are United States citizens and are or will be aged 18 or older at the time of the next election.  *See, e.g.*, Mo. Rev. Stat. § 115.155; *see also* 52 U.S.C. § 20508(b)(2) ("The mail voter registration form . . .  shall include a statement that—(A) specifies each eligibility requirement (including citizenship); [and] (B) contains an attestation that the applicant meets each such requirement . . . .").  Thus, it is hard to see how Plaintiffs can complain about citizenship status being shared with the States when they already must provide that information to States in order to vote.  *See New Hampshire v. Maine*, 532 U.S. 742, 750 (2001) (Courts estop parties from "deliberately changing positions according to the exigencies of the moment." (citation omitted)).

Finally, once again, Plaintiffs cannot plausibly allege causation or redressability—because other, unchallenged federal programs already provide citizenship data to the States.  *See supra*, Section I.A.1.

### 3.  <u>Plaintiffs' alleged diversion of resources does not confer standing.</u>

Plaintiffs also complain that the EO will force them to divert resources to educating voters about the State Citizenship Lists and away from their "core activities."  *See, e.g.*, LWV Compl. ¶ 112; Doc. 74, LWV Br. at 25.  This allegation does not create Article III standing.

Notably, the Supreme Court recently rejected resource-diversion standing in *Alliance for Hippocratic Medicine*, 602 U.S. at 394. *See also Conn. Fair Hous. Ctr. v. CoreLogic Rental Prop. Sols., LLC*, 167 F.4th 605, 618 (2d Cir. 2026) (holding that a "diversion of resources" theory "does not work to demonstrate standing" after *Alliance for Hippocratic Medicine*) (quoting *All. for Hippocratic Med.*, 602 U.S. at 394). As the Supreme Court explained, "an organization that has not suffered a concrete injury caused by a defendant's action cannot spend its way into standing simply by expending money to gather information and advocate against the defendant's action." *All. for Hippocratic Med.*, 602 U.S. at 394. If that were enough, it "would mean that all the organizations in America would have standing to challenge almost every federal policy that they dislike, provided they spend a single dollar opposing those policies." *Id.* at 395. Accordingly, "Article III standing screens out plaintiffs who might have only a general legal, moral, ideological, or policy objection to a particular government action." *Id.* at 381.

Here, Plaintiffs point to expended resources devoted to provide "education to voters about these changes and the new process." LWV Compl. ¶ 112. But that is nearly identical to the standing allegations found insufficient by the Supreme Court in *Alliance for Hippocratic Medicine*. *Compare* 602 U.S. at 394 ("The medical associations say that they have demonstrated something more here. They claim to have standing not based on their mere disagreement with FDA's policies, but based on their incurring costs to oppose FDA's actions. They say that FDA has 'caused' the associations to conduct their own studies on mifepristone so that the associations can better inform their members and the public about mifepristone's risks. They contend that FDA has 'forced' the associations to 'expend considerable time, energy, and resources' drafting citizen petitions to FDA, as well as engaging in public advocacy and public education. And all of that has caused the associations to spend 'considerable resources' to the detriment of other spending priorities. But . .

8

. [a]n organization cannot manufacture its own standing in that way." (citations omitted)). Like in *Alliance for Hippocratic Medicine* where plaintiffs challenged FDA regulations that permitted *others* to prescribe mifepristone but did not implicate the plaintiffs' own practices, so too here; *nothing* in the EO prevents Defendants from continuing to educate and mobilize voters. *Cf. Strong Communities Found. of Arizona Inc. v. Richer*, No. CV-24-02030-PHX-KML, 2024 WL 4475248, at *9 (D. Ariz. Oct. 11, 2024) (plaintiff "must show that a challenged governmental action directly injures the organization's pre-existing core activities and does so *apart* from the plaintiffs' response to that governmental action" (cleaned up)); *Republican Nat'l Comm. v. Aguilar*, No. 2:24-CV-00518-CDS-MDC, 2024 WL 4529358, at *7 (D. Nev. Oct. 18, 2024) ("[V]ague allegations of shifting resources," where plaintiff shifted "some resources from one set of pre-existing activities in support of their overall mission to another, new set of such activities," "fail[ed] to provide the court any information regarding what or which resources the organizational plaintiffs have needed to shift." (cleaned up)). Plaintiffs' resource-diversion theory is therefore foreclosed by Supreme Court precedent.

### B. Plaintiffs' challenges to Section 2 are not ripe.

The ripeness doctrine also precludes consideration of Plaintiffs' challenges to Section 2. In addition to showing that "an injury that is concrete, particularized, and imminent rather than conjectural or hypothetical," *Carney v. Adams*, 592 U.S. 53, 60 (2020) (quotations omitted), Plaintiffs must show that the case is "ripe"—that is, not dependent on "contingent future events that may not occur as anticipated, or indeed may not occur at all." *Texas v. United States*, 523 U.S. 296, 300 (1998).

This case is riddled with contingencies and speculation that impede judicial review. Crucially, it is unknown whether the State Citizenship Lists will even be created, let alone the how

9

it will be done, as Section 2(a) qualifies its directive to the Secretary of Homeland Security that it shall compile and transmit the lists "[t]o the extent feasible and consistent with applicable law." The Department of Homeland Security must therefore first assess whether it is feasible to create the State Citizenship Lists and, if it is, how it can do so in accordance with applicable law.  The Supreme Court has held that an identical condition in an executive order rendered a challenge to it unripe for judicial intervention.  *See Trump v. New York*, 592 U.S. 125, 131 (2020) (rejecting judicial review of presidential where directive was qualified being "feasible" and "practicable").  Indeed, where "the President qualified his directive by providing that the Secretary should gather information 'to the extent practicable' and take action 'to the extent feasible,'" "[a]ny prediction how the Executive Branch might eventually implement this general statement of policy is 'no more than conjecture' at this time."  *Id.*  Like the executive order in *Trump v. New York*, Section 2(a) "may not prove feasible to implement in any manner whatsoever, let alone in a manner substantially likely to harm any of the plaintiffs here."  *Id.* at 132.  Until the Secretary makes these determinations, judicial resolution of this dispute is premature.

### C. Plaintiffs lack a cause of action to challenge Section 2 under the APA.

Plaintiffs allege that Section 2 violates the Privacy Act of 1974.  *See* LWV Compl. ¶¶ 185–205.  However, the APA does not permit this challenge because there has been no final agency action.  Plaintiffs' claims that the qualified directive in Section 2 itself is "final" is rebutted by the Executive Order's express language and controlling precedent.

An agency action is "final" and judicially reviewable when it: (1) "mark[s] the 'consummation' of the agency's decisionmaking process" and (2) is an action "by which 'rights or obligations have been determined,' or from which 'legal consequences will flow.'"  *Bennett v. Spear*, 520 U.S. 154, 178 (1997) (cleaned up).  Importantly, "[p]roposed rules meet neither of

the[se] two requirements for final agency action." *In re Murray Energy Corp.*, 788 F.3d 330, 334 (D.C. Cir. 2015). Thus, notices of rulemaking are not final agency actions. *See id.* For example, in *Center for Democracy & Technology v. Trump*, a challenge to an executive order was dismissed on ripeness grounds because the order "merely direct[ed] government officials to take *initial* steps in government processes that might (but may not) *eventually* lead to law governing private parties." 507 F. Supp. 3d 213, 217 (D.D.C. 2020). Under this framework, Section 2(a) is far from "final."

An executive order is also in itself not a final agency action because the President is not an "agency" under the APA. *Franklin v. Massachusetts*, 505 U.S. 788, 796–801 (1992); *see also Cohen v. Rice*, 992 F.2d 376, 382 (1st Cir. 1993) (holding that a presidential commission's actions could not constitute final agency action). Here, as in *Franklin*, "the final action complained of is that of the President, and the President is not an agency within the meaning of the Act. Accordingly, there is no final agency action that may be reviewed under the APA standards." *Id.*; *accord LULAC v. Exec. Off. of President*, 808 F. Supp. 3d 29, 69 (D.D.C. 2025) (agreeing).

Even if the President could be treated as agency under the APA, the express terms of Section 2(a), specifically the first phase, preclude a finding of final agency action: "To the extent feasible and consistent with applicable law, including but not limited to the Privacy Act of 1974 . . ." EO § 2(a). By its plain terms, the State Citizenship List is not "mandatory" but rather contingent on a subsequent decision that the List being both feasible and assembled lawfully, including under the very Act that Plaintiffs claim will be violated. Critically, the EO is only a month old, and it remains to be seen if and how DHS and SSA will create and transmit the State Citizenship List. Section 2's qualifying language and the absence of a decision concerning whether and how the State Citizenship Lists will be created accordingly render Plaintiffs' cited authority inapposite.

11

Without the APA, Plaintiffs do not have a cause of action under the Privacy Act and, in turn, cannot be granted injunctive relief.  Indeed, Plaintiffs fail to cite a single cause of action— aside from the APA—that allows them to enforce the Privacy Act.  And, without an applicable cause of action, Plaintiffs lack authority to sue under federal statutes. *See Alexander v. Sandoval*, 532 U.S. 275, 286–87 (2001) ("Without [congressional authorization], a cause of action does not exist and courts may not create one, no matter how desirable that might be as a policy matter, or how compatible with the statute."); *Frazier v. Fairhaven Sch. Comm.*, 276 F.3d 52, 68 (1st Cir. 2002) (similar).  Plaintiffs therefore do not have a cause of action to challenge.

## II.    Plaintiffs Are Not Entitled to a Preliminary Injunction and Their Challenges to Section 3 Should Be Dismissed.

### A.  Plaintiffs Lack Standing to Challenge Section 3.

Section 3 directs the United States Postal Service to *initiate* rulemaking procedures for a rule requiring ballots to be mailed in officially marked envelopes that bear tracking codes.  EO § 3(b)(i).  Any forthcoming rule shall also provide for a "State-specific Mail-In and Absentee Participation List" "that the USPS shall provide each State with a list of individuals . . . who are enrolled with the USPS . . . for mail-in or absentee ballots provided by such State." *Id.* § 3(b)(iv). Additionally, the forthcoming rule shall provide that States "may choose" to provide the USPS "a list of voters eligible to vote" absentee. *Id.* § 3(b)(ii).  Finally, under the EO, the forthcoming rule shall provide that the USPS may "not transmit" absentee ballots from unidentified individuals who are not enrolled "on a State-specific list." *Id.* § 3(b)(iii).

To have standing, a challenged policy must be sufficiently concrete to assess whether a threatened injury is imminent. *See New York*, 592 U.S. at 131–32.  Here, that is impossible because a notice of proposed rulemaking has not even been issued yet—much less a final rule. *Cf. id*. Plaintiffs even admit that they are uncertain about what a potential USPS rule would provide for,

12

stating that "[t]he Executive Order provides no further explanation as to what this enrollment process will look like, or how USPS should determine which of its users are entitled to mail their ballots." LWV Compl. ¶ 149.  At best, they claim that the EO "*appears* to condition USPS's ballot transmission on voters' appearance on the DHS State Citizenship Lists."  LWV Br. 14 (emphasis added).  This is pure conjecture and is not stated anywhere in the EO.  Without knowledge of even the basic contours of the USPS's forthcoming rule, Plaintiffs lack standing to challenge Section 3. *See New York*, 592 U.S. at 131–32 (denying the plaintiffs standing because "[a]ny prediction how the Executive Branch might eventually implement [executive order] is 'no more than conjecture' at this time") (citations omitted).

Unable to articulate what they are challenging, Plaintiffs fail to articulate a concrete injury caused by Section 3.  Plaintiffs claim that Section 3 will prevent eligible voters from voting.  *See* LWV Br. at 26–27.  But Section 3 simply directs to the USPS to initiate rulemaking—it does not regulate States or private organizations directly and it does not directly inhibit *anyone*'s voting rights.  Thus, Plaintiffs' alleged injury is speculative and not sufficiently traceable to Section 3 because Plaintiffs are not regulated by the EO.  *See Babbitt v. United Farm Workers Nat. Union*, 442 U.S. 289, 298 (1979) (To challenge a statute prospectively, Plaintiffs must allege "an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute.").  Plaintiffs also claim that the EO will cause "uncertainty" resulting in organizational plaintiffs facing goodwill and reputational injury from loss of public trust.  *See* LWV Br. at 24; *see also id.* at 23 (claiming EO will "cast even greater doubt over the viability of mail voting").  This theory is likewise extraordinarily speculative and not fairly traceable to the EO.

**B.  Plaintiffs' challenges to Section 3 are not ripe.**

Alternatively, even if this Court finds that Plaintiffs have standing, the Court should reject their challenges to Section 3 as prudentially unripe. *See Nat'l Park Hospitality Ass'n v. Dep't of the Interior*, 538 U.S. 803, 807–08 (2003) (quoting *Reno v. Catholic Soc. Servs., Inc.*, 509 U.S. 43, 57 n.18 (1993)) ("Ripeness is a justiciability doctrine" that is "'drawn both from Article III limitations on judicial power and from prudential reasons for refusing to exercise jurisdiction.'"). "[P]remature review not only can involve judges in deciding issues in a context not sufficiently concrete to allow for focus and intelligent analysis, but it also can involve them in deciding issues unnecessarily, wasting time and effort." *W.R. Grace & Co. v. EPA,* 959 F.2d 360, 366 (1st Cir. 1992) (internal quotation omitted). This principle "prevent[s] the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements." *Nat'l Park Hosp. Ass'n*, 538 U.S. at 807 (citation omitted). To determine whether a claim satisfies prudential ripeness, courts consider: (1) the "fitness of the issues for judicial decision"; and (2) the "hardship to the parties of withholding court consideration." *City of Fall River, Mass. v. FERC*, 507 F.3d 1, 6 (1st Cir. 2007) (internal quotation omitted). Assessing whether an issue is "fit" for adjudication requires courts to consider "whether the issue presented is purely legal, as opposed to factual, and the degree to which any challenged agency action is final." *W.R. Grace & Co.*, 959 F.2d at 364.

Plaintiffs fail to establish the first prong for prudential ripeness because no concrete legal dispute fit for adjudication exists here. At the outset, Section 3 provides a broad outline of what the USPS regulation will include, but the administrative process remains ongoing and the processes for implementing the EO have not yet been published. *See* EO § 3(b)(iv) (directing "[p]roposed provisions specifying that the USPS shall provide each State with a list of individuals (Mail-In and Absentee Participation List) who are enrolled with the USPS, *pursuant to a process specified in the rulemaking directed by this subsection*" (emphasis added)); *id.* § 3(b)(v) (directing

unspecified "procedures enabling each State to routinely supplement and provide suggested modifications or amendments to the State's Mail-In and Absentee Participation List"). It would also be imprudent to review an executive order directing rulemaking when Plaintiffs cannot allege what the ultimate rule will provide. *See, e.g.*, LWV Compl. ¶ 149.

In allowing ongoing administrative proceedings to be completed, courts "respect the Executive Branch's interest in 'crystallizing its policy before that policy is subjected to judicial review.'" *Common Cause v. Trump*, 506 F. Supp. 3d 39, 46 (D.D.C. 2020) (quoting *Am. Petroleum Inst. v. E.P.A.*, 683 F.3d 382, 387 (D.C. Cir. 2012)). Where, as here, "the possibility that further [administrative] consideration will actually occur before implementation is not theoretical, but real," "[j]udicial intervention at this time would inappropriately interfere with ongoing action within the Executive Branch." *Id.* at 45. Moreover, the EO's direction that USPS's action be "pursuant to 39 U.S.C. 401 and other applicable authority," in "compl[iance] with the Privacy Act and all applicable use agreements," and "consistent with applicable State law" underscores the intention that said action be conducted lawfully. EO § 3(b)(iv)–(v). The "presumption of regularity," which requires courts to presume that public officers have "properly discharged their official duties" absent evidence to the contrary, supports this reading of Section 3. *United States v. Chem. Found.*, 272 U.S. 1, 14–15 (1926).

There has also not been any final agency action with respect to Section 3. Section 3 simply directs the USPS to *initiate* rulemaking about mail-in and absentee ballots, and it specifies that "any final rule" by the USPS "shall be issued no later than 120 days from the date of this order." EO § 3(d). A notice of proposed rulemaking is an "intermediate agency action," not a "final" one. 5 U.S.C. § 704; *In re Murray Energy Corp.*, 788 U.S. at 334–35. Thus, Plaintiffs cannot prematurely sue with the deadline for the USPS's "final rule" still three months away. EO § 3(d).

15

Given that USPS has not yet taken any final agency action, Plaintiffs likewise fail to show that "delayed judicial review would cause them 'immediate and significant hardship'" to satisfy the second prong for prudential ripeness. *Church v. Biden*, 573 F. Supp. 3d 118, 136 (D.D.C. 2021) (quoting *Finca Santa Elena, Inc. v. U.S. Army Corps of Eng'rs*, 873 F. Supp. 2d 363, 371 (D.D.C. 2012)). For this reason and others, the Plaintiffs' cited caselaw in support of ripeness are inapposite. *See Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 167–68 (2014) (statute challenge was ripe because the issues "'will not be clarified by further factual development'") (cited at LWV Br. at 28); *Bost v. Ill. State Bd. of Elections*, 146 S. Ct. 513, 521 (2026) (concerning candidate, not organizational, standing to challenge a final Illinois election law) (cited at LWV Br. at 28); *Democratic Nat'l Comm. v. Wisc. State Legis.*, 141 S. Ct. 28, 31 (2020) (Kavanaugh, J., concurring) (denying application to vacate stay of district court's injunction to change state election rules without consideration of standing or ripeness) (cited at LWV Br. at 28). Premature adjudication of USPS's actions in the way Plaintiffs desire "denies the agency an opportunity to . . . apply its expertise" in implementing the EO consistent with its regular rulemaking procedures. *See Finca Santa Elena, Inc.*, 873 F. Supp. 2d at 369 (citation omitted). For these reasons, Plaintiffs' challenges to Section 3 are not ripe for adjudication.

### C. Plaintiffs cannot show irreparable harm from Section 3.

The irreparable harm element is "a necessary threshold showing for awarding preliminary injunctive relief." *Matos ex rel. Matos v. Clinton Sch. Dist.*, 367 F.3d 68, 73 (1st Cir. 2004). "A threat that is either unlikely to materialize or purely theoretical will not do" and precludes injunctive relief. *Id.*; *see also Matos*, 367 F.3d at 73 (failure to show irreparable harm is sufficient grounds for denying preliminary relief even if the other requirements of the preliminary injunction standard are met). The First Circuit also imposes "an independent obligation to make sure that the

16

plaintiffs have met their requisite burden at this [preliminary injunction] stage of the litigation to show such standing exists." *New Hampshire Indonesian Cmty. Support v. Trump*, 157 F.4th 29, 34 (1st Cir. 2025). For this reason, failure to show a concrete Article III injury precludes a finding of irreparable harm for purposes of injunctive relief. *See Frank Martin Sons, Inc. v. John Deere Const. & Forestry Co.*, 542 F. Supp. 2d 101, 106 n.5 (D. Me. 2008) ("[S]peculative injury 'does not constitute a showing of irreparable harm.'" (citations omitted)). As explained above, the challenged rule is three months from finality and Plaintiffs cannot show a concrete, non-speculative injury. For this reason too, Plaintiffs are not entitled to a preliminary injunction.

### D. Plaintiffs are unlikely to succeed in showing that the President cannot direct USPS to engage in rulemaking.

In asking this Court to enjoin the President from issuing instructions to a federal agency, Plaintiffs are proposing an extraordinary intrusion on the President's constitutional authority. But they fail to show any statute that clearly directs this extraordinary result. And even if a statute did prevent the President from supervising USPS, such a statute would be unconstitutional.

> 1. <u>Plaintiffs must, but cannot, identify a clear statement from Congress preventing the President from supervising USPS.</u>

Courts require clear statements from Congress before they will conclude Congress intended to interfere with the President's authority to supervise the executive branch. For example, courts require a clear statement that Congress intended to limit the President's ability to freely remove executive officials. *See, e.g.*, *Kennedy v. Braidwood Mgmt., Inc.*, 606 U.S. 748, 778 (2025). As another example, in *Franklin v. Massachusetts,* the Supreme Court held that where "[t]he President is not explicitly excluded from the APA's purview, but he is not explicitly included, either," "textual silence is not enough to subject the President to the provisions of the APA." 505 U.S. 788, 800–01 (1992). Instead, "an express statement by Congress" is required. *Id.*; *see also Nixon*

17

*v. Fitzgerald*, 457 U.S. 731, 748 n.27 (1982) (Court would require an explicit statement by Congress before assuming Congress had created a damages action against the President).  These clear statement rules exist due to "respect for the separation of powers and the unique constitutional position of the President." *Franklin*, 505 U.S. at 800–01.

Plaintiffs do not identify any clear statutory statements preventing the President from directing USPS to engage in rulemaking.  Rather, they cite statutory provisions that assign powers to others without an express exclusion of presidential authority.  For example, Plaintiffs cite 39 U.S.C. § 202, which establishes the Board of Governors, LWV Br. at 12, but § 202 does not "explicitly" exclude the President from exercising supervisory authority.  *Franklin*, 505 U.S. at 800–01.  Likewise, Plaintiffs point out that 39 U.S.C. § 401 grants USPS authority to "adopt, amend, and repeal such rules and regulations," LWV Br. at 4, but § 401 does not prohibit the President from directing the USPS.  The same is true of 39 U.S.C. §§ 501–502, LWV Br. at 4, which authorizes the Postal Regulatory Commission to promulgate rules and regulations, but again, it does not expressly insulate the President from any supervisory role.  These provisions are not the "explicit" denials of presidential authority that the Supreme Court demands.  *Braidwood Management*, 606 U.S. at 778.

     2.  <u>Any statute preventing the President from directing USPS rulemakings is unconstitutional.</u>

Even if Plaintiffs could identify a statute clearly prohibiting the President from directing USPS rulemaking, it would be unconstitutional.  The Constitution vests the entirety of the executive power in the President. U.S. Const. art. II, § 1, cl. 1.  In exercising this power, the President must be able to control and supervise his subordinates in order to "take Care that the Laws be faithfully executed."  U.S. Const. art. II, § 3; *see Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 483 (2010).  Indeed, "the activities of executive officers may take

legislative and judicial forms, but they are exercises of—indeed, under our constitutional structure they *must be* exercises of—the executive Power, for which the President is ultimately responsible." *United States v. Arthrex, Inc.*, 594 U.S. 1, 17 (2021) (quotations and citations omitted).  Thus, the "thousands of officers [who] wield executive power" in the federal government "acquire[] [their] legitimacy and accountability to the public through 'a clear and effective chain of command' down from the President."  *Id.* at 11 (quoting *Free Enterprise Fund*, 561 U.S. at 498).

Given those constitutional rules, Congress cannot bar the President from supervising USPS.  The Constitution protects the President's ability to "discharge his own constitutional duty of seeing that the laws be faithfully executed."  *Myers v. United States*, 272 U.S. 52, 135 (1926).  Indeed, in *Myers*, the Supreme Court has already held that Congress cannot interfere with the President's ability to supervise the U.S. Postal Service.  There, the Supreme Court held that Article II prevents Congress from restricting the President's removal powers over post office officials.  *See id.*  If Congress cannot prevent the President from *firing* postal officials, it follows naturally that Congress cannot prohibit the President from giving directives to postal officials.

Nor does the Supreme Court's decision in *Humphrey's Executor v. United States* save Plaintiffs' claims.  295 U.S. 602 (1935).  The Supreme Court has already signaled its intent to overrule *Humphrey's Executor* and stayed an order preventing the removal of an FTC Commissioner.  *See Trump v. Slaughter*, 146 S. Ct. 18 (2025).  But even if *Humphrey's Executor* is not overruled, the Supreme Court in *Humphrey's* explicitly suggested its rationale did not insulate postal officials from removal—on the rationale that such officials perform "executive functions."  295 U.S. at 627 ("The office of a postmaster is so essentially unlike the office now involved that the decision in the *Myers* Case cannot be accepted as controlling our decision here. A postmaster is an executive officer restricted to the performance of executive functions."); *see*

19

*also U.S. Postal Serv. v. Flamingo Indus. (USA) Ltd.*, 540 U.S. 736, 747 (2004) ("Postal Service has many powers more characteristic of Government than of private enterprise, including its state-conferred monopoly on mail delivery, the power of eminent domain, and the power to conclude international postal agreements.").

Nor could Plaintiffs analogize USPS to "financial institutions like the Second Bank and the Federal Reserve," which "can claim a special historical status" because they "have historically enjoyed some insulation from the President." *Seila L. LLC v. Consumer Fin. Prot. Bureau*, 591 U.S. 197, 222 n.8 (2020). Unlike the Federal Reserve, USPS does not share the same historical lineage of independence. For most of the country's history, the Postmaster General was a member of the President's Cabinet, and it was not until 1970 that Congress attempted to give the agency more independence. *See Flamingo Indus.*, 540 U.S. at 740 (providing historical overview). Article II of the Constitution therefore prohibits Congress from interfering with the President's authority to supervise USPS—including by directing rulemaking. *See Myers*, 272 U.S. at 135.

## **CONCLUSION**

For the foregoing reasons, the Court should deny Plaintiffs' motion for a preliminary injunction and dismiss their claims.

20

Date: May 7, 2026

Respectfully submitted,

**STEVE MARSHALL**
ALABAMA ATTORNEY GENERAL

*/s/ A. Barrett Bowdre*
A. Barrett Bowdre*
  *Solicitor General*
STATE OF ALABAMA
OFFICE OF THE ATTORNEY GENERAL
501 Washington Avenue
Montgomery, Alabama 36104
Telephone: (334) 353-8892
Fax: (334) 353-8400
Barrett.Bowdre@AlabamaAG.gov

**CATHERINE L. HANAWAY**
MISSOURI ATTORNEY GENERAL

*/s/ Louis J. Capozzi III*
Louis J. Capozzi III, DC Bar No. 90018764*
  *Solicitor General*
J. Michael Patton*
  *Deputy Solicitor General*
Benjamin S. Gilberg*
  *Deputy Solicitor General*
Missouri Attorney General's Office
815 Olive Street, Suite 200
St. Louis, MO 63101
Tel. (573) 645-9662
Fax (573) 751-0774
Louis.Capozzi@ago.mo.gov
Michael.Patton@ago.mo.gov
Benjamin.Gilberg@ago.mo.gov

**JAMES UTHMEIER**
FLORIDA ATTORNEY GENERAL

*/s/ David M.S. Dewhirst*
David M.S. Dewhirst*
  *Solicitor General*
Jason J. Muehlhoff*
  *Chief Deputy Solicitor General*
Office of the Attorney General
PL-01, The Capitol
Tallahassee, FL 32399-1050
(850) 414-3300
david.dewhirst@myfloridalegal.com
jason.muehlhoff@myfloridalegal.com

**THEODORE E. ROKITA**
INDIANA ATTORNEY GENERAL

/s/ *James A. Barta*
James. A Barta, DC Bar No. 1032613*
  *Solicitor General*
Office of the Indiana Attorney General
302 W. Washington Street
IGC South, Fifth Floor
Indianapolis, IN 46204-2770
Phone: (317) 232-0709
Fax: (317) 232-7979
James.Barta@atg.in.gov

21

**KRIS W. KOBACH**
KANSAS ATTORNEY GENERAL

*/s/ James R. Rodriguez*
James R. Rodriguez*
*Assistant Attorney General*
Kansas Office of the Attorney General
Topeka, Kansas 66612
Phone: (785) 368-8197
jay.rodriguez@ag.ks.gov

**AUSTIN KNUDSEN**
MONTANA ATTORNEY GENERAL

*/s/ Christian B. Corrigan*
Christian B. Corrigan*
 *Solicitor General*
Montana Department of Justice
215 N. Sanders Helena, MT 59601
(406) 444-2707 (o)
Christian.Corrigan@mt.gov

**GENTER DRUMMOND**
OKLAHOMA ATTORNEY GENERAL

*/s/ Garry M. Gaskins, II*
Garry M. Gaskins, II**
 *Solicitor General*
Office of the Attorney General of Oklahoma
313 NE Twenty-First St.
Oklahoma City, OK 73105
(405) 521-3921
garry.gaskins@oag.ok.gov

**ELIZABETH B. MURRILL**
LOUISIANA ATTORNEY GENERAL

*/s/ J. Benjamin Aguiñaga*
J. Benjamin Aguiñaga*
 *Solicitor General*
Louisiana Department of Justice
1885 N. Third St.
Baton Rouge, LA 70802
(225) 506-3746
AguinagaB@ag.louisiana.gov

**MICHAEL T. HILGERS**
NEBRASKA ATTORNEY GENERAL

/s/ *Cody S. Barnett*
Cody S. Barnett*
 *Solicitor General*
Nebraska Department of Justice
1445 K Street, Room 2115
Lincoln, Nebraska 68508
Tel.: (402) 471-2683
Fax: (402) 471-3297
cody.barnett@nebraska.gov

**ALAN WILSON**
SOUTH CAROLINA ATTORNEY GENERAL

*/s/ Joseph D. Spate*
Joseph D. Spate*
 *Deputy Solicitor General*
1000 Assembly Street
Columbia, South Carolina 29201
Tel. (803) 734-3371
Fax (803) 734-3677
josephspate@scag.gov

**MARTY J. JACKLEY**
SOUTH DAKOTA ATTORNEY GENERAL

/s/ *Grant Flynn*
Grant Flynn**
  *Assistant Attorney General*
South Dakota Office of the Attorney General
1302 East SD Highway 1889,
Suite 1
Pierre, SD 57501-8501
Telephone: (605) 773-3215
Email: grant.flynn@state.sd.us


/s/ *Ian D. Prior*
Ian D. Prior (Bar No. 655704)
America First Legal Foundation
611 Pennsylvania Ave S.E. No. 231
Washington, D.C. 20003
(410) 205-9681
ian.prior@aflegal.org


**KEN PAXTON**
TEXAS ATTORNEY GENERAL

s/ *David Bryant*
David Bryant*
  *Senior Special Counsel*
Office of the Attorney General of Texas
Special Litigation Division
P.O. Box 12548, Capitol Station
Austin, Texas 78711-2548
Tel.: (512) 463-2100
david.bryant@oag.texas.gov


* *Admitted pro hac vice*
** *Pro hac vice forthcoming*

23

## CERTIFICATE OF SERVICE

I certify that on May 7, 2026, the above was filed electronically through the Court's electronic filing system to be served electronically on counsel for the parties.

/s/ *Louis J. Capozzi III*

24