**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| LEAGUE OF WOMEN VOTERS OF MASSACHUSETTS, *et al.*,<br><br>     *Plaintiffs*,<br>  v.<br><br>DONALD J. TRUMP, in his official capacity as President of the United States, *et al.*,<br><br>     *Defendants*. | Case No. 1:26-cv-11549-IT |

**<u>PLAINTIFFS' OPPOSITION TO DEFENDANTS' AND INTERVENORS' MOTIONS TO DISMISS AND REPLY IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION</u>**

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................. 1

ARGUMENT ....................................................................................................................... 1

    I.  Plaintiffs' Claims Are Justiciable. ............................................................................. 1

        A.  Plaintiffs' Claims Are Ripe. ............................................................................ 2

        B.  Plaintiffs Have Demonstrated Organizational and Associational Injury. ......... 7

        C.  Plaintiffs Have Satisfied Traceability and Redressability. ............................ 12

    II.  Plaintiffs Are Entitled to a Preliminary Injunction. .................................................. 13

        A.  Plaintiffs Are Likely to Succeed on The Merits of Counts I and II. ............... 13

        B.  Plaintiffs Will Suffer Irreparable Harm Absent a Preliminary
            Injunction. ...................................................................................................... 21

        C.  The Balance of Equities and Public Interest Weigh Heavily in
            Plaintiffs' Favor. ........................................................................................... 24

        D.  This Court Should Deny Defendants' Request for an Injunction Bond. ......... 25

    III.  Defendants' Motions to Dismiss Should Be Denied Because Plaintiffs
    Plausibly Allege Challenges to the Executive Order. ............................................... 25

        A.  The Executive Order Violates Separation-of-Powers and Federalism
            Principles (Counts I, III). ............................................................................... 25

        B.  Section 3 of the Order Commands USPS to Violate the Law
            (Counts II, IV, V)........................................................................................... 26

        C.  Section 2 of the Order Commands Defendants to Violate the Law by
            Requiring Creation of State Citizenship Lists (Count VI). ............................ 27

CONCLUSION................................................................................................................... 30

**TABLE OF AUTHORITIES**

**Cases**

*American Federation of Labor & Congress of Industrial Organizations v. U.S. Department of Labor*,
No. 25-CV-339, 2026 WL 879518 (D.D.C. Mar. 31, 2026) ................................................... 28

*American School of Magnetic Healing v. McAnnulty*,
187 U.S. 94 (1902).................................................................................................................. 15

*Armstrong v. Exceptional Child Center, Inc.*,
575 U.S. 320 (2015)................................................................................................... 14, 15, 16

*Association of American Universities v. Department of Energy*,
789 F. Supp. 3d 118 (D. Mass. 2025) ..................................................................................... 28

*Atlantic Richfield v. Christian*,
590 U.S. 1 (2020)....................................................................................................................... 3

*Barbara v. Trump*,
790 F. Supp. 3d 80 (D.N.H. 2025)........................................................................................... 23

*Bennett v. Spear*,
520 U.S. 154 (1997)................................................................................................................. 27

*Bond v. United States*,
564 U.S. 211 (2011)................................................................................................................. 25

*Caicedo v. DeSantis*,
No. 23-CV-2303, 2024 WL 4729160 (M.D. Fla. Nov. 8, 2024) .............................................. 9

*California v. Trump*,
786 F. Supp. 3d 359 (D. Mass. 2025) .............................................................................. passim

*California v. Trump*,
805 F. Supp. 3d 387 (D. Mass. 2025) ............................................................................... 25, 26

*Camel Hair & Cashmere Institute of America, Inc. v. Associated Dry Goods Corp.*,
799 F.2d 6 (1st Cir. 1986)........................................................................................................ 12

*Chamber of Commerce of the United States v. Reich*,
57 F.3d 1099 (D.C. Cir. 1995).................................................................................................. 7

*Chamber of Commerce of the United States v. Reich*,
74 F.3d 1322 (D.C. Cir. 1996)........................................................................................... 14, 15

*City & County of San Franciso v. Trump*,
897 F.3d 1225 (9th Cir. 2018) ......................................................................................... 3, 5, 19

*City of San Jose v. Trump*,
  497 F. Supp. 3d 680 (N.D. Cal. 2020) ....................................................... 8

*Civitas Massachusetts Regional Center, LLC v. Mayorkas*,
  No. 21-cv-10344-LTS (D. Mass. Jan. 19, 2022) .................................... 28

*Clapper v. Amnesty International USA*,
  568 U.S. 398 (2013) ................................................................................ 10

*Coalition for Open Democracy v. Scanlan*,
  794 F. Supp. 3d 28 (D.N.H. 2025) ............................................................ 9

*Dalton v. Spector*,
  511 U.S. 462 (1994) ................................................................................ 16

*Del Gallo v. Parent*,
  557 F.3d 58 (1st Cir. 2009) ................................................................ 19, 20

*Doe v. Trump*,
  766 F. Supp. 3d 266 (D. Mass. 2025) ..................................................... 23

*Doe v. Trump*,
  157 F.4th 36 (1st Cir. 2025) .................................................................... 14

*Enviromental Integrity Project v. U.S. Enviromental Protection Agency*,
  425 F.3d 992 (D.C. Cir. 2005) .................................................................. 6

*First Choice Women's Resource Centers, Inc. v. Davenport*,
  No. 24-781, 2026 WL 1153029 (U.S. Apr. 29, 2026) ....................... 11, 12

*Food & Drug Administration v. Alliance for Hippocratic Medicine*,
  602 U.S. 367 (2024) .......................................................................... passim

*Federal Aviation Administration v. Cooper*,
  566 U.S. 284 (2012) ................................................................................ 27

*Flock v. U.S. Department of Transportation*,
  136 F. Supp. 3d 138 (D. Mass. 2015) ..................................................... 29

*Franklin v. Massachusetts*,
  505 U.S. 788 (1992) ................................................................................ 14

*Get Loud Arkansas v. Thurston*,
  748 F. Supp. 3d 630 (W.D. Ark. 2024) ..................................................... 9

*Havens Realty Corp. v. Coleman*,
  455 U.S. 363 (1982) .......................................................................... 8, 9, 11

iv

*Heckler v. Chaney*,
470 U.S. 821 (1985).................................................................................................... 17

*Hunt v. Washington State Apple Advertising Commission*,
432 U.S. 333 (1977).................................................................................................... 11

*International Association of Machinists & Aerospace Workers v. Eastern Airlines*,
925 F.2d 6 (1st Cir. 1991)........................................................................................ 24, 25

*Jensen v. Rhode Island Cannabis Control Commission*,
160 F.4th 18 (1st Cir. 2025)......................................................................................... 6

*Kennedy v. Braidwood Management, Inc.*,
606 U.S. 748 (2025).................................................................................................... 20

*Krabach v. King County*,
No. 2:22-cv-1252-BJR, 2023 WL 7018431 (W.D. Wash. Oct. 25, 2023) ....................... 26, 27

*League of United Latin American Citizens v. Executive Office of the President*,
780 F. Supp. 3d 135 (D.D.C. 2025).......................................................................... passim

*League of United Latin American Citizens v. Executive Office of the President*,
808 F. Supp. 3d 29 (D.D.C. 2025).............................................................................. 16

*League of United Latin American Citizens v. Executive Office of the President*,
818 F. Supp. 3d 34 (D.D.C. 2026)................................................................... 27, 29, 30

*League of Women Voters of Missouri v. Ashcroft*,
336 F. Supp. 3d 998 (W.D. Mo. 2018) ......................................................................... 22

*League of Women Voters of Ohio v. LaRose*,
741 F. Supp. 3d 694 (N.D. Ohio 2024)......................................................................... 9

*League of Women Voters of the United States v. Newby*,
838 F.3d 1 (D.C. Cir. 2016)...................................................................................... passim

*Learning Resources, Inc. v. Trump*,
146 S. Ct. 628 (2026)................................................................................................. 20

*Lujan v. Defenders of Wildlife*,
504 U.S. 555 (1992).................................................................................................... 12

*Madison v. Cruz*,
393 F. Supp. 3d 135 (D. Mass. 2019) ............................................................................ 2

*Myers v. United States*,
272 U.S. 52 (1926)....................................................................................................... 21

*Narrigan v. Goldberg,*
 170 F.4th 14 (1st Cir. 2026)................................................................................... 7, 10

*New Hampshire Youth Movement v. Scanlan,*
 No. 24-cv-291-SE, 2026 WL 323171 (D.N.H. Feb. 6, 2026).................................. 10

*New York v. McMahon,*
 784 F. Supp. 3d 311 (D. Mass. 2025) ..................................................................... 22

*New York v. Trump,*
 133 F.4th 51 (1st Cir. 2025).................................................................... 3, 19, 27, 28

*New York v. Trump,*
 485 F. Supp. 3d 422 (S.D.N.Y. 2020)....................................................................... 8

*Nixon v. Fitzgerald,*
 457 U.S. 731 (1982)................................................................................................ 24

*Nuclear Regulatory Commission v. Texas,*
 605 U.S. 665 (2025)................................................................................... 15, 16, 17

*Ocasio-Hernandez v. Fortuno-Burset,*
 640 F.3d 1 (1st Cir. 2011)....................................................................................... 30

*Öztürk v. Trump,*
 No. 25-CV-12334-DJC, 2025 WL 3514320 (D. Mass. Dec. 8, 2025) ................... 25

*PFLAG, Inc. v. Trump,*
 769 F. Supp. 3d 405 (D. Md. 2025).......................................................................... 2

*President & Fellows of Harvard College v. U.S. Department of Health and Human Services,*
 798 F. Supp. 3d 77 (D. Mass. 2025) ....................................................................... 14

*President & Fellows of Harvard College v. U.S. Department of Homeland Security,*
 788 F. Supp. 3d 182 (D. Mass. 2025) ..................................................................... 19

*Presidents' Alliance on Higher Educuation & Immigration v. Noem,*
 No. 25-CV-11109-PBS, 2026 WL 788185 (D. Mass. Mar. 20, 2026) .................... 12

*Providence v. Barr,*
 954 F.3d 23 (1st Cir. 2020)..................................................................................... 26

*Puerto Rico v. United States,*
 490 F.3d 50 (1st Cir. 2007)..................................................................................... 14

*Reynolds v. Sims,*
 377 U.S. 533 (1964)................................................................................................ 11

*Rhode Island Department of Environmental Management v. United States*,
    304 F.3d 31 (1st Cir. 2002)......................................................................................... 15

*Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*,
    102 F.3d 12 (1st Cir. 1996)......................................................................................... 23

*Ryan v. U.S. Immigration & Customs Enforcement*,
    974 F.3d 9 (1st Cir. 2020)........................................................................................... 13

*Somerville Public Schools v. McMahon*,
    139 F.4th 63 (1st Cir. 2025)........................................................................................ 24

*Susan B. Anthony List v. Driehaus*,
    573 U.S. 149 (2014)................................................................................................ 2, 10

*Trump v. American Federation of Government Employees*,
    145 S. Ct. 2635 (2025)................................................................................................... 5

*Trump v. New York*,
    592 U.S. 125 (2020).............................................................................................. passim

*United States v. Zannino*,
    895 F.2d 1 (1st Cir. 1990)........................................................................................... 26

*Venetian Casino Resort, L.L.C. v. Equal Employment Opportunity Commission*,
    530 F.3d 925 (D.C. Cir. 2008)..................................................................................... 28

*Warth v. Seldin*,
    422 U.S. 490 (1975).................................................................................................... 12

*Washington v. Trump*,
    814 F. Supp. 3d 1173 (W.D. Wash. 2026)............................................................... 5, 16

*Winter v. Natural Resources Defense Council, Inc.*,
    555 U.S. 7 (2008)........................................................................................................ 23

*Youngstown Sheet & Tube Co. v. Sawyer*,
    343 U.S. 579 (1952).................................................................................................... 19

**Statutes**

5 U.S.C. § 552a.............................................................................................................. 29, 30

5 U.S.C. § 706...................................................................................................................... 27

39 U.S.C. § 101.................................................................................................................... 16

39 U.S.C. § 401.................................................................................................................... 17

39 U.S.C. § 403 ................................................................................................................. 17

39 U.S.C. § 404 ................................................................................................................. 17

39 U.S.C. § 410 ................................................................................................................. 15

39 U.S.C. § 3001 ............................................................................................................... 17

39 U.S.C. § 3005 ............................................................................................................... 17

39 U.S.C. § 3007 ............................................................................................................... 17

39 U.S.C. § 3703 ............................................................................................................... 17

39 U.S.C. § 3704 ............................................................................................................... 17

52 U.S.C. § 20304 ............................................................................................................. 21

## Other Authorities

85 Fed. Reg. 44680 (July 21, 2020) ................................................................................. 4

90 Fed. Reg. 9670 (Feb. 11, 2025) ................................................................................... 5

Fed. R. Evid. 201 .............................................................................................................. 2

**INTRODUCTION**

Defendants and Intervenors do not seriously defend Executive Order No. 14399 (Executive Order, or Order) on the merits. Nor could they. The President has no power to create rules for federal elections, nor does he have power to command USPS to take unauthorized and unlawful actions. Section 3 of the Order should thus be preliminarily enjoined because it violates the Constitution's separation of powers (Count I) and is ultra vires (Count II).

Instead, Defendants purport to target the Court's jurisdiction. They contest standing and ripeness rather than the lawfulness of the Order itself, but ignore its plain language and the evidence that Plaintiffs are already suffering organizational and associational harm—harm Plaintiffs need not wait to compound before seeking relief. Nor do they grapple with the substance of the Order's commands. And they do not engage with the constitutional restraints on presidential power over elections and USPS or with conflicting statutory mandates, such as the Postal Reorganization Act's (PRA) universal-service mandate or UOCAVA's mandate to deliver every overseas ballot without exception. At bottom, Defendants ask this Court to defer analysis of the merits of Plaintiffs' claims until it is too late. Their motions to dismiss should be denied, and Plaintiffs' motion to enjoin Section 3 of the Order should be granted.

**ARGUMENT**

**I.    Plaintiffs' Claims Are Justiciable.**

Defendants (at 7–12, 12–16) and Intervenors (at 3–9) argue for dismissal, contending Plaintiffs' claims are unripe since agencies have not completely implemented the Executive Order, and Plaintiffs have not shown harm to support standing. But Plaintiffs' claims are ripe: The Order mandates specific unlawful actions from executive agencies on a defined, imminent timeline. And Plaintiffs have standing because they have already suffered ongoing injuries as a direct result of the Order and face substantial risk of imminent injuries to themselves and their members. These

1

injuries are directly traceable to Defendants and redressable by an injunction against them.

### A. Plaintiffs' Claims Are Ripe.

Plaintiffs' claims are ripe for adjudication because Plaintiffs have shown current, ongoing harms caused by the Executive Order as well as imminent future injuries from its implementation. Pls. Br. 20–28. Full implementation or actual "enforcement action is not a prerequisite to challenging the law." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014) (*SBA List*). This makes good sense as a jurisdictional principle--"ripeness cannot hinge on the actual [implementation of the Order if] . . . the *threat*" of implementation has already caused cognizable harms. *PFLAG, Inc. v. Trump*, 769 F. Supp. 3d 405, 423 (D. Md. 2025).

Defendants' declaration confirm that USPS is already deliberating about "how to implement the directives in the Executive Order," and planning to "issue[] a proposed rule [that] will be published in the Federal Register." Decl. of Steven W. Monteith ¶¶ 2–5, Dkt. No. 127-3.[1] These concessions confirm what the Order's text makes clear: Its commands are "directives" that the agencies will carry out, *see* Monteith Decl. ¶¶ 3–5. Just like President Trump's 2025 executive order on elections (2025 Order), a challenge to which a court in this District found ripe, this Order "does not merely authorize or suggest a change" but "leaves no doubt" that its commands "will be required." *California v. Trump*, 786 F. Supp. 3d 359, 382 (D. Mass. 2025) (*California I*).

Contrary to Defendants' (*e.g.*, at 14) and Intervenors' (*e.g.*, at 15) repeated suggestions, the Order's 'saving clauses'—e.g., language requiring implementation "consistent with applicable . . .

---

[1] Indeed, USPS confirmed in a statement to the press that "the Postal Service is . . . working on a draft of a proposed rule." Ex. 16, Decl. of Sophia Lin Lakin, *Trump Is Pushing Forward His Plan for Voter Lists*. This Court can take judicial notice of USPS's statement. Fed. R. Evid. 201; *see Madison v. Cruz*, 393 F. Supp. 3d 135, 137 n.2 (D. Mass. 2019) (recognizing courts have "taken judicial notice of newspaper articles and press releases . . . when their conten[t]s cannot be reasonably questioned").

law," Order § 3(b)(v)—cannot save it. A saving clause that is "nothing more than window dressing on an unconstitutional directive by the Executive" does not make that directive legal. *New York v. Trump*, 133 F.4th 51, 69 (1st Cir. 2025) (citation omitted). "If [the phrase] 'consistent with law' precludes a court from examining whether the Executive Order is consistent with law, judicial review is a meaningless exercise, precluding resolution of the critical legal issues." *City & Cnty. of S.F. v. Trump*, 897 F.3d 1225, 1240 (9th Cir. 2018). For that reason,"[t]he Supreme Court has long rejected interpretations of sweeping saving clauses that prove absolutely inconsistent with the provisions of the act in which they are found." *California I*, 786 F. Supp. 3d at 381 (quoting *Atl. Richfield v. Christian*, 590 U.S. 1, 23 (2020) (quotation omitted)). Here, the Order "cannot possibly be implemented consistent with applicable law," rendering the saving clause "meaningless." *League of United Latin Am. Citizens v. Exec. Off. of the President*, 780 F. Supp. 3d 135, 176 (D.D.C. 2025) (*LULAC I*).

Defendants' and Intervenors' reliance on *Trump v. New York*, 592 U.S. 125 (2020), is misplaced. The 2020 executive order issued there (2020 Order) directed the exclusion of undocumented immigrants from the congressional apportionment base with no concrete directives or specified implementation timeline and many contingencies. *Id.* at 129–30. It therefore acted more as general policy guidance, making plaintiffs' pre-implementation claims against it unripe. *Id.* at 134. That is meaningfully different from the Order here. Different facts yield different results.

Here, the far more analogous cases are those challenging the 2025 Order, which directed the EAC to "take appropriate action to require" documentary proof of citizenship on the federal voter registration form "[w]ithin 30 days." *See California I*, 786 F. Supp. 3d at 378; *LULAC I*, 780 F. Supp. 3d at 166. There, the substantially similar defendants raised nearly identical ripeness arguments to those here—namely, that the order did not provide sufficient clarity about what

3

actions, if any, the agency must take, making the harm speculative. *Compare LULAC I*, 780 F. Supp. 3d at 184 ("In Defendants' telling, it is entirely unclear what the Executive Order requires of the EAC or whether it requires anything at all. They suggest . . . Plaintiffs are engaged in nothing more than 'speculation about future actions the EAC may take.'") (citation omitted), *with* Defs. Br. 41 (arguing that "none of the key implementation actions have even been decided yet, much less finalized," and that Plaintiffs have only "speculative fears" about how the Order will be implemented). Multiple courts rejected those arguments, finding that even if the 2025 Order had not yet been implemented, it "dictate[d] a particular outcome and le[ft] no uncertainty" about what "it purport[ed] to mandate"—namely, documentary proof of citizenship on the Federal Form. *LULAC I*, 780 F. Supp. 3d at 185; *accord California I*, 786 F. Supp. 3d at 378–79 (similar). For at least two reasons, this Order is more akin to the 2025 Order than the 2020 Order.

*First*, this Order sets out mandatory directives to agencies, without meaningful leeway to consider contingencies—down to the barcodes it requires USPS to print on envelopes and the contents of prohibitory lists for mail ballot recipients and senders. *E.g.* Order § 3(b)(i), (iii), (iv). The 2020 Order contained qualifiers that cast significant doubt on enforcement: e.g., directing exclusion of undocumented immigrants from the apportionment base "*to the maximum extent feasible* and consistent with the discretion delegated to the executive branch," and directing the Secretary of Commerce to take action only "*to the extent practicable.*" 85 Fed. Reg. 44680 (July 21, 2020) (emphasis added); *see Trump,* 592 U.S. at 131. The order neither identified which categories of residents to exclude nor resolved whether matching census respondents with administrative records was feasible, making it more akin to "general statement[s] of policy." *Trump*, 592 U.S. at 131–32. The Supreme Court found that these qualifiers and uncertainties cast doubt on whether the order would "prove feasible to implement in any manner." *Id*. at 131–32.

Justice Sotomayor's stay concurrence in *Trump v. American Federation of Government Employees*, 145 S. Ct. 2635 (2025), on which Defendants rely (at 15), is likewise inapposite. That executive order used more general, less mandatory terms, directing agency heads to "*undertake preparations to initiate large-scale reductions in force.*" *See* 90 Fed. Reg. 9670 (Feb. 11, 2025) (emphasis added).

By contrast, the 2025 Order "dictate[d] the precise contents of the new rule" and "mandate[d] that the EAC take action to require documentary proof of citizenship on the Federal Form." *LULAC I*, 780 F. Supp. 3d at 184–85; *California I*, 786 F. Supp. 3d at 378–79. So too, here. This Order bears all the hallmarks of a definite agency command. *See Washington v. Trump*, 814 F. Supp. 3d 1173, 1199–1200 (W.D. Wash. 2026) (finding ripeness because 2025 Order imposed mandatory directives notwithstanding unresolved details of future implementation). As with the 2025 Order, the challenged provisions mandate action without meaningful caveats: "the Postmaster General is hereby directed to initiate a proposed rulemaking" which "shall include, at minimum, the following. . . ." Order § 3(b). "Because the Executive Order unambiguously commands action, here there is more than a 'mere possibility that some agency might make a legally suspect decision.'" *City & Cnty. of S.F.*, 897 F.3d at 1240 (citation omitted). Evidence beyond the Order itself supports this conclusion. The Order's signing ceremony statement, the Postmaster General's public statements, and postal workers' union representatives all confirm that USPS intends to comply unless enjoined.[2] *See* Pls. Br. 7, 26; Dkt. Nos. 75-15, 75-8, 75-9.

*Second*, this Order requires agencies to carry out its directives on a specific—and

---

[2] The White House's published fact sheet also confirms the Order is a mandatory directive. *See* Ex. 17, Lakin Decl., *Fact Sheet: President Donald J. Trump Ensures Citizenship Verification and Voter Eligibility in Federal Elections* ("The Order *directs* the Secretary of Homeland Security . . . to compile and transmit to each State a State Citizenship List"; "The lists *will be* updated and transmitted no fewer than 60 days before each regularly scheduled Federal election"; "The Order *requires* the USPS to transmit ballots only to individuals enrolled on a State-specific Mail-in and Absentee Participation List") (emphasis added).

aggressive—timeline. In enjoining the 2025 Order before implementation, courts emphasized that it "impose[d] a deadline" for agency action. *California I*, 786 F. Supp. 3d at 378; *accord LULAC I*, 780 F. Supp. 3d at 184. This likewise distinguishes the 2020 Order, which set no deadlines for agency action and instead merely directed the Census Bureau "to provide information permitting the President, to the extent practicable, to exercise the President's discretion to carry out the policy" in the order. *Trump*, 592 U.S. at 130 (citation omitted). In *Trump*, the lack of timelines and broad discretion left to the President made clear that "the policy may not prove feasible to implement." *Id*. at 132. By contrast, like the 2025 Order, this Order directs specific agency action within definite, short timelines: sixty days to propose USPS regulations and 120 days to issue final regulations. Order §§ 3(b), (d). The Government appears to ask this Court (at 12–14) to delay adjudication because *they* are behind the ball in implementing the Order. But haphazard, last-minute implementation in areas far afield from the Agencies' expertise will only exacerbate—not ameliorate—Plaintiffs' harms. *See, e.g.*, Compl. ¶¶ 69 & n.2, 90–92, 99; Pls. Mot. 7–8.

Finally, that USPS has not yet proposed or finalized specific rule text does "not mean that the eventual promulgation [i]s an uncertain or contingent event" or "render the case not ripe." *Jensen v. R.I. Cannabis Control Comm'n*, 160 F.4th 18, 24–25 (1st Cir. 2025). Defendants argue (at 3) that the Order merely directs USPS to initiate a proposed rulemaking, with no directions as to what may appear in the final rule. But the Order directs USPS to initiate a proposed rulemaking—with numerous specific substantive provisions—within sixty days, and to issue any final rule within 120. Order §§ 3(b), (d). Practically speaking, this timing does not allow USPS to promulgate a rule that meaningfully deviates from its proposal and, as a matter of law, any final rule must be a "logical outgrowth" of what was proposed. *Envt'l Integrity Proj. v. EPA*, 425 F.3d 992, 996 (D.C. Cir. 2005). Defendants offer declaration testimony that USPS has not yet published

a proposed rule, but that testimony notably does not disavow any plans to implement the Order. *See* Monteith Decl. ¶ 4. In short, where the Order provides USPS with clear instructions on the contents of its rulemaking and mandates that a final rule be issued shortly after it is proposed, the lack of a final rule is no barrier to ripeness.

### B. Plaintiffs Have Demonstrated Organizational and Associational Injury.

*1. The Order has inflicted ongoing harm to Plaintiffs' core organizational activities, which will be compounded by the Order's implementation.*

**Ongoing Harms.** Plaintiffs have standing because the Executive Order has *already* "affected and interfered with" their "core business activities." *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 395 (2024) (*AHM*). Specifically, the Order directs the addition of "new obstacles [that] unquestionably make it more difficult for the Leagues [and all Plaintiffs] to accomplish their primary mission[s]" and activities of educating, encouraging, and facilitating vote-by-mail by members and other voters. *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 9 (D.C. Cir. 2016). That interference creates concrete, ongoing harm sufficient for standing, even before the Order is fully implemented. *See Narrigan v. Goldberg*, 170 F.4th 14, 19 (1st Cir. 2026); *see also Chamber of Com. of U.S. v. Reich*, 57 F.3d 1099, 1100 (D.C. Cir. 1995) (finding imminent injury where "the mere existence of the Order" regardless of implementation "alters the balance of bargaining power between employers and employees"); *California I*, 786 F. Supp. 3d at 379 n.5 ("[A]ctions directly interfering with an organization's core mission suffice to ground standing.").

Plaintiffs' ongoing injuries further distinguish this case from *Trump*, where plaintiffs lacked ongoing pre-enforcement harm. 592 U.S. at 130–31. In *Trump*, plaintiffs alleged two theories of harm from the 2020 Order: (1) the order would depress census participation and thereby degrade census data used for government decisions; and (2) implementation of the order could alter apportionment and reduce congressional representation and funding for certain jurisdictions.

7

*Id*. at 130–31. Plaintiffs conceded by the time of oral argument, however, that the first theory of harm was moot because census collection had concluded, and any chilling effect on participation had "dissipated." *Id*. at 131. The remaining injury was contingent on whether and how the Executive Branch might ultimately implement the 2020 Order. Importantly, the Supreme Court's decision did not undermine the findings of two unanimous three-judge panels that, while the census enumeration was still ongoing, those pre-enforcement harms to the census count created standing and ripe claims. *See New York v. Trump*, 485 F. Supp. 3d 422, 455–56 (S.D.N.Y. 2020); *City of San Jose v. Trump*, 497 F. Supp. 3d 680, 702–03 (N.D. Cal. 2020).

Defendants do not meaningfully engage with Plaintiffs' organizational injuries.[3] *First*, the Order has already interfered with Plaintiffs' core activities of educating, facilitating, and encouraging use of mail voting among their members and communities they serve. The Order has caused widespread confusion about the viability of mail voting, and upended Plaintiffs' core mail-voting work, requiring Plaintiffs to stop some essential voter education entirely. Compl. ¶¶ 107, 112, 115, 117; *see* Pls. Br. 22–23 (citing declarations describing harm of voter confusion and paused programming). For instance, "LWVMA has stopped actively disseminating any new voter-education materials about mail voting because of . . . the [Order]." Decl. of Celia Canavan ¶ 28, Dkt. No. 75-2; *see LULAC I*, 780 F. Supp. 3d at 189 (applying *AHM* and *Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982) to hold that the 2025 Order would force plaintiffs "to either update or replace [their] tools" conferring standing).

The Order's interference with Plaintiffs' mail-voting work has forced them to divert resources to try to mitigate these harms, impeding their work on other mission-critical projects.

---

[3] Defendants assure this Court (*e.g.*, at 40) that "if Plaintiffs do eventually face any imminent harm" they can "sue (or even seek a preliminary injunction) at that time." But Plaintiffs face irreparable harm *now*.

Intervenors accuse Plaintiffs of trying to "spend [their] way into standing." Intvrs. Br. 8 (quoting *AHM*, 602 U.S. at 394). Not so. Plaintiffs are not "simply . . . expending money to gather information and advocate against the defendant's action." *Id*. (quoting *AHM*, 602 U.S. at 394). The Order has necessitated expenditure of resources to counter "confusion and . . . fears that the Executive Order will prevent [members] from voting by mail," taking away valuable staff time from other priorities such as organizing voter registration drives and candidate forums. Decl. of Celina W. Stewart ¶¶ 16, 18, 21, Dkt. No. 75-3; *see also id.* ¶¶ 4, 16; Compl. ¶ 112 (similar); Canavan Decl. ¶¶ 29, 39, 49; Decl. of Dorcas Washington ¶¶ 44, 52, Dkt. No. 75-6. Just as HOME's counseling service in *Havens* was "directly affected and interfered with" by racial steering, *AHM*, 602 U.S. at 395 (citing *Havens*, 455 U.S. at 368), so too Plaintiffs' essential programs centered on mail voting are disrupted—or rendered ineffective—by the Order, necessitating diversion of resources as a result.

Post-*AHM*, courts have continued to recognize standing where election-related practices impair an organization's core voter-engagement activities.[4] In *LULAC I*, the court found standing for several of the same plaintiffs on facts close to those here: The order required them "to update educational information that they provide to prospective voters" and "invest additional resources in training their staff and volunteers" constituting "a direct impediment to . . . the organizations' 'core business activities.'" 780 F. Supp. 3d at 189 (quoting *AHM*, 602 U.S. at 395).

**Substantial Risk of Future Harms.** Plaintiffs also face a "substantial risk" of future injuries from the existence of the Order and its implementation, independently conferring standing.

---

[4] *See, e.g.*, *Coal. for Open Democracy v. Scanlan*, 794 F. Supp. 3d 28, 39–44 (D.N.H. 2025); *League of Women Voters of Ohio v. LaRose*, 741 F. Supp. 3d 694, 707 n.3 (N.D. Ohio 2024); *Caicedo v. DeSantis*, No. 23-CV-2303, 2024 WL 4729160, at *5 (M.D. Fla. Nov. 8, 2024); *Get Loud Ark. v. Thurston*, 748 F. Supp. 3d 630, 652–54 (W.D. Ark. 2024), *aff'd sub nom.*, *Get Loud Ark. v. Jester,* 171 F.4th 1058 (8th Cir. 2026).

*SBA List*, 573 U.S. at 158; *see Narrigan*, 170 F.4th at 19. The Supreme Court has repeatedly "found standing based on a 'substantial risk' that the harm will occur," which may cause plaintiffs to incur mitigation costs. *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 414 n.5 (2013). Where, as here, the Order specifies deadlines for agency action along with the "precise contours of its requirement[s]," Plaintiffs have standing to sue prior to the agency's expected implementation. *See California I*, 786 F. Supp. 3d at 378–79 (quoting *LULAC I*, 780 F. Supp. 3d at 184); *supra* § I.A.

The implementation of the clear terms of the Order will inevitably cause Plaintiffs additional injuries. *First*, it will "interfere[] with [Plaintiffs'] core business activities." *See AHM*, 602 U.S. at 395. As organizations whose work centers on educating and assisting voters, Plaintiffs will be forced to redraft online materials and "update educational information that they provide to prospective voters, much of which they have translated into multiple languages." *LULAC I*, 780 F. Supp. 3d at 189. Regardless of the specific way Defendants decide to implement the Order, Plaintiffs will be forced to respond by taking voter-education tools offline to be redesigned, retraining volunteers, and overhauling their education and communication materials, among other harms. Compl. ¶¶ 103–08, 111–12, 115, 118; *see* Pls. Br. 23–25.

*Second*, the Order's direction to USPS to promulgate a rule contemplating the non-delivery of certain ballots will render Plaintiffs' work less effective because fewer voters will be able to confidently rely on vote-by-mail and cast an effective mail ballot. Compl. ¶¶ 85–102, Pls. Br. 19, 23. Voter-engagement organizations like Plaintiffs suffer cognizable harm when the challenged action renders them "unable to assist many . . . voters through voter outreach efforts." *N.H. Youth Movement v. Scanlan*, No. 24-cv-291-SE, 2026 WL 323171, *8, 10 (D.N.H. Feb. 6, 2026); *see also LULAC I*, 780 F. Supp. 3d at 189. Implementation will also compound voter confusion and deter voters from casting a mail ballot, harming Plaintiffs' core missions of ensuring maximum

10

democratic participation. Compl. ¶¶ 105, 109–10, 114, 118; *see* Pls. Br. 23–25.

*Third*, the mandated non-delivery of certain ballots will give Plaintiffs the choice: they can either encourage mail voting—and participate in their members' and other voters' potential disenfranchisement—or they can stop their core activity of helping voters across the country vote by mail. *See* Compl. ¶¶ 74, 92, 105, 107, 113–19; Pls. Br. 24–25. Defendants do not dispute that USPS's gatekeeping of ballots mandated by the Order will cause this result. This is "far more than simply a setback to the organization[s'] social interests." *AHM*, 602 U.S. at 394 (quoting *Havens Realty Corp.*, 455 U.S. at 379). It undermines the heart of Plaintiffs' work of helping as many voters participate as possible. *See Newby*, 838 F.3d at 9.

Defendants and Intervenors do not meaningfully dispute that these injuries satisfy Article III standing if sufficiently imminent. Instead, they argue that the legal challenge is "riddled with contingencies and speculation," Defs. Br. 16; Intvrs. Br. 6 (both quoting *Trump*, 592 U.S. at 131)—however, as explained above, Plaintiffs' claims are ripe and they have standing. *See supra* § I.A.

### 2. The Order's implementation will harm Plaintiffs' members.

Plaintiffs also meet the three requirements for associational standing to sue on behalf of their members. *See Hunt v. Washington State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977). *First*, Plaintiffs have members who will be harmed by the Order's implementation. *See, e.g.*, Compl. ¶¶ 97, 100, 102, 113, 116, 119; Pls. Br. 26–27. These members include individuals who must rely on mail voting because they live overseas, reside out of state, and have disabilities, among others. *See, e.g.*, Compl. ¶¶ 24, 28, 30, 36, 39; Pls. Br. 26–27 (elucidating associational harms with declaration cites describing specific members). "This likelihood of disenfranchisement is a serious harm because 'the right to vote freely . . . is of the essence of a democratic society, and any restrictions on that right strike at the heart of representative government.'" *California I*, 786 F. Supp. 3d at 393 (quoting *Reynolds v. Sims*, 377 U.S. 533, 555 (1964) (citation modified); *see*

11

*also First Choice Women's Res. Ctrs., Inc. v. Davenport*, No. 24-781, 2026 WL 1153029, at *8 (U.S. Apr. 29, 2026) ("An injury in fact . . . can also arise when a defendant burdens a plaintiff's constitutional rights."). *Second*, protecting the right to vote and ability to vote by mail for all eligible citizens is "germane to the [Plaintiff] organizations' purposes." *See LULAC I*, 780 F. Supp. 3d at 191; *see, e.g.*, Compl. ¶¶ 21, 25–26, 31, 34, 38; Pls. Br. 21–23. And *third*, Plaintiffs' voting rights claims seeking declaratory and injunctive relief do not require the participation of individual members because such claims "have generally been held particularly suited to group representation." *Camel Hair & Cashmere Inst. of Am., Inc. v. Assoc. Dry Goods Corp.*, 799 F.2d 6, 12 (1st Cir. 1986); *see Warth v. Seldin*, 422 U.S. 490, 515 (1975).

As with organizational standing, Defendants claim (at 41) that this injury is too speculative. Yet as noted *supra*, the Order is sufficiently concrete and "the threatened harm is sufficiently imminent and substantial to satisfy the injury-in-fact requirement and support standing to seek forward-looking injunctive relief against its implementation." *LULAC I*, 780 F. Supp. 3d at 193 (citation modified). Plaintiffs need not wait until their members are disenfranchised to secure the very injunctive relief needed to ensure that does not happen. *See Newby*, 838 F.3d at 9.

### C. Plaintiffs Have Satisfied Traceability and Redressability.

Finally, Plaintiffs satisfy the second and third requirements of standing—causation and redressability—because Plaintiffs' organizational and associational injuries are caused by the Order and enjoining it would cure those injuries. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992). Defendants contend any injury will come from implementation, not the Order itself (at 9), but Plaintiffs' standing is grounded in "the predictable effect of Government action"—here, the issuance of the Order—"on the decisions of third parties." *Dep't of Com. v. New York*, 588 U.S. 752, 768 (2019). An executive order that "predictably prompted the flood of requests for assistance from member[s] . . . and the need for [Plaintiffs] to expend resources in response" "satisfies the

causation and redressability requirements." *Presidents' All. on Higher Educ. & Immigr. v. Noem*, No. 25-CV-11109-PBS, 2026 WL 788185, at *9 (D. Mass. Mar. 20, 2026). The Order will also impose a foreseeable obstacle to Plaintiffs' members voting by mail, "inflicting a cognizable harm that is directly traceable to the Executive Order." *See LULAC I*, 780 F. Supp. 3d at 190–92.

Intervenors' argument (at 5) that "Plaintiffs cannot plausibly allege causation or redressability [] because other, unchallenged federal programs already provide citizenship data to the States" misunderstands the concrete harm Plaintiffs allege and fails on its own terms. Intervenors concede (at 5) that only *some* "of the information at issue here is already disclosed," meaning that the Order in fact expands disclosure to states. More importantly, Plaintiffs do not challenge Section 2 of the Order in a vacuum but in conjunction with Section 3, which uses this flawed citizenship data as a gatekeeping mechanism for delivering mail ballots, *see* Order §§ 3(b)(i)–(iv), which will foreseeably harm Plaintiffs' members. *See* Pls. Br. 21. This "streamlined" system of exchanging and relying on flawed citizenship data, as Intervenors describe it (at 5), is precisely what creates a great risk of disenfranchisement to Plaintiffs and their members—a risk that is directly traceable to the Order and that will be redressed by halting its implementation.

## II.    Plaintiffs Are Entitled to a Preliminary Injunction.

### A.  Plaintiffs Are Likely to Succeed on The Merits of Counts I and II.

Defendants barely contest Plaintiffs' likelihood of success, the factor that "weighs most heavily in the preliminary injunction calculus." *Ryan v. USCIS*, 974 F.3d 9, 18 (1st Cir. 2020). A few of Defendants' and Intervenors' misconstructions of the merits are worth clarification.

#### 1.  Plaintiffs May Challenge the Executive Order in Equity.

Defendants conflate two distinct questions (at 23–24): whether Plaintiffs have a cause of action and whether equitable review of unlawful executive action is available. Courts routinely

13

review and enjoin executive orders that are unlawful or direct others to act unlawfully through the longstanding equitable power of federal courts, not through an implied statutory cause of action.[5]

"The ability to sue to enjoin unconstitutional actions by state and federal officers is the creation of courts of equity, and reflects a long history of judicial review of illegal executive action," *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 327 (2015). That alone forecloses Defendants' argument. This Court therefore has "jurisdiction over the ultra vires . . . claims," alleging unlawful executive action "pursuant to its 'equitable power[].'" *Pres. & Fellows of Harvard Coll. v. HHS*, 798 F. Supp. 3d 77, 108 n.11 (D. Mass. 2025) (quoting *Armstrong*, 575 U.S. at 328). Even "if a plaintiff is unable to bring his case predicated on either a specific or a general statutory review provision, he may still be able to institute a non-statutory review action." *Puerto Rico v. United States*, 490 F.3d 50, 59 (1st Cir. 2007) (quotation marks omitted); *accord Doe v. Trump*, 157 F.4th 36, 46–47 (1st Cir. 2025) (challengers were likely to succeed on "equitable causes of action to challenge [an] EO, its enforcement, and its implementation" on statutory and constitutional grounds).

This equitable power extends to presidential orders to agencies. "[I]t is now well established that '[r]eview of the legality of Presidential action can ordinarily be obtained in a suit seeking to enjoin the officers who attempt to enforce the President's directive.'" *Chamber of Com. of U.S. v. Reich*, 74 F.3d 1322, 1330 (D.C. Cir. 1996) (quoting *Franklin v. Massachusetts*, 505 U.S. 788, 815 (1992) (Scalia, J., concurring)). "[C]ourts have power to compel subordinate executive officials to disobey illegal Presidential commands." *Reich*, 74 F.3d at 1328 (quotation omitted).

For these reasons, Defendants' discussion (at 23) of final agency action under the Administrative Procedure Act (APA)—and their attempt to channel Plaintiffs' ultra vires claims

---

[5] Plaintiffs do not seek injunctive relief as to the President, only the USPS Defendants.

14

to eventual APA review—is irrelevant. *See also* Intvrs. Br. 15–16. Plaintiffs seek preliminary relief on Counts 1 and 2, neither of which arises under the APA. Ultra vires review remains available independent of the APA: "[E]ven after the passage of the APA, some residuum of power remains with the district court to review agency action that is *ultra vires*." *R.I. Dep't of Env't Mgmt. v. United States*, 304 F.3d 31, 42 (1st Cir. 2002). This review is important because the APA's judicial review provisions do not apply "to the exercise of the powers of the Postal Service." 39 U.S.C. § 410(a). In any event, future APA review would be inadequate: Plaintiffs suffer irreparable harm *now*, as described *supra*.

Indeed, the Supreme Court itself has exercised its equitable authority to review Postal Service actions—specifically, the refusal to deliver certain forms of mail. In *American School of Magnetic Healing v. McAnnulty*, the Court held that the Postal Service's "right to exclude letters, or to refuse to permit their delivery to persons addressed, must depend upon some law of Congress, and if no such law exists, then [it] cannot exclude or refuse to deliver them." 187 U.S. 94, 109 (1902). "The reasoning of *McAnnulty* has been employed repeatedly" to review actions by a variety of agencies. *Reich*, 74 F.3d at 1327–28 (collecting cases). Ultra vires review is available.

Defendants nevertheless argue (at 24–25) that Plaintiffs must satisfy the standard articulated in *Nuclear Regulatory Commission v. Texas*, 605 U.S. 665 (2025) (*NRC*), under which the agency must have "taken action entirely in excess of its delegated powers and contrary to a specific prohibition in a statute." *Id.* at 681 (citation modified). The petitioners there sought review outside the judicial review scheme set by Congress in the Hobbs Act, arguing the NRC acted outside its statutory authority. *Id.* at 680. But Plaintiffs' Count 1 is a constitutional separation-of-powers claim with no statutory analogue, and Defendants do not dispute that *NRC* does not apply to constitutional claims. The Supreme Court has "long held" that federal courts have inherent

15

equitable power to enjoin "violations of federal law by federal officials." *Armstrong*, 575 U.S. at 326–27; *see also, e.g.*, *Washington*, 814 F. Supp. 3d at 1186–87. The claim "turn[s] on whether the Constitution authorized the President's actions." *Dalton v. Spector*, 511 U.S. 462, 473 (1994). The Constitution does not authorize the Executive Order because Congress—not the President— has power over election administration (together with states) and the postal service. *See Washington*, 814 F. Supp. at 1186–87; Pls. Br. 2–4; 10–12. And contrary to Defendants' (at 34) and Intervenors' (at 18–19) arguments, the Vesting Clause does not grant the President authority to direct an independent agency's rulemaking. *See League of United Latin Am. Citizens v. Exec. Off. of the President*, 808 F. Supp. 3d 29, 71 (D.D.C. 2025) (*LULAC II*). "[T]he more demanding standards applicable to ultra vires review of statutory claims" in other circumstances are inapplicable to Count 1. *Id*.

Plaintiffs' ultra vires claim in Count 2 is also not governed by the *NRC* standard, but rather the *McAnnulty* framework used for claims that a government official acted ultra vires: whether the official's action was authorized by law. *NRC* turned on the petitioners' attempt to make an "end-run around the limitations of the" applicable "judicial-review statutes." 605 U.S. at 680–81. Unlike in *NRC*, Plaintiffs do not attempt to "end-run" a congressionally prescribed exclusive review scheme such as the Hobbs Act. *See id.* at 680–82. Further, Defendants even acknowledge (at 17 n.6) that a "form of ultra vires review may be applicable to certain Postal Service determinations," but try to pin the ultra vires claim to the *NRC* standard.

In any event, even assuming that *NRC* review applies here, Plaintiffs satisfy the standard. Congress has delegated *no powers* to USPS over state election administration—duties the Constitution assigns to states and Congress. *NRC*, 605 U.S. at 681. Congress has instead mandated that USPS operate a universal service, without discrimination among postal users or mail, and with

16

sharply limited authority to refuse to deliver mail or perform nonpostal services. 39 U.S.C. §§ 101, 401, 403, 404, 3001, 3703; *see* Pls. Br. 14–20. The Order therefore directs USPS to issue a rule that is entirely outside of "its delegated powers"—satisfying the first prong of *NRC*. 605 U.S. at 681. And contrary to Defendants' argument (at 25), the Order directs USPS to violate multiple specific statutory prohibitions. *See* Pls. Br. 14–20. The Order states that USPS "shall not transmit mail-in or absentee ballots from any individual" unless those individuals appear on certain lists, Order § 3(b)(iii)–(iv), despite USPS's clear mandate to "operate[] as a basic and fundamental service" to "patrons in all areas and . . . all communities," without "undue or unreasonable discrimination among users." 39 U.S.C. § 101(a); *id*. § 403(c). It directs USPS to take a central role in election administration, *see* Order § 3(b), despite USPS's circumscribed authority to provide nonpostal services. *See* 39 U.S.C. §§ 3703–3704. And it directs USPS not to transmit certain voters' ballots, *see* Order § 3(b)(iii), directly contravening Congress's detailed and exhaustive list of nonmailable materials—and robust protections for any mail outside of it. *See* 39 U.S.C. §§ 3001, 3005, 3007. The actions commanded by the Order are more than "contrary to a specific prohibition" in a statute; they are contrary to several. *NRC*, 605 U.S. at 681.

Defendants argue (at 26–28) that aspects of the Order are unreviewable because those provisions may "facilitate possible future post-election enforcement of criminal laws." But Plaintiffs do not challenge prosecutorial priorities or hypothetical future enforcement decisions. They challenge the Order's mandates to USPS to engage in rulemaking to restrict ballot transmission. Defendants cite (at 26) *Heckler v. Chaney*, 470 U.S. 821 (1985), but that case merely suggests narrow protection from judicial review of enforcement discretion; *Heckler* does not insulate the Order from review just because it contemplates future criminal enforcement activity.

### 2. *The Executive Order is a Mandatory and Unambiguous Directive.*

Defendants next claim (at 31–33) that the Order's enforcement is too speculative to assess

Plaintiffs' likelihood of success on the merits. *See also* Intvrs. Br. 12–13. But the Order is unlawful *on its face*. Implementing it in a way that complies with the Constitution and federal statutes would mean ignoring its mandatory, unambiguous instructions.

Section 3(b) directs that any USPS rulemaking "shall include, at minimum," several specified provisions—among them, that USPS "shall provide each State with a list" of enrolled voters and "shall not transmit mail-in or absentee ballots from any individual[s] unless those individuals have been enrolled" on it. Order § 3(b), (b)(iii)–(iv). "[T]here is no mystery about what [the Order] purports to require or whether [the Order] purports to require it." *LULAC I*, 780 F. Supp. 3d at 184. And as discussed below, those directives exceed the President's constitutional authority and command USPS to violate the PRA and UOCAVA. *See infra* §§ II.A.3 and II.A.4.

Defendants attempt to redraft these mandatory—and unlawful—instructions. They recast Section 3(b) (at 26, 36) as merely concerning "barcodes on mail-in ballots . . . which can facilitate possible future post-election enforcement of criminal laws," and dismiss as "implausible" (at 21) any suggestion that Section 2's State Citizenship Lists could be used "to somehow prevent eligible voters from receiving ballots." This may be the order Defendants wish to defend, but it is not the one issued. As described *supra*, Defendants offer nothing to suggest that USPS will not issue final rules that incorporate what the Order plainly directs. USPS's declarant suggested the very opposite.

Rather than engage with the actual Order, Defendants (*e.g.*, at 32–34) take refuge in boilerplate language directing agencies to act "to the extent feasible" or consistent with applicable law. *See* Order §§ 2(a), 4(c), 7(b); *see also* Intvrs. Br. 11 (similar). But Section 3(b) contains no such language and these purported limitations do not apply to USPS. Even if they did, this is precisely Plaintiffs' point: The Order directs DHS and USPS to act inconsistently with applicable law, and therefore they must be enjoined from effectuating it. "[I]f 'consistent with law' precludes

18

a court from examining whether [an] Executive Order is consistent with law, judicial review is a meaningless exercise, precluding resolution of the critical legal issues." *California I*, 786 F. Supp. 3d at 381 (quoting *City & Cnty. of S.F.*, 897 F.3d at 1239–40). A catch-all saving clause cannot salvage the Order. *See supra* § I.A.

Nor can the presumption of regularity, on which Defendants (at 33) and Intervenors (at 15) rely, bear the weight they place on it. Government agencies are presumed to act lawfully, but that presumption cannot "shield [agency] action from a thorough, probing, in-depth review." *New York*, 133 F.4th at 73 (quotation omitted). And the presumption has no role here in any event given the Order is "irregular on its face." *Pres. & Fellows of Harvard Coll. v. DHS,* 788 F. Supp. 3d 182, 205 (D. Mass. 2025).

### 3.    *The Executive Order Violates the Constitutional Separation of Powers.*

Neither Defendants nor Intervenors engage with the substance of Plaintiffs' Count I: The President lacks any authority, inherent or delegated, to regulate elections or USPS. The power to issue the Order "must stem either from an act of Congress or from the Constitution itself." *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 585 (1952). The Order is based on neither.

The President has no inherent power here because the Constitution grants states power over elections (subject to congressional—not presidential—intervention), and Congress power over the postal service. *See* Pls. Br. 10–12. Nor does the President have any delegated power. Congress exercised its authority over the postal service—which unlike other administrative agencies, is expressly conferred on Congress by the Constitution's text—in the PRA, which "abolished the Post Office Department as a Cabinet-level Department," restructuring it as USPS, and "insulate[d] the Postal Service from electoral politics by establishing institutional buffers between the President and the officers and employees of the Postal Service." *Del Gallo v. Parent*, 557 F.3d 58, 63–64 (1st Cir. 2009) (citation modified). Congress created USPS's Board of Governors to provide postal

19

services and the Postal Regulatory Commission to oversee certain USPS decisions; both Governors and Commissioners are appointed to fixed terms based on their expertise and are removable only for cause. *See generally* Pls. Br. 3–4.

Intervenors argue (at 17–18) that the Court should interpret the PRA to silently delegate authority to the President. *See also* Defs. Br. 34 (arguing the Order is "an exercise of the President's supervisory authority over the Executive Branch" (citation omitted)). But nothing in the PRA suggests Congress intended to delegate its powers over USPS to the President; in fact, the statute's structure suggests the opposite. Courts should be wary of claims of "delegations of core congressional powers" absent "clear congressional authorization." *Learning Res., Inc. v. Trump*, 146 S. Ct. 628, 642 (2026).

Intervenors cite (at 17) *Kennedy v. Braidwood Management, Inc.*, 606 U.S. 748 (2025), for the idea that Congress must make a clear statement "before [courts] will conclude Congress intended to interfere with the President's authority to supervise the executive branch." But *Braidwood* concerned removal power, not the power to direct rulemaking or otherwise supervise agency officials. *See* 606 U.S. at 754. Regardless, *Braidwood* recognized for-cause removal provisions indicate Congress's intent for an agency to be independent. *Id.* at 771–72. For-cause removal—as well as the set length of terms, the partisan composition balance, and the criteria of subject matter and managerial expertise—all establish that Congress intended to insulate USPS from presidential interference. *See Del Gallo*, 557 F.3d at 63–64.

Intervenors argue (at 18–19) that, regardless of whether Congress intended to delegate this authority to the President, Article II requires interpreting the PRA as authorizing the President to command USPS action. *See also* Defs. Br. 34. This expansive interpretation is "untethered from precedent and unsupported by even a maximalist view of 'the executive Power,'" and was no

20

defense for the 2025 Order. *LULAC I,* 780 F. Supp. 3d at 198 (citation omitted); *accord California I*, 786 F. Supp. 3d at 380–81. In support of this maximalist reading, Intervenors rely on *Myers v. United States*, 272 U.S. 52 (1926), which held that a law requiring the Senate's prior advice and consent to remove postmasters was unconstitutional. As with *Braidwood*, this confuses removal power with the power to direct specific rulemaking. And regardless, *Myers* does not change the *Youngstown* analysis: The President does not enjoy any inherent authority over USPS or elections. *Myers* also pre-dates the PRA, which removed USPS from direct presidential control—meaning that the President also lacks any delegated authority to issue the commands contained in the Order. Without inherent or delegated authority, the Order is unconstitutional and ultra vires.

4. *The Executive Order commands USPS to violate the PRA.*

Finally, Defendants and Intervenors nowhere explain how the challenged provisions of the Order comply with the PRA. Defendants' sole engagement (at 32) with Plaintiffs' statutory ultra vires argument is to suggest that the Order's unavoidable violation of UOCAVA could somehow disappear once implemented. UOCAVA mandates that USPS "provide expedited mail delivery service for *all* . . . absentee ballots" of covered voters. 52 U.S.C. § 20304(b)(2) (emphasis added); *but see* Order § 3(b)(iii)–(iv) (directing USPS to propose a rule not to transmit certain ballots, namely those of voters who do not appear on state-specific lists). Defendants ask (at 32), "What if . . . the final rule[] specifically addresses Plaintiffs' concerns about UOCAVA?" The only way to do so would be to ignore the Order's unambiguous instructions, which direct USPS to propose rules to take actions which are unauthorized and in direct contravention of the PRA and UOCAVA.

## B. Plaintiffs Will Suffer Irreparable Harm Absent a Preliminary Injunction.

Defendants attempt to deny Plaintiffs' irreparable harm on similar grounds as ripeness and

standing.[6] As shown above, Plaintiffs already have standing and ripe claims, *see supra* § I. For similar reasons as to justiciability, Defendants' irreparable harm arguments fail as a matter of law.

*First*, Defendants argue (at 38) that Plaintiffs suffer no irreparable harm because the Order "by itself does not require the *LWVMA* Plaintiffs . . . to do anything." But even where an executive order does not directly regulate plaintiffs, the "chaos, disruption, [and] uncertainty" it causes can constitute irreparable harm. *New York v. McMahon*, 784 F. Supp. 3d 311, 336 (D. Mass. 2025) (citation omitted). And "actions by a defendant that make it more difficult for an organization to accomplish its primary mission provide for injury purposes [of] irreparable harm." *Id.* at 362 (citation modified). The Order sows uncertainty among voters, upends Plaintiffs' work, and impedes their core missions to educate and facilitate voters' participation in democracy through mail voting, regardless of whether Plaintiffs are directly regulated. *See LULAC I*, 780 F. Supp. 3d at 200–01. As the D.C. Circuit concluded in *Newby*, executive action that created "new obstacles" that "unquestionably made it more difficult for the Leagues to accomplish their primary mission . . . provided injury for purposes both of standing and irreparable harm." 838 F.3d at 9 (citation modified).

"[C]ourts routinely recognize that organizations suffer irreparable harm when a defendant's conduct causes them to lose opportunities to conduct election-related activities, such as voter registration and education." *League of Women Voters of Mo. v. Ashcroft*, 336 F. Supp. 3d 998, 1005 (W.D. Mo. 2018) (collecting cases). Defendants argue (at 38) that the Order does not "require" Plaintiffs to halt existing work or upend their mail-voting activities, but this does not negate irreparable harm—its harms manifest in exactly that way. The Order casts objective uncertainty

---

[6] Intervenors opt to collapse justiciability and irreparable harm; only Defendants formulate any response to irreparable harm. *See* Intvrs. Br. 16–17.

over the viability of mail voting and threatens mass disenfranchisement, including of Plaintiffs' members. *See* Pls. Br. 20–26. Treating the Order as merely advisory, as Defendants propose, risks Plaintiffs' participation in disenfranchising their members and other voters, causing irreversible reputational harm and undermining their missions. *See id.* 24–25; *Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*, 102 F.3d 12, 20 (1st Cir. 1996). This interference with Plaintiffs' work and mission is the type of injury "not accurately measurable or adequately compensable by money damages." *Ross-Simons of Warwick*, 102 F.3d at 19.

*Second*, Defendants (at 39–40) assert a lack of final agency action. This misunderstands the applicable legal standard. Plaintiffs need only show they are "*likely* to suffer irreparable harm in the absence of preliminary relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008) (emphasis added). Plaintiffs have shown through declarations both existing and likely irreparable harm to themselves and their members. *See* Pls. Br. 20–27. Courts, including in this District, have not required plaintiffs to wait for final agency action before enjoining unlawful executive actions that threaten irreparable harm. *See, e.g.*, *California I*, 786 F. Supp. 3d at 389–93; *Doe v. Trump*, 766 F. Supp. 3d 266, 285–86 & n.22 (D. Mass. 2025), *stay granted in part on other grounds sub. nom., Trump v. CASA, Inc.*, 606 U.S. 381 (2025) (rejecting argument that plaintiffs should "wait and see how the EO will be implemented" for not-yet-implemented birthright citizenship executive order); *Barbara v. Trump*, 790 F. Supp. 3d 80, 102–03 (D.N.H. 2025), *cert. granted*, 146 S. Ct. 879 (2025) (enjoining birthright citizenship executive order that would go into effect more than six months later). "Damocles's sword does not have to actually fall on all appellants before the court will issue an injunction." *Newby*, 838 F.3d at 9.

*Finally*, Defendants claim (at 39) that a single special election in mid-April illustrates "why the Executive Order itself has not (and will not) cause any irreparable harm." Defendants'

conclusory assertion that the "special election took place without incident," *id.*, is no response to the irreparable harm Plaintiffs have already suffered, separate and apart from that election. *See* Pls. Br. 21–23. Nor is the election responsive to the harm Plaintiffs face with the Order's imminent implementation, *see id*. at 23–27; deadlines which Defendants admit (at 39–40) they currently face.

### C.  The Balance of Equities and Public Interest Weigh Heavily in Plaintiffs' Favor.

Defendants and Intervenors fail to articulate any public interest weighing in their favor. In response to the significant public harms articulated by Plaintiffs, Pls. Br. 28–30, Defendants make two arguments, which both fail. *First*, they claim (at 42–43) that "*LWVMA* Plaintiffs' interest is slight" and "they merely seek to prevent hypothesized harm[s]" that "have not yet come to pass and may never come to pass." This ignores the voter disenfranchisement that is nearly guaranteed to flow from Section 3 once implemented. Pls. Br. 26–27. Plaintiffs need not show the Order has already disrupted voting. *See Newby*, 838 F.3d at 8–9. And the Order continues to interfere with Plaintiffs' core activities and frustrate their missions regardless. Pls. Br. 21–26.

*Second*, Defendants claim (at 42) that the public interest would be harmed by an injunction "that would restrain the President from overseeing the Executive Branch." To the contrary, neither the public nor the federal government suffers harm from an injunction that stops the "perpetuation of unlawful" executive action. *Somerville Pub. Schs. v. McMahon*, 139 F.4th 63, 76 (1st Cir. 2025) (citation omitted). There is no public interest in violating the constitutional separation of powers under the Executive Order. *Nixon v. Fitzgerald*, 457 U.S. 731, 754 (1982) ("[J]udicial action is needed to serve broad public interests—as when the Court acts, not in derogation of the separation of powers, but to maintain their proper balance."). And an injunction that protects and upholds the separation of powers—and the laws passed by Congress—is in the public interest.

With the federal government facing no harm at all, the balance of equities and public interest heavily favor an injunction. Pls. Br. 28–30.

24

**D. This Court Should Deny Defendants' Request for an Injunction Bond.**

This Court should exercise its "substantial discretion" to deny Defendants' passing request (at 48) for an injunction bond. *Int'l Ass'n of Machinists & Aerospace Workers v. E. Airlines*, 925 F.2d 6, 9 (1st Cir. 1991). Defendants do "not suggest and ha[ve] not demonstrated that [they] will suffer a monetary loss" from an injunction. *California I*, 786 F. Supp. 3d at 395. But "requiring a bond as a condition of obtaining an injunction against an unlawful executive action . . . would risk deterring other litigants from pursing their right to judicial review of unlawful executive action." *Öztürk v. Trump*, No. 25-CV-12334-DJC, 2025 WL 3514320, at *10 (D. Mass. Dec. 8, 2025) (quoting *LULAC I*, 780 F. Supp. 3d at 225).

**III. Defendants' Motions to Dismiss Should Be Denied Because Plaintiffs Plausibly Allege Challenges to the Executive Order.**

**A. The Executive Order Violates Separation-of-Powers and Federalism Principles (Counts I, III).**

Defendants and Intervenors do not seriously contest that the Order violates the separation of powers and federalism. *See Bond v. United States*, 564 U.S. 211, 220 (2011) (private individuals "can assert injury from government action taken in excess of the authority that federalism defines"). Nor could they: As discussed *supra*, Plaintiffs have standing and ripe claims and are likely to succeed on their claim that the Order violates separation-of-powers and federalism principles, a higher standard than is required to survive a motion to dismiss. *California v. Trump*, 805 F. Supp. 3d 387, 405 (D. Mass. 2025) (*California II*).

Plaintiffs' allegations show that Section 3 violates separation-of-powers principles by usurping the Constitution's grant of authority over elections to Congress and states, and over the postal service to Congress. *See, e.g.*, Compl. ¶¶ 124, 136. Congress has not authorized the President to create federal election policy through USPS, *id.* ¶¶ 125–32, 137–38, and Article II grants the President no authority to circumvent Congress's statutory regime or Article I's

25

allocation of authority. *Id.* ¶¶ 139–40. Plaintiffs also plausibly allege that Section 3 violates federalism principles by intruding on state authority over election procedures and conditioning ballot delivery on state acquiescence. *Id.* ¶¶ 165–66. Defendants do not meaningfully explain how Plaintiffs' pleading falls short, or how coercion is not the purpose of Section 3.

### B. Section 3 of the Order Commands USPS to Violate the Law (Counts II, IV, V).

Plaintiffs plausibly allege that Section 3 directs USPS to violate federal law, including the PRA, the constitutional right to vote, and Section 11(a) of the Voting Rights Act (VRA).

As discussed *supra* § II.A, Plaintiffs have shown a likelihood of success on their ultra vires claim, which exceeds the standard required to survive a motion to dismiss. *See California II*, 805 F. Supp. 3d at 405. Defendants argue that an ultra vires claim is not available because the PRA does not contain a "specific prohibition" against the conduct ordered by the President but merely imposes "general obligation[s]." Defs. Br. 24–25 (citation omitted). A statute need not satisfy Defendants' overly formalistic, magic-words requirement, however, to support an ultra vires claim when the challenged actions exceed statutory authority. *See City of Providence v. Barr*, 954 F.3d 23, 31 (1st Cir. 2020) ("Any action that an agency takes outside the bounds of its statutory authority is ultra vires."). In any event, Plaintiffs have identified multiple statutory provisions that the Order directs USPS to violate. *See supra* § II.A.4; Pls. Br. 14–20; Compl. ¶¶ 144–47.

Defendants fail to explain in any substance how Plaintiffs have not pleaded claims that Section 3 unduly burdens the constitutional right to vote and violates Section 11(a) of the VRA. Instead, Defendants cursorily offer (at 24) that they are "aware of no[]" applicable private right of action to enforce Section 11(a). But "issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived." *United States v. Zannino*, 895 F.2d 1, 17 (1st Cir. 1990). And regardless, although Section 11 of the VRA does not contain an express private right of action, "persuasive authority across multiple districts has found

26

congressional intent to create an implied right of action for § 11(b) specifically within the statutory text, meeting the 'high bar' for implied causes of action." *Krabach v. King Cnty.*, No. 2:22-cv-1252-BJR, 2023 WL 7018431, at *3 (W.D. Wash. Oct. 25, 2023) (collecting cases). The same authority applies equally to Section 11(a). Plaintiffs plausibly allege that the Order directs USPS to take actions that violate the constitutional right to vote and Section 11(a). Compl. ¶¶ 169–84.

**C. Section 2 of the Order Commands Defendants to Violate the Law by Requiring Creation of State Citizenship Lists (Count VI).**

Finally, Plaintiffs plausibly allege that the Order's directives for the creation of State Citizenship Lists violate the Privacy Act. Plaintiffs may seek relief under the APA for these violations because the creation of the Lists itself is final agency action, as a decision "'from which legal consequences' flow[]." *New York*, 133 F.4th at 62 (quoting *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997)). Defendants have at least two legal obligations under the Privacy Act: (1) publishing a System of Records Notice (SORN) both by entities providing records and by DHS for the establishment of the State Citizenship Lists; and (2) ensuring that the Lists are accurate and complete. Plaintiffs plausibly pled that Defendants will not comply with either duty.

*1. APA Review is available and Plaintiffs have alleged final agency action.*

*First,* the APA provides a cause of action for Plaintiffs' Privacy Act claim, because it "is necessary to prevent imminent harm that cannot be remedied through the limited forms of . . . relief available under the . . . Act." *League of United Latin Am. Citizens v. Exec. Off. of the President*, 818 F. Supp. 3d 34, 111 (D.D.C. 2026) (*LULAC III*); *see also FAA v. Cooper*, 566 U.S. 284, 303 n.12 (2012); *Doe v. Chao*, 540 U.S. 614, 619 n.1 (2004). Here, the compilation and transmission of the State Citizenship Lists are not "in accordance with" the Privacy Act's disclosure rules, *see* 5 U.S.C. § 706(2)(A), and the Act's narrow remedies cannot cure those violations, Compl. ¶¶ 197–205. APA review is available.

27

*Second*, Plaintiffs have plausibly alleged final agency action, even if the State Citizenship Lists have not yet been compiled. The Order expressly directs the DHS Secretary to "take appropriate action to compile and transmit" the Lists, Order § 2(a), and "within 90 days" of the Order, to "establish the infrastructure necessary to compile, maintain, and transmit the State Citizenship List[s]," *id*. § 4(c). Such "mandatory" language may constitute consummation of agency decisionmaking even if the agency later "clarif[ies] or provide[s] further instructions." *Ass'n of Am. Univs. v. Dep't of Energy*, 789 F. Supp. 3d 118, 138–39 (D. Mass. 2025). Defendants (*e.g.*, at 18) and Intervenors (at 10–11) claim there is no final agency action because Defendants are still considering *how* to compile the State Citizenship Lists consistent with applicable law; Defendants state (at 19) that they have not yet established the necessary infrastructure. But this conflates creating the infrastructure with deciding whether to create it—the latter constitutes culmination of decision making, while the former simply effectuates it. *See* Order on Mot. to Dismiss at 11, *Civitas Mass. Reg'l Ctr., LLC v. Mayorkas*, No. 21-cv-10344-LTS (D. Mass. Jan. 19, 2022), Dkt. No. 39 (holding that a policy with "unequivocal" language was the consummation of agency decision making, even as implementation details "continue[d] to evolve"). Drawing all reasonable inferences in Plaintiffs' favor, Defendants are moving forward with complying with the Order's requirement to compile the State Citizenship Lists and as discussed *infra*, there are legal consequences of this decision under the Privacy Act. Together, this means there is final agency action for purposes of the APA. *See New York*, 133 F.4th at 62; *see also Am. Fed'n of Lab. & Cong. of Indus. Orgs. v. Dep't of Lab.*, No. 25-CV-339, 2026 WL 879518, at *12 (D.D.C. Mar. 31, 2026) (holding that policy of granting access to private data constitutes final agency action).

      2.  *Plaintiffs plausibly allege Defendants' creation of the State Citizenship Lists violates the Privacy Act.*

Under the Privacy Act, any agency that maintains a system of records must publish a SORN

and provide at least a thirty-day comment period in advance of either establishing a new system of records or expanding its routine use.[7] 5 U.S.C. §§ 552a(e)(4), (e)(11); *see also Flock v. DOT*, 136 F. Supp. 3d 138, 141 (D. Mass. 2015), *aff'd*, 840 F.3d 49 (1st Cir. 2016). Defendants do not dispute that a SORN is needed for DHS's establishment of the State Citizenship Lists, that SSA will provide records to DHS, or that they will establish infrastructure for the Lists within ninety days of the Order.

To comply with the Privacy Act, two consecutive publications are needed. *See* 5 U.S.C. §§ 552a(e)(4), (e)(11); *Flock*, 136 F. Supp. 3d at 141. First, SSA (and any other agency providing information to DHS) must publish, with thirty-days' notice, a new routine use allowing its system of records to be used to create the Lists. 5 U.S.C. § 552a(e)(11). Then, DHS must publish a new SORN, again with thirty-days' notice, before transmitting the Lists to the states. 5 U.S.C. § 552a(e)(4). Neither publication has yet been made, *see* Compl. ¶¶ 198–99, and fewer than sixty days remain before the ninety-day deadline. Because SSA and DHS cannot publish the necessary notices while complying with the Order's ninety-day directive, a violation of the Privacy Act is a certainty.

At most, Defendants claim (at 18–19) only that they "perhaps . . . will *agree* with Plaintiffs about the need" for a new or updated SORN. They suggest (at 19) that this Court should not entertain Plaintiffs' claim, citing a case in which DHS mooted a request for injunctive relief by eventually publishing a SORN. But they fail to mention that court also held "[i]t is flatly inconsistent with the text, structure, and purpose of the Privacy Act for an agency to initiate a major new data-sharing program affecting the sensitive data of millions of Americans, then

---

[7] *See* Ex. 18, Lakin Decl., Off. of Mgmt. & Budget Circular No. A-108, Federal Agency Responsibilities for Review, Reporting, and Publication under the Privacy Act at 7.

validate that program as a 'routine use' months after it has begun." *LULAC III*, 818 F. Supp. 3d at 115–16. Regardless, Defendants are welcome to argue mootness if they in fact publish the required notices prior to creating and using the Lists, but that does not render Plaintiffs' claim premature.

### 3. *Plaintiffs plausibly allege that the State Citizenship Lists cannot include reliable, timely, and accurate information, which violates the Privacy Act.*

Apart from the procedural SORN requirements and publication of the records' routine uses, the Privacy Act has a substantive requirement that the agency ensure that the records it maintains and disseminates are accurate, timely, and complete. *See* 5 U.S.C. § 552a(e)(5)–(6). Plaintiffs plausibly allege that the State Citizenship Lists will necessarily be incomplete and inaccurate because of the known gaps and limitations of data available to federal agencies, meaning the Secretary cannot comply with the Privacy Act's requirement that DHS maintain and disseminate accurate, timely, and complete information. Compl. ¶¶ 91, 99, 101, 202. None of the Order's specified sources for the Lists are "comprehensive citizenship databases." Compl. ¶ 91. Defendants do not deny those sources' limitations, but instead speculate (at 21) that "the use of other (as-yet-unidentified) 'other relevant federal databases' could mitigate or resolve Plaintiffs' concerns." But speculation cannot overcome Plaintiffs' well-pleaded facts that the Lists will be inaccurate and incomplete. *See Ocasio-Hernandez v. Fortuno-Burset*, 640 F.3d 1, 12 (1st Cir. 2011).

### CONCLUSION

Plaintiffs respectfully request that this Court deny Defendants' and Intervenors' motions to dismiss and grant Plaintiffs' motion for a preliminary injunction.

Dated: May 14, 2026

Respectfully submitted,

/s/ Sophia Lin Lakin

Jessie J. Rossman (BBO #670685)
Suzanne Schlossberg (BBO #703914)
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION OF MASSACHUSETTS,
INC.
One Center Plaza, Suite 850
Boston, MA 02108
(617) 482-3170
jrossman@aclum.org
sschlossberg@aclum.org

Eliza Sweren-Becker*
Wendy Weiser*
Andrew B. Garber*
BRENNAN CENTER FOR JUSTICE AT
NYU SCHOOL OF LAW
120 Broadway, Suite 1750
New York, NY 10271
(646) 292-8310
sweren-beckere@brennan.law.nyu.edu
weiserw@brennan.law.nyu.edu
garbera@brennan.law.nyu.edu

Justin Lam*
BRENNAN CENTER FOR JUSTICE AT
NYU SCHOOL OF LAW
777 6th Street NW, Suite 1100
Washington, DC 20001
(202) 249-7190
lamju@brennan.law.nyu.edu

Niyati Shah*
Noah Baron*
Ejaz Baluch, Jr.*
ASIAN AMERICANS ADVANCING
JUSTICE-AAJC
1620 L Street NW, Suite 1050
Washington, DC 20036
(202) 296-2300
nshah@advancingjustice-aajc.org
nbaron@advancingjustice-aajc.org
ebaluch@advancingjustice-aajc.org

Sophia Lin Lakin*
Theresa J. Lee*
Davin Rosborough*
Ethan Herenstein*
Jonathan Topaz*
Ming Cheung*
William Hughes*
Clayton Pierce*
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
125 Broad Street, 18th Floor
New York, NY 10004
(212) 549-2500
slakin@aclu.org
tlee@aclu.org
drosborough@aclu.org
eherenstein@aclu.org
jtopaz@aclu.org
mcheung@aclu.org
whughes@aclu.org
cpierce@aclu.org

Sarah Brannon*
Adriel I. Cepeda Derieux*
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
915 15th Street NW
Washington, DC 20001
(202) 457-0800
sbrannon@aclu.org
acepedaderieux@aclu.org

Leah C. Aden*
Brenda Wright*
John S. Cusick*
NAACP LEGAL DEFENSE &
EDUCATIONAL FUND, INC.
40 Rector Street, 5th Floor
New York, NY 10006
(212) 965-2200
laden@naacpldf.org
bwright@naacpldf.org
jcusick@naacpldf.org

31

Miranda Galindo*
Latino Justice PRLDEF
475 Riverside Drive, Suite 1901
New York, NY 10115
(212) 392-4752
mgalindo@latinojustice.org

I. Sara Rohani*
NAACP LEGAL DEFENSE &
EDUCATIONAL FUND, INC.
700 14th Street NW, Suite 600
Washington, DC 20005
(202) 682-1300
srohani@naacpldf.org


*Admitted pro hac vice

*Counsel for Plaintiffs League of Women Voters of Massachusetts, League of Women Voters Lotte E. Scharfman Memorial Education Fund, League of Women Voters of the United States, League of Women Voters Education Fund, Association of Americans Resident Overseas, U.S. Vote Foundation, OCA-Asian Pacific American Advocates, and Delta Sigma Theta Sorority, Inc.*

**CERTIFICATE OF SERVICE**

I hereby certify that on May 14, 2026, a true copy of the above document was filed via the

Court's CM/ECF system and that a copy will be sent automatically to all counsel of record.

May 14, 2026                                              /s/ *Sophia Lin Lakin*
                                                          Sophia Lin Lakin

33