# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

LEAGUE OF WOMEN VOTERS OF MASSACHUSETTS, *et al.*,

    *Plaintiffs*,

    v.

DONALD J. TRUMP, in his official capacity as President of the United States, *et al.*,

    *Defendants*,

STATE OF MISSOURI, STATE OF ALABAMA, STATE OF FLORIDA, STATE OF INDIANA, STATE OF KANSAS, STATE OF LOUISIANA, STATE OF MONTANA, STATE OF NEBRASKA, STATE OF OKLAHOMA, STATE OF SOUTH CAROLINA, STATE OF SOUTH DAKOTA, and STATE OF TEXAS,

    *Intervenor Defendants*.

Case No. 1:26-cv-11549-IT

## REPLY IN SUPPORT OF INTERVENER STATES' MOTION TO DISMISS

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................................. iii

INTRODUCTION .............................................................................................................. 1

ARGUMENT .................................................................................................................... 1

    I.    Plaintiffs' Claims Are Not Ripe ............................................................................ 1

    II.   Plaintiffs Have Not Shown Organizational or Associational Standing .............................. 6

    III.  Plaintiffs' Requested Remedy Is Unconstitutional. ............................................... 9

CONCLUSION ................................................................................................................ 10

CERTIFICATE OF SERVICE ............................................................................................. 14

# TABLE OF AUTHORITIES

**Cases**                                                   Page(s)

*Bldg. & Const. Trades Dep't, AFL-CIO v. Allbaugh*,
295 F.3d 28 (D.C. Cir. 2002) ............ 4

*Caicedo v. DeSantis*,
No. 23-CV-2303, 2024 WL 4729160 (M.D. Fla. Nov. 8, 2024) ............ 8

*California v. Trump*,
786 F. Supp. 3d 359 (D. Mass 2025) ............ 5, 6

*City & Cnty. of S.F. v. Trump*,
897 F.3d 1225 (9th Cir. 2018) ............ 5

*Clapper v. Amnesty Int'l USA*,
568 U.S. 398 (2013) ............ 1

*Coal. for Open Democracy v. Scanlan*,
794 F. Supp. 3d 28 (D.N.H. 2025) ............ 8

*Common Cause v. Trump*,
506 F. Supp. 3d 39 (D.D.C. 2020) ............ 2, 5

*Conn. Fair Hous. Ctr. v. CoreLogic Rental Prop. Sols., LLC*,
167 F.4th 605 (2d Cir. 2026) ............ 7

Excluding Illegal Aliens From the Apportionment Base Following the 2020 Census,
85 Fed. Reg. 44,679 (July 21, 2020) ............ 3

*FDA v. All. for Hippocratic Med.*,
(*AHM*), 602 U.S. 367 (2024) ............ 7, 8

*Get Loud Ark. v. Thurston*,
748 F. Supp. 3d 630 (W.D. Ark. 2024) ............ 8

*Havens Realty Corp. v. Coleman*,
455 U.S. 363 (1982) ............ 7, 8

*In re Murray Energy Corp.*,
788 F.3d 330 (D.C. Cir. 2015) ............ 3

*League of United Latin Am. Citizens v. Exec. Off. of the President*,
(*LULAC I*), 780 F. Supp. 3d 135 (D.D.C. 2025) ............ 2, 5, 6, 10

*League of Women Voters of Ohio v. LaRose*,
741 F. Supp. 3d 694 (N.D. Ohio 2024) ............ 8

*Myers v. United States*,
  272 U.S. 52 (1926)...................................................................................................... 10

*N.H. Youth Movement v. Scanlan*,
  No. 24-cv-291-SE, 2026 WL 323171 (D.N.H. Feb. 6, 2026)...................................................... 9

*New York v. Trump*,
  133 F.4th 51 (1st Cir. 2025)...................................................................................... 4, 5

*Perez v. Mortgage Bankers Ass'n*,
  575 U.S. 92 (2015)...................................................................................................... 3

*Reno v. Flores*,
  507 U.S. 292 (1993)...................................................................................................... 4

*TransUnion LLC v. Ramirez*,
  594 U.S. 413 (2021)...................................................................................................... 9

*Trump v. New York*,
  592 U.S. 125 (2020)............................................................................................... 2, 3, 6

*United States v. Arthrex, Inc.*,
  594 U.S. 1 (2021)...................................................................................................... 10

*Washington v. Trump*,
  814 F. Supp. 3d 1173 (W.D. Wash. 2026)................................................................................ 6

**Statutes**

5 U.S.C. § 704............................................................................................................ 3

39 U.S.C. 401............................................................................................................ 3

39 U.S.C. § 401(2)...................................................................................................... 10

**Other Authorities**

Executive Order No. 14399 ("EO").......................................................................... *passim*

**INTRODUCTION**

Plaintiffs push the same theories of injury in their May 14, 2026 memorandum as they did on April 23, 2026. They were speculative then and remain speculative today. The status of Executive Order No. 14399 ("EO") is the same today as it was when Plaintiffs filed their complaint – no proposed rulemaking has been published, and no decision has been made concerning if and how the State Citizenship Lists will be compiled. Plaintiffs' claim that the EO will prevent them from carrying out their voter-engagement activities and prevent their members from voting is therefore riddled with contingencies and multiple layers of speculation. Without knowing the exact rules they are challenging, Plaintiffs' lawsuit is premature and Article III requires dismissal. Accordingly, the Court should dismiss their claims.

**ARGUMENT**

I. **Plaintiffs' Claims Are Not Ripe**

Whether considered as a matter of Article III standing or prudential ripeness, Plaintiffs lack standing because their alleged harms are contingent on speculation about future events. Doc. 125 ("State Br.") at 9–10, 14–16; *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409–10, 414 n.5 (2013).

*First*, Plaintiffs' challenge to Section 2(a) is impermissibly based on multiple contingencies and layers of speculation. State Br. at 3–6. Even assuming the State Citizenship Lists are created, Plaintiffs do not know *how* this will be done. State Br. at 9–10. For example, Plaintiffs speculate that the State Citizenship Lists will violate the Privacy Act, LWV Compl. ¶¶ 185–205, even though the EO expressly says that the Lists should only be created "to the extent feasible and consistent with applicable law." EO § 2(a). Notably, Judge Kollar-Kotelly declined to preliminary enjoin a similar executive order that mandated the creation of citizenship lists based on speculation that the lists would violate the Privacy Act—precisely because the government *could* create such lists

1

consistent with the Privacy Act. *League of United Latin Am. Citizens v. Exec. Off. of the President* (*LULAC I*), 780 F. Supp. 3d 135, 206 (D.D.C. 2025).

Plaintiffs' extensive speculation dooms their case. State Br. at 3–6. The Supreme Court in *Trump v. New York* rejected judicial review of a presidential directive where it included the exact caveat. *See* 592 U.S. 125, 131–32 (2020) (explaining that where "the President qualified his directive by providing that the Secretary should gather information 'to the extent practicable' and [take action] 'to the extent feasible,'" "[a]ny prediction how the Executive Branch might eventually implement this general statement of policy is 'no more than conjecture' at this time" and the order "may not prove feasible to implement in any manner whatsoever, let alone in a manner substantially likely to harm any of the plaintiffs here"); *see also Common Cause v. Trump*, 506 F. Supp. 3d 39, 47 (D.D.C. 2020) (Katsas, J.) (holding presidential memorandum challenge was unripe where the order included qualifiers that any action taken be only "to the extent feasible" and "to the extent practicable").

Plaintiffs argue that *Trump v. New York* is inapposite because, in that case, the executive order "directed the exclusion of undocumented immigrants from the congressional apportionment base with no concrete directives or specified implementation timeline and many contingencies" and "therefore acted more as general policy guidance." Doc. 139 ("LWV Br.") at 3. But the Court did not discuss the lack of deadlines in finding the challenge unripe and centered its analysis on the requirements of practicality and feasibility to determine that there were too many open questions. *New York*, 592 U.S. at 131–32. Plaintiffs are also wrong when they say that the 2020 executive order is less concrete than Section 2(a). In fact, the directives are nearly identical – like Section 2(a)'s instruction to gather information for the State Citizenship Lists, the 2020 order "instructed executive departments and agencies to share information with the Department of

2

Commerce, to the extent permissible and consistent with law, to allow the Secretary to obtain accurate data on [citizens and noncitizens]." Excluding Illegal Aliens From the Apportionment Base Following the 2020 Census, 85 Fed. Reg. 44,679, 44,680 (July 21, 2020). Section 2(a) is therefore no riper than the 2020 order and *Trump v. New York* accordingly mandates dismissal of Plaintiffs' challenge.

*Second*, Plaintiffs' challenge to Section 3 of the EO is also too speculative to proceed. State Br. at 12–13. USPS has not even issued a *proposed* rule—let alone a final one. As previously explained, the EO contains only a broad outline of the proposed USPS regulations—which means Plaintiffs cannot allege what the ultimate rule will provide. *See, e.g.*, EO § 3(b)(iv) (directing "[p]roposed provisions specifying that the USPS shall provide each State with a list of individuals (Mail-In and Absentee Participation List) who are enrolled with the USPS, *pursuant to a process specified in the rulemaking directed by this subsection*" (emphasis added)).

Litigants cannot even challenge *proposed rules* before they are finalized. *See* 5 U.S.C. § 704; *In re Murray Energy Corp.*, 788 F.3d 330, 334 (D.C. Cir. 2015). The reason why is obvious: A proposed rule can change during rulemaking. Here, USPS has committed not to implement any of the proposals from Section 3 before completing notice-and-comment rulemaking. Doc. 127-3 (Decl. of S. Monteith) ¶ 5. That means USPS will be legally required to accept and consider ideas submitted in comments. *Id.* Agencies *must* consider changes suggested by commenters, *Perez v. Mortgage Bankers Ass'n*, 575 U.S. 92, 96 (2015), so there is no reason to assume the final rule will look exactly like Section 3 of the EO. Moreover, like Section 2(a), Section 3 directs that USPS's action be "pursuant to 39 U.S.C. 401 and other applicable authority," in "compl[iance] with the Privacy Act and all applicable use agreements," and "consistent with applicable State law," which will require USPS to make discretionary decisions about, among other things, how

3

the Mail-In and Absentee Participation Lists will be compiled and how the enrollment process will work. EO § 3(b)(iv)–(v). The only evidence Plaintiffs can produce about USPS's rulemaking process in response to the EO is an article published on May 14, 2026 reporting a USPS statement that "the Postal Service is examining the executive order, and we are working on a draft of a proposed rule." Doc 140-1 at 5. This statement does not provide any detail on what the regulation will look like or how the regulation will be implemented consistently with applicable law. If anything, Plaintiffs' evidence shows that there are too many open questions about the unborn rules being challenged. Plaintiffs' claim that Section 3 cannot possibly be implemented lawfully is therefore mere conjecture and should be rejected.

In response, Plaintiffs insist that the EO's direction that the rulemaking be carried out lawfully is unimportant to the ripeness analysis because this Circuit has found that the "consistent with applicable . . . law" caveat does not make a directive legal. LWV Br. at 2–3 (citing *New York v. Trump*, 133 F.4th 51, 69 (1st Cir. 2025)). But the suggestion that the requirement is meaningless misconstrues the law. Indeed, "[t]he mere possibility that some agency might make a legally suspect decision" and ignore a saving clause's command to follow the law when implementing an executive order "does not justify an injunction against enforcement" of that order. *Bldg. & Const. Trades Dep't, AFL-CIO v. Allbaugh*, 295 F.3d 28, 33 (D.C. Cir. 2002); *see also Reno v. Flores*, 507 U.S. 292, 301 (1993) (to prevail in facial attack, complainant "must establish that no set of circumstances exists under which the regulation would be valid" (cleaned up)). Instead, "if an executive order containing a saving clause directs a subordinate to achieve some goal, and that goal could be achieved in multiple ways—some of which would be legal and some of which would be illegal—a reviewing court will interpret the order in light of the saving clause to direct only

4

permissible action." *LULAC I,* 780 F. Supp. 3d at 176 (citing *Common Cause*, 506 F. Supp. 3d at 49–50, 53 n.8 and *New York*, 592 U.S. at 131).

The "savings clause" caselaw relied on by Plaintiffs is also inapposite. In *New York v. Trump* (cited at LWV Br. at 3), the Office of Management and Budget's directive to pause federal financial assistance programs was a final agency action that was not contingent on uncertain rulemaking procedures, and the First Circuit did not address ripeness at all. *See New York*, 133 F.4th at 67. That case merely stands for the proposition that unlawful final agency actions cannot be made lawful by merely adding the language "consistent with the law." *See id.* at 69 (holding that the "undisputed evidence before [the district court] [wa]s that adding the 'consistent with the law' caveat was nothing more than window dressing on an unconstitutional directive by the Executive" (second alteration in original)). In *City & Cnty. of S.F. v. Trump* (cited at LWV Br. at 3), the Ninth Circuit held that a challenge to an executive order unambiguously directing that sanctuary jurisdictions not receive federal grants was ripe where Plaintiffs showed a "history of past prosecution or enforcement." 897 F.3d 1225, 1238 (9th Cir. 2018). Those circumstances are not present here. In *LULAC I* (cited at LWV Br. at 3), the court afforded little force to an executive order's qualifiers because, in that case, no further factual development was needed because, unlike here, there was no uncertainty of the outcome. 780 F. Supp. 3d at 185. Finally, in *California v. Trump* (cited at LWV Br. at 3), the court found that a challenge to an executive order directing the Election Assistance Commission to require documentary proof of citizenship for federal mail-in voter registration application form was ripe because that single requirement was unambiguous and "that the administrative process prior to implementation will address only technical details." 786 F. Supp. 3d 359, 378–79 (D. Mass 2025). Here, in contrast and as described above, many of the significant contours of both Sections 2 and 3 are yet to be determined and the agencies will need

5

to make substantive decisions during the rulemaking process.  It is therefore too soon to challenge the EO on the merits and the Court should not rush to judgment when the necessary details will soon be known.

Plaintiffs argue that the EO is more analogous to the 2025 executive order at issue in *California v. Trump*, 786 F.Supp.3d 359 (D. Mass 2025), than the 2020 Executive Order at issue in *Trump v. New York*, 592 U.S. 125 (2020).  LWV Br. at 3–4.  But the opposite is true:  Like the 2020 order and unlike the 2025 order, many aspects of how the EO will be implemented remain to be seen.  USPS must go through its required rulemaking to determine how enrollment procedures and the creation of the Mail-In and Absentee Participation List can be done in accordance with both state and federal law.  This is much different than the 2025 order, which was self-executing and involved miniscule action at the administrative level.  *See California*, 786 F. Supp. 3d at 378–79; *see also Washington v. Trump*, 814 F. Supp. 3d 1173, 1207–08 (W.D. Wash. 2026) (reasoning that challenge to the 2025 order was ripe because the claims did not require further factual development); *LULAC I*, 780 F. Supp. 3d at 203 (same).

The Court should dismiss Plaintiffs' claims for lack of standing and ripeness.

## II.   Plaintiffs Have Not Shown Organizational or Associational Standing

Despite the EO not yet being implemented, Plaintiffs somehow claim that it is currently inflicting ongoing or imminent harm.  *See, e.g.*, LWV Compl. ¶ 112.  But none of Plaintiffs' standing theories withstand scrutiny.

*First*, Plaintiffs speculate that unnamed individuals' rights to vote could be harmed—due to being improperly removed from a State's voter registration list.  *See* LWV Br. 11–12.  But this is extraordinarily speculative and not concrete.  State Br. at 5.  As already explained, this theory of injury depends on speculation that the State Citizenship List will be inaccurate.  It also depends

6

on the assumption that States will use the Lists to arbitrarily remove voters from the rolls.  But, to start, there is no reason to think that all States will even use the Lists—which are optional.  EO § 2(a).  Even among States who might use the Lists, each State has its own rules for maintaining its voter registration lists (and in some States, county officials do this work).  In asking this Court to speculate that thousands of state and local election officials will use the Lists to arbitrarily disenfranchise voters, Plaintiffs not only speculate—they do so unreasonably.

*Second*, Plaintiffs point to the "expenditure of resources to counter" harms they speculate will result from the EO.  LWV Br. at 9.  Even putting aside the enormous speculation inherent in this standing theory, Plaintiffs cannot "spend their way into standing." *Id.* (cleaned up).  The Supreme Court rejected resource-diversion standing in *FDA v. All. for Hippocratic Med.* (*AHM*), 602 U.S. 367, 394 (2024); *see Conn. Fair Hous. Ctr. v. CoreLogic Rental Prop. Sols., LLC*, 167 F.4th 605, 618 (2d Cir. 2026) (holding that a "diversion of resources" theory "'does not work to demonstrate standing'" after *AHM* (quoting *AHM*, 602 U.S. at 394)).

Plaintiffs try to distinguish *AHM* by pointing to their voluntary decisions to expend resources "to counter confusion and fears that the Executive Order will prevent members from voting by mail."  LWV Br. 9 (cleaned up); *accord id.* at 10.  But the Alliance for Hippocratic Medicine also alleged that the defendants' actions forced it to divert resources from other projects to educate people about the challenged actions.  *AHM*, 602 U.S. at 390.  That theory of standing failed in *AHM*, and it must fail here too.

Resisting this point, Plaintiffs cite the Supreme Court's decision in *Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982). But in *AHM*, the Supreme Court clarified that "*Havens* was an unusual case, and this Court has been careful not to extend the *Havens* holding beyond its context." 602 U.S. at 396.  The Supreme Court explained that standing existed in *Havens* because the

7

defendant's provision of false information about apartment availability impaired the organization's "ability to provide counseling and referral services for low-and moderate-income homeseekers," *Havens Realty Corp. v. Coleman*, 455 U.S. at 379, "not dissimilar to a retailer who sues a manufacturer for selling defective goods to the retailer." *AHM*, 602 U.S. at 395. This narrow scenario has no bearing here, as the EO does not directly prevent Plaintiffs from engaging in their core activities, which purportedly consist of voter education and mobilization programs. Plaintiffs remain just as free to educate voters about mail voting as they were before the EO was announced.

Plaintiffs' other resource-diversion cases are no more persuasive in light of *AHM*. *See* LWV Br. at 9 n.4. Instead, those cases dealt with injuries that had already occurred or pertained to an additional voting requirement that, unlike here, did interfere with core business activities and therefore were not speculative or conjectural. *See Coal. for Open Democracy v. Scanlan*, 794 F. Supp. 3d 28 (D.N.H. 2025) (concerning New Hampshire House Bill changing New Hampshire's voter registration and identification requirements); *League of Women Voters of Ohio v. LaRose*, 741 F. Supp. 3d 694 (N.D. Ohio 2024) (concerning Ohio statute that directly forbade plaintiff from engaging in core activities); *Caicedo v. DeSantis*, No. 23-CV-2303, 2024 WL 4729160 (M.D. Fla. Nov. 8, 2024) (concerning removal of State Attorney without addressing *Alliance for Hippocratic Medicine*); *Get Loud Ark. v. Thurston*, 748 F. Supp. 3d 630 (W.D. Ark. 2024) (involving litigants whose voter-registrations were rejected). This Court should reject Plaintiffs' theories of standing.

*Third*, Plaintiffs speculate that the EO could result in fewer individuals being able to vote by mail. LWV Br. at 10. But, once again, this injury relies on far too much speculation. State Br. at 14–16. Indeed, Plaintiffs admitted as much in their Complaint, stating that that "[t]he Executive Order provides no further explanation as to what this enrollment process will look like, or how USPS should determine which of its users are entitled to mail their ballots." LWV Compl. ¶ 149.

Plaintiffs' claimed injury that "fewer voters will be able to confidently rely on vote-by-mail and cast an effective mail ballot" is extraordinarily speculative, rendering its cited authority inapposite. LWV Br. at 10; *N.H. Youth Movement v. Scanlan*, No. 24-cv-291-SE, 2026 WL 323171, at *8, 10 (D.N.H. Feb. 6, 2026) (holding that *enacted* state law adding voting requirements harmed organizational plaintiffs' ability to register some voters).

*Finally*, to the extent Plaintiffs are relying on a privacy injury—based on the potential disclosure of their citizenship information—this injury is not cognizable or redressable. Plaintiffs have not met their burden of proving this injury—different parts of the American government sharing citizenship information—has "a close historical or common-law analogue for their asserted injury." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 424 (2021). As for redressability, Plaintiffs cryptically suggest that only "some" of the information implicated by the EO is already shared. LWV Br. at 13. But the only information the State Citizenship Lists would contain is citizenship and age—information already available in other federal databases. EO § 2(a). And, once again, because everyone must attest to being a citizen and being age-eligible when registering to vote, it is hard to see how Plaintiffs could be injured by the disclosure of information they already provided. State Br. at 7.

## III.   Plaintiffs' Requested Remedy Is Unconstitutional

Plaintiffs ask the Court to do something truly extraordinary and unprecedented: Bar the President from asking a federal agency to engage in rulemaking. LWV Compl. ¶ 18. But Plaintiffs identify no clear statutory authority for their argument that the President cannot supervise USPS, and any such statute would be unconstitutional. State Br. at 17–18.

Plaintiffs resist their obligation to cite clear statutory authority for their argument that USPS is wholly independent from the President, insisting that cases about *removal* are inapposite.

9

LWV Br. at 20.  But it is hard to see how.  The reason *why* the President must be generally allowed to remove executive officials is because "the activities of executive officers . . . *must be* exercises of—the executive Power, for which the President is ultimately responsible."  *United States v. Arthrex, Inc.*, 594 U.S. 1, 17 (2021) (quotations and citations omitted).  If a President is constitutionally entitled to fire an agency official for refusing to follow his policy, it would be downright strange if a court could simply bar the President from giving the order in the first place.

Finally, Plaintiffs do not meaningfully contest that it would be unconstitutional for Congress to insulate USPS from presidential control.  State Br. at 19.  Indeed, the U.S. Supreme Court already said as much in *Myers v. United States*.  272 U.S. 52, 135 (1926).  The fact that *Myers* "pre-dates the [Postal Reorganization Act]" cannot change the constitutional analysis.  LWV Br. at 21.

\*       \*       \*

The primary theme of Plaintiffs' brief is that the defendants do not focus on the merits.  *Id.* at 1.  But it is easy to *imagine* various things the EO could lead to, and it is easy to *imagine* how they could be legal.  For example, with respect to Section 2(a), the federal government could create a list that complies with the Privacy Act—either because sharing citizenship information is a "routine use" or by complying with the Privacy Act's statutory steps.  *Cf. LULAC I*, 780 F. Supp. 3d at 205.  As for Section 3, USPS has been given broad authority to issue regulations governing what passes through the mail.  39 U.S.C. § 401(2).

Intervener States could offer more speculation.  But the point is that this lawsuit *must wait* until the parties and the Court are no longer forced to speculate about what the EO will do.

## CONCLUSION

For the foregoing reasons, the Court should grant Intervener States' Motion to dismiss.

10

Date: May 22, 2026                                  Respectfully submitted,


**STEVE MARSHALL**                                  **CATHERINE L. HANAWAY**
ALABAMA ATTORNEY GENERAL                            MISSOURI ATTORNEY GENERAL


*/s/ A. Barrett Bowdre*                             */s/ Louis J. Capozzi III*
A. Barrett Bowdre*                                  Louis J. Capozzi III, DC Bar No. 90018764*
  *Solicitor General*                                 *Solicitor General*
STATE OF ALABAMA                                    J. Michael Patton*
OFFICE OF THE ATTORNEY GENERAL                        *Deputy Solicitor General*
501 Washington Avenue                               Benjamin S. Gilberg*
Montgomery, Alabama 36104                             *Deputy Solicitor General*
Telephone: (334) 353-8892                           Missouri Attorney General's Office
Fax: (334) 353-8400                                 815 Olive Street, Suite 200
Barrett.Bowdre@AlabamaAG.gov                        St. Louis, MO 63101
                                                    Tel. (573) 645-9662
                                                    Fax (573) 751-0774
                                                    Louis.Capozzi@ago.mo.gov
                                                    Michael.Patton@ago.mo.gov
                                                    Benjamin.Gilberg@ago.mo.gov


**JAMES UTHMEIER**                                  **THEODORE E. ROKITA**
FLORIDA ATTORNEY GENERAL                            INDIANA ATTORNEY GENERAL


*/s/ David M.S. Dewhirst*                           /s/ *James A. Barta*
David M.S. Dewhirst*                                James. A Barta, DC Bar No. 1032613*
  *Solicitor General*                                 *Solicitor General*
Jason J. Muehlhoff*                                 Office of the Indiana Attorney General
  *Chief Deputy Solicitor General*                  302 W. Washington Street
Office of the Attorney General                      IGC South, Fifth Floor
PL-01, The Capitol                                  Indianapolis, IN 46204-2770
Tallahassee, FL 32399-1050                          Phone: (317) 232-0709
(850) 414-3300                                      Fax: (317) 232-7979
david.dewhirst@myfloridalegal.com                   James.Barta@atg.in.gov
jason.muehlhoff@myfloridalegal.com

11

**KRIS W. KOBACH**
KANSAS ATTORNEY GENERAL

*/s/ James R. Rodriguez*
James R. Rodriguez*
*Assistant Attorney General*
Kansas Office of the Attorney General
Topeka, Kansas 66612
Phone: (785) 368-8197
jay.rodriguez@ag.ks.gov


**AUSTIN KNUDSEN**
MONTANA ATTORNEY GENERAL

*/s/ Christian B. Corrigan*
Christian B. Corrigan*
 *Solicitor General*
Montana Department of Justice
215 N. Sanders Helena, MT 59601
(406) 444-2707 (o)
Christian.Corrigan@mt.gov


**GENTER DRUMMOND**
OKLAHOMA ATTORNEY GENERAL

*/s/ Garry M. Gaskins, II*
Garry M. Gaskins, II**
 *Solicitor General*
Office of the Attorney General of Oklahoma
313 NE Twenty-First St.
Oklahoma City, OK 73105
(405) 521-3921
garry.gaskins@oag.ok.gov


**ELIZABETH B. MURRILL**
LOUISIANA ATTORNEY GENERAL

*/s/ J. Benjamin Aguiñaga*
J. Benjamin Aguiñaga*
 *Solicitor General*
Louisiana Department of Justice
1885 N. Third St.
Baton Rouge, LA 70802
(225) 506-3746
AguinagaB@ag.louisiana.gov


**MICHAEL T. HILGERS**
NEBRASKA ATTORNEY GENERAL

/s/ *Cody S. Barnett*
Cody S. Barnett*
 *Solicitor General*
Nebraska Department of Justice
1445 K Street, Room 2115
Lincoln, Nebraska 68508
Tel.: (402) 471-2683
Fax: (402) 471-3297
cody.barnett@nebraska.gov


**ALAN WILSON**
SOUTH CAROLINA ATTORNEY GENERAL

*/s/ Joseph D. Spate*
Joseph D. Spate*
 *Deputy Solicitor General*
1000 Assembly Street
Columbia, South Carolina 29201
Tel. (803) 734-3371
Fax (803) 734-3677
josephspate@scag.gov

12

**MARTY J. JACKLEY**
SOUTH DAKOTA ATTORNEY GENERAL

/s/ *Grant Flynn*
Grant Flynn*
  *Assistant Attorney General*
South Dakota Office of the Attorney General
1302 East SD Highway 1889,
Suite 1
Pierre, SD 57501-8501
Telephone: (605) 773-3215
Email: grant.flynn@state.sd.us


/s/ *Ian D. Prior*
Ian D. Prior (Bar No. 655704)
America First Legal Foundation
611 Pennsylvania Ave S.E. No. 231
Washington, D.C. 20003
(410) 205-9681
ian.prior@aflegal.org


*\* Admitted pro hac vice*
*\*\* Pro hac vice forthcoming*

**KEN PAXTON**
TEXAS ATTORNEY GENERAL

s/ *David Bryant*
David Bryant*
  *Senior Special Counsel*
Office of the Attorney General of Texas
Special Litigation Division
P.O. Box 12548, Capitol Station
Austin, Texas 78711-2548
Tel.: (512) 463-2100
david.bryant@oag.texas.gov

13

## CERTIFICATE OF SERVICE

I certify that on May 22, 2026, the above was filed electronically through the Court's electronic filing system to be served electronically on counsel for the parties.

/s/ *Louis J. Capozzi III*

14