**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| LEAGUE OF WOMEN VOTERS OF MASSACHUSETTS, *et al.*,<br><br>    Plaintiffs,<br><br>    v.<br><br>DONALD J. TRUMP, in his official capacity as President of the United States, *et al.*,<br><br>    Defendants. | Case No. 1:26-cv-11549-IT |
| STATE OF CALIFORNIA, *et al.*,<br><br>    Plaintiffs,<br><br>    v.<br><br>DONALD J. TRUMP, in his official capacity as President of the United States, *et al.*,<br><br>    Defendants. | Case No. 1:26-cv-11581-IT |

**DEFENDANTS' REPLY IN SUPPORT OF THEIR MOTIONS TO DISMISS**

## TABLE OF CONTENTS

INTRODUCTION.................................................................................................................... 1

ARGUMENT............................................................................................................................ 2

**I.**    Plaintiffs lack Article III standing................................................................................ 2

**II.**    Plaintiffs' claims are not ripe...................................................................................... 10

**III.**    Plaintiffs' APA claims fail to challenge any final agency action. .................................. 15

**IV.**    Plaintiffs fail to identify any viable cause of action for their statutory claims. ................ 20

**V.**    Plaintiffs' claims challenging the enforcement priorities and enforcement
discretion of the Executive Branch are independently unreviewable. .............................. 23

**VI.**    The President and the Department of Commerce should be dismissed............................ 24

**CONCLUSION** .................................................................................................................... **26**

# **TABLE OF AUTHORITIES**

Page(s)

**Cases**

*Alexander v. Sandoval,*
532 U.S. 275 (2001)........................................................................................ 22

*Am. Fed'n of Tchrs. v. Bessent,*
152 F.4th 162 (4th Cir. 2025) ......................................................................... 21

*Ass'n of Am. Univs. v. Dep't of Energy,*
789 F. Supp. 3d 118 (D. Mass. 2025) ............................................................. 18

*Bell v. New Jersey,*
461 U.S. 773 (1983)........................................................................................ 16

*Bennett v. Spear,*
520 U.S. 154 (1997)........................................................................... 15, 17, 18

*Building & Constr. Trades Dep't, AFL-CIO v. Allbaugh,*
295 F.3d 28  (D.C. Cir. 2002)................................................................... 10, 14

*California v. Trump* ("*California I*"),
786 F. Supp. 3d 359 (D. Mass. 2025) .......................................................... 1, 13

*California v. Trump* ("*California II*"),
805 F. Supp. 3d 387 (D. Mass. 2025) ............................................................... 8

*Centro de Trabajadores Unidos v. Bessent,*
167 F.4th 1218 (D.C. Cir. 2026)............................................................... 15, 17

*Changji Esquel Textile Co. v. Raimondo,*
40 F.4th 716 (D.C. Cir. 2022)................................................................... 21, 22

*City & County of San Francisco v. Trump,*
897 F.3d 1225 (9th Cir. 2018) ........................................................................ 11

*Clapper v. Amnesty Int'l USA,*
568 U.S. 398 (2013).......................................................................... 3, 5, 8, 9

*Common Cause v. Trump,*
506 F. Supp. 3d 39 (D.D.C. 2020)...................................................... 12, 13, 14

*Ctr. for Democracy & Tech. v. Trump,*
507 F. Supp. 3d 213 (D.D.C. 2020)................................................................... 3

*Ctr. for Democracy & Technology v. Biden*,
  No. 21-5062, 2021 WL 11659822 (D.C. Cir. Aug. 9, 2021) ........................................................ 3

*Defs. of Wildlife v. Perciasepe*,
  714 F.3d 1317 (D.C. Cir. 2013) ................................................................................................. 3

*Doe v. Stephens*,
  851 F.2d 1457 (D.C. Cir. 1988) ............................................................................................... 20

*FDA v. Alliance for Hippocratic Medicine*,
  602 U.S. 367 (2024) ................................................................................................................... 8

*FDIC v. Bank of Am., N.A.*,
  783 F. Supp. 3d 1 (D.D.C. 2025) ............................................................................................. 16

*Fed. Express Corp. v. U.S. Dep't of Com.*,
  39 F. 4th 756 (D.C. Cir. 2022) ................................................................................................. 21

*Franklin v. Massachusetts*,
  505 U.S. 788 (1992) ........................................................................................................... 20, 26

*Groden v. N&D Transp. Co.*,
  866 F.3d 22 (1st Cir. 2017) ....................................................................................................... 3

*Havens Realty Corp. v. Coleman*,
  455 U.S. 363 (1982) ................................................................................................................... 8

*In re Bluewater Network*,
  234 F.3d 1305 (D.C. Cir. 2000) ............................................................................................... 16

*In re Murray Energy Corp.*,
  788 F.3d 330 (D.C. Cir. 2015) ............................................................................................. 1, 16

*J.G.G. v. Trump*,
  No. 25-5067, 2025 WL 914682 (D.C. Cir. Mar. 26, 2025) ...................................................... 25

*Krabach v. King County*,
  No. 2:22-cv-1252-BJR, 2023 WL 7018431 (W.D. Wash. Oct. 25, 2023) ............................... 22

*League of United Latin Am. Citizens v. Exec. Off. of President*,
  808 F. Supp. 3d 29 (D.D.C. 2025) ...................................................................................... 12, 20

*League of United Latin Am. Citizens v. Exec. Off. of the President*,
  818 F. Supp. 3d 34 (D.D.C. 2026) ........................................................................................... 14

*League of Women Voters of United States v. Newby*,
   838 F.3d 1 (D.C. Cir. 2016) ................................................................................................ 6

*League of Women Voters v. U.S. Dep't of Homeland Sec.*,
   Civ. A. No. 25-3501, 2025 WL 3198970 (D.D.C. Nov. 17, 2025) ....................................... 6, 7

*Los Angeles v. Lyons*,
   461 U.S. 95 (1983) ............................................................................................................. 11

*LULAC v. Exec. Off. Of President*,
   780 F. Supp. 3d 135 (D.D.C. 2025) .................................................................................... 13

*MSP Recovery Claims Series 44, LLC v. Bunker Hill Ins. Co.*,
   683 F. Supp. 3d 172 (D. Mass. 2023) ................................................................................... 3

*Nat'l Urb. League v. Trump*,
   783 F. Supp. 3d 61 (D.D.C. 2025) ........................................................................................ 3

*Newdow v. Roberts*,
   603 F.3d 1002 (D.C. Cir. 2010) .................................................................................... 25, 26

*NRC v. Texas*,
   605 U.S. 665 (2025) ........................................................................................................... 21

*Nyunt v. Chairman, Broad. Bd. of Governors*,
   589 F.3d 445 (D.C. Cir. 2009) ........................................................................................... 21

*Off. of Commc'n of United Church of Christ v. FCC*,
   826 F.2d 101 (D.C. Cir. 1987) ........................................................................................... 12

*Schilling v. Washburne*,
   592 F. Supp. 3d 492 (W.D. Va. 2022) ................................................................................ 22

*Summers v. Earth Island Inst.*,
   555 U.S. 488 (2009) ............................................................................................................. 4

*Sussman v. U.S. Marshals Serv.*,
   494 F.3d 1106 (D.C. Cir. 2007) ......................................................................................... 20

*TransUnion LLC v. Ramirez*,
   594 U.S. 413 (2021) ................................................................................................. 8, 18, 23

*Trump v. New York*,
   592 U.S. 125 (2020) ..................................................................................................*passim*

*Trump v. United States*,
603 U.S. 593 (2024) ........................................................................................ 8, 24

*United States v. Armstrong*,
517 U.S. 456 (1996) ............................................................................................ 23

*United States v. Nixon*,
418 U.S. 683 (1974) .............................................................................................. 8

*United States v. Texas*,
599 U.S. 670 (2023) ........................................................................................ 8, 23

*Westcott v. McHugh*,
39 F. Supp. 3d 21 (D.D.C. 2014) ....................................................................... 21

**Constitution**

U.S. Const. art. II, § 2, cl. 1 ............................................................................... 25

**Statutes**

5 U.S.C. § 552a ............................................................................................. 19, 20

5 U.S.C. § 704 ............................................................................................... 15, 20

18 U.S.C. § 611 ................................................................................................... 24

18 U.S.C. § 1015 ................................................................................................. 24

52 U.S.C. § 10307 ............................................................................................... 23

52 U.S.C. § 20511 ............................................................................................... 24

Voting Rights Act,
Pub. L. No. 89-110, 79 Stat. 437 (1965), codified as 52 U.S.C. § 10307 ................................. 23

**Rules**

Federal Rule of Civil Procedure 12 ................................................................... 3, 26

**Regulations**

85 Fed. Reg. 44,679 (July 21, 2020) ................................................................ 11, 13

Exec. Order No. 14,399, 91 Fed. Reg. 17,125 (Mar. 31, 2026) ............................................ *passim*

Exec. Order No. 14,248, 90 Fed. Reg. 14,005 (Mar. 25, 2025) ................................................. 13

**INTRODUCTION**

Plaintiffs' opposition briefs include an extraordinary amount of material that is both undisputed and irrelevant to the resolution of Defendants' motions to dismiss—arguing, for example, that "the right to vote freely . . . is of the essence of a democratic society." *LWVMA* MTD Opp'n at 11, Doc. 139 (quoting *California v. Trump* ("*California I*"), 786 F. Supp. 3d 359, 393 (D. Mass. 2025), *appeal filed*, No. 25-1726 (1st Cir. Aug. 1, 2025)). But the Executive Order before the Court does not alter anyone's right to vote, by mail or otherwise. On the core legal issues that govern this sort of pre-implementation challenge to a non-self-executing Executive Order—which, on its own, changes nothing about the rules of any election—Plaintiffs have very little to say. And what little they do say fails to refute Defendants' core submission: that at least "[a]t present, this case is riddled with contingencies and speculation that impede judicial review." *Trump v. New York*, 592 U.S. 125, 131 (2020) (per curiam). That is because, as explained by Defendants' now-undisputed declarations, deliberations within the Executive Branch are ongoing regarding implementation of every major component of the Order—including questions of feasibility and legality that might narrow or resolve at least some of the parties' possible future disagreements before they ever cause any cognizable injury.

For example, as for Section 3(b)—which calls for the Postal Service "to initiate a *proposed* rulemaking," but says nothing about the contents of any final rule, *Ensuring Citizenship Verification and Integrity in Federal Elections*, Exec. Order No. 14,399 ("E.O." or "the Executive Order" or "the Order") § 3(b), 91 Fed. Reg. 17,125 (Mar. 31, 2026) (emphasis added)—"the Postal Service is still in the deliberation phase of determining how to implement the Executive Order," and has "not yet published a proposed rule," Decl. of S. Monteith ("Monteith Decl.") ¶ 4, ECF No. 107-3. In any event, courts "do not have authority to review proposed agency rules," *In re Murray Energy Corp.*, 788 F.3d 330, 334 (D.C. Cir. 2015) (Kavanaugh, J.)—so judicial review of action by the Postal Service rule must await a *final* rule, if any. Those claims are thus (at least as of this filing) doubly premature, in the absence of any proposal.

As for Section 2(a), which contemplates the creation of State Citizenship Lists—though only to the extent "feasible and consistent with applicable law, including but not limited to the Privacy Act of 1974," E.O. § 2(a)—it is likewise undisputed that "deliberations are currently on-going within DHS and USCIS," that "USCIS has not yet begun preparation of any 'State Citizenship List,'" and that DHS has not yet made "final decisions regarding the 'State Citizenship Lists' discussed in E.O. 14,399." Ex. 1, Supp. Decl. of M. Mayhew, ("Supp. Mayhew Decl.") ¶¶ 5, 7, 8[1]; *see also* Decl. of J.B. MacBride, ("MacBride Decl.") ¶¶ 5-6, *LWVMA* ECF No. 127-2 (similar statements from SSA). Accordingly, much remains uncertain—even within the Executive Branch—about what those lists (if any) will look like, how they will be compiled, using what data sources, and what (if anything) they will be used for.

Under these circumstances, Article III requires the Court to "[l]et[] the Executive Branch's decisionmaking process run its course," *Trump v. New York*, 592 U.S. at 134—without prejudice to the possibility of judicial review later, if necessary, over any final agency action that causes Plaintiffs any actual or imminent injury. Accordingly, the Court should dismiss this case, in its entirety, without prejudice.

## ARGUMENT

### I. Plaintiffs lack Article III standing.

**a.** As Defendants have explained, Executive Order 14,399 is an intra-Executive Branch directive—which, of its own force, does not change anything at all about elections in any State. It does not require anyone outside the government—and certainly not any of Plaintiffs—to do (or refrain from doing) anything at all. Generally, these sorts of "intra-governmental mandates" in an

---

[1] As explained in the Supplemental Mayhew Declaration, Mr. Mayhew "previously provided a declaration in the above-captioned matters, signed on May 5, 2026." Supp. Mayhew Decl. ¶ 1. The Supplemental Mayhew Declaration (signed today) is being submitted to "updat[e] [his] previous declaration with information accurate as of today." *Id.* Although none of the factual developments described in the Supplemental Mayhew Declaration are material to any of the legal arguments that are currently before the Court, Defendants have nonetheless prepared an updated declaration out of an abundance of caution.

Executive Order "do not inflict on Plaintiffs an injury in fact." *Nat'l Urb. League v. Trump*, 783 F. Supp. 3d 61, 77 (D.D.C. 2025); *see also, e.g.*, *Ctr. for Democracy & Tech. v. Trump*, 507 F. Supp. 3d 213, 222 (D.D.C. 2020) (no standing to challenge an Executive Order that "does not apply to private parties," and instead "only sets a course of government processes into motion"), *vacated as moot sub nom. Ctr. for Democracy & Technology v. Biden*, No. 21-5062, 2021 WL 11659822 (D.C. Cir. Aug. 9, 2021). That is the case here.

Ultimately, Plaintiffs' real concern is not with the Executive Order itself—it is that agencies may *implement* the Order in a way that (unlike the Order itself) actually *does* affect Plaintiffs' interests in some concrete way (whether it be privacy interests, voting-related interests, or something else). That is why much of the relief they seek purports to run against future agency implementation of the Order. *See, e.g.*, *California* Compl. at 44, Prayer for Relief ¶ 2; *LWVMA* Compl. at 54, Prayer for Relief ¶ 2. But "Article III standing requires more than the possibility of potentially adverse regulation." *Defs. of Wildlife v. Perciasepe*, 714 F.3d 1317, 1324-25 (D.C. Cir. 2013). And so, at least at this time, any injury based on possible future agency actions implementing the Executive Order is far "too speculative for Article III purposes," *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013)—after all, it is currently unknown how the agencies referenced in the Order will implement it, or on what timeline, or under what parameters, or using what processes. That uncertainty extends to the government itself: as explained in several undisputed declarations, the relevant agencies *themselves* are still deliberating about the contours of the Executive Order's possible future implementation. *See* Monteith Decl. ¶ 3; Supp. Mayhew Decl. ¶ 5; Mac-Bride Decl. ¶ 5.[2] Plaintiffs have thus failed to carry their burden to show any concrete, particularized, actual or imminent Article III injury.

---

[2] "When considering motions to dismiss for lack of subject-matter jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(1), the court may consider materials outside the pleadings." *Groden v. N&D Transp. Co.*, 866 F.3d 22, 24 (1st Cir. 2017); *see also, e.g.*, *MSP Recovery Claims Series 44, LLC v. Bunker Hill Ins. Co.*, 683 F. Supp. 3d 172, 177-78 (D. Mass. 2023) (collecting cases).

Even if Plaintiffs could show injury, the disconnect between Plaintiffs' complaints (which challenge the Executive Order) and their possible future injuries (which would stem, if at all, from its future implementation) also gives rise to an independently fatal causation (or traceability) problem.  In short, that is because "the source of any injury to the plaintiffs is the action that the [government] might take in the future to" implement the Executive Order—"not the policy itself 'in the abstract.'"  *Trump v. New York*, 592 U.S. at 133-34 (quoting *Summers v. Earth Island Inst.*, 555 U.S. 488, 494 (2009)).  That disconnect independently warrants dismissal for lack of standing.

**b.**  In large part, Plaintiffs' briefs are non-responsive to those core arguments—that is, that their suits are premature, because they challenge an Executive Order that does not itself change the rules of any election, nor require Plaintiffs to do (or refrain from doing) anything.  Instead of refuting that argument, Plaintiffs spend most of their briefs trying to establish various other tangentially related propositions—at least some of which may ultimately be undisputed—that are largely irrelevant to this case, at least at this time.

For example, to support associational standing, the *LWVMA* Plaintiffs argue that their members "rely on mail voting because they live overseas, reside out of state, and have disabilities," and suggest that those members risk being "disenfranchised" by the Order.  *LWVMA* MTD Opp'n at 11-12.  Of course, actual or imminent disenfranchisement would suffice for Article III standing.  But this Executive Order, by itself, cannot and does not disenfranchise a single voter, nor does it "impose a foreseeable obstacle" to anyone "voting by mail."  *Id.* at 13.  What Plaintiffs really fear is that a future Postal Service rule—not yet issued or even proposed—might have some practical effect on the ability of some individuals to vote by mail.  But even if Plaintiffs are right about that, the standing questions raised by that sort of possible future rule would look very different.  And the only action that is currently before the Court—that is, the Executive Order itself—does not affect anyone's legal or practical ability to vote, by mail or otherwise.  That remains dispositive of the standing questions in this case, at least at this time.

The *LWVMA* Plaintiffs also continue to express concerns about "disclosure to states" of private information. *LWVMA* MTD Opp'n at 13. But what disclosure are we talking about, exactly? The Executive Order does not contemplate the disclosure of any sensitive personal information—only the future, potential disclosure of whether or not someone is a United States citizen, whether or not they are at least 18 years old, and whether or not they live in a particular State. *See* E.O. § 2(a). And whatever disclosure Plaintiffs have in mind, it cannot be a disclosure made by the Executive Order itself—as Plaintiffs do not allege (nor could they) that any such disclosure has happened. *See generally* Supp. Mayhew Decl.; MacBride Decl. Again, what Plaintiffs really fear are possible *future* disclosures, which they speculate will be made by agencies implementing the Executive Order. But those sorts of "conjectural" and "hypothetical" possible future injuries do not suffice for standing. *Clapper*, 568 U.S. at 416.

The *California* Plaintiffs likewise assert that Section 3(b) of the Executive Order "inflicts sovereign harms" by "overriding States' choices" about "about who can utilize mail ballots." *California* MTD Opp'n at 8. Again, if that were true, the standing questions in this case would be very different. But it isn't. In reality, Section 3(b) instead directs USPS to "initiate a proposed rulemaking," E.O. § 3(b)—which has, in any event, not even happened yet—about the use of the federal mails for mail-in and absentee voting. So, not only does the Executive Order not "overrid[e] States' choices" or change State rules "about who can utilize mail ballots," *California* MTD Opp'n at 8, it doesn't even alter *Postal Service* rules—that would only happen, if ever, from the consummation of a future rulemaking that has not yet begun. *See* Monteith Decl. Of course, if the Postal Service issues a *final* rule that (to use Plaintiffs' words) purports to "overrid[e] States' choices" "about who can utilize mail ballots," *California* MTD Opp'n at 8, that would have significant implications for the standing arguments in this case. But no election rules have been altered *by the Executive Order* itself, and the Executive Order is all that Plaintiffs challenge here—indeed, this litigation was filed almost immediately after its issuance. This Court should not exercise judicial review over an imagined version of the Executive Order that goes beyond even the Executive Branch's arguments about the President's legal authority. To be clear, counsel for the

United States is not asking this Court to hold that the President can alter State election rules by Executive Order—that question is simply not presented here.

The *LWVMA* Plaintiffs rely heavily on *League of Women Voters of United States v. Newby*, 838 F.3d 1, 9 (D.C. Cir. 2016), which generally stands for the proposition that "new obstacles" to voter registration can support organizational standing for an organization like this. *See LWVMA* MTD Opp'n at 7, 12. Again, that may be right in some circumstances—but here, what "new obstacle" do they have in mind? In *Newby*, it was a requirement to provide documentary proof of citizenship when registering to vote. Lawful or unlawful, that sort of requirement could arguably be characterized as a "new obstacle" to voter registration. But here, no such obstacle exists— voter-registration requirements are wholly unchanged by the Executive Order. So are the election rules of every single state. And they never *will* be changed *by the Executive Order* itself—any new regulatory requirements would come from future implementation by the Postal Service, DHS, or other agencies, which can then be subject to judicial review in the ordinary course.

Several Plaintiffs also continue to express alarm about imperfections in databases that they speculate will be used to create State Citizenship Lists. But whether for purposes of standing or the merits, it is not Defendants' burden to show that any particular database *is* perfect. And that is certainly not Defendants' burden before the relevant agencies even *know* what databases will be used, and how. *See* Supp. Mayhew Decl. ¶¶ 7-8. In any event, Defendants already explained why those concerns are exaggerated. Defs.' Combined Mem. of Law in Supp. of Their Mots. to Dismiss & in Opp'n to Pls.' Mot. for a Prelim. Inj., ("Defs.' Br.") at 20-21, *LWVMA* ECF No. 128. Judge Sooknanan recently came to a similar conclusion in denying a motion for a preliminary injunction on a similar theory of "hypothetical injury." *League of Women Voters v. U.S. Dep't of Homeland Sec.*, Civ. A. No. 25-3501, 2025 WL 3198970, at *7 (D.D.C. Nov. 17, 2025); *see also id.* ("Plaintiffs ask this Court to find irreparable injury because their SSA records are *likely* inaccurate, which *might* lead DHS to return an incorrect 'non-citizen' response to a request from their home state, which *might* then cause the state to terminate their voter registration or take other adverse actions. This falls well short of the requisite showing of irreparable harm.").

Plaintiffs also fail to explain how an imperfect data set would be an impediment to constructing a list of "individuals *confirmed* to be United States citizens who will be above the age of 18 at the time of an upcoming Federal election and who maintain a residence in the subject State." E.O. § 2(a) (emphasis added). Even if some individuals cannot be definitively "confirmed" to fit those categories, that doesn't mean that any such list would be inaccurate, or unlawful, or injurious—it could still include all individuals who *were* fully "confirmed" to be citizens of the relevant age and residency. Nothing in the Executive Order suggests that omission from a State Citizenship List by itself confirms *non*-citizenship, or ineligibility to vote under State or federal law. And, in any event, the mere *existence* of any Section 2 list itself causes no legal consequences—before it matters to anyone, recipient States would have to take action that is based on that list and itself injures Plaintiffs. That makes Plaintiffs' accuracy-related concerns even more speculative than the voting-related harms that failed to suffice in *League of Women Voters*. *See* 2025 WL 3198970, at *7 ("[N]othing in the current record supports the Plaintiffs' assertion that in lieu of additional verification, a state would remove individuals from voter rolls, deny registration, or pursue criminal investigation based on an inconclusive SAVE response alone." (citation omitted)). That is even more obvious in the *California* case—to the extent that *these* Plaintiff States are concerned about the list, they need not rely on it to take any action at all.

The *California* Plaintiffs assert without explanation that "there is no 'uncertainty' about whether the regulations will be issued or what they will require." *California* MTD Opp'n at 8. That is materially wrong on both counts: the Executive Order does not require that any "regulations will be issued," *id.*, only that the Postal Service "initiate a *proposed* rulemaking," E.O. § 3(b) (emphasis added). And the Executive Order likewise does not specify what any possible future regulations "will require," *California* MTD Opp'n at 8—it says only that "[t]he notice of *proposed* rulemaking shall include, at minimum," certain specified proposals, E.O. § 3(b) (emphasis added). The eventual decision of whether to publish "*[a]ny* final rule," as well as the contents of any such rule, ultimately rests with the Postal Service. E.O. § 3(d) (emphasis added). So when the *Califor-*

*nia* Plaintiffs rest their core arguments, for example, on repeated assertions that "Section 3 'dictate[s] the precise contents of the new rule,'" they are mistaken. *California* MTD Opp'n at 9 (quoting *California v. Trump* ("*California II*"), 805 F. Supp. 3d 387, 398 (D. Mass. 2025)).

**c.** The *California* Plaintiffs assert that "Defendants never expressly disclaim the threat that failure to abide by the State Citizenship Lists exposes state and local officials to federal prosecution." *California* MTD Opp'n at 7. Defendants are happy to expressly disclaim that proposition now: nobody can be prosecuted for violation *of the Executive Order*. Instead, any criminal investigation or prosecution of anyone—if it ever happens, a speculative and far-off possibility—would be for criminal violations of existing federal laws that are already on the books. Plaintiffs do not challenge those laws. And there is nothing unlawful or injurious about "threatening" to enforce existing federal criminal laws—such a "threat" (if it can even be called a "threat") is always present in a nation governed by law. And it is especially true in this context, as "the Executive Branch has 'exclusive authority and absolute discretion' to decide which crimes to investigate and prosecute, including with respect to allegations of election crime." *Trump v. United States*, 603 U.S. at 620 (quoting *Nixon*, 418 U.S. at 693); *see also Texas*, 599 U.S. at 678-79 ("Under Article II, the Executive Branch possesses authority to decide how to prioritize and how aggressively to pursue legal actions against defendants who violate the law." (quoting *TransUnion*, 594 U.S. at 429)). The Executive Order thus cannot be challenged on this basis.

**d.** Plaintiffs also continue to allege (often explicitly citing *Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982), *see* LWVMA MTD Opp'n at 8, 9, 11) that they have diverted resources in response to publication of the Executive Order, *but see FDA v. Alliance for Hippocratic Medicine*, 602 U.S. 367, 394 (2024) (discussing *Havens*); and that they have spent money to prepare for the possibility that agencies may implement the Executive Order in a way that causes them harm, *but see Clapper*, 568 U.S. at 416. None of those theories work, either. In short, Plaintiffs "cannot manufacture standing merely by inflicting harm on themselves based on their fears of hypothetical future harm that is not certainly impending." *Id.* That is so even if their "fear" could

fairly be described as "nonparanoid" or "not fanciful, irrational, or clearly unreasonable." *Id.* Such "fear[s]," reasonable or not, do not support a case or controversy under Article III.

e.  In response to Defendants' arguments about the recent special election in New Jersey, the *California* Plaintiffs respond that "New Jersey was forced to contend with confusion and out-reach from elections officials about the EO." *California* MTD Opp'n at 5 n.3.  The cited declaration, however, says only that "[s]everal county election officials involved in that election reached out in the days following publishing of the EO, inquiring whether it applied to the special election." Decl. of D. Barber ¶ 10, ECF No. 100-15.  Tellingly, however, the declaration does not say what answer the New Jersey election officials provided in response to that question.  But surely, if those officials correctly understood the legal landscape, the answer they provided would have been some version of: "No, the Executive Order by itself changes nothing about the administration of this election."  And that is Defendants' core point.  Regardless, being forced to answer "several" questions from a few confused officials is not an Article III injury.  So at most, that episode supports Defendants' key argument: that it is not the Executive Order itself, but some hypothetical future agency actions, that Plaintiffs should be preparing to challenge.

f.  Finally, the *California* Plaintiffs' "Unlawful Document Preservation Mandate" claim (Count Three) as relates to Section 5 of the Order is equally subject to dismissal for lack of standing.  That claim was originally premised on the *California* Plaintiffs' assumption that "Section 5 seemingly requires Plaintiff States to preserve election records" for five years.  *California* MTD Opp'n at 9.  But the Executive order says only that "States and localities *should* preserve, for a 5-year period, all records and materials—excluding ballots cast—evidencing voter participation in any Federal election," E.O. § 5 (emphasis added)—not that they must do so.  And so, as Defendants explained, "State and Local officials thus face no legal consequences . . . from that provision of the Order," which is explicitly phrased in "precatory" terms. Defs.' Br. at 11-12.  That is enough to dismiss this claim for lack of Article III standing.

In response, to their credit, the *California* Plaintiffs do not strenuously resist the premise that this provision of the Executive Order imposes no legal obligations.  Instead, they argue that

"[i]f the Court accepts Defendants' interpretation that Section 5 is strictly precatory," then the Court should "expressly find that it does not impose any requirements on Plaintiff States." *California* MTD Opp'n at 27. As a formal matter, Defendants cannot consent to that request, because this Court lacks subject-matter jurisdiction to opine on a provision that causes no Article III injury. That said, Defendants agree that that provision "does not impose any requirements on Plaintiff States." *Id.* So, a court order saying so would have no practical significance—which is why Plaintiffs lack standing to challenge it in the first place.

## II.    Plaintiffs' claims are not ripe.

**a.** Defendants' opening brief emphasized—just as the Supreme Court did in *Trump v. New York*—that this Executive Order is replete with explicit textual limitations to ensure that it is implemented in a way that is both "feasible" and "consistent with applicable law." Section 2(a) explicitly calls for the creation of State Citizenship Lists only "[t]o the extent feasible and consistent with applicable law, including but not limited to the Privacy Act of 1974." Section 3(b)(iv) provides that the Postal Service's proposed rule should make clear that "[t]he preparation and transmission of each State-specific Mail-In and Absentee Participation List shall comply with the Privacy Act and all applicable use agreements." Section 4(c) specifies that SSA's provision of data in support of the implementation of this Executive Order must be "consistent with applicable law, the Privacy Act, and all applicable use agreements." Section 5 directs the Attorney General to "take all lawful steps" to enforce federal laws on these subjects. And Section 7(b) provides the Order overall, in its entirety, "shall be implemented consistent with applicable law."

Because of those limitations, "if an executive agency . . . may lawfully implement the Executive Order, then it must do so; if the agency is prohibited, by statute or other law, from implementing the Executive Order, then the Executive Order itself instructs the agency to follow the law." *Building & Constr. Trades Dep't, AFL-CIO v. Allbaugh*, 295 F.3d 28, 33 (D.C. Cir. 2002). In other words, the Order "is not self executing." *Id.* Due to those genuine constraints of feasibility and legality, "[a]ny prediction how the Executive Branch might eventually implement this general statement of policy is 'no more than conjecture' at this time." *Trump v. New York*, 592 U.S. at 131

- 10 -

(quoting *Los Angeles v. Lyons*, 461 U.S. 95, 108 (1983)) (dismissing analogous pre-implementation challenge to a Presidential Memorandum on this basis).  That is a ripeness problem.

In response, Plaintiffs rely heavily on the Ninth Circuit's 2018 decision in *City & County of San Francisco v. Trump*, in which the Ninth Circuit exercised review over an Executive Order (in part) because of its view that that "Executive Order's savings clause does not and cannot override its meaning."  897 F.3d 1225, 1240 (9th Cir. 2018).  But this Court cannot take its guidance from Ninth Circuit opinions from 2018 that are inconsistent with Supreme Court opinions from 2020.  And *Trump v. New York* explicitly rejects this very reasoning—placing nearly dispositive weight on materially indistinguishable language to order dismissal on grounds of both standing and ripeness.  *See, e.g.*, 592 U.S. at 131 (emphasizing that "the President qualified his directive by providing that the Secretary should gather information 'to the extent practicable' and that aliens should be excluded 'to the extent feasible'" (quoting *Excluding Illegal Aliens From the Apportionment Base Following the 2020 Census*, 85 Fed. Reg. 44,679, 44,680 (July 21, 2020)).

Plaintiffs' (quite limited) responses to Defendants' arguments about *Trump v. New York* are revealing.  The *LWVMA* Plaintiffs, for example, respond that "[d]ifferent facts yield different results."  *LWVMA* MTD Opp'n at 3.  But what "different facts" do they have in mind, and why are they material?  They do not say, other than an unexplained reference to "the exclusion of undocumented immigrants from the congressional apportionment base."  *Id.*  The Supreme Court's decision in *Trump v. New York* was not an opinion that was unique to the context of immigration law or the decennial census—it was an opinion about standing and ripeness, which are "[t]wo related doctrines of justiciability" that "each originat[e] in the case-or-controversy requirement of Article III" that governs *all* federal litigation.  592 U.S. at 131.  When the Supreme Court issues an opinion about (in its words) "foundational principle[s] of Article III," those "foundational principles" apply across subject-matter areas, *id.*—or at least, at an absolute minimum, to other pre-implementation challenges to non-self-executing directives from the President.  Nothing about that opinion is limited to cases raising issues about "immigrants" or "apportionment," as Plaintiffs seem to assume without explanation.

- 11 -

*Common Cause v. Trump* also states in passing, in one footnote, that "laws (or executive orders) cannot be held to destroy themselves through saving clauses." 506 F. Supp. 3d 39, 53 n.8 (D.D.C. 2020) (citation omitted).  But overall, that decision, if anything, supports Defendants' position.  Ultimately, that opinion holds—over a dissent that reads thematically quite similarly to Plaintiffs' briefs in these cases, *see id.* at 56-61 (Cooper, J., dissenting)—that judicial review was premature in the context of a pre-implementation challenge to the same Presidential Memorandum that the Supreme Court eventually addressed in *Trump v. New York*.  In short, as explained in *LULAC*, "the *Common Cause* court relied on the challenged executive order's saving clause to conclude that judicial review was premature." *League of United Latin Am. Citizens v. Exec. Off. of President*, 808 F. Supp. 3d 29, 67 (D.D.C. 2025) ("*LULAC*").

To justify that result, the court explained that "[l]ike the Executive Branch," the courts also "have a substantial interest in postponing review" of a pre-implementation challenge to a non-self-executing Presidential directive.  *Common Cause*, 506 F. Supp. 3d at 53.  And it reasoned that, "[a]lthough we 'are not faced with a serious doubt as to whether the [memorandum] will ever translate into action at all,' we have 'doubts about *how* the [Secretary and President] may make that translation.'" *Id.* (quoting *Off. of Commc'n of United Church of Christ v. FCC*, 826 F.2d 101, 105 (D.C. Cir. 1987) (citation modified)) (emphasis added).  That uncertainty was important to the court as a matter of ripeness, because "how they do so"—that is, how agencies actually implement the President's policy goals—"will substantially shape the important legal questions that the plaintiffs would have us decide in the abstract." *Id.*  So too here—even accepting (as the court did in *Common Cause*) that there is no "serious doubt" that at least some portions of the Executive Order will be implemented in some fashion.  Ultimately, the approach of the three-judge court in *Common Cause* was vindicated by the Supreme Court in *Trump v. New York*.

Defendants recognize that (unlike the Ninth Circuit decision on which they each rely) the district-court opinions in *LULAC*, 808 F. Supp. 3d 29 (D.D.C. 2025), and *California v. Trump*, 786 F. Supp. 3d 359 (D. Mass. 2025), *do* post-date the Supreme Court's decisions in *Trump v. New*

*York*. But this Court should not rely on those decisions, for at least three reasons. First, respectfully, those courts made the same mistake that Plaintiffs do in their briefs, by relying on *San Francisco* and footnote eight of *Common Cause* to support a proposition that is inconsistent with the Supreme Court's subsequent decision in *Trump v. New York*. This Court need not and should not embrace the flawed reasoning in those decisions, which are currently on appeal. Instead, this Court should decide this case consistently with the (binding) opinion in *Trump v. New York*—which found it not only relevant, but effectively dispositive that the Presidential Memorandum at issue in that case called for "implementation 'to the maximum extent feasible and consistent with the discretion delegated to the executive branch.'" 592 U.S. at 130 (quoting 85 Fed. Reg. at 44,680).

Second, even setting aside the significance of the feasibility and legality constraints in the text of this Executive Order, the Order at issue in this case is materially different from the one at issue in *LULAC* and *California* (at least, as that Order was interpreted by those courts). For example, those courts believed that Executive Order 14,248 "dictate[d] the precise contents of the new rule" and "mandate[d] that the [Election Assistance Commission] take action to require documentary proof of citizenship on the Federal Form." *LULAC v. Exec. Off. Of President*, 780 F. Supp. 3d 135, 184-85 (D.D.C. 2025); *California I*, 786 F. Supp. 3d at 378-79. Whether that is a correct interpretation of *that* Executive Order is a subject more appropriately addressed in the (ongoing) appeals in those cases. But it would certainly not be the right interpretation of *this* Executive Order, which does not directly decide the contents of any final rule (at most, a proposed rule), nor "mandate" any particular final agency action at all. Instead, this Executive Order leaves meaningful and genuine discretion for the President's subordinates, who are currently deliberating regarding its implementation (and, in the case of the Postal Service, will be seeking and considering public comment before issuing any final rule). *See* Monteith Decl. ¶ 3; Supp. Mayhew Decl. ¶ 5; MacBride Decl. ¶ 5. So, even if those opinions were binding here, and even in the absence of *Trump v. New York*, the result in this case should be different.

Third, the most recent opinion in *LULAC* itself correctly ruled in the *government*'s favor on at least some claims that are broadly analogous to the claims at issue here. *See, e.g.*, *League of*

*United Latin Am. Citizens v. Exec. Off. of the President*, 818 F. Supp. 3d 34, 105 (D.D.C. 2026) ("[B]ecause the Court must assume that the Attorney General will heed the 'requirement of lawful implementation,' it cannot conclude that implementation of Section 7(a) will imminently harm Plaintiffs in a manner redressable by a favorable decision in this case.") (citing that Executive Order's savings clause; *Common Cause*, 506 F. Supp. 3d at 49; and *Allbaugh*, 295 F.3d at 34). Those same legal principles support the government's jurisdictional arguments—not Plaintiffs'— even if the government respectfully disagrees with Judge Kollar-Kotelly's interpretation of the Executive Order at issue in those cases.

Remarkably, the *LWVMA* Plaintiffs seem to take the position that even *discussing* the Executive Order is unlawful or subject to an injunction. *See LWVMA* MTD Opp'n at 2 (arguing that "Defendants' declaration confirm[s] that USPS is already deliberating about 'how to implement the directives in the Executive Order'). But the fact that such deliberations are ongoing—as fully disclosed in Defendants' own filings and declarations—is neither surprising, nor unlawful, nor subject to judicial review. If the Executive Order itself caused some concrete injury, it is hard to see why Plaintiffs' filings would have to take aim at internal Executive Branch discussions.

Finally, the *California* Plaintiffs, in a footnote, say that "Defendants interpret the EO to illogically mandate only the substance of the *proposed* rule, even though Section 3(d) sets a 120-day deadline for a 'final rule pursuant to this section,' plainly encompassing the specific mandates of Section 3." *California* MTD Opp'n at 13 n.5. There is nothing illogical about the Executive Branch's interpretation of the President's own order—the plain text of which calls for the Postal Service "to initiate a *proposed* rulemaking," and to publish a "notice of *proposed* rulemaking" with certain provisions—not a final rule. E.O. § 3(b). Tellingly, Plaintiffs had to materially misquote the Executive Order to make their point: it does not require publication of a "final rule pursuant to this section," as they imply, *California* MTD Opp'n at 13 n.5—it instead states the timing for "*any* final rule" that may be issued, E.O. § 3(d) (emphasis added). The use of the word "any" before "final rule" proves that Defendants' interpretation is correct, not "illogical," *California*

MTD Opp'n at 13 n.5. Plaintiffs offer no response—other than, apparently, to cut off the quotation to obscure that section's meaning.

*       *       *

Ultimately, whether considered as a problem of standing, ripeness, or both, the fatal flaw of these lawsuits—at least as currently constructed—remains the same. In short, at least "[a]t present, this case is riddled with contingencies and speculation that impede judicial review." *Trump*, 592 U.S. at 131. Accordingly, Plaintiffs' claims should be dismissed, in their entirety, for lack of subject-matter jurisdiction. That dismissal would be without prejudice to the future exercise of judicial review over any final agency action that causes Plaintiffs an actual or imminent Article III injury.

### III.    Plaintiffs' APA claims fail to challenge any final agency action.

Even if they could show standing and ripeness, all of Plaintiffs' APA claims fail for lack of final agency action. It is axiomatic that APA claims may only challenge final agency action. 5 U.S.C. § 704; *Centro de Trabajadores Unidos v. Bessent*, 167 F.4th 1218, 1235 (D.C. Cir. 2026) ("The APA authorizes courts to review only 'final agency action[s].'") (alteration in the original) (quoting 5 U.S.C. § 704). "To be final and thus reviewable, an agency action must (1) mark the 'consummation' of the agency's decisionmaking process" and (2) determine 'rights or obligations,' or produce 'legal consequences.'" *Id.* (citation omitted) (quoting *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997)). "Each prong of *Bennett* must be satisfied independently for agency action to be final." *Id*. (citation modified).

In their opposition briefs, Plaintiffs continue to assert that final agency action has occurred, but neither *Bennett* requirement has been satisfied. *LWVMA* MTD Opp'n at 27-30. *California* Plaintiffs appear to disclaim any APA-specific claims. *See California* MTD Opp'n at 14 n.6 ("Defendants suggest that Plaintiff States bring Administrative Procedure Act ("APA") claims . . . They do not." (citation omitted)).

- 15 -

**Section 3(b) – Postal Service Rulemaking.**  As to Section 3(b) of the Order, in which the Postmaster General is directed to "initiate a proposed rulemaking" and "establish uniform standards for mail-in or absentee ballots," USPS has not issued a proposed rule.  It has certainly not issued a final rule.  E.O. § 3(b); Monteith Decl. ¶ 4.  Courts "do not have authority to review proposed rules." *In re Murray Energy*, 788 F.3d at 334; *see also, e.g.*, *In re Bluewater Network*, 234 F.3d 1305, 1313 (D.C. Cir. 2000) ("[A]n agency's pronouncement of its intent to defer or to engage in future rulemaking generally does not constitute final agency action reviewable by this court.") (citation omitted); *FDIC v. Bank of Am., N.A.*, 783 F. Supp. 3d 1, 24 (D.D.C. 2025) ("[P]roposed rules are not 'final agency actions' that this court has authority to review.").  After all, "a proposed rule is just a proposal." *In re Murray Energy*, 788 F.3d at 334.  Plaintiffs offer no meaningful response to this straightforward basis for dismissal of all APA claims relating to the Postal Service.[3]

**Section 2(a) – State Citizenship Lists.**  Section 2(a) of the Order contemplates, "[t]o the extent feasible and consistent with applicable law, including but not limited to the Privacy Act of 1974," the creation of State Citizenship Lists consisting "of individuals confirmed to be United States citizens who will be above the age of 18 at the time of an upcoming Federal election and who maintain a residence in the subject State." *Id.* § 2(a).  But no such lists have been compiled. *See* Supp. Mayhew Decl. ¶ 7.  And no such lists have been transmitted.  *Id.*  Should such lists be compiled and transmitted, the Order does not instruct or mandate states or their officials to use the lists, let alone instruct or mandate that individuals not appearing on the list must be culled from voter rolls.  *See* E.O. § 2(a).  Any contrary interpretation is inconsistent with the text of the Order. *See id.* ("An individual's identification on the State Citizenship List does not indicate that the

---

[3] As explained in greater detail in Defendants' motion to dismiss, APA review is not necessarily available with respect to the Postal Service's determinations.  *See* Defs.' Br. at 17 n.6 (discussing a form of ultra vires review that governs review of certain actions by the Postal service).  Regardless, any potential form of judicial review would still require a final action by the Postal Service.  *See Bell v. New Jersey*, 461 U.S. 773, 777-79 (1983) (even outside the context of APA review, explaining that "[t]he strong presumption is that judicial review will be available only when agency action becomes final").

individual has been properly registered to vote in the State.  State and Federal laws and State procedures must still be followed for an individual to be registered to vote.").

Accordingly, final agency action has not occurred.  *First*, on its face, the Order explicitly applies only "[t]o the extent feasible and consistent with applicable law, including but not limited to the Privacy Act of 1974."  *Id.*  Deliberations within DHS are ongoing, which includes consideration of (as required by the Order) what is "feasible" and "consistent with applicable law," including (but not limited to) the Privacy Act.  *Id.*; *see* Supp. Mayhew Decl. ¶ 5; *see also* MacBride Decl. ¶ 5.  As of this filing, it is not even clear whether or when these lists will be created—much less in what form, based on what data, or how they might be used.  There is thus no final agency decision, as is required under the first *Bennett* requirement.  520 U.S. at 177-78.

*Second*, the Order contains further directives to "establish the infrastructure necessary to compile, maintain, and transmit" the State Citizenship Lists and to "establish procedures" to allow individuals to "update or correct" their records and for states to "suggest[] modifications or amendments" to the State Citizenship Lists.  E.O. §§ 4(c), 2(a).  Neither the infrastructure to compile, maintain, and transmit the lists, nor the procedures to amend and update the lists have been finalized.  *See* Supp. Mayhew Decl. ¶¶ 7-8.  In other words, DHS has not yet consummated its decisionmaking process, with respect to the first *Bennett* requirement.

*Third*, even if and when the State Citizenship Lists are compiled, the mere creation of the lists does not implicate the second *Bennett* requirement, that "rights or obligations" have been determined, or "legal consequences" have been produced.  *Bessent*, 167 F.4th at 1235 (citation omitted).  The mere compilation of State Citizenship Lists within the federal government, without more, has no impact on any voting rights.  For instance, the confirmation of someone's citizenship status, or whether they are over 18 years old, from SSA to DHS—especially if it is done consistent with the Privacy Act and other applicable law (as the Order directs)—produces no legal consequences for that person.  Since both *Bennett* requirements must be met for final agency action to occur, and since no lists have been transmitted, final agency action has not taken place.

*LWVMA* Plaintiffs contend that their APA challenge to Section 2(a) appropriately challenges final agency action. *LWVMA* MTD Opp'n at 27-30.  They are mistaken.  They first assert that final agency action has taken place because of the "mandatory" language in Sections 2(a) and 4(c) of the Order.  *LWVMA* MTD Opp'n at 28 (quoting *Ass'n of Am. Univs. v. Dep't of Energy*, 789 F. Supp. 3d 118, 138-39 (D. Mass. 2025)).  *LWVMA* Plaintiffs further assert that final agency action has taken place because agencies have already decided to establish the necessary infrastructure to create State Citizenship Lists, even if they are "still considering *how* to compile the State Citizenship Lists consistent with applicable law."  *Id*.  But these arguments are contradicted by the MacBride and Mayhew Declarations.  *See, e.g.*, MacBride Decl. ¶ 6 ("SSA has not yet made any final decisions about its role in implementation of the Executive Order."); Supp. Mayhew Decl. ¶ 7 ("USCIS has not yet begun preparation of any 'State Citizenship List' as contemplated by E.O. 14,399.").  Besides, the Order itself cabins the supposedly "mandatory" language *LWVMA* Plaintiffs point out by requiring any implementation be limited to the "extent feasible and consistent with applicable law, including but not limited to the Privacy Act of 1974." E.O. § 2(a).

Even if and when DHS makes that decision, the two *Bennett* requirements must be met before agency action is deemed final.  DHS would need to consummate its decisionmaking process by, under any theory, at least compiling and transmitting State Citizenship Lists.  *But see TransUnion LLC v. Ramirez*, 594 U.S. 413, 437-38 (2021) (holding that 6,332 plaintiffs with misleading alerts in their credit files lacked Article III standing to pursue claims against agency when said files had not been disseminated to third-party businesses, unlike 1,853 plaintiffs who did have Article III standing because their reports were disseminated).  Even then, *Bennett*'s second requirement asks whether the agency has determined rights or obligations or produce legal consequences.  But here, the Order merely contemplates compilation and transmission of State Citizenship Lists but does not require state elections officials to do anything with those lists.  In the absence of legal consequences or any determination of right or obligations tied to the compilation and transmission of the State Citizenship Lists, *Bennett*'s second requirement is not satisfied, and such agency action is not final.

- 18 -

Next, *LWVMA* Plaintiffs assert that creation of the State Citizenship Lists would violate the Privacy Act procedurally and substantively, but these are merits arguments, not final agency action arguments. Moreover, the Order itself specifically contemplates adherence to the Privacy Act and commands DHS to proceed with the creation of the State Citizenship Lists only if doing so is consistent with the Privacy Act and applicable laws. E.O. § 2(a).

Even if the Court were to look to the merits, however, *LWVMA* Plaintiffs' are wrong to say that it would be impossible to comply with the Privacy Act for the reasons they state. Procedurally, *LWVMA* Plaintiffs assert that "two consecutive publications are needed." *LWVMA* MTD Opp'n at 29 (citation omitted). Specifically, a new System of Records Notice (SORN), first by SSA (and any other agency providing information to DHS), with a thirty-day notice prior to providing information to DHS, and a subsequent SORN with a thirty-day notice prior to DHS transmitting State Citizenship Lists to states. *Id.* Since "fewer than sixty days remain before the ninety-day deadline" to establish the State Citizenship List infrastructure, *LWVMA* Plaintiffs contend that a procedural "violation of the Privacy Act is a certainty." *Id.* Not so. Even assuming that DHS determines that creation of the State Citizenship Lists is feasible and consistent with applicable law, and that *LWVMA* Plaintiffs are correct about the need for two new SORNs (which they have not established), they fail to explain why a second SORN could not be issued before DHS has received all data from other agencies. *LWVMA* Plaintiffs also have no answer to the possibility that DHS could simply delay its establishment of the infrastructure necessary to compile a State Citizenship List after the 90-day timeline contemplated by the Order, on the grounds that it would not be feasible and consistent with applicable law to meet the Order's contemplated timing (that is, on Plaintiffs' view of what the law requires).

*LWVMA* Plaintiffs also assert that any State Citizenship List will be unable to meet the substantive requirements under 5 U.S.C. § 552a(e)(5)-(6) that the records compiled and transmitted will be "accurate, timely, and complete." *LWVMA* MTD Opp'n at 30. But this too is based on their flawed assumption that the lists will "necessarily be incomplete and inaccurate because of the known gaps and limitations of data available to federal agencies." *Id.* But how can *LWVMA*

Plaintiffs make such a determination before the State Citizenship Lists have even been created? Perhaps DHS will identify and utilize "other relevant Federal databases" and/or revamp existing sources to ensure accurate, timely, and complete data. E.O. § 2(a). Perhaps DHS will provide clear disclaimers on the State Citizenship Lists data to ensure state election official recipients understand its limitations. Or perhaps DHS will run into some other as-yet-unidentified practical or legal constraint that affects implementation of the Order. All of this uncertainty underscores why *LWVMA* Plaintiffs' APA challenge of Section 2(a) of the Order cannot succeed as final agency action has not yet taken shape.

**IV.    Plaintiffs fail to identify any viable cause of action for their statutory claims.**

To the extent that Plaintiffs continue to assume the APA provides the relevant cause of action for all or most of their statutory claims, that is incorrect (at least) because of their failure to identify any "final agency action," 5 U.S.C. § 704, as discussed *supra*, Section III. In addition, with respect to their claims against the President—and thus, all of their statutory claims challenging the Executive Order itself, rather than possible future implementation of that Order—Plaintiffs cannot sue under the APA because "the President is not an agency within the meaning of the" APA. *Franklin v. Massachusetts*, 505 U.S. 788, 796 (1992); *accord LULAC v. Exec. Off. of President*, 808 F. Supp. 3d 29, 69 (D.D.C. 2025) ("[B]ecause 'the President is not an agency within the meaning of' the APA, the issuance of an executive order is not a final agency action that is reviewable within the APA framework." (quoting *Franklin*, 505 U.S. at 796)), *appeals filed*, No. 25-5476 (D.C. Cir. Dec. 31, 2025), & No. 25-5478 (D.C. Cir. Dec. 31, 2025).

**Privacy Act.** Plaintiffs sometimes reference the Privacy Act's statutory cause of action. But the Privacy Act itself creates a cause of action only for adversely affected "individual[s]," 5 U.S.C. § 552a(g)(1)(D), not organizations, and only for injunctive relief only in narrow circumstances that are plainly inapplicable here. *See, e.g.*, *Sussman v. U.S. Marshals Serv.*, 494 F.3d 1106, 1122 (D.C. Cir. 2007) ("We have held that only monetary damages, not declaratory or injunctive relief, are available to § 552a(g)(1)(D) plaintiffs") (citing *Doe v. Stephens*, 851 F.2d 1457, 1463 (D.C. Cir. 1988)). That much seems to be undisputed. In addition, generally, "a plaintiff

cannot bring an APA claim to obtain relief for an alleged Privacy Act violation." *Westcott v. McHugh*, 39 F. Supp. 3d 21, 33 (D.D.C. 2014); *see also, e.g.*, *Am. Fed'n of Tchrs. v. Bessent*, 152 F.4th 162, 175-76 (4th Cir. 2025), *abrogated on other grounds by Am. Fed'n of State, Cnty. & Mun. Emps. v. SSA*, 172 F.4th 361 (4th Cir. 2026) (en banc).  And if that were *not* correct, it is hard to understand why Congress went to such great lengths to specify what remedies are (and are not) available to vindicate rights under the Privacy Act.

**Ultra Vires.**  To the extent Plaintiffs assert statutory ultra vires claims, these cannot succeed for at least two reasons.  First, such claims apply only to situations of an extreme statutory error "that disregards a specific and unambiguous statutory directive, or that violates some specific command of a statute will support relief."  *Changji Esquel Textile Co. v. Raimondo*, 40 F.4th 716, 722 (D.C. Cir. 2022) (quoting *Fed. Express Corp. v. U.S. Dep't of Com.*, 39 F. 4th 756, 764 (D.C. Cir. 2022)).  These "Hail Mary pass" claims "rarely succeed[]."  *NRC v. Texas*, 605 U.S. 665, 681-82 (2025) (quoting *Nyunt v. Chairman, Broad. Bd. of Governors*, 589 F.3d 445, 449 (D.C. Cir. 2009)).  Here, there is no such asserted statutory violation.  Second, statutory ultra vires review is unavailable where "an alternative path to judicial review" exists.  *NRC*, 605 U.S. at 682; s*ee also* Defs.' Br. at 17 n.6 (discussing the possible applicability of a different form of ultra vires review that might govern review of certain possible future actions by the Postal Service).  Plaintiffs can access just such an alternative path by waiting for final agency action to take place and then sue, whether under the APA, under the Privacy Act (*e.g.*, for monetary relief to an individual who suffers actual damages), or under the other statutory provisions that some Plaintiffs cite, addressed below, provided they can cite a valid cause of action.

But Plaintiffs point to nothing close to a statutory violation of that sort here.  Instead, they offer no more than the sort of "typical statutory-authority argument[s]" that do not suffice to state an ultra vires claim.  *NRC*, 605 U.S. at 682.  For example, rather than identify any "'clear and mandatory' statutory command" that some agency has violated, *Changji*, 40 F.4th at 722 (citation omitted), Plaintiffs simply argue that "Section 3 [of the Order] directs USPS to violate federal law, including the PRA . . . and Section 11(a) of the Voting Rights Act."  *LWVMA* MTD Opp'n at

- 21 -

26. That is incorrect—but even if it were correct, the Postal Service has still not "disregard[ed] a specific and unambiguous statutory directive" in a way that could support an ultra vires claim. *Changji*, 40 F.4th at 722 (citation omitted).

**Other Statutory Claims.** Setting aside Plaintiffs' Privacy Act claims (that rely on the APA) and statutory ultra vires claims, already addressed above, some Plaintiffs reference other statutes. But "[w]ithout [statutory authorization], a cause of action does not exist and courts may not create one, no matter how desirable that might be as a policy matter, or how compatible with the statute." *Alexander v. Sandoval*, 532 U.S. 275, 286-87 (2001) (citation omitted). Those Plaintiffs fail to identify a private right of action to invoke for their statutory claims that do not involve the Privacy Act and thus those challenges are without merit.

*LWVMA* Plaintiffs appear to invoke an implied cause of action for their Voting Rights Act § 11(a) ("VRA") statutory claim and rely on the APA as a vehicle for their Privacy Act statutory claims. *See LWVMA* MTD Opp'n at 26-28. But they also concede that "Section 11 of the VRA does not contain an express private right of action." *LWVMA* MTD Opp'n at 26. Nonetheless, they contend that "persuasive authority across multiple districts has found congressional intent to create an implied right of action for § 11(b) specifically within the statutory text, meeting the 'high bar' for implied causes of action." *Id*. at 26-27 (quoting *Krabach v. King County*, No. 2:22-cv-1252-BJR, 2023 WL 7018431, at *3 (W.D. Wash. Oct. 25, 2023)). This Court need not delve into that issue, for which *LWVMA* Plaintiffs cite only disputed out-of-circuit district court opinions.[4] *LWVMA* Plaintiffs do not and cannot plausibly plead any VRA § 11(a) claim because that statute states: "No person acting under color of law shall fail or refuse to permit any person to vote who is entitled to vote under any provision of this Act or is otherwise qualified to vote, or willfully fail

---

[4] *Krabach* itself acknowledges the contrary holding in *Schilling v. Washburne*, 592 F. Supp. 3d 492, 498 (W.D. Va. 2022), which held against finding an implied right of action to enforce VRA § 11(b). Moreover, *LWVMA* Plaintiffs assert, despite citing no authority (persuasive or otherwise) that an implied right of action to enforce VRA § 11(b) "applies equally to Section 11(a)". *LWVMA* MTD Opp'n at 27. *LWVMA* Plaintiffs thus fail to meet their burden under *Sandoval* to identify a private right of action to enforce VRA § 11(a).

or refuse to tabulate, count and report such person's vote." VRA, Pub. L. No. 89-110, § 11(a), 79 Stat. 437, 443 (1965) [codified as 52 U.S.C. § 10307]. But nothing in the Order comes close to refusing to permit anyone entitled to vote from doing so, nor does anything in the Order come close to refusing to tabulate, count, and/or report anyone's vote. At most, *LWVMA* Plaintiffs fear that a USPS final rule implementing Section 3(b) of the Order will cause such an injury. But *LWVMA* Plaintiffs cannot plausibly state a claim that relies on hypothetical injury to a person's ability to vote based on a final rule that does not and may never exist.

## V.    Plaintiffs' claims challenging the enforcement priorities and enforcement discretion of the Executive Branch are independently unreviewable.

*LWVMA* Plaintiffs do not appear to challenge parts of the Order which pertain to the enforcement priorities of the Executive Branch, *e.g.*, E.O. §§ 2(b), 4(b), and 5. The *California* Plaintiffs, however, do challenge E.O. § 2(b). *California* MTD Opp'n at 15-17, 21-23. Such challenges are without merit as they seek to improperly intrude upon the Executive's "'broad discretion' to enforce the Nation's criminal laws." *Armstrong*, 517 U.S. at 464 (citation omitted). Decisions about "how to prioritize and how aggressively to pursue legal actions against defendants who violate the law" thus fall "within the discretion of the Executive Branch, not within the purview of private plaintiffs (and their attorneys)." *TransUnion*, 594 U.S. at 429. Accordingly, lawsuits challenging enforcement priorities "run up against the Executive's Article II authority to enforce federal law," *Texas*, 599 U.S. at 678, and "courts generally lack meaningful standards for assessing the propriety of enforcement choices" of the law-enforcement, investigation, and prosecution functions of the Executive Branch. *Id.* at 679. As a result, "federal courts lack Article III jurisdiction over . . . suit[s]" that challenge the Executive's enforcement decisions. *Id.* at 685.

The *California* Plaintiffs argue that "Defendants mischaracterize Plaintiff States' challenge." *California* MTD Opp'n at 16. *California* Plaintiffs read Section 2(b) of the Order as an attempt to "coerce Plaintiff States to withhold ballots from voters omitted from the State Citizenship Lists, and even to assist in maintaining the Lists themselves." *Id.* at 21. But the *California* Plaintiffs are simply mistaken in their reading of Section 2(b) of the Order. No part of the Order,

- 23 -

including Section 2(b), coerces *California* Plaintiffs to do anything with the State Citizenship Lists, let alone to withhold ballots from anyone. No part of the Order, including Section 2(b), forces *California* Plaintiffs to maintain the State Citizenship Lists. No part of the Order, including Section 2(b), threatens criminal prosecution for nonadherence to the Order itself. To the extent Plaintiffs' concern is with future agency action not even stated in the plain text of the Order, such a challenge is surely unripe.

The only mentions of criminal enforcement throughout the Order concern the prosecution of existing federal voting-related crimes. *See, e.g.,* E.O. § 2(b) (listing 18 U.S.C. § 611 (illegal voting by aliens); 18 U.S.C. § 1015 (false statement to register or vote in an election); 52 U.S.C. § 20511 (knowing and willful fraud by election official)). The only mention of maintaining the State Citizenship Lists by states is in Section 2(a)(ii), which simply charges the Secretary of Homeland Security with establishing procedures to "enable States to routinely supplement and provide suggested modifications or amendments to the State Citizenship List transmitted thereto." E.O. § 2(a). The Order imposes no duty on *California* Plaintiffs to use the State Citizenship Lists nor to maintain them. *California* Plaintiffs' assertion that the Order imposes both duties, under the threat of criminal prosecution no less, is without basis in the text of the Order. And to the extent that *California* Plaintiffs more generally challenge the authority or discretion of the Executive Branch in prioritizing criminal investigations, "the Executive Branch has 'exclusive authority and absolute discretion' to decide which crimes to investigate and prosecute, including with respect to allegations of election crime." *Trump v. United States*, 603 U.S. at 620 (citation omitted).

## VI.     The President and the Department of Commerce should be dismissed.

Even if Plaintiffs could overcome all of the threshold problems above, at a minimum, the President of the United States, the Department of Commerce, and the Secretary of Commerce (in his official capacity) should be dismissed as Defendants in these suits.

**Department of Commerce.** As for the Department of Commerce and the Secretary of Commerce (in his official capacity), their only mention in the Order is in Section 4(a), which

- 24 -

provides that "[t]he Secretary of Homeland Security, the Commissioner of SSA, and the Postmaster General shall coordinate with the Secretary of Commerce in effectuating all relevant aspects of the implementation of this order." E.O. § 4(a).  Any "coordination" role for the Department of Commerce would reflect internal government deliberations only and thus has no legal effect and causes no cognizable Article III injury subject to judicial review.

*California* Plaintiffs urge that their suit against the Department of Commerce and the Secretary of Commerce be maintained, citing Section 4(a) of the Order.  *See California* MTD Opp'n at 30.   The Order does not charge the Department of Commerce with providing data to DHS for use in the State Citizenship Lists.  The Order does not charge the Department of Commerce with conducting any rulemaking or prioritizing any prosecutions of federal voting-related crimes.  Any coordination role in Section 4(a) of the Order has no legal effect on any plaintiff and causes no plaintiff a cognizable Article III injury.  And a court order preventing one cabinet secretary from talking to another cabinet secretary would raise serious separation-of-powers problems.  *Cf.* U.S. Const. art. II, § 2, cl. 1 ("[The President] may require the Opinion, in writing, of the principal Officer in each of the executive Departments, upon any Subject relating to the Duties of their respective Offices").  Therefore, the Department of Commerce and Secretary Lutnick should be dismissed.

**President Trump**.  As addressed *supra*, section III, the President is not a proper subject of an APA challenge.  The President is also not properly subject to an injunction as there is no tradition of equitable relief against the President.  *See J.G.G. v. Trump*, No. 25-5067, 2025 WL 914682, at *13 (D.C. Cir. Mar. 26, 2025) (per curiam) (Henderson, C.J., concurring) ("At common law, the Chancellor could not grant 'any relief against the king, or direct any act to be done by him.' This historic limitation carries forward to today and strips the federal courts of equitable 'jurisdiction . . . to enjoin the President in the performance of his official duties.'" (omission in original) (citations omitted)).  Nor could Plaintiffs' references to the Declaratory Judgment Act warrant issuance of a declaration in lieu of an injunction.  The D.C. Circuit has observed that courts "have never submitted the President to declaratory relief," *Newdow v. Roberts*, 603 F.3d 1002,

1013 (D.C. Cir. 2010), built on Justice Scalia's separate opinion in *Franklin*, which properly regarded declaratory relief as unavailable against the President under the same historical tradition denying injunctive relief against the President, 505 U.S. at 827-28 (Scalia, J., concurring in part and concurring in the judgment). Declaratory relief is therefore unavailable for essentially the same reasons as an injunction.

*LWVMA* Plaintiffs appear to accept that the President cannot be subject to injunctive relief, but it is unclear whether they assert that they may obtain declaratory relief against the President. *See LWVMA* MTD Opp'n at 14, n.5 (*LWVMA* Plaintiffs "do not seek injunctive relief as to the President"). *California* Plaintiffs cursorily assert that the President is subject to declaratory relief. *See California* MTD Opp'n at 30. Plaintiffs do not appear to squarely address Defendants' arguments, particularly in *Newdow*, that declaratory relief is not available against the President. *See* Defs.' Br. at 46-47. In any event, the Court should follow the D.C. Circuit's approach to this issue, for the reasons explained in Defendants' motion to dismiss.

## CONCLUSION

For these reasons, these cases should be dismissed, without prejudice, under Federal Rule of Civil Procedure 12(b)(1) or 12(b)(6).

Dated: May 22, 2026                         Respectfully submitted,

                                            BRETT A. SHUMATE
                                            Assistant Attorney General
                                            Civil Division

                                            ERIC J. HAMILTON
                                            Deputy Assistant Attorney General
                                            Civil Division

                                            JOSEPH E. BORSON
                                            Assistant Branch Director
                                            Federal Programs Branch

                                            /s/ Stephen M. Pezzi
                                            STEPHEN M. PEZZI
                                             Chief Litigation Counsel (FL Bar 1041279)
                                            ESAM K. AL-SHAREFFI
                                             Trial Attorney (D.C. Bar 90010174)
                                            U.S. Department of Justice
                                            Civil Division, Federal Programs Branch
                                            1100 L Street, NW
                                            Washington, DC 20530
                                            Telephone: (202) 305-8576
                                            E-mail: stephen.pezzi@usdoj.gov

- 27 -