UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

---

LEAGUE OF WOMEN VOTERS OF MASSACHUSETTS, et al.,

Plaintiffs,

v.

DONALD J. TRUMP, in his official capacity as President of the United States, et al.,

Defendants.

Civil Action No. 1:26-cv-11549-IT

---

STATE OF CALIFORNIA, et al.,

Plaintiffs,

v.

DONALD J. TRUMP, in his official capacity as President of the United States, et al.,

Defendants.

Civil Action No. 1:26-cv-11581-IT

---

BEFORE THE HONORABLE INDIRA TALWANI, DISTRICT JUDGE

MOTION HEARING

Tuesday, June 2, 2026
10:15 a.m.

John J. Moakley United States Courthouse
Courtroom No. 9
One Courthouse Way
Boston, Massachusetts

Robert W. Paschal, RMR, CRR
Official Court Reporter
rwp.reporter@gmail.com

**A P P E A R A N C E S**

On behalf of the Plaintiff States:

CALIFORNIA ATTORNEY GENERAL'S OFFICE
BY: MICHAEL SURREN COHEN
ANNE P. BELLOWS
PO Box 944255
Sacramento, CA 94244
(916) 445-9555
michael.cohen@doj.ca.gov
anne.bellows@doj.ca.gov

NEVADA ATTORNEY GENERAL'S OFFICE
BY: KIEL IRELAND
One State of Nevada Way
Suite 100
Las Vegas, NV 89119
(702) 486-3420
kireland@ag.nv.gov

OFFICE OF THE ATTORNEY GENERAL
BY: VANESSA AZNIV ARSLANIAN
One Ashburton Place
Boston, MA 02108
(617) 727-2200
vanessa.arslanian@mass.gov

On behalf of the League of Women Voters Plaintiffs:

AMERICAN CIVIL LIBERTIES UNION FOUNDATION
BY: THERESA J. LEE
SOPHIA LIN LAKIN
CLAYTON PIERCE
125 Broad Street
18th Floor
New York, NY 10004
(212) 549-2500
tlee@aclu.org
slakin@aclu.org
cpierce@aclu.org

ACLU OF MASSACHUSETTS
BY: JESSIE J. ROSSMAN
One Center Plaza
Suite 850
Boston, MA 02108
(617) 482-3170
jrossman@aclum.org

BRENNAN CENTER FOR JUSTICE
BY: ELIZA SWEREN-BECKER
120 Broadway
Suite 1750
New York, NY 10271
(646) 292-8310
sweren-beckere@brennan.law.nyu.edu

On behalf of the Defendants:

UNITED STATES DEPARTMENT OF JUSTICE
BY: STEPHEN MICHAEL PEZZI
ESAM AL-SHAREFFI
1100 L Street NW
Washington, DC 20005
(202) 305-8576
stephen.pezzi@usdoj.gov
esam.k.al-shareffi@usdoj.gov

On behalf of Intervenor States:

MISSOURI ATTORNEY GENERAL'S OFFICE
BY: LOUIS JOSEPH CAPOZZI, III
BENJAMIN GILBERG
JOHN MICHAEL PATTON
815 Olive Street
Suite 200
St. Louis, MO 63101
(314) 340-6816
louis.capozzi@ago.mo.gov
benjamin.gilberg@ago.mo.gov
michael.patton@ago.mo.gov

**P R O C E E D I N G S**

(In open court at 10:15 a.m.)

THE DEPUTY CLERK: United States District Court is now in session, the Honorable Judge Indira Talwani presiding.

This is a motion hearing in Case Numbers 26-cv-11549, League of Women Voters of Massachusetts, et al. v. Trump, et al.; and 26-cv-11581, State of California, et al. v. Trump, et al.

Will counsel please identify themselves for the record.

MR. COHEN: Good morning, Your Honor. Michael Cohen on behalf of the State of California and the plaintiff states.

THE COURT: Good morning.

MS. BELLOWS: Anne Bellows on behalf of the State of California and plaintiff states. And I'd like to note Mr. Cohen and myself will be splitting argument.

THE COURT: Okay. Good morning.

MR. IRELAND: Good morning, Your Honor. Kiel Ireland on behalf of the State of Nevada.

THE COURT: Good morning.

MS. ARSLANIAN: Good morning, Your Honor. Vanessa Arslanian from the Massachusetts Attorney General's Office.

MS. LEE: Theresa Lee from the American Civil Liberties Union on behalf of the League of Women Voters of

Massachusetts plaintiffs. I'd also like to acknowledge that members of each of our plaintiff organization are here with us in the courtroom today.

THE COURT: Good morning.

MS. LAKIN: Good morning. Sophia Lakin with the ACLU for League of Women Voters plaintiffs.

THE COURT: Good morning.

MS. ROSSMAN: Good morning, Your Honor. Jessie Rossman with the ACLU of Massachusetts.

THE COURT: Good morning.

MS. SWEREN-BECKER: Good morning, Your Honor. Eliza Sweren-Becker with the Brennan Center for Justice on behalf of the League plaintiffs.

THE COURT: Good morning.

MR. PIERCE: Good morning, Your Honor. Clayton Pierce with the American Civil Liberties Union on behalf of the League plaintiffs.

THE COURT: Good morning.

MR. PEZZI: Good morning, Your Honor. Stephen Pezzi from the Department of Justice on behalf of the United States.

THE COURT: Good morning.

MR. AL-SHAREFFI: Good morning, Your Honor. Esam Al-Shareffi from the Department of Justice, also representing the United States.

THE COURT: Good morning.

MR. CAPOZZI: Good morning, Your Honor. Louis Capozzi on behalf of the intervenor defendants, State of Missouri and the other states.

THE COURT: Good morning.

MR. GILBERG: Good morning, Your Honor. Benjamin Gilberg on behalf of the intervenor states as well.

THE COURT: Good morning.

MR. PATTON: Good morning, Your Honor. Michael Patton on behalf of the intervenor states.

THE COURT: Good morning.

So I have, essentially, three motions in front of me: I have the defendants' motion to dismiss in both cases, I have the plaintiff states' motion for summary judgment, and I have the League of Women Voters plaintiffs' motion for a preliminary injunction.

And I think the way I'm planning to proceed here is I'm going to start with the defendants', really, the 12(b)(1) arguments that are applicable in both cases and hear argument on that; I then intend to hear argument on the state plaintiffs' motion for summary judgment and then on the League plaintiffs' motion for a preliminary injunction.

And I'm doing the two plaintiffs groups in that order because -- I suppose we could switch it the other way, too, but the state plaintiffs, I understand, are seeking to

address Sections 2, 3, and 5 of the executive order; and the League plaintiffs are only addressing Section 3 of the executive order. So that's how I intend to proceed.

I do want to start with a sua sponte reconsideration of a prior order of mine. When the states -- you've identified yourself as the intervening states, but when the states moved -- and that is the -- Missouri, Alabama, Florida, Indiana, Kansas, Louisiana, Montana, Nebraska, Oklahoma, South Carolina, South Dakota, and Texas -- when those states sought to intervene, the defendants and the plaintiffs opposed intervention as of right, which I continue to agree with.

On permissive intervention, the League plaintiffs didn't oppose it. The state plaintiffs did. So on the League plaintiffs, I just allowed it without -- because it was unopposed as permissive intervention.

On the state case, the defendant -- the plaintiff states argued that, for permissive intervention, one question is whether the defendant will be fully defending the action and/or sufficiently defending the action. And based on that, I denied the motion to intervene in the state case and only allowed participation as amicus.

After reviewing the briefs on merits, I do think there's a distinction between the positions taken by the United States and the intervening/amicus states which is, in

brief, that the United States has taken the position that we don't yet know what's going to happen with these citizenship lists, whereas -- or whether they're feasible or will ever come to happen -- whereas the states are affirmatively taking the position that you want the citizenship lists.

And so, for that reason, I do think that distinction does merit permissive intervention; and so, on reconsideration on my own of that order, I am allowing the states that moved to intervene to intervene in both cases, not just the one.

So with that starting point -- I don't think, for the 12(b)(1) argument, we're necessarily in a different -- that there's anything that I'm really looking for you to add on that, although you're welcome to; but on the merits arguments, I do think I'd like to hear a little bit more from everyone.

So with that, I always start with the moving party; and on the 12(b)(1), that is the defendants. And for those of you who have been before me before, you know I go back and forth as I try to make my way through the arguments.

MR. PEZZI: Okay. Good morning, Your Honor. Stephen Pezzi from the Department of Justice on behalf of the United States.

I'd like to start with the timing of this lawsuit, or these lawsuits, which were filed mere days after the

issuance of Executive Order 14,399. Those timing considerations bear significantly on the 12(b)(1) arguments that the government has raised here and that Judge Nichols addressed in his preliminary injunction opinion last week in parallel litigation in the District of Columbia.

In short, there are both standing and ripeness problems created by plaintiffs' litigation strategy here to immediately challenge the executive order itself and on its face rather than to await and then challenge eventual implementation of that executive order by the defendant agencies here.

And so I'm happy to take the provisions of the executive order one by one. Section 2(a) of the executive order is about state citizenship lists. It contemplates --

THE COURT: For ease of communication here, there are things that the federal government is doing as contemplated by the executive order, there are things that states might be doing as contemplated by the executive order, and then there are things specifically that the post office may be doing as contemplated by the executive order. And there are lists being generated all over.

So for clarity, the list that's referenced in 2(a), which is a list generated by the federal government to be given state specifically, if we call it a "state citizenship list," it sounds like it's the list the state is creating.

So can you refer to that list as either the "federal citizenship list" or the "citizenship list," but not -- I know the executive order says "state," but that's not what it is. It's the list that the federal government is hoping to generate on a state-by-state basis.

MR. PEZZI: Yes, Your Honor. I will endeavor to be as precise as possible, notwithstanding the language of the executive order itself that has, of course, been drilled into my head for several weeks now.

But, yes, the citizenship lists contemplated by Section 2(a) of the executive order to be generated primarily by the Secretary of Homeland Security, to the extent feasible and consistent with applicable with law. The executive order contemplates preparation of certain infrastructure that would allow both individuals and states to make any sort of corrections or editions to those lists if necessary.

But, I mean, the most important part of that section of the executive order for today's purposes, in the view of the United States, is that, you know, as the record, I think, makes clear and as I think is undisputed, this is all potential implementation activity that has not yet been completed; and there remain significant uncertainties, even within the federal government, about how and to what extent the executive order will be implemented.

THE COURT: Okay. So let me just make sure we're

on the same page about timing. There -- for Section 2(a), there is a deadline for DHS to have established the infrastructure necessary to compile the lists, correct?

MR. PEZZI: Yes, Your Honor. That's in Section 4(c).

THE COURT: And that's 90 days, which would be June 29th?

MR. PEZZI: I believe that's right. Yes, Your Honor.

THE COURT: Okay. So by June 29th, DHS is to have established the infrastructure. And then under the -- I'm not sure which section it is -- the DHS is required to provide the states a copy of this list no later than 60 days before a regularly scheduled federal election or promptly before another election as requested by the states, correct?

MR. PEZZI: So with the very important caveat, I guess, two important caveats, I mean, one that I don't want to dwell on because I know Your Honor is familiar with it, the feasibility and legality considerations first would need to be overcome before DHS does that; but assuming those issues are overcome, that is certainly the timeline contemplated by the executive order.

Those are not legally binding or judicially enforceable deadlines, of course. That is, you know, the President's direction to his or her subordinates, and I don't

want to jump around on different parts of the executive order; but, I mean, the postal service notice of proposed rulemaking, for example, that is being published in the federal register this morning missed that deadline by a few days, so I don't want to suggest --

THE COURT: Okay. So let's hold off on the post office for a minute because I just -- I think -- to be clear, as I read the executive order, there's some overlap between what happens with the citizenship list and what happens with the post office. But in many ways, they're very separate; and so let's talk about them first separately. I mean, you're welcome to explain their interactions.

But the citizenship list, as you said, may or may not be coming out, but it's unlikely to come out prior to the date given, which was June 29th.

MR. PEZZI: That's right, Your Honor.

THE COURT: But at the same time, if an election is coming up, you have to provide that list -- assuming it's come out June 29th, you would be providing that list then to the state 60 days before the election, right?

MR. PEZZI: Not necessarily, Your Honor. I mean -- and I think this is where the feasibility constraint in Section 2(a) could be very important.

I mean, there have already, in fact, been federal elections since the issuance of this executive order; and,

again, I think it's undisputed that, you know, no state -- excuse me -- no citizenship lists contemplated by Section 2(a) were sent.

THE COURT: Well, there's been elections, but I think today is the first day that we have elections since the 60-day -- so there was an initial 60-day deadline -- no, I'm sorry. For the citizenship list, the first date is the 90 days.

So we haven't yet had an election that has happened under the anticipated dates here. The anticipated date was that you would get a citizenship list by 6/29. And once you have that citizenship list, the states can then ask for the citizenship list for a regularly scheduled -- for a special election; but in addition, any regularly scheduled election, you have to give it to them 60 days before.

MR. PEZZI: I think, generally, that is what the executive order contemplates; but to the extent Your Honor's question was about -- you know, to the extent there's some sort of impossibility or incompatibility between those timelines, I mean, I think by using the word "feasible," the executive order is making clear that, if it is not possible to do that, the agency need not do that, and that does not violate the executive order. That's all I'm trying to say.

THE COURT: Okay. So I'm just really wanting to focus for a few minutes on -- more on timing, because I do

think timing is a really critical question here. So I went -- I'm not going to say this out loud because then it gets picked up by the news.

But I managed to get a list of all of the dates, and I won't tell you how I managed to get this date or its reliability; but it is my understanding that we have elections coming up, so June 2nd, today -- too soon for this.

Let's forward to June 29th. So after June 29th, we have a primary in Colorado on June 30th, a primary in Arizona on July 29th. So let's say the June 30th is still in the not feasible area. We're right at the end between when you get this thing on June 29th and they can't get it -- they certainly can't get it 60 days before.

The July 28th runoff, you wouldn't have 60 days before, but you'd have time to -- some time to be able to get it. That's South Dakota runoff, if applicable.

August 4th, primaries in Kansas, Michigan, Missouri, Virginia, Washington; August 6th, Tennessee primary; August 6th, Hawaii primary; August 11th, Connecticut, Minnesota, Vermont, Wisconsin; August 18th, Alaska, Florida, Wyoming; August 25th, Oklahoma, if there's a runoff; September 1st, Massachusetts primaries; September 8th, New Hampshire.

So certainly towards those end dates, the argument that if those lists come out, it's not feasible has sort of

disappeared, right? At that point, we might have a list.

So if I tell these folks that this is premature and the list comes out as scheduled on June 29th and they have a primary on September 1st, that list will be in play.

MR. PEZZI: Possibly, Your Honor, although, again, some important caveats. I won't repeat all the caveats that I've already advanced, but one or two more that I think are important.

One is, it is not clear on the face of the executive order whether it's intended to apply to primary elections. That was also true of the postal service provision, which I know we'll get to, and now the proposed rulemaking -- which, again, is just a proposal -- proposes carving out primary elections, and so --

THE COURT: But right now -- I mean, on its face, what it says is you'll give it for a federal election. And I understand that the post office has taken the position that a primary isn't a federal election because it's something else. I'm not sure. But that could -- they could change that view by the time a final rule comes out; but, at any rate, this executive order just says this.

So -- and let's assume that the state wants to use it, right? So now we have the state saying, "I want to use this. I have a primary September 8th." What happens then? Do they then file at that point?

MR. PEZZI: Sure, Your Honor. And to be clear, I mean, we don't dispute the basic premise that there are eventually going to be federal elections coming after the date by which, if and when these citizenship lists are produced, that they are -- and they're, obviously, contemplated --

THE COURT: So I understand, for example, that if you have a challenge to how a census is going to be, but nothing really is going to happen for a few years that really matters, that you let it work its way through.

But my question here for you -- and so to the extent -- I can sort of give you a little bit of my tentative thinking on this. To the extent that the challenge is to these -- to the executive order ongoing or to the rules ongoing, for the more distant future, let's say after November 3rd, it probably is premature.

What I'm thinking about, though, is are -- the elections between now and November 3rd and including November 3rd; and what I'm thinking further is that I'm just a district judge, right? And whatever I do, one side or the other is going to appeal.

And when you appeal, if I have granted relief, the government will be asking me to stay my hand, stay the order, and it will go up to the Court of Appeals. And whatever happens there, it's likely one side or the other will seek

review of it.

So when I'm thinking about, can you run into court to deal with this election coming, I'm not thinking, can I work 24 hours around the clock and get an answer out on a TRO or on a PI in very, very short order; but I'm -- this is an issue that I'm not resolving at the end of the day finally.

I think -- certainly, I think that is the position of the government, that, ultimately, one district judge here or one district judge there, they do what they do; but there will be the court of appeal and maybe the Supreme Court that will decide.

So given that, is this really not in a position to address its ramifications for the November 3rd election or the elections before November 3rd?

MR. PEZZI: Sure, Your Honor. And I'm candidly quite sensitive, and as I'm sure all the many lawyers in this room are quite sensitive to some of the practical implications of the government's position here and the opinion issued by Judge Nichols recently in that -- I mean, we fully expect and are -- it is entirely consistent with our position here that judicial review of these issues will happen.

And if the Court were to accept the government's arguments, some of those issues may have to be litigated on a time-sensitive basis. And the government is sensitive to the

practical problems that arise from that sort of litigation.

THE COURT: But it's a time-sensitive basis -- I mean, to -- if you -- if you came here into the court and you said, "Judge, don't deal with this now, but if you deal with this on October 15th, we will all live with that for the November 3rd election," that would be one thing.

But, you know, you can go and listen to the justices talking about the emergency docket, and everybody else; we are all, at all levels of the court, we are all struggling with having to deal with weighty, constitutional issues on an expedited basis.

And so to say let's start that run-up now -- because, at the end of the day, nobody wants my opinion on this. At the end of the day, the question is: What's the Supreme Court going to say on this, or at least the Court of Appeals? It may not or may not be taken by the Supreme Court, but at least the Court of Appeals.

And so when you say it's not ripe and there's enough time to address this once the other shoe drops, is that really true?

MR. PEZZI: I think it can be litigated, if necessary, on an expedited basis later this summer or in the fall. I don't have an answer other than the doctrinal one, which is that, you know, there is no convenience exception under Article III. And so we've --

THE COURT: No, but isn't -- on the cases you've cited to me where you say we wait on ripeness, we wait till it's, you know, really there and ready, don't they all have sort of a carve-out assuming review would then still be possible at that time?

And so to the extent that the question here today would be can these issues be addressed in time for when they matter, which would be when people are voting next, which could be November 3rd, but it could be August or September, isn't that -- under those same cases that you have cited, don't those fall under the "so long as review can happen"?

Because what -- you can't take the position -- I think you would agree with me on this -- you can't take the position that there can never be review. The point is there has to be review, and there has to be review that's meaningful. You don't let all the rights come and go and say, well, that's okay. We can lose rights for this time around. Whether it's the right of the states that want the list or the rights of the states or the organizations that are concerned about these, on both sides, don't they get an answer to that before the election?

MR. PEZZI: So we are certainly not taking the position that nobody gets judicial review. We expect it -- if the government were to prevail on every argument in this motion to dismiss, that if and when the agencies, you know,

complete final agency actions to implement these actions or plaintiffs face either an actual or an imminent injury -- to be clear, an imminent injury also works under Article III -- the judicial review is quite likely. Obviously --

THE COURT: And Judge Nichols' decision in DC was absolutely not on the merits. It was entirely just on the question -- it was a denial of the requested relief without prejudice until things moved forward.

MR. PEZZI: He did address likelihood of success on the merits, but you're certainly right, Your Honor. I mean, that's a preliminary injunction opinion, and his opinion contemplates, just like the government's briefs contemplate, the possibility of judicial review once final actions are taken, if final actions are taken, to implement these provisions of the order.

THE COURT: Okay. So let's go back to ripeness. I understand the argument on ripeness, to the extent that you're saying, if no rule ever comes out from the post office, that's not yet ripe; but let's turn to the citizenship part of it, because we're not waiting on a rule. We're -- or rulemaking. We're having, currently, the Department of Homeland Security compiling this list, putting together a process and figuring out if it's feasible and so forth, yes?

MR. PEZZI: Yes, Your Honor.

THE COURT: So tell me more about your view on why that isn't ripe at this point.

MR. PEZZI: Certainly, Your Honor.

So the challenge here is to Section 2(a) of the executive order, which does contemplate the creation of these sorts of lists to the extent feasible and consistent with applicable law, including but not limited to the Privacy Act. Those deliberations were ongoing during the parties' briefing and remain ongoing now. And so no final decisions have been made, as I understand it, within the Department of Homeland Security on these issues.

And so not only are plaintiffs not suffering any Article III injury from that portion of the executive order, it's very difficult to imagine how we could litigate the merits of the claims that would attack those provisions of the executive order, and I'll give an example or two.

I mean, to the extent plaintiffs discussed this in their briefs, a lot of their theories are about the Privacy Act and privacy rights. And, in fact, plaintiffs explicitly say in one or two places in their brief that the executive order is unlawful because it, you know, commands violation of plaintiffs' privacy rights. I mean, I think the executive order commands the opposite. It commands compliance with the Privacy Act.

THE COURT: Well, it says, "Create a list as

feasible and lawful of eligible citizens who are residents of a particular state." It doesn't say, "Compile a list of ineligible people." So let's sort of -- just sort of divide out. So it's creating a list of people who are -- who the government can confirm are citizens of a particular state.

But -- and maybe the -- maybe the answer here, as I'm pondering this myself, is that if you comply with the privacy right -- the Privacy Act, you'll have a small list. You'll have a list of the people who -- you might have people who you think aren't eligible, but that's not what you're giving the state. You're giving the state the list of people you think are eligible. And if you're complying with the privacy right -- the Privacy Act, I'm not sure what you're compiling that from.

For example, if you have a five-generation US citizen who has always filed their taxes and lives in a particular state, their tax records would probably go back and show their Social Security number and where they live and so forth. But I'm not sure how they would show up on your list without violating the Privacy Act.

MR. PEZZI: I think there's some fair questions there, Your Honor. I mean, I think, to the extent Your Honor's intuition is that a list of individuals confirmed to be over the age of 18 and confirmed to be US citizens and confirmed to live in a particular state is going

to include less than 100 percent of the individuals who --

THE COURT: Well, more than -- I mean, let's not be -- we're not talking 99 percent either. We're talking a very much smaller percent, because what you're getting -- you're getting people -- you'll get your -- ideally, you will get your naturalized citizens.

But let's talk for a minute about native-born Americans. How are you getting them on your list? How are you getting the women who've changed their names when they got married? How are you getting the Americans who've moved from state to state? They're not in a federal database by state.

You're getting -- you're saying to the states, "Here's a list of naturalized citizens." I think you can get -- probably get to that, although, obviously, the plaintiffs have talked about problems with same names and so forth, but -- or that you didn't think they were naturalized yet, but they are.

But putting those aside, let's assume you can try to get a close group of the naturalized citizens. Let's just -- you certainly aren't saying you're getting 99 percent of Americans, of American-born citizens, are you? From what database?

MR. PEZZI: So those very questions, Your Honor, I think, are core to the government's ripeness argument here

and, I think, support the government's position. Because I don't know, plaintiffs do not know, and the Department of Homeland Security has not made any final decisions regarding what databases are going to be relied upon. The executive order itself identifies some possibilities.

THE COURT: No, but you're not promising -- you're not promising a complete list. That's not what this executive order is about. You're promising a list of confirmed citizens, which, I think, you're not -- you're not disputing and you're saying it's not 100 percent, but you're not disputing it's not going to be complete, to be clear.

MR. PEZZI: Yes, Your Honor. It is a list of confirmed citizens. So to the extent someone is unconfirmed --

THE COURT: Okay.

MR. PEZZI: -- it does not mean they're a noncitizen.

THE COURT: So why would I assume -- why should I assume for purposes of this ripeness analysis that DHS isn't going to do what the President has asked it to do, which is to create a list, to the extent possible, of confirmed United States citizens residents? And so there will -- why shouldn't I assume there will be such a list?

MR. PEZZI: So I think -- even if Your Honor were to assume that, I don't think that is fatal to the

government's ripeness argument, because to litigate the questions of whether that sort of list violates the law, you require some information that no one in this courtroom has right now about how the lists were compiled, using what information and --

THE COURT: Okay. So let me assume regularity, which I think I'm supposed to do. So let me assume that the government has -- the federal government had created a list of confirmed citizens without violating the Privacy Act. Okay?

Can I consider at that point -- maybe they don't have any other challenges, but can't I consider that, whether that -- if they were -- if they're coming out with a list that violates the Privacy Act, we have that problem.

But let's say they come out with a list that the main criticism of this list is that it is underinclusive. Okay? So it's not violating any laws. It's just an underinclusive, perhaps closely underinclusive, but let's say it's an underinclusive list. They may or may not have good legal arguments about it, but isn't that question ripe?

MR. PEZZI: So once -- if and when a list is created, there are still significant steps that would have to be taken before plaintiffs suffer any Article III injury or any final agency action is created -- is taken.

I mean, there are all sorts of data in all sorts of

government databases right now and have always been there. And that data just sitting in a file somewhere, under the Supreme Court's decision in *TransUnion*, does not give rise to Article III standing.

The question is what the federal government first and then, ultimately, I think, in this set of questions, what the state governments might do with such a list that would give rise to some sort of Article III injury that could be litigated.

Now, obviously, on that hypothetical, the government hasn't violated the law anyway, and so I'm not sure what the concern would be.

THE COURT: Well, so let me ask them. Let me assume that I accord a presumption of regularity. And under the Privacy Act, much of the data that the President has suggested maybe should be included, maybe it won't be included because we have these Privacy Act laws. So let's assume that the government comes out with a list on June 29th that is not violating the Privacy Act. It's now a federal list of confirmed citizens.

Do you have a ripe issue at that point?

MS. BELLOWS: I can address that for plaintiff states. If I may, I'd like to handle two housekeeping matters first.

One, I just want to reiterate our objection to the

intervention of the other states for the reasons that were laid out in our papers and additionally note that issue is currently being briefed in the First Circuit.

I also just want to clarify for the Court I'll be addressing Section 2 issues; and my colleague, Mr. Cohen, will be addressing issues related to Section 3, so you can direct your -- and Section 5, so you can direct questions accordingly.

So if the government created a list that was in compliance with the Privacy Act -- and to be clear, plaintiff states have not raised a Privacy Act claim here. We certainly would have and, in fact, we do have today a live controversy about whether the President has statutory or constitutional authority to direct the Department of Homeland Security and the Social Security Administration to create such a list.

And one of the reasons we have that today is because the executive order is extraordinarily clear about what DHS must do. It's clear about what the list consists of with criteria for inclusion on the list, when it must be deliberated, that there needs to be these mechanisms by which individuals and states can submit instructions.

And defendants have talked about feasibility, but there is no evidence in the record citing any barrier to the creation of this list. And they have not --

THE COURT: Well, that's my point in saying it might be a -- it might turn out as a feasibility matter that it's a small list, but a list of some sort could be created without violating the Privacy Act. It just might be a small list.

MS. BELLOWS: Correct. And there's nothing in the record to suggest otherwise.

On the -- I guess, let me also address some of the ripeness colloquy, if that's all right, that came up earlier. I think the Court identified some of the grave hardship issues that come from withholding review.

But the other reason that this is ripe is that our challenge goes to the President's authority to issue these orders, and that has already occurred. Those -- that issue has been -- has been squarely crystallized by the issuance of this executive order.

And there's nothing about the implementation that will change either the shape of that question nor the fact that we have existing harms. So as we've laid out in a mountain of evidence through our declarations, plaintiff states, as administrators of the election, need to grapple with the fallout from these lists no matter what. So -- and there's two reasons -- three reasons, actually, that I'd like to highlight for that.

First is that our election officials are under a

threat of prosecution under this executive order if they issue ballots to voters who the federal government believes are not eligible to vote in federal elections, and I can talk at length about that, but that means --

THE COURT: And just to be clear here, we have a little bit of a disconnect because the list you're getting from the government isn't a list of people who are disqualified from voting. It's a list that is not a complete list of some people who are qualified to vote, but if the election officials are sending ballots or allowing people to vote who aren't on the list, there's a threat of prosecution.

MS. BELLOWS: That's right. And election officials have testified to this in the declarations we've put in describing it as chilling in a way with no prior antecedent in their experience, saying that they feel personally threatened about the risk of a criminal prosecution if a ballot issues to state election officials.

So one -- one result of this is that, in order to protect their election officials and others involved in administering the elections, states have to try to minimize errors on that list to the extent possible. So when these lists come out, as everything indicates they will, we're going to have to launch a massive and technically very complex data matching and analysis investigation.

And, currently, states are already working to

prepare what their plan will be, who will handle it, can they get additional resources, what are some of the technical hurdles that we'll have to cover come, so those injuries are occurring now.

Other reasons I want to highlight why these lists will cause and are causing injuries are that, first of all, no matter what, they will cause confusion among voters and among election officials; and that, too, is attested in the declarations by all of the inquiries and concerns that have already been brought to the forefront, to the feet of our elections officials, and that will only increase once these come out.

So states are beginning to and will have to issue guidance and training to elections officials so they understand what their duties are and are not related to this list.

There are tens or hundreds of thousands of people who we entrust to run our elections throughout plaintiff states; and we need to make sure that all of them know, for example, that just because someone is not on the state citizenship list, that does not mean they're not eligible to vote.

THE COURT: I'm calling it the "citizenship list" for here.

MS. BELLOWS: Sorry. Citizenship list. Thank you

for the reminder.

In the same way, to dispel confusion among the public, we'll have to mount public education campaigns, respond to questions, and make sure that the public understands, again, what these lists are and what they are not.

And the last reason we have to do something about this is because they pose a serious risk of disenfranchisement. And so, you know, again, that could be from voters who are confused, who are deterred from voting because they fear that they may be prosecuted wrongly for not being eligible. And it also comes from the risk that election officials, despite our best efforts, will misunderstand their duties and withhold ballots from eligible voters.

So this -- we know this is coming towards us. The executive order is very clear about that, and we must prepare and are preparing, and so all of those injuries are live now and will only become more acute as we approach the elections.

I can also speak to the saving clause and feasibility issues that my brother on the other side has raised, if that would be helpful.

THE COURT: Sure.

MS. BELLOWS: Okay. So, well, on feasibility, as I mentioned, there's nothing in the record to suggest they're

not feasible. I also want to point the Court to the --

THE COURT: Well, I think you would agree it's not feasible to create a full and complete and accurate list of -- by the federal government of citizens.

MS. BELLOWS: Absolutely. And we've put forward evidence to that effect. This is a core part of our concern, because we know these lists will be incomplete.

THE COURT: So the feasibility question is it's feasible to create some kind of list.

MS. BELLOWS: Right. And there's no evidence that something would stop them from actually putting forward the list, and none of their declarants have said that they wouldn't do it.

I also wanted to point the Court, as a legal matter, in interpreting the EO, to Section 4(c), which directs DHS and SSA to take steps, you know, to establish the infrastructure to share data, and none of that has any qualifier about feasibility in it. And I think that really shows why the feasibility is just window dressing and an attempt to insulate this particular directive from judicial review.

THE COURT: Well, I mean, if you take a look -- I think window dressing is a little too strong. I mean, if you take a look at what the post office's proposed rule is by cutting out primaries, they've somewhat acknowledged that the

way primaries are handled might be so complicated and difficult that this doesn't make sense maybe. And to cut out overseas ballots, they've recognized that the rule is not feasible as to oversea ballots.

Just on that question, you're not taking the position -- no one is taking the position, however, that a Section 2 list wouldn't apply to voters for overseas ballots? It's just the mail -- it's just the post office sending --

MR. PEZZI: So I think I generally agree with that, Your Honor. The list contemplated by Section 2 -- well, I guess I should back up and say that is just not a question that's answered by the executive order itself.

THE COURT: Well, it doesn't have a carve-out for overseas voters.

MR. PEZZI: That is correct, Your Honor. And although --

THE COURT: And, in fact, it cites the overseas voters statute, doesn't it? Or maybe not. Maybe it doesn't.

MR. PEZZI: I don't think it does in the executive order itself.

THE COURT: Okay.

MS. BELLOWS: If I could continue and address the saving clause, this is an issue that the defendants have relied on quite heavily. But if you look at their cases, for example, in *Allbaugh*, there was an order that applied across

the federal government, numerous agencies, numerous streams of funding. And it set a default policy and said, "Follow this to the extent permitted by law."

But what we have here is an executive order that is very prescriptive and very detailed about what particular agencies must do. And they're attempting to use the saving clause to nullify the provisions in the executive order.

And courts have strongly rejected that. They have said where a saving clause would destroy the order itself, it has no effect. When there is no way to lawfully -- to lawfully implement the provisions of the executive order, it has no effect, and the Court can directly address the legal questions presented.

And just to clarify, you know, Mr. Pezzi said that we should have waited for implementation but chose to mount a facial challenge, and it's absolutely correct that we have mounted a facial challenge because our contention here is that the President does not have authority to order any of this; and that, again, is something which is -- which is perfectly -- perfectly ripe for this Court's review.

So -- and that is also why the saving clause is sort of of no moment, because there's no way for DHS to lawfully create a new program that's beyond the statutory authority and which trespasses into the province of other branches of government, including Congress and the states to

regulate federal elections.

THE COURT: So isn't the government's argument, though, that until -- so, you know, the President puts out this executive order. We assume he means what he says, but he puts out this executive order; and, in fact, it might not happen the way he wants it to happen.

Why isn't that a reason, that basically he -- maybe he issued an executive order, he wants this to really happen, but it's just not going to. Why isn't that an adequate defense? Because I think that's essentially what they're saying here, or at least the government is. The intervenor states don't really want it to go that way, but that's what the government is saying, is, look, don't worry about this executive order. We don't even know if it's going to do anything.

Why isn't that a reason for me to hold off on considering these weighty constitutional issues?

MS. BELLOWS: So defendants have presented it somewhat more softly here than they have defending it in their papers. In their papers, they acknowledge, as they must, the executive orders are legally significant documents. They are -- as they put it, it's an intra-executive branch directive from the President to his subordinates, and that's in their response to plaintiffs' statement of undisputed facts, paragraph 4.

THE COURT: But does the Supreme Court really want me to get into the question of what the President can tell the people working for him?

MS. BELLOWS: Certainly where there is a clear and mandatory and detailed directive that is beyond the President's power and there is every indication that the agency will implement it, I think it is proper for the courts to step in and --

THE COURT: But isn't there an issue that, until they implement it, it's just him saying, "This is what I want." And somebody might say to him, "No, you can't have that"; but "This is what I want," is that something that you can act on?

And, you know, again, to sort of show my hand here a little bit, I think the answer is that's probably a good defense for the things that they will be tying to consider later, but that maybe isn't a good enough defense for the things that we need to deal with this year.

MS. BELLOWS: Yeah. I mean, executive orders are certainly within the Court's -- you know, within the justiciable acts that a Court can address. And so, you know, I understand sort of the instinct to, like, "Let's just see what happens"; but when the executive order is clear about what will happen, then there's no need to wait.

There may be some differences around the edges, but

we already know that this list is coming towards us. We already know that it's going to have a severely disruptive effect on our elections. And so all of the sort of core elements that this Court needs to find standing are live.

All the legal questions that are presented about the -- whether the President has the power to issue this aren't going to change based on those sorts of implementation questions, which additional databases, you know, in addition to the ones that are mandated to be used by the executive order, which additional databases will they tap into for the state citizenship list, that has no bearing on the core legal question that our challenge presents, which is: Did the President lack the legal authority to direct the creation of this program, period?

Whatever the minor implementation differences around that program may be, none of that is necessary for this Court to address the heart of our case. And that's why there's a clear legal question. There's a live controversy because of the harm it's causing us that is fit for a judicial resolution now.

THE COURT: Okay. So back to you.

The argument here -- and I'm not really looking right now for the merits of this question. But don't I need to determine whether they're right that he does or doesn't have the authority to do this? Isn't that question ripe?

MR. PEZZI: So it's, certainly, I think easier to first address that in the context of standing. I mean, we do not shy away at all from the language in the brief about an executive order, including this one, is an intra-executive branch directive from the President to his subordinates. That directive doesn't cause any of the injuries that counsel for the plaintiff states was just describing.

All of the injuries that we just heard about are about what might happen if the lists are created, if the lists are sent to states, and then what states might do with them; although, to be clear, I mean, I think, certainly, in response to the plaintiff states -- I recognize with respect to the League of Women Voters plaintiffs, it's a little more complicated.

The answer for California and the other plaintiff states is quite easy. I mean, the executive order does not require the states to do anything at all with these lists, and so even --

THE COURT: With the one exception, I think, that, under the -- and now I'm sliding a little bit into Section 3. But the -- the post office cannot send a ballot out to somebody who is not on the -- I'm going to call it now the "post office list," and the post office list is given to the post office by the states after the state receives the federal citizenship list.

So the way the executive order reads, I think, is that you have a federal list. The federal list goes to the state. The state looks at it, and then says to the post office, "Okay. Please send ballots to these people."

And if those people aren't on the citizenship list, does the post office send those, or will postal employees worry that they will now be subject to prosecution? Do they not get sent? What happens if they aren't on this federal list?

I understand that it's a post office list that's coming from the state, but if the state sends -- you're saying the state doesn't have to do anything with our citizenship list. But the state now sends a list of -- saying, "Here's the people we are going to send ballots to." What happens at that point if that list is different from the citizenship list?

MR. PEZZI: Yes, Your Honor. I'm very glad you asked this question because I think a lot of people have read the executive order in that way. I don't think that's the way it is going to be implemented, at least based on the proposal from the postal service, which, again, is just a proposal.

THE COURT: But you have hanging over the threat of enforcement of federal law violations. So however those people are individually implementing it, understanding it,

and interpreting it, and they may all be interpreting it wrong, but tell me what the right interpretation is.

MR. PEZZI: Certainly. And I want to address the enforcement piece too.

But the high-level answer is there is not a connection between the citizenship lists generated by the Department of Homeland Security and the mail-in and absentee ballot list generated by the states for purposes of the postal service section.

THE COURT: So how do you tell either the postal employee who is running the mail out or the state employee who is sending the ballots over to the post office that they're not going to be prosecuted by virtue of having a state list that isn't the same as the citizenship list or sending to people who aren't on the citizenship list?

How do you convey that -- how do you convey the information so people aren't afraid of the threatened prosecution? Which in the first -- I mean, nobody is talking about Section 1. Section 1, the purpose of this whole thing is to prohibit noncitizens from voting and to make sure that's explicitly what we're doing, and that's why we're doing it, and we're going to do it, including preventing violations of federal criminal law.

So why isn't -- even though you haven't said they're connected, the fact that everybody has interpreted it

that way -- and I agree with you that, when you look at them, they are separate lists. There is nothing in this order that says that when the state sends -- gives ballots to the post office, they have to follow the federal list.

But there is, throughout the whole order, "If you mail to a noncitizen, you will be prosecuted. And we're telling you who the noncitizens are because they're not on our list."

MR. PEZZI: So respectfully, Your Honor, the order does not say if you mail a single ballot to --

THE COURT: But then why does everybody think that's what it means? And if everybody thinks that's what it means, why isn't there this real live threat?

MR. PEZZI: So I think the best I can say about that is neither the President nor the Department of Homeland Security nor the United States Postal Service can change the federal criminal code, and you can only be prosecuted for violating existing federal criminal laws.

THE COURT: Which require a willful and knowing violation. But why doesn't someone have to worry now that if they've received a list from the federal government that these are the citizens, not your list of citizens, but these are the citizens, but you still send them a ballot, you're going to be investigated for violating our election law?

I mean, isn't that what it has -- isn't that

what -- the current harm?

MR. PEZZI: So, respectfully, I don't think so, Your Honor, because, again, it is not possible to prosecute somebody for violating an executive order or --

THE COURT: But it is problem -- it is possible to investigate and prosecute someone for mailing a ballot to a person who is not a citizen or resident. And even though it turns out they are, you can do that vindictive prosecution or threatened prosecution.

They may not be convicted for it because, in order to be convicted, you have to have a jury understand that you willfully did this. But why wouldn't a jury be presented with information that you willfully sent it to this person when you said, "Were they on the federal list?"

"No, they weren't on the federal list."

"Well, why did you send it to that person?"

Wouldn't you be worried about sending it to that person at that point?

MR. PEZZI: So I guess I have two responses to that. I mean, one is the list, on its face, the citizenship lists created by the Department of Homeland Security, are lists of individuals confirmed to be US citizens. It does not even on its face purport to be an exhaustive list, and there is no list of noncitizens that is being sent to the states. This is a list of confirmed citizens.

THE COURT: So is it your suggestion that it would not -- if the State of California handed to the post office a list of people to send ballots to and 50 percent of them aren't on your list, are you saying that that person would not be investigated for violating the laws saying you can't send them to noncitizens?

MR. PEZZI: Well, I'm saying, Your Honor, that the things you can and cannot be prosecuted or investigated for relating to the election laws in this country are unchanged by this executive order. And whether or not someone is investigated or prosecuted and whether or not that investigation or prosecution would be lawful or appropriate or lead to a conviction --

THE COURT: Well, let me ask you this question: If someone sent a ballot to somebody who is not on the citizenship list, is that a reason to suspect an unlawful act?

MR. PEZZI: So I need to be a little bit careful on how I answer this. I am not a criminal prosecutor, and so I am not an expert on the things that can and cannot predicate a federal investigation; but I can certainly say that there will be no investigation predicated on the fact that -- violation of an executive order, in other words --

THE COURT: No, no. But violation of the executive order isn't the issue. The issue is sending ballots to

people who are on -- who are not on your, acknowledged as incomplete, citizenship list. If you send a ballot to someone who is not on that list, does that mean that you are engaging in something illegal?

MR. PEZZI: It is -- that -- sending a ballot to someone who is not on that list standing alone I don't think would establish the violation of any federal criminal statute that I am aware of.

THE COURT: But would it give you probable cause?

MR. PEZZI: I -- I don't know the answer to that question, Your Honor. But, I mean, look, I think some of the questions we addressed earlier today might bear on that. I mean, what these lists ultimately look like and how complete they are might have a lot to do with, you know, what would be responsible for someone to use or not use.

THE COURT: So what are they supposed to do on September 5th, when they have to send the ballots out? How are they supposed to know the answer to these questions?

MR. PEZZI: So with respect to the postal service list -- and, again, this is just a proposal; and I don't need to repeat all the arguments in our brief about why the fact that it's a proposal is very legally significant.

But, I mean, were the postal service to finalize a rule with exactly all the terms of this proposal, it says very explicitly in multiple places that states retain full

control over the contents of their mail-in and absentee ballot list. This is not the postal service or the Department of Homeland Security or the President deciding who can vote by mail. It is the same people who currently decide who can vote by mail, which is state and local governments.

Now, again, I mean, as to the criminal enforcement priorities piece of this, we have separate justiciability arguments that Judge Nichols accepted in footnote 11 of his opinion. And, I mean, I think it's quite clear from -- the most recent Supreme Court case on this is *United States v. Texas* from 2023 -- that there is not a tradition of litigation over executive branch enforcement priorities.

And so I acknowledge that the executive order has some discussion over those enforcement priorities, but the actual federal criminal laws and the things that are and are not prescribed by those federal criminal laws are unchanged by this order.

THE COURT: Okay. I said that I was going to start with the justiciability arguments and then move to these other things, and we've spent most of this time on the justiciability arguments. I will make my way through them still very carefully because I do think there is a substantial issue about which shoe has dropped, as Judge Nichols has found.

But I am -- where I am leaning here is really

thinking about what happens in the next six months, in the next five months and --

Yes?

MS. LEE: Your Honor, I also just wanted to underscore that there are, obviously, for Section 2 of the order, but to the 12(b)(1) questions, though we don't seek an preliminary injunction with respect to that, there are actually injuries that we've pleaded that accrue even prior to June 29th because in order -- the Privacy Act governs not just transmission of data outside of the federal government, but across agencies as well. And --

THE COURT: 100 percent.

MS. LEE: Okay.

THE COURT: But there -- I understand that, that we can't -- it seems pretty ironclad to me that your IRS-filed data, for example, doesn't -- can't be used by a different part of the government just because somebody wants it to be. There's very specific rules. That's how we encourage people to file their taxes, is to not think everything is going to get spread around.

So I understand that, and I understand that the law is very clear that, because one piece -- part of the government has it doesn't mean another.

But they are saying that they are intending to figure this out without violating that. And I'm in a pretty

tough place to be saying, oh, no, I'm going to assume they're violating it. That's not how the Supreme Court wants me to be considering these. I believe that they are entitled to some presumption that -- of regularity.

So given that --

MS. LEE: For the motion to dismiss, however, Your Honor, the question is whether we've plausibly alleged those. Whether we ultimately succeed with respect to the Privacy Act claim isn't the particular question with respect to Section 2 for the League plaintiffs.

THE COURT: What's the harm for your clients and your case if I were to dismiss without prejudice the sections that you aren't pushing on a -- for a PI, your challenges that you aren't pushing for the PI, if I were to dismiss those portions of the complaint without prejudice to refiling when the next shoe drops?

MS. LEE: Because there's -- there's harms that are accruing now.

The process that they've described, even if we go outside the four corners of the complaint, nowhere have they disclaimed that there will be no list at all. And so, therefore, the transmission of data not in compliance with the Privacy Act, which cannot happen --

THE COURT: Well, so tell me -- are you saying that, in your view, there is no list that could be created

without violating the Privacy Act?

I mean, for example, the SAVE list. Why would -- if all they did was put together the information that you can access right -- states can access right now for verification under SAVE, right? If that was the list, what would that violate?

MS. LEE: Because that is not one of the routine uses already contemplated, Congress provided those protections for this very reason because the federal government isn't supposed to be able to accrue and use at will tranches of data without people being able to sort of --

THE COURT: Because those lists are being used -- are in place to verify rights for benefits, not for voting?

MS. LEE: Correct. And furthermore, Your Honor, we have -- there is timing that's required by the notices that are required under the Privacy Act as well and that, likewise, we have pleaded. There's only -- there's only 30 days left, and those would minimally need 60 days, and so for that reason alone --

THE COURT: Although, for next year, we're still fine. To the extent your argument is that these injuries are happening now, if I split my analysis here between the things for next year versus the things for this year, the -- we don't need to get to the question of this has to happen in less than -- you don't have enough time to do it or you need

to do certain notices for next year. That's next year's problem. For this year, we would.

MS. LEE: Certainly, Your Honor.

THE COURT: What's your answer on that, either --

MR. PEZZI: Sure. A few things, Your Honor.

One is it is -- I very strongly disagree with the suggestion that it would not be possible to construct any list of the sort described in Section 2(a) consistent with the Privacy Act. The only sort of substantive reason that I heard offered there was the routine use limitations in the Privacy Act.

And Your Honor asked about SAVE. Both DHS and SSA relatively recently updated their systems of records, notices to explicitly allow sharing of information related to voter verification purposes. This is described in another case filed by the League of Women Voters. It's 2025 WL 3198970. It's in footnote 7 of our motion to dismiss.

And so, I mean, I agree with the general concept that there might be some procedural constraints on the sharing of that information, and there's some substantive constraints as well imposed by the Privacy Act, other statutes like Your Honor mentioned, the IRS data.

But the executive order itself commands compliance with those obligations, and so that can't be the basis either of harm, certainly not irreparable harm; and, you know,

ultimately on the merits, those questions could be addressed later.

MS. LEE: Your Honor, just in response to that, the *League of Women Voters* case, that was as to the PI. That case was not -- was not a dismissal. And so the standard here is whether we have plausibly alleged this violation when we're speaking to Section 2, and nothing counsel has indicated undermines that conclusion.

And additionally, they've repeatedly said here that it would not be an exhaustive list. It would not be a comprehensive list. In addition to the procedural protections of the Privacy Act, we have also plausibly alleged violation of the more substantive that require all such data to be accurate, complete, and timely.

THE COURT: Okay.

MR. CAPOZZI: Your Honor, may the states be heard on --

THE COURT: Absolutely.

MR. CAPOZZI: -- some of the standing issues here?

Good morning, Your Honor. The intervenor states are thankful that you granted intervention.

On the Section 2 challenges, I think it's helpful to differentiate between Section 2(a), which is -- create the list and Section 2(b), which is the executive branch's enforcement priorities.

The intervenor states understand Section 2(a) quite differently than our colleague states. The lists are purely optional. Every state has the choice to do something with the list or do nothing with the list. And so with due respect to the California, they can just ignore the list if they want to and --

THE COURT: So what do your client states want to do with the list?

MR. CAPOZZI: Well, I think the first response is we want to see what the list actually looks like. We don't know exactly what the list will be.

THE COURT: Okay.

MR. CAPOZZI: Once we know what it purports to be, each state will have to do a legal analysis. Every state has state laws and federal law to follow in maintaining voter registration list.

THE COURT: But don't you have state and federal laws to both allow voters who are citizens and residents to vote? You have an affirmative obligation to let them vote and an affirmative obligation to protect citizens from fraudulent votes, but they're both equally there in your requirement.

So you get this list from the government that, you know, let's be simplistic here; it doesn't include any married women who changed their name, for example -- might

not. Or it doesn't include anybody who has moved into your state in the last five years.

What are you going to do now?

MR. CAPOZZI: I think each state will have to make an independent choice based on what the list ends up looking like, and that's my point, Your Honor.

Part of the issue with plaintiffs' suit in this posture is this is really a state-by-state or maybe even a county-by-county issue because every state handles voter registration differently, and so they're seeking nationwide relief as to Section 2(a). That will cover a lot of states that simply could choose to ignore the order. So we don't see how there could be --

THE COURT: Well, I think the problem with your concern about their ignoring the order is that every other -- not every other sentence -- but many sentences in the executive order talk about how these things are going to be enforced. So I think their decision to opt out is a different question.

Your -- what I'm interested in is your -- as I understood the reason you wanted to be here was not because you cared what California did, but that you wanted to use the list. And that's why I'm asking you what do you do with the list that the -- that the federal government is conceding here will not be complete?

How incomplete, we don't know, but it isn't -- you know, I think the confusion here is that it sounds like you're being given a list of people to say these people can't vote, but that's not what you're being given. You're being given a list of these people who can vote. It's a subset of your people who you are legally required by the Constitution and by all of these federal and state laws to let vote.

So what are you going to do when you get this list, which is supposed to be the people who -- it's not the people who can't vote, it's just a subset of the people who can vote?

MR. CAPOZZI: So the inherently speculative nature of plaintiffs' claims forces me to speculate a bit to answer your question, but I think what we could do theoretically, depending on the shape the list takes when it's finalized, is states could check their existing voter registration lists and flag people on the state voter registration list that are not on the federal list; but then just to be clear, it would be illegal, under state and federal law to just throw those people off the list. We would have to engage in additional verification procedures.

THE COURT: Could you do that by November 3rd?

MR. CAPOZZI: I doubt it. And so I think that's another practical point is plaintiffs have not shown irreparable because it's just not plausible that states are

going to try to throw people off the voter registration lists when, in many states, there's already ongoing active elections.

In Missouri, we have an ongoing primary election right now, and I'm pretty sure there's state law that would prevent us from changing the voter registration lists in the middle of an election.

And so, again, it's a standing issue because plaintiffs haven't shown how this harms them. It's an irreparable harm issue because they haven't pleaded, let alone proved, that there is any imminent risk of people being taken off the voter registration lists.

THE COURT: So --

MR. CAPOZZI: The only thing that was brought up today was this fear of prosecution, the fear that Your Honor articulated where, if a state official chooses to ignore the Section 2 list, you know, when it comes to Section 3, well, what happens to that election official?

The standard for standing here comes from *Clapper v. Amnesty International*. And the Supreme Court said you can't point to chill. You can't point to fear. You have to point to concrete evidence of an imminent criminal prosecution in a specific case, which plaintiffs don't have here.

I mean, they point to the *Susan B. Anthony v.*

*Driehaus* case, which is a slightly relaxed imminent standard for First Amendment claims. But in *Susan B. Anthony List*, the particular plaintiff had been prosecuted under the challenged law. I think it was a year earlier.

And so there was enforcement evidence in that case. There's no evidence of investigations. There's no evidence of enforcement here.

THE COURT: So this is the part that I'm having a little difficulty on both the defendant and the defendant intervenors' argument, which it feels like it comes down to: Don't worry about what -- any of the things they're saying because this list isn't going to have any meaning or import this election cycle.

And I don't -- I don't -- I mean, if your defense -- and that's really why I wanted you in here as intervenors because I didn't think the government was defending it. But now you're not either. You're saying we really won't be able to get a chance to use this before November 3rd.

MR. CAPOZZI: Well --

THE COURT: So my question for you is then why -- I mean, I understand this idea that, "Okay. There's no harm, no foul. Go away, Judge. We don't need anything." But if there's no harm, no foul, then there's also, you know, on the balancing on their PI or whatever, what's the problem if I

say no one can use this list for this November election?

MR. CAPOZZI: So to be clear, the states do want the list. The limited point that I was just making is I think it's unlikely that states would actually remove voters from the registration rolls this year.

That doesn't mean that states couldn't use the lists this year this election cycle. States could use the list for monitoring, for law enforcement purposes, for investigations, for tracking. Again, a lot of this is speculation because we don't know exactly what the lists are going to look like.

But the reason that the intervenor states wanted to get into this case is because plaintiffs' lawsuit seeks to prevent the federal government from creating these lists at all. And it is a resource. We think it could be helpful. We're not exactly sure how we would use it because we're not exactly sure what the lists would look like. But we're here because we don't want this process to be sort of strangled in the crib, so to speak.

THE COURT: So any response? And perhaps the response here may be from the League. Do you have anything to say? Because I think the plaintiff states and the intervenor states might be dealing with different groups of people on different issues, but you've got the voters in their states.

MS. LEE: Sure. So one thing I will say, Your Honor, is that, to the extent he was speaking about kicking people off the lists immediately, one of the things that's obviously and has no feasibility carve-outs, et cetera, within the executive order itself is the nontransmission of ballots. So it's not as though the only risk to voters here is cancellation of voter registration. So that's sort of a first initial point.

With respect to Section -- the sections are getting a little bit muddled, Your Honor. If you'd like me to speak to the harms related to Section 3 --

THE COURT: I think we can -- let's move on to Section 3 substantively here.

MS. LEE: Okay.

THE COURT: It would be helpful because I think we're running out of time if we don't get there.

MS. LEE: Okay. So -- certainly, Your Honor.

So moving to Section 3 substantively, I think the -- what three courts did with respect to the 2025 executive order, including another -- another court within this district provides a clear path for the Court here and in particular for the League plaintiffs' preliminary injunction. And that's the *LULAC* -- for the preliminary injunction standard it's the *LULAC I* case and then the *California v. Trump I*. There's a follow-on motion to dismiss there as

well.

And just as there, here the executive order directs unconstitutional action from an independent agency -- there the EAC, here the USPS. And there's no way for it to proceed in accordance with law because the directive itself violates separation of powers and is ultra vires.

And all of the evidence demonstrates this is the case as well: the statement before the executive order was signed; the text of the executive order itself that all the following subsections are hereby ordered; and then within Section 3, the post master general is -- it hereby directs and that the rule shall include at a minimum; and then the statement of the post master general after, and that's at 75-8; and the head of the postal workers' union statement at 75-9; to the White House's own fact sheet, which is at ECF 140-2, which says that it requires the postal service to transmit ballots only to those on the relevant list.

And the proposed rule itself --

THE COURT: Which list? Which list there?

MS. LEE: So this would be the what we've been calling the -- I believe the postal service, the postal service list. But the proposed rule itself and that it's proposed doesn't alter the certainty. It's just more evidence demonstrating that the order itself is not contingent and is ripe for review and if --

THE COURT: But --

MS. LEE: Sorry.

THE COURT: -- just to be careful there, the list that you can't -- you're saying if -- if this order said the postal service may not deliver a ballot to the -- anyone who is not on the citizenship list, that would be one case. I'm not sure that's the case we have.

MS. LEE: Oh, I certainly agree that's not the case we have, Your Honor. But what is defined as nonmailable material is in statute, and that does not include ballots, whether they're on this list or that list or whichever list we're talking about.

The refusal to transmit ballots, which is what the order directs --

THE COURT: But if they aren't refusing to -- it depends what it really means here, doesn't it? If what they're doing is saying you can only transmit ballots to the addresses the states give us, isn't that what you do anyway? I mean, it's going to be in a list form instead of on the individual envelopes, but you're giving them the letters to mail where you're telling them to mail it.

And if you -- they could just scan that and have that information. And if instead they say to you, "Give it to us in a list," what's the difference?

MS. LEE: What's the difference, then, is if there

is a distinction between what's on the envelope and what's been input into a system, it will not be transmitted and it will be returned to sender. And that is not -- and that is not something that's contemplated in the statute.

THE COURT: Okay. Let me just interrupt you there because I am very confused about this piece. What is different about what is inputted in by the state official who has now been designated as the ballot inputer versus what you would see when the ballot comes, scan through, if they just gave you the envelope?

MR. PEZZI: So to make sure I'm answering the question properly, I think Your Honor's intuition is absolutely right that, at least if finalized in the form of this proposal -- and, again, setting aside all the caveats in our brief about why it is just a proposal and why that matters -- the lists and the addresses and the names on that list are provided to the postal service by state election officials or local election officials.

Surely, they already have and must use lists with names and addresses to prepare and send ballots, so --

THE COURT: So what's going on with this step? Because it just seems -- I mean, if I brought a stack of mail to the post office and you wanted to have a list of who I'm mailing to, it would be pretty easy to generate. You're scanning the documents. You'd have the addresses in there.

So what exactly is it that the state official is supposed to be uploading into the ballot list which the post office is now going to compare against?

MR. PEZZI: Names and addresses, Your Honor. But to be clear, the postal service is not comparing that list against anything.

THE COURT: Well, but they are comparing it -- they're not allowed to mail -- so they get a piece of mail. They can't mail it to anyone who isn't on the list that was added by -- through the portal. So they are comparing it to something.

MR. PEZZI: So even that, Your Honor, I think is an interpretation of the executive order itself rather than interpretation of the proposed rule. What the proposed rule says -- and, again, this is just a proposal that was published just this morning, but --

THE COURT: Well, it was published in exactly the same form on Thursday. So we've --

MR. PEZZI: Yes.

THE COURT: -- all had a chance to read it.

MR. PEZZI: Yes, Your Honor, and that's why we filed it, of course.

But the language that plaintiffs reference about "shall not transmit," there is not a perfectly analog for that language in the proposed rule itself. What the proposed

rule does is it says that if you want to send outbound federal ballot mail, as in you are a state or a local election official and you want to send absentee ballots to a group of, you know, over 200 or 500 voters, here are the procedural steps you need to take first.

First, you need to put in the list of names and addresses so that barcodes can be generated that match the name and address and barcode of all those individuals. And then the postal service will accept that stack of ballots sent them out as long as it meets that criteria.

THE COURT: Okay. So somebody goes to the ballot portal and they put a person's name, address, and barcode, right? That's on 24.4.2. And then they have a stack of envelopes that they deliver to the post office. And for some reason, the name on the stack of envelopes differs than the name that the person who was typing it in on the ballot portal. That list is being prepared, no?

MR. PEZZI: I actually don't -- and, again, this is not been out for very long, so it is possible that I have overlooked something; but I do not see anything in the proposed rule that even requires that sort of comparison. It's possible I've missed it.

But I -- what I see here is a requirement to first submit names, addresses, barcodes, et cetera, come to the postal service with a stack of ballots; and, you know, once

it is -- those steps have been created, the postal service will send out the ballots to the names and addresses provided by state officials, which, again --

THE COURT: So -- but to be clear on -- if -- even if they're not comparing it, don't we have a burden that is different than how US mail works to say to one group of senders you may not send mail, first class mail, you may not send mail to this group of people unless you comply with a set of rules?

MR. PEZZI: Sure, Your Honor. And this is where I think I have to return to some of the threshold caveats, which is that is part of the reason why the standing questions in this case will look very different if the postal service finalizes this rule.

THE COURT: But so this is again saying I don't have a defense for what you're saying the proposed rule will be except maybe they won't adopt it.

MR. PEZZI: Or it could differ from the contents in the proposal, which, importantly, the executive order itself, although it has some language about what the proposed rule should say, has nothing about what the final rule should say.

But, I mean, I -- look, I'm not even sure --

THE COURT: I mean, you can't be -- you can't be -- you're saying here -- either you're saying your only defense is that it's not ripe yet and you have nothing to say on the

merits, or you can tell me what -- assuming this is ripe, this would or wouldn't be okay.

MR. PEZZI: Sorry, Your Honor. I understand your previous question to be about the jurisdictional questions again. I mean, on the merits, obviously, we would prepare a more fulsome defense of the merits on a final rule; but, I mean, the proposal itself cites some of the statutes that allow the postal service to issue regulations regarding the use of the mail. But, obviously, our threshold arguments will look very different if and when this rule is finalized.

THE COURT: Well, you have in front of you a motion for summary judgment, and I don't have a bifurcation order in here. So I am going to address your motion to dismiss first; but if I get past your 12(b)(1), we're onto the merits, and so to say you would have prepared a more fulsome answer doesn't help me.

MR. PEZZI: I understand that, Your Honor, although the merits of what is an important question, and the merits that are being litigated today are the merits of the executive order. We absolutely have included arguments about the merits of the executive order, and Judge Nichols accepted those arguments, that this is a directive from the President to his subordinates. It requires compliance with the law.

THE COURT: Okay.

MR. PEZZI: And --

THE COURT: But imagine for a moment that you're stuck with me right now, and I want to wrestle with these merits. And I hear what you're saying, that if all I'm looking at is the executive order, that's the -- I've got your briefing on that.

But let's assume that you're stuck with a judge who wants to say, "Okay. But we're going to deal with this next week. What's going to -- looks like it's happening; and if this looks like it's happening, would that be lawful?" What's your answer to it? Would it be lawful to require one set of users of the United States Postal Service to have to enter certain information, including barcodes, before they're allowed to use the mail service?

MR. PEZZI: Sure, Your Honor. So, I mean, again, it's the kind of issue that I would prefer to address in the context of an actual rule rather than a proposal, but the proposal itself does provide some citations to the agency's statutory authority. This is the -- the general concept of taking certain sensitive types of mail and requiring, you know, additional procedures to ensure they are tracked properly is not new.

I would also --

THE COURT: Requiring or recommending?

MR. PEZZI: So, I mean, certainly the postal service has long recommended and many of these very states

use many similar procedures already. Your Honor is correct that this would be imposing a new requirement with respect to election mail. We don't point to prior examples of this sort of action with respect to election mail.

Although, there are other types of mail for which the postal service has required special handling; and so we think that, you know, again, in the context text of a final rule, we would explain in more detail. But, I mean, that's the basis for the proposal that's stated in the federal register this morning.

THE COURT: Ms. Lee.

MS. LEE: So why I was standing for a bit, Your Honor, was I just wanted to point counsel and the Court to 24.5.1, which says -- it's not merely they drop it off and it's all taken. It requires the postal service to review the mailings prior to acceptance -- that's prior to the acceptance into the mail system -- evaluate whether it meets the standards, and is being sent to individuals who have been enrolled with the postal service. So --

THE COURT: That's the uploading.

MS. LEE: Exactly. And so this, for us, because the counts on which we're seeking a preliminary injunction go to the lawfulness of the order, this just demonstrates that the -- all of the relevant actors are taking the order as an order.

And, additionally, I would say, Your Honor, is that it -- the certainty of the injury -- sort of twofold. So, one, there's the currently ongoing injuries. Our clients are some of the oldest and sort of longest running largest programs who provide services to voters, including with respect to facilitating mail voting, voter registration, et cetera. And so there are present harms.

As you've said, everyone is understanding the order this way, and voters are being faced with concern. Especially voters who really need to rely on mail voting wouldn't be able to go in person anyway. And so there are concrete harms to our clients' direct services that they offer to voters in needing to respond, update education materials now.

Additionally, this echoes a lot, like, the Supreme Court case in *Diamond Alternative Energy* where the Court mused that, when the government seeks to justify its actions on the one hand that there aren't really any effects, don't worry about it, while the other time -- and thus, it's unreviewable -- while at the same time touting what it does -- i.e., the President saying that it directs that these ballots won't be transmitted -- courts can be appropriately skeptical of that argument and are -- you know, aren't bound to be more naive than the general public is free from.

THE COURT: Yes?

MR. CAPOZZI: Your Honor, briefly, if I could respond to a couple of the League's points, the League is asserting resource-diversion standing. They're talking -- when they talk about their present harms, they're saying that they're diverting resources to educating voters, to responding to voter fears and concerns.

The US Supreme Court has abolished resource-diversion standing in the *Alliance for Hippocratic Medicine* case. Judge Nichols agreed with that.

THE COURT: What about their arguments on behalf of their members, though?

MR. CAPOZZI: So if the argument is that an individual member could be denied a mail ballot, I think that that's too speculative. It's not ripe for the reasons that the federal government has talked about. I'm not sure what other basis of injury an individual voter could have.

With respect to the proposed order, the intervenor states --

THE COURT: What about the likelihood that they're not going to get to vote?

MR. CAPOZZI: Well, I just think that's speculative, Your Honor.

THE COURT: Well, if you want to use those state lists, you want to use those incomplete lists that we know are incomplete, if they ever come out, but if they do come

out, we know they're going to be incomplete, and you want to use those to start an investigation, isn't there a reasonable fear and concern on the behalf of the voters that they're going to be precluded?

I just -- you know, I go into this -- the President cited as the authority for -- among the purposes, he cited as a statute -- he cited as a statute a number of criminal statutes, 18 USC Section 241, 52 USC Section 20511. And 18 USC Section 241 is conspiracy to injure, oppress, threaten, or intimidate a person in the free exercise or enjoyment of rights and privileges secured by the Constitution and the lawsuits of the United States. That's people's right to vote, is included in there.

And 52 USC Section 2511 has criminal penalties under subsection 2 for depriving a fair election by having people vote who shouldn't. But under 1, it's threatening for registering to vote or attempting to register to vote or for voting.

So isn't the concern -- I mean, it's not a constitutional level. It's a statutory level. Isn't the concern about a people's right to vote -- right? You're worried about the people who can't -- who will be diluting somebody's vote if they're not lawfully here. But you have to acknowledge that the harm is equally great if the person who wants to vote with me isn't allowed to vote when they're

a citizen. And for the citizens themselves, the harm is enormous and direct if they're not allowed to vote.

And that's what they're trying -- that member's vote, right, isn't that at issue?

MR. CAPOZZI: So I think there's two theories here, and I don't think either of them work. If the fear is that someone is not going to be able to vote, that's a lot of speculation. There's a lot of links in the chain. It depends on the actions of third parties not before the Court, including county election officials.

It depends on the content of the finalized rule. It depends what which state chooses to do with the list within each state. It depends what which county official wants to do with the list. And so what I would suggest to plaintiffs is, if a particular state or if a particular county actually takes steps to use the list to disenfranchise people, sue them.

The other injury that you could be understanding them to make out is a sort of fear, a chill. And the Supreme Court in *Laird v. Tatum* said chill is not good enough for standing. You know, when it comes for fear of prosecution, *Clapper v. Amnesty International* is the standard. They made the same arguments in *Clapper*. The plaintiff said, "We're afraid we're going to get prosecuted. We have to do all these things to avoid prosecution," and the Supreme Court

said that's nowhere near good enough.

THE COURT: Or "We're afraid we can't vote." So you're saying don't address the "We're afraid we can't vote" today?

MR. CAPOZZI: Correct. I think that's -- it is either too speculative -- the idea that someone could actually be disenfranchised is too speculative --

THE COURT: Well --

MR. CAPOZZI: -- and fear is not a cognizable injury.

THE COURT: It just seems like we're -- in the circumstance where we are announcing that there is going to be a citizenship list, that those of us here in the courtroom know is an incomplete list of people who have been verified and doesn't mean that other people aren't citizens, but -- and that's all it is, and yet we're going to be out there having this citizen list that we're enforcing and making sure that people aren't going to get to vote -- you know, we have this invasion; that's the other part that is being cited by the President, this fear of invasion to our government.

I mean, it just seems like the fundamental votes of United States citizens are the ones, the people who have been here for generations and aren't going to show up on your naturalization records.

MR. CAPOZZI: So, again, Your Honor, the sort of

chill, the fear of prosecution, the fear of future events, that's just too speculative. It's not sufficiently imminent for standing. That's the *Clapper* case.

THE COURT: Okay.

MR. CAPOZZI: Scholars have --

THE COURT: We've been here for two hours mostly on standing. I really need to talk about the merits.

MR. CAPOZZI: Can I make a quick one on the merits, Your Honor?

THE COURT: I'm going to let plaintiffs start on the merits because that's -- I start with the people whose motion it is. So I'm going to have you sit down. I'm going to have the states start in on their motion for summary judgment.

MS. BELLOWS: Thank you, Your Honor. I'll start addressing Section 2.

The President's orders must be authorized by statute or Constitution. No statute allows the activities that are very specifically mandated by this executive order as to DHS, the creation of the entire state citizenship list program. Defendants have never argued otherwise. They have never identified a statute that allows this.

Defendants' sole --

THE COURT: Any --

MS. BELLOWS: Sorry.

THE COURT: Any disagreement that there's no specific statute that authorizes what we're talking about here?

MR. PEZZI: Yes, Your Honor. I mean, we don't know exactly what statute we're going to need to use to justify a list that has not been created yet, but if the suggestion is that the government has conceded that there is no statutory authority to create such a list, we respectfully disagree with that.

MS. BELLOWS: They have not named one. And they certainly have every notice about what the state citizenship list program looks like based on the --

THE COURT: Don't call it the "state citizenship list."

MS. BELLOWS: I'm so sorry. The citizenship list. I apologize.

Defendants' sole constitutional argument is that they are empowered by -- the President is empowered by Article II to issue orders to subordinate branches -- subordinate agencies --

THE COURT: Article II and to enforce the laws.

MS. BELLOWS: And to enforce the laws. And that provides the President the power to oversee executive agencies in the performance of their statutory duties or to delegate his own constitutional authority. But he has no

constitutional authority over elections that he can delegate here. And as we just discussed, there's no statutory authority to carry out these programs.

THE COURT: So if I find the authority that he has here is his authority to enforce the criminal statutes that prohibit illegal voting, that's the authority that all of this is under.

MS. BELLOWS: That -- that authority does not extend to DHS creating a new program. Federal agencies are creatures of statute, and they cannot take -- undertake freewheeling policy initiatives without -- that are beyond their statutory mandate merely to advance a criminal enforcement agenda.

THE COURT: So what if the reasoning goes like this: I want to make sure no noncitizen can vote; and in order to do that, I am, therefore, ordering a set of steps which will help me find out in November if anybody who wasn't a citizen voted. Why isn't he allowed to do that?

MS. BELLOWS: Well, the President could create investigative lists.

THE COURT: Yeah. So let's say this is what it is. This is an FBI -- this is a hit list. We're creating -- we're starting our criminal investigation today. Can he do that?

MS. BELLOWS: If this was a list that was solely

internal to the federal government, and setting aside some of the Privacy Act questions which I know our co-plaintiffs have raised, that is not something that would give rise to our injuries.

What gives rise to our injuries, what makes it unlawful and problematic, is that this is a list that is distributed to state elections officials and made available to the public. And so what you have is not a simple investigatory tool that the government is using for its purposes. It's an entire program that's being rolled out across the country that will have severely disruptive effects on the administration of our elections.

THE COURT: It will sow confusion.

MS. BELLOWS: I'm so sorry?

THE COURT: It will sow confusion.

MS. BELLOWS: It will sow confusion. And it's intended in this way because there's that interaction between the federal government and the state officials around this list; it appears to be intended to supervise their administration of their voter rolls and their issuance of ballots.

And that supervision is trespassing on the -- both the authority of the states, who have ultimate responsibility for these things, but also the statutory design of federal laws that govern voter eligibility and -- and voter -- voter

roll maintenance.

And so what the President is doing here is stepping squarely into an area that is regulated by the states and is regulated by Congress and distorting it in ways that are deeply disruptive and intrusive on the states' authority in this area.

THE COURT: Okay. What's my -- we don't have an explicit cause of action here. What's my legal framework for this?

MS. BELLOWS: My colleague will be addressing that issue.

MR. COHEN: That's right, Your Honor.

And I can answer maybe that question first, and I fear that some of the Section 3 justiciability issues may have gotten away from us a little bit. So with Your Honor's permission --

THE COURT: We do need to get to Section 3A. I have to say that, although Section 3 has gotten more press, it seems to me, Section 2 seems a more fundamental question, which is who gets to decide who votes, but --

MR. COHEN: Well, that very question is also raised in Section 3, Your Honor, precisely because Your Honor's reading of the proposed rule is correct; and the proposed rule, of course, regurgitates what's in the order, which is that USPS is going to be screening the states' ballot mail

and arresting mail that is not being sent to or from a voter that's not on what we're now calling the "post office list."

So, certainly, that central question is also presented with respect to Section 3; but maybe before we get away from that, I can speak to the nonstatutory cause of action that the states have brought here.

It's really at this point uncontroversial, Your Honor. Courts across the country, up to the Supreme Court, have long recognized that a nonstatutory equitable cause of action to enjoin unlawful presidential conduct is legitimate. And that's the precise type of claims that the states are invoking here.

And defendants haven't offered a single argument, by the way, relevant to the states' claims, not one. They just address APA claims and some statutory claims, but that's not what the plaintiffs are presenting. They're availing themselves of this long-recognized, nonstatutory, equitable cause of action, much like the cause of action at issue in *California* and *LULAC* and some of the other authorities the plaintiffs have cited.

THE COURT: And in terms of this cause of action, ultimately, it is a federalism/separation of powers argument?

MR. COHEN: I think that's a fair framing, Your Honor. And I know that there's been some confusion over the statutory arguments that we have raised. But I do want

to be clear that, where the states are demonstrating that the executive order runs afoul of any statutes, that's just to further demonstrate that the President has no authority in this space. So it all ties back to this vertical and horizontal separation of powers issue.

THE COURT: And as I was sort of trying to reread the Constitution and figure out where we are and how we got here, we have three -- we have the parts of the Constitution that talks about how federal officers are elected.

And then we have three constitutional amendments: The -- everyone can -- citizens can vote regardless of race, citizens can vote regardless -- women can vote as well as men, and 18-year-olds and up can vote. So we have three constitutional amendments, which each say Congress may enact laws to further that.

That, to me, says the -- oh, the states shall hold elections, and Congress shall -- may enact laws further than that.

That's, as I see it, the constitutional framework that we're working off of, yes?

MR. COHEN: That's exactly right, Your Honor. I think you're alluding to, first, the elections clause; and of course, the plaintiff states have also relied on Congress's exclusive legislative authority over the postal service. So that's also cited in the states' papers.

But I think the way you're thinking about the framework is exactly right; and courts including *LULAC*, *California*, other courts have long recognized that this nonstatutory cause of action exists.

THE COURT: Okay. Your response to the idea that there's a nonstatutory cause of action, which I'm describing as separation of powers/federalism, but --

MR. PEZZI: Sure, Your Honor. So, I mean, the first thing I would say is it is certainly not correct to say that that is a, quote, "noncontroversial proposition." I think even the authorities that plaintiffs rely on, such as Judge Kollar-Kotelly's opinions in the *LULAC*'s case, actually talk quite a bit and say a lot that the government agrees with, even though there are parts the government disagrees with about this cause of action.

She recognizes, I think, correctly that it is, in fact, quite unsettled and controversial. There's more case law in the DC circuit on it than there is in the First Circuit. Plaintiffs are not wrong to say that there are cases they can cite and that they have cited where plaintiffs have brought that sort of a cause of action.

Our briefs largely do not get into the underlying premise because we think we satisfy the standard for prevailing on that sort a cause of action. And at least in the DC circuit, the way those cases proceed is, you know,

plaintiffs can and sometimes do challenge an executive order on the grounds that it is facially invalid or cannot lawfully be implemented in any way.

And ultimately, that is, you know, what Judge Kollar-Kotelly held in some of those cases, at least on some of those claims. You know, those cases are on appeal; and I don't want to get ahead of, you know, the government's or anybody's arguments about that appeal on those cases.

But, you know, we think applying that standard here, the executive order survives. It is absolutely capable of lawful implementation. We've already discussed, you know, some of the Privacy Act constraints that might apply. And the executive order does not say violate the Privacy Act. It says comply with the Privacy Act. On the --

THE COURT: Yeah, but the bigger question that they're proposing, which is it says that the President doesn't have authority -- their argument is the President doesn't have authority over elections, federal elections, that the states are mandated with holding those and running those elections properly; and that Congress has a supervisory role it can use, but that the President has no authority.

MR. PEZZI: Yeah. So I'm not even sure that there is any disagreement between the parties on any of those questions, to the extent they are presented in this case. In the abstract, does the California AG's office and the

Department of Justice think about the elections clause in the exact same way?

Candidly, I don't even know the answer to that question because, in this case, the government is not asking Your Honor to hold that the President can do election administration on its own with or without the help of Congress. The argument here is that that is just not --

THE COURT: That nothing is happening here. There's no there there, is kind of the argument.

MR. PEZZI: At least at this time, Your Honor. Yes, that's right.

THE COURT: So turning back to the plaintiffs -- or maybe -- I don't know who is going to answer my question here, but the plaintiffs -- have a summary judgment motion, and I have a statement of undisputed facts under Rule 56.1.

And under that statement of undisputed facts, there's a number of facts that are undisputed. And then there's a number of paragraphs where the plaintiffs have set out all of the obligations in -- state by state to meet certain deadlines on the calendar and that, you know, this has to happen and here's how we have to produce it and this is what the ballots require of us and all of those details.

Yes?

MR. COHEN: That's right, Your Honor. And I'll let my co-counsel speak to all this in the first instance.

MS. BELLOWS: Sure. Thank you for tolerating our switching back and forth.

So -- so I can -- I can speak to the statement of undisputed facts, and it's our view that there is no dispute of fact in the record and that the summary judgment motion should --

THE COURT: And I was just summarizing what you had in those paragraphs, and then I'm going to turn to government counsel on their response to it.

MS. BELLOWS: Okay.

THE COURT: So your response on those paragraphs that say, "Hey, this is what the state has to do right now per state law," is you said they're disputed because these are questions of law. But you don't have any dispute that those are the specific statutes at issue in those states, do you?

MR. PEZZI: No, I don't think so, Your Honor. I mean, I don't think -- I mean, we're not going to fight with the states about what state law requires. We just don't think those are factual assertions --

THE COURT: Okay.

MR. PEZZI: -- nor material.

THE COURT: Well, as a -- I don't want to have to go through, as a legal interpretation, and figure out what each one says. I'm going to assume, without any argument --

unless I have argument from you, I'm going to assume that the plaintiffs' characterizations of what those statutes require is correct.

Any problem with my doing that?

MR. PEZZI: Understood, Your Honor. And, I mean, no, we have not offered any argument in the papers; and I am not here to offer any argument today to explain why the states are wrong about those state law questions.

THE COURT: Okay. So we have a set of obligations that you have to meet on these. It's undisputed. And so, to some degree, for Section 2, there is a question of: To what extent there is or isn't any conflict with that?

Similarly, for Section 3, there's a question of: Is there or isn't there any conflict? And so maybe I'll let you speak now to Section 3, which I've been holding off on.

MR. COHEN: Yeah. Thank you very much, Your Honor.

And perhaps with Your Honor's permission, I can speak to first justiciability and then I can touch on the merits, which I know we've also batted around.

THE COURT: I would love for you to move quickly to merits, because it's 12:10, and I have a criminal matter at 1:00. So I need to get off before that.

MR. COHEN: Understood. And I will be extremely quick with all of this, Your Honor.

I do want to emphasize that the plaintiff states

agree with the League that the proposed rule validates both that the executive order is mandatory and that the plaintiff states suffer real harm that flows from it.

And I do want to emphasize for the Court that that harm is already happening right now, and there's evidence in the record that there's fiscal and sovereign harms that are impacting the states at this moment.

And I would refer the Court especially to declarations like the one from Minnesota's election director, which describes the substantial time and effort that the office has understood taken to implement the order.

The Virginia elections commissioner, that's Docket Number 123 -- the former was 114 -- the Virginia elections commissioner describes that the reports -- that they had to issue reports and guidance after the order issued.

And likewise, the Nevada deputy secretary of state has a declaration that's Docket Number 103 that describes the immediate notifications that they had to undertake when they -- when the order issued.

So in that way, of course, there's harms that are affecting the states in this moment; and, of course, the order's further implementation will harm the states even more significantly both by exacerbating those fiscal and sovereign harms, but then also by further damaging the states' reputations and touching on some of the other harms that the

plaintiff states have alleged.

With respect to the proposed rulemaking which came up earlier, I do want to clear up a couple of questions that were raised. The first is: How does all this work? What do election officials actually do operationally here?

And I just want to emphasize is that the states strenuously object to the characterization of all this, that all they have to do is drag and drop data from one database into another or print out a list that they already have on hand and send it over to USPS.

There is some massive data compatibility and formatting issues here that are very serious and very difficult to administer. All told, it's going to be hugely burdensome for states to administer what is, essentially, a second voter roll in USPS's hands.

And I'll refer Your Honor to the Jana Lean declaration. She's the elections director over in California, which is Docket Number 100-1, for a description of how some of that might work operationally and precisely why it's burdensome.

THE COURT: Let me ask you this question about the barcodes. Other than the fact that there's probably no longer time or it will be inconvenient for this year to deal with barcodes? Is there a larger question -- in the long run if you had adequate time to figure out barcodes for your

envelopes, is there -- is there a problem other than implementation without adequate time with regard to the barcodes?

MR. COHEN: Yes, Your Honor. And the answer is cost, and I can speak to this in a few different ways.

I mean, the first is that, as a general matter, the states' elections budgets are already incredibly strained. So if you look, for instance, to the declaration from Oregon, it demonstrates that the state is staring down massive budget cuts; and any sort of implementation of any of these pieces of the order could really deplete their election budget and actually force them to make sacrifices in other aspects of their election administration.

But I also want to emphasize that this is going to be, I mean, really, just a sea change in the way that some states are administering their ballots. Not all states use intelligent mail barcodes. In fact, in Massachusetts no jurisdictions use mail -- intelligent mail barcodes; likewise, in Connecticut, or they use them in different ways. And in requiring them to do so could do just what I mentioned, which is depleting election budgets.

THE COURT: Okay. But nobody is doing it right now. I get that. And it's going to cost money to do it. I get that. Anything further for why it's a problem to use barcodes?

MR. COHEN: I think Your Honor is hitting on the top two points, really, which is it's very difficult to administer, could cause serious delays in electoral administration, and would cost a significant amount of money. The only --

THE COURT: What's the difficulty to -- I don't -- I don't understand -- I understand the cost. That seems simple. But I'm not sure -- maybe I don't know enough about barcodes, but it would seem to me that what you're -- you know, if you have a barcode, two matching barcodes, and you put one on the ballot and one on the one envelope and one on the other envelope, then you can see if the one that you -- went out is the one that comes back.

What's the difficulty in administering it?

MR. COHEN: Well, there's three points I would make on that, Your Honor. I mean, the first is that what we have to submit to USPS under the proposed rule and the order includes the intelligent mail barcode that is connected with each voter. So this information has to be nailed down well in advance, and it requires us --

THE COURT: I get the timing problem. So -- okay. Let's say we get past the timing. Let's say we're doing this for next year. Let's say that most voters would agree in this; most citizens would agree in this country that they should vote and noncitizens shouldn't vote.

And let's say that one way to make sure that noncitizens don't vote is that the ballot envelope inside and the ballot envelope on the outside match; and, moreover, that we now have computer technology so we could read it. And now you're saying but we don't have the computer technology to read it. We have a cost there. So I get the cost.

But I'm not -- and I get the having to give the list 30 days in advance. I see why that's a problem. But other than those two things, is there some further problem on the barcodes?

MR. COHEN: I don't think so, Your Honor.

THE COURT: Okay. I'll let you continue with 3.

MR. COHEN: Great. Thank you so much.

So all of this has shown, I think -- and there's plenty of evidence in the record to suggest that the states -- as the states have argued, that the proposed rulemaking, which clearly flows from the order -- it even says on section -- on page 2, this is USPS's adopting this consistently with the order -- is just going to be tremendously burdensome and disruptive.

And Your Honor's concern about the November general election was precisely the right concern. This proposed rulemaking, as is required under the order, is to be adopted shortly before that election, in fact, within weeks of ballots actually going out. So it's just difficult to

overstate the disruption that this will cause to election administration.

And, of course, the proposed rule, like the order, is drafted to become immediately effective upon adoption. So this is -- the states really cannot afford to wait for that final rule to come out.

THE COURT: And just so I'm -- make sure I am 100 percent correct on the dates, June 29th is the date for DHS to have established infrastructure necessary to compile a citizenship list, July 29th is the final rule for USPS due, and then August 5th is the last date for states to give notice of intent to use mail ballots and saying whether they will or will not submit info for a list.

And I think if you don't submit info -- as the proposed rule is written, if -- you don't have to submit info for a list, but if you don't submit info for a list, no ballots would go out.

MR. PEZZI: So there's a 90-day optional notice ahead of time which is solely just for logistical purposes to make sure that everyone is aware. And then there are the separate provisions relating to the batch mailings of ballots that require, you know, name, address, barcodes in the ways that we discussed.

THE COURT: So you're saying this notice to -- notice of intent to use the mail, including whether the state

will submit info for the list, that's totally optional?

MR. PEZZI: Yes, Your Honor. Again, under the proposal, it says, quote, "A state's failure to provide the optional 90-day notice to the postal service under 24.2 will not prevent enrollment under 24.4."

THE COURT: But that's only one of the two things. So there's the notice to use mail and then, also, separately a question -- I guess I didn't understand why it's two questions, right? If you're going to use the mail, you have to agree to submit the list.

MR. PEZZI: Yes, Your Honor. I think you have to go through the procedure stated here to send out batch mailings of absentee ballots.

THE COURT: But to be clear, there's a date, so we have 90 days before, which would be August 5th; but if you don't actually go on August 5th, you could come later, up to, I think, it's 30 days before, except if it's not practicable, and then you can do later.

But to the extent that they have the list, they have to tell you, yes, we're going to do mailing, and if we're going to do mailing, whether we're going to give you a list; but if you don't give us the list, then you can't do a mailing?

MR. PEZZI: That is, I think, an accurate description of the proposed rule. Yes, Your Honor.

THE COURT: Okay. So August 5th is the date -- it's sort of an advisory kind of list.

Then September 4th -- so we had where DHS is filling out in this -- June 29th, DHS is establishing the infrastructure. And then I understand it is September 4th, 60 days before the election, that DHS would confirm the list to the state.

MR. PEZZI: So I think that is, again, a correct reflection of the timing contemplated by the order. Those deadlines are not enforceable; and the postal service, obviously, already missed the first one. But I don't disagree with the calendar timing, unless I've missed something.

THE COURT: And then -- okay. I'll let you continue.

MR. COHEN: So maybe with that, Your Honor, I can touch on the merits of Section 3.

THE COURT: Please.

MR. COHEN: I think you're right, Your Honor. The defendants still haven't offered any theory of how USPS can implement this part of the executive order, not one. And, actually, as a matter of fact, I think that supports ripeness precisely because any manifestation of Section 3 is unlawful.

I believe that there was some dialogue earlier about whether or not Section 3 really just calls for a

proposed rule. And while I think that's true to the text of the executive order, of course, to Your Honor's point, the Court is not required to be naive about what's actually happening here.

THE COURT: That was your words, not me.

MR. COHEN: Pardon?

THE COURT: You said I didn't have to be naive. I said I have to presume regularity.

MR. COHEN: Your Honor, as recently as 2025, the First Circuit has recognized, in *New York v. Trump*, that courts have not required to adopt a naivete from which ordinary citizens are free, and that's a direct quote.

And I think, in this case, that's pertinent precisely because this is nothing less than an order from the President to undertake certain actions. And, as a matter of fact, USPS is taking those actions; and it will have and is having a substantial impact on the plaintiff states.

But I also want to highlight another argument.

THE COURT: Just one little caveat there of where they're not, though: The President didn't differentiate between primaries and other elections, but they aren't enforcing this as to the primaries.

MR. COHEN: That's correct, Your Honor. But whatever slight deviation that might reflect from the order, I don't think that is the sort of deviation that calls into

question that the states have real harms that are flowing from the order, both now and in the future.

But I think the second argument that I'd like to highlight here is that it's just basic administrative law that any final rule has to be in keeping with a proposed rule. And, of course, that's the design of the executive order, is to take advantage of precisely that.

The Court said this in *National Urban League*. It said the substance of the forthcoming final rule is, quote, "clear, even if the agencies might use slightly different formulations."

And that's exactly true here. And that was the basis of the Court's conclusion in *LULAC*, in *California*, in the *Washington* case that the states have cited. All of these cases reflect the idea that, you know, what the President is purporting to try and accomplish here is require a certain deliberative process that belongs to an agency under that agency's congressionally and legislatively enacted authority to come out in a certain way. And that's exactly what's happening with respect to Section 3.

In fact, I'll quote just one more portion from *National Urban League*, which is that the Court there found the defendants were the ones speculating by suggesting that the agencies weren't going to follow the President's orders at issue in that case.

And I think that's true exactly here as well. The executive order is mandatory. Defendants seem to agree that the executive order is mandatory, and it requires USPS to do a certain thing. And so I don't think we need to sit here and speculate that USPS isn't going to be doing that thing precisely because they already are.

Another case that I would refer the Court to is the *Susman Godfrey* case. That was also a challenge to an executive order. It's cited in the states' reply. And that case concerned restrictions on law firms' dealings with the federal government.

And the Court found there that, while the precise contours of those limitations hadn't been set, any limitation contemplated by the executive order would be unlawful; and, likewise, that is exactly the case here. So I don't think we have to suppose anything that the order doesn't actually say.

THE COURT: And is that because -- are you taking that position because it doesn't matter what -- in your view -- what the details are of the directives in the rule with regard to the post office's involvement here, but because it violates either states' rights or Congress's role here?

MR. COHEN: That's exactly right, Your Honor. The order leaves nothing left for further development. It's clear and it's directive and it's mandatory.

THE COURT: Okay.

MR. COHEN: So with that, Your Honor, I think there's not been any real dispute over whether the President has authority to order agencies like USPS to violate their governing statutes because defendants' primary argument is, well, we can't know whether they're doing that yet. But, of course, much of plaintiff states' merits argument raises that exact point, and it hasn't really been seriously --

THE COURT: Okay. So I understand the "they're not going to violate the Privacy Act." What's the argument here that enacting this rule would violate the post office's governing statute?

MR. COHEN: Sure.

THE COURT: Because they -- well, tell me.

MR. COHEN: So there are a few reasons cited in plaintiffs' papers, and both in our motion and in our reply papers; but just to summarize it for the sake of time, Title 39 of the US code imposes a great deal of restrictions on USPS's operation. And the order flouts those precisely by expanding nonpostal services and categories of nonmailable matter beyond what the statutes contemplate.

THE COURT: So if they're not creating the list and they're merely checking the list, does that get them out of the problem?

MR. COHEN: I don't think it would, Your Honor. I

mean, as a matter of course --

THE COURT: Because I think what the defendants' position is, is you're telling them where to mail it, and they're mailing it to them --

MR. COHEN: Well --

THE COURT: -- to people. They're saying they're not differentiating in their mailing between what you're giving them. They're just going ahead and mailing to those people.

MR. COHEN: With the only addition that their position is we'll do that provided you play by our rules; and, as a matter of course, those rules encroach very substantially into the way that the states actually administer mail voting.

THE COURT: Okay. But right now we're talking about the postal -- the postal service coming up with things that would be in violation of their own governing laws, so tell me -- you started off by saying they're going to be doing things that aren't part of their mandate. And your briefing, I think, said they're creating lists, but they're not creating the list. They're only checking on it.

So is it your position that checking on a list would be beyond the role of delivering mail and so forth?

MR. COHEN: Well, I think that provision comes with a number of other very substantial and disruptive provisions,

which don't just require us to give them information that they administer. They will be checking outbound and inbound mail under the proposed rule. So clearly they're playing this screening role, which is exactly what the order contemplates.

THE COURT: Are they checking the inbound mail, or is the problem that the state official has to check the inbound mail and check the barcode to make sure they take the vote?

MR. COHEN: Well, I would refer Your Honor to 705, 24.4.2, which is very close to the provision that the League referenced earlier. At least as I read that provision, it does require some sort of USPS screening of inbound mail. And, in fact, in 24.5.3, it says mailings that don't comply with 24.5.1 won't be accepted, and they're going to be returned to the states.

THE COURT: Right. That's your outgoing mail.

MR. COHEN: That's right. I believe the provision -- well, I suppose that all of this is sort of downstream of what is already obvious, which is that USPS is not going to be accepting this ballot mail into its mail stream in the first place, which is, of course, itself extremely disruptive.

And I'll add, too, that if USPS undertakes this screening close in time to an election, as it presumably

would because that's when states actually sent out ballots, the ballots wouldn't be returned to the state.

In other words, the state wouldn't actually know that the ballot isn't being delivered to the voter until well into the election calendar, presumably within days of the election, in fact. So there's no question that this could be extremely disruptive to states' mail ballot programs.

With that, Your Honor, I think we've sort of hammered the new restrictions on mail voting. I can touch for a moment on some of these new ballot design mandates which we got into with the intelligent mail barcode.

But I do want to emphasize that the President can't unilaterally override Congress's design for USPS's regulatory changes. And the first First Circuit alluded to this in *Campanale* case that we've cited in the states' papers in which the Court found that a statutory consultation requirement actually has to be meaningful; otherwise, it completely undermines what Congress intended to do in setting out that exact process.

I mean, I would ask what's even the point of a postal regulatory commission that is independent and bipartisan and issues advisory opinions on regulatory changes like these if the President can just bypass it, as he's done here.

THE COURT: What's your answer to that, that this

is bypassing the postal commission?

MR. PEZZI: Yeah, so the postal regulatory commission has this complicated structure for purposes of issuing advisory opinions -- which, to be clear, are only advisory -- is not triggered for every single thing that the postal service does. That's for nationwide service changes, change in, you know, postal rates, for example.

And so my understanding is that the long-standing position of the postal service, unchanged here, is that this sort of regulatory change does not go through the postal regulatory commission process.

THE COURT: So this manual, the postal -- post office manual that's being proposed to amend here, all of that is at some point came through notice rulemaking, presumably. Would that have been with or without the approval of the postal commission?

MR. PEZZI: So I wish I could make a more definitive statement. I am quite confident that this is not the first time that changes to the domestic mail manual have been made without going through the postal regulatory commission. There may have been some changes that did, but it is certainly not a new position of the postal service that this sort of regulatory change would not require going --

THE COURT: But is there somewhere where that distinction has -- rests? You know, is it from enacting

legislation of the postal commission? Is there somewhere where there's a division of what types of things -- I mean, I hear you saying rates would have to go to the postal commission.

MR. PEZZI: I believe that's right. The answer to your question is a statutory one. There are statutes that are not, candidly, the focus of either side's briefing in this case that do govern the question of when something does or does not have to go through postal regulatory commission review.

Now, even at the end of that process, to be clear, it's a nonbinding advisory opinion, as I understand it. And I think, to the extent plaintiffs have had a concern about that, judicial review of those questions goes directly to the DC circuit, typically.

So I don't -- I don't think that question is squarely teed up here. There may be a disagreement between the parties on it that is not addressed at much length in the briefs, but that is certainly the position of the postal service. On --

THE COURT: Any disagreement there, that a challenge to the postal commission role would have to go through the DC circuit?

MR. COHEN: Not exactly directly to that point, Your Honor. I do want to point to page 36; that's the ECF

pagination of plaintiffs' reply brief, Docket Number 163, which lays out some of the regulatory infrastructure here and describes why, in the states' view, this is -- you know, this is a substantive change, clearly, to the domestic mail manual. It has the potential to massively disrupt mail voting.

And those regulations seem to be very clear that substantive changes to the domestic mail manual are revised through a public notice and comment process. And that's precisely what USPS is doing here --

THE COURT: Well, isn't this a -- yeah. Okay. So this is a public notice and comment. But the question is: Where does the commission's advisory role come in?

MR. COHEN: This would be on -- it looks like it's 39 CFR 3661, which dictates some of the commission's requirements. I'm not prepared, Your Honor, to necessarily insist here that USPS has made some grave error in not seeking the postal regulatory commission's advisory opinion.

What I will point out, though, is that even if the PCR process isn't actually going to be playing out because, in USPS's view, this isn't the sort of thing that needs to be brought to their attention, there's still a public notice and comment process. And so I would pose the exact same question.

THE COURT: I'm sorry; isn't that what the rule,

proposed rule is, is the notice and comment?

MR. COHEN: That's exactly right, Your Honor. And where I'm going with that is that I would pose the same question that I posed with respect to the postal regulatory commission, which is: What is the point of public notice and comment if not to establish a deliberative process where what comes out the other end could be different? But here, the President has dictated precisely what needs to come out the other end.

THE COURT: No. So you want me to say that because the President said do X, the notice and comment rulemaking is a farce. I -- that's kind of beyond what is my role to do here.

MR. COHEN: Well, it is not unusual for courts to have done that in the sense that, I mean, if we look to the first elections executive order case that the plaintiff states brought in this district last year, the Court did find that the order unconstitutionally required some sort of outcome to the election assistance commission's deliberative process for rulemaking in that context.

So in that way, it's not so different. But, certainly, I also think that we're getting a little too far afield potentially from what is the core of the states' claims, which is that it's the order itself that's unconstitutional.

And insofar as the proposed rulemaking is really relevant here, it is in a major way relevant precisely because it validates that, one, USPS is actually adopting this proposed rule, doing what the President is clearly telling the agency to do; and, two, it validates that the states have real harms that flow from it, and those harms are in the record.

And by the way, Your Honor, defendants haven't even contested the fiscal harms in the record as to Section 3. Those harms remain uncontested. So there's no question that there's real harms that flow from this order, and the proposed rulemaking just emphasizes that.

MR. PEZZI: I want to be respectful of Your Honor's time, but very briefly, I very strongly disagree with much of what my friend on the other side just said. The last thing he said I think is completely right, which is that the question before Your Honor right now is the legality of the executive order rather than the legality of a possible future rule to be issued by the postal service.

What is very much not correct is that the contents of a final rule issued by the postal service are knowable in advance, are required by the executive order. Even on its face, the executive order does not require the contents of any particular final rule. It says that any final rule shall be issued by a particular date. That is the only thing it

says about a final rule.

And I can certainly say that the men and women of the postal service take very seriously their obligations to deliver the mail. Some of the concerns that plaintiffs have raised I think would be a completely appropriate ground for a comment.

So, for example, to the extent there are data limitations or compatibility issues or practical concerns, the postal service very much wants to hear about those in this very comment process and, of course, ultimately will consider all the comments it receives, both about the legality of the proposed rules as well as the practical concerns the plaintiffs have raised, any policy considerations anyone wants to advance.

And if it issues a final rule, it will account for those comments. Until that happens, I don't think there's any basis for judicial review over the postal service's actions thus far.

MR. COHEN: The only thing I would add, Your Honor, is that the states can't afford to wait here. If a rule, anything like this, any rule like this, issues shortly before the general election, I think I've hammered this pretty hard, that it's going to be extremely disruptive to the states' mail ballot programs.

And so for that reason, we can't just wait to see

what shakes out on the other end precisely because we know what the President wants, and we know what he's told USPS to do. So for that reason, we would ask that the Court enjoin the order now.

MS. LEE: Your Honor, just very briefly on the merits, just as with the 2025 executive order, plaintiffs -- and I understand this to be the plaintiff states' argument as well -- argue that there's no lawful outcome possible because the directive itself is unconstitutional.

The President is acting at the lowest ebb of any possible powers. I don't believe *Youngstown* is cited in defendants' briefs, but that is the framework we're looking at these through, nor is the postal clause.

So we have both the elections clause, which textually assigns the authorities here to the states with Congress as a check, as has been discussed; but the postal clause also textually assigns these authorities to Congress as well.

And because of the directive itself being unlawful, the President lacks any authority to dictate the USPS rulemaking, much less rulemaking as relates to ballots.

And the savings clauses don't help because, if there's no authority to issue the order, necessarily, everything commanded in the order is likewise unlawful. And that would be the exact scenario where the savings clauses

are being used to subsume all of the content within.

I have various justiciability points for Your Honor, but they're well covered in our briefs, and I will not beat them to death here.

MR. CAPOZZI: Your Honor, just one point.

So the intervenor states did argue on the merits for Section 2 that the President doesn't need affirmative statutory authority to do 2(a), that he has inherent authority under the *Youngstown* framework. We did engage with the *Youngstown* framework. We would just refer the Court to those arguments.

THE COURT: Okay. Thank you.

I have one other question for the states. And I think, if I were to open -- if I were to go through your declarants' statements, they would say we are currently in the process of doing X. The question for you is: When before an election do you start the process for that election?

MR. COHEN: Sure, Your Honor. I'd be happy to take that. And you're right that the declarations really do lay out quite a lot of evidence that we're doing things right now and suffering harms right now.

But the reality is that states are, essentially, always in the course of an election cycle because elections, as the Supreme Court has recognized, are extremely

complicated. They take months and months and months to prepare for and administer; and any change along the lines of that contemplated in the order tends to trigger a lot of outreach from elections officials, from the public. And, of course, what hangs in the balance is the fundamental right to vote.

So states can't take their obligations on this score lightly. So if you were to ask any of the secretaries of state or chief elections officials who are the states' declarants in this case, I think they would say we have year-round obligations every year to do something that is incredibly burdensome, incredibly complex, and that the executive order, by the way, unlawfully encroaches upon.

THE COURT: And that ramps up 3 months before, 6 months before, 9 months before, 12 months before an election?

MR. COHEN: So there's --

THE COURT: I don't imagine it's constant. I mean, sorry, that's the wrong word. I don't imagine it doesn't have ebbs and flows.

MR. COHEN: I think you're exactly right, Your Honor. It does have ebbs and flows.

I think the point at which election administration obligations are most acute is probably roughly six to eight months before an election, and they sort of become more and

more burdensome as you get closer to election day.

Of course, in the weeks and months following an election, there's certifications and statements of the vote, but I think that's the rough time period that I would point Your Honor to. But I do want to emphasize that these obligations don't ever just go away. I mean, these are ongoing year-round obligations for the states.

THE COURT: Okay. Last question for you. We haven't talked about Section 5 at all. I understand the plaintiff states' position to be that we're required by Congress to keep ballots for 22 months, or whatever the number is. And the defendants' position is this is simply "should"; we're not telling you what to do.

Is that the end of that discussion, that, essentially, the government's position is that Section 5 doesn't mandate anything?

MR. PEZZI: Yes, Your Honor. That is the position of the United States.

MR. COHEN: That's exactly right, Your Honor. I would just point Your Honor to the Michigan declaration, which in paragraph 85 describes some of the costs that the state will incur. There's other --

THE COURT: But they're saying they're not asking you to do it, or they're not telling you to do it.

MR. COHEN: That's right, Your Honor. But as a

matter of course, elections officials are treating this as mandatory and understandably so because it's something that comes from an executive order --

THE COURT: Well, if I write an opinion that says the government takes the position this is not mandatory, it's just a suggestion, they still think it's mandatory? Because nobody is that interested in what I have to say, again.

MR. COHEN: Well, you're doing yourself a dishonor, Your Honor, but as a matter of -- no pun intended.

But I think that's precisely why the courts -- the states have requested the relief we have on this point. And in plaintiff states' reply brief, we've stayed, look, if Your Honor finds that this is strictly precatory, please just say so so that we know and we don't have to incur all the costs that record shows we will incur from this section.

THE COURT: You don't disagree that I can say it's strictly precatory?

MR. PEZZI: I'd love to be able to consent to relief on that section. We obviously can't because of the jurisdictional positions we've taken in the brief. But to the extent Your Honor is already writing an opinion, it is certainly the position of the United States that that section of the executive order imposes no mandatory obligation on the states. So we have no objection with Your Honor saying that.

THE COURT: Okay. I think I have to give my court

reporter a break for a few minutes and get off the bench.

Thank you. It was all very helpful argument, and I'm -- don't have it written. It will take me some time, but I understand that time is sensitive here, so . . .

THE DEPUTY CLERK: We are in recess.

(Court in recess at 12:43 p.m.)

**CERTIFICATE OF OFFICIAL REPORTER**

I, Robert W. Paschal, Registered Merit Reporter and Certified Realtime Reporter, in and for the United States District Court for the District of Massachusetts, do hereby certify that pursuant to Section 753, Title 28, United States Code, the foregoing pages are a true and correct transcript of the stenographically reported proceedings held in the above-entitled matter and that the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.

Dated this 8th day of June, 2026.

/s/ Robert W. Paschal

ROBERT W. PASCHAL, RMR, CRR
Official Court Reporter