UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| LEAGUE OF WOMEN VOTERS OF OF MASSACHUSETTS, et al., | * * * * | |
| Plaintiffs, | * * | |
| v. | * * | |
| DONALD J. TRUMP, in his official capacity as President of the United States, et al., | * * * | Civil Action No. 1:26-cv-11549-IT |
| Defendants, | * * * | |
| and | * * | |
| STATE OF MISSOURI, et al., | * * | |
| Intervenor-Defendants. | * | |

MEMORANDUM & ORDER

July 22, 2026

TALWANI, D.J.

Eight non-profit organizations involved with voter education and advocacy (collectively, "Plaintiff Organizations"),[1] challenge Sections 2 and 3 of Executive Order 14399, Ensuring Citizenship Verification and Integrity in Federal Elections (the "EO"), 91 Fed. Reg. 17125 (Mar. 31, 2026), as violative of the Constitution and several statutes. Compl. [Doc. No. 1]. Plaintiff Organizations assert these claims against the President, and various agencies and agency heads

---

[1] Plaintiff Organizations are the League of Women Voters of Massachusetts ("LWVM"), League of Women Voters Lotte E. Scharfman Memorial Education Fund, League of Women Voters of the United States, League of Women Voters Education Fund, Association of Americans Resident Overseas, U.S. Vote Foundation, OCA-Asian Pacific American Advocates ("OCA"), and Delta Sigma Theta Sorority ("Delta Sigma Theta").

listed in the EO. Id.[2] Defendants, joined by Intervenor States,[3] seek dismissal of Plaintiff

Organizations' Complaint [Doc. No. 1] pursuant to Federal Rules of Civil Procedure 12(b)(1)

and 12(b)(6). Intervenors' Mot. to Dismiss [Doc. No. 124]; Defs.' Mot. to Dismiss [Doc. No.

126].

In its June 18, 2026 Memorandum and Order [Doc. No. 166], the court addressed

Defendants' and Intervenor-Defendants' motions as to ripeness. The court now GRANTS in part

and DENIES in part the remainder of Defendants' and Intervenor-Defendants' motions. The

court DENIES dismissal of claims pursuant to Federal Rule of Civil Procedure 12(b)(1), finding

that Plaintiff Organizations have both organizational and association standing to assert claims

regarding elections on and before November 3, 2026. The court further DENIES dismissal of

Plaintiff Organizations' constitutional claims, Counts I–IV, pursuant to Federal Rule of Civil

Procedure 12(b)(6), finding that Plaintiffs have plausibly alleged that Section 3 of the EO

violates the separation of powers doctrine, is ultra vires, violates principles of Federalism, and

violates their members' right to vote. The court also DENIES dismissal of Plaintiff

Organizations' Voting Rights Act claim, Count V, but GRANTS dismissal of Count VI, finding

that Plaintiffs have failed to assert a cause of action under the Administrative Procedure Act.

---

[2] Counts I–IV, challenging Section 3 of the EO, are brought against the U.S. Postal Service, Postmaster General, Deputy Postmaster General, U.S. Postal Service Board of Governors Chairwoman, Board of Governors Vice Chairman, and Board of Governor Members (collectively, "USPS Defendants") and President Donald J. Trump. Id. ¶¶ 120–80 [Doc. No. 1]. Count V, challenging Section 3 of the EO, is brought against the USPS Defendants alone. Id. ¶¶ 181–184. Count VI, challenging Section 2 of the EO, is brought against the U.S. Department of Homeland Security and its Secretary (collectively, "DHS Defendants"); the U.S. Citizenship and Immigration Services and its Director (collectively, "USCIS Defendants"); and the Social Security Administration and its Commissioner (collectively, "SSA Defendants"). Id. ¶¶ 185–205 [Doc. No. 1].

[3] Intervenor-Defendants are the States of Alabama, Florida, Indiana, Kansas, Louisiana, Missouri, Montana, Nebraska, Oklahoma, South Carolina, South Dakota, and Texas.

## I.      Background

The EO asserts "an unavoidable duty under Article II of the Constitution of the United States to enforce Federal law, which includes preventing violations of Federal criminal law and maintaining public confidence in election outcomes." Exec. Order 14399 § 1. The EO states that several executive agencies maintain records that "can assist in verifying identity and Federal election voter eligibility" and concludes that "additional measures are necessary[]" to "enhance election integrity via the United States Mail[.]" Id.

The EO directs agency heads to take certain actions. As relevant here, Section 2 of the EO directs the Director of the U.S. States Citizenship and Immigration Services ("USCIS"), a component within the Department of Homeland Security ("DHS"), in coordination with the Commissioner of the Social Security Administration ("SSA"), to compile lists of citizens eligible to vote in a specific state (the "Confirmed Citizen Lists"[4]) "[t]o the extent feasible and consistent with applicable law[.]" Exec. Order 14399 § 2(a). The EO defines the Confirmed Citizen Lists as limited to "individuals confirmed to be United States citizens who will be above the age of 18 at the time of an upcoming Federal election and who maintain a residence in the subject State[.]" Id.

The EO requires DHS to "establish the infrastructure necessary to compile, maintain, and transmit" the Confirmed Citizen Lists by **June 29, 2026**. Id. § 4(c) (emphasis added). Also by **June 29, 2026**, DHS must designate a point of contact regarding List-related inquiries from individuals and State election officials. Id. The EO requires that DHS update and transmit the Confirmed Citizen List for each State to State election officials at least 60 days before each

---

[4] The EO refers to these federally created lists as "State Citizenship Lists." Exec. Order 14399 § 2(a).

regularly scheduled Federal election, or upon request regarding a special Federal election. Id. § 2(a). Accordingly, for the November 3, 2026 general election, the EO requires DHS to provide the Confirmed Citizen Lists to State election officials by **September 4, 2026**.

Section 3 of the EO directs the Postmaster General of the U.S. Postal Service ("USPS") to initiate a proposed rulemaking to ensure the integrity of mail voting and requires that a final rule be published by **July 29, 2026**. Id. § 3(b); USPS Notice of Proposed Rulemaking, Ballot Mail for Federal Elections, 91 Fed. Reg. 32915 (June 2, 2026). The EO mandates that the proposed rule (1) include requirements regarding election mail design; and (2) specify that USPS, after receiving State-furnished lists of voters approved to vote by mail, shall provide each State with a list of individuals who are "enrolled with the USPS" pursuant to a process specified in the rule, and shall not transmit the ballot of any voter unless the individual has been so "enrolled." Exec. Order 14399 § 3(b). The EO requires the proposed rule to specify that States may choose to notify USPS of their intent to use mail ballots no fewer than 90 days prior to a Federal election, and States may submit to USPS, no fewer than 60 days before the election, a list of voters to whom the State intends to provide mail ballots. Id. § 3(b)(ii). Accordingly, for the November 3, 2026 general election, States may notify USPS by **August 5, 2026**, of their intent to use mail ballots, and by **September 4, 2026**, of their mail-ballot voter lists. Id.

In Sections 2 and 5, the EO describes several criminal offenses, both directly and indirectly relating to voter fraud, and requires the Attorney General to prioritize the investigation and prosecution of State and local officials who issue ballots to individuals not eligible to vote. Id. §§ 2(b), 5.

II.    **Defendants' and Intervenor States' Motions to Dismiss for Lack of Subject-Matter Jurisdiction**

A.  **Ripeness**

Defendants and Intervenor-Defendants contend that judicial review will be appropriate later, after implementation actions have been taken, because Defendant agencies are still considering and deliberating future action. Defs.' Mem. ISO Mot. to Dismiss and Opp'n ("Defs.' Mem.") 9 [Doc. No. 128]; Intervenors' Mem. ISO Mot. to Dismiss and Opp'n ("Intervenors' Mem.") 7, 15 [Doc. No. 125]. The court has accepted this argument in part and dismissed without prejudice Plaintiff Organizations' complaint pursuant to Federal Rule of Civil Procedure 12(b)(1) on prudential ripeness grounds as to their claims regarding the EO and its implementation with regard to elections occurring after November 3, 2026. Mem. & Order [Doc. No. 166]. The court denied dismissal pursuant to Federal Rule of Civil Procedure 12(b)(1) on prudential ripeness grounds with regard to the November 3, 2026 election, and all earlier elections. Id.

B.  **Standing**

Defendants and Intervenor-Defendants contest the court's subject matter jurisdiction over this case, arguing that Plaintiff Organizations lack standing to challenge the EO. See Defs.' Mem. 7–12 [Doc. No. 127]; Intervenors' Mem. 3–9 [Doc. No. 125]. "Article III confines the federal judicial power to the resolution of 'Cases' and 'Controversies.'" TransUnion LLC v. Ramirez, 594 U.S. 413, 423 (2021). "Such a case or controversy exists only when the plaintiff demonstrates such a personal stake in the outcome of the controversy as to assure that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends." Gustavsen v. Alcon Labs., Inc., 903 F.3d 1, 6–7 (1st Cir. 2018) (citations omitted). "For there to be a case or controversy under Article III, the plaintiff must have a 'personal stake' in the case –

5

in other words, standing." Ramirez, 594 U.S. at 423 (citation omitted). To establish standing, "a plaintiff must show (i) that he suffered an injury in fact that is concrete, particularized, and actual or imminent; (ii) that the injury was likely caused by the defendant; and (iii) that the injury would likely be redressed by judicial relief." Id. "If the plaintiff does not claim to have suffered an injury . . . there is no case or controversy for the federal court to resolve." Id. (citation and internal quotation marks omitted). In the context of a motion to dismiss, the plausibility standard governs the court's review of plaintiffs' allegations regarding standing. Hochendoner v. Genzyme Corp., 823 F.3d 724, 730–32 (1st Cir. 2016).

Here, Plaintiff Organizations assert standing both in their own name, and on behalf of their members.

### 1. Organizational Standing

Organizational standing allows an organization to sue when, like an individual, it has "'alleged . . . a personal stake in the outcome of the controversy' as to warrant [its] invocation of federal-court jurisdiction." Louis v. Saferent Sols., LLC, 685 F. Supp. 3d 19, 32 (D. Mass. 2023) (quoting Havens Realty Corp. v. Coleman, 455 U.S. 363, 378–79 (1982)). An organization must "show that the defendant's actions cause a 'concrete and demonstrable injury to the organization's activities' that is 'more than simply a setback to the organization's abstract social interests.'" Id. (quoting Nat'l Ass'n of Consumer Advocs. v. Uejio, 521 F. Supp. 3d 130, 142 (D. Mass. 2021)). This is "'not a demanding standard,' as 'only a perceptible impairment of an organization's activities is necessary for there to be an injury in fact.'" Id. (quoting Nat'l Ass'n of Consumer Advocs., 521 F. Supp. 3d at 142).

As to organizational harms, Plaintiffs assert that their core missions are to help their members and others vote and increase electoral participation. Pls.' Mem. [Doc. No. 74]. Plaintiff

Organizations explain that the EO "has disrupted Plaintiffs' ongoing voter education, requiring their staff to spend resources and time responding to fear and confusion from members and partner organizations." Id. at 22. Specifically, Plaintiff LWVM asserts that it has been "forced . . . to suspend core voter-education and facilitation work tied to mail voting . . . [e.g.,] translating its Massachusetts-specific voter information, including vote-by-mail information, into Haitian Creole and Portuguese[.]" Id. at 23; see Canavan Decl. ¶¶ 40–45 [Doc. No. 75-2] (describing resources expended on translation work). Further, Plaintiffs have stopped disseminating educational materials regarding mail voting lest they confuse or mislead their members. See Stewart Decl. ¶ 15–16 [Doc. No. 75-3]. In particular, Plaintiff LWVM has changed its plan to distribute "high school-specific 'graduation cards' and 'gift' packages for eligible graduating seniors." Canavan Decl. ¶ 32 [Doc. No. 75-2]. Whereas LWVM previously created materials encouraging high school graduates to plan to vote by mail "as they are likely to rely on mail voting if they move out of state for college," LVWM "stopped those plans . . . because of the uncertainty the EO creates." Id.

Defendants assert that "[n]othing in the [EO] compels Plaintiffs to stop voter outreach and education efforts" and nothing in the EO "prevents translation of voter information to other languages." Defs.' Mem. 40 [Doc. No. 128]. Intervenor-Defendants argue that Plaintiff Organizations' education efforts regarding the EO amount to mere "resource diversion." Intervenors' Mem. 8–9 [Doc. No. 125] (citing FDA v. Alliance for Hippocratic Med., 602 U.S. 367, 394 (2024)). Defendants similarly contend that Plaintiff Organizations' resource expenditure in anticipation of the EO's implementation is insufficient for an Article III injury in fact. Defs.' Reply 8 [Doc. No. 147] (citing Alliance for Hippocratic Med., 602 U.S. at 394).

Alliance for Hippocratic Medicine is not a useful analogue to this case. In Alliance for Hippocratic Medicine, the plaintiff doctors and medical associations sought to challenge "FDA's regulations [that] appl[ied] to doctors prescribing mifepristone and to pregnant women taking mifepristone," despite plaintiffs not prescribing or using mifepristone themselves. 602 U.S. at 385. The Supreme Court explained that "general legal, moral, ideological, and policy concerns do not suffice on their own to confer Article III standing." Id. at 386. In response to the plaintiff doctors and medical associations' argument that they had diverted resources in order to challenge the FDA's regulations, the Supreme Court explained that "an organization that has not suffered a concrete injury caused by a defendant's action cannot spend its way into standing simply by expending money to gather information and advocate against the defendant's action. An organization cannot manufacture its own standing in this way." Id. at 394. Rather, additional costs must have been incurred because a defendant's "actions directly affected and interfered with [the organization's] core business activities." Id. at 395 (citing Havens, 455 U.S. at 379).

Unlike the plaintiffs in Alliance for Hippocratic Medicine, Plaintiff Organizations here do not claim an expenditure based on opposing the EO. Instead, they point to the EO's direct interference with their core business activities, where the EO, inter alia, directs (1) DHS to create a new database for the stated purpose of verifying voter eligibility requirements like citizenship and residency; and (2) USPS to newly commence the regulation of mail-in voting. Plaintiff Organizations are all "organizations dedicated . . . to protecting the right to vote" and their core business activities involve voter education and supporting their members to vote. Compl. ¶ 9 [Doc. No. 1]. Plaintiff Organizations have alleged that many of their members have limited English proficiency and/or are only able to vote by mail, due to residence, age, ability, or illness. Id. ¶¶ 39, 113–14. Rather than expending resources to advocate against the EO, Plaintiff

8

Organizations have been forced to withdraw and amend their educational materials, retranslate informational resources, and spend money and time counseling their members on how the EO impacts their ability to vote. Id. ¶¶ 103–119. The EO has "directly affected and interfered with" Plaintiff Organizations' core business activities, directly causing injuries to Plaintiff Organizations that would be redressed by an order enjoining the EO's implementation. Alliance for Hippocratic Medicine, 602 U.S. at 395; see Havens, 455 U.S. at 379.

### 2. Associational Standing

An organization must meet the following three criteria to demonstrate associational standing: "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." Hunt v. Wash. State Apple Advert. Comm'n, 432 U.S. 333, 343 (1977); see In re Fin. Oversight & Mgmt. Bd. for P.R., 110 F.4th 295, 308 (1st Cir. 2024). "The first two prongs of this test have constitutional dimensions; the third prong is prudential." Housatonic River Initiative v. EPA, 75 F.4th 248, 265 (1st Cir. 2023) (citing United Food & Com. Workers Union Local 751 v. Brown Grp., Inc., 517 U.S. 544, 554–58 (1996); and Back Beach Neighbors Comm. v. Town of Rockport, 63 F.4th 126, 129 n.2 (1st Cir. 2023)).

Plaintiffs argue that their members face substantial risk of disenfranchisement because of the EO. Pls.' Opp'n to Defs.' and Reply ("Pls.' Opp'n") 9–12 [Doc. No. 139]. For example, Plaintiff OCA asserts that it supports members throughout the naturalization process, and that OCA anticipates difficulty assisting its members to vote if they are naturalized within 60 days of a federal election because those members will be excluded from the Confirmed Citizen Lists mandated by Section 2 of the EO. See Ngyuen Decl. ¶¶ 36–42 [Doc. No. 75-7]. Additionally,

Plaintiffs assert that, given the strict directives of the EO, it is likely that USPS will promulgate a final rule that prevents USPS from transmitting certain mail-in ballots. Id. at 9–10. Many of Plaintiffs' members must vote by mail, see Washington Decl. ¶ 33 [Doc. No. 75-6] ("Many [of Plaintiff Delta Sigma Theta's Massachusetts members] rely on mail-in voting due to the significant number of elderly members who depend on others for transportation to polling locations and may require assistance standing in long lines."). Plaintiffs argue that the implementation of the USPS final rule will prevent the transmission of their members' ballots. Pls.' Opp'n 10 [Doc. No. 139]; see Washington Decl. ¶ 61 [Doc. No. 75-6] (Many of Plaintiff Delta Sigma Theta's members "rely on mail voting due to being away from where they are registered to vote on Election Day because of school, work, military, or other obligations, physical disabilities, health issues, and mobility challenges, among other reasons like living in rural areas where transportation is limited and difficult to access."); Nguyen Decl. ¶ 12 [Doc. No. 75-7] ("Many [of Plaintiff] OCA members rely on mail-in voting, especially limited English proficiency, youth, and elderly members, and members with disabilities because it allows them to vote with the autonomy and privacy that many of them would not have at the polling place due to a disability or language assistance needs.").

Defendants characterize the EO as an "intra-Executive Branch directive" that "does not require . . . any of the Plaintiffs . . . to do (or refrain from doing) anything at all." Defs.' Mem. 8 [Doc. No. 128]. Because it only contains "intra-governmental mandates[,]" Defendants argue that the EO does "not inflict on Plaintiffs an injury in fact." Id. (citation omitted). Defendants assert that future action taken by agency officials to implement the EO is both insufficiently imminent and too speculative to lead to Plaintiffs' members' disenfranchisement. Id. at 9–11. Similarly, Intervenor-Defendants argue that Plaintiff Organizations' members can show neither

10

an ongoing injury nor an immediate threat of injury caused by the EO because implementation has not yet occurred. Intervenors' Mem. 4–7, 12–13 [Doc. No. 125]. Finally, Defendants deny that "fear and confusion" as to the EO's impact on voting is sufficiently concrete to constitute injury suffered by Plaintiffs' members. Defs.' Mem. 40–41 [Doc. No. 128].

First, Plaintiff Organizations have plausibly alleged that their members have standing to challenge the EO. Hunt, 432 U.S. at 343. Plaintiff Organizations' members will plausibly be harmed by the EO's implementation because those members include individuals who must rely on mail voting as they live overseas, reside out of state, have disabilities, or are unable to travel to the polls and vote in person. See Compl. ¶¶ 24, 28, 30, 36, 39 [Doc. No. 1]. Given the clear mandates of the EO, directing USPS to initiate rulemaking that would prohibit the transmission of non-compliant mail-ballots, Plaintiffs' members' disenfranchisement as to the upcoming election is plausibly likely and imminent. In addition to members' particularized injury, voters have standing to challenge voting-related regulation, even if the specific plaintiff is ultimately able to vote. See, e.g., Common Cause/Ga. v. Billups, 554 F.3d 1340, 1351–52 (11th Cir. 2009) (even if voters "possessed an acceptable form of photo identification, they would still have standing to challenge the statute that required them to produce" photo ID to vote); Fish v. Schwab, 957 F.3d 1105, 1119–20 (10th Cir. 2020) (holding even a voter who could comply with proof of citizenship law had standing to challenge it).

Second, protecting the right to vote and ability to vote by mail for all eligible citizens is clearly "germane to the [Plaintiff Organizations'] purpose[.]" Hunt, 432 U.S. at 343; see Compl. ¶¶ 21, 25–26, 31, 34, 38. Third, the participation of individual members is not necessary to the resolution of this case and Plaintiff Organizations are well able to represent their members. See Friends of the Earth, Inc. v. Laidlaw Envt'l Servs. (TOC), Inc., 528 U.S. 167, 181 (2000).

Finally, Plaintiffs' organizational and associational injuries are caused by the EO's novel voting regulation mandates and enjoining the EO would cure those injuries. See Lujan v. Defs. of Wildlife, 504 U.S. 555, 560–61 (1992).

Therefore, Defendants' and Intervenors' Motions to Dismiss [Doc. No. 124, Doc. No. 126] pursuant to Federal Rule of Civil Procedure 12(b)(1) are DENIED because Plaintiff Organizations' claims as to elections prior to and on November 3, 2026, are prudentially ripe and Plaintiff Organizations have both organizational and associational standing to assert those claims.

## III.    Defendants' Motion to Dismiss for Failure to State a Claim

### A.  Standard of Review

In assessing a complaint under Federal Rule of Civil Procedure 12(b)(6), the court assumes "the truth of all well-pleaded facts" and draws "all reasonable inferences in the plaintiff's favor." Nisselson v. Lernout, 469 F.3d 143, 150 (1st Cir. 2006). To survive dismissal, a complaint must contain sufficient factual material to "state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007). "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations . . . [f]actual allegations must be enough to raise a right to relief above the speculative level[.]" Id. at 545 (citations omitted). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).

### B.  Constitutional Claims

The right to vote is a fundamental right, which the Constitution guarantees to all citizens. See, e.g., Bush v. Gore, 531 U.S. 98, 104 (2000); Burson v. Freeman, 504 U.S. 191, 198 (1992);

12

Tashjian v. Republican Party of Conn., 479 U.S. 208 (1986); Buckley v. Valeo, 424 U.S. 1, 49 n.55 (1976); Lubin v. Panish, 415 U.S. 709, 721 (1974); Bullock v. Carter, 405 U.S. 134 (1972); City of Phoenix v. Kolodziejski, 399 U.S. 204 (1970); Harper v. Va. State Bd. of Elections, 383 U.S. 663, 667 (1966); Reynolds v. Sims, 377 U.S. 533, 561–562 (1964); Wesberry v. Sanders, 376 U.S. 1, 7 (1964).

> No right is more precious in a free country than that of having a voice in the election of those who make the laws under which, as good citizens, we must live. Other rights, even the most basic, are illusory if the right to vote is undermined. Our Constitution leaves no room for classification of people in a way that unnecessarily abridges this right.

Wesberry, 376 U.S. at 17–18. "[H]istory has seen a continuing expansion of the scope of the right of suffrage in this country. The right to vote freely for the candidate of one's choice is of the essence of a democratic society, and any restrictions on that right strike at the heart of representative government." Reynolds, 377 U.S. at 555 (footnote omitted).

As this court has explained, Section 3 of the EO is unconstitutional. California v. Trump, __ F. Supp. 3d __, 2026 WL 1826490, at *15 (D. Mass. June 25, 2026), appeal docketed, No. 26-1779 (1st Cir. July 3, 2026). The "Constitution lodges power over congressional elections in state legislatures 'primarily' and in Congress 'ultimately.'" Watson v. Republican Nat'l Comm., 609 U.S. __, 2026 WL 1855462 (June 29, 2026) (quoting THE FEDERALIST No. 59 (Alexander Hamilton)). The President plays no role in the regulation of elections. See Trump v. United States, 603 U.S. 593, 627 (2024).

Congress has not delegated authority to USPS to sort the mail,[5] let alone to refuse to transmit mail ballots for certain voters. See Exec. Order 14399 § 3(b); see also USPS Notice of

---

[5] Indeed, the EO directs the violation of several of obligations imposed on USPS by Congress, including the exhaustive statutory definition of "nonmailable matter," which does not include

Proposed Rulemaking, Ballot Mail for Federal Elections, 91 Fed. Reg. 32915, 32918 (June 2, 2026) (Mail ballots "that do not comply with [standards required by the EO] will not be accepted and will be returned to the authorized ballot mailer.").[6] Section 3(b) unconstitutionally inserts the Executive Branch, via the USPS, as a regulator of state mail-ballot programs where neither the Constitution nor USPS's enabling act allow for that role.

Therefore, Plaintiff Organizations have plausibly alleged that Section 3 of the EO violates the doctrine of Separation of Powers, is ultra vires, violates principles of Federalism, and infringes upon their right to vote, as protected by the Fourteenth, Fifteenth, Nineteenth, and the Twenty-Sixth Amendments to the U.S. Constitution, as implemented for elections occurring prior to or on November 3, 2026. Defendants and Intervenor-Defendants' Motions [Doc. No. 124, Doc. No. 126] to dismiss Counts I–IV of Plaintiff Organizations' Complaint [Doc. No. 1] pursuant to Fed. Rule of Civ. P. 12(b)(6) are DENIED.

### C. Dismissal of the President

Defendants argue next that President Trump should be dismissed as a defendant from Counts I–IV because the court lacks jurisdiction to issue injunctive or declaratory relief as to the President in the performance of his official duties. See Defs.' Mem. 30–31 [Doc. No. 128], id. at 46–47 (first citing Mississippi v. Johnson, 71 U.S. 475 (1866); and then citing Franklin v. Massachusetts, 505 U.S. 788, 827 (1992) (Scalia, J., concurring)).

---

ballot mail from unenrolled individuals, see 39 U.S.C. §§ 3001–18, and USPS's obligation not to make "any undue or unreasonable discrimination among users of the mails," id. § 403(c).

[6] Defendant U.S. Postmaster General Steiner was recently asked "under what legal authority can the Postal Service regulate who and how people can vote by mail," and declined to substantively respond. See Hearing Before the Comm. on Homeland Sec. & Gov't'l Affairs, 119th Cong. at 40:25-42:01 (2026), https://www.hsgac.senate.gov/hearings/reforming-the-u-s-postal-services-broken-business-model/.

However, Presidential action is not inherently unreviewable. Franklin, 505 U.S. at 828 (Scalia, J., concurring) (citing Youngstown Sheet & Tube Co. v. Sawyer, 343 U.S. 579 (1952)); Nixon v. Fitzgerald, 457 U.S. 731, 753–54 (1982) ("separation-of-powers doctrine does not bar every exercise of jurisdiction over the President of the United States."). Rather, "the President is subject to judicial process in appropriate circumstances[,]" Clinton v. Jones, 520 U.S. 681, 703 (1997), and the Supreme Court has expressly rejected the notion of "an absolute, unqualified Presidential privilege of immunity from judicial process under all circumstances," id. at 704 (quoting United States v. Nixon, 418 U.S. 683, 706 (1974)).

Ultimately, Justice Scalia's Franklin concurrence does not ineludibly proscribe declaratory judgments against the President. See Kingdom v. Trump, No. 25-cv-691-RCL, 2025 WL 1568238, at *16 (D.D.C. June 3, 2025) (declining to dismiss declaratory judgment claim against President); Missouri v. Biden, 662 F. Supp. 3d 626, 682 (W.D. La. 2023) (same); Stone v. Trump, 400 F. Supp. 3d 317, 359 (D. Md. 2019) (same). Therefore, the court DENIES Defendants' Motion [Doc. No. 126] to dismiss the President.

### D. Statutory Claims

Defendants argue next that Plaintiff Organizations have failed to state a cause of action for their statutory claims for violations of the Voting Rights Act (Count V) and the Privacy Act and Administrative Procedure Act (Count VI). Defs.' Mem. 23–25 [Doc. No. 128].

#### 1. Voting Rights Act (Count V)

Plaintiffs assert that Section 3(b)(iii) of the EO violates Section 11(a) of the Voting Rights Act ("VRA"). Compl. ¶¶ 181–184 [Doc. No. 1]. Section 11(a) provides that "[n]o person acting under color of law shall fail or refuse to permit any person to vote who is entitled to vote under any provision of chapters 103 to 107 of this title or is otherwise qualified to vote[.]" 52

U.S.C. § 10307(a). In their memorandum in support of their motion to dismiss, Defendants assert that Plaintiff Organizations "fail to identify any applicable private right of action under [the VRA] and Defendants are aware of none." Defs.' Mem. 24 [Doc. No. 128].

In response, Plaintiff Organizations contend first that "issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived[,]" Pls.' Opp'n 26 [Doc. No. 139] (quoting United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990)). Plaintiffs argue further that "persuasive authority across multiple districts has found congressional intent to create an implied right of action for § 11(b) specifically within the statutory text, meeting the 'high bar' for implied causes of action" and that "[t]he same authority applies equally to Section 11(a)." Id. at 26-27 (quoting Krabach v. King Cnty., No. 2:22-cv-1252-BJR, 2023 WL 7018431, at *3 (W.D. Wash. Oct. 25, 2023) (collecting cases)). In reply, Defendants object that Plaintiffs have not offered any authority that Section 11(a) and Section 11(b) should be treated the same. Defs.' Reply 22 [Doc. No. 147].

The court finds the legal issue waived for purposes of this motion to dismiss where Defendants offer no substantive discussion. Zannino, 895 F.2d at 17. Moreover, a cursory review of the case law supports Plaintiff Organizations' claim of a private right of action.

Shortly after the VRA was enacted, the Supreme Court explained that the VRA "was drafted to make the guarantees of the Fifteenth Amendment finally a reality for all citizens[,]" and that "[t]he achievement of the Act's laudable goal could be severely hampered . . . if each citizen were required to depend solely on litigation instituted at the discretion of the Attorney General." Allen v. State Bd. of Elections, 393 U.S. 544, 556 (1969) (holding that private parties may enforce § 5 of the Voting Rights Act).

16

Later, in 1975, Congress made several amendments to the VRA relevant here. See Act of Aug. 6, 1975, Pub. L. No. 94-73, § 401, 89 Stat. 400, 404. First, in describing proceedings to enforce the right to vote, Congress expanded Section 3 to include "an aggrieved person" as able to institute a VRA proceeding, in addition to the Attorney General. 52 U.S.C. § 10302(a) ("Whenever the Attorney General or an aggrieved person institutes a proceeding under any statute to enforce the voting guarantees of the fourteenth or fifteenth amendment . . . the court shall authorize the appointment of Federal observers [if certain conditions are met.]") (emphasis added); see also id. § 10302(b) ("If in a proceeding instituted by the Attorney General or an aggrieved person under any statute to enforce the voting guarantees of the fourteenth or fifteenth amendment . . . the court finds that a test or device has been used for the purpose or with the effect of denying or abridging the right of any citizen of the United States to vote on account of race or color, or in contravention of the voting guarantees set forth in section 10303(f)(2) of this title, it shall suspend the use of tests and devices [as appropriate.]") (emphases added); id. § 10302(c) ("If in any proceeding instituted by the Attorney General or an aggrieved person under any statute to enforce the voting guarantees of the fourteenth or fifteenth amendment . . . the court finds that violations of the fourteenth or fifteenth amendment justifying equitable relief . . . , the court, in addition to such relief as it may grant, shall retain jurisdiction and for such period as it may deem appropriate . . . ") (emphases added).

Second, Congress amended the VRA to allow for reasonable attorney's fees and costs for the "prevailing party, other than the United States" in any proceeding to enforce the constitutional right to vote. 52 U.S.C. § 10310(e). In describing the function of the amendments, the Senate report explained that Congress "depend[ed] heavily upon private citizens to enforce the fundamental rights involved [in VRA litigation]" and that providing prevailing party fees was

17

a "necessary means of enabling private citizens to vindicate these Federal rights." S. Rep. 94-295, at 40 (1975).

Reviewing those amendments and other Congressional actions, the Supreme Court explained that:

> Congress has not only ratified <u>Allen</u>'s construction of § 5 in subsequent reenactments, <u>see</u> H.R. Rep. No. 91-397, p. 8 (1970), but extended its logic to other provisions of the [VRA]. Although § 2, like § 5, provides no right to sue on its face, "the existence of the private right of action under Section 2 . . . has been clearly intended by Congress since 1965." S. Rep. No. 97-417, at 30 (citing <u>Allen</u>); <u>see also</u> H.R. Rep. No. 97-227, p. 32 (1981). [The Court], in turn, ha[s] entertained cases brought by private litigants to enforce § 2. <u>See, e.g.</u>, <u>Chisom v. Roemer</u>, 501 U.S. 380 (1991); <u>Johnson v. De Grandy</u>, 512 U.S. 997 (1994). It would be anomalous, to say the least, to hold that both § 2 and § 5 are enforceable by private action but § 10 is not, when all lack the same express authorizing language.
>
> . . . Furthermore, when Congress reenacted and extended the life of the Voting Rights Act in 1975, it recognized that private rights of action were equally available under § 10. Section 3, for example, originally provided for special procedures in any action brought "under any statute to enforce the guarantees of the fifteenth amendment" by the Attorney General. <u>See</u> 79 Stat. 437. In 1975, Congress amended that section to cover actions brought by "the Attorney General <u>or an aggrieved person</u>." 42 U.S.C. § 1973a (1988 ed.) (emphasis added). The Senate Report explained that the purpose of the change was to provide the same remedies to private parties as had formerly been available to the Attorney General alone. <u>See</u> S. Rep. No. 94-295, pp. 39–40 (1975). Since § 10 is, by its terms, a statute designed for enforcement of the guarantees of the Fourteenth and Fifteenth Amendments, <u>see</u> 42 U.S.C. § 1973h(b) (1988 ed.), Congress must have intended it to provide private remedies.
>
> The same logic applies to § 14(e), added in 1975, which allows attorney fees to be granted to "the prevailing party, <u>other than the United States</u>," in any action "to enforce the voting guarantees of the fourteenth or fifteenth amendment." 42 U.S.C. § 1973l(e) (1988 ed.) (emphasis added). Obviously, a private litigant is not the United States, and the Attorney General does not collect attorney's fees. Both this section and § 3 thus recognize the existence of a private right of action under § 10.

<u>Morse v. Republican Party of Va.</u>, 517 U.S. 186, 232–234 (1996) (footnotes omitted).

The First Circuit, in turn, has consistently allowed private enforcement of claims under Section 2 of the VRA. <u>See, e.g.</u>, <u>Diffenderfer v. Gomez-Colon</u>, 587 F. 3d 445, 454 (1st Cir. 2009); <u>Metts v. Murphy</u>, 363 F.3d 8, 10–11 (1st Cir. 2009); <u>Vecinos De Barrio Uno v. City of</u>

18

Holyoke, 72 F.3d 973, 980 (1st Cir. 1995). Additionally, since the development of the Supreme

Court's "rights-creating language" test, Alexander v. Sandoval, 532 U.S. 275, 288–89 (2001),

many courts have explicitly determined that both Sections 2 and 11(b) contain an implied private

right of action. See, e.g., Miss. State Conf. NAACP v. State Bd. of Election Comm'rs, 739 F.

Supp. 3d 383, 411 (S.D. Miss. 2024); Coca v. City of Dodge City, 669 F. Supp. 3d 1131, 1140

(D. Kan. 2023); Krabach v. King Cnty., No. 2:22-cv-1252, 2023 WL 7018431, at *3 (W.D.

Wash. Oct. 25, 2023).

In light of the 1975 expansive amendments and legislative history, the First Circuit's

allowance of private enforcement of the VRA, and the Supreme Court's lack of contrary

instruction, the court sees no reason to interpret the language of Section 11(a) as excluding a

private right of action. See 52 U.S.C. §§ 10302(a), 10310(e); S. Rep. 94-295, at 40 (1975).[7] "[I]t

would be ambitious indeed for a [lower] court . . . to deny a private right of action in the light of

precedent and history." League of United Latin Am. Citizens v. Abbott, No. EP-21-CV-00259-

DCG-JES-JVB, 2021 WL 5762035, at *1 (W.D. Tex. Dec. 3, 2021) (three-judge court).

---

[7] Courts have also widely interpreted Section 11(b) of the VRA as containing an implied right of action. See Mich. Welfare Rts Org. v. Trump, 600 F. Supp. 3d 85, 105–106 (D.D.C. 2022); Nat'l Coal. on Black Civic Participation v. Wohl, 498 F. Supp. 3d 457, 476 (S.D.N.Y. 2020), reconsideration denied, 2020 WL 6365336 (S.D.N.Y. Oct. 29, 2020) ("Defendants contend that Section 11(b) affords no private right of action. That is incorrect. Consistent with Section 11(b)'s broad reach, both the government and private parties may sue to enforce Section 11(b).") (citation omitted); Rhodes v. Siver, 2021 WL 912393, at *1–2 (E.D. Mich. Mar. 10, 2021) (same); Mi Familia Vota v. Abbott, 497 F. Supp. 3d 195, 223 (W.D. Tex. 2020) ("Congress did not intend to foreclose private causes of action by also granting Attorney General enforcement authority.") (citation omitted) (emphasis in original); Council on Am.-Islamic Rels. Minn. v. Atlas Aegis, LLC, 497 F.Supp.3d 371, 378 (D. Minn. 2020) (assuming private right of action); League of United Latin Am. Citizens v. Pub. Int. Legal Found., 2018 WL 3848404, at *3 (E.D. Va. Aug. 13, 2018) (same). The court agrees with Plaintiff Organizations that this significant authority regarding Section 11(b) is persuasive as to the court's review of Section 11(a). See Pls.' Opp'n 26–27 [Doc. No. 139].

Defendants also assert on reply that the cause of action must be dismissed because the EO does not disenfranchise voters. Defs.' Reply 22–23 [Doc. No. 147]. But the EO directs USPS to prohibit transmission of certain ballots, thereby plausibly denying mail-in voters the ability to vote.

In sum, where Plaintiffs have an implied right of action to enforce the VRA and the EO plausibly denies mail-in voters the ability to vote, Defendants' Motion [Doc. No. 126] to dismiss Count V of Plaintiff Organizations' Complaint [Doc. No. 1] is DENIED.

### 2.    APA Claim – Privacy Act (Count VI)

Plaintiffs assert that Section 2 of the EO violates the APA because it is contrary to the Privacy Act. Compl. ¶¶ 185–205 [Doc. No. 1]. Defendants and Intervenor-Defendants argue that Plaintiff Organizations may not challenge the EO through the APA and that the Privacy Act establishes no private right of action. Defs.' Mem. 16–17 [Doc. No. 128]; Intervenors' Mem. 10–11 [Doc. No. 125].

Judicial review under the APA is available "only for 'final agency action.'" Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys., 603 U.S. 799, 808 (2024) (quoting 5 U.S.C. § 704). A plaintiff can only challenge an action that "mark[s] the consummation of the agency's decisionmaking process" and is "one by which rights or obligations have been determined, or from which legal consequences will flow." Bennett v. Spear, 520 U.S. 154, 177–78 (1997) (citations omitted). The APA is unavailable to challenge an executive order because "the President is not an agency within the meaning of" the APA, and the issuance of an executive order is not a final agency action. Franklin, 505 U.S. 788, 796 (1992).

The court reads Plaintiff Organizations' Complaint [Doc. No. 1] as a facial challenge to the EO. While the implementation of the EO's clear mandates may well violate both the APA

20

and the Privacy Act, Plaintiff Organizations have not alleged any final agency action in their Complaint [Doc. No. 1]. Therefore, the court GRANTS Defendants' Motion [Doc. No. 126] to dismiss Plaintiff Organizations' APA claim, asserting that Section 2 is contrary to the Privacy Act, and Count VI is DISMISSED without prejudice.[8]

### IV.    Conclusion

For the foregoing reasons, the court supplements its June 18, 2026 Memorandum and Order [Doc. No. 166] and orders further that, as to the elections occurring on or before November 3, 2026, Defendants' Motion to Dismiss [Doc. No. 126] and Intervenor-Defendants' Motion to Dismiss [Doc. No. 124] the Complaint [Doc. No. 1] pursuant to Federal Rule of Civil Procedure 12(b)(1), and to dismiss Plaintiffs' constitutional claims and Voting Rights Act claim as to Section 3 of the EO are DENIED. The court GRANTS Defendants' Motion to Dismiss [Doc. No. 126] and Intervenor-Defendants' Motion to Dismiss [Doc. No. 124] Count VI of Plaintiff Organization's Complaint [Doc. No. 1] pursuant to Federal Rule of Civil Procedure 12(b)(6) and DISMISSES Count VI without prejudice.

IT IS SO ORDERED.

July 22, 2026                                                          /s/ Indira Talwani
                                                                            United States District Judge

---

[8] Because Count VI is subject to dismissal based on the unavailability of the APA to challenge an executive order, the court declines to consider whether, as a threshold matter, an organization may bring an APA claim to obtain relief for an alleged Privacy Act violation, and, as to the merits, whether Plaintiff Organizations have plausibly alleged such a violation. See Pls.' Opp'n 27–30 [Doc. No. 139].