**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| LEAGUE OF WOMEN VOTERS OF MAS-SACHUSETTS, *et al.*,<br><br>    Plaintiffs,<br><br>    v.<br><br>DONALD J. TRUMP, in his official capacity as President of the United States, *et al.*,<br><br>    Defendants. | Case No. 1:26-cv-11549-IT |

**DEFENDANTS' OPPOSITION TO PLAINTIFFS'**
**RENEWED MOTION FOR PRELIMINARY INJUNCTION**

## TABLE OF CONTENTS

INTRODUCTION...................................................................................................................... 1

ARGUMENT.............................................................................................................................. 2

I.      PLAINTIFFS LACK ARTICLE III STANDING AND THUS ARE NOT LIKELY TO SUC-
        CEED ON THE MERITS. ......................................................................................... 3

II.     PLAINTIFFS' CLAIMS ARE NOT RIPE AND THUS THEY ARE NOT LIKELY TO SUC-
        CEED ON THE MERITS. ......................................................................................... 7

III.    REGARDLESS OF STANDING OR RIPENESS, PLAINTIFFS' CLAIMS LIKELY FAIL
        ON THE MERITS. ................................................................................................ 10

IV.     PLAINTIFFS HAVE NOT MET THEIR BURDEN TO DEMONSTRATE IRREPARABLE
        HARM. ............................................................................................................... 13

V.      THE PUBLIC INTEREST FACTORS TIP IN FAVOR OF FEDERAL DEFENDANTS. ................... 15

VI.     AT A MINIMUM, PLAINTIFFS' REQUESTED RELIEF IS OVERBROAD. ............................... 15

CONCLUSION ........................................................................................................................ 18

## TABLE OF AUTHORITIES

Page(s)

**Cases**

*Akebia Therapeutics, Inc. v. Azar,*
  976 F.3d 86 (1st Cir. 2020) ........................................................................................ 10

*Armstrong v. Exceptional Child Ctr., Inc.,*
  575 U.S. 320 (2015) .................................................................................................... 16

*Building & Constr. Trades Dep't, AFL-CIO v. Allbaugh,*
  295 F.3d 28  (D.C. Cir. 2002) ................................................................................... 8, 12

*Califano v. Yamasaki,*
  442 U.S. 682 (1979) .................................................................................................... 15

*California v. Trump,*
  No. 26-cv-11581 (D. Mass.), ECF No. 191 ............................................................. 6, 14
  Nos. 26-1774, 26-1779, 2026 WL 2144084 (1st Cir. July 25, 2026) ("First Circuit's Stay
  Opinion") ...................................................................................................................... 3
  No. 26A124 (U.S. July 27, 2026) ................................................................................. 3

*Capen v. Campbell,*
  134 F.4th 660 (1st Cir. 2025) ................................................................................... 2, 10

*Clapper v. Amnesty Int'l USA,*
  568 U.S. 398 (2013) ................................................................................................... 4, 7

*Corp. Techs., Inc. v. Harnett,*
  731 F.3d 6 (1st Cir. 2013) ............................................................................................. 2

*Ctr. for Democracy & Tech. v. Trump,*
  507 F. Supp. 3d 213 (D.D.C. 2020) .............................................................................. 4

*Ctr. for Democracy & Technology v. Biden,*
  No. 21-5062, 2021 WL 11659822 (D.C. Cir. Aug. 9, 2021) ........................................ 4

*Cty. & Cnty. of Denver v. N.Y. Trust Co.,*
  229 U.S. 123 (1913) .................................................................................................... 10

*Daumont-Colon v. Cooperativa de Ahorro y Credito de Caguas,*
  982 F.3d 20 (1st Cir. 2020) ........................................................................................... 3

*Defs. of Wildlife v. Perciasepe,*
  714 F.3d 1317 (D.C. Cir. 2013) ................................................................................. 4, 5

*DSCC v. Trump*,
No. 25-cv-1114, 2026 WL 1487833 (D.D.C. May 28, 2026) .................................................. 7

*Fayetteville Invs. v. Com. Builders, Inc.*,
936 F.2d 1462 (4th Cir. 1991) ................................................................................................ 3

*FDA v. Wages & White Lion Invs., LLC*,
604 U.S. 542 (2025) ............................................................................................................. 10

*Franklin v. Massachusetts*,
505 U.S. 788 (1992) ............................................................................................................. 17

*Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*,
561 U.S. 477 (2010) ............................................................................................................. 16

*Gill v. Whitford*,
585 U.S. 48 (2018) ............................................................................................................... 15

*Glob. Naps, Inc. v. Verizon New England, Inc.*,
489 F.3d 13 (1st Cir. 2007) .................................................................................................. 18

*González-Droz v. González-Colon*,
573 F.3d 75 (1st Cir. 2009) .................................................................................................. 15

*Grupo Mexicano de Desarrollo, S.A. v. All. Bond Fund, Inc.*,
527 U.S. 308 (1999) ............................................................................................................. 17

*Harris v. Adams*,
757 F. Supp. 3d 111 (D. Mass. 2024) .................................................................................. 13

*In re Murray Energy Corp.*,
788 F.3d 330 (D.C. Cir. 2015) ..................................................................................... 2, 4, 14

*J.G.G. v. Trump*,
No. 25-5067, 2025 WL 914682 (D.C. Cir. Mar. 26, 2025) .................................................. 17

*Kingdom v. Trump*,
No. 26-5181, 2026 WL 1905418 (D.C. Cir. June 17, 2026) ................................................ 15

*Los Angeles v. Lyons*,
461 U.S. 95 (1983) ................................................................................................................. 8

*Maryland v. King*,
567 U.S. 1301 (2012) ........................................................................................................... 15

*Matos ex. rel. Matos v. Clinton School Dist.*,
  367 F.3d 68 (1st Cir. 2004) ........................................................................................... 13

*Minnesota v. Mille Lacs Band of Chippewa Indians*,
  526 U.S. 172 (1999) ....................................................................................................... 16

*Mississippi v. Johnson*,
  71 U.S. 475 (1866) .......................................................................................................... 17

*Munaf v. Geren*,
  553 U.S. 674 (2008) ....................................................................................................... 10

*NAACP v. United States Postal Serv.*,
  No. 26-5257, 2026 U.S. App. LEXIS 21384 (D.C. Cir. July 17, 2026) ..................................... 2

*Nat'l Park Hosp. Ass'n v. Dep't of Interior*,
  538 U.S. 803 (2003) .......................................................................................................... 8

*Nat'l Treasury Emps. Union v. Nixon*,
  492 F.2d 587 (D.C. Cir. 1974) ....................................................................................... 17

*Nat'l Urb. League v. Trump*,
  783 F. Supp. 3d 61 (D.D.C. 2025) ..................................................................... 4, 11, 12, 13

*Nixon v. Fitzgerald*,
  457 U.S. 731 (1982) ....................................................................................................... 17

*Reno v. Catholic Soc. Servs., Inc.*,
  509 U.S. 43 (1993) ........................................................................................................ 7, 8

*Sierra Club v. Costle*,
  657 F.2d 298 (D.C. Cir. 1981) ....................................................................................... 12

*Seila Law LLC v. CFPB*,
  591 U.S. 197 (2020) ....................................................................................................... 15

*Summers v. Earth Island Inst.*,
  555 U.S. 488 (2009) ......................................................................................................... 5

*Swan v. Clinton*,
  100 F.3d 973 (D.C. Cir. 1996) ....................................................................................... 17

*Texas v. United States*,
  523 U.S. 296 (1998) ......................................................................................................... 8

*TransUnion LLC v. Ramirez*,
  594 U.S. 413 (2021) ................................................................................................... 4

*Trump v. Am. Fed'n of Gov't Emps.*,
  145 S. Ct. 2635 (2025) ............................................................................................. 11

*Trump v. New York*,
  592 U.S. 125 (2020) ........................................................................................ *passim*

*USPS v. Gregory*,
  534 U.S. 1 (2001) .................................................................................................... 10

*U.S. ex rel. McLennan v. Wilbur*,
  283 U.S. 414 (1931) ................................................................................................ 18

*Whitmore v. Arkansas*,
  495 U.S. 149 (1990) .................................................................................................. 4

*Wilbur v. U.S. ex rel. Kadrie*,
  281 U.S. 206 (1930) ................................................................................................ 18

*Winter v. Nat. Res. Def. Council, Inc.*,
  555 U.S. 7 (2008) ...................................................................................................... 2

**Constitution**

U.S. Const. art. II, § 1, cl. 1 ................................................................................... 11, 15

**Rules**

Federal Rule of Civil Procedure 54 ............................................................................. 3

Federal Rule of Civil Procedure 65 ........................................................................... 18

**Regulations**

*Ballot Mail for Federal Elections*,
  91 Fed. Reg. 32,915 (June 2, 2026) ("Proposed Rule") ................................. *passim*

Exec. Order No. 14,399, 91 Fed. Reg. 17,125 (Mar. 31, 2026) ............................. *passim*

**INTRODUCTION**

Plaintiffs' renewed motion for a preliminary injunction with respect to Section 3 (and only Section 3) of Executive Order 14,399 is premised on the mistaken understanding that they and their members are harmed by the President's Executive Order, rather than by the possible future implementation of that Order by the Postal Service. But the Executive Order before the Court does not alter anyone's right to vote, by mail or otherwise. On the core legal issues that govern this sort of pre-implementation challenge to a non-self-executing Executive Order—which, on its own, changes nothing about the rules of any election—Plaintiffs still have very little to say. And what little they do say fails to refute Defendants' core submission: that at least "[a]t present, this case is riddled with contingencies and speculation that impede judicial review." *Trump v. New York*, 592 U.S. 125, 131 (2020) (per curiam). That is even more obvious now that Plaintiffs have seemingly abandoned all efforts to obtain an immediate injunction with respect to Section 2 of the Executive Order (about citizenship lists) and instead narrow their request only to an injunction that would prevent the Postal Service from engaging in rulemaking.

Plaintiffs' real concern is not with the Executive Order itself—which does not require anyone outside the government to do (or refrain from doing) anything—nor even with the Postal Service's proposed rule (*see Ballot Mail for Federal Elections*, 91 Fed. Reg. 32,915 (June 2, 2026) ("Proposed Rule")), which has no legal force on its own. Instead, Plaintiffs fear possible harms that may arise depending upon what specific actions the Postal Service ultimately decides to take if and when it actually implements the President's directives in the form of a final rule—which (unlike a proposed rule) *would* have legal effect, and would be subject to judicial review in the normal course. And so, in dismissing many of plaintiffs' claims as premature, this Court reached the heart of the matter: "There are clearly many uncertainties as to how the agencies will ultimately implement the [Executive Order] including . . . what final rule, if any, will be adopted by the USPS," and "implementation of the [Executive Order] may well result in the evolving and dynamic process described by Defendants, in which Plaintiffs may participate in a comment period that

could result in their concerns being incorporated in agency decision making." Mem. & Order of June 18, 2026, ECF No. 166, at 10.

In any event, courts "do not have authority to review proposed agency rules," *In re Murray Energy Corp.*, 788 F.3d 330, 334 (D.C. Cir. 2015) (Kavanaugh, J.)—so judicial review of action by the Postal Service must await a *final* rule, if any. A unanimous D.C. Circuit panel recently came to the same conclusion in a related challenge to the same proposed rule at issue here, in granting a stay of a district-court injunction pending appeal. *See NAACP v. United States Postal Serv.*, No. 26-5257, 2026 U.S. App. LEXIS 21384, at *1 (D.C. Cir. July 17, 2026) ("Appellants have made a strong showing that they will likely succeed" on their argument that the "proposed rule is likely neither constitutionally nor prudentially ripe for review") (citations omitted). Under these circumstances, Article III requires the Court to "[l]et[] the Executive Branch's decisionmaking process run its course," *Trump v. New York*, 592 U.S. at 134—without prejudice to the possibility of judicial review later, if necessary, over any final agency action that causes Plaintiffs any actual or imminent injury.

## ARGUMENT

"A preliminary injunction is an 'extraordinary remedy never awarded as of right.'" *Capen v. Campbell*, 134 F.4th 660, 666 (1st Cir. 2025) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008)). "In determining whether to grant a preliminary injunction, the district court must consider: (i) the movant's likelihood of success on the merits of its claims; (ii) whether and to what extent the movant will suffer irreparable harm if the injunction is withheld; (iii) the balance of hardships as between the parties; and (iv) the effect, if any, that an injunction (or the withholding of one) may have on the public interest." *Capen*, 134 F.4th at 660 (quoting *Corp. Techs., Inc. v. Harnett*, 731 F.3d 6, 9 (1st Cir. 2013)). Plaintiffs lack standing and their claims are not ripe, thus they cannot meet their burden to establish likelihood of success on the merits. Plaintiffs also cannot establish any present or imminent harm, let alone irreparable harm. Finally, the public interest factors tip in favor of Federal Defendants. Accordingly, Plaintiffs cannot meet their burden in

- 2 -

satisfying the preliminary injunction elements, and this Court should deny their preliminary injunction motion.[1]

Plaintiffs' motion for preliminary injunction is specifically limited to "enjoin[ing] the USPS Defendants from implementing or giving effect to Section 3 of the Order." *See* Renewed Mot. for Preliminary Injunction, ECF No. 170, at 2. Further, Plaintiffs seek preliminary relief only as to Count I and Count II of their complaint. *See* Mem., ECF No. 171, at 1 ("Plaintiffs seek to preliminarily enjoin Section 3 of the Order, which violates the Constitution's separation of powers (Count I) and commands USPS to take unauthorized and unlawful action (Count II)"); Complaint, ECF No. 1 at 35 ("Count I: Separation of Powers"), at 40 ("Count II: Ultra Vires").

## I.    PLAINTIFFS LACK ARTICLE III STANDING AND THUS ARE NOT LIKELY TO SUCCEED ON THE MERITS.

To establish standing, a plaintiff must show (i) an injury in fact that is "concrete, particularized, and actual or imminent"; (ii) that was "likely caused by the defendant"; and (iii) that

---

[1] Defendants acknowledge that some of the arguments that follow have already been rejected by this Court in one or more of its previous opinions on this subject or by the First Circuit in *California v. Trump*, Nos. 26-1774, 26-1779, 2026 WL 2144084 (1st Cir. July 25, 2026) ("First Circuit's Stay Opinion"), and that all of the arguments that follow have already been the subject of extensive prior briefing and argument. Of course, this Court is not bound by its own prior, interlocutory orders in this case. *See Daumont-Colon v. Cooperativa de Ahorro y Credito de Caguas*, 982 F.3d 20, 26 (1st Cir. 2020) ("Especially because the Civil Rules authorize district courts to revise their own orders and decisions at any time before entering final judgment, *see* Fed. R. Civ. P. 54(b), such interlocutory rulings ordinarily 'do not constitute the law of the case'") (citations omitted); *Fayetteville Invs. v. Com. Builders, Inc.*, 936 F.2d 1462, 1469 (4th Cir. 1991) ("An interlocutory order is subject to reconsideration at any time prior to the entry of a final judgment."); Fed. R. Civ. P. 54(b) (any order that "does not end the action" "may be revised at any time before the entry" of final judgment). The First Circuit's stay opinion in *California* is also not controlling here, among other reasons, because the First Circuit itself suggested that its analysis might differ with respect to plaintiffs that are *not* States, like Plaintiffs here. *See* First Circuit's Stay Opinion, at n.7 (indicating that decisions in the D.C. Circuit and D.D.C. endorsing federal defendants' positions on standing and ripeness "have limited bearing here" because "only in this case are the plaintiffs the very states and state officials that the EO identifies and targets."). Defendants further note that they have filed a stay application with the Supreme Court. *See* Application for a Stay of the Injunction Issued by the United States District Court for the District of Massachusetts and Request for Administrative Stay, *California v. Trump*, No. 26A124 (U.S. July 27, 2026). In all events, Defendants preserve all of their arguments (including those that have already been rejected) for further review, if necessary.

"would likely be redressed by judicial relief." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021)); *see also Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013). The Supreme Court has "repeatedly reiterated that 'threatened injury must be *certainly impending* to constitute injury in fact,' and that '[a]llegations of *possible* future injury' are not sufficient." *Clapper*, 568 U.S. at 409 (alteration in original) (quoting *Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990)).

Executive Order 14,399, *Ensuring Citizenship Verification and Integrity in Federal Elections*, 91 Fed. Reg. 17,125 (Mar. 31, 2026) ("E.O." or "Executive Order" or "Order"), is an intra-Executive Branch directive—which, of its own force, does not change anything at all about elections in any State. It does not require anyone outside the government—and certainly not any of Plaintiffs—to do (or refrain from doing) anything at all. Generally, these sorts of "intra-governmental mandates" in an Executive Order "do not inflict on Plaintiffs an injury in fact." *Nat'l Urb. League v. Trump*, 783 F. Supp. 3d 61, 77 (D.D.C. 2025); *see also, e.g.*, *Ctr. for Democracy & Tech. v. Trump*, 507 F. Supp. 3d 213, 222 (D.D.C. 2020) (no standing to challenge an Executive Order that "does not apply to private parties," and instead "only sets a course of government processes into motion"), *vacated as moot sub nom. Ctr. for Democracy & Technology v. Biden*, No. 21-5062, 2021 WL 11659822 (D.C. Cir. Aug. 9, 2021). That is the case here.

Ultimately, Plaintiffs' real concern is not with the Executive Order itself—which does not dictate the contents of a final rule with legal effect, let alone require that a final rule issue (*see* Order § 3)—it is that agencies may *implement* the Order in a way that (unlike the Order itself) actually *does* affect Plaintiffs' interests in some concrete way (whether it be privacy interests, voting-related interests, or something else). But "Article III standing requires more than the possibility of potentially adverse regulation." *Defs. of Wildlife v. Perciasepe*, 714 F.3d 1317, 1324-25 (D.C. Cir. 2013). And so, at least at this time, any injury based on possible future agency actions implementing the Executive Order is far "too speculative for Article III purposes," *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013)—after all, as relevant to Plaintiffs' motion, it is undisputed that USPS has not issued any final rule implementing Section 3 of the Order. And "a proposed rule is just a proposal." *In re Murray Energy*, 788 F.3d at 334.

- 4 -

Even if Plaintiffs could show injury, the disconnect between Plaintiffs' challenge to Section 3 the Order and their possible future injuries (which would stem, if at all, from a final rule issued by the Postal Service) also gives rise to an independently fatal causation (or traceability) problem. In short, that is because "the source of any injury to the plaintiffs is the action that the [government] might take in the future to" implement the Executive Order—"not the policy itself 'in the abstract.'" *Trump v. New York*, 592 U.S. at 133-34 (quoting *Summers v. Earth Island Inst.*, 555 U.S. 488, 494 (2009)). That disconnect independently warrants a finding that Plaintiffs lack standing and hence are not likely to succeed on the merits in their motion for preliminary injunction.

In their brief, Plaintiffs argue they are entitled to both organizational and associational standing due to purported organizational harms and because their members "rely on mail voting because they have disabilities, live in rural places without transportation, or reside out of state for college and other reasons." *See* Mem., ECF No. 171, at 5-8. Of course, actual or imminent disenfranchisement would suffice for Article III standing. But this Executive Order, by itself, cannot and does not disenfranchise a single voter. Nor does the Postal Service's Proposed Rule, which has no legal effect as a proposed rule. *See Defenders of Wildlife v. Perciasepe*, 714 F.3d 1317 (D.C. Cir. 2013) (observing that "Article III standing requires more than the possibility of potentially adverse regulation" and that plaintiffs are not injured "by the initiation of a rulemaking").

Of course, what Plaintiffs really fear is that a future Postal Service final rule might have some practical effect on the ability of some individuals to vote by mail. But even if Plaintiffs are right about that—a question this Court cannot answer before it even knows what the final rule (if any) will look like—the standing questions raised by that sort of possible future rule would look very different. And the only action that is currently before the Court—that is, Plaintiffs' motion for a preliminary injunction as to Section 3 of the Executive Order itself—does not affect anyone's legal or practical ability to vote, by mail or otherwise. That remains dispositive of the standing questions in this case, at least at this time.

Even assuming, *arguendo*, that a final rule is issued which exactly mirrors the Proposed Rule, Plaintiffs would still be unable to establish standing. Plaintiffs assert that their "core business activities" including "educating voters and facilitating mail voting" would be harmed. *See* Mem., ECF No. 171, at 5. But even if a final rule is implemented by the Postal Service in time for the upcoming general election, such a rule would impact "Outbound Federal Ballot Mail," i.e., envelopes containing blank ballots sent from authorized state or local election officials to voters. *See* 91 Fed. Reg. at 32,917-18. Despite their numerous declarations, *see* ECF Nos. 172-1 through 172-6, Plaintiffs do not (and cannot) articulate how their "core business activities" in "educating voters and facilitating mail voting" are implicated by such a rule. *See* Mem., ECF No. 171 at 5. In other words, from the perspective of the voter receiving a mail-in or absentee ballot, the Proposed Rule (if finalized without modification) does not require *voters* to do anything differently in requesting a ballot so as to necessitate a change in voter educational materials. Nor do Plaintiffs articulate any role they have in facilitating mail voting that would be altered by a final rule. And although *States* and state election officials might have different standing arguments available in the event of a final rule that actually affected their use of the mail, no States (or state officials) are before the Court in the above-captioned matter. *See* 91 Fed. Reg. 32,918 at § 24.4.2 b (requiring state or local election officials to provide name, address, and barcode identifiers to enroll voters with the Postal Service "for inclusion on a state's Mail-In and Absentee Participation List"); at § 24.4.2 f (requiring state or local election officials to certify that mail-in or absentee ballots meet envelope design criteria required by §§ 24.3.1 and 24.3.2).

Plaintiffs' real concern is thus even more tenuous: That this Court's injunction in the *California* case is stayed or dissolved, that a final rule mirroring the Proposed Rule issues after the Postal Service's deliberations and consideration of comments to the Proposed Rule, that the Postal Service is able to overcome all logistical considerations and implements the final rule in time for the November 3, 2026 federal elections, that state and local election officials will *not* adhere to the technical requirements in the rule (e.g., fail to use the appropriate barcoded envelopes to send ballots or fail to provide to the Postal Service the barcode numbers, *see* 91 Fed. Reg. at 32,917-

18,) *and* will not provide some alternate means for a voter desiring to vote by mail to receive a ballot. But as another district court has recognized in holding premature functionally identical claims, "the Executive Order does not command Plaintiffs to do anything," "no agency has yet acted pursuant to the Order in a way that could harm Plaintiffs," and Plaintiffs thus "have not suffered any harm at present, much less harm that is certain, great, and imminent." *DSCC v. Trump*, No. 25-cv-1114, 2026 WL 1487833 at *13 (D.D.C. May 28, 2026) (quotation marks omitted).

Plaintiffs also assert that they have spent money and staff time to prepare for the possibility that agencies may implement the Executive Order in a way that causes them harm, *see* Mem., ECF No. 171, at 6, *but see Clapper*, 568 U.S. at 416. None of those theories as sufficient to establish standing. In short, Plaintiffs "cannot manufacture standing merely by inflicting harm on themselves based on their fears of hypothetical future harm that is not certainly impending." *Id.* That is so even if their "fear" could fairly be described as "nonparanoid" or "not fanciful, irrational, or clearly unreasonable." *Id.* Such "fear[s]," reasonable or not, do not support a case or controversy under Article III.

At bottom, Plaintiffs fail to establish a legal basis for standing. The Order, as an intra-Executive Branch directive, has no legal force as to Plaintiffs. The Order itself does not dictate the contents of any final rule, nor even require that a final rule issue. *See* Order § 3(b) (directing the initiating of a "proposed rulemaking" with certain minimum criteria); § 3(d) (stating that "[a]ny final rule" issue within 120 days of the Order but not requiring that a final rule issue). Similarly, the Proposed Rule carries no legal force and cannot be the basis of Plaintiffs' standing. Finally, Plaintiffs' attempts to manufacture standing by voluntarily expending resources to address hypothetical future harm also fails to confer them with standing.

## II. PLAINTIFFS' CLAIMS ARE NOT RIPE AND THUS THEY ARE NOT LIKELY TO SUCCEED ON THE MERITS.

"[R]ipeness doctrine is drawn both from Article III limitations on judicial power and from prudential reasons for refusing to exercise jurisdiction." *Reno v. Catholic Soc. Servs., Inc.*, 509

U.S. 43, 57 n.18 (1993). Ripeness "prevent[s] the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies," and shields "agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties.'" *Nat'l Park Hosp. Ass'n v. Dep't of Interior*, 538 U.S. 803, 807-08 (2003) (citation omitted). "A claim is not ripe for adjudication if it rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all." *Texas v. United States*, 523 U.S. 296, 300 (1998) (citation and quotation marks omitted).

This Executive Order is replete with explicit textual limitations to ensure that it is implemented in a way that is both "feasible" and "consistent with applicable law." Section 3(b)(iv) provides that the Postal Service's proposed rule should make clear that "[t]he preparation and transmission of each State-specific Mail-In and Absentee Participation List shall comply with the Privacy Act and all applicable use agreements." Section 7(b) provides that the Order, in its entirety, "shall be implemented consistent with applicable law."

Because of those limitations, "if an executive agency . . . may lawfully implement the Executive Order, then it must do so; if the agency is prohibited, by statute or other law, from implementing the Executive Order, then the Executive Order itself instructs the agency to follow the law." *Building & Constr. Trades Dep't, AFL-CIO v. Allbaugh*, 295 F.3d 28, 33 (D.C. Cir. 2002). In other words, the Order "is not self[-]executing." *Id.* Due to those genuine constraints of feasibility and legality, "[a]ny prediction how the Executive Branch might eventually implement this general statement of policy is 'no more than conjecture' at this time." *Trump v. New York*, 592 U.S. at 131 (quoting *Los Angeles v. Lyons*, 461 U.S. 95, 108 (1983)) (dismissing analogous pre-implementation challenge to a Presidential Memorandum on this basis). That is a ripeness problem.

Plaintiffs cannot demonstrate they suffer any particularized injury from ongoing policymaking deliberations within the Executive Branch. Instead, their concern is with possible "action that the [government] *might* take in the future." *Trump v. New York*, 592 U.S. 125, 133-34. Thus, this suit is indistinguishable from the suit the Supreme Court dismissed as premature in *Trump v.*

- 8 -

*New York*. There, President Trump issued a memorandum that "announced a policy of excluding from the apportionment base aliens who are not in a lawful immigration status'" for the 2020 decennial census. *Id.* at 129-30 (quotation marks omitted). That directive also called for "implementation to the maximum extent feasible and consistent with the discretion delegated to the executive branch." *Id.* The Supreme Court rejected a challenge brought prior to implementation of the memorandum, holding that the "standing and ripeness inquiries both lead to the conclusion that judicial resolution of this dispute is premature." *Id.* at 134. The Court acknowledged the memorandum outlined policy priorities, but concluded that because "the President qualified his directive by providing that the Secretary should gather information to the extent practicable and that aliens should be excluded to the extent feasible," "[a]ny prediction how the Executive Branch might eventually implement this general statement of policy [was] no more than conjecture at th[at] time." *Id.* at 131 (quotation marks omitted). For example, the Supreme Court explained that the President's "policy may not prove feasible to implement in any manner whatsoever, let alone in a manner substantially likely to harm any of the plaintiffs here." *Id.* at 132. Exactly the same is true here, including the important qualifications that any actions taken be "feasible and consistent with applicable law, including but not limited to the Privacy Act." *See* EO §§ 3(b)(iv), 7(b). Any resulting injury to Plaintiffs will depend on whether and how the policy directives are implemented subject to these qualifications.

Ultimately, whether considered as a problem of standing, ripeness, or both, the fatal flaw of Plaintiffs' motion—at least as currently constructed—remains the same. In short, at least "[a]t present, this case is riddled with contingencies and speculation that impede judicial review." *Trump*, 592 U.S. at 131. Accordingly, Plaintiffs cannot hope to succeed on the merits when they lack standing and their claims are not ripe, and therefore Plaintiffs' motion for a preliminary injunction should be denied.

### III.    REGARDLESS OF STANDING OR RIPENESS, PLAINTIFFS' CLAIMS LIKELY FAIL ON THE MERITS.

The Court should not reach the merits now, as Plaintiffs fail to satisfy numerous threshold requirements as set forth above. *See, supra*, Sections I & II. Even so, if the Court does attempt to consider Plaintiffs' likelihood of success on the merits in evaluating their preliminary-injunction motion—their arguments are meritless, overbroad, or (for the most part) based upon unsupported assumptions about the contours of possible future agency actions that do not yet exist (and might never exist in the form that Plaintiffs assume).

Most obviously, Plaintiffs' claims are likely to fail on the merits because this Court should never *reach* the merits, due to the multiple defects of jurisdiction and justiciability above. *See supra*, Sections I & 2. This Court need not go any further to deny Plaintiffs' motions. *See, e.g.*, *Munaf v. Geren*, 553 U.S. 674, 691 (2008) ("Review of a preliminary injunction 'is not confined to the act of granting the injunction, but extends as well to determining whether there is any insuperable objection, in point of jurisdiction or merits, to the maintenance of the bill, and, if so, to directing a final decree dismissing it.'") (quoting *Cty. & Cnty. of Denver v. N.Y. Trust Co.*, 229 U.S. 123, 136 (1913)). And if Plaintiffs are unlikely to succeed on the merits, this Court need not consider the remaining injunction factors. *Capen*, 134 F.4th at 660 ("If the movant fails to demonstrate a likelihood of success on the merits, the remaining elements are of little consequence.") (quoting *Akebia Therapeutics, Inc. v. Azar*, 976 F.3d 86, 92 (1st Cir. 2020)).

In any event, as a practical matter, it is not *possible* to litigate the merits of this case at this time, on this record, given that neither the Executive Order nor the Proposed Rule have any legal effect. Until and unless Postal Service deliberations conclude and culminate in the promulgation of a final rule, there is nothing for the parties to litigate, nor for the Court to enjoin or vacate.

Plaintiffs' merits arguments are further undermined by the well-settled principle that government agencies are "entitled to a presumption of regularity." *FDA v. Wages & White Lion Invs., LLC*, 604 U.S. 542, 577 (2025) (citation omitted); *see USPS v. Gregory*, 534 U.S. 1, 10 (2001) ("[A] presumption of regularity attaches to the actions of government agencies."). In the interim,

prior to promulgation of a final rule, Plaintiffs do not suffer harm (and cannot suffer imminent harm) from possible future agency action that is presumed to follow all applicable legal constraints—particularly where, as here, the President himself explicitly ordered agencies to consider those very legal constraints before acting. *See* Order § 7(b) ("This order shall be implemented consistent with applicable law."); *see also Trump v. Am. Fed'n of Gov't Emps.*, 145 S. Ct. 2635, 2635 (2025) (Sotomayor, J., concurring) (acknowledging that because the "the relevant Executive Order" in that case "directs agencies to plan reorganizations and reductions in force consistent with applicable law," the Court had "no occasion to consider whether they can and will be carried out consistent with the constraints of law" at that stage, prior to implementation of that Executive Order).

Under these circumstances, the Court cannot conclude that Plaintiffs are likely to succeed on the merits of any of their claims—after all, the factual and legal landscape for those claims has not yet been settled. That uncertainty is independently fatal to Plaintiffs' preliminary-injunction motion, as it is their burden to make a "clear showing" that they are likely to succeed on the merits—not Defendants' burden to disprove the opposite. *Nat'l Urb. League*, 783 F. Supp. 3d at 82 (citation omitted).

At a broader level, even if this Court were to somehow try and address the merits at this premature stage, these cases challenge an order from the President to his own subordinates—not a directive to Plaintiffs. Particularly with its caveat that the Order be "implemented consistent with applicable law", *see* Order § 7(b), the Order standing alone is not *ultra vires* and does not violate the separation of powers. And whatever may be said about possible future agency actions taken to *implement* the order, no final USPS rule is before the Court at this time. This Court should not accept Plaintiffs' invitation to opine on the legality of actions that do not yet exist.

The "executive Power shall be vested in a President of the United States of America." U.S. Const. art. II, § 1, cl. 1. Accordingly, "[t]he ordinary duties of officers prescribed by statute come under the general administrative control of the President by virtue of the general grant to him of the executive power, and he may properly supervise and guide their construction of the statutes

- 11 -

under which they act in order to secure that unitary and uniform execution of the law which Article II of the Constitution evidently contemplated in vesting general executive power in the President alone." *Sierra Club v. Costle*, 657 F.2d 298, 406 n.524 (D.C. Cir. 1981). "Those officers are duty-bound to give effect to the policies embodied in the President's direction, *to the extent allowed by the law*." *Bldg. & Const. Trades Dep't., AFL-CIO v. Allbaugh*, 295 F.3d 28, 32 (D.C. Cir. 2002) (emphasis added).

Executive Order 14,399 fits comfortably within this tradition, as "an exercise of the President's supervisory authority over the Executive Branch." *Id.* at 33. Like the Executive Order at issue in *Allbaugh*—which was likewise limited to implementation "[t]o the extent permitted by law"—Executive Order 14,399 is replete with limiting instructions to agencies (both about feasibility and legality). *See* E.O. § 2(a) ("To the extent feasible and consistent with applicable law, including but not limited to the Privacy Act of 1974"); § 4(c) ("consistent with applicable law, the Privacy Act, and all applicable use agreements"); § 5 ("shall take all lawful steps"); § 7(b) ("This order shall be implemented consistent with applicable law. . . ."). The effect of this language is that "if an executive agency . . . may lawfully implement the Executive Order, then it must do so; if the agency is prohibited, by statute or other law, from implementing the Executive Order, then the Executive Order itself instructs the agency to follow the law." *Allbaugh*, 295 F.3d at 33. In other words, the Order "is not self[-]executing." *Id.* Accordingly, "[t]he mere possibility that some agency might make a legally suspect" act does not justify an injunction against the Order itself. *Id.* Thus, Plaintiffs must either attack agency implementation of the Order—*i.e.*, a final rule promulgated by the Postal Service, if and when such a rule is issued—or instead advance a "facial challenge" showing that the Order "is without any valid application." *Id.*

Neither option works here. Plaintiffs cannot yet challenge implementation of Section 3 of the Order, for the simple reason that none of its provisions have yet been implemented via any final agency action. In any event, "Plaintiffs attack the executive order[] and ask for relief in ways confirming that their challenges are facial and not as-applied." *Nat'l Urb. League*, 783 F. Supp. 3d at 88. But Plaintiffs also cannot obtain an injunction against the Order itself, on its face—

- 12 -

because it is subject to lawful interpretation, given both the presumption of agency regularity and § 7(b) of the Order, which mandate implementation be "consistent with applicable law."  Order § 7(b).  Ultimately, even the *possibility* that the Order could be interpreted in a manner that is lawful is enough to defeat a facial challenge to the Order itself.  *See Nat'l Urb. League*, 783 F. Supp. 3d at 87-91.  And of course, if the Order is eventually implemented in a manner that Plaintiffs believe is both unlawful and injurious, they are free to seek injunctive relief at that time.  An injunction now, however, is both unnecessary and inappropriate.

At bottom, Plaintiffs advance a maximalist interpretation of the Order, assume—contrary to the presumption of regularity and the text of the Order itself—that it will be implemented in a manner that violates the law, and then seek the extraordinary remedy of a preliminary injunction based solely on imagined harms stemming from their own speculative and unsupported assumptions.  This Court need not and should not take that approach.

## IV. PLAINTIFFS HAVE NOT MET THEIR BURDEN TO DEMONSTRATE IRREPARABLE HARM.

Plaintiffs have failed to establish that a preliminary injunction is necessary to prevent imminent irreparable harm, which is enough to deny their motions. *See Matos ex. rel. Matos v. Clinton School Dist.*, 367 F.3d 68, 73 (1st Cir. 2004) ("We need not discuss three of these elements [likelihood of success, balance of hardships, and public interest]. In most cases—and this case is no exception—irreparable harm is a necessary threshold showing for awarding preliminary injunctive relief."). "A finding of irreparable harm must be grounded on something more than conjecture, surmise, or a party's unsubstantiated fears of what the future may have in store." *Harris v. Adams*, 757 F. Supp. 3d 111, 129 (D. Mass. 2024) (citations omitted). Plaintiffs have not demonstrated imminent irreparable harm here.

For largely the same reasons that Plaintiffs have failed to show any actual or imminent injury in fact (*see supra*, Sections I & II), *a fortiori* they have not shown that they will face imminent irreparable harm.

Again, neither the Order nor the Proposed Rule require Plaintiffs (or anyone outside of the Executive Branch) to do anything.  The Postal Service is charged with publishing a proposed rule.

- 13 -

Executive Order § 3.  But *Plaintiffs* need not do anything (or refrain from doing anything) under the Order or the Proposed Rule. Plaintiffs thus suffer no harm—let alone irreparable harm.

Plaintiffs' concerns about a future Postal Service final rule are just that—concerns—there can be no actual or imminent harm (irreparable or otherwise) from a *proposed* rule. As then-Judge Kavanaugh once put it, "a proposed rule is just a proposal." *In re Murray Energy*, 788 F.3d at 334. Plaintiffs are not harmed (nor subject to imminent harm) prior to the issuance of a final rule.  If Plaintiffs do eventually face any imminent or actual harm by the publication of a final rule, they can apply for injunctive relief at that time.

Moreover, this Court has already enjoined the Postal Service from issuing a final rule that would impact a group of twenty-three plaintiff states for federal elections on or before November 3, 2026 in consolidated litigation. *See California v. Trump*, No. 26-cv-11581 (D. Mass.), ECF No. 191.  The Postal Service has already asserted in that related litigation that "[i]t is not feasible for the Postal Service to implement a final rule with respect to states other than the Plaintiff States. Accordingly . . . the effect of the injunction, if not stayed, means it is likely that the Postal Service could not complete all of the tasks necessary to put a final rule in place, (if it in fact issues a final rule), prior to the November 3, 2026 election for *any state*." *Id.*, Monteith Decl., ECF No. 194-2, at ¶ 4 (emphasis added).  *See also id.* at ¶ 5 ("The Postal Service operates a nationwide network and provides nationwide guidance with respect to Election Mail. Operationally, it would not be possible for us to put a two-tiered system in place where one set of rules apply to the ballot mail of the Plaintiff States, and another applies to the remaining states. Doing so would cause operational confusion and significantly increase the complexity and efficiency of implementing any final rule. Thus . . . absent a stay, the Postal Service is likely to be unable to implement a final rule in time for the November election.").  So long as this Court's injunction remains in effect, Plaintiffs cannot carry their burden to demonstrate irreparable harm, because the Postal Service is hindered from issuing a final rule that could be implemented prior to the November 3, 2026 federal elections. *Cf.* Mem. & Order of July 13, 2026, ECF No. 167, at 2 ("Where the D.C. Injunction obviates Plaintiff Organizations' assertions of irreparable harm, the Court DENIES, without prejudice,

Plaintiff Organizations' Motion." (citing *González-Droz v. González-Colon*, 573 F.3d 75, 79 (1st Cir. 2009) ("irreparable harm constitutes a necessary threshold showing for an award of preliminary injunctive relief"))).

## V.    THE PUBLIC INTEREST FACTORS TIP IN FAVOR OF FEDERAL DEFENDANTS.

The balance of equities and public interest also disfavor injunctive relief. Ultimately, Plaintiffs request an injunction that would restrain the President from overseeing the Executive Branch. Such an order would harm the public interest, given the Framers' decision to vest all of "[t]he executive Power" in the President and entrust him with the sole constitutional responsibility to "take Care that the Laws be faithfully executed." U.S. Const. art. II, § 1, cl. 1; *id.* § 3; *Seila Law LLC v. CFPB*, 591 U.S. 197, 203 (2020); *cf. Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers) ("[A]ny time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury." (citation omitted)); *see also Kingdom v. Trump*, No. 26-5181, 2026 WL 1905418, at *2 (D.C. Cir. June 17, 2026) (per curiam) (the United States is always "irreparably harmed by an improper intrusion by a federal court into the workings of a coordinate branch of the Government.") (citation omitted).  On the other side of the balance, Plaintiffs' interest is slight. At least at this time, they merely seek to prevent hypothesized harm based on speculation about a series of future contingencies that have not yet come to pass and may never come to pass.

## VI.    AT A MINIMUM, PLAINTIFFS' REQUESTED RELIEF IS OVERBROAD.

Plaintiffs are not entitled to any preliminary relief. Regardless, Plaintiffs' requested relief is overbroad in several respects and subject to important equitable limitations.

### A.    Any equitable relief should be narrowly tailored.

It is a bedrock principle of equity that "injunctive relief should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs." *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979).  Accordingly, any equitable relief "must be 'limited to the inadequacy that produced [the] injury in fact.'" *Gill v. Whitford*, 585 U.S. 48, 66 (2018) (citation omitted).

- 15 -

So, to the extent that the Court determines that any particular feature of the Order likely violates the law, and causes particular Plaintiffs an Article III injury, any equitable relief should be limited to remedying that specific violation.

Any doubt on this point is resolved by the text of the Order itself, which provides expressly that "[i]f any provision of this order, or the application of any provision to any agency, person, or circumstance, is held to be invalid, the remainder of this order and the application of its provisions to any other agencies, persons, or circumstances shall not be affected thereby." Order § 6. This Court should respect that severability clause here, if necessary. *Cf. Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 508 (2010) ("Generally speaking, when confronting a constitutional flaw in a statute, we try to limit the solution to the problem, severing any problematic portions while leaving the remainder intact.") (quotations and citation omitted). Because "the unconstitutionality of a part of an Act does not necessarily defeat or affect the validity of its remaining provisions," the "normal rule" is "that partial, rather than facial, invalidation is the required course." *Id.* (quotations and citations omitted); *see also Minnesota v. Mille Lacs Band of Chippewa Indians*, 526 U.S. 172, 173 (1999) (assuming without deciding that "the severability standard for statutes . . . also applies to Executive Orders.").

### B.    The Court should not issue any injunction against the President.

Federal defendants construe Plaintiffs' renewed preliminary injunction motion as directed only towards Postal Service defendants and not the President. *See* Renewed Mot. for Preliminary Injunction, ECF No. 170, at 2 (Plaintiffs seek an order to enjoin "the *USPS Defendants* from implementing or giving effect to Section 3 of the Order.") (emphasis added). But if "USPS Defendants" also refers to the President, then even if some injunctive relief were appropriate here, it should not run against the President.

Although courts of equity may in some circumstances permit suits to "enjoin unconstitutional actions by . . . federal officers," *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 327 (2015), the availability of such relief depends on whether it "was traditionally accorded by

- 16 -

courts of equity," *Grupo Mexicano de Desarrollo, S.A. v. All. Bond Fund, Inc.*, 527 U.S. 308, 319 (1999).

There is no tradition of equitable relief against the President. *See J.G.G. v. Trump*, No. 25-5067, 2025 WL 914682, at *13 (D.C. Cir. Mar. 26, 2025) (per curiam) (Henderson, C.J., concurring) ("At common law, the Chancellor could not grant 'any relief against the king, or direct any act to be done by him.' This historic limitation carries forward to today and strips the federal courts of equitable 'jurisdiction . . . to enjoin the President in the performance of his official duties.'" (citations omitted)). To the contrary, federal courts have "no jurisdiction of a bill to enjoin the President in the performance of his official duties." *Mississippi v. Johnson*, 71 U.S. 475, 501 (1866). The Supreme Court reaffirmed that principle in *Franklin v. Massachusetts*, 505 U.S. 788, 800-01 (1992), in declining to construe the APA to supply a cause of action against the President "[o]ut of respect for the separation of powers and the unique constitutional position of the President." That tradition properly respects the President's "unique position in the constitutional scheme." *See Nixon v. Fitzgerald*, 457 U.S. 731, 748 n.27, 749-50 (1982) (declining to assume that implied damages "cause[s] of action run[] against the President of the United States"); *see also Franklin*, 505 U.S. at 827 (Scalia, J., concurring in part and concurring in the judgment).

In this case, similarly, the "reasons why courts should be hesitant to grant" injunctive "relief are painfully obvious" given the President's unique constitutional role and potential tension with the separation of powers. *Swan v. Clinton*, 100 F.3d 973, 978 (D.C. Cir. 1996). Although, for the reasons above, no relief at all is proper here, if the Court were to conclude otherwise, relief could only be directed at subordinate officials. *See id.*

The narrow exception potentially left open by *Mississippi* for injunctions seeking to direct the Executive to perform "ministerial" functions does not apply here. Left unresolved by that decision was "whether a court could compel the President to perform a ministerial act" (there, adjusting federal employee compensation under a statute). *Nat'l Treasury Emps. Union v. Nixon*, 492 F.2d 587, 607 (D.C. Cir. 1974). "A ministerial duty . . . is one in respect to which nothing is left to discretion." *Mississippi*, 71 U.S. at 498. Such a duty must be "so plainly prescribed as to

be free from doubt and equivalent to a positive command." *Wilbur v. U.S. ex rel. Kadrie*, 281 U.S. 206, 218 (1930); *see also U.S. ex rel. McLennan v. Wilbur*, 283 U.S. 414, 420 (1931). But the acts of the President here in issuing the Order are not "ministerial." Rather, the Order entails an exercise of the President's discretion in supervising and directing the Executive Branch, and an injunction invalidating that order would countermand that discretion—not direct the President to carry out a "ministerial" task.

### C.      The court should require Plaintiffs to post an injunction bond.

If the Court orders any injunctive relief, it should also order the relevant Plaintiffs to post security. Under Federal Rule of Civil Procedure 65(c), the Court may issue a preliminary injunctive relief "only if the movant gives security" for "costs and damages sustained" by Defendants if they are later found to "have been wrongfully enjoined." Accordingly, "[s]ince a preliminary injunction may be granted on a mere probability of success on the merits, generally the moving party must demonstrate confidence in his legal position by posting bond in an amount sufficient to protect his adversary from loss in the event that future proceedings prove that the injunction issued wrongfully. The bond, in effect, is the moving party's warranty that the law will uphold the issuance of the injunction." *Glob. Naps, Inc. v. Verizon New England, Inc.*, 489 F.3d 13, 21 (1st Cir. 2007) (citation omitted). So, in the event the Court issues preliminary relief, it should also require Plaintiffs to post an appropriate bond, commensurate with the scope of any such order.

### CONCLUSION

For these reasons, Plaintiffs' Renewed Motion for a Preliminary Injunction, ECF No. 170, should be denied.

- 18 -

Dated: July 27, 2026                    Respectfully submitted,

                                        BRETT A. SHUMATE
                                        Assistant Attorney General
                                        Civil Division

                                        ERIC J. HAMILTON
                                        Deputy Assistant Attorney General
                                        Civil Division

                                        JOSEPH E. BORSON
                                        Assistant Branch Director
                                        Federal Programs Branch

                                        /s/ *Esam Al-Shareffi*
                                        STEPHEN M. PEZZI
                                         Chief Litigation Counsel (FL Bar 1041279)
                                        ESAM K. AL-SHAREFFI
                                         Trial Attorney (D.C. Bar 90010174)
                                        U.S. Department of Justice
                                        Civil Division, Federal Programs Branch
                                        1100 L Street, NW
                                        Washington, DC 20530
                                        Telephone: (202) 598-7367
                                        E-mail: esam.k.al-shareffi@usdoj.gov