# EXHIBIT 1

# United States Court of Appeals
### FOR THE DISTRICT OF COLUMBIA CIRCUIT

---

**No. 26-5193**                         **September Term, 2025**
FILED ON: JULY 28, 2026

DSCC, ET AL.,
                    APPELLANTS

v.

DONALD J. TRUMP, IN HIS OFFICIAL CAPACITY AS PRESIDENT OF THE UNITED STATES, ET AL.,
                    APPELLEES

---

Appeal from the United States District Court
for the District of Columbia
(No. 1:26-cv-01114)

---

Before: MILLETT, WILKINS, and KATSAS, *Circuit Judges*.

### **J U D G M E N T**

This appeal was considered on the record from the United States District Court for the District of Columbia and on the briefs of the parties.  *See* FED. R. APP. P. 34(a)(2); D.C. CIR. R. 34(j).  The court has afforded the issues full consideration and has determined that they do not warrant a published opinion.  *See* D.C. CIR. R. 36(d).  For the reasons stated below, it is:

**ORDERED** and **ADJUDGED** that the order of the district court issued on May 28, 2026, denying appellants' motion for a preliminary injunction pursuant to Federal Rule of Civil Procedure 65(a) be **AFFIRMED**.

\*    \*    \*

On March 31, 2026, President Trump issued Executive Order No. 14,399, 91 Fed. Reg. 17,125 (April 3, 2026).  That Executive Order directs the Department of Homeland Security, the United States Postal Service, and other agencies to begin developing new rules and procedures for mail voting in the upcoming midterm and future elections.  The day after the Executive Order issued, and before any of those agencies acted, Plaintiffs—the national arms and leaders of the Democratic Party—sued in the U.S. District Court for the District of Columbia.[1]  A week later,

---

[1]  Plaintiffs are the Democratic Senatorial Campaign Committee, the Democratic Congressional

1

they moved for a preliminary injunction barring the Order's implementation.  The district court subsequently denied preliminary relief.

We affirm because, while Plaintiffs have identified a number of serious questions concerning the lawfulness of *proposed* actions *if* implemented on the threshold of the upcoming federal election, this case likely is unripe for review in its present posture.  *See Trump v. New York*, 141 S. Ct. 530, 535–537 (2020) (*per curiam*).  In particular, Plaintiffs' request for preliminary relief "is premised on the threatened impact" of the Executive Order *after* it is implemented and *if* in violation of federal law.  *Id.* at 535.  In addition, the Executive Order, which is not self-executing, directs the agencies to act only to "the extent feasible and consistent with applicable law, including but not limited to the Privacy Act of 1974," and so requires compliance with the very legal limitations about which Plaintiffs are concerned.  Exec. Order 14,399 § 2(a); *see also id.* §§ 3(b)(iv), 4(c), 7(b).

If the defendant agencies take steps to implement the Executive Order in a manner that violates federal law or the Constitution, Plaintiffs can promptly seek relief, which the district court and this court can decide in as expeditious a manner as circumstances require.

I

Two aspects of Executive Order 14,399 are relevant to this appeal.

First, Section 2(a) directs the Department of Homeland Security ("DHS") and the United States Citizenship and Immigration Services ("USCIS") to coordinate with the Social Security Administration, "[t]o the extent feasible and consistent with applicable law, including but not limited to the Privacy Act of 1974[,]" to take "appropriate action" to "compile and transmit to the chief election official of each State" a list of U.S. citizens "who will be above the age of 18 at the time of an upcoming Federal election and who maintain a residence in the subject State."  Exec. Order 14,399 § 2(a).  Those lists—dubbed "State Citizenship Lists"—are to be compiled from various federal databases.  *Id.*  Section 2(a) further directs DHS to "establish procedures" that would allow individuals to access and correct their records and allow States to "provide suggested modifications" to the lists.  *Id.* § 2(a)(i)–(ii).  Per the Order, DHS is to "establish the infrastructure necessary" to fulfill these directives "within 90 days" of the Order's issuance—that is, by June 29, 2026.[2]  *Id.* § 4(c).  The Social Security Administration is to assist that effort "consistent with applicable law, the Privacy Act, and all applicable use agreements."  *Id.*

Second, Section 3(b) of the Order directs the United States Postal Service to "initiate a proposed rulemaking" "within 60 days" of the Order's issuance—that is, by May 30, 2026—that

---

Campaign Committee, the Democratic National Committee, the Democratic Governors Association, Senate Minority Leader Charles E. Schumer, and House Minority Leader Hakeem S. Jeffries.

[2]  On June 8, 2026, DHS agreed to a USCIS request for "approval regarding a course of action" to implement Section 2(a).  *See* Mem. for the Sec'y, ECF No. 151-1, at 1.  At that time, USCIS represented that it "is on track to deliver the core technological infrastructure required" to do so "on or around June 30, 2026[.]"  *Id.*  No further details or updates have been filed with the district court or this court.  Plaintiffs have not renewed their request for injunctive relief in light of this development, which postdates the district court's decision in this case.

will set the terms on which the Postal Service will deliver mail ballots.  Exec. Order 14,399 § 3(b).  The Order then provides that the final rule "shall be issued no later than 120 days" from the Order's issuance—that is, by July 29, 2026.  *Id.* § 3(d).  Section 3(b) directs that the notice of proposed rulemaking contain "[p]roposed provisions" that would require States to conform their mail ballots to particular design criteria to qualify for mailing through the Postal Service.  *Id.* § 3(b)(i)(A)–(C).  Next, Section 3(b) directs that the notice of proposed rulemaking contain "[p]roposed provisions" for the creation of "a process" by which the Postal Service will require voters to "enroll[]" on a "Mail-In and Absentee Participation List[.]"  *Id.* § 3(b)(iv).  That otherwise undefined enrollment process is to "comply with the Privacy Act and all applicable use agreements."  *Id.*  Finally, Section 3(b) directs that the notice of proposed rulemaking contain "[p]roposed provisions" requiring that the Postal Service refuse to carry mail or absentee ballots "unless" the sender has "been enrolled" on the Mail-In and Absentee Participation List.  *Id.* § 3(b)(iii).[3]

All of the Order's directives "shall be implemented consistent with applicable law and subject to the availability of appropriations."  Exec. Order 14,399 § 7(b).

## II

The day after Executive Order 14,399 issued, Plaintiffs sued in the U.S. District Court for the District of Columbia.[4]  The following week, Plaintiffs moved to preliminarily enjoin DHS, USCIS, the Social Security Administration, the Postal Service, and the heads of those agencies from implementing Sections 2(a) and 3(b) of the Executive Order.[5]

Broadly, Plaintiffs press three challenges.  First, they argue that Sections 2(a) and 3(b) unconstitutionally usurp the States' and Congress's authority to regulate federal elections under the Elections Clause and are *ultra vires* of any authority over elections conferred on the Executive by statute.  *See* P.I. Mem., ECF No. 55, at 31–40.  Second, Plaintiffs contend that the State Citizenship Lists contemplated by Section 2(a) will violate the Privacy Act of 1974 and thus constitute final agency action contrary to law under the Administrative Procedure Act.  *Id.* at 42–51.  Third, they argue that actions described in the rulemaking contemplated by Section 3(b) are *ultra vires* of any authority conferred on the Postal Service by statute and conflict with the statutory scheme delineating the types of "nonmailable matter" that the Postal Service may not transmit, 39 U.S.C. §§ 3001–3018.  *See* P.I. Mem. at 40–42.[6]

---

[3]  After the district court's decision in this case, the Postal Service issued its Notice of Proposed Rulemaking as directed.  *See* Ballot Mail for Federal Elections, 91 Fed. Reg. 32,915 (June 2, 2026).  That Notice tracks the Executive Order's proposed provisions exactly.

[4]  The district court later consolidated this case with suits brought by two other groups of plaintiffs.  Those plaintiffs are not parties to this appeal.

[5]  Plaintiffs initially moved for both a preliminary injunction and a stay under the Administrative Procedure Act, 5 U.S.C. § 705.  *See* P.I. Mot., ECF No. 34, at 2.  But neither their subsequent briefing before the district court nor their briefs on appeal before this court request a stay under the APA.

[6]  While "proceedings concerning the mailability of matter" are subject to review under the Administrative Procedure Act, 39 U.S.C. § 3001(m), for purposes of the current preliminary injunction

The district court denied Plaintiffs' motion for a preliminary injunction. *DSCC v. Trump*, --- F. Supp. 3d ----, 2026 WL 1487833, at *2 (D.D.C. May 28, 2026).  In relevant part, the court concluded that it likely lacked jurisdiction over the dispute then before it because Plaintiffs' claims were not yet ripe. *Id.* at *11.[7]  The court issued its denial without prejudice to Plaintiffs' ability to "renew their motion[] if and when" the dispute ripened further. *Id.* at *1.

Plaintiffs timely appealed.  We have jurisdiction under 28 U.S.C. § 1292(a)(1).

Since appealing, Plaintiffs have informed this court of subsequent factual developments bearing on the ripeness of their claims. *See, e.g.*, Reply Br. 20–21 (describing "Defendants' actions following the district court's order").  We do not consider those developments because they are not part of the record before the district court or before us on appeal.  *See* FED. R. APP. P. 10(a); *see also Public Emps. for Env't Resp. v. Zeldin*, 174 F.4th 183, 191 (D.C. Cir. 2026).

### III

To secure a preliminary injunction, a movant must show, among other things, that it is likely to succeed on the merits. *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).  To do so, the movant must make a clear showing that the district court likely has jurisdiction. *Murthy v. Missouri*, 144 S. Ct. 1972, 1986 (2024).  On appeal from the denial of a preliminary injunction, we review *de novo* the district court's legal conclusions as to the likelihood of its jurisdiction. *Centro de Trabajadores Unidos v. Bessent*, 167 F.4th 1218, 1228 (D.C. Cir. 2026). We review the ultimate decision to deny a preliminary injunction for abuse of discretion. *Id.*

The ripeness doctrine imposes a threshold timing barrier to federal courts' subject-matter jurisdiction. *POET Biorefining, LLC v. EPA*, 970 F.3d 392, 403 (D.C. Cir. 2020).  "Part of the doctrine is subsumed into" the Article III standing requirements that an injury be "imminent" or "certainly impending." *American Petroleum Inst. v. EPA*, 683 F.3d 382, 386 (D.C. Cir. 2012) (quotation marks omitted).  Another "prudential" part of the doctrine inquires into "the fitness of the issues for judicial decision" and "the hardship to the parties" of delayed review. *National Park Hospitality Ass'n v. Department of Interior*, 538 U.S. 803, 808 (2003).  In both dimensions, the ripeness requirement constrains "when a federal court can or should decide a case." *American Petroleum*, 683 F.3d at 386.  That constraint prevents courts from "entangling themselves in abstract disagreements over administrative policies" by delaying review "until an administrative

---

motion, Plaintiffs disavowed pressing any APA challenge to Section 3(b), *see* P.I. Mem. at 40 n.8; P.I. Reply, ECF No. 122, at 13–14 & n.4.  The motion instead focuses on other aspects of the Postal Service's authority to which the APA does not apply.  P.I. Reply at 14 n.4 (citing 39 U.S.C. § 401(2)); *see* 39 U.S.C. §§ 410(a) (exempting the Postal Service from the APA "except as otherwise provided"), 3662(a) (providing an alternative review scheme for claims that "the Postal Service is not operating in conformance with the requirements" of Section 401(2)); *see also New York v. Trump*, --- F.4th ----, 2026 WL 2023744, at *3 (D.C. Cir. July 14, 2026) (enforcing that scheme).

[7] Despite that holding, the district court went on to discuss what could constitute a concrete injury and the underlying merits should the dispute hypothetically ripen further. *See, e.g.*, *DSCC*, 2026 WL 1487833, at *7, *11–12.  As ripeness provides a sufficient ground to affirm, we do not address or affirm the other aspects of the district court's decision.

decision has been formalized and its effects felt in a concrete way by the challenging parties." *Abbott Laboratories v. Gardner*, 387 U.S. 136, 148–149 (1967).

On the present record, the district court did not abuse its discretion in denying a preliminary injunction due to the unripeness of Plaintiffs' claims.

**A**

Plaintiffs challenge an Executive Order directing future action by various agencies to the extent feasible and permitted by law. The Supreme Court addressed a dispute in a similar posture in *Trump v. New York*, 141 S. Ct. 530 (2020) (*per curiam*). There, the President issued a memorandum announcing a policy of excluding certain non-citizens from the apportionment base for the decennial census. *Id.* at 534. The memorandum further ordered the Secretary of Commerce, "to the maximum extent feasible and consistent with the discretion delegated to the executive branch" by applicable law, to "provide information permitting the President, to the extent practicable, to exercise the President's discretion to carry out the policy." *Id.* A group of plaintiffs secured an injunction barring the Secretary from doing so on the ground that the contemplated exclusion would violate the Constitution's Enumerations Clause, as amended by the Fourteenth Amendment, and the statute implementing it. *See id.* at 533–534.

The Supreme Court vacated that injunction and directed the district court to dismiss the case as unripe. *Trump*, 141 S. Ct. at 536–537.

First, the Court reasoned that the plaintiffs' claimed injuries—lost seats in the House of Representatives and diminished federal funding—were the product of "action that the Secretary or President *might* take in the future to exclude unspecified individuals from the apportionment base[,]" rather than of the President's memorandum "itself in the abstract[.]" *Trump*, 141 S. Ct. at 536 (quotation marks omitted). At the time of the injunction, the Secretary had not delivered the report contemplated by the memorandum or otherwise "altered census operations in a concrete manner[,]" and the apportionment process "remain[ed] at a preliminary stage." *Id.* at 535–536.

Second, the Court stressed how the absence of implementing action by the relevant agencies hobbled judicial review. Because the injunction issued before the Secretary had taken any action to implement the memorandum, "the record [was] silent on which (and how many)" persons might be excluded from the apportionment base. *Trump*, 141 S. Ct. at 535. In addition, because the memorandum was rife with saving clauses directing only "feasible" action "consistent with" applicable law, "any prediction about future injury" flowing from the ultimate apportionment would be complicated by the "legal and practical constraints" the memorandum imposed. *Id.* at 534, 536. As a result, "letting the Executive Branch's decisionmaking process run its course" would "bring[] more manageable proportions to the scope of the parties' dispute." *Id.* (formatting modified).

Third, the Court observed that the memorandum itself would impose no concrete harm on the plaintiffs if review was delayed because the memorandum did "not require them to do anything or to refrain from doing anything" while the dispute ripened. *Trump*, 141 S. Ct. at 536 (quotation marks omitted).

**B**

Plaintiffs' current motion is in a similar position.

*First*, Plaintiffs claim four types of injuries that—like the injuries in *Trump v. New York*—flow not from Executive Order 14,399 itself, but entirely from predicted future actions contemplated by that Order.

Plaintiffs first assert that Section 2(a) injures their members' privacy interests. *See* Opening Br. 16–22. But any such injury will follow if and only if DHS makes the decision to compile the State Citizenship Lists in a manner that intrudes on the asserted privacy interests, not upon the issuance of Section 2(a) of the Executive Order itself. As the matter stood when the district court ruled, DHS had neither determined it would create those lists nor developed the infrastructure to do so. *See DSCC*, 2026 WL 1487833, at *7.

Next, Plaintiffs argue that Section 3(b) injures their members' voting rights. *See* Opening Br. 32–33. But again, the injury they identify—conditioning "transmission of a mail ballot on whether a voter appears on USPS's eligible list"—will occur if and only if the Postal Service enacts a rule imposing that condition. Opening Br. 33.

Plaintiffs' third and fourth theories of injury are that both Sections 2(a) and 3(b) injure their interests as political competitors in the rules governing the election process, Opening Br. 22–24, 30, and injure their organizational interests by forcing them to divert resources to respond to the changes those sections contemplate, Opening Br. 24–25, 30–32. But as articulated in this record, these claimed injuries, like the first two, are "premised on the threatened impact" of actions the Defendants "*might* take in the future" to implement Sections 2(a) and 3(b). *Trump*, 141 S. Ct. at 535–536.[8]

*Second*, the record before us—like the record in *Trump v. New York*—imposes "legal and practical constraints" that impede judicial review of Executive Order 14,399 at this early juncture. 141 S. Ct. at 536. For example, Plaintiffs argue that Section 2(a) violates the Privacy Act because it will require DHS to employ federal databases for purposes not contemplated by that statute. *See* Opening Br. 47–49. But the record before the district court is silent on which databases DHS might tap to compile State Citizenship Lists or whether DHS would even do so at all. *See DSCC*, 2026 WL 1487833, at *7. The same uncertainty attends Plaintiffs' early challenge to Section 3(b). *See* Opening Br. 44–46. The record before the district court offers no indication of what, if anything, the Postal Service will require before carrying mail ballots. The completed rulemaking process—not the "[p]roposed provisions" for a notice of proposed rulemaking—will determine that. *See* Exec. Order 14,399 § 3(b).

---

[8] Plaintiffs rely extensively on *Bost v. Illinois State Board of Elections*, 146 S. Ct. 513 (2026), for their arguments about political-competitor standing. But *Bost* held that candidates have a concrete and particularized interest in the "process" of elections sufficient on its own to challenge an extant election rule. *Id.* at 519–521. *Bost* did not address the ripeness of a challenge to as-yet-untaken agency actions in the absence of an alleged currently occurring injury to the candidate.

Complicating matters further, Executive Order 14,399 repeatedly directs that any action taken under it must be both "feasible" and "consistent with applicable law." Exec. Order 14,399 § 2(a); *see id.* §§ 3(b)(iv), 4(c), 7(b). As in *Trump v. New York*, those qualifiers would appear to have real bite in the unique circumstances of this case. The action the Order contemplates would involve the President, whom the Constitution vests with no express authority over the conduct of elections, undertaking a substantial and unfunded overhaul of election procedures—including the implementation of a nationwide reform to Postal Service mail-handling processes—on the threshold of the November election. Put differently, the Order "may not prove feasible to implement in any manner whatsoever," at least before the 2026 election to which Plaintiffs tie their claims of irreparable harm. *Trump*, 141 S. Ct. at 535.

*Third*, these Plaintiffs are not directly regulated by the Order, which functions as a directive to federal agencies. Nor are they the States charged with administering elections and adapting their procedures to the requirements contemplated by the Order. Nor do they assert injuries as electoral candidates whose individual campaigns currently are being adversely affected by the ordered instability and uncertainty of the field on which they are competing.[9] Plaintiffs argue instead that their organizations will be harmed by expending resources to counter not the Executive Order, but the ensuing agency actions that Order contemplates. So the record does not establish that the Order "itself" is inflicting "concrete harm" on these Plaintiffs before the agencies act. *Trump*, 141 S. Ct. at 536.

Plaintiffs object that, unless review occurs now, Defendants will later invoke *Purcell v. Gonzalez*, 549 U.S. 1 (2006) (*per curiam*), to argue that injunctive relief against any forthcoming agency action is foreclosed for being too proximate to the November 2026 election. *See* Opening Br. 10, 56. The "*Purcell* principle" counsels federal courts against entering injunctive relief on the eve of an election "when candidates, election officials, and voters have relied on the rules in place at that time." *Malliotakis v. Williams*, 146 S. Ct. 809, 811 (2026) (Alito, J., concurring in grant of stay). That principle vindicates, among other things, a federalism interest: "It is one thing for a State on its own to toy with its election laws close to a State's elections. But it is quite another thing for a federal court to swoop in and re-do a State's election laws in the period close to an election." *Merrill v. Milligan*, 142 S. Ct. 879, 881 (2022) (Kavanaugh, J., concurring in grant of stay); *see also id.* (describing "the State's extraordinarily strong interest in avoiding late, judicially imposed changes to its election laws and procedures").

---

[9] Only one Plaintiff, Minority Leader Jeffries, is a candidate in the upcoming election. *See* Declaration of Hakeem S. Jeffries, ECF No. 55-7, at ¶ 3. Leader Jeffries avers that anticipated future agency action to comply with the Order would "deprive [him] and [his] fellow candidates of a fair process" and inject "uncertainty" and "confusion" into the election cycle by working "fundamental changes to the process for voting by mail." *Id.* ¶¶ 7, 11. That type of harm, once felt, surely qualifies as a ripe Article III injury under *Bost*. *See* 146 S. Ct. at 520 ("Departures from preordained rules cause [candidates] particularized and concrete harm."). But the harms Leader Jeffries ties to the Order itself are different. *See* Jeffries Decl. ¶ 17 (expressing that the possibility of "disclosures from any federal database" is itself "deeply concerning to me"); *id.* ¶ 22 (describing intent to expend resources "providing information and assistance" in response to the Order); *id.* ¶ 23 ("The E.O. therefore significantly undermines my ability to effectively carry out my responsibilities as the Leader of the House Democratic Caucus.").

Plaintiffs' fear has the *Purcell* principle backwards. *If* the federal agencies were to take the actions the Plaintiffs fear and *if* they were to attempt to impose those massive changes on the States' voting systems on the threshold of the upcoming election, then those actions (*if* found unlawful) could be enjoined without implicating any federalism or reliance interests because the injunction would preserve the States' existing electoral status quo. Given the Executive Order's repeated commands for agency action to conform to the law, this court cannot assume that the agencies will impose such late-breaking disruption on the States' conduct of the 2026 elections.

## IV

The district court's judgment is affirmed.

Pursuant to D.C. Circuit Rule 36, this disposition will not be published. The Clerk is directed to withhold issuance of the mandate until seven days after resolution of any timely petition for rehearing or rehearing en banc. *See* FED. R. APP. P. 41(b); D.C. CIR. R. 41.

**Per Curiam**

**FOR THE COURT:**
Clifton B. Cislak, Clerk

BY:    /s/
       Daniel J. Reidy
       Deputy Clerk

.