UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| LEAGUE OF WOMEN VOTERS OF OF MASSACHUSETTS, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>DONALD J. TRUMP, in his official capacity as President of the United States, et al.,<br><br>Defendants,<br><br>and<br><br>STATE OF MISSOURI, et al.,<br><br>Intervenor-Defendants. | * * * * * * * * * * * * * * * * * * | Civil Action No. 1:26-cv-11549-IT |

MEMORANDUM & ORDER

August 11, 2026

TALWANI, D.J.

On March 31, 2026, President Trump issued Executive Order 14399: "Ensuring Citizenship Verification and Integrity in Federal Elections" (the "EO"), ordering, inter alia, the United States Postal Service ("USPS") to refuse to transmit mail-ballots either not compliant with new design and technology requirements and/or to individuals whose names do not appear on lists provided to the USPS. 91 Fed. Reg. 17125 (Mar. 31, 2026). Much litigation has ensued in response to this unprecedented directive. Throughout the multiple actions before district courts, courts of appeal, and the Supreme Court of the United States, the federal government has declined to defend the constitutionality of the EO's directives. Instead, the federal government has asked this court and others to postpone judicial review on standing and ripeness grounds,

1

arguing that no party may challenge the EO's constitutionality until the USPS promulgates a Final Rule.

As discussed in its prior decisions and expanded upon below, the court finds it prudent to review the EO now, where less than 90 days pend before the midterms and the millions of citizens who rely on mail voting require clarity as to how or whether they will vote in November. As to those elections occurring before or on November 3, 2026, the court preserves the current electoral status quo, GRANTS the Plaintiffs' Renewed Motion for a Preliminary Injunction [Doc. No. 170], and ENJOINS the USPS's implementation of Section 3 of the EO.

## I.   Background

### A.  Legal Background

#### 1.   The Post Office

After the American Revolution, both the Articles of Confederation and the Constitution explicitly empowered the federal government to provide and regulate postal services. ARTICLES OF CONFEDERATION of 1781, art. IX, para. 4; U.S. CONST., art. I, § 8. Since its establishment, the national postal service has been reorganized or restructured several times. See U.S. Postal Serv. v. Council of Greenburgh Civic Ass'ns, 453 U.S. 114, 120–126 (1981).

The Postal Reorganization Act of 1970 ("PRA"), 39 U.S.C. § 101 et seq., was directed in part toward reducing political influences on its operations. Postal Serv., 453 U.S. at 122–26. The PRA removed the postal service from the Cabinet to make it "an independent establishment of the executive branch of the Government of the United States[.]" 39 U.S.C. § 201. An eleven-member Board of Governors superintends the USPS. Id. § 202. With the advice and consent of the Senate, the President appoints nine governors and may only remove the governors for cause. Id. The nine then appoint the Postmaster General, who also serves as the chief executive officer

of the USPS. Id. §§ 202–03. The nine Governors and the Postmaster General appoint the Deputy Postmaster General. Id. § 202.

The PRA also established the Postal Rate Commission, now called the Postal Regulatory Commission ("PRC"). Id. § 3601 (repealed 2006). The USPS must submit any "change in the nature of postal services which will generally affect service on a nationwide or substantially nationwide basis" to the PRC for an advisory opinion. Id. U.S.C. § 3661. Upon receiving a proposal from the USPS, the PRC has 90 days to issue its advisory opinion. Id. § 3662. The PRC may, at its discretion, evaluate any "alternatives or related issues of significant importance" that may have been raised during the course of its proceedings. 39 C.F.R. § 3020.102.

The USPS has issued several non-binding pieces of subregulatory guidance regarding election mail. In that guidance, the USPS has recommended but not required both the use of the official "election mail logo" and the use of various forms of tracking technology (including Serialized Intelligent Mail barcodes and specific three-digit Service Type Identifiers) on all election mail. See USPS, Publication 631: Official Election Mail — Graphic Guidelines and Logos (Feb. 2026), https://about.usps.com/publications/pub631.pdf; see USPS, New IMb Political Mail Service Type IDs For Letters & Flats Effective July 7, 2020 (Apr. 17, 2020), https://postalpro.usps.com/IMb_PoliticalMail_SvcTypeIDs_July2020. Additionally, the USPS recommends that election officials consult with certain postal employees to ensure that election envelopes are compatible with automated sorting equipment. See USPS, 2026–2027 Official Election Mail Guide (Kit 600) (Feb. 2026), https://about.usps.com/kits/kit600.pdf.

In enacting the PRA, Congress delegated many express powers to the USPS, including eminent domain, promulgating postal regulations, entering international postal agreements subject to the supervision of the Secretary of State, contracting, acquiring property, and settling

3

claims. 39 U.S.C. §§ 401, 407. The PRA does not delegate to the USPS any specific authority regarding treatment of election mail. And under the PRA, the USPS retains the obligation to provide universal service to all parts of the country. Id. §§ 101, 403.

2.   Legal Background on Elections

The Constitution entrusts power over federal elections to "[S]tate legislatures 'primarily' and [to] Congress 'ultimately.'" Watson v. Republican Nat'l Comm., 609 U.S. __, 146 S.Ct. 2165, 2170 (June 29, 2026) (citing The Federalist No. 59, at 362 (Alexander Hamilton) (Clinton Rossiter ed., 1961)); see U.S. CONST. art. I, § 4, cl. 1. Under the Elections Clause, the States hold the "responsibility" of administering "the mechanics of congressional elections," Foster v. Love, 522 U.S. 67, 69 (1997), and Congress has "the power to override" States' regulations by establishing unform rules for federal elections. U.S. Term Limits, Inc. v. Thornton, 514 U.S. 779, 832–33 (1995).

A "consistent line of decisions" by the Supreme Court in cases involving attempts to deny or restrict the right of suffrage has made "indelibly clear" that "the Constitution of the United States protects the right of all qualified citizens to vote, in state as well as in federal elections." Reynolds v. Sims, 377 U.S. 533, 554 (1964) (citations omitted). Indeed, "[t]he right to vote freely for the candidate of one's choice is of the essence of a democratic society, and any restrictions on that right strike at the heart of representative government." Id. at 555.

Pursuant to its Elections Clause power, Congress has enacted several laws to support voting by mail and increase citizen participation in voting. In 1986, Congress enacted comprehensive voting-access requirements for U.S. citizen servicemembers and other U.S. citizens living abroad in the Uniformed and Overseas Citizens Absentee Voting Act

4

("UOCAVA"), which requires States to allow such citizens to register and vote absentee in federal elections. 52 U.S.C. § 20302(a)(1).

In 1993, Congress passed the National Voter Registration Act ("NVRA"), "the first significant federal regulation of voter registration enacted under the Elections Clause since Reconstruction." Arizona v. Inter Tribal Council of Ariz., Inc., 570 U.S. 1, 40 (2013) (Alito, J., dissenting). In passing the NVRA, Congress sought to "increase the number of eligible citizens who register to vote" and to help government officials "enhance[] the participation of eligible citizens as voters in [federal] elections." 52 U.S.C. § 20501(b)(1)–(2).

Through the NVRA, Congress requires States to allow citizens to register by mail or when applying for a driver's license, id. § 20503(a), and to attest to their citizenship through the use of a federal registration form, id. §§ 20505(a)(1), 20508(b)(2). Under the NVRA, States retain control over compiling rolls of citizens eligible to vote and maintaining those voter rolls. Id. § 20507(a)(4). To avoid potentially erroneous disenfranchisement, the NVRA also prohibits States from systematically removing ineligible individuals from voter rolls fewer than 90 days before a federal election. Id. § 20507(c)(2)(A).

In 2002, Congress enacted the Help America Vote Act ("HAVA") to ensure that States upgraded their voting infrastructure. See Pub. L. No. 107-252, 116 Stat. 1666. HAVA requires States to maintain accurate, centralized databases of registered voters. 52 U.S.C. § 21083(a). While HAVA requires States to use specific procedures to verify citizens' identities, id. § 21083(a)(5), Congress left the details regarding implementation of HAVA's requirements "to the discretion of the State," id. § 21085.

States have permitted absentee ballots and voting by mail since the Civil War. See Watson, 146 S.Ct. at 2175. The current State law landscape reflects significant variety. Eight

5

States and the District of Columbia allow all elections to be conducted entirely by mail. See Cal. Elec. Code § 3000.5; Colo. Rev. Stat. § 1-5-401; D.C. Code § 1–1001.05; Haw. Rev. Stat. § 11-101; Nev. Rev. Stat. § 293.269911; Or. Rev. Stat. § 254.465; Utah Code § 20A-3a-202; Vt. Stat. tit. 17, § 2537a; Wash. Rev. Code § 29A.40.010.

Two States permit counties to opt into conducting elections by mail and allow all eligible citizens to vote by mail. See Neb. Rev. Stat. §§ 32-908, 32-952-63; N.D. Cent. Code §§ 16.1-11.1-01, 16.1-07-01.

Twenty-seven States allow any citizen to request a mail ballot without asserting a need or "excuse" to vote by mail, often referred to as no-excuse absentee voting. See Alaska Stat. § 15.20.010; Ariz. Rev. Stat. § 16-541; Conn. Gen. Stat. § 9-135; Fla. Stat. § 101.62; Ga. Code § 21-2-380; Idaho Code § 34-1001; 10 Ill. Comp. Stat. § 5/19-1; Iowa Code § 53.1; Kan. Stat. § 25-1119(a); Me. Rev. Stat. tit. 21-A § 751; Md. Elec. Law § 9-304; Mass. Gen. Laws. ch. 54 § 25B; Mich. Comp. Laws § 168.759; Minn. Stat. § 203B.02; Mont. Code § 13-13-201; N.J. Rev. Stat. § 19:63-3; N.M. Stat. § 1-6-3; N.Y. Elec. Law § 8-700; N.C. Gen. Stat. § 163-226; Ohio Rev. Code § 3509.02; Okla. Stat. tit. 26, § 14-105; Or. Rev. Stat. § 254.465; 25 Pa. Stat. § 3150.11; R.I. Gen. Laws § 17-20-2; S.D. Codified Laws § 12-19-1; Va. Code § 24.2-700; Wis. Stat. § 6.86 (1)(ac); Wyo. Stat. § 22-9-102.

Thirteen States require that citizens provide a reason as to why they need to vote by mail, with different States deeming different "excuses" justifiable. See Ala. Code § 17-11-3; Ark. Code § 7-5-402; Del. Code tit. 15, § 5502; Ind. Code § 3-11-10-24; Ky. Rev. Stat. § 117.085(1)(a), § 117.077; La. Stat. § 18:1303; Miss. Code § 23-15-715; Mo. Rev. Stat. § 115.277; N.H. Rev. Stat. § 657:1; S.C. Code § 7-15-320; Tenn. Code § 2-6-201; Tex. Elec.

6

Code § 82.001 et seq.; W. Va. Code, § 3-3-1. In all States, absence, illness, and disability are permitted "excuses" for which a citizen may request a mail ballot.

The fifty States and the District of Columbia have different rules as to when citizens need to request mail ballots. For example, Florida citizens must apply for absentee status by October 22, 2026, for the midterms, Fla. Stat. § 101.62(3)(c), while Connecticut citizens may request their mail ballots the day before Election Day, or November 3, for this year's midterm election. Conn. Gen. Stat. § 9-140.

### B. The Undisputed Factual Record

Millions of U.S. citizens rely on mail voting each election. Stewart Supp. Decl. ¶ 22 [Doc. No. 172-1]. The Plaintiff Organizations[1] are all long-operating, nonpartisan, and nonprofit groups dedicated to voter education and increasing voter participation. All Organizations educate their members on and assist their members with absentee and mail-in voting. Compl. ¶¶ 22, 27–28, 30, 32, 34, 38 [Doc. No. 1].

For example, Plaintiff LWV runs an educational website, VOTE411.org, which provides voting resources, including substantial information on each State's specific absentee voting rules. Stewart Supp. Decl. ¶ 8 [Doc. No. 172-1].

"As a nonpartisan organization with a focus on Black and disenfranchised individuals and communities, [Plaintiff] Delta Sigma Theta's aim is to ensure that all voters have a full, meaningful, and non-burdensome access . . . to the ballot box." Washington Supp. Decl. ¶ 18 [Doc. No. 172-5]. In pursuit of that goal, Plaintiff Delta Sigma Theta has "organiz[ed] and

---

[1] Plaintiff Organizations are the League of Women Voters of Massachusetts ("LWVM"), League of Women Voters Lotte E. Scharfman Memorial Education Fund, League of Women Voters of the United States ("LWV"), League of Women Voters Education Fund, Association of Americans Resident Overseas, U.S. Vote Foundation, OCA-Asian Pacific American Advocates ("OCA"), and Delta Sigma Theta Sorority, Inc. ("Delta Sigma Theta").

facilitat[ed] voter registration drives; host[ed] voter education forums on local issues; develop[ed] and distribut[ed] 'Know Before You Go' voting literature that helps promote early voting dates, how to find [a citizen's] polling location and how to request an absentee or mail-ballot . . . ." Id. ¶ 21.

Plaintiff OCA serves the Asian American, Native Hawaiians, and Pacific Islanders community, which has a high limited English proficiency ("LEP") rate, and many States do not provide voting resources/instructions in OCA members' native languages. Nguyen Supp. Decl. ¶ 16 [Doc. No. 172-6]. OCA translates election materials for its members. Id. ¶ 17. In Texas, OCA-Greater Houston, "hands out in-language instructions on how to request a mail-in ballot." Id. ¶ 20. In Ohio, OCA-Greater Cleveland "prepar[es] written in-language voter guides and translations of election-related materials, including specifically those related for mail-in voting, such as social media graphics, e-mails, and paper flyers to be distributed at local businesses and left at residences." Id. ¶ 22.

Plaintiff Organizations have also demonstrated—and Defendants and Intervenor-Defendants do not dispute—that many of their members rely on and are limited to voting by mail. For example, LVW members in Arkansas "rely on absentee voting, particularly in rural areas where they live far from polling locations and lack access to public transportation." Stewart Supp. Decl. ¶ 27 [Doc. No. 172-1]. LVW members in Louisiana include a high population of elderly and disabled citizens. Id. ¶ 28. LVW members in North Dakota rely on mail voting, "including rural, elderly, and Indigenous voters." Id. ¶ 29. Many LVW members in Ohio "rely on mail voting, including seniors, people with disabilities, people who serve as poll workers on election day, and college students." Id. ¶ 31. Many Delta Sigma Theta members in Texas "rely on vote by mail, particularly those in rural communities (such as those outside the Dallas County

8

area, as one example), those with transportation issues, and homebound citizens." Washington Supp. Decl. ¶ 73 [Doc. No. 172-5].

Further, "mail voting is the primary method of voting in Utah. Most of [LVW members in Utah] rely on mail voting." Stewart Supp. Decl. ¶ 33 [Doc. No. 172-1]. OCA has chapters in States including Arizona, Florida, Missouri, Ohio, and Texas, and "[m]any OCA members rely on mail-in voting, especially LEP, youth, and elderly members, and members with disabilities because it allows them to vote with the autonomy and privacy that many of them would not have at the polling place due to a disability or language assistance needs." Nguyen Supp. Decl. ¶¶ 7, 12 [Doc. No. 172-6].

In sum, for the college student unable to return to their home state by election day, the individual with limited English proficiency, and for those unable to travel to the polls—due to age, disability, or rural residence—absentee and mail-in voting allows eligible citizens to vote. Stewart Supp. Decl. ¶ 11 [Doc. No. 172-1] ("LWV's members include registered voters who are eligible to vote by mail in their states, have voted by mail in the past, and plan to vote by mail in the future. This includes members who are older than 65, have health concerns or disabilities that make it difficult to vote in person, live overseas, and other reasons that require them to vote by mail."); Canavan Supp. Decl. ¶¶ 24–25, 47 [Doc. No. 172-2] ("LWVMA's roughly 3,000 members include a significant number of members who are registered to vote and rely on vote-by-mail. I am personally aware of almost 200 members who plan to vote by mail in the 2026 federal elections. And I am aware that many of these individuals were born before 1978. . . . This includes members who vote by mail because it would be difficult, if not impossible, to vote in-person, such as members with disabilities or who live overseas. This also includes members who rely on vote-by-mail because of how convenient it is."); Washington Supp. Decl. ¶ 64 [Doc. No.

9

172-5] ("Delta Sigma Theta members and members of their community . . . rely on mail voting due to being away from where they are registered to vote on Election Day because of school, work, military, or other obligations, physical disabilities, health issues, and mobility challenges, among other reasons like living in rural areas where transportation is limited and difficult to access."); Nguyen Supp. Decl. ¶ 16 [Doc. No. 172-6] ("Mail-in voting enables more LEP voters to complete their ballot because it allows them flexibility and a multitude of options in seeking assistance with translation when needed, including but not limited to having expanded time frames to obtain translations, ability to seek out more than one translator, and in certain cases, getting translations over the telephone. These options are especially necessary as many states do not provide translated ballots in languages spoken by our communities and members. Without mail/absentee ballots, LEP voters are limited to finding translators who are available at the polling location, requiring them to coordinate with assistors who may [have] limited availability and who may only assist one voter at a time, and often denying them an assistor of their choice."); Nguyen Supp. Decl. ¶ 32 [Doc. No. 172-6] ("OCA members who go away for college often rely on mail/absentee voting to vote at their permanent address. For example, Member A is an OCA youth member and qualified voter residing in Colorado who needs to vote by mail while at college in Massachusetts. Member B is an OCA youth member and qualified voter residing in Hawai'i who needs to vote by mail while at college in California.").

The record is devoid of any declarations or other proffered evidence to suggest that mail-in voting has resulted in voting by non-citizens.

### C.  The Executive Order

On March 31, 2026, President Trump issued the EO. 91 Fed. Reg. at 17125. The EO makes no reference to any noncitizens actually registering to vote or voting in Federal elections,

10

but nonetheless asserts that "[t]o enhance election integrity via the United States Mail, additional measures are necessary." Id.

Relevant here, Section 3 of the EO, titled "United States Postal Service Rulemaking on Mail-In and Absentee Ballots," directs the Postmaster General to "initiate a proposed rulemaking" within 60 days of the EO's issuance to "protect the integrity of the mail" in federal elections. Id. at 17126. The notice of proposed rulemaking "shall include, at minimum," various requirements for the design of envelopes used by state and local officials to enable voting by mail, including specific markings and unique barcodes for all such envelopes. Id. Section 3(b) requires further that the proposed rule provide that "all outbound ballot mail" sent by States and localities to voters "must be mailed" in such envelopes and that the USPS "shall not transmit mail-in or absentee ballots from any individual" voter unless the individual's name appears on a State-specific list, pursuant to a process specified by the rule. Id.

Section 3(d) directs that "[a]ny final rule" adopted pursuant to Section 3 "shall be issued no later than 120 days from the date of" the EO, i.e., by July 29, 2026. Id. at 17127.

### D.  Notice of Proposed Rulemaking

On June 2, 2026, the USPS issued a proposed rule to implement Section 3. See USPS Notice of Proposed Rulemaking, Ballot Mail for Federal Elections ("NPRM"), 91 Fed. Reg. 32915 (June 2, 2026). Despite a "Background" section and a section entitled "Legal Authority and Rationale," the NPRM includes no factual background to support the Executive Order's claims, citing instead only to the Executive Order itself and the USPS's "understand[ing]" that the proposed rule would "facilitate the faithful execution of federal law." Id.

The proposed rule requires the envelope-design standards listed in the EO. Id. at 32915–32916. To effectuate the compilation of the "Mail-In and Absentee Participation Lists," the

11

proposed rule provides a "process," Exec. Order 14339 § 3(b)(iv), for the USPS to establish a new online "Federal Ballot Mail Portal," which States must use to submit the names of all individuals receiving a mail or absentee ballot, along with a unique barcode for each such voter. NPRM, 91 Fed. Reg. at 32916. The proposed rule, consistent with the EO, commits the USPS to sending the States "a final State-Specific Mail-In and Absentee Participation List." Id. at 32916. Finally, the proposed rule describes a "verification procedure for compliance with" the envelope-design and voter-list requirements whereby the USPS would "confirm that a state submitted a list consistent with the conditions laid out in the proposed rule" and verify the barcodes on outbound ballots to ensure they are "destined to individuals on the list." Id. Ballot mail that does not comply with these requirements "will not be accepted and will be returned" to the State. Id. at 32918.

As discussed further below, despite the EO's directive to the Post Office to issue a rule by July 29, 2026, no final rule has been announced.

## II.    **Procedural History**

### A.  **Litigation Challenging the EO is Commenced in this District**

On April 2, 2026, Plaintiff Organizations initiated this litigation against President Trump, the agencies principally charged with implementing the EO, and those agencies' officers.[2] Compl. [Doc. No. 1]. On April 3, 2026, twenty-three States and the District of Columbia (the "State Plaintiffs") challenged the same EO, in a related case assigned to this session. See California v. Trump, No. 1:26-cv-11581 (D. Mass. Apr. 3, 2026). On May 1, 2026, the court

---

[2] In addition to President Trump, Plaintiff Organizations sued the U.S. Postal Service ("USPS"), Postmaster General, Deputy Postmaster General, Chairwoman and members of the USPS Board of Governors (collectively, the "USPS Defendants"), Department of Homeland Security and its Secretary; U.S. Citizenship and Immigration Services and its Director; and Social Security Administration and its Commissioner.

allowed permissive intervention by Alabama, Florida, Indiana, Kansas, Louisiana, Missouri, Montana, Nebraska, Oklahoma, South Carolina, South Dakota, and Texas (collectively, the "Intervenor-Defendants"), pursuant to Federal Rule of Civil Procedure 24(b). Elec. Order [Doc. No. 106].

### B.  The Consolidated Proceedings

The court consolidated the two cases pursuant to Federal Rule of Civil Procedure 42(a) for the limited purpose of a joint briefing and hearing schedule on certain anticipated motions. See Order [Doc. No. 57].

On May 7, 2026, Defendants and Intervenor-Defendants moved to dismiss Plaintiff Organizations' and the Plaintiff States' complaints. Intervenors' Mot. to Dismiss [Doc. No. 124]; Defs.' Mot. to Dismiss [Doc. No. 126].

On June 18, 2026, the court granted in part Defendants' and Intervenor-Defendants' motions and dismissed without prejudice pursuant to Federal Rule of Civil Procedure 12(b)(1) on prudential ripeness grounds Plaintiff Organizations' and Plaintiff States' claims regarding the EO and its implementation with regard to elections occurring after November 3, 2026. Mem. & Order [Doc. No. 190].[3] The court denied dismissal pursuant to Federal Rule of Civil Procedure 12(b)(1) on prudential ripeness grounds with regard to the November 3, 2026 election, and all earlier elections. Id. The court reserved on Defendants' and Intervenor-Defendants' further arguments. Id.

---

[3] In light of this dismissal, neither this court's injunction in State of California (discussed below) nor the injunction sought by Plaintiff Organizations bars the Defendants from adopting a proposed rule for elections after November 3, 2026, in all 50 States and the District of Columbia. If Defendants issued a rule for later elections only, judicial review could proceed in an orderly fashion rather than through requests for expedited review on the Supreme Court's emergency docket.

### C.  Further Proceedings in State of California

On June 25, 2026, the court denied the remainder of Defendants' and Intervenor-Defendants' motion to dismiss the Plaintiff States' complaint and granted summary judgment in favor of the plaintiff States. See California v. Trump, No. 1:26-cv-11581, 2026 WL 1826490 (D. Mass. June 25, 2026). The court's judgment enjoined implementation of Sections 2 and 3 of the EO, but only as to the twenty-three plaintiff States and D.C. and only with respect to elections occurring before or on November 3, 2026. Final Judgment, California v. Trump, No. 1:26-cv-11581 (D. Mass. July 7, 2026) [Doc. No. 207]. The court denied the federal defendants' and intervenor States' requests to stay the injunction pending appeal, except as to a seven-day administrative stay. See Mem. & Order, California v. Trump, No. 1:26-cv-11581 (D. Mass. July 7, 2026) [Doc. No. 208].

In the First Circuit, the federal defendants and intervenor States sought a stay pending appeal, arguing solely on the basis of standing and ripeness. See California v. Trump, __ F.4th __, 2026 WL 2144084 (1st Cir. July 25, 2026). The First Circuit denied the stay request, finding Article III standing where the EO threatened the Plaintiff States with criminal prosecution, pecuniary injury, and harm to their sovereign interests. Id. at *9–10. The First Circuit noted both that the federal defendants had declined to defend the legality of the EO and that "[t]he EO directs unprecedented levels of involvement by federal officials in how states administer elections." Id. at *10.

The federal defendants and intervenor States filed emergency applications for a stay with the Supreme Court of the United States. See Trump v. California, No. 26A124 (U.S. July 27, 2026); Alabama v. California, No. 26A139 (U.S. July 29, 2026). Before the Supreme Court, defendants and intervenor-States again declined to contest the merits of this court's final

14

judgment finding the EO unconstitutional. See Appl., Trump v. California, No. 26A124 (U.S. July 27, 2026); Appl., Alabama v. California, No. 26A139 (U.S. July 29, 2026).[4] The applications are pending.

### D.  Further Proceedings in the Action Before this Court

On July 13, 2026, the court denied without prejudice Plaintiff Organizations' first preliminary injunction motion, finding that another court's nationwide preliminary injunction of Section 3 of the EO obviated Plaintiff Organizations' alleged irreparable harm. Mem. & Order [Doc. No. 167].[5] On July 20, 2026, after that preliminary injunction was stayed,[6] Plaintiff Organizations renewed their preliminary injunction motion. Pls.' Mot. for Prelim. Inj. [Doc. No. 170].

On July 22, 2026, the court granted Defendants' and Intervenor-Defendants' motions to dismiss in part, dismissing Count VI of Plaintiff Organizations' complaint without prejudice, where Plaintiff Organizations had failed to allege any final agency action sufficient for a claim

---

[4] Federal defendants claim that this court's injunction in State of California makes implementing the EO infeasible as to the twenty-seven states where the injunction is not in place. See Reply, at 15–16, Trump v. California, No. 26A124 (U.S. Aug. 4, 2026). This inaction, without further explanation, undermines their "election integrity" concerns. See 91 Fed. Reg. at 17125.

[5] In NAACP v. USPS, a plaintiff advocacy organization moved to enforce the USPS's compliance with a settlement agreement arising from a lawsuit which had alleged claims under the Administrative Procedure Act related to the 2020 federal election. See No. 20-cv-2295, 2026 WL 1893762 (D.D.C. July 1, 2026), appeal pending, NAACP v. USPS, No. 26-5257 (D.C.C. July 9, 2026). The D.C. district court found that the proposed rule would violate the parties' settlement agreement. Id. at *4. At the time of this court's denial of the Plaintiff Organization's first motion for a preliminary injunction, the D.C. district court's order enjoining the USPS from implementing its proposed rule pursuant to Section 3 of the EO, see id. at *7, was in effect.

[6] In a one-paragraph order, the D.C. Circuit stayed the D.C. district court's order, determining that the appellants had made a strong showing that they would succeed in showing that their proposed rule is not ripe for review where no final rule had yet issued and that the EO likely would not violate the settlement agreement. See NAACP v. USPS, No. 26-5257, 2026 WL 2168004 (D.C. Cir. July 17, 2026). The court also found that the government would experience irreparable harm from an order that prohibited the USPS from promulgating a final rule. Id. The panel did not elaborate further as to its reasoning. See id.

under the Administrative Procedure Act. Mem. & Order [Doc. No. 175]. The court denied the remainder of the motions to dismiss, finding that Plaintiff Organizations had both organizational and associational standing to challenge the EO as to elections occurring on or before November 3, 2026, and that Plaintiffs had plausibly alleged constitutional claims and a claim under the Voting Rights Act. Id.

Defendants and Intervenors thereafter opposed the renewed motion for a preliminary injunction. Defs.' Opp'n [Doc. No. 176]; Intervenors' Opp'n [Doc. No. 177]. The court heard argument on the renewed motion on August 7, 2026.

### III.   **Standard of Review**

The issuance of a preliminary injunction before a trial on the merits can be held is an "extraordinary remedy" that shall enter only if a plaintiff makes a clear showing of entitlement to such relief. Winter v. Nat. Res. Def. Council, Inc., 555 U.S. 7, 22 (2008). The purpose of a preliminary injunction is "merely to preserve the relative positions of the parties until a trial on the merits can be held." Starbucks Corp. v. McKinney, 602 U.S. 339, 346 (2024) (quoting Univ. of Texas v. Camenisch, 451 U.S. 390, 395 (1981)). In evaluating a motion for a preliminary injunction, the court considers four factors:

> (1) the likelihood of success on the merits; (2) the potential for irreparable harm [to the movants] if the injunction is denied; (3) the balance of relevant impositions, i.e., the hardship to the nonmovant if enjoined as contrasted with the hardship to the movant if no injunction issues; and (4) the effect (if any) of the court's ruling on the public interest.

Esso Standard Oil Co. v. Monroig-Zayas, 445 F.3d 13, 17–18 (1st Cir. 2006) (quoting Bl(a)ck Tea Soc'y v. City of Boston, 378 F.3d 8, 11 (1st Cir. 2004)). The balancing of hardships and the analysis of the public interest merge when, as here, the government is the opposing party. Does 1–6 v. Mills, 16 F.4th 20, 37 (1st Cir. 2021) (citing Nken v. Holder, 556 U.S. 418, 435 (2009)).

16

## IV.    Discussion

Plaintiff Organizations seek a preliminary injunction on Counts I and II of their complaint against the USPS Defendants,[7] prohibiting them from implementing Section 3 of the EO, on the basis that the EO's directive violates the separation of powers and is ultra vires. Pls.' Mot. for Prelim. Inj., Ex. A (Proposed Order) [Doc. No. 170-1]. Defendants and Defendant-Intervenors argue again that Plaintiffs lack standing to assert their claims, that the claims remain unripe until the USPS issues a final rule, and that this court lacks jurisdiction to enjoin the President. Defs.' Opp'n [Doc. No. 176]; Intervenors' Opp'n [Doc. No. 177].

### A.  Likelihood of Success on the Merits

As explained by prior decisions of this court, Plaintiff Organizations are likely to succeed on the merits of Counts I and II of their complaint, claiming that Section 3 of the EO violates the separation of powers and is ultra vires. Compl. ¶¶ 120–155. [Doc. No. 1]; see Mem. & Order 12–14 [Doc. No. 175]; California v. Trump, __ F. Supp. 3d __, 2026 WL 1826490, at *15 (D. Mass. June 25, 2026), appeal docketed, No. 26-1779 (1st Cir. July 3, 2026); see also California v. Trump, __ F.4th __, 2026 WL 2144084, at *7 (1st Cir. July 25, 2026) (explaining that "state and local officials are assigned primary responsibility for administering federal elections under the Constitution, and the EO directs various changes to the voting-by-mail process for these elections . . . ." (citing U.S. CONST. art. I, § 4, cl. 1; art. II, § 1, cl. 2)).

#### 1.  Standing

Defendants and Intervenor-Defendants assert that Plaintiff Organizations' lack standing to assert their claims, and that the court, deprived of subject matter jurisdiction, is therefore

---

[7] Plaintiff Organizations do not seek injunctive relief applicable to the President. See Proposed Order [Doc. No. 170-1]. Accordingly, the court considers Defendants' argument regarding the unavailability of injunctive relief against the president moot.

unable to consider the merits. Defs.' Opp'n 3–7 [Doc. No. 176]; Intervenors' Opp'n 4–8 [Doc. No. 177]. However, the court has already found that Plaintiff Organizations have both organizational and associational standing because the EO has interfered with the Organizations' core business activities of supporting voter education, and the EO threatens Plaintiffs' members' ability to vote. See Mem. & Order 5–12 [Doc. No. 175]. Plaintiff Organizations' imminent injuries both to their educational work and their members' enfranchisement, directly flowing from the EO's clear directives and redressable by injunction, provide this court with subject matter jurisdiction. See id.; infra Part III.B (the court's following discussion of irreparable harm). Given the intertwined nature of injury-in-fact and irreparable harm in this case, see, e.g., Doe v. Trump, 157 F.4th 36, 78–80 (1st Cir. 2025), the court addresses Intervenor-Defendants' argument as to lack of standing further below with respect to the second preliminary injunction factor.

### 2. Prudential Ripeness

Defendants and Intervenor-Defendants challenge the ripeness of Plaintiff Organizations' claims. Defs.' Opp'n 7–9 [Doc. No. 176]; Intervenors' Opp'n 9–11 [Doc. No. 177]. As discussed by this court previously, Plaintiff Organizations' claims regarding implementation of the EO as to elections occurring before or on November 3, 2026, are prudentially ripe because of the EO's prescriptive language, the imminence of the EO's deadlines, and the onerous hardship to be borne by Plaintiff Organizations and their members if the court postpones judicial review. See Mem. & Order 7–16 [Doc. No. 166].

Defendants and Intervenor-Defendants argue that Plaintiff Organizations' claims will not be ripe at least until the USPS issues a final rule. Defs.' Opp'n 5–7 [Doc. No. 176]; Intervenors'

18

Opp'n 6 [Doc. No. 177].[8] But the Plaintiff Organizations do not seek to preliminarily enjoin a final rule pursuant to the Administrative Procedure Act.[9] Instead, Plaintiff Organizations bring a facial challenge to the constitutionality of Section 3 of the EO, text that—by directing the USPS to issue a rule—is currently causing confusion for Plaintiff Organizations' members who undisputedly have historically relied on mail-in voting and seek to vote by mail in the future. See Stewart Supp. Decl. ¶¶ 5, 23 [Doc. No. 172-1]; Washington Supp. Decl. ¶¶ 50, 64, 71 [Doc. No. 172-5]; Nguyen Supp. Decl. ¶¶ 13, 32, 44 [Doc. No. 172-6]. Additionally, the EO's directed timetable significantly impairs Plaintiff Organizations' voter education work where Plaintiffs have increasingly dwindling time to teach members how the EO will affect their ability to vote by mail before the November 3, 2026 elections. See Stewart Supp. Decl. ¶¶ 12, 20 [Doc. No. 172-1] ("It is much less useful and contrary to our mission to educate voters at the last minute or on Election Day. We must provide information well in advance of absentee voting request and ballot receipt deadlines, and each day that passes we lose opportunities to engage voters in the democratic process through mail voting."); Washington Supp. Decl. ¶¶ 69–70, 72 [Doc. No. 172-5]; Nguyen Supp. Decl. ¶¶ 17, 22, 24 [Doc. No. 172-6]. Therefore, the court finds that withholding a decision at this time would cause undue hardship to Plaintiff Organizations. Roman Catholic Bishop of Springfield v. City of Springfield, 724 F.3d 78, 90 (1st Cir. 2013) (quoting Mangual v. Rotger–Sabat, 317 F.3d 45, 59 (1st Cir. 2003)).

---

[8] Neither Defendants nor Intervenor-Defendants makes any argument that the EO could be implemented lawfully. See California, 2026 WL 1826490, at *11–12 (explaining that executive orders cannot be construed to destroy themselves through saving clauses).

[9] The absence of an APA challenge differentiates this case from NAACP v. USPS, where the court found an APA claim unripe. No. 26-5257, 2026 WL 2168004, at *1 (D.C. Cir. July 17, 2026)

Defendants point the court's attention to the D.C. Circuit's recent decision regarding the same EO. See DSCC v. Trump, No. 26-5193, 2026 WL 2168617 (July 28, 2026). There, in a *per curiam*, unpublished decision, the United States Court of Appeals for the District of Columbia Circuit found that a district court did not abuse its discretion, when it denied on May 28, 2026, a preliminary injunction sought by political candidates and other plaintiff organizations representing individual voters and political candidates, finding that the "case likely is unripe for review in its present posture." Id. at *1. The D.C. Circuit expressly declined to consider developments, such as the NPRM, occurring after the district court's May 28, 2026 decision. Id. at *3–4. However, unlike the record before that court of appeals, this court must consider the NPRM—published June 2, 2026—and the additional steps taken toward implementation by the USPS, such as sending the proposed rule to the Office of Information and Regulatory Affairs on July 27, 2026, for review prior to final publication. See OIRA, Conditions on the Preparation of Ballot Mail for Federal Elections, https://www.reginfo.gov/public/do/eoDetails?rrid=1485175 (last visited Aug. 11, 2026). Moreover, while there were still more than five months before the November 3, 2026, election when the D.C. district court denied a nationwide injunction, the midterms are now less than three months away.

In light of the NPRM's reiteration of the EO's directives, USPS's constraints under the logical outgrowth doctrine (which requires that a final rule must be a logical extension of the proposed rule), and the immediacy of the upcoming election, the record before the court reflects a case ripe for adjudication. See Nat. Res. Def. Council, Inc. v. EPA, 824 F.2d 1258, 1283 (1st Cir. 1987).

3.   Constitutionality of Section 3 of the EO

Defendants and Intervenor-Defendants' sole attempts to grapple with the actual merits of Plaintiff Organizations' constitutional challenge are their briefly presented unitary executive arguments. Defs.' Opp'n 11–13 [Doc. No. 176]; Intervenors' Opp'n 11–13 [Doc. No. 177]. However, contrary to Defendants and Intervenor-Defendants' characterization, Plaintiff Organizations do not challenge the President's ability to direct his subordinates generally, and the court need not answer the extraneous question of whether the President has authority to direct the USPS specifically. Instead, the court need only determine whether the EO is facially unconstitutional based on the substance of the text's directives.

The court has already answered and will again resolve the question clearly and affirmatively. See Mem. & Order 12–14 [Doc. No. 175]; California v. Trump, __ F. Supp. 3d __, 2026 WL 1826490, at *15 (D. Mass. June 25, 2026), appeal docketed, No. 26-1779 (1st Cir. July 3, 2026). The executive branch has no authority to regulate elections. U.S. CONST., art. I, § 4, cl. 1; id., art. II.

**B.  Irreparable Harm**

Defendants and Intervenor-Defendants argue that Plaintiff Organizations are unable to demonstrate irreparable harm because the USPS has not yet issued a final rule. Defs.' Opp'n 13– 15 [Doc. No. 176]; Intervenors' Opp'n 13 [Doc. No. 177]. They assert that Plaintiff Organizations' allegation of harm is too speculative because the USPS must publish a final rule and then implement the rule before disenfranchisement is imminent. Defs.' Opp'n 13–15 [Doc. No. 176]; Intervenors' Opp'n 13 [Doc. No. 177]. Additionally, Defendants contend that the USPS has been unable to publish a final rule because of this court's injunction in California v. Trump, No. 1:26-cv-11581, 2026 WL 1826490 (D. Mass. June 25, 2026), and the USPS's

21

inability to implement a rule only applicable to half of the States. Defs.' Opp'n 14 [Doc. No. 176]. The court finds that Plaintiff Organizations are currently suffering irreparable harm both as to themselves as organizations and as to their members.

       1.   Harm to Organizations

Plaintiff Organizations have demonstrated that (1) they are nonpartisan organizations, dedicated to increasing voter participation through education and assistance; (2) they engage in significant educational efforts and trainings leading up to federal elections; and (3) those activities are currently being disrupted by the EO. For example, visits to Plaintiff LWV's educational website, VOTE411.org, "increase[] dramatically in the months prior to the election." Stewart Supp. Decl. ¶ 20 [Doc. No. 172-1]. Plaintiff LWV is currently unable to update its website to educate voters on mail-in voting because of the confusion and uncertainty caused by the EO. Id.

Similarly, Plaintiff Delta Sigma Theta's "mail voting education and facilitation has been impeded by the [EO]." Washington Supp. Decl. ¶ 70 [Doc. No. 172-5]. The organization is "unable to provide updated information to members" living in States not covered by the California, No. 1:26-cv-11581 injunction because Delta Sigma Theta does "not know who is subject to which rules, or exactly what those rules are." Id. Specifically, Plaintiff Delta Sigma Theta chapters in Texas have prepared for and planned mail voting trainings to take place in September and October of 2026. Id. ¶ 72. The Texas chapters will have to revise their materials "at significant cost if the [EO] stands. They also will have to develop and execute additional volunteer trainings." Id.

For OCA, "[i]f the [EO] takes effect, [the organization] will have little to no time to create and translate state-specific materials that explain how to vote by mail and how to ensure a

voter is on the various lists mandated by the [EO] so that they are able to cast a mail/absentee ballot." Nguyen Supp. Decl. ¶ 26 [Doc. No. 172-6].

Intervenor-Defendants again contend that Plaintiff Organizations' expenditure of resources is insufficient for Article III injury. Intervenors' Opp'n at 7–8 [Doc. No. 177] (citing FDA v. All. for Hippocratic Med., 602 U.S. 367, 394 (2024). However, unlike the physicians in All. for Hippocratic Med., Plaintiff Organizations do not merely disagree with the EO. 602 U.S. at 390–93. Instead, Plaintiff Organizations' core missions to educate citizens and maximize electoral participation are irreparably harmed not only by the EO's unlawful directives, but, importantly by the timeframe imposed, i.e., the November 3, 2026 midterm elections.

### 2. Harm to Members

Additionally, Plaintiff Organizations have demonstrated—and Defendants and Intervenor-Defendants do not dispute—that many of their members rely on and are limited to voting by mail, including members who live in States not covered by the California, No. 1:26-cv-11581 injunction. Stewart Supp. Decl. ¶ 25 [Doc. No. 172-1] (LVW has members residing and eligible to vote in Intervenor States and Alaska, Arkansas, Georgia, Hawaii, Idaho, Iowa, Kentucky, Mississippi, New Hampshire, North Dakota, Ohio, Tennessee, Utah, and Wyoming); Washington Supp. Decl. ¶ 70 [Doc. No. 172-5] ("Delta Sigma Theta has active chapters in 22 [S]tates not covered by [the California, No. 1:26-cv-11581] injunction."); Nguyen Supp. Decl. ¶¶ 6–7 [Doc. No. 172-6] (OCA has chapters in 45 States, including Florida, Missouri, Ohio, and Texas).

Accordingly, Plaintiff Organizations' members need to vote by mail. These members have been deprived of their typical sources of assistance and support in navigating their States' widely varying requirements for mail-in voting. See supra Part I.A.2. Even if the USPS's final

23

rule is never published, the EO's directives have left Plaintiff Organizations' members without confidence as to whether they will or will not be permitted to participate in mail-in voting, while deadlines for requesting ballots are looming. The EO—even in the absence of a final rule—is thus causing irreparable harm to Plaintiff Organizations' members through the confusion it has engendered as to how they may vote in the fast-approaching midterm elections.

### C.  Balance of the Equities and the Public Interest

Defendants argue that the balance of the equities and public interest factors tip in their favor because an injunction would undermine the Constitution's clause mandating that the President take care that laws be faithfully executed and the clause vesting executive power in the executive branch. Defs.' Opp'n 15 [Doc. No. 176] (citing U.S. CONST., art. II, § 1, cl. 1; id., § 3). Similarly, Intervenor-Defendants argue that "the federal government has a strong interest in getting a chance to implement executive orders lawfully." Intervenors' Opp'n 14 [Doc. No. 177]. The sincerity of these arguments is belied by Defendants' choice to neither issue a Final Rule that applies only after the November 3, 2026 election, nor to issue a Final Rule that applies in the twenty-seven States that are not subject to the pending injunction in State of California.

With respect to the public interest, Defendants and Intervenor-Defendants have notably declined to argue that enjoining implementation of the EO will jeopardize the integrity of mail-in voting. The record is devoid of any evidentiary support of illegal or fraudulent absentee voting. See League of United Latin Am. Citizens v. Exec. Off. of the President, et. al., 780 F. Supp. 135, 211–12 (D.D.C. 2025) ("[A]lthough there is a strong public interest in preserving the integrity of the election process, the present record does not show that an injunction . . . would disserve that interest." (cleaned up)). This void sits starkly against Plaintiff Organizations' undisputed showing that its members rely on and are eligible to vote by mail.

24

Further, Defendants and Intervenor-Defendants have made little effort to defend the EO on its merits. Accordingly, the court lacks any support for the assertion that preliminarily enjoining the USPS from implementing Section 3 of the EO will harm the public. Indeed, if Section 3 is unlawful, as the court has determined, no harm will ensue from the issuance of injunctive relief. See Rhode Island v. Trump, 155 F.4th 35, 50 (1st Cir. 2025) (explaining that where "there is generally no public interest in the perpetuation of unlawful [government] action," the public interest does not favor a stay).

Finally, the court countenances the public's "strong interest in exercising the fundamental political right to vote [where eligible]." Purcell v. Gonzalez, 549 U.S. 1, 4 (2006) (citation modified); League of Women Voters of the United States v. Newby, 838 F.3d 1, 12 (D.C. Cir. 2016) (in the context of awarding injunctive relief, where plaintiffs demonstrate a "substantial risk" that, "absent an injunction, . . . citizens will be disenfranchised in the present federal election cycle[,] . . . [t]he public interest . . . favors permitting as many qualified voters to vote as possible[.]"). Where the EO is presently causing confusion and threatening both increasing chaos and an erosion of trust in our democracy, the court finds that enfranchisement heavily outweighs the executive's attempt to unconstitutionally insert itself into the domain of election regulation. That it is now less than 90 days before the November 3, 2026 midterm elections underscores the critical need for an injunction to prevent Defendants from changing election rules on the eve of the election.

**D. Bond**

Defendants request that Plaintiffs be required to post an injunction bond or any other security as a condition of obtaining the injunction described in this Memorandum or the accompanying Order. Defs.' Opp'n 18 [Doc. No. 176].

Federal Rule of Civil Procedure 65(c) provides in relevant part:

> The court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained.

The First Circuit has noted the "ample authority for the proposition that the provisions of Rule 65(c) are not mandatory and that a district court retains substantial discretion to dictate the terms of an injunction bond." Int'l Ass'n of Machinists & Aerospace Workers v. Eastern Airlines, Inc., 925 F.2d 6, 9 (1st Cir. 1991).

Here, Defendants make no showing of any costs and damages that they would sustain if they were wrongfully enjoined. See Liu v. Noem, 780 F. Supp. 3d 386, 405 (D.N.H. 2025) (waiving bond requirement where defendants requested that plaintiff post bond but did not "request a specific amount," "explain any costs they will incur by complying with the preliminary injunction," or describe "any damages they will have sustained" if the preliminary injunction was later found to be erroneous).

Accordingly, the court finds only a $100 nominal bond appropriate, which Plaintiffs shall deposit with the court no later than August 18, 2026.

## V.    Order

For the foregoing reasons, the court GRANTS Plaintiff Organizations' Renewed Motion for a Preliminary Injunction [Doc. No. 170].

The Defendants the United States Postal Service, the Board of Governors of the USPS, Amber F. McReynolds (in her official capacity as Chair of the Board of Governors of the USPS), Derek T. Kan (in his official capacity as Vice Chairman of the Board of Governors of the USPS), Ronald A. Stroman (in his official capacity as a Member of the Board of Governors of the USPS), Daniel M. Tangherlini (in his official capacity as a Member of the Board of Governors of

the USPS), Douglas A. Tulino (in his official capacity as United States Deputy Postmaster General), and David P. Steiner (in his official capacity as United States Postmaster General), including their officers, agents, servants, and employees, are preliminarily enjoined from implementing, giving effect to, or enforcing Section 3 of Executive Order No. 14399, with respect to the November 3, 2026 or any earlier federal election, including refusing to transmit mail-in or absentee ballots; or otherwise initiating or completing rulemaking to promulgate the specific regulations outlined in Section 3(b)(i)(v) or (d) of the EO for the November 3, 2026 or any earlier election. This injunction does not bar the federal government from providing non-binding USPS guidance on ballot mail envelopes.

Plaintiff Organizations shall post a nominal $100 bond with the court no later than August 18, 2026.

IT IS SO ORDERED.

August 11, 2026                                    /s/ Indira Talwani
                                                   United States District Judge

27