# EXHIBIT A

This document is scheduled to be published in the Federal Register on 2026-08-26 and available online at https://www.federalregister.gov/d/2026-17238, and on https://govinfo.gov

7710-12

**POSTAL SERVICE**

**39 CFR Part 111**

**Ballot Mail For Federal Elections**

**AGENCY:** Postal Service.

**ACTION:** Final rule.

**SUMMARY:** The Postal Service is amending the *Mailing Standards of the United States Postal Service*, Domestic Mail Manual, regarding the transmission of mail-in or absentee ballots for federal elections pursuant to its rulemaking authority.

**DATES:** Effective August 21, 2026.

**FOR FURTHER INFORMATION CONTACT:** Keith Weidner, (202) 268-2950 or Drew Mitchum, (202) 779-2766.

**SUPPLEMENTARY INFORMATION**:

## I. Background

On March 31, 2026, the President issued Executive Order 14399*, Ensuring Citizenship Verification and Integrity in Federal Elections*, 91 Fed. Reg. 17125 (2026) ("Executive Order" or "Order"). The Executive Order stresses the federal government's "unavoidable duty under Article II of the Constitution of the United States to enforce [f]ederal law, which includes preventing violations of [f]ederal criminal law and maintaining public confidence in election outcomes." *Id.* To these ends, the Order points out the need for additional measures concerning the use of the mail in order to facilitate enforcement of federal law, reduce the risk of fraud, and help protect the integrity of federal elections. *Id*. Following the issuance of the Order, the Postal Service engaged in an interagency review process through the Office of Management and Budget ("OMB"), and subsequently issued a proposed rule regarding the preparation of ballot mail for federal elections to facilitate the enforcement of federal law and to implement best

practices for Postal Service operations regarding ballot mail. *Ballot Mail for Federal Elections,* 91 Fed. Reg. 32915 (June 2, 2026).

Although exempt by 39 U.S.C. § 410(a) from the notice and comment requirements of the Administrative Procedure Act ("APA") (5 U.S.C. § 553) regarding proposed rulemaking, the Postal Service invited public comment on the proposed revisions to *Mailing Standards of the United States Postal Service*, Domestic Mail Manual ("DMM"), incorporated by reference in the Code of Federal Regulations, set forth in the proposed rule. The comment period closed on July 2, 2026.

To ensure the faithful execution of federal law in connection with federal elections, this rule has an immediate effective date. Delaying the effective date would jeopardize implementation of this rule in time for the 2026 general election, which will be held on November 3, 2026. Given injunctions currently in place in *State of California v. Trump*, No. 26-cv-11581 (D. Mass. June 25, 2026), and *League of Women Voters of Massachusetts v. Trump*, No. 26-cv-11549 (D. Mass. Aug. 11, 2026), the Postal Service will not take actions to implement the rule specifically for the 2026 election unless and until the government obtains relief from those injunctions. If the government obtains timely relief from the injunctions, implementation immediately thereafter will provide election officials as much time as possible before the next election to comply with the rule's preparation standards for Federal Ballot Mail envelopes, and to prepare to submit data to the Federal Ballot Mail Portal ("Portal"), before the mail-in and absentee ballots subject to this rule are mailed (which generally occurs in September or thereafter, as determined by state law). The Portal will become active (along with the verification process that relies on Portal data) at the time of the publication of the system of records ("SOR") governing the Portal. Publication of the SOR will occur on or after August 17, 2026 (pending the Postal Service's separate consideration of the comments on that SOR proposal).Finally, the terms "mail-in ballot" and "absentee ballot" are synonymous

and interchangeable for the purposes of this rule. These terms include any ballot sent through the U.S. Mail, irrespective of state law terminology.

## II. Overview of Comments

The Postal Service received more than 200,000 responses during the comment period. These comments consisted primarily of form letters that appeared to be drawn from templates; brief statements of general support for or opposition to the proposed rule; and individualized messages from concerned citizens. Additionally, organizational commenters individually and jointly submitted over 250 letters. This group of commenters included postal unions; federal, state, local, and tribal officials, including state attorneys general, governors, and members of Congress; election officials, including secretaries of state and county election administrators; voting rights organizations; and a range of other issue-based and political advocacy groups.

As discussed below, some opposition to the proposed rule reflected misunderstandings about how the rule will operate in practice; to these misunderstandings the Postal Service offers explanations in the "Operation of the Final Rule" section below.

### A. Comments in Support of the Rule

Supportive comments emphasized several themes. Some discussed voter fraud as a significant problem and lauded the proposed rule for helping to restore voters' confidence in election integrity. One letter, submitted by an Alabama-led coalition of thirteen state attorneys general, contended that the proposed rule would facilitate efforts to combat voter fraud while shoring up public confidence in ways that states could not achieve on their own initiative. That coalition further emphasized that states retain full control of ballots until they are transferred to the Postal Service, and that the proposed rule would help mitigate weaknesses in the chain of custody of Federal Ballot Mail.

Supporting commenters also appraised the proposed rule as enhancing election security by improving the visibility of Federal Ballot Mail in the mailstream; approved of the ballot envelope design standards it would normalize; emphasized the benefits of creating reconcilable data (through the state-specific Mail-In and Absentee Participation Lists (“Lists”)) that offers a neutral administrative check which strengthens confidence in elections; and predicted that the rule would reduce uncertainty as to whether ballots have reached their intended destination.

Supporting commenters further evaluated the actions that state and local election officials may need to take to comply with the proposed rule’s standards. The Alabama-led coalition of state attorneys general, for instance, acknowledged that the proposal would impose certain burdens but characterized them as “plainly justified by the security and accountability benefits of the proposed rule,” concluding that the rule “addresses real vulnerabilities inherent in mail-in voting, responds to legitimate and widespread public concerns about federal election integrity, and equips States with tools that strengthen their own oversight capabilities without displacing their authority.”

Finally, many supporting commenters affirmed the Postal Service’s statutory and constitutional authority to enact the rule. Some cited Article II, Section 3 of the U.S. Constitution (requiring the President to “take Care that the Laws be faithfully executed”) as legal grounds for the rule, while also endorsing the analysis of authorities set out in the Notice of Proposed Rulemaking. There, the Postal Service cited authority to regulate the mail as embodied in 39 U.S.C. §§ 401 and 404 and described the proposed regulations as setting forth “mailpiece preparation and data reporting standards that can provide information regarding the sending of ballots through the mail that would be available for use by law enforcement, and are consistent with title 39 of the U.S. Code.” The Postal Service addresses the legal authority to promulgate the final rule at greater length in the “Legal Authority” section below.

Finally, some commenters urged the Postal Service to adopt additional measures, including citizenship-verification requirements, as part of a final rule.

B. Comments in Opposition to the Rule

Comments received in opposition to the proposed rule generally urged the Postal Service to withdraw the rule or to delay its implementation until after the November 3, 2026, general election. Several commenters argued that the rule should be withdrawn in light of an injunction entered by the United States District Court for the District of Massachusetts (*California v. Trump*, 2026 WL 1826490 (D. Mass. June 25, 2026)) and a now-stayed injunction issued by the United States District Court for the District of Columbia, in litigation arising out of a 2021 settlement with the National Association for the Advancement of Colored People ("NAACP") in the United States District Court for the District of Columbia (*NAACP v. U.S. Postal Serv.*, 2026 WL 1893762 (D.D.C. July 1, 2026)).

Concerns raised by opposing commenters largely fell into three broad categories, each of which is addressed in greater detail below:

- The alleged legal deficiencies of the proposed rule;
- Concerns regarding the purported practical implementation challenges;
- Concerns about the proposed rule's alleged broader political and social impact.

With respect to legal objections, opposing commenters argued that the Postal Service lacks legal authority to adopt or implement the proposed rule. Commenters further argued that, even if the Postal Service possesses the requisite authority, adoption of the proposed rule would be arbitrary and capricious. These legal objections are addressed at length in the "Legal Authority" and "Impact of the Final Rule" sections below.

With respect to the substance of the proposed rule, opposing commenters frequently focused on the Portal, the acceptance (or verification) provisions, and the fact that the

Postal Service would refuse to accept certain ballots for federal elections that states tender without satisfying the data-entry obligations that the rule would impose. Although these provisions were uniformly opposed by commenters not otherwise supportive of the rule, some expressed greater openness to the envelope-design requirements, asserting that such requirements would fall more squarely within the Postal Service's sphere of authority. Thus, in the opinion of some commenters, the envelope design provisions for Outbound and Return Federal Ballot Mail in DMM 705.24.3 could be retained while the verification, Portal, and optional notice provisions should be removed. In a similar vein, at least one commenter signaled conditional support for the proposed rule so long as all mandatory provisions were made voluntary. Comments raising specific implementation concerns—arising from asserted costs and burdens associated with implementation before the 2026 general election, as well as those costs and burdens that would purportedly be incurred on an ongoing basis; the potential risk of administrative or data errors leading to ballot rejection; and the Postal Service's perceived lack of readiness—are addressed at length in the sections below.

A number of commenters urged the Postal Service to publish a system of records notice ("SORN") under the Privacy Act and raised questions addressable through the SORN, including whether personally identifiable information will be collected and stored, how long such information will be retained, which entities and personnel will have access to it, whether it will be shared with other federal entities or contractors, what cybersecurity safeguards will be implemented, and what remedies will be available in the event of improper disclosure. The Postal Service published a SORN on July 17, 2026. 91 Fed. Reg. 44880. The public was invited to submit comments relevant to the SORN and related Privacy Act considerations in that proceeding.

C. Comments Outside the Scope of This Rulemaking

The Postal Service also received a significant number of comments that fall outside the scope of this proceeding.

First, many commenters described voting by mail as an effective means of exercising their franchise due to their individual circumstances. Other commenters, by contrast, criticized mail-in voting as a general practice and urged the Postal Service to cease delivering ballot mail altogether. The Postal Service takes no position on whether, or the extent to which, states should utilize the mail as part of the administration of their elections. Indeed, the Postal Service does not advocate for or against voting by mail. Instead, the Postal Service collects, processes, transports, and delivers mail and packages, and remains fully committed to transporting all types of mail, including Federal Ballot Mail that conforms with the Postal Service's mail preparation, data reporting, acceptance, and entry standards. As discussed further below, under the proposed rule, and as retained in the final rule, the states retain full authority to decide whether to utilize the U.S. Mail as part of their electoral systems, and to determine who should be eligible to vote by mail.

Second, comments that comprehensively address state and local election administration or the Postal Service's election mail procedures fall outside the scope of this proceeding. By way of example, one commenter raised concerns regarding the accuracy of voter registration rolls, recounted their experience of observing purported irregularities during the 2020 election cycle, and urged the Postal Service to undertake a comprehensive review of all mail-in ballot procedures. Comments in this vein, which concern the entire system of election mail administration, rather than the DMM provisions set forth in the Notice of Proposed Rulemaking, will not be addressed below.

Third, numerous comments raised concerns influenced by partisan political speculation. This included conjecture about the underlying intent of the Order and the impact it may have on voter turnout or election outcomes. Such remarks are speculative

and exceed the scope of this proceeding. In any event, as explained further below, this rule does not—nor is it intended to—facilitate any form of voter suppression, affect election outcomes, or target particular demographics, districts, or states.

Fourth, a number of comments raised issues that fall outside both the scope of this proceeding and the Postal Service's authority generally, extending the rule's logic beyond election mail and/or invoking executive branch entities not involved in Postal Service operations. Some, for example, proposed that ballots be accepted only if they arrive by election day; demanded that mail-in voting be discontinued; urged Congress to enact the Safeguard American Voter Eligibility (SAVE) Act; and weighed in on sections of Executive Order 14399 that do not concern the Postal Service. Comments addressing election deadlines, the policy of mail-in voting, other election administration changes, pending legislation, and other entities' law enforcement priorities are not relevant to this proceeding.

Fifth, some commenters raised broad issues of service performance and operational decision-making. Such issues include which facilities process particular mail classes; postmarking practices; service performance complaints; the scope of Postal Police Officers' authority; operational changes or service commitments for ballots mailed to and from military and overseas voters; and collateral consequences to the Postal Service's brand reputation or revenue if a final rule is issued. Such comments are beyond the scope of this proceeding and will not be addressed below.

Sixth, the Postal Service received numerous comments addressing matters unrelated to election mail or to the matters discussed in this proceeding. These included comments expressing personal opinions of the President; remarks concerning nominees to the Postal Service Board of Governors and criticisms of the Board's leadership; objections to postage and stamp prices; requests for congressional action; appraisals of judges who have issued decisions concerning election mail; appraisals of

the current and former Postmaster General; comments aimed at postal management and staff; comments on postal reform and privatization; comments on voter intimidation; comments regarding the role of public election auditors and observers; opinions about the impact of the Supreme Court's recent decisions dealing with the Voting Rights Act; comments regarding the Federal Election Commission's Clearinghouse on Election Administration; and feedback on other administrative proceedings, including a Department of Justice ("DOJ") rulemaking concerning the review of state bar complaints and allegations against DOJ attorneys and a separate Postal Service rulemaking concerning the mailability of firearms. Such comments are also beyond the scope of this proceeding and will not be addressed below.

### D. Conclusion

The Postal Service has carefully considered all comments received. The summary above is intended to broadly cover the issues they raise. Substantive legal objections, operational issues, requests for additional study, suggested revisions to the proposed rule, and additional topics related to the proposed rule are addressed in the dedicated subsections that follow.

## III. Legal Authority

Numerous commenters asserted, on varying grounds, that the Postal Service lacks the legal authority to implement the proposed rule. This section recites the specific arguments advanced by commenters, followed in each case by a response affirming the legal basis of the DMM changes.

### A. General Remarks

Ballot mail presents unique considerations, given the role it plays in the electoral process. This role has also grown in importance in recent years, as many states have expanded eligibility for mail-in voting, with some states moving to universal mail-in voting. The number of voters using the mail to receive and cast their ballots has

commensurately increased. The Postal Service's policies regarding election mail in general, and ballot mail in particular, have evolved to reflect these unique considerations. From an operational standpoint, the Postal Service deploys special practices on a nationwide basis for the processing and delivery of ballot mail to ensure that such mail is prioritized across the postal network and timely delivered. These practices include the use of extraordinary measures during the period surrounding federal general elections to accelerate the delivery of return ballot mail beyond the Postal Service's typical operations when its employees are able to identify a mailpiece as a ballot. In recognition of the importance of ballot mail, the Postal Service regularly issues nationwide guidance documents in federal election cycles, has dedicated points of contact to coordinate with election officials, and has created a dedicated election mail group tasked with overseeing the Postal Service's election mail procedures nationwide. The Postal Service also amended DMM 703.8.0 in 2022 to add its longstanding best-practices recommendations concerning ballot mail to facilitate efficient handling and prompt delivery and to improve mailpiece visibility. Some jurisdictions have adopted those recommendations.

The use of the U.S. Mail to vote also implicates federal interests regarding whether the postal system is being used in a manner that is consistent with federal law, including those laws governing who is allowed to vote in federal elections. Executive Order 14399 emphasizes the constitutional obligation of the Executive Branch to take care that these laws are faithfully executed, and discusses the importance of applying additional measures concerning the use of the mail to vote in federal elections, in order to facilitate enforcement of federal law, reduce the risk of fraud, and help protect the integrity of federal elections—a point subsequently echoed by some comments supporting the rule. It is fully appropriate for the Postal Service, as an establishment of the Executive Branch, to take actions deemed necessary to ensure the faithful execution of federal

law and enhance the efficiency of postal operations. As discussed below, the Postal Service has the statutory and constitutional authority to take such actions.

B. Election Integrity

The Postal Service received many comments expressing differing views on the incidence of voter fraud and its impact on election integrity. Some commenters, in voicing support for the proposed rule, portrayed voter fraud as a significant problem, while commenters opposing the rule argued that it is not a problem, and disputed the Postal Service's legal authority and rationale to impose preparation requirements for Outbound Federal Ballot Mail.

While the Postal Service acknowledges the range of disagreement on this point, the incidence of voter fraud does not impact the proposed rule's legal grounding. As discussed in the Notice of Proposed Rulemaking and in further detail below, the rule will afford significantly enhanced visibility into the sending of Federal Ballot Mail, and this will in turn facilitate law enforcement efforts by enabling law enforcement to better detect potential issues meriting further investigation. Such enhanced visibility will help identify potential issues that would have otherwise gone undetected; at the very least, it will provide increased assurance that any potential issues are more capable of being effectively identified and investigated. *Cf. Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181, 196-97 (2008) (noting the propriety of taking steps designed to detect and deter potential electoral fraud, which also has the benefit of "safeguarding voter confidence" in elections). Whether or not voter fraud is common or uncommon, the Postal Service has the legal authority to take the measures in this rule to facilitate enforcement of federal law, reduce the risk of fraud, and help protect the integrity of federal elections.

C. The Constitution's Elections Clause and the 10th Amendment

Numerous commenters argued that the Postal Service, through the proposed DMM provisions, would supplant the states' authority to administer elections. Some of these comments characterized the proposed rule as inconsistent with the Elections Clause of the Constitution, Article I, Section 4, Clause 1 (vesting authority over the "manner of elections" with the States and Congress), and with the 10th Amendment (reserving all non-enumerated powers to the states). According to many of these comments, the proposed rule would allegedly recast the Postal Service as an "auditor of state voter rolls and an arbiter of ballot validity," a "gatekeeper of who can vote by mail," or a "checkpoint for voting." In a similar vein, commenters asserted that the proposed rule contravenes the separation of powers by arrogating powers that lie with Congress. Finally, at least one commenter argued that, by requiring that states expend resources to comply with the standards mandated by the Postal Service, the proposed rule would unconstitutionally commandeer State resources.

These comments are fundamentally erroneous. The rule does not recast the Postal Service as an election administrator, nor dictate the manner of elections in the states. On the contrary, it sets forth mailpiece design and data reporting standards tied to the use of the mail. States maintain complete control over their own voter registration rolls, deciding who within their jurisdiction is eligible to vote by mail. States also retain complete autonomy to determine the extent to which they utilize the postal system as an aspect of their elections. The rule is plainly consistent with the Elections Clause, the 10th Amendment, and the separation of powers, as well as the Postal Service's statutory and regulatory authority.

Some commenters acknowledged the Postal Service's authority to impose general standards governing the dispatch of election mail, including ballot mail. For instance, election mail must today conform with the DMM provisions that apply to the class of mail in which it is entered, and users of such mail must pay the required postage. The

requirement to follow federal mail regulations if states choose to use the federal postal system, then, cannot inherently violate the Elections Clause, nor would it in any way "commandeer" state resources. The Postal Service is not constitutionally obliged to defer to a given state's Outbound Federal Ballot Mail design preferences or accept a given state's decision not to use barcodes. On the contrary, establishing a standardized set of mailpiece design requirements for Outbound Federal Ballot Mail—requirements that, being tailored to enable more efficient handling of Outbound Federal Ballot Mail, improve such mail's visibility in the mailstream, and Postal Service operations—lies within the Postal Service's authority. These requirements do not amount to election administration, nor do they usurp state resources; rather, they regulate the use of the mail to improve operational efficiency and support the faithful execution of federal law. In this regard, as a general matter, states do not have to use the U.S. mail to conduct their elections, and the Postal Service can take steps to ensure that if states do use the mail, that use occurs in a manner that achieves these legitimate purposes.

Similarly, the requirement to report mailpiece-level data into the Portal is not tantamount to election administration. States retain full control over who within their jurisdictions is (or is not) eligible to vote by mail in federal elections; they would, moreover, determine who is enrolled in their respective Mail-In and Absentee Participation Lists. DMM 705.24.4 only requires that states provide to the Postal Service certain information inscribed on the Outbound and Return Federal Ballot Mail envelopes that they mail to voters, prior to or at the time of the outbound mailing. This information, which necessarily lies in the states' possession, would not be subject to revision by the Postal Service. Eligible voters will therefore be listed by and at the discretion of election officials, and the Postal Service will not second-guess the states' submissions. State election officials will thus retain full control over who is permitted to vote in federal elections in their state by U.S. mail.

Finally, the verification process aims only to ensure that states adhere to the mailpiece design and data reporting standards. By checking the outbound barcode, the Postal Service will be able to verify that the state or political subdivision thereof has satisfied the Portal data entry requirements (e.g., certifying that Outbound and Return Federal Ballot Mail envelopes have been submitted for Mailpiece Design Analyst ("MDA") review and that feedback has been received, all required data fields have been entered). Again, the Postal Service will exercise no discretion or authority over whether an individual should or should not be on the list a state provides.

This rule does not involve or authorize inspection of a mail-in ballot's contents, review of individual voter's eligibility, or auditing of state voter rolls. It instead focuses exclusively on exterior mailpiece criteria and barcode scan data. As DMM 704.24.6 explains, "[t]his rule relates only to the use of the U.S. Mail," leaving states "fully responsible for the contents of [their] Mail-In and Absentee Participation List." 91 Fed. Reg. 32929. Specifically, DMM 705.24.1.b limits enrollment in the Portal to users authorized by a state's chief election official; accordingly, and as detailed in DMM 705.24.4.3, the Postal Service will compile and return to each state only the information that the state itself has submitted, thus preserving the states' control over who is (and is not) able to vote by mail. It further bears emphasizing that the verification process delineated in DMM 705.24.5 would not involve voter eligibility determinations in any way; it will not entail scrutiny into, or any attempt to evaluate, individual voters. Finally, as plainly stated in DMM 705.24.5.2, "Postal Service personnel are not authorized to open mail sealed against inspection." In short, the rule adds a layer of security and accountability while leaving the administration of elections firmly in the hands of the states.

D. First Amendment and Privacy Act Concerns

Some commenters raised First Amendment concerns, noting that the Supreme Court has long recognized that voting is a protected form of political participation and that compelled disclosure of political participation can chill the exercise of First Amendment freedoms. Though some commenters correctly acknowledged that the Postal Service does not propose to disclose voting choices, numerous commenters nevertheless alleged that the rule would compel the creation and maintenance of records identifying citizens who engage in mail-in or absentee voting; speculated that such records may be subject to future disclosure, misuse, breach, or political targeting; and advised against collecting personally identifiable election-participation information absent a compelling need and robust safeguards.

Other commenters invoked the Privacy Act, and 5 U.S.C. § 552a(e)(7) in particular, as a statutory bar on the maintenance of records "describing how any individual exercises rights guaranteed by the First Amendment unless expressly authorized by statute or by the individual about whom the record is maintained or unless pertinent to and within the scope of an authorized law enforcement activity[.]".

These First Amendment concerns are misplaced. First, the Postal Service reiterates that it will not collect or record party affiliation and will not inspect ballot contents. Postal Service personnel are not authorized to open mail sealed against inspection. Instead, through the Portal the Postal Service will maintain data of the sort that is routinely generated for mail from the exterior of the mailpiece, including addressing and barcode information.

The rule's enactment will not entail "compelled disclosure of political participation." Supreme Court cases on "compelled disclosure" in the electoral context address compelled public disclosure of personally identifiable election participation information, such as a public records law making the signatures on a referendum petition publicly available upon request. *John Doe No. 1 v. Reed*, 561 U.S. 186, 192 (2010). The rule, by

contrast, neither directs nor contemplates the public disclosure of Mail-In and Absentee Participation Lists or the underlying Portal data.

The Postal Service recognizes the importance of ensuring that the Lists are protected from "future disclosure, misuse, breach, or political targeting." The Notice of Proposed Rulemaking indicated that "steps necessary for the creation of a new SORN in accordance with the Privacy Act" would be initiated. 91 Fed. Reg. 32971. On July 17, 2026, the SORN was published in the Federal Register. The SORN provides details regarding retention periods, access, disclosure, notification, and contest procedures under 39 CFR 266.5. 91 Fed. Reg. 44880. The notice specifies the categories of records covered, a five-year retention period, encryption of online data transmissions, and badge- and log-on-controlled access limited to personnel whose duties require it. The Postal Service can therefore confirm that no data will be collected through the Portal until a system of record (SOR) is in effect, and that records will be disclosed and maintained consistently with any final SOR, which does not allow public disclosure of the Lists.

The proposed rule is also consistent with 5 U.S.C. § 552a(e)(7), which applies only to records revealing "how any individual exercises rights guaranteed by the First Amendment." Courts have interpreted this "how" to mean gathering and recording the "content" of expressive activity under the First Amendment. *E.g., Reuber v. United States*, 829 F.2d 133, 143 (D.C. Cir. 1987) (holding that a letter reprimanding an employee for privately published essays did not depict "how" he had exercised First Amendment rights under the Privacy Act because it did not discuss "the content" of his privately published essays and made "only vague allusions to the manner in which he expressed his views").

This section of the Privacy Act could only be invoked here if the Postal Service were gathering and maintaining records indicating the "content" of an individual's exercise of

their First Amendment rights (i.e., the content of an individual's ballot, and thus the candidate for which an individual voted). That is not the type of information being collected under the rule. The state-specific Mail-In and Absentee Participation Lists indicate whether a state planned to mail a blank ballot to any given individual. This information does not describe "the content" of expressive activity under the First Amendment, but simply indicates the specific means by which an individual may have chosen to receive or return their ballot.

Furthermore, Section 552a(e)(7)'s prohibitions are operative "unless pertinent to and within the scope of an authorized law enforcement activity"—and as stated above, this rule is enacted to assist in the faithful execution and enforcement of federal law. *See Jabara v. Webster*, 691 F.2d 272, 280 (6th Cir. 1982) (Section 552a(e)(7) "does not bar the maintenance of records describing how a person exercises First Amendment rights if there is a direct nexus to an authorized criminal, civil or administrative law enforcement activity"). The applicability of Section 552a(e)(7)'s law enforcement exception to DMM 705.24.4 is further confirmed by the DOJ Office of Legal Counsel's recent memorandum opinion, "Authority to Obtain and Share Statewide Voter Roll Data." 50 Op. OLC ___ (May 12, 2026), Slip. Op. at 25-29 (explaining that Section 552a(e)(7)'s law enforcement exception permits retention of statewide voter-registration lists when a SORN is published).

E. Fourth Amendment Concerns

Some commenters argued that the proposed rule would violate the Fourth Amendment by allegedly:

- Allowing unreasonable search of voter information encoded on the outside of Federal Ballot Mail envelopes;
- Permitting unreasonable seizure of Federal Ballot Mail encoded with voter information; and

- Requiring voter information to be encoded on the outside of Federal Ballot Mail envelopes and allowing suspicionless searches (also known as "administrative" or "special needs" searches) of that information for general law-enforcement purposes that fall outside of the Postal Service's lawful mission of mail delivery.

The Postal Service notes that courts have long held that there is no reasonable expectation of privacy in information displayed on the exterior of a mailpiece because it is exposed to anyone's view, including postal employees who must rely upon it in the performance of their duties. *E.g., United States v. Choate*, 576 F.2d 165, 175-77 (9th Cir. 1978). Thus, the Postal Service's creation of "mail covers"—images of the outside cover of envelopes or packages in its custody—for general law enforcement purposes do not constitute a "search" under the Fourth Amendment. *See generally* 39 C.F.R. § 233.3. Likewise, the government's use of voter information displayed or encoded on Federal Ballot Mail envelopes would not constitute a Fourth Amendment "search"—administrative or otherwise—because it invades no reasonable expectation of privacy.

F. <u>Due Process Concerns</u>

Some commenters argued that once a state provides for absentee voting, the state has enabled a qualified individual to exercise their fundamental right to vote in a way that was previously unavailable; and that, as a result, the state must afford appropriate due process protections, including notice and a hearing, before rejecting an absentee ballot. Commenters analogized this principle (which applies via the Fourteenth Amendment to the states) to the Fifth Amendment, which, in their view, requires the federal government to provide adequate due process before restricting voters' use of otherwise permissible voting methods.

The Postal Service reiterates that the rule adopted herein does not determine any individual's eligibility to vote and thus does not raise the specter of a due process violation. The verification procedures set forth in DMM 705.24.5 are instead designed to

ensure that states sending Federal Ballot Mail have transmitted to the Federal Ballot Mail Portal the information required for each state-specific Mail-In and Absentee Participation List. Such information lies with the states, which already fully control who is, and who is not, included on the Lists; voters themselves cannot provide all of that information (e.g., unique Intelligent Mail barcode ("IMb") on the outbound and return envelope), and the Postal Service cannot correct or amend it. While the verification process may identify missing data or other errors between Outbound Federal Ballot mailings and the Portal data, the states themselves control the information that they transmit (as they do already, even in the absence of this rule), and any procedural protections attaching to such information must accordingly be provided by the states. Ultimately, with or without this rule, states are responsible for managing their own voter rolls, and deciding who is or is not eligible to vote by mail.

G. Equal Protection Concerns

Some commenters raised concerns regarding the guarantee of equal protection under the Fourteenth Amendment (and subsequently incorporated into the Fifth Amendment by *Bolling v. Sharpe*, 347 U.S. 497 (1954)). For example, at least one commenter asserted that the exemption for ballots covered by the Uniformed and Overseas Citizens Absentee Voting Act ("UOCAVA") affords unequal legal protection (on the mistaken grounds that UOCAVA covers military personnel but not overseas civilians). Moreover, at least one commenter argued that by creating the possibility of noncompliance, the rule's envelope-design standards and verification process might restrict some voters' ability to vote by mail, thus withholding equal protection under the law.

However, another commenter reasoned that uniform national standards—far from raising equal-protection issues—resolve these constitutional concerns. Relying on *Jones v. U.S. Postal Service,* 488 F. Supp. 3d 103 (S.D.N.Y. 2020), the commenter

explained that Fifth Amendment equal-protection claims were likely to succeed where there were no standards or uniformity for handling election mail; this inconsistency can result in intrastate and interstate disparities in citizens' voting power. The proposed rule, the commenter argued, eliminates such concerns by setting a single, nationwide standard for Federal Ballot Mail.

The Postal Service agrees with this commenter that the rule safeguards, rather than abrogates, equal protection. The rule is neutral on its face and uniform in application: DMM 705.24.3 applies objective requirements to all Outbound and Return Federal Ballot Mail envelopes without distinction, and the data entry and verification processes delineated by DMM 705.24.4 and 705.24.5, respectively, likewise apply to all states equally. Furthermore, as noted, the rule promotes multiple rational objectives through nationwide standards and implementation, including the enhancement of Federal Ballot Mail visibility in the mailstream, Postal Service operations, and the facilitation of law enforcement objectives. *Cf. United States v. Salerno*, 481 U.S. 739, 734 (1987) (holding that facial challenges to statutes "must establish that no set of circumstances exists under which the Act would be valid"); *Reno v. Flores*, 507 U.S. 292, 301 (1993) (extending the *Salerno* standard to federal agency regulations). The rule's exemptions also rest on a legitimate, nondiscriminatory basis. Congress, for example, created in UOCAVA a separate federal statutory scheme with its own requirements, including different timing constraints and deadlines. *McDonald v. Board of Election Comm'rs*, 394 U.S. 802, 809 (1969) (allowing exceptions within an absentee ballot voting scheme provided "some rational relationship to a legitimate state end"). Furthermore, as indicated, UOCAVA coverage does in fact extend to non-military U.S. citizens who reside outside the United States. 52 U.S.C. § 20310(5)(B)-(C).

H. <u>Statutory Grounding in Title 39</u>

Multiple commenters argued that, as a general matter, the Postal Service lacks the statutory authority to implement the proposed rule. Along similar lines, some commenters alleged specifically that, because no provisions in title 39 explicitly contemplate mandatory standards regarding Federal Ballot Mail, title 39 impliedly bars the Postal Service from implementing such standards.

These statutory arguments are unavailing. As explained in the Notice of Proposed Rulemaking, 39 U.S.C. § 401(2) authorizes the Postal Service "to adopt, amend, and repeal such rules and regulations, not inconsistent with this title, as may be necessary in the execution of its functions under this title and such other functions as may be assigned to the Postal Service under any provisions of law outside of this title," and further grants the Postal Service "all other powers incidental, necessary, or appropriate to the carrying on of its functions or the exercise of its specific powers." *Id.* § 401(10). Furthermore, Section 404 grants the Postal Service specific powers, including the power "to provide for the collection, handling, transportation, delivery, forwarding, returning, and holding of mail, and for the disposition of undeliverable mail." *Id.* § 404(a)(1).

Setting preparation and data-reporting standards for a defined category of mail falls squarely within that statutory authority. Supreme Court precedent confirms the Postal Service's expansive rulemaking authority. As noted by one commenter, in *U.S. Postal Service v. Council of Greenburgh*, the Court explained that under 39 U.S.C. § 401 "the Postal Service is broadly empowered to adopt rules and regulations." 453 U.S. 114, 122 (1981). This commenter further argued that the Postal Service has long managed election mail as a distinct category under its authority. In *Rider v. United States*, the commenter explained, the Claims Court recognized that the Postal Service issues "detailed regulations and management instructions concerning the various classes of mail and types of postal services in its Domestic Mail Manual" pursuant to Section

404(a), and that its Postal Operations Manual establishes "special operating procedures" to ensure that election and campaign mailings "are processed properly, delivered with equitable care and attention and that proper records are maintained." 7 Cl. Ct. 770 (1985). Courts have recognized the Postal Service's broad regulatory authority in other contexts as well. *See Grover City v. U.S. Postal Serv.*, 391 F. Supp. 982, 986 (C.D. Cal.1975) (finding postal regulations setting mail receptacle standards to be valid exercises of § 404(a)(1) delivery power and § 401(2) rulemaking authority); *Rockville Reminder v. U.S. Postal Serv.*, 480 F.2d 4, 7 (2nd Cir. 1973) (upholding postal regulations prohibiting mailbox installations facilitating private delivery of advertising circulars under the Postal Service's broad rulemaking authority); *Egger v. U.S. Postal Serv.*, 436 F. Supp. 138, 142 (W.D. Va. 1977) (upholding the Postal Service's interpretation of its regulations governing mail addressed to people at school).

The Postal Service has the statutory authority to set forth mail preparation, acceptance, and entry standards that are necessary to achieve the functions assigned to it by law—functions that include investigation into the potential misuse of the mail and coordination with other federal law enforcement entities. *See* 39 U.S.C. § 401(2); *cf.* 18 U.S.C. § 3061(b) (authorizing the Postal Service to investigate crimes regarding "the use of the mails" and other appropriate crimes as determined by agreement with the Attorney General); 52 U.S.C. §§ 10307, 20511. The rule sets forth tailored requirements regarding the use of the mail—the design of Federal Ballot Mail envelopes and the provision of mailpiece-level data concerning such ballot mailings—to help ensure the faithful execution of federal law; and the information yielded by these requirements would be available for use by law enforcement. Additionally, the rule would implement the Postal Service's longstanding best practices for ballot mail, thereby advancing execution of a key Postal Service function: processing and delivery of the Nation's mail. Contrary to commenters' arguments, achieving such purposes is within the scope of the

Postal Service's authority to take "necessary" action to regulate the use of the mail and achieve its assigned functions.

There is also no basis to conclude that the Postal Service's broad statutory authority regarding the postal system encompasses all types of mail except ballot mail, and specifically Federal Ballot Mail. On the contrary, the Postal Service has acted pursuant to its existing authority to take many actions regarding ballot mail, reflective of the unique considerations raised by such mail, including by establishing special operational procedures and issuing best practice recommendations. While the Postal Service is now taking additional action to make some of these recommendations mandatory, and to add a requirement that states provide mailpiece-level detail about their mailings, such additional steps equally fall within the Postal Service's authority to execute on functions as assigned.

I. <u>Grounding in Law Enforcement Statutes</u>

Multiple commenters contested the state-specific Mail-In and Absentee Participation Lists' grounding in law enforcement objectives, on the theory that the Lists, and the purposes to which they will allegedly be put, exceed the Postal Service's authority to investigate crimes involving election fraud. In general, these comments assert that the criminal statutes cited by the Notice of Proposed Rulemaking either have nothing to do with voting or are related to voting but are not enforceable by the Postal Service. Specific arguments include:

- *The U.S. Code does not confer on the Postal Service authority to enforce election statutes.* Commenters asserted that 52 U.S.C. §§ 10307 and 20511 do not expressly name the Postal Service, and as such cannot be taken to confer enforcement or investigative authority on the Postal Service with respect to voter intimidation and fraudulent registration or voting. Conversely, 39 U.S.C. §

404(a)(6) confers on the Postal Service the power "to investigate postal offenses and civil matters relating to the Postal Service," not election law per se.

- *The investigatory and enforcement powers conferred by statute on Postal Inspectors are limited.* Some commenters averred that 18 U.S.C. § 3061(b) grants only limited law enforcement powers to Postal Inspectors, which are confined to "the enforcement of laws regarding property in the custody of the Postal Service, property of the Postal Service, the use of the mails, and other postal offenses," and to any offenses subject to interagency agreement with the Attorney General. This grant of authority, some asserted, does not authorize the Postal Service to collect data on voters. Similarly, the regulations in 39 C.F.R. § 233.1(b) do not expressly grant Postal Inspectors authority to administer elections, determine voter eligibility, maintain voter registration databases, or conduct election fraud investigations unrelated to postal offenses.
- *The proposed rule lacks a factual predicate*. To initiate an investigation, the Postal Service requires either direct, visible evidence of a crime or reasonable grounds to suspect that a crime is or has been committed. Some commenters characterized voter fraud, including through use of the mail, as rare. Commenters contended that the proposed rule nevertheless assumes that every mail-in voter may cast a fraudulent vote and must be placed under surveillance.
- *Lack of a clear statement conferring investigative or enforcement authority*. Commenters argued that if Congress had intended to deputize the Postal Service as an adjunct of federal election law enforcement, it would have said so clearly.

Each of the above arguments is unpersuasive. The proposed rule establishes mailpiece preparation and data reporting standards that will significantly enhance the visibility of Federal Ballot Mail. The information generated by the implementation of those standards would be available for use by appropriately authorized law enforcement

entities to help ensure the faithful execution of federal law. The determination of whether to investigate, refer, charge, or prosecute any matter relating to illegal voting, voter fraud or voter intimidation rests, and will continue to rest, with the entities to which Congress has assigned such functions. Moreover, as noted above, the rule does not dictate the administration of elections, the determination of voter eligibility, or the maintenance of voter registration databases—all of which is controlled by the states–nor does the rule authorize the Postal Service to conduct investigations unrelated to postal offenses.

Concerning the proposed rule's factual predicate (or alleged lack thereof), claims regarding the empirical incidence of voter fraud do not, as explained above, affect the Postal Service's authority to adopt these regulations. The Postal Service further emphasizes that, under the rule, it will not surveil mail-in or absentee voters. Under the rule's plain terms, information generated at acceptance is embedded in exterior mailpiece indicia and barcode scan data; Postal Service personnel are not authorized to open mail sealed against inspection; and no provision in DMM 705.24 authorizes review of any ballot's contents.

Concerning the implied clear statement rule discerned by some commenters, the Postal Service does not purport to discover "transformative power" in a "long-extant" statute. Rather, the envelope design, automation, barcoding and design review standards set forth by DMM 705.24.3 are similar to mail preparation requirements routinely applied across other mail categories. The rule, therefore, does not introduce new and unsettled "major questions"—a point explained in greater depth below.

J. <u>The Major Questions Doctrine</u>

Some commenters asserted that the proposed rule would violate the "major questions doctrine," which applies to agency actions purporting to "discover in a long-extant statute an unheralded power representing a transformative expansion in its

regulatory authority." *West Virginia v. EPA*, 597 U.S. 697, 724 (2022). Such comments theorized that as the right to vote is a fundamental political right, and as the Postal Service has no authority to adopt rules regulating voting in federal elections without express congressional authorization, the proposed rule would derive from its stated sources of statutory authority just such "transformative" powers.

As an initial matter, it bears repeating that this rule does not regulate the right or eligibility to vote, voter registration, or the manner by which states administer elections. States will retain full autonomy to decide whether (and to what extent) they utilize the U.S. Mail as part of their electoral systems and who can use ballot mail to cast a vote. The rule instead imposes modest data and mail preparation requirements on Federal Ballot Mail envelopes. The preparation requirements have for years been issued as best-practice guidance—and are substantively similar to the standards already employed to varying extents by some election officials. And the data standards require that states provide information regarding the exterior of Federal Ballot Mail envelopes that they will already have available as part of their ballot mailings. The verification procedures simply help to ensure these standards have been met prior to accepting an Outbound Federal Ballot mailing. Furthermore, the Postal Service is authorized to regulate certain mail preparation requirements in furtherance of federal law enforcement and to advance its ability to efficiently handle the mail. On its face, then, the rule does not represent any "transformative expansion" of regulatory authority, rendering the "major questions" doctrine inapplicable.

By way of further explanation, major questions arise when agencies claim to "discover in a long-extant statute an unheralded power representing a transformative expansion in its regulatory authority." *West Virginia*, 597 U.S. at 724. Per *West Virginia*, "the history and breadth of the authority that [the agency] has asserted" distinguishes "extraordinary cases" from ordinary ones. Such cases, which "provide a reason to

hesitate before concluding that Congress meant to confer such authority," typically involve an agency reaching beyond its area of expertise. *Id.* at 721; *see also, e.g.*, *Alabama Ass'n of Realtors v. HHS*, 594 U.S. 758, 764 (2021) (the Centers for Disease Control regulating landlord-tenant relations); *NFIB v. OSHA*, 595 U.S. 109, (2022) (OSHA regulating a public health risk rather than workplace hazards). By contrast, in *United States v. White*, 97 F.4th 532, 540 (7th Cir. 2024), the Seventh Circuit refused to apply the major questions doctrine in a case plainly lacking "the hallmarks of the truly extraordinary cases," with no claim to "unheralded power." In *Nebraska v. Su*, 121 F.4th 1 (9th Cir. 2024), the Ninth Circuit likewise held the major questions doctrine not to apply to a federal contractor minimum wage mandate which, following a history of presidents setting federal contractor rules, constituted neither a "transformative" nor an "unheralded" expansion of regulatory power. *Id*. at 14.

Similar to the facts in *White* and *Su*, envelope preparation and data transmission and verification requirements of the sort contemplated here fall well short of an "unheralded transformation" of regulatory authority, lack "the hallmarks of the truly extraordinary cases," and do not derive "unheralded power" from a "long-extant statute." Indeed, the Postal Service has for years conditioned eligibility for certain rate levels on specific requirements, including barcodes and Mailer IDs, and has done so under the same statutory authority that underlies this rule. For example, the Full-Service Intelligent Mail program, described in DMM 705.23, offers automation discounts for commercial mailers in exchange for end-to-end mail tracking, electronic documentation, and address corrections. Participation in this program is mandatory for automation pricing. *See* 78 Fed. Reg. 23,137 (Apr. 18, 2013) (requiring the use of "full-service" Intelligent Mail "to qualify for automation prices for postcards (First-Class Mail® only), letters, and flats when mailed using the following services: First-Class Mail, Standard Mail and Periodicals; and for flats mailed at Bound Printed Matter prices"). If the Full-Service IMb

regime is lawful under Sections 401 and 404, and it is, then the proposed rule cannot be said to effect an "unheralded transformation" of the regulatory prerogatives embedded in those statutes. Barcode, logo, automation-compatibility, design review, and electronic documentation conditions on defined mail categories constitute normal exercises of Postal Service authority; they have, moreover, in large part, long been included in the Postal Service's guidance to state Boards of Elections.

Other major-questions cases focus on the "economic and political significance" of the authority at issue. *Learning Res., Inc. v. Trump*, 607 U.S. 229, 246 (2026); *see also, e.g.*, *Biden v. Nebraska*, 600 U.S. 477, 502 (2023). Here, the economic significance of the rule is slight as compared to prior major-questions cases. *See Learning Resources*, 607 U.S. at 246 ("could be worth $15 trillion"); *Nebraska*, 600 U.S. at 502 ("between $496 billion and $519 billion"). And although actual changes to eligibility of voters to vote by mail might fairly be described as having political significance in some sense, this rule makes no such changes—it instead leaves voter-eligibility unchanged, requiring only certain modest envelope-design and data reporting standards, most of which have long been recommended by the Postal Service (and are voluntarily complied with by some jurisdictions already). It follows that the rule's incorporation of these practices does not raise any "major question" in the relevant sense.

K. *Ultra Vires* Creation of "Nonmailable Matter" Categories

Some commenters noted that, in 39 U.S.C. §§ 3001–3018, Congress specified categories of nonmailable materials with robust protections for all forms of mail not included. These commenters then argued that the rule effectively creates a new category of "nonmailable matter," and thereby exceeds title 39's statutory scheme. On this basis, they contended that the rule and the verification process that it establishes is *ultra vires*.

The rule does not create a new category of "nonmailable matter" into which Federal Ballot Mail as a class may generally fall. Rather, it is designed to ensure that Federal Ballot Mail envelopes meet certain preparation standards consistent with operational best practices and to condition acceptance on the provision of certain mailpiece-level data regarding those ballot envelopes—both of which support the execution of federal law. The rule does not prohibit federal ballots from being mailed altogether. While it is true that outbound mail-in ballots may be rejected from the mailstream as a consequence of noncompliance with the rule's requirements, conditions on the acceptance of mailable matter are distinct from a determination that the matter is nonmailable. Moreover, compliance is straightforward: states need only provide information that is inscribed on the outside of Federal Ballot Mail envelopes, which will necessarily be in their possession. And ample resources are available to assist states with ballot mail envelope design, should such assistance be required. Compliance is verified by checking a single data point (IMb) on Outbound Federal Ballot Mail prior to acceptance. Although Outbound Federal Ballot mailings that fail the verification process may be temporarily rejected (and thus not permitted to enter the mailstream), any errors may be corrected and the mailpieces will thereafter be accepted for mailing.

Rather than usurp Congress's authority to create new categories of "nonmailable matter," then, the Postal Service will impose mailpiece design and reporting standards to promote a rational and legitimate objective. As discussed below, to support this proposal, the Postal Service has reasonably determined that the mailpiece design requirements will help ensure proper handling, efficient processing, and timely delivery of such ballots to and from voters. *See* 90 Fed. Reg. at 9843 (special conditions are appropriate for "sensitive matter" where such conditions "will improve visibility and enhance handling methods"). Moreover, requiring the submission of a consolidated list of data concerning Federal Ballot Mail will assist law enforcement authorities in

investigating crimes, including those involving the mails, as is consistent with the Postal Service's regulatory authorities. *See* 39 U.S.C. § 401(b) (noting that the Postal Service can issue regulations to support functions assigned to it by law); 18 U.S.C. § 3061(b) (authorizing Postal Service to investigate crimes "regarding the use of the mails" and other appropriate crimes as determined by agreement with the Attorney General).

The Postal Service has previously relied on its authority under 39 U.S.C. § 401(2) to establish standards applicable to the acceptance and transmission of certain unique articles in furtherance of specific Postal Service operational interests where those articles raise special handling concerns, even where the articles are not dangerous. For example, cremated human and animal remains must be transported through specific types of USPS-provided boxes, and must be trackable via barcode. *See Cremated Remains Packaging Requirements*, 90 Fed. Reg. 9843 (Feb 19, 2025) (implementing rules concerning the sending of cremated remains in specific types of USPS-provided boxes because the Postal Service understands such remains are "sensitive matter and believes this will improve visibility and enhance handling methods throughout processing and transportation"). Similarly, replica explosives—which, although not dangerous, also require special handling to prevent operational disruptions—rather than being prohibited from the mail altogether must be mailed in certain ways, including in-person presentation to a retail counter and shipment via Registered Mail. *Restricting the Mailing of Replica or Inert Explosives*, 75 Fed. Reg. 282 (Jan. 5, 2010) (noting that "[t]his process will ensure that packages containing these items remain separate and easily identifiable during the mailing process").

Although ballot mail does not present precisely the same operational issues as cremated remains or replica explosives, it is unquestionably sensitive mail that raises unique operational considerations, as discussed above, and the Postal Service's authority under Section 401(2) is sufficiently expansive to encompass mail-entry

conditions that further the effective execution of federal law and advance operational best practices. 39 U.S.C. § 401(2) (noting that the Postal Service can issue regulations to support functions assigned to it by law). And incidental to the ability to impose standards in furtherance of such legitimate objectives is the ability to restrict mailings that do not meet those conditions from being accepted. *Cf. id*. § 401(10) (Postal Service is granted "incidental" and "necessary" powers to effectuate its responsibilities).

L. Consistency With 39 U.S.C. §§ 101(a), 403(c), 404(e), 412, and 3661

Commenters also argued that the proposed rule is inconsistent with various title 39 provisions, i.e., 39 U.S.C. §§ 101(a), 403(c), 404(e), and 412. Other commenters averred that, prior to implementing these provisions, the Postal Service must request an advisory opinion from the Postal Regulatory Commission ("PRC") under 39 U.S.C. § 3661(b).

The Postal Service disagrees with these assessments and addresses each of the above-cited title 39 provisions in turn.

Section 101(a) establishes the Postal Service's foundational legal mandate to bind the nation together by providing reliable, efficient, and regular mail services to all communities. This obligation coexists with federal laws determining what is mailable, and the Postal Service abides by several statutory and regulatory directives regarding items that are not mailable, such as hazardous substances or explosives, or (as here) mailable with conditions imposed on preparation and data reporting. The existence of these directives does not negate the foundational legal mandate, and neither would Federal Ballot Mail envelope design standards and electronic documentation requirements that align with preexisting guidance. Furthermore, the Postal Service will continue to coordinate with state election officials and other officials regarding the transmittal of election mail and will maintain its longstanding election mail practices concerning the processing and delivery of ballots that enter the mailstream, including

completed ballots mailed by voters to election officials. Indeed, consistent implementation of longstanding best practices recommendations will enhance, rather than hinder, these efforts.

Section 403(c) mandates that, in providing services, "the Postal Service shall not . . . make any undue or unreasonable discrimination among users of the mails, nor shall it grant any undue or unreasonable preferences to any such user." The PRC has noted that a violation of section 403(c) requires that (1) a user of the mail is receiving less favorable services than those provided to one or more other postal customers, (2) the user is similarly situated to those postal customers receiving more favorable service, and (3) there is no rational or legitimate basis for denying the user the more favorable service currently being provided to those similarly situated postal customers. PRC Order No. 718, *Advisory Opinion (AO) on Service Changes Associated with First-Class Mail and Periodicals*, July 20, 2021, Docket No. N2021-1 at 170.

The rule adopted herein sets forth neutral, uniform, and non-discriminatory mailpiece design and data reporting standards that apply uniformly to all Federal Ballot Mail; thus, no "preferential mail service" is granted to one class of mail-in voters over another. Nor does the Postal Service violate Section 403(c) by requiring that Federal Ballot Mail meet these uniform standards, since given the unique considerations raised by such mail, Federal Ballot Mail is not "similarly situated" to other types of mail. Indeed, the Postal Service already accords to election mail special operational treatment that is unavailable for other mail matter sent as First-Class Mail or Marketing Mail (the postal products typically used to send ballot mail), and there is no basis to conclude that this special operational treatment constitutes undue discrimination against any users of the mail. Finally, Section 403(c) does not prohibit all distinctions among mail users, but only preferences that are "undue" or "unreasonable." Given the reasonable and legitimate objectives of the new standards, they are neither "undue" nor "unreasonable"—even

assuming *arguendo* that users of Federal Ballot Mail are “similarly situated” to users of other mail classes not covered by those standards, and even if those standards were conceded to somehow provide “less favorable” terms (and they do not).

The Postal Service also notes an issue flagged by several commenters: namely, that not all states can implement the rule’s requirements with the same facility. By way of example, one comment noted that states with universal mail-in voting can more readily implement the new electronic documentation requirements than can states that do not mail absentee ballots unless requested by the voter—since the states in the former category can submit their entire list of enrollees in one session through the ballot portal, while states in the latter category must submit names in a more piecemeal fashion and only for those individuals requesting to receive a ballot through the mail. The Postal Service acknowledges the existing variations in state mail-in voting practices, which may require different levels of process changes in order to comply with the rule; however, as noted, the rule itself sets forth neutral, uniform, and non-discriminatory mailpiece design and data reporting standards that apply equally to all Federal Ballot Mail. Compliance with these standards is straightforward and facilitated by existing resources (in some cases, free of charge). Furthermore, the nature and degree of states’ prospective compliance efforts reflect the states’ own policies, not the uniform standards adopted by the Postal Service. Such discrepancies, therefore, do not implicate Section 403(c).

Section 404(e) generally prohibits the Postal Service from providing any new “nonpostal service.” The term “service” is not defined in title 39; the statute directed the PRC to review the “nonpostal services” offered by the Postal Service as of January 1, 2006, to determine whether each such service may continue. *Id.* § 404(e)(1). In carrying out that responsibility, the PRC defined the term “service” by regulation as “any ongoing, commercial activity offered to the public for the purpose of financial gain.” PRC

Order 154, *Review of Nonpostal Services Under the Postal Accountability and Enhancement Act*, Dec. 19, 2008, Docket No. MC2008-1 at 14. Because the creation and distribution of the Mail-in and Absentee Participation Lists are not "commercial" in nature, are not offered to the public, and are not offered "for the purpose of financial gain," it would not qualify as a "service" for the purposes of Section 404(e).

In any event, the creation of such lists is "postal" in nature, as it would involve "delivery of letters, printed matter, or mailable packages, including acceptance, collection, sorting, transportation, or other functions ancillary thereto." 39 U.S.C. § 102(5); *see also id.* § 404(e)(1) ("the term 'nonpostal service' means any service that is not a postal service defined under section 102(5)"). As noted above, these provisions set forth preparation and data standards that are tailored to the sending of ballots, and hence to the use of the mail.

Section 412 provides in part that "no officer or employee of the Postal Service shall make available to the public by any means or for any purpose any mailing or other list of names or addresses (past or present) of postal patrons or other persons." Some commenters theorized that unless state law shields postal-provided state-specific Mail-In and Absentee Participation Lists from disclosure, furnishing the state's chief election official with a list containing the names and addresses of those receiving a mail-in ballot likely violates this section. However, 39 U.S.C. § 412(a) addresses lists of "postal patrons" or "other persons" compiled from postal data, and provides that the Postal Service shall not make such a postal list available to the public. The information on which the Mail-In and Absentee Participation Lists will be based is provided by the *states* themselves, and specifically the states' records of individuals to whom they (or their authorized election officials) plan to mail blank ballots. Because the lists involve information furnished by the states, 39 U.S.C. § 412(a) is not applicable; and in any event, the Postal Service will not make the lists public.

Certain commenters nevertheless argued that the exception structure created by Section 412(a) (allowing disclosure of information "as specifically provided by subsection (b) or other law") in tandem with Section 412(b) (stating that "[t]he Postal service shall provide to the Secretary of Commerce for use by the Bureau of the Census such address information, address-related information, and point of postal delivery information . . . as may be determined by the Secretary to be appropriate for any census or survey"), impliedly excludes the provision of Mail-In and Absentee Participation Lists to state officials. It therefore bears emphasizing that even if Section 412(a) were applicable to Mail-In and Absentee Participation Lists, it would not bar the provision of such lists to state elections officials.

First and foremost, the provisions of these lists to state election officials does not constitute such disclosure of protected information "to the *public*." (Emphasis added.) Indeed, at least one court has interpreted disclosure to state law enforcement officials under 39 U.S.C. § 412 as not being tantamount to an impermissible disclosure to the public. *See, e.g.*, *People v. Pearson*, 169 Cal. App. 3d 319, 323 (1985) (holding that an individual "had no reasonable expectation of privacy of his name and residential address given to the United States Postal Service when applying for a post office box"; noting that "the information was not made available to the public" under 39 U.S.C. § 412 "but rather to a law enforcement officer conducting an official investigation").

Second, Section 412(a) allows disclosure of information "as specifically provided by subsection (b) <u>or other law</u>." (Emphasis added.) Postal Service regulations accordingly make clear that disclosure of information under Section 412 to the Secretary of Commerce for census-related purposes is not exclusive, countenancing such disclosure pursuant to certain contracts and interagency agreements, by written request and with the prior consent of the individuals, or as "otherwise expressly authorized by federal law" *See* 39 C.F.R. § 266.3(b)(3). As noted, the rule's Mail-In and

Absentee Participation List disclosure provisions are adopted pursuant to 39 U.S.C. §§ 401 and 404 with the aim of supporting the faithful execution of federal law, and disclosure would occur in accordance with an established SOR.

Third, federal legislation serves as both a precedent and a template for the sharing of information by the Postal Service with state election officials, in the context of voting. Specifically, the National Voter Registration Act of 1993 ("NVRA") requires each state to manage a voter list maintenance program, and to make reasonable efforts to remove ineligible voters from voting rolls. 52 U.S.C. § 20507(a)(4). The NVRA includes a safe harbor provision, whereby a state can comply with its obligation to have a voter list maintenance program if "change-of-address information supplied by the Postal Service through its licensees is used to identify registrants whose addresses may have changed." 52 U.S.C. § 20507(c)(1)(A). In 2018, the Supreme Court determined that it was "undisputedly lawful" for a state to utilize the Postal Service national change-of-address data for voter list maintenance purposes, as described in the NVRA. *See Husted v. A. Philip Randolph Inst.,* 584 U.S. 756, 765 (2018) (citing 52 U.S.C. § 20507(c)(1) and referring to the NVRA safe harbor as "the Postal Service option"). As a general matter, then, the Postal Service's sharing of information with government officials is not exclusively limited to providing information to the Secretary of Commerce under Section 412(b).

<u>Section 3661(b)</u> provides that, when the Postal Service "determines that there should be a change in the nature of postal services which will generally affect service on a nationwide or substantially nationwide basis," it must request an advisory opinion from the PRC before implementing the change. Some commenters reasoned that a change touching Federal Ballot Mail is a nationwide change in postal services within the meaning of Section 3661—one requiring pre-filing conferences with affected

stakeholders and a formal request filed with the PRC at least 90 days before implementation (39 C.F.R. §§ 3020.110–3020.112).

As an initial matter, 39 C.F.R. §§ 3020.110–3020.112 are regulations binding the PRC, not the Postal Service. It is therefore incorrect to suggest (as some commenters did) that the Postal Service's adoption of this proposed rule would violate its own regulations.

More importantly, the changes contemplated by the proposed rule do not trigger any obligations under Section 3661. As noted, the obligations attendant to Section 3661 arise in the event of "a change in the nature of postal services which will generally affect service on a nationwide or substantially nationwide basis." Implementation of this rule does not constitute such a nationwide change in postal services. As the leading case on this issue explains, Section 3661 must be read within the context of the overall statutory scheme of title 39, which is designed to give the Postal Service "broad authority in postal management" to ensure that management is not "unjustly hampered in its efforts to administer the Department in a businesslike way." *Buchanan v. U.S. Postal Serv.*, 508 F.2d 259, 262–63 (5th Cir. 1975). Section 3661(b) therefore comes into play only in limited circumstances, if (1) there is a change that has a "meaningful impact on service," (2) the change is "in the nature of postal service," and (3) the change affects service "on a nationwide or substantially nationwide basis." *Id.* "These three factors combine to demonstrate that Congress intended the safeguards of 3661 to apply only when changes of significance were contemplated." *Id.* at 263.

As to the first *Buchanan* factor, a proposed change triggers the Section 3661 advisory opinion requirement when that change is "meaningful" rather than "minor" from a quantitative perspective. *See Buchanan*, 508 F.2d at 262. Alterations that have a minimal effect on the general class of postal users therefore do not fall within the scope of Section 3661. *Id.* Here, the rule's requirements apply only to Federal Ballot Mail—a

subset of election mail—and only in connection with federal general, special, or runoff elections (and not state elections or primary elections). To put this in context, in 2020 the Postal Service delivered roughly 400 million pieces of mail per day, and election mail in the 2020 general election accounted for only a small fraction of a percentage (roughly 0.1%) of that total mail volume. The standards being imposed on this exceedingly small subset of overall mail volume do not constitute a change of sufficient scale and scope to implicate Section 3661, but will instead have only a *de minimis* effect on the nature of postal services available to ordinary Postal Service users.

Moreover, whether a proposed action constitutes a change in the "nature of postal services" within the meaning of Section 3661(b) "involves a qualitative examination of the manner in which postal services available to the users will be altered." *Buchanan*, 508 F.2d at 263. In that regard, the PRC has held that "in determining whether an initiative involves a change in the nature of postal services '[i]t is the experience of the individual postal consumer, the recipient of the complex of services provided by the Postal Service and the intended beneficiary of the policies incorporated by § 3661, that must be assayed.'" *Pennsylvania v. DeJoy*, 490 F. Supp. 3d 833, 885 (E.D. Pa. 2020). Here, the changes contemplated by this rule do not directly affect the provision of postal services; rather, they encompass preparation and documentation requirements that are within the control of the states and, if adhered to, will not disturb the acceptance, processing, transmission or delivery of Federal Ballot Mail. The rule contemplates no changes to how the Postal Service processes and delivers election mail. In other words, as long as the rule's conditions are met, Outbound Federal Ballot Mail will enter the mailstream as usual, will transit as usual to its intended destination, and will in the usual manner be delivered: no discernible difference in the nature of postal services will arise. Indeed, as explained more fully below, the Postal Service will work closely with Boards of Elections to facilitate that very

outcome. And, once the Outbound Federal Ballot Mail reaches a voter, the voter will experience no change. Voters may complete and return their ballot as they do now. It further bears noting that even if a state declined to submit the information required by the rule, the resulting acceptance refusal would not implicate Section 3661 any more than would a large-scale mailer's decision to opt out of the mail system: the nationwide availability of postal services would remain unchanged.

Finally, some commenters argued that it was unlawful for the President to issue an Executive Order directing action by the Postmaster General. To be sure, Executive Order 14399 was relevant to the Postal Service's consideration of this subject and began the deliberative process that is now resulting in this rule. While the Executive Order did not mandate a final rule, the Postal Service has determined that, to help achieve the goals articulated by the Order as necessary to faithfully execute federal law and also to advance the Postal Service's operational interests, it is appropriate to exercise its statutory authority to promulgate these provisions. Considerations of Postal Service independence are not relevant to this rulemaking.

M. <u>2021 Settlement with the NAACP</u>

In a 2021 settlement with the NAACP, the Postal Service agreed to take certain actions regarding mail-in voting in future federal elections, including prioritizing monitoring and timely delivery of election mail through 2028. Some commenters argued that the enactment of new mail preparation and electronic documentation requirements, particularly immediately, would deprioritize the timely delivery of election mail and, thus, violate that settlement agreement. In doing so, some commenters pointed to a recent judgment by the U.S. District Court for the District of Columbia granting NAACP's motion to enforce the settlement agreement, and enjoining the proposed rule's implementation. *See NAACP v. U.S. Postal Serv.*, No. 1:20-cv-2295 (D.D.C.).

On July 17, 2026, the U.S. Court of Appeals for the D.C. Circuit stayed the district court's injunction, concluding that "even if adopted, that proposed rule likely would not violate . . . the parties' settlement agreement." *NAACP v. U.S. Postal Serv.*, No. 26-5257 (D.C. Cir. July 17, 2026). As the government has explained in that litigation, implementation of this proposed rule is not inconsistent with the terms of the settlement agreement: nothing in the rule adopted herein deprioritizes the timely delivery of election mail. To the contrary, implementation of these standards will, in fact, facilitate the Postal Service's efforts to deliver Federal Ballot Mail in a timely manner. Furthermore, the Postal Service will continue to work closely with stakeholders, and will deploy an array of special operational procedures (including so-called "extraordinary measures") to ensure the timely delivery of election mail, as it has done in prior election cycles.

N. NVRA, the Help America Vote Act and the Voting Rights Act

Some commenters argued that NVRA (intended primarily to facilitate the registration of voters) and the Help America Vote Act ("HAVA") (establishing a funding program to support state administration of elections) neither grant the President authority to identify the additional measures outlined in Executive Order 14399, nor authorize the Postal Service to adopt the rule as proposed. Commenters further argued that implementation of the proposed rule, and in particular the refusal to accept Outbound Federal Ballot Mail mailings that do not comply with the acceptance standards embodied in DMM 705.24, would violate the Voting Rights Act. As background, Congress enacted the Voting Rights Act to protect citizens' constitutional right to vote and to move freely across state lines, providing that no U.S. citizen shall "be denied the right to vote" in federal elections "because of the failure of such citizen to be physically present in such State or political subdivision at the time of such election," so long as the citizen has "complied with the requirements prescribed by the law of such State or political

subdivision" concerning absentee ballots. 52 U.S.C. § 10502. The enforcement provisions of the Voting Rights Act, *id.* § 10307(a), further establish that "[n]o person acting under color of law shall fail or refuse to permit any person to vote who is entitled to vote under any provision of chapters 103 to 107 of this title or is otherwise qualified to vote[.]" In these commenters' view, the rule as proposed would violate these statutes by adding a new enrollment requirement as a necessary precondition to the delivery of absentee ballots. Other commenters argued that the Election Assistance Commission ("EAC"), not the Postal Service, is the federal entity tasked to act as a national clearinghouse and resource for the compilation of information with respect to administration of Federal elections; if the EAC cannot impose any requirement on any state or local unit of government, the Postal Service cannot do so through its proposed rule either.

As discussed above, under the rule, states retain full control over how to utilize the mail in their electoral systems, including by determining who is registered to vote and who is eligible to receive and send a mail-in ballot. The rule requires only that Federal Ballot Mail envelopes meet certain mail preparation requirements and that states provide mailpiece-level data regarding their Outbound and Return Federal Ballot mailings. As such, this rule simply regulates the use of the mail, and does not interfere with or supplant the schemes established under NVRA, HAVA, or the Voting Rights Act. The Postal Service's rule complements, rather than replaces, these statutory responsibilities by supporting the accurate distribution of ballots after states have determined who is eligible to receive them. Similarly, the Postal Service is not usurping the authority vested in the EAC. This rule concerns the mail, not election administration; voting systems and other election administration tasks remain squarely within EAC's scope. The Postal Service will continue (as before) to provide change of address information to state and local officials; and state and local officials will continue (as

before) to maintain their official voter registration lists. Mail-In and Absentee Participation Lists will be based entirely on data in the possession of, and provided by, the states, and the Postal Service will not change the content of those lists. In this regard, it bears repeating that the Portal is not in any way a federal voting database; instead, it establishes a mechanism whereby states can provide data, which is fully within their possession and control, regarding Federal Ballot mailings.

O. The Paperwork Reduction Act

Some commenters faulted the proposed rule for its alleged failure to address the obligations under the Paperwork Reduction Act, 44 U.S.C. § 3501 *et seq.*, which requires that federal agencies obtain approval from OMB before imposing a new information collection requirement on persons, including state governments.

The Postal Service notes that it is outside the Paperwork Reduction Act's scope. *See Kuzma v. U.S. Postal Serv.*, 798 F.2d 29, 32 (2d Cir. 1986); *Shane v. Buck*, 658 F. Supp. 908, 915 (D. Utah 1985), *aff'd*, 817 F.2d 87 (10th Cir. 1987).

P. Administrative Procedure Act Requirements

Some commenters took issue with the length of the notice and comment period, with some alleging that the time allotted for comments was insufficient under the APA, and others remarking that for a rule of such scope and consequence, a 60-day comment period would be more fitting and appropriate.

Although the Postal Service is part of the executive branch, it is not subject to many of the laws and guidance that govern the rulemaking processes used by other executive branch entities—including the APA (except in proceedings concerning mailability, which as explained above and in the Notice of Proposed Rulemaking, the instant proceeding is not). 39 U.S.C. §§ 410(a), 3001(m). The Postal Service also notes that the Notice of Proposed Rulemaking prompted more than 200,000 comments covering a wide range of topics and opinions. There is thus no indication that the public

had inadequate time to share its views, or that 30 additional days would have resulted in material additional comments. The Postal Service has considered and taken seriously all significant comments.

## IV. <u>Operation of the Final Rule</u>

The proposed rule, and the final rule on which it is based, was designed to be flexible enough to accommodate the variation in state election laws and election administration practices. However, some commenters interpreted this flexibility as vague, expressing frustration about the lack of concrete compliance steps or confusion over the responsibilities of Authorized Ballot Mailers and Federal Ballot Mail Portal Users. Commenters also misconstrued the proposed rule's provisions as covering the most expansive scope of ballot mail possible while also operating in the most restrictive manner possible. This led to a substantial volume of comments that were premised on inaccurate factual assumptions, with the underlying basis for the expressed opposition being based, either in full or in part, on these inaccurate assumptions. These inaccuracies led to many exaggerated claims about the impact of the proposed rule as well as the Postal Service's role under the rule.

The Postal Service does not expressly recount each inaccuracy here, in an effort to avoid further confusion. Instead, to respond to the multitude of factual misunderstandings represented in the comments, and in an effort to supply additional details, the Postal Service offers the following explanation of how the final rule is intended to be implemented.

### A. <u>Overview</u>

To begin, the Postal Service is continuing to accept and deliver ballot mail, including Federal Ballot Mail, from election officials and voters. The proposed rule does not end or prevent mail-in or absentee voting, contrary to the mistaken claims raised in comments. As explained above, the Postal Service is continuing to carry out its core

statutory mission in a uniform, neutral, and nondiscriminatory manner. Nothing in this rule need prevent that outcome, as states will retain full control over who is (or is not) permitted to vote by mail in their jurisdiction.

The rule introduces new mailpiece preparation requirements and data reporting standards for Federal Ballot Mail that must be satisfied prior to presenting Outbound Federal Ballot Mail for acceptance into the mailstream. Thus, the final rule regulates Federal Ballot Mail, consistent with the Postal Service's core statutory function, not the franchise. Eligibility for mail-in and absentee voting will continue to be governed by state law; state and local election officials will still determine which individuals are eligible under these laws; and state and local election officials will determine whether completed ballots are eligible to be counted. To repeat, the Postal Service will not play any role in determining voter eligibility, maintaining voter rolls, or counting ballots. The Postal Service will not open ballot mail, including Federal Ballot Mail; will not know the contents of a ballot; will not know how an individual voted; and will not know an individual's political party affiliation.

However, as many commenters acknowledged, and consistent with the stated authority above, the Postal Service will generally not accept Outbound Federal Ballot mailings unless compliance with the rule's new standards has been verified, as further detailed below and in the final rule.

B. Optional 90-Day Pre-Mailing Notice

Section 705.24.2 of the rule creates an optional process through which a state's chief election official (including those representing D.C. and U.S. territories) may alert the Postal Service of the state's intent to allow mail-in or absentee ballots to be transmitted by the Postal Service. This notice may be given 90 days prior to a federal election. This provision does not require a response from the state official, and also does not require preparation of a list of individuals to whom a ballot will be mailed or coordination with local officials (although the state official may choose to do so).

Some commenters misunderstood the purpose of this optional notice. For instance, one comment from a former election official stated that the Postal Service is already well aware of whether a state intends to use its services. The purpose of this provision, however, is to facilitate pre-election planning, as some commenters accurately recognized. When the Postal Service knows that a state plans to send ballots for a federal election using the mail, it can conduct outreach on mail preparation, provide resources related to IMbs, and offer guidance on how access and use the Federal Ballot Mail Portal. While the process to enroll in the Portal is straightforward, beginning this process sooner—as the 90-day notice would allow—will be logistically beneficial.

Alternatively, the chief state election official can provide no notice at all. This does not preclude the state from using the Postal Service to transmit mail-in and absentee ballots for federal elections. Ballots for federal elections may still be sent through the mail so long as the chief state election official, and any other Federal Ballot Mail Portal User, creates a Portal account, satisfies the rule's mail preparation requirements, enters the required information into the Portal, and successfully completes verification prior to their Outbound Federal Ballot Mail being accepting for mailing.

The chief state election official may also provide notice that they do not intend to transmit ballots using the mail or that they do not intend to use the Portal. This also provides the Postal Service with valuable information to plan its resources and may inform internal training.

It should also be emphasized that these notices are not binding. For example, if the chief state election official initially informs the Postal Service that they do not intend to use the Portal, they may later change their mind and send ballots using the mail by following the steps outlined above.

C. Envelope Design

The rule makes several of the Postal Service's longstanding mailpiece design preparation recommendations required elements for Federal Ballot Mail. As many commenters recognized, these elements—the Official Election Mail logo, automation-compatible envelope design, uniquely serialized IMbs on outbound and return envelopes, and mailpiece design review—are not novel. Each of these design elements is already recommended in the Postal Service's Official Election Mail Guide ("Kit 600") and included as a best practice in DMM 703.8.0. Some jurisdictions have, on their own initiative, already opted to implement these recommendations to varying degrees. However, nothing in the rule prevents or discourages election officials from including envelope design elements required by state law, such as printed affidavits. Nor does anything in the rule prevent states from complying with accessibility laws or including unique envelope design elements intended to accommodate voters covered by these laws. The rule will not create a single, uniform ballot envelope design across all states; variation will remain. Rather, as one commenter explained, what the rule adds is uniformity: it makes these proven measures a consistent baseline for every jurisdiction that mails federal ballots, closing the patchwork that today inhibits mailpiece visibility and can make it more difficult to process and deliver ballot mail.

The rule’s design requirements help to ensure timely processing and delivery of Federal Ballot Mail. As explained in the proposed rule and as echoed by many commenters, envelopes built for automation move through processing with less manual intervention and fewer chances for error. A consistent, recognizable election mail logo helps postal employees distinguish ballot mail from other mailpieces and facilitates proper handling, in accordance with existing Postal Service policy. And unique IMb data helps facilitate the tracking of individual pieces of Federal Ballot Mail to and from individual voters as the barcodes are scanned on the Postal Service's mail processing equipment.

Some commenters, including election officials and election-related organizations, appeared confused about how to generate IMbs. Unique IMbs can be generated for any type of address, including P.O. Boxes and nontraditional addresses. Generating and printing unique IMbs does not require specialized equipment or expensive software. It can be done by election officials of any level of technical sophistication, including those jurisdictions that manually print and stuff their own ballot envelopes, using free tools and common office equipment.

The Postal Service offers a number of tools and resources to make generating unique IMbs simple, quick, and cost-effective. For example, the Postal Service’s Intelligent Mail for Small Business Tool (“IMsb Tool”) is a free (voluntary) online tool specifically designed for small-volume mailers that do not use Business Reply Mail, allowing such mailers to generate unique IMbs for printing on address labels or envelopes. The IMsb Tool is a web-based program that does not require any software or downloads. It allows small mailers to create mailings and documentation without making the investment of engaging software providers. Customers can upload their mailing list into the Tool to create and print address labels, envelopes, inserts or card stock and also generate the associated postage statements. The printing can be done

from a regular printer. Some in the election community have printed the IMbs themselves using this tool for several years. More information about getting started in the IMsb Tool is available on PostalPro: https://postalpro.usps.com/node/2266.

The Postal Service also anticipates making modifications to the IMsb Tool to further enhance its functionality for Federal Ballot Mail. For instance, the Tool will be able to create lists for Portal submissions that contain a file with the name, address, and unique outbound and return IMb of individuals on the election official's mailing list. This file can be uploaded directly to the Portal by Federal Ballot Mail Portal Users. Another change for Federal Ballot Mail in the IMsb Tool will allow election officials to generate a unique IMb even where the address cannot be verified using Delivery Point Verification ("DPV"). Although DPV helps to identify issues that may hinder delivery, this modification will reduce the chance of an administrative or technical issue that could prevent an election official from generating a unique IMb.

Alternatively, if an election official prefers to work with a vendor, as many do, the Postal Service provides a list of certified vendors and Mail Service Providers ("MSPs") at https://postalpro.usps.com/certifiedmsps/. It is a basic function of MSPs to print mailings with unique IMbs. To the extent they arise, printing issues, including jams, are surmountable and do not prevent proper implementation of the rule.

The Postal Service's Managers of Customer Relations ("MCRs") are also available to provide guidance and support on mailpiece design as election officials work to comply with the rule. MCRs serve as dedicated points of contact for each election jurisdiction, including territories. They regularly educate election officials on the benefits of using unique IMbs and can direct election officials to available postal resources to help them get started. Election officials can contact their local MCR directly or by following this link: https://electionmail.usps.com/s/contact-local-mcr. Election Officials can also contact the Mailing & Shipping Solutions Center ("MSSC") for support

regarding IMbs by email at MSSC@usps.gov or by phone at 1-877-672-0007 (Monday–Friday, 7:00 AM to 7:00 PM CT).

D. Mailpiece Design Analyst Review

Once election officials or their vendors have designed the Outbound and Return Federal Ballot Mail envelope to include the required elements, as set forth in DMM 705.24.3, the mailpiece must be submitted to the Postal Service for review by one of its MDAs. The envelope design must be reviewed each election cycle. If a state uses a single design, each political subdivision thereof does not need to separately submit the envelope for review. Mailpieces do not need to be reviewed prior to each separate mailing.

The mailpiece design review referenced in 705.24.3 is the existing MDA review process that many in the election community already utilize. MDAs are specially trained postal employees who can answer questions about mailpiece design, including IMbs and automation compatibility. Consulting with Postal Service MDAs will help ensure election officials have a well-designed Federal Ballot Mail envelope that is compatible with Postal Service guidelines and regulations, including the provisions of this rule. Although MDAs are already trained to assess the design elements included in this rule, the Postal Service will provide supplemental training to MDAs on Federal Ballot Mail and will offer additional resources as necessary to ensure customers receive consistent, accurate advice.

The rule does not change the process for submitting a mailpiece for review, receiving feedback, or contesting an MDA's advice. Customers can receive assistance from an MDA by submitting a design review request to MDA@usps.gov, through the Postal Service's Election Mail website at https://electionmail.usps.com/s/election-mail-review, or by calling 877-672- 0007 (select option 3 for mailpiece design) (Monday–Friday, 7:00 AM to 7:00 PM CT).

MDA review is generally a quick process. MDAs typically aim to provide feedback to mailers within 2 business days after receiving the mailer's request and necessary information and samples.

More information about the MDA review process is available in Kit 600 or at https://postalpro.usps.com/node/773.

E. Federal Ballot Mail Portal

Under 705.24.4, Federal Ballot Mail Portal Users, including state and local election officials and other authorized users, such as MSPs, must submit certain data into the Federal Ballot Mail Portal prior to presenting an Outbound Federal Ballot mailing for acceptance. Chief state election officials are not required to enter this data themselves or to consolidate data for all political subdivisions within their state before data can be entered into the Portal. The chief state election official of each state does, however, authorize access for other Federal Ballot Mail Portal Users within their state. The rule also allows other individuals to enter information into the Portal if authorized, such as staff members, MSPs, or other vendors, thereby minimizing any potential administrative burden on election officials.

The Postal Service recognizes that many states have decentralized election administration. It is important that the state, through the chief state election official, maintain ultimate control over access to the Portal because they will have more visibility into their own election structures than will the Postal Service.

Voters themselves will not enroll with the Postal Service, and are not responsible for verifying Portal information or correcting information provided by Federal Ballot Mail Portal Users. In part, this is because voters do not design ballot mail envelopes and, consequently, do not have the relevant data elements for the Portal. Instead, that responsibility lies exclusively with election officials and their authorized MSPs.

Once Federal Ballot Mail Portal Users have set up a Portal account, they will be prompted to certify that their Outbound and Return Federal Ballot Mail envelopes have been submitted for MDA review and that they have received feedback. Federal Ballot Mail Portal Users will not be able to upload any data into the Portal until the certification is complete. This will ensure compliance with DMM 705.24.3.1 and 705.24.3.2 and reduces the information that is verified prior to acceptance of an Outbound Federal Ballot mailing. Business Mail Entry Unit ("BMEU") technicians and Retail clerks will not perform a separate review of this information.

After completing the certification, Federal Ballot Mail Portal Users must provide: the name and address of the voter as found on Outbound Federal Ballot Mail envelope; the issuing state; and the IMbs on the Outbound and Return Federal Ballot Mail envelopes. This information must be uploaded to the Portal prior to presenting Outbound Federal Ballot Mail for acceptance. These data help to ensure that the rule's preparation standards have been satisfied, can provide valuable insight to election officials and law enforcement, and facilitate the verification process. This type of information is regularly collected by the Postal Service, including on mailing manifests. No other voter information, such as birthdate, social security number, or other voter registration details, will be uploaded to the Portal. As described further below, the Postal Service is developing this Portal with appropriate cybersecurity and privacy safeguards to protect Portal data, consistent with applicable law.

The required information can be uploaded into the Portal using an Excel template specifically formatted for Portal submission. Uploading and generating the necessary information is similar to submitting a manifest for bulk mailings, which larger election offices and their MSPs routinely complete. For smaller jurisdictions, the (free and optional) IMsb Tool can be used to generate a file that can be uploaded directly into the Portal. This will help minimize any data entry burden. The Postal Service does not

anticipate that providing Portal data should require any change to statewide systems or databases. States must necessarily already maintain lists or databases with the relevant name and address information, otherwise it would never have been possible to mail those ballots in the first place. These systems are intended to remain separate, and do not need to be interconnected with the Portal. One commenter mentioned that states may wish to update their databases to include IMb data. States are free to undertake such actions, but it is not required by the rule.

Under the proposed rule, there is a flexible timeline for uploading data into the Portal. Initial mailing lists should be entered into the Portal at least 30 days before the election, if possible, or by the date on which ballots must begin being mailed under state law. This 30-day timeline, retained without modification in the final rule, is not a rigid deadline for completing Portal data entry. Although Executive Order 14399 contemplated a proposal in which states would submit such lists “no fewer than 60 days before the election,” the flexible 30-day timeline accommodates variations in state law.

The Postal Service does not expect these initial lists to be complete or final. States may continue to add, amend, or remove data from the Portal to account for new voters, new mail-in or absentee ballot requests, replacement ballots, addressing administrative errors, and other changes consistent with their state’s law. These changes can be made as a new separate entry or by updating prior entries. This flexibility is intended to facilitate—not constrain—voters’ ability to access mail-in or absentee voting as permitted by their own state’s voting law, none of which are altered by this rule.

Federal Ballot Mail Portal Users can update the information submitted through the Portal as frequently as needed, consistent with state law. This process is designed to be flexible to account for variation in state law. For example, as one commenter explained, California Elections Code Section 3000.5(a) dictates when county election

officials are to mail ballots to registered voters. Section 3005.5(a) provides, in part: "for each election, the elections official shall, no later than 29 days before the day of the election, begin mailing the materials specified in Section 3010 to every registered voter. The elections official shall have five days to mail a ballot to each person who is registered to vote on the 29th day before the day of the election and five days to mail a ballot to each person who is subsequently registered to vote." Under California law, a voter may also register as late as 15 days before an election and will subsequently be sent a ballot via mail. Even after the 15th day before an election, voters may request a replacement mail ballot upon request to their county election official. This state statutory scheme is consistent with the rule. California election officials could submit initial mailing lists into the Portal 30 days (or sooner) before the election and present Outbound Federal Mailings for acceptance "no later than 29 days before the day of the election," consistent with state law. California election officials may continue to add Portal entries for Outbound Federal Ballot Mail destined for voters who register after that time and until the 15th day before the election, and even after the 15th day before the election may continue to make supplemental entries for any replacement requests.

The ability to add and amend lists also allows Authorized Ballot Mailers to enter Outbound Federal Ballot Mail in batches, consistent with the current practice for many in the election community. Federal Ballot Mail Portal Users may continue to supplement the Portal data as permitted by state law, potentially up until Election Day. The only constraint imposed by the rule in this regard is that the information for a particular mailing must be uploaded into the Portal prior to the Outbound Federal Ballot mailing being presented to the Postal Service for acceptance. Thus, the Portal and verification process accommodate election officials who (for example) may do one large mailing and multiple smaller mailings. It also accommodates election officials who prepare

many ballots for mailing at once but enter them into the mailstream in multiple installments.

Portal data will be updated as soon as it is submitted by the Federal Ballot Mail Portal User, and there should be minimal to no delay between Portal upload and a mailer's ability to present the mailing for acceptance. Portal data will also be available for verification purposes on a nationwide basis. If an Outbound Federal Ballot mailing is presented for acceptance outside of the issuing state, Postal Service employees would still have access to the necessary Portal data to perform verification under DMM 705.24.5.

Within the Portal, the Postal Service plans to confirm that the required data fields are completed (i.e., they may not be left blank) prior to Outbound Federal Ballot mailings being presented for acceptance. This includes verifying the unique IMb on Return Federal Ballot Mail has been uploaded into the Portal. Aside from confirming that the required data has been uploaded, however, the Postal Service will not otherwise verify, correct, or amend any data entered into the Portal. It will not determine whether an individual's name is accurate; so, for example, married women changing their names or potential mismatches for misspellings will not prevent a ballot from reaching a voter under the rule. Likewise, the Postal Service will not assess the accuracy of the address entered, such as to determine whether there is a Change of Address or whether the address is otherwise invalid. Moreover, the address uploaded into the Portal should be the address used on the Outbound Federal Ballot Mail envelope. Nontraditional addresses, such as tribal addresses, college dormitories, and long-term care facilities, can and should be entered into the Portal if that is the address on the Outbound Federal Ballot envelope. Voters who may move often, like students, the homeless, the elderly, renters, or people whose mailing addresses do not match identically with government

records, should not experience delivery issues under the rule so long as their state or local election official has their current mailing address.

The Postal Service will not be comparing any data entered into the Portal against state voter rolls as part of the verification process or otherwise. This means that state election officials will maintain full control over managing their own voter rolls and determining voter eligibility without any interference or involvement from the Postal Service.

All data or changes submitted by Federal Ballot Mail Portal Users will be accepted. The possibility that the Portal may, therefore, be overinclusive does not undermine the purposes of the rule as the State Mail-In and Absentee Participation List, which compiles all Portal data for a state and is not intended to serve as a replacement for official voter rolls.

Finally, shortly after the effective date of the final rule, the Postal Service will make additional guidance documents available, including a User Guide for the Portal and Technical Specifications for the Portal. These resources will explain how to create a Portal account, how to assign and approve Federal Ballot Mail Portal Users, the file format for Portal uploads, and how to resolve errors and make new submissions; these documents will be available in accessible formats. The Postal Service has an established process for communicating new or updated technical requirements that it will deploy to inform election officials, MSPs, and others in the mailing community about the Portal and these resources. This process includes familiar communications channels, including Industry Alerts and Mailers Technical Advisory Committee User Group notifications, which help to ensure that the information reaches the appropriate audience. MCRs are also available to assist individual customers by email and phone. The Postal Service will also directly engage with election officials, MSPs, and other

stakeholders to answer questions and provide guidance related to implementation of the rule.

F. Outbound Federal Ballot Mail Entry

When preparing Outbound Federal Ballot mailings, Authorized Ballot Mailers must segregate Outbound Federal Ballot Mail from other types of ballot mail, such as primary ballots, UOCAVA ballots, or ballots for state or local elections only. Comingling non-federal ballot mail with Outbound Federal Ballot Mail may impact the verification process and could prevent or delay proper acceptance of mailings. For ballots that have both federal and state issues on the ballot, the mailing will be treated as Outbound Federal Ballot Mail and will be subject to the rule. At entry, mailers should inform the BMEU technician or Retail clerk if a ballot mailing contains non-federal ballots. Timing differences (between primaries and general elections or between federal and state elections) and external indicia may also help alert postal employees to the presence of non-Federal Ballot Mail.

The Postal Service is also working on establishing Federal Election Mail and Non-Federal Election Mail Service Type Identifiers ("STIDs"). Specifically, the Postal Service is planning to convert the current Election Mail STIDs to Federal Election Mail STIDs. New STIDs will be developed for non-Federal elections. This approach will assist jurisdictions that may have already finalized the printing process for their 2026 general election envelopes relying on the existing STID table, and will support their ability to comply with the final rule. Having unique STIDs for Federal and non-Federal elections will help to further distinguish Federal Ballot Mail from other ballot mail. Prior to finalizing and releasing the new STIDs, the Postal Service will publish a notice in the Federal Register.

As stated in the proposed rule, Outbound Federal Ballot mailings must be entered at a Post Office retail counter, including manual post offices, or a BMEU. A

locator tool for Postal Service locations is available here: https://tools.usps.com/locations/. These mailings may not be entered into blue collection boxes, collection boxes in retail lobbies, or through other means. While the rule makes this restriction mandatory, it is also consistent with the Postal Service's general guidance for outbound ballot mailings. Commercial mailings must meet applicable DMM requirements. Mailings paid at single-piece First Class Mail rates are not required to meet commercial mailing standards.

Verification under 705.24.5 will be performed at a BMEU or Post Office retail counter when an Outbound Federal Ballot mailing is presented for acceptance. Conducting verification prior to acceptance is intended to obviate confusion and provide a clear, immediate identification of potential issues. Either a BMEU technician, if the mailing is presented at a BMEU, or Retail clerk, if the mailing is presented at a Post Office or other Postal Service retail location, will perform the verification. Both BMEU technicians and Retail clerks will receive training on this process.

The verification process is straightforward. The Outbound Federal Ballot mailings will be verified using the IMb on the outside of the Outbound Federal Ballot Mail envelope. Relying on existing scanning technology and devices, the Postal Service will confirm the presence of scanned barcodes in the Federal Ballot Mail Portal. Portal data will be available for verification purposes on a nationwide basis. Therefore, if a state uses an MSP located in a state different than the issuing state of the ballot, the Postal Service will still be able to conduct verification.

This process can be completed promptly. Scanning a barcode generally takes less than a minute per mailpiece. Depending on how many barcodes are scanned, the verification process should take no more than a few hours for larger mailings, and potentially only a few minutes for smaller mailings. Authorized Ballot Mailers should remain at the BMEU or postal retail location during the verification process.

If the Outbound Federal Ballot mailing meets the verification standards, it will be accepted by the Postal Service. No further action is needed by election officials or voters under the rule.

Authorized Ballot Mailers will be informed of the escalation procedures should they decide to challenge a rejection; relevant Postal Service employees will also receive training about these procedures. The ability to cure rests not with the voter, as the franchise itself is not impacted, but with the officials responsible for preparing the envelope and entering Portal data. This approach is consistent with how election mail works now, where election officials and mailers are responsible for preparing the ballot mail, addressing the mailpieces properly, ensuring that they are going to the proper individual, and correcting any error that may occur or prevent delivery to the intended recipient. Thus, the Postal Service will continue to resolve issues consistent with our current approach, rather than creating a new "appeal" process for voters, as many commenters urged, that would impose a direct burden on voters and increase the risk of confusion and concern.

Once Outbound Federal Ballot Mail is accepted by the Postal Service, it will enter and move through the mailstream as it has in prior elections. It will not be intercepted, returned, or delayed due to the rule.

The verification process does not entail scrutiny into, or any attempt to evaluate, individual voters. The Postal Service is not verifying addresses, names, voter eligibility, or citizenship status as part of this verification process. As noted above, Portal data will be regularly refreshed to minimize the risk that the verification process incorrectly flags, delays, or disrupts lawful federal ballot materials.

Verification under DMM 705.24.5 is done only for Outbound Federal Ballot mailings. If a voter chooses to return their completed ballot by mail, they should use the Federal Return Ballot Mail envelope provided by their state; and they may continue to

mail from a residential mailbox, a blue collection box, or any retail counter. Once the Federal Return Ballot Mail enters the mailstream, it will be processed and delivered consistently with current operational practices. This includes generating scan data from the unique IMb on the outer return envelope when the mailpiece is processed on the Postal Service's automated equipment subject to certain limitations, including extraordinary measures that may remove ballots from normal operational processes to expedite delivery.

The Postal Service also wishes to clarify two provisions of the proposed rule, which are adopted without change in the final rule. First, the Postal Service would like to clarify the meaning of Section 705.24.5.2, which provides in part that "[t]he Postal Service's acceptance of Outbound Federal Ballot Mail does not constitute verified compliance." This provision was included in recognition of the fact that, despite the Postal Service's best efforts, some Outbound Federal Mail may enter the mailstream that does not meet the preparation or data standards set forth in the rule. For that reason, DMM 705.24.5.2 is intended to acknowledge that acceptance (and ultimately delivery) of an outbound federal ballot does not, in and of itself, evidence compliance with the rule's provisions.

Second, commenters expressed concern over 705.24.5.3.d, which states that "[t]he Postal Service assumes no responsibility for any outbound ballot mailing presented until it is accepted into the mail. The Postal Service is not responsible for service delays when the Ballot Portal User or Authorized Ballot Mailer does not meet the applicable preparation or entry standards." The Postal Service notes that comparable statements appear throughout the DMM, and that the provision reflects the longstanding principle that the Postal Service is not responsible for a mailing until the mailing is in its custody—that is, until it has been accepted. For example, DMM 608.11.3 (Postmarks and Postal Possession) describes the point at which the "Postal

Service accept[s] custody of a mailpiece," and the Plant-Verified Drop Shipment provisions of DMM 705 provide that such shipments "are freight until deposited and accepted as mail at the destination facility." The specific language in 705.24.5.3.d is similar to a provision discussing the effects on service for Metered Mail Drop Shipments, which also must satisfy specific preparation conditions to be accepted for mailing. DMM 705.19.1. That provision states: "The USPS assumes no responsibility for the material presented until it is accepted into the mail. The USPS is not responsible for service delays when the mailer does not meet the applicable preparation or entry requirements." This language is included in the rule to ensure that mailers know that they must remain in control of an Outbound Federal Ballot mailing until it has been accepted by the Postal Service.

G. State-Specific Mail-In and Absentee Participation List

On or about Election Day, the Postal Service will generate a state-specific Mail-In and Absentee Participation List, which compiles all Federal Ballot Mail Portal entries submitted for the originating state. This list will be securely transmitted to the chief election official of each state. The Postal Service will not disclose the Lists to the public. The List is in effect a manifest, and is primarily intended to assist election officials and law enforcement to understand who may have been mailed a ballot, in order to identify potentially anomalous incidents that may merit further investigation. Providing the list on or after Election Day is consistent with this purpose.

To be clear, the state-specific Lists are not intended to substitute for or supplant state voter rolls. It simply offers another data point at the chief state election official's disposal based on their own Portal data. The chief state election official is free to choose whether and how to use the state-specific list. Those decisions are not dictated by the Postal Service or this rule. States have sole responsibility for ensuring the accuracy of their voter rolls and counting ballots as permitted under state law.

The Portal data is the sole data source used to generate the Lists. These data are provided directly by election officials (and other Federal Ballot Mail Portal Users) based on the mailings they actually made or planned to make. The List will not be based on external sources of information, such as federal databases made available by the Department of Homeland Security or the Social Security Administration. Nor will the Postal Service compare Portal data to any other internal or external source (e.g., National Change of Address data, federal data lists), filter the information, or otherwise alter the Portal data on its own when compiling the state-specific List. The Lists will also not contain any scan data. As one commenter correctly stated, the rule "require[s] USPS to provide the state with the List that contained the same information that the state provided to USPS."

In light of the above, some commenters questioned the purpose of the Lists. Other commenters recognized that the value of the List lies in the creation of reconcilable data that offer a neutral administrative check that strengthens confidence in elections. These commenters argued that credible post-election audits can rise or fall on the quality of the underlying data. The state-specific List would meaningfully sharpen that data by providing significantly enhanced visibility regarding the sending of mail-in ballots, as it will provide federal law enforcement with a list of individuals to whom states planned to mail a ballot (and who may potentially use the mail to vote), along with the associated barcode data, which the Postal Service understands will help to facilitate enforcement of federal law. Currently, law enforcement lacks such information regarding the use of the mail. The List is not intended to substitute for official election records or state mandated reconciliation procedures. In assessing the List for areas of potential further investigation, it should also be noted that some variation may exist between the List and the (separate) scan data for a variety of reasons, for example not all voters who receive a mail-in ballot will return it by mail, and as noted above the Portal data may be

over-inclusive. The benefits of the rule are still achieved notwithstanding these variations.

## V. Impact of the Final Rule

Consistent with the operation of the rule set forth above, the Postal Service also clarifies the impact of the rule on voters and election officials, particularly as weighed against the rule's purpose and benefits. As provided by the comments, this section discusses commenters' claims regarding the benefits and burdens of the rule, and how the Postal Service is striking an appropriate balance in the final rule.

### A. Benefits of the Rule

Those commenters who supported the rule believed that the benefits to the rule are aligned with the rule's intended purpose and that the rule's policy goals are properly weighed against the potential burdens, harms, and costs. They urged the Postal Service to swiftly adopt the proposed rule, so that all federal elections could benefit from its stated improvements, including mailpiece visibility and the enforcement of federal law.

As an initial matter, these comments acknowledged that mail ballots play an important role for many voters, but also had concerns related to voter fraud. These commenters noted that even the possibility that elections are taking place in an unsecure manner due to lack of necessary visibility can undermine public confidence in the electoral process, even if no fraud is ultimately discovered. These commenters asserted that given the prevalence of mail-in voting, it would be both appropriate and beneficial for the government entity tasked with delivering ballots to and from the voter and the election office to put safeguards in place. Many of these commenters argued that by making the mailstream more reliable and more transparent on a nationwide basis, the rule would provide states with a means to combat potential voter fraud in ways they could not do acting alone. Commenters note that this would strengthen public confidence in the election system without altering any state election laws, voter

registration, or eligibility requirements; or changing how ballots are issued, collected, or counted. As one comment explained: public confidence in elections is best sustained by procedures that can be verified, documented, and consistently applied.

Moreover, these commenters recognized that the rule offers efficiency and security benefits for voters and election officials, and promotes secure elections that the public can be confident in. Commenters note that a set of minimum envelope-design standards would help election officials, the Postal Service, and the public better account for Federal Ballot Mail moving through the mailstream. As several commenters explained, a ballot that can be tracked is far harder to misplace, stall, or counterfeit. Improved tracking may also help identify discrepancies between ballots mailed and ballots received, some commenters added, making it easier to detect and deter potential fraud or irregularities while protecting the integrity of mail-in voting. Even parties opposing the rule recognized that unique IMbs can provide unmatched visibility into the mailpiece's progress in the mailstream. Commenters also reiterated the importance of the Official Election Mail logo as a means for voters to recognize election mail as important and distinct from other mailings and to help Postal Service employees identify official election mail among the millions of mailpieces processed daily. Commenters further explained that advance review of ballot envelope designs would reduce operational errors, delays, and delivery issues that have sometimes affected voters and delayed delivery of their ballots. As examples, commenters pointed out that non-automation compatible ballot mail is more likely to encounter avoidable processing complications or delays, and other mailpiece design defects could prevent barcodes from being read or increase the need for manual handling. Commenters concluded that requiring design review before ballot envelopes are printed and mailed is a low-cost, high-value step that can prevent serious problems during the compressed period before an election.

Furthermore, these commenters state that the rule's other preparation and data entry requirements, particularly those involving the Portal, would support stronger coordination between state election officials and the Postal Service. For example, the rule would improve pre-election planning by allowing states to notify the Postal Service before using the postal system for ballot delivery. States would still retain full control over who receives a ballot, and the Postal Service would have better information to plan resources. Many election officials who submitted comments, including those who opposed the rule, expressed appreciation for the Postal Service's ongoing efforts to support election officials. The rule, some commenters noted, provides another avenue to strengthen those relationships. Many commenters concluded that by improving coordination between election officials and the Postal Service, the proposed rule has the potential to reduce undeliverable election mail, strengthen ballot accountability, and reinforce public confidence that election mail is being sent to the correct recipients.

These commenters further contend that applying reasonable verification procedures to federal election ballots is consistent with the Postal Service's longstanding mission of delivering mail accurately, securely, and reliably. Commenters noted that verification, as contemplated in the rule, does not alter the states' authority to determine voter eligibility or administer elections. Rather, it provides an additional administrative safeguard to help ensure that ballots approved by election officials are delivered accurately to the intended recipient. Commenters opposing and supporting the rule noted the extensive efforts election officials undertake to maintain accurate voter rolls. Those in favor of the proposed rule argue that rather than duplicating, undermining, or usurping these efforts, the rule strengthens ballot distribution procedures as a logical complement to states' election administration responsibilities.

Ultimately, these commenters reasoned that while the rule would place some administrative burdens on states, as they take advantage of the new Portal registration,

barcode generation, and list submission provisions, these burdens are plainly justified by the rule's security and accountability benefits. Overall, in their view, the rule's standards would improve accountability without displacing the role of states in deciding who is eligible to vote or how elections are administered. The operational improvements that the rule mandates would benefit voters of every political affiliation because they promote accuracy, efficiency, and transparency in the administration of federal elections. These commenters explained that public confidence in elections is strengthened when every stage of ballot distribution is transparent. They also opined that the rule would help facilitate the appropriate direction of resources to law enforcement efforts.

B. Burdens and Costs of the Rule

Separate from arguments, discussed above, about the legal authority for the rule, numerous commenters opposing the rule also criticized it for purportedly failing to account for the potential burdens and other alleged harms it would impose on voters and election officials, not addressing associated reliance interests, and not adequately demonstrating a connection between the proposed rule's provisions and its stated goal. These commenters asserted that a rule of this nature should be based on detailed study, should be gradually rolled out, and should move forward only after election officials and the Postal Service are fully prepared for implementation. In particular, these commenters argued that a rule of this nature should not be issued roughly three months before an election. These commenters contended that the Postal Service should not finalize this rule without a reasoned explanation, a full implementation analysis, and an assessment of foreseeable civil rights impacts. Commenters strongly urged the Postal Service not to finalize it.

*Voters*

Those opposed to the rule expressed concern about the possibility of disenfranchisement. They contended that voters may be omitted from the Portal with no recourse, that an administrative or technical error may result in an otherwise lawful ballot being rejected by the Postal Service, or that voters may not receive a ballot at all if their state government chooses not to provide data in the Portal. Any of these scenarios, commenters argued, could result in voters having their mail-in or absentee ballots withheld or delayed, without any recourse or viable alternative to cast a ballot. Commenters asserted that some voters may be especially impacted should their ability to vote by mail be altered in any way, including those who are disabled, are elderly, have limited English proficiency, live in rural-dwelling, or are financially distressed. According to commenters, voters would bear the practical consequence of any delivery delay, even if the delay was caused by an administrative process outside the voter's control. Commenters asserted that the rule would discourage individuals from voting by mail. Other commenters argued that any policy that could result in the delay, rejection, segregation, or differential treatment of mail ballots raises concerns regarding voter access, election administration, and public confidence in the democratic process.

Commenters also discussed the risks of confusion that the rule would purportedly create, particularly because voters may not know if their state has complied with or will be able to comply with the rule. These commenters claimed that the potential for voter confusion due to the rule is a harm in and of itself.

Others expressed concerns for their privacy and did not want voter information included in a Portal run by the federal government or their identity linked to uniquely serialized IMbs on Outbound and Return Federal Ballot Mail envelopes.

*Election Officials*

Among the most frequently raised concerns from commenters opposing the rule was the purported burden imposed on election officials, specifically if the rule were implemented immediately. Commenters, particularly election officials, secretaries of state, governmental officials, and voting organizations, stated that it would be difficult if not impossible to implement the rule in time for the 2026 general election. Election officials asserted that their preparations for the 2026 election are already underway and that they lack the time, funding, and staff to implement the proposed rule. Some commenters asserted that they have already purchased envelopes for the 2026 election cycle, and that generating unique barcodes for both outbound and return ballot mailings in some cases would require significant changes to their ballot envelope design, as well as procurement of those redesigned envelopes on an expedited timeline, which they assert would not be possible. Other commenters explained that in some cases, legislative action, Attorney General guidance, or state board approval are needed before such changes could be made. Some commenters posited that smaller and more rural counties with limited technology would be disproportionately affected, while others thought complying with the rule would be more onerous for election officials in states that have universal mail-in voting compared to states that do not mail absentee ballots unless requested by the voter.

Commenters also argued that the rule would impose new and recurring costs and administrative burdens for future elections cycles that do not currently exist. In this regard, commenters note that election systems are designed around state law, existing technology systems, vendor contracts, staffing structures, election calendars, and operational procedures that have been developed over time, and introducing new reporting, certification, and verification processes for Federal Ballot Mail would, in their view, require significant modifications to existing workflows and systems. Having

previously relied on current procedures in structuring their budgets, staffing, and election timelines, commenters note that states would have to absorb any new costs, which those plans never contemplated.

Complying with the mail preparation and data-reporting standards, commenters asserted, would require them to divert resources away from processing voter registration applications and mail-in or absentee ballot applications, and in some instances the staffing necessary to implement the proposed rule may not be available at all. Election officials also asserted that there will be additional costs for direct voter contact, and other voter education efforts required to explain the rule to voters and to respond to related inquiries, including an increase in support calls.

*Reliance Interests*

Other commenters argued that, when a federal entity issues new standards, it must assess whether there were reliance interests, determine whether these interests were significant, and weigh any such interests against competing policy concerns, and alleged that the Postal Service has failed to do so. Commenters argued that the rule would create a “one size fits all” federal policy that would displace established state and local practices driven by the needs of different localities and grounded in reliance on the Postal Service’s dependable transmission of mail-in and absentee ballots. As noted above, commenters further focused on reliance interests related to preparations for the 2026 election cycle.

*Relationship of the Rule to Its Intended Purpose*

Commenters argued that the proposed rule was not sufficiently tied to its stated purpose—namely to help ensure election integrity, fraud prevention, and facilitation of federal law enforcement. In their view, the proposed rule provides no empirical evidence or other explanation to articulate why existing election mail procedures are deficient, what operational problem would be solved by the Portal, or how IMb data would help

mitigate or investigate election crimes. Numerous commenters also argued that, the proposed rule would not provide any material new information to law enforcement.

Some commenters who opposed 705.24.4 and 705.24.5 were supportive of the mailpiece envelope design provisions of 705.24.3. However, those commenters noted that many of the envelope design best practices the rule would mandate are already available and used voluntarily. Commenters argued that converting these recommendations into federal requirements adds cost and operational risk for election officials without counterbalancing benefits.

*Evaluating Less Restrictive Alternatives*

Several commenters also argued that the Postal Service should evaluate less restrictive alternatives. For example commenters suggested: voluntary pilot programs, phased implementation after the 2026 election cycle or a capacity-adjusted implementation timeline, aggregate or post-mailing reconciliation, data minimization, hashed or non-voter-identifying records, safe harbors for minor or correctable defects, mandatory acceptance during Portal outages, making the data entry standards optional, and emergency escalation procedures for replacement ballots, late-added voters, court-ordered ballots, and small-volume local mailings. Other commenters argued that rejection of Outbound Federal Ballot Mail for failure to satisfy preparation and data entry standards is a disproportionate consequence compared to the monetary penalties imposed elsewhere in the DMM for failing to meet other preparation or eligibility standards after an administrative review. *See* DMM 607.

C. Balancing Interests

After careful consideration of these various viewpoints, and the comments discussing these issues, the Postal Service is moving to finalize the proposed rule, subject to certain modifications explained in “Revisions Adopted in the Final Rule.”

The Postal Service has thoroughly explained the rationale for imposing mail preparation and data reporting requirements as set forth in the proposed rule, which are necessary to help promote the faithful execution of federal law and advance the Postal Service’s ability to efficiently handle Federal Ballot Mail. While the Postal Service’s existing processes are designed to support the timely delivery and smooth processing of ballot mail, it has long recognized that across-the-board compliance with its longstanding recommendations would further improve efficient handling, processing, and delivery. This would benefit the Postal Service, election officials, and voters alike. Moreover, while the Postal Service currently does obtain scan data for some ballot mail that could be useful for law-enforcement purposes, mandating compliance with the data reporting and mail-preparation requirements for all Federal Ballot Mail would significantly improve the quality of that data. This visibility will, in turn, put law enforcement in a better position to identify any potential issues regarding compliance with federal law that may merit further investigation.

Weighing these benefits and the operational needs of the Postal Service, the rule is intended to minimize the burden and impact on voters and election officials, while still achieving the rule’s purposes. Under this rule, states will retain complete autonomy to determine voter eligibility to use the mail to vote, as they do today. If their state complies with the rule’s relatively modest mail preparation and data entry standards, voters should not experience any difference from the status quo. The Postal Service anticipates that all states will make a good faith effort to comply with the rule, consistent with the belief expressed by some commenters, thereby enabling eligible voters to continue to use the mail to vote. Overall, the rule imposes requirements that are

rationally and carefully tailored to the underlying purposes of the rule. The Postal Service would also reiterate that the rule does not mandate that states administer elections in a “one size fits all” manner; on the contrary, state election laws and practices will continue to vary in accordance with state law, as states will retain control over the manner of their elections, unaltered by the rule. The rule requires merely that states that choose to use the U.S. mail as part of their elections adhere to certain standard mailpiece design and data reporting standards when sending Federal Ballot Mail.

The Postal Service also notes that some commenters narrowly focused their concerns on the purportedly substantial costs and practical challenges that election officials would presently face in attempting to comply with the rule for the November 2026 general election. The Postal Service recognizes that the rule would require states to adjust their processes and adapt to the changes imposed by the rule, potentially incurring new costs. While the Postal Service has weighed these considerations, including the possibility that some jurisdictions would need to order new ballot envelopes and devote resources to complying with the new envelope-design standards and reporting requirements, those considerations have to be balanced against the benefits of the rule, and in particular the fact that these standards are necessary to ensure the faithful execution of federal law. Given that mail-in ballots subject to this rule are generally mailed in September or thereafter, an immediate effective date ensures the maximum possible time for election officials to adjust their ballot mail envelopes to meet the new preparation standards if necessary, and to prepare to submit data to the Portal once it becomes active. This promotes states’ and political subdivisions’ ability to successfully implement the rule prior to the 2026 general election with good faith efforts and the available postal resources, notwithstanding the comments that described this task as “impossible.” And despite any logistical or financial difficulties states may face

complying with the rule, including some claims that immediate implementation would prove impossible, the visibility and law-enforcement benefits of the rule, including for this election cycle, are such that there is no compelling reason for any delay. In recognition of the potential burdens on election officials and the timeline involved, the Postal Service will make available considerable educational and other support resources discussed above to assist election officials with implementation and help facilitate timely compliance with the rule.

The Postal Service has also considered alternatives to the proposed rule, including both more and less restrictive options. The Postal Service received comments proposing a number of alternatives including: using registered mail to transmit ballots; performing verification of additional forms of data (including name, address, or Return Federal Ballot Mail envelope IMb); expanding the rule to cover primaries or all voters; making all of the rule's provisions optional; eliminating verification and rejection procedures; and not requiring a unique IMb on return ballot envelopes.

As explained above, the Postal Service believes the proposed rule, as modified in the final rule, is appropriate in scale and scope. A more restrictive approach is unnecessary to achieve the goals of the rule and realize the related benefits. At the same time, the sensitivity of Outbound Federal Ballot Mail, the importance of voter confidence and election security, and the ability to support law enforcement purposes that are necessary to ensure the faithful execution of federal law require the inclusion of the verification and rejection procedures as set forth in 704.24.5 in order to fulfill the purposes of the rule. A less restrictive approach would not achieve all of the rule's benefits. For example, scans from unique IMbs provide a level of visibility into individual mailpieces that is not possible using non-serialized IMbs. The Postal Service agrees with commenters that this visibility is dependent on the mailpieces being scanned, and believes that the potential for improved visibility made possible by the use of unique

IMbs on both Outbound and Return Federal Ballot Mail better serves the intended goals of the rule than if a unique IMb were only on Outbound Federal Ballot Mail. Moreover, if the rule were not applied in a consistent, nationwide fashion (e.g., if its provisions only applied to some ballot mail, were optional, or if there were a phased roll-out), it may prevent the full benefits of the rule from being realized, prove unadministrable, and could potentially cause confusion and delays.

The final rule creates an appropriate balance of the purported burdens imposed by the rule against its intended benefits. As one commenter explained, election integrity and voter access are complementary goals. Any regulatory changes should strengthen public confidence while avoiding unnecessary obstacles to the timely and reliable delivery of election mail. This rule properly balances those considerations.

## VI. Other Considerations

### A. Postal Service Readiness

Numerous commenters expressed concern over the Postal Service's ability to successfully implement this rule. They expressed concern over whether the Postal Service had the necessary financial resources and staffing capacity and conjectured that proposed rule would saddle the Postal Service with election administration functions; require additional clerks, mailpiece design personnel, information technology support staff, and other human resources; and impose new obligations on retail offices and field operations.

Other commenters sought clarification about the training that postal employees would need to perform the new processes set forth in the rule. Other commenters, including some postal employees, questioned whether postal employees could satisfy their obligations under the Hatch Act and to the public under the rule.

The Postal Service is prepared to implement the rule, consistent with its legal obligations and available resources. The Postal Service already possesses the

necessary staffing capacity at BMEUs and retail locations as well as mail acceptance infrastructure necessary to administer the rule: wholly new institutional capacity does not need to be built from scratch. The Postal Service currently operates nationwide digital systems through the Business Customer Gateway and PostalOne!, and business mailers must already submit mailing documentation electronically. The Postal Service also maintains centralized support channels, including the MDA help desk. Furthermore, as stated in the Notice of Proposed Rulemaking, the Postal Service has available or will soon publish resources to assist election officials with compliance, including technical instructions on barcode creation, service type identifiers, acceptance processes, file preparation, documentation submission, and entry of data into the proposed portal. The addition of a new compliance review for a small subset of overall mail volume is not expected to require additional staff or be a significant burden on employees. Since the rule builds on processes already in place for election mail, its implementation should not prove inordinately costly. The Postal Service is able to balance the cost of implementing the rule, including developing the Portal, with the costs required to fulfill its other core operational responsibilities.

As explained above, there are only a few categories of employees who will be directly responsible for verifying compliance with the rule under 705.24.5, namely BMEU technicians, Retail clerks, and discrete support functions like employees in the PCSC. For employees in direct operational roles, the new pre-acceptance verification measures are similar to, and are no more onerous than, other mailing manifest reviews. With respect to other provisions in the rule, the Postal Service also recognizes that MDAs will see an increase in mailpiece design review requests under the rule. The Postal Service is committed to ensuring this process is completed in a timely manner, consistent with current customer expectations.

The Postal Service agrees that proper training to ensure nationwide consistency is important. The Postal Service is developing specific training for employees who will be directly responsible for conducting verification under the rule. Retail clerks and BMEU technicians will be trained on how to identify Federal Outbound Ballot Mail and what the scanning verification process requires. The training will be rolled out and conducted consistently with the Postal Service's usual processes. Additionally, MDAs will receive training on the rule's design requirements and recordkeeping requirements.

It is important to remember that the vast majority of employees will not experience a change in their responsibilities as a result of the rule. For example, letter carriers and employees in delivery and processing functions will not have any new responsibilities. These employees will continue to process and deliver ballot mail, including Federal Ballot Mail, and all other election mail, consistent with existing Postal Service processes, procedures, and guidance. Letter carriers and employees in processing and delivery functions will not validate, withhold, delay, or remove ballots in the mailstream.

The rule's requirements should not impact how the Postal Service processes and delivers Federal Ballot Mail. Longstanding processing and delivery practices for completed ballots that enter the mainstream will remain unchanged. As noted, designing automation compatible mailpieces, inclusion of the Official Election Mail logo, serialized IMbs on both the outbound and return ballots, and MDA mailpiece review have long been key components of the Postal Service's best practices guidance for ballot mail. Ensuring compliance with these longstanding recommendations, together with verification processes for IMbs on Outbound Federal Ballot Mail, lie within the Postal Service's zone of competence, and can therefore be incorporated into the Postal Service's normal course of operations.

The Postal Service would also note that the rule does not implicate the Hatch Act, as it neither directs nor authorizes any partisan political activity as defined by that Act by Postal Service employees.

B. Portal Security

The Postal Service received a number of comments concerned that creating a centralized data repository with voter information would make elections less secure. These comments argued that creating a centralized Portal establishes a high-value target for state-sponsored cyberattacks, other data breaches, and election disruption, and that the recent rise of AI-enhanced hacking technology increases these risks. For these commenters, the value of the Portal is minimal because it is, they argue, largely duplicative of existing state systems, and, in their view, does not justify the risk. Commenters contend that decentralized election systems improve election security.

Some commenters were concerned about the Postal Service's ability to maintain and protect data in complex, public-facing systems, with a few commenters suggesting technology, services, and other resources that the Postal Service could use to create the Portal. Commenters noted that system outages, technical malfunction or cyberattacks impacting the Portal could impact, or potentially halt, Outbound Federal Ballot mailings across multiple states simultaneously. Others emphasized that neither the Portal nor any related technical specifications are currently available; as a result, these commenters questioned whether election offices (especially those in small or under-resourced jurisdictions) would have the time and technical capacity to build the required data files immediately.

The Postal Service has extensive experience in developing, maintaining, and safeguarding public-facing data systems. The Postal Service faces ongoing cyberthreats and challenges that could directly impact customers, partners, and employees, and it is well prepared to defend against these threats. The Postal Service's

Corporate Information Security Office (CISO) protects its critical stakeholders by safeguarding the postal network, monitoring threats, and responding to incidents. As with comparable organizations in the government and private-sector, cybersecurity is a top priority for the Postal Service.

Against this backdrop, the Postal Service maintains a vast commercial public-facing website and has a number of existing systems for mailers to enter data to satisfy other mail preparation standards. It also has experience in quickly developing and deploying public-facing websites, like the website created to facilitate ordering and distribution of COVID-19 test kits. These are high-volume systems that maintain sensitive data. The Postal Service has specific guidelines and protocols in place for protecting and handling the sensitive and critical data contained within these systems. In short, contrary to commenters' claims and concerns, the Postal Service has meaningful experience developing and operating a system like the Portal.

The Portal will contain multi-layered security controls, including encrypted data transmission and storage, strict access management with multi-factor authentication, and role-based permissions. The system will be protected by enterprise-grade network defenses, real-time monitoring, and comprehensive audit logging, ensuring that sensitive data is accessible only to authorized officials and is retained securely.

As discussed above in "Operation of the Final Rule," there are free, optional tools available that can assist election officials and Federal Ballot Mail Portal Users in generating the data files necessary to satisfy the rule's data reporting requirements and ensure that the necessary information for Outbound Federal Ballot mailings is available to satisfy verification and be accepted into the mailstream. Jurisdictions using a vendor may already have such data files prepared as part of other mailing documentation. In either case, the burdens are modest and can be timely satisfied.

C. <u>Other State Law Concerns</u>

Commenters, including election officials, raised concerns about the ability of election officials to satisfy the requirements of the rule while also complying with various state laws. For example, some comments argued that the obligation to provide Portal data for inclusion on a state-specific List could require election officials to choose between complying with state privacy laws or the rule. Other commenters questioned election officials' ability to satisfy the rule's requirements while also complying with state statutory timing requirements for requesting, processing, and issuing ballots. And others argued that the rule would impact state and local elections where consolidated ballots are used.

The decision of how to arrange ballots is a matter for the states. Ballots that contain both federal and state or local elections are covered by the rule. States can easily avoid any effects on their state elections by either complying with the rule's requirements or by separating their federal ballots to exclude any non-federal elections. Either is permissible under the rule and would eliminate any impact on exclusively state or local elections.

The rule is also not facially incompatible with the various timing provisions in state election law. The envelope design review, data entry, and verification processes set forth in the rule should be relatively quick to complete and should not significantly alter the timeline for election officials. The rule's requirements will permit an election official to prepare and send Outbound Federal Ballot Mail near election day, as they do now. And, once Outbound Federal Ballot Mail is accepted into the postal network, the Postal Service has a strong track record of promptly delivering ballots to and from voters.

The rule also does not require that sensitive voter information be made public, like birthdates or social security numbers that may be protected from disclosure by state law. For one thing, the Portal and the Lists will not contain this kind of sensitive

information; they include information that appears on the outside of the ballot mail envelopes. For another, the Lists and the underlying Portal data will not be made publicly available. There are existing statutory and regulatory protections against the disclosure of customer addresses and other sensitive information. For example, while 39 U.S.C. § 410 provides that the Postal Service is subject to the Freedom of Information Act and the Privacy Act, it limits the scope of access to certain kinds of postal records. In particular, Section 410(c)(1) provides that neither law requires the Postal Service to release "the name or address, past or present, of any postal patron." Similarly, postal regulations provide that disclosures of address information may be made to state and local governments and law enforcement agencies, but generally prohibit disclosure of an individual person's mailing address to a non-government individual except in limited, enumerated circumstances. 39 C.F.R. § 265.14(d)(2)-(5), (9). Furthermore, as discussed above and reiterated below, many of these privacy concerns may be resolved by the information contained in the SOR for the Portal, which was published in the Federal Register on July 17, 2026.

D. Tribal Issues

The Postal Service received a small number of comments arguing that the proposed rule did not meaningfully address how the rule's requirements would affect tribal communities. Commenters were concerned about the ability of election officials to generate unique IMbs for nontraditional mailing addresses used by many Native American households, and about the impact of the rule more broadly given the unique mail delivery challenges that can impact these communities. Other commenters advocated for tribal consultation prior issuance of a final rule. In particular, one commenter argued that the rule should not be finalized until the Postal Service conducted formal consultation with federally recognized tribes pursuant to Executive Order 13175.

As the Postal Service has explained, the rule does not require any change to existing addressing practices. It only requires that the address uploaded into the Portal be the address used on the Outbound Federal Ballot Mail envelope. Election officials may continue to address ballots to nontraditional addresses and may generate unique IMbs for these addresses to comply with the rule. As discussed above, election officials may be able to use the free IMsb tool to generate a unique IMb even if these addresses cannot be validated through DPV.

With respect to consultation, the Postal Service will continue to work with tribal stakeholders as part of its broader outreach, education, and implementation efforts. However, Executive Order 13175 does not require the Postal Service to engage in such consultations. Only agencies covered by the Paperwork Reduction Act are subject to that Executive Order and, as noted above, the Postal Service is outside the Paperwork Reduction Act's scope. *Shane*, 658 F. Supp. at 915; *accord Kuzma*, 798 F.2d at 32. Therefore, consultation under Executive Order 13175 is not required prior to finalizing the rule.

E. Requests for More Information

The Postal Service received several comments requesting detailed analysis about the potential impact of the proposed rule and recommending that the results of any such analysis be published before issuing a final rule. For example, requests were made for a state-by-state analysis of the rule's impact; impact assessments for Tribal communities and UOCAVA voters (despite the express exclusion of UOCAVA ballots from the rule's scope); detailed information about the development of this rule and the Portal; an evaluation of any differential administrative burdens based on the size or resources of election jurisdictions; an assessment of the anticipated ballot-rejection rate under DMM 705.24.5; and a formal disability accessibility impact assessment before finalizing any changes to ballot mail procedures.

The Postal Service declines to conduct, publish, or otherwise disclose any additional analysis or information concerning the rule or Portal. The Postal Service has received sufficient information through public comments to assess the impact of the proposed rule and issue this final rule. Each state and political subdivision thereof may choose different means to satisfy the rule's mail preparation and data entry requirements based on their own capabilities and resources. As a result, the impact on states may vary but these decisions are not dictated by the Postal Service. Similarly, the Postal Service anticipates that the rejection rate of Outbound Federal Ballot Mail will be low, as states need only comply with the final rule's relatively modest mail preparation and data entry standards.

F. System of Records Notice

The Postal Service received numerous comments urging it to publish a new SORN for the Federal Ballot Mail Portal in accordance with the Privacy Act. Commenters sought information about retention periods for Portal data, access to that data, and limits on disclosure, among other things. While these comments are outside the scope of this rulemaking, the Postal Service separately took steps necessary for the creation of a SORN, as stated in the Notice of Proposed Rulemaking. On July 17, 2026, the SORN was published in the Federal Register. 91 Fed. Reg. 44880. As explained in the SORN, a SOR will need to be in place to implement this final rule, because no data will be collected through the Portal or disclosed until a SOR is in place. The SORN provides details regarding retention periods, access, disclosure, and the other matters raised by commenters. Comments will be accepted on the SORN for 30 days. Interested parties were invited to submit comments.

## VII. Suggested Revisions to the Proposed Rule

A. UOCAVA

In the Notice of Proposed Rulemaking, the Postal Service specifically invited comments on the exemption in the proposed rule for UOCAVA voters. Many commenters supported this exemption. Other commenters, while supporting the exemption, believed that the rule's express exclusion of UOCAVA ballots was insufficient to exclude or protect UOCAVA voters. These commenters asked for more assurances and safeguards to ensure UOCAVA ballots would not be impacted by the rule, as errors could occur that would accidentally apply the rule's standards to UOCAVA ballots.

Some commenters opposed the exemption for UOCAVA ballots. These commenters argued that "[a]pplying the EO 14399 framework"—such as enhanced tracking and participation lists—to UOCAVA ballots would strengthen integrity without undermining access, while aligning with existing Postal Service special handling for election mail to and from military and overseas voters. Excluding them, in the opinion of some commenters, leaves a significant portion of ballot mail for federal elections outside the new security measures, and including UOCAVA ballots would create a more comprehensive, uniform system that better serves all eligible voters while deterring unlawful use of the mail.

The Postal Service finds that the proposed rule provides sufficient safeguards for UOCAVA voters as drafted and declines to make additional changes. Further safeguards and assurances are unnecessary because these voters will experience no change as a result of proper implementation of the rule given its exemption of UOCAVA ballots. At the same time, the exemption does not create an anomaly or otherwise undermine the stated purpose of the rule. Rather, it reflects the unique logistical circumstances that overseas and military voters and their family members face, consistent with the statutory scheme enacted by Congress.

Separately, other comments sought clarification on how the Postal Service would distinguish between ballots sent pursuant to UOCAVA and other mail-in or absentee ballots. Existing postal regulations require that ballots sent to and from UOCAVA voters include unique identifiers on the exterior of the envelope that are not present on the ballot envelopes for non-UOCAVA voters. Specifically, DMM 703.8.8.5 requires that envelopes for mailing and receiving absentee ballots under UOCAVA must contain the following words: "No Postage Necessary in the U.S. Mail – DMM 703.8.0." Additionally, balloting envelopes for UOCAVA voters contain the statement: "U.S. Postage Paid 39 U.S.C. § 3406." These indicia enable the Postal Service to distinguish between UOCAVA ballots and ballots that fall within the scope of the rule. As explained above, UOCAVA ballots should be segregated from Outbound Federal Ballot Mail when presented for mailing. This will help ensure that both UOCAVA ballots and Outbound Federal Ballot Mail covered by the rule are properly accepted under applicable rules. Therefore, revisions to the proposed rule are unnecessary to ensure that UOCAVA ballots are distinguishable from Federal Ballot Mail.

B. Primaries

The Postal Service received several comments about primary elections specifically. Describing primaries as gateways to federal general elections, and further noting that in noncompetitive districts, primaries may effectively determine the outcomes of federal races, commenters argued that the rule's exclusion of primary elections creates inconsistencies in tracking, verification, and security standards. Commenters contended that the Notice of Proposed Rulemaking inadequately explained why fraud prevention and law enforcement rationales for ballots for general, special, and runoff federal elections would not apply equally to primaries. These commenters opined that voters and election officials would benefit from uniform Postal Service requirements throughout the election cycle.

The Postal Service reaffirms that, consistent with the framework for the proposed rule set forth in Executive Order 14399, the rule will not apply to primaries. Primary elections involve the selection of political party nominees through procedures chosen by the parties themselves, not the election of federal officials; as such, they fall outside the rule's scope and reach.

C. Address Confidentiality Protection and Other Voter Confidentiality Programs

As some commenters pointed out, survivors of domestic and sexual violence and/or stalking may experience significant privacy concerns related to the voter registration process. The fear of being located may deter such victims from voting in person, and even from registering to vote. Furthermore, as commenters noted, survivors of domestic violence, sexual violence, and/or stalking often relocate multiple times and/or postpone updating public records until adequate safety measures are in place. For these reasons, commenters concluded, many survivors rely crucially on the ability to vote by mail.

According to commenters, to assist such survivors, forty-seven states have instituted Address Confidentiality Protection programs ("ACPs")—confidential mail forwarding services available to survivors of domestic violence, stalking, sexual violence, child abduction and/or human trafficking who have recently relocated to a location unknown to their abuser or stalker. To ensure participant safety, commenters explained, ACPs typically shield participants from appearing in public voter files, usually by substituting alternative addresses or keeping records entirely offline. Often, ACP registration is entered manually in a locked file and not entered into the state's typical voter registration system. The ballot is then mailed to the state's substitute address, which, by design, differs from the voter's confidential actual address. In some instances, even an individual's name is protected under ACPs. Some commenters also noted that other states have additional privacy protections in place for participants.

Some commenters voiced concern that including information about these voters in the Portal and the contemplated exchange of this information through the state-specific Mail-In and Absentee Participation Lists would compromise ACP and other confidentiality programs and may call into question compliance with certain state requirements. One commenter noted a lack of guidance as to whether states would be required to upload survivors' actual physical addresses to the Portal, or whether the Postal Service (or other entities within the federal government) would question mailing ballots to a potentially large number of voters registered to a single alternative mailing address. Other commenters criticized the proposed rule for allegedly increasing risks to survivor safety. One commenter cited recent large-scale privacy breaches affecting government agencies and suggested that Mail-In and Absentee Participation Lists in the Postal Service's custody (including, presumably, the private information of voters protected under ACPs) could fall prey to such a breach.

The Postal Service clarifies that the rule requires that the name and address used on the outside of a ballot envelope be submitted to the Portal; it would not require that confidential information known only to the state be provided. The information in the Portal would also not be publicly disclosed, and the Postal Service has taken appropriate cybersecurity measures with respect to the Portal cybersecurity as discussed above. For these reasons, the proposed rule is compatible with state ACP programs.

D. Alternative Operational Approaches

A small number of commenters recommended that the rule be accompanied by ambitious operational changes, including a dedicated postal-run "state ballot box" into which only ballots would be placed, the establishment of a separate processing and delivery system for ballots, and fundamental Mailer ID redesign (a key component of IMbs).

The Postal Service declines to adopt these proposals. Such large-scale (and costly) operational changes are not necessary to accomplish the rule's objectives.

## VIII. Revisions Adopted in the Final Rule

Very few comments included recommended changes to the rule itself. The Postal Service received several suggestions that would result in a more expansive final rule ; however, these suggestions fall outside the scope of this rulemaking and the Postal Service's authority. For instance, a few commenters encouraged the Postal Service to add provisions into the rule to verify a voter's citizenship status as a condition of mail acceptance. Other commenters advocated for exclusively in-person voting, and still others proposed only accepting ballots that are received by Election Day. The Postal Service also received comments recommending a narrower final rule that would retain the proposed rule's provisions concerning ballot envelope design for Federal Ballot Mail, in 705.24.3, and eliminate the rule's other substantive provisions, namely 705.24.4 and 705.24.5. Within the scope of this rulemaking, the Postal Service is making several changes in response to the concerns discussed above.

First, the Postal Service makes clear that the verification process set forth in 705.24.5 (i.e., mail sent by authorized ballot mailers) does not apply to Return Federal Ballot Mail. Many comments demonstrated a factual misunderstanding about the inapplicability of these verification procedures to return ballots. Given the widespread confusion, the Postal Service believes that clarifying the final rule will reduce voter confusion and help ensure consistent implementation of the rule. However, as noted above, for individuals transmitting Return Federal Ballot mail to be in compliance with this rule, Return Federal Ballot Mail must be mailed in an envelope that meets the requirements of 705.24.3.2. As under existing law, voters may use their residential mailbox, any retail counter, or other authorized means to transmit their compliant Return Federal Ballot Mail.

In the event a voter loses or misplaces the Return Federal Ballot Mail envelope provided by the Authorized Ballot Mailer, or if the Authorized Ballot Mailer fails to provide the voter with a compliant Return Federal Ballot Mail envelope, the voter should request a replacement envelope from the Authorized Ballot Mailer that conforms to 705.24.3.2. The Postal Service may also provide such other means as reasonably determined by the Postal Service for transmitting Return Federal Ballot Mail consistent with the requirements of this rule. This will provide visibility and scan data for these ballot envelopes when processed on the Postal Service's automated equipment.

Second, there was confusion over how the MDA review requirements would be verified and enforced, and the circumstances under which the MDA review requirements could lead to an Outbound Federal Ballot mailing being rejected. As set forth above, certification of MDA review will not be verified when an Outbound Federal Ballot mailing is presented for acceptance. Instead, prior to uploading data into the Portal, Federal Ballot Mail Portal Users will be prompted to certify that their ballot envelope design has been submitted for review by an MDA and that the MDA has provided feedback. If they do not provide such certification, Federal Ballot Mail Portal Users will be unable to upload data into the Portal. To reduce confusion and clarify the responsibilities of Federal Ballot Mail Portal Users, the Postal Service is amending the language in 705.24.3.1, 705.24.3.2, and 705.24.4.2.f, and striking 705.24.5.3.b from the final rule.

Third, the Postal Service is amending the language in 705.24.3.1.c and 705.23.3.2.c to make clear that Authorized Ballot Mailers are responsible for creating IMbs. The Postal Service is also amending the language in 705.24.4.2.b.3 and 705.24.4.2.b.4 to clarify that the unique IMb submitted into the Portal is the IMb printed on the Outbound and Return Federal Ballot Mail envelopes. These clarifications are

intended to reduce confusion and provide clarity for Federal Ballot Mail Portal users; they do not substantively change the rule's data reporting requirements.

Fourth, the Postal Service is amending the language in 705.24.5.2 to clarify that only commercial mailings are subject to commercial mailing standards and regulations. There was confusion over whether non-commercial mailings must be entered at BMEUs or otherwise meet commercial mailing standards. The Postal Service has simplified the language in 705.24.5.2 to help avoid confusion.

Finally, the Postal Service is changing the term "Ballot Portal User" to "Federal Ballot Mail Portal User" to clarify the relationship between Federal Ballot Mail, the rule's data standards, and the Federal Ballot Mail Portal. The Postal Service's hope is that this reduces confusion about the application of rule's data-entry requirements to other ballot mail as well as confusion about data entry that needs to be performed at the state-level.

## IX. Explanation of Final Rule

After evaluating the comments, the Postal Service is adopting the new DMM Section 705.24. The final text of DMM Section 705.24 incorporates the revisions noted above. Accordingly, the Postal Service adopts the described changes to *Mailing Standards of the United States Postal Service*, Domestic Mail Manual (DMM), incorporated by reference in the *Code of Federal Regulations*. We will publish an appropriate amendment to 39 CFR part 111 to reflect these changes.

**List of Subjects in 39 CFR Part 111**

Administrative practice and procedure, Postal Service.

Accordingly, the Postal Service amends *Mailing Standards of the United States Postal Service,* Domestic Mail Manual (DMM), incorporated by reference in the *Code of Federal Regulations* as follows (*see* 39 CFR 111.1):

**PART 111 – [AMENDED]**

1. The authority citation for 39 CFR part 111 continues to read as follows:

**Authority:** 5 U.S.C. 552(a); 13 U.S.C. 301-307; 18 U.S.C. 1692-1737; 39 U.S.C. 101, 401-404, 414, 416, 3001-3018, 3201-3220, 3401-3406, 3621, 3622, 3626, 3629, 3631-3633, 3641, 3681-3685, and 5001.

2. Revise *Mailing Standards of the United States Postal Service*, Domestic Mail Manual (DMM) as follows:

***Mailing Standards of the United States Postal Service*, Domestic Mail Manual (DMM)**

* * * * *

**700 Special Standards**

* * * * *

**705 Advanced Preparation and Special Postage Payment Systems**

* * * * *

*[Insert after 705.23 the following:]*

**24.0 Ballot Mail for Federal Elections**

**24.1 Definitions**

For the purposes of Section 705.24, the following definitions apply:

a. *Authorized ballot mailer* means an election official of a state or a political subdivision thereof who is responsible for sending mail-in or absentee ballots to eligible voters of that state or political subdivision; or an individual or entity, such as a mail service provider, that an election official has authorized to send mail-in or absentee ballots by mail on the election official’s behalf.

b. *Federal Ballot Mail Portal User* means the chief election official of each state and any individual or entity, such as a mail service provider or an election official of that state or a political subdivision thereof, authorized by the chief election official to provide information through the Postal Service Federal Ballot Mail Portal as described in 24.4.2.b.

c. *Mail-in or absentee ballot* means a physical ballot, other than a ballot provided at a designated polling place, that may be used to cast a vote in a federal election. For the purposes of Section 705.24, a mail-in or absentee ballot does not include a ballot mailed under 703.8.8 or 703.8.9.

d. *Outbound Federal Ballot Mail* means any mailpiece containing a mail-in or absentee ballot for a federal election sent from an authorized ballot mailer to an individual voter.

e. *Return Federal Ballot Mail* means any mailpiece containing a mail-in or absentee ballot for a federal election sent from an individual voter to an election office, or an authorized recipient of ballot mail, of a state or a political subdivision thereof.

*f.* *Federal election* means any general, special, or runoff election for the office of President or Vice President; or of Senator or Representative in, or Delegate or Resident Commissioner to, the Congress. This definition does not include primary elections.

*g.* *State* includes all 50 states, as well as the District of Columbia, Puerto Rico, the Virgin Islands, Guam, American Samoa, and the Northern Mariana Islands.

h. *Intelligent Mail barcode (IMb)* has the meaning provided in 204.1.2.1.

i. *Official Election Mail logo* is a unique registered trademark designed exclusively for inclusion in the design of Official Election Mail. The conditions of use are provided in Publication 631, *Official Election Mail – Graphic Guidelines and Logos*.

**24.2 Optional 90-Day Pre-Mailing Notice**

A state's chief election official may notify the Postal Service, no fewer than 90 days prior to a federal election, of its intent to allow for mail-in or absentee ballots in the

federal election to be transmitted by the Postal Service. This notification should indicate whether the state intends to submit to the Postal Service the information described in 24.4.2.b to the Postal Service Federal Ballot Mail Portal as set forth in 24.4.2.d.

A state's failure to provide the optional 90-day notice to the Postal Service under 24.2 will not prevent enrollment under 24.4.

**24.3 Federal Ballot Mail**

**24.3.1 Outbound Federal Ballot Mail Envelope Standards**

Outbound Federal Ballot Mail must be mailed in an envelope that:

a. Includes the official Election Mail logo;

b. Is automation compatible; and

c. Bears the voter's unique IMb, as created by the Authorized Ballot Mailer, with the Delivery Point ZIP Code embedded and a Federal Ballot Mail Service Type Identifier (STID).

Outbound Federal Ballot Mail envelopes must be submitted to the Postal Service for mailpiece design review and feedback.

**24.3.2 Return Federal Ballot Mail Envelope Standards**

Return Federal Ballot Mail must be mailed in an envelope that:

a. Includes the official Election Mail logo;

b. Is automation compatible; and

c. Bears the voter's unique IMb, as created by the Authorized Ballot Mailer, with the Delivery Point ZIP Code embedded and a Federal Ballot Mail STID.

Return Federal Ballot Mail envelopes must be submitted to the Postal Service for mailpiece design review and feedback.

**24.3.3 Authorized Ballot Mailer Responsibility**

Authorized ballot mailers are responsible for barcode creation under 24.3.1 and 24.3.2 as well as envelope design and printing for all ballot mail.

**24.3.4 Additional Recommendations**

For additional information on the Postal Service's recommendations for all ballot mail, see DMM 703.8.4.

**24.4 State-Specific Mail-In and Absentee Participation Lists**

**24.4.1 Postal Service Federal Ballot Mail Portal User Registration**

To access the Postal Service Federal Ballot Mail Portal, each Federal Ballot Mail Portal User must have a registered account. Registration must be completed no later than two business days before an Outbound Federal Ballot mailing. The chief election official of each state is responsible for authorizing the Federal Ballot Mail Portal Users for their state including political subdivisions thereof.

24.4.2 Enrollment

a. Any state that intends to receive mail-in or absentee ballots from individual voters through the Postal Service must ensure that such individuals have been enrolled with the Postal Service for inclusion on the state's Mail-In and Absentee Participation List.

b. In order for an individual to be enrolled with the Postal Service for inclusion on a state's Mail-In and Absentee Participation List, a Federal Ballot Mail Portal User in that state must provide the following information through the Postal Service Federal Ballot Mail Portal:

1. Name of individual receiving a mail-in or absentee ballot;

2. Address of individual receiving a mail-in or absentee ballot;

3. Unique IMb applied on the Outbound Federal Ballot Mail envelope pursuant to 24.3.1;

4. Unique IMb applied on the Return Federal Ballot Mail envelope pursuant to 24.3.2; and

5. Originating election office state.

c. An individual will be deemed enrolled with the Postal Service for inclusion on a state's Mail-In and Absentee Participation List as of the date that the information in 24.4.2.b is provided.

d. Federal Ballot Mail Portal Users must provide the information in 24.4.2.b at least 30 days before the date of the federal election, to the extent practicable, or by the date on which mail-in or absentee ballots may begin to be mailed under state law. Federal Ballot Mail Portal Users may make supplemental submissions to enroll additional individuals or modify prior submissions until the last day that ballots may be mailed out to individuals under state law. A separate submission is required in connection with each Outbound Federal Ballot mailing, regardless of the number of mailpieces in the mailing.

e. The information provided in 24.4.2.b must meet the Postal Service's technical specifications for the Federal Ballot Mail Portal.

f. Before providing the information in 24.4.2.b, Federal Ballot Mail Portal Users must certify in the Federal Ballot Mail Portal that any mail-in or absentee ballots their state's authorized ballot mailers provide to the Postal Service for mailing have been submitted for review and that they have received feedback consistent with 24.3.1 and 24.3.2 Federal Ballot Mail Portal Users will not be able to enter the information in 24.4.2.b into the Federal Ballot Mail Portal if the certification is incomplete.

**24.4.3 Provision of State-Specific Lists**

On or about the date of the federal election, the Postal Service will provide a state-specific Mail-In and Absentee Participant List to each state's chief election official that contains the name and address of each individual in that state who was enrolled

through the process set forth in 24.4.2, along with the unique IMb associated with the Outbound and Return Federal Ballot Mail sent to each such individual.

**24.5 Outbound Federal Ballot Mail Verification**

**24.5.1 Procedure**

Using the information provided in 24.4.2, the Postal Service will review mailings identified as Outbound Federal Ballot Mail prior to acceptance to evaluate whether the mailing meets the standards in 24.3.1 and is being sent to individuals who have been enrolled with the Postal Service for inclusion on the state's Mail-In and Absentee Participation List, consistent with the technical specifications for the Federal Ballot Mail Portal.

**24.5.2 Authorized Verification**

Mailings identified as Outbound Federal Ballot Mail are verified by Postal Service employees when presented for acceptance. Outbound Federal Ballot Mail must be entered at a facility that performs business mail acceptance functions or at a Postal Service retail counter. Commercial mailings must comply with applicable requirements. Postal Service personnel are not authorized to open mail sealed against inspection, except under circumstances described in ASM 274. The Postal Service's acceptance of Outbound Federal Ballot Mail does not constitute verified compliance.

**24.5.3 Noncompliance**

a. Mailings that do not comply with 24.5.1 and 24.5.2 will not be accepted and will be returned to the authorized ballot mailer. The authorized ballot mailer or Federal Ballot Mail Portal User must address the error(s) before resubmitting the mailing.

b. An authorized ballot mailer may request further review by the Postal Service if Outbound Federal Ballot Mail is not accepted.

c. The Postal Service assumes no responsibility for any outbound ballot mailing presented until it is accepted into the mail. The Postal Service is not responsible for service delays when the Federal Ballot Mail Portal User or authorized ballot mailer does not meet the applicable preparation or entry standards.

d. Authorized ballot mailers must comply with all applicable postal laws and regulations governing mailability and preparation for mailing, as well as nonpostal laws and regulations on the possession, treatment, transmission, or transfer of particular matter.

**24.5.4 Return Federal Ballot Mail**

705.24.5 does not apply to Return Federal Ballot Mail.

**24.6 Non-Interference with State or Federal Election Laws**

This rule relates only to the use of the U.S. Mail. The Postal Service does not purport to alter the eligibility of any individual to vote under state or federal law. The Postal Service does not have any legal responsibility for management of state voter rolls or administration of federal elections within each state. States are fully responsible for the contents of each State’s Mail-In and Absentee Participation List.

* * * * *

**Colleen Hibbert-Kapler,**

*Attorney, Ethics and Legal Compliance.*

[FR Doc. 2026-17238 Filed: 8/21/2026 9:00 pm; Publication Date: 8/26/2026]