**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

LEAGUE OF WOMEN VOTERS OF MASSACHUSETTS, LEAGUE OF WOMEN VOTERS LOTTE E. SCHARFMAN MEMORIAL EDUCATION FUND, LEAGUE OF WOMEN VOTERS OF THE UNITED STATES, LEAGUE OF WOMEN VOTERS EDUCATION FUND, ASSOCIATION OF AMERICANS RESIDENT OVERSEAS, U.S. VOTE FOUNDATION, OCA-ASIAN PACIFIC AMERICAN ADVOCATES, DELTA SIGMA THETA SORORITY, INC.,

*Plaintiffs*,

v.

DONALD J. TRUMP, in his official capacity as President of the United States, UNITED STATES POSTAL SERVICE, UNITED STATES POSTAL SERVICE BOARD OF GOVERNORS, DAVID STEINER, in his official capacity as Postmaster General, DOUGLAS A. TULINO, in his official capacity as Deputy Postmaster General, AMBER F. MCREYNOLDS, in her official capacity as Chairwoman of the Board of Governors of the United States Postal Service, DEREK T. KAN, in his official capacity as the Vice Chairman of the Board of Governors of the United States Postal Service, RONALD A. STROMAN, in his official capacity as a member of the Board of Governors of the United States Postal Service, DANIEL M. TANGHERLINI, in his official capacity as a member of the Board of Governors of the United States Postal Service,

*Defendants*.

Case No. 1:26-cv-11549-IT

**SUPPLEMENTAL COMPLAINT**

***Leave to file granted on August 25, 2026***

**SUPPLEMENTAL COMPLAINT**

Pursuant to Federal Rule of Civil Procedure 15(d), Plaintiffs supplement their April 2, 2026, Complaint, Dkt. No. 1, to allege subsequent events and plead additional claims based on those events. This Supplemental Complaint supplements, rather than replaces, Plaintiffs' Complaint.

## INTRODUCTION

1. For months after Executive Order No. 14399, "Ensuring Citizenship Verification and Integrity in Federal Elections," USPS contended that it was speculative to assert whether any Final Rule would issue, let alone one that tracked closely Section 3 of the Executive Order. As late as August 4, 2026, USPS told the Supreme Court in *Trump v. California*, that the Executive Order "neither dictates the contents of any final rule nor even requires that one issue at all," casting doubt as to whether any Final Rule would issue and disputing that the Order would "facilitate USPS's ability to intercept ballots." Reply in Supp. of Application for Stay at 6–7, *Trump v. California*, No. 26A124 (U.S. 2026). And as recently as August 12, 2026, USPS told the Supreme Court that there was significant "uncertainty concerning the government's future actions." Suppl. Br. in Supp. of Application for Stay at 2, *Trump v. California*, No. 26A124 (U.S. 2026).

2. That uncertainty is gone. On August 21, USPS completed the rulemaking this Court had enjoined and issued a final rule, effective immediately, that implements Section 3's central requirements for the November 2026 election; the rule was formally published on August 26, 2026. Ballot Mail for Federal Elections, 91 Fed. Reg. 54966 (Aug. 26, 2026) (the Final Rule). USPS received more than 200,000 comments yet made no material changes from its Proposed Rule; the Final Rule tracks the Proposed Rule, which tracks Section 3 of the Order. The Final Rule now makes concrete what Defendants previously called speculative. USPS has asserted authority to mandate design requirements for ballot envelopes, collect voter-specific election information, maintain state-specific participation lists, verify ballot recipients against those lists, and refuse to transmit ballot mail to voters that fail to meet its new requirements.

3. USPS has no such authority. The Final Rule both assigns USPS an unprecedented gatekeeping role in the administration of mail voting, intruding on the constitutional authority of

the states and Congress to regulate federal elections, and conflicts with statutory limits Congress imposed on USPS's authority. Plaintiffs therefore supplement their Complaint to challenge the Final Rule directly.

## SUPPLEMENTAL ALLEGATIONS

### I. USPS Moves Toward a Final Rule Implementing Section 3 of the Executive Order.

#### A. USPS Proposes a Rule and System of Records in Line with the Executive Order.

4. As early as May 6, USPS was already deliberating about how to implement the Executive Order and was working on a draft of the proposed rule. Decl. of Steven W. Monteith, Dkt. No. 127-3.

5. On June 2, 2026, as directed by the Executive Order, USPS issued a proposed rule. *See* Ballot Mail for Federal Elections, 91 Fed. Reg. 32915 (June 2, 2026) (the Proposed Rule). The Proposed Rule, which stated it was issued pursuant to the Order, tracked the Order's requirements for delivery of mail ballots. As directed, the Proposed Rule provided that states may give notice of their intent to use USPS to transmit ballots, and required election officials to submit lists of voters to whom mail ballots will be sent. *Id.* at 32917–18 (§ 705.24.4). It contemplated that before accepting mail ballots for delivery to voters, USPS "will review" the mailing to "evaluate whether . . . [it] is being sent to individuals who have been enrolled with the Postal Service." *Id.* at 32918 (§ 705.24.5.1). It required that any mail ballots sent must be "verified by Postal Service employees," *id.* (§ 705.24.5.2), and that no mail ballots would be sent to individuals not on the verified list. It also required that ballots must be mailed and returned in envelopes with certain design specifications. *Id.* at 32917–18 (§§ 705.24.3.1, 705.24.3.2).

6. The Proposed Rule was subject to a 30-day public comment period. More than 200,000 comments were submitted. On July 2, 2026, Plaintiffs and their counsel submitted a

comment to oppose and request the withdrawal of the Proposed Rule because, like the Executive Order, it is unlawful. As the comment explained, the Proposed Rule is "wholly outside of the President's constitutional powers and directly contrary to multiple federal statutes" and impedes Plaintiffs' respective missions and harms voters, including members of Plaintiff organizations.

7. On July 17, 2026, USPS also issued a System of Records Notice (SORN) under the Privacy Act of 1974 in connection with its proposed rulemaking. Privacy Act of 1974, System of Records, 91 Fed. Reg. 44880 (July 17, 2026). The SORN stated that it would become effective within 30 days of publication (if no comments were received), on the publication date of USPS's responses to comments, or on the effective date of any final rule, whichever was latest. *Id.*

8. The SORN proposed that, in accordance with the June 2, 2026 Proposed Rule, USPS will maintain a list of individuals who appear on each state's Participation List, as well as their addresses, the unique ballot identifier that appears on the absentee ballot envelopes, and the state or political subdivision that issued the ballot. These lists would be retained for five years.

9. On August 14, 2026, Plaintiffs and their counsel submitted a comment in opposition and requested the withdrawal of the proposed System of Records. That comment explained that, in addition to effectuating an unconstitutional Order, the SORN exceeded USPS's statutory authority and violated multiple requirements of the Privacy Act.

10. USPS has not yet published a response to Plaintiffs' comment—or to any other comments—on the SORN.

11. In addition to this rulemaking, postal officials stated as early as July 1 that they had "tak[en] steps to create a Postal Service portal that state and local elections officials . . . will utilize to provide their lists to the Postal Service of voters who are mailed ballots" based on the understanding that States "will be preparing to mail their first mail-in ballots by the end of August

[2026].” Decl. of S. Monteith ¶ 7, *California v. Trump*, No. 26-cv-11581 (D. Mass. July 1, 2026), Dkt. No. 194–2; *accord California v. Trump*, 183 F.4th 52, 65–66 (1st Cir. 2026).

12. On July 27, 2026, the Office of Information and Regulatory Affairs (OIRA), a division within the Office of Management and Budget under the Executive Office of the President, received a final rule from USPS for its review. https://www.reginfo.gov/public/jsp/EO/eoDashboard.myjsp [https://perma.cc/7V8B-N35N]. OIRA oversees the implementation of government-wide policies, and reviews draft regulations to ensure agency compliance with executive orders. According to counsel for USPS Defendants, not every rule is sent to OIRA for review. Aug. 7, 2026 Hr'g Tr. at 48:2–3, Dkt. No. 181.

13. On June 29, 2026, the American Postal Workers Union, AFL-CIO warned that the Proposed Rule would be unworkable, explaining that “[c]onfirming postal practices to the proposed rule is logistically [] impossible” and that the Postal Service “does not have the time or resources” to conduct proper trainings for new requirements and timelines based on the rushed timeline. Letter from Jonathan Smith, President of American Postal Workers Union, AFL-CIO, to Director, Product Classification, U.S. Postal Service (June 29, 2026), https://apwu.org/wp-content/uploads/2026/06/APWU-Comments-VBM-Rulemaking.pdf.

**B. USPS Issues a Final Rule.**

14. On August 21, 2026, USPS issued the Final Rule, which went into effect immediately and was formally published on August 26, 2026. *See* 91 Fed. Reg. at 54966. The Final Rule mirrors the Proposed Rule and substantively complies with the Executive Order's commands.

15. The Final Rule amends the Domestic Mail Manual by adding a new Section: § 705.24, “Ballot Mail for Federal Elections.” USPS states that it promulgated the Final Rule to implement the Executive Order, including Section 3(b).

16. As the Executive Order directs, *see* Order § 3(b)(ii), the Final Rule provides that each state may give notice of its intent to use USPS to transmit ballots and establishes standards for ballot envelopes. 91 Fed. Reg. at 54990 (§ 705.24.2).

17. The Final Rule exempts ballots mailed pursuant to the Uniformed and Overseas Citizens Absentee Voting Act (UOCAVA) from its requirements. 91 Fed. Reg. at 54988. But the Final Rule requires authorized ballot mailers to segregate "Outbound Federal Ballot Mail" from other types of ballot mail, including UOCAVA ballots. *Id.* USPS warns that "[c]omingling non-federal ballot mail with Outbound Federal Ballot Mail may impact the verification process and could prevent or delay proper acceptance of mailings." *Id.* at 54981. The Final Rule further instructs that UOCAVA ballots "should be segregated from Outbound Federal Ballot Mail when presented for mailing" to ensure that both categories of ballot mail are properly accepted. *Id.* at 54988.

18. The Final Rule also requires USPS to create a "Federal Ballot Mail Portal" into which election officials must submit lists of voters to whom mail ballots would be sent, titled "Mail-in and Absentee Participation List." *Id.* at 54991 (§ 705.24.4). The Federal Ballot Mail Portal is not yet live, and the Final Rule's preface states that it will become active once the system of records required by the Privacy Act and governing the portal takes effect.

19. The only way for an individual to be enrolled on USPS's Mail-in and Absentee Participation List is to be included on the list a state submits to USPS. *Id.* Any state that "intends to receive" ballots from voters through the mail "must ensure that such individuals have been enrolled" on the list before a voter may receive a mail ballot. *Id.* at 54991 (§ 705.24.4.2(a)). Any outgoing ballot mail from jurisdictions to voters that does not comply with the exacting voter

enrollment requirements "will not be accepted and will be returned" to the jurisdiction. *Id.* (§ 705.24.5.3(a)).

20. For each voter, the submission must include, among other things, the voter's name and address, a unique Intelligent Mail barcode (IMb) on the outbound envelope, and a separate unique IMb on the return envelope. *Id*. (§ 705.24.4.2(b)). The data must conform to unspecified "technical specifications" for the Federal Ballot Mail Portal. *Id.* (§ 705.24.4.2(e)).

21. Submissions must be made "at least 30 days before the date of the federal election, to the extent practicable, or by the date on which mail-in or absentee ballot may begin to be mailed under state law." *Id*. (§ 705.24.4.2(d)). A state may add voters or revise earlier submissions until the last day ballots may be mailed under state law, but "[a] separate submission is required in connection with each Outbound Federal Ballot mailing, regardless of the number of mailpieces in the mailing." *Id*. Thus, under the Final Rule, if an election office mails ballots in successive batches—a virtually universal practice—each of those mailings must be preceded by a separate submission to the Portal.

22. Only a registered "Ballot Mail Portal User" may submit data, and registration to be a Ballot Mail Portal User "must be completed no later than two business days before an Outbound Federal Ballot mailing." *Id*. (§ 705.24.4.1).

23. "On or about the date of the federal election," USPS must provide state elections officials the corresponding Mail-In and Absentee Participation List, containing the name and address of each enrolled voter, along with the IMb for their outbound and return envelopes. *Id.* (§ 705.24.4.3). In practice, this means that even after acceptance of a ballot mailing, state election officials and voters may not know if USPS has mailed a specific ballot until after election day, so voters will have no ability to cure any errors.

24. The Final Rule provides that, before accepting mail ballots for delivery to voters, USPS "will review" the mailing to "evaluate whether . . . [it] is being sent to individuals who have been enrolled with the Postal Service for inclusion on the state's Mail-In and Absentee Participation List." *Id*. (§ 705.24.5.1). Mail ballots sent must be "verified by Postal Service employees." *Id*. (§ 705.24.5.2).

25. The Final Rule also requires that all ballots must be mailed and returned in envelopes with certain design specifications, which first "must be submitted to the Postal Service for mailpiece design review and feedback." *Id.* at 54990–91 (§§ 705.24.3.1, 705.24.3.2).

26. Under the Final Rule, USPS will review whether a mail ballot complies with the new envelope standards and matches the state-submitted Mail-in and Absentee Participation List and associated bar codes. Noncompliant mailings will not be accepted and transmitted to voters but instead returned to the election official conducting the mailing. *Id*. at 54991 (§§ 705.24.5.3(a)–(b)). As to the design standards, this means some voters will not receive their mail ballots in this November's elections if their local election officials are not able to design new ballots that meet these standards in the coming weeks—a practical impossibility. Moreover, under the Final Rule, USPS decides whether an updated ballot meets the design specifications, thereby making itself a regulator of ballot design with veto power over the decisions of election officials.

27. Every outbound mailing must be verified by USPS employees before it is accepted, each time it is presented at a USPS business mail facility or retail counter. *Id*. at 54991 (§§ 705.24.5.1–2). Even though mailings can be comprised of thousands of individual mailpieces, the Final Rule disclaims responsibility for ballots held awaiting verification or for delays that result. *Id*. (§ 705.24.5.3(c)).

28. USPS's own estimates reveal that this verification step could introduce significant delay. The Final Rule's preface states that "scanning a barcode generally takes less than a minute per mailpiece." *Id.* at 54981. Depending on exactly how long that scanning takes in reality, that verification could potentially take days—not just the "few hours" the Rule's preface suggests—for larger mailings. *Id.* And a delay of a few hours can be massively disruptive for election offices and post offices in smaller jurisdictions with fewer staff. Nevertheless, the preface goes on to state that election officials "should remain at the [Business Mail Entry Unit] or postal retail location during the verification process." *Id.*

29. In addition, because the Final Rule requires verification at the level of the entire "mailing," a single, nonconforming mailpiece can cause USPS to reject or delay the entire batch. For example, if a mailing contains even one ballot whose information does not conform to USPS's undisclosed technical specifications, USPS must refuse and return the entire mailing. *Id.* at 54991 (§§ 705.24.4.2(d), 705.24.5.1, 705.24.5.3).

30. On top of this, acceptance of a mailing does not constitute verified compliance, *Id.* (§ 705.24.5.2), meaning that a verified ballot may still not be delivered to its intended recipient even after it has been accepted.

31. The Rule also makes USPS the arbiter of state laws regarding deadlines to send out mail ballots because it permits officials to update the Mail-In and Absentee Participation Lists only until the final day mail ballots must be sent out under state law. 91 Fed. Reg. at 54991 (§ 705.24.4.2(d)). USPS will not accept new names on the list after this point, meaning some voters may not receive their mail ballots as a result of USPS's choices on how to enforce state law. The Final Rule attempts to disguise as a technical procedure what is really it granting itself authority to enforce state election laws.

32. In other words, the Final Rule directs USPS to refuse to deliver eligible voters' mail ballots whenever it determines that election officials have not perfectly complied with requirements found nowhere in statute and brought about only by the Order.

33. The Final Rule turns USPS into an election regulator by assigning itself a variety of election administration tasks that are rightfully the purview of the states. The Final Rule makes USPS responsible for deciding what voter information needs to be collected for mail ballots beyond state or federal law requirements, receiving and maintaining voter lists, participating in the design of ballot envelopes, and determining whether ballots were sent by state law deadlines.

34. Plaintiffs are unaware of any point in USPS's history in which it chose not to deliver properly addressed, stamped, lawful, nonhazardous mail from a government entity.

35. The Final Rule marks a departure from USPS's own prior description of its role in elections. In 2022, USPS declared: "The role of the USPS in American elections is clear and well defined: to process, transport, and deliver the nation's Election Mail, including ballots. We have no role in determining the extent to which mail is used for participating in elections, the design of ballots or return envelopes, or whether or how ballots are counted." U.S. Postal Serv., *2022 Post-Election Analysis: Successfully Delivering the Nation's Election Mail During the 2022 Midterm Elections*, at 3 (2022), https://perma.cc/MD5R-2BV7.

## II. Implementation of the Final Rule for the November 2026 Election Is Not Possible Without Substantial Burdens on Election Officials and Voters.

36. Even before USPS issued a Final Rule, the Executive Order and Proposed Rule had already caused concern about the feasibility of administering this year's midterm elections under the Rule.

37. For example, in seeking to block injunctions ordered by this Court and another federal court in the District of Columbia, Defendants represented that they needed the injunctions

lifted as soon as possible in order to have lead time to implement the rule by the Order's July 29 date for publishing the final rule. They represented that they needed time to "train" employees and "coordinate with election officials to ensure that" new processes are usable. Reply in Supp. of Defs.' Mot. to Stay at 13–14, *NAACP v. USPS*, No. 20-cv-2295, Dkt. No. 187 (D.D.C. July 15, 2026).

38. On July 15, USPS represented that "even if USPS is successful in dissolving the injunction on appeal, it may be too late to issue a final rule and have enough time subsequently for USPS to issue new technical instructions and guidance to states for the smooth implementation of any final rule in time for the November 2026 general election." *Id.* USPS echoed similar concerns the next day on July 16 in another filing, warning that even "an extremely expedited appeal would not allow sufficient time for implementation of any final rule for the November election, given that any new processes would need to be implemented well before November." Reply Supp. Mot. Stay Pending Appeal at 13, *NAACP v. USPS*, No. 26-5257 (D.C. Cir. July 16, 2026). According to USPS, these procedures needed to be implemented "as soon as early August" because of "the timing of state election procedures concerning voter-roll verification and absentee or mail-in voting." *Id.*

39. At oral argument on Plaintiffs' renewed preliminary injunction motion, USPS counsel represented that "the rule needs to be put in place ideally before any ballots are issued to voters; and the dates that were mentioned there were in August, by late August." Aug. 7, 2026 Hr'g Tr. at 34, Dkt. No. 181.

40. State and local officials have likewise identified administrative, financial, and technical obstacles to keeping the lists current within the Final Rule's timeframe. *See* Pl. States' L.R. 56.1 Statement of Undisputed Material Facts, *California v. Trump*, No. 26-cv-11581 (D.

Mass. Apr. 23, 2026), Dkt. No. 105 (compiling statements from declarations submitted by election officials from nineteen states and three localities).

41. Many states have already purchased mail ballot envelopes that do not meet the Final Rule's new requirements. Pls.' Opp. to Defs.' & Intervenors' Emergency Mots. for Stay Pending Appeal at 15, *California v. Trump*, No. 26-1774 (1st Cir. July 13, 2026). Several states and the District of Columbia have warned that rushing to implement untested protocols risks "chaos, confusion, and disenfranchisement." *Id.* They have warned that "[v]oters would likely be disenfranchised, as officials inevitably make mistakes in rushing to formulate new voter lists and roll out untested technologies to scan ballots for eligibility determinations." *Id.* at 9. Plaintiffs have members in the states who have warned about the serious obstacles to complying with the ballot envelope design requirements.

42. Because voters cannot control whether election officials timely or accurately satisfy USPS's new data-submission, envelope design, and verification requirements, and because, as explained above, the Rule's novel and burdensome requirements make such errors substantially likely, Plaintiffs' members face a substantial risk that USPS will reject or delay ballot mail intended for them through no fault of their own.

## III. Additional Burdens on Plaintiffs and Their Members.

43. Because the Final Rule inserts USPS into the vote by mail process and adds new steps that USPS acknowledges will cause delays, *see* 91 Fed. Reg. at 54991 (§ 705.24.5.3(c)), Plaintiffs' core activities of educating voters and encouraging all eligible Americans to vote in each election will be impeded.

44. Plaintiffs' collective millions of members span all 50 states, including many members who are eligible to vote by mail under the laws of their states and rely on this method to cast their ballot. These include members with disabilities and elderly members who cannot

physically vote in person, members who live in rural places without access to transportation to the polls, members who rely on language translations not available at the polls, and members who attend college away from home, among many others.

45. The Final Rule burdens voters who, for whatever reason, will not appear correctly on the state-specific lists it calls for, including Plaintiffs' members and the communities they serve. Such errors are substantially likely given the Rule's requirement that jurisdictions supply in advance, not only a voter's name and address, but also the originating election office, a unique IMb on the outbound envelope (the envelope the jurisdiction mails to the absentee voter), and a separate unique IMb on the return envelope (the envelope the voter uses to send a completed absentee ballot back to the jurisdiction). 91 Fed. Reg. at 54991 (§ 705.24.4.2(b)). If any of this information does not exactly match what appears on the envelope or otherwise conform to the Federal Ballot Mail Portal's unspecified "technical specifications," the mailing will be deemed noncompliant, and the ballot "will not be accepted and will be returned to the authorized ballot mailer." *Id.* (§ 705.24.5.3(a)). With only days before ballots begin to be mailed, the new requirements create a substantial risk of errors or omission in voter data—and thus a substantial risk that USPS will delay or reject ballot mail intended for Plaintiffs' members.

46. Similar delays and burdens are also likely because a single nonconforming mailpiece in a large batch can cause USPS to reject or delay the entire batch.

47. The Final Rule also burdens eligible voters who reside in states whose mail ballot envelopes fail to conform to the requirements of the Rule, as their ballots will be returned to the sending election official.

48. The Final Rule will cause delays in the sending of mail ballots, due to the short timeframe before the 2026 election, and the fact that USPS is under-resourced and these methods

are entirely untested. Even short delays in the processing of mail ballots can result in disenfranchisement.

49. The Final Rule will significantly impede OCA-Asian Pacific American Advocate's (OCA) core activities of educating voters, encouraging eligible Americans to participate in each election. OCA and its chapters provide voter registration, voter education, and mobilization assistance, including information about how to vote by mail, in-language voter guides, social media materials, phone and text banking, and individualized translation assistance, among other resources. OCA is currently preparing voter guides for the November 2026 election that must be finalized and sent to its chapters by September 1, 2026, for local printing and distribution. Those guides are produced in English and, depending on the needs of particular chapters, multiple Asian and Pacific Islander (AAPI) languages.

50. Operation of the Final Rule would force OCA to substantially revise these voter-education materials and programs on an extremely compressed timeline. Among other things, OCA will need to develop and translate new materials explaining the changes to mail voting, revise scripts, retrain volunteers, and educate voters about how to ensure that they can successfully vote by mail under the new requirements. Those efforts will require OCA and its chapters to expend additional staff time and money, including the additional costs associated with expedited translations.

51. Those resources will have to be diverted from OCA's existing voter education and civic-engagement activities. Staff who would otherwise educate community members about voter registration, upcoming elections, and issues will instead have to focus on explaining the Final Rule and its effects on mail voting. OCA and its chapters will likewise have fewer resources for other ongoing civic-engagement efforts, including promoting the API Voter Hotline. If OCA does not

redirect those resources, it will be unable to carry out its core business activities of providing the voter education and assistance on which its members and communities rely.

52. The operation of the Final Rule will interfere significantly with the League of Women Voters' (LWV, with its state and local Leagues, the League) and League of Women Voters of Massachusetts' (LWVMA) core activities. The operation of the Final Rule will interfere significantly with the League of Women Voters' (LWV, with its state and local Leagues, the League) and League of Women Voters of Massachusetts' (LWVMA) core activities. Their core mission is to help ensure that every eligible voter actually votes, to achieve maximum participation in the electoral process. Voting by mail is a method of accessible voting that makes it possible for many individuals to vote and is an option LWV and LWVMA have long promoted to encourage participation in elections, especially for voters who have difficulty voting in person.

53. The Final Rule will cause delays and other unforeseen complications that will result in some otherwise-eligible voters not getting mail ballots, given that the Final Rule requires implementation of untested protocols in a short period of time. And the Final Rule will exacerbate fear and uncertainty about mail voting because some otherwise eligible voters will not be on the state-specific lists or will have their information input incorrectly by election officials, leading to USPS refusing to transmit their ballots. All these concerns will undermine voters' reliance on vote by mail and will result in the LWV and LWVMA being less successful in achieving their core mission of ensuring maximum participation in the electoral process.

54. In particular, LWVMA's core mission of ensuring maximum participation in the electoral process will be impaired given its past reliance on the straightforward vote-by-mail process promoted by Massachusetts law and election officials in Massachusetts. Now it must also

educate voters on how the Final Rule will operate and the potential risks involved with voting by mail under the new protocols.

55. As a result of the Final Rule, LWVMA will have to revise their information on mail voting and refer potential voters to state election officials for more information about changes to mail ballot procedures; this will be the first time LWVMA has ever referred voters to an outside source in this manner, and it will damage their role and reputation as a trusted source of election information.

56. The Final Rule will also cause significant strains on LWV's and LWVMA's resources. Educating the public about how to vote by mail is core to the League's mission to make sure every eligible voter can vote. One of the methods LWV uses to accomplish this core mission is overseeing and maintaining (in cooperation with its state and local Leagues) its nonpartisan, award-winning website, VOTE411.org. Because VOTE411.org provides information about how to vote by mail, LWV will need to update, with its state and local Leagues, that information for every state. Given the limited time before the November elections, and the significant changes the operation of the Final Rule would cause, LWV may not be able to complete this essential work in time for the materials and guidance to be used as the organization originally planned for the general election.

57. LWVMA will also have to update the Massachusetts page of VOTE411.org that it maintains with LWV. This effort will require a significant overhaul that will be especially challenging given there just a few months before the general election.

58. Additionally, the Final Rule will exacerbate voters' fears that their ballot will be intercepted by USPS and their confusion about how the Final Rule will impact their mail ballot and whether they are listed on yet-to-be-created lists. To attempt to carry out their longstanding

missions, LWV and LWVMA will be required to provide extensive education to voters about the impact the Final Rule will have on state vote by mail processes. This will be a burdensome task that will require LWV and LWVMA to divert resources away from other core activities, such as registering voters and advocacy to improve election procedures.

59. LWV and LWVMA have many members who will likely be injured by the Final Rule because it will prevent them from voting by mail. For some members over the age of 65 and with disabilities that prevent them from voting in person, this means they will be unable to vote at all.

60. LWV also has members in states like Utah where almost all voters vote by mail. The changes to state vote by mail processes required by the Final Rule and the additional burdens that those changes will create will be particularly impactful in states that currently rely almost exclusively on voting by mail.

61. One of Delta Sigma Theta, Inc.'s core activities is voter education, including education around vote by mail. During midterm and presidential election cycles, like 2026, Delta Sigma Theta chapters ramp up this work, including by developing and conducting trainings, providing guidance and updates about voting-related laws and regulations, and assisting voters with questions and other issues. As a result of the Final Rule, Delta Sigma Theta will have to revise its training materials and guidance documents, overhaul its programming and planning related to the upcoming elections, and address the questions that these last-minute changes have predictably raised. This is all the more challenging because it is falling during the greatest period of need for Delta Sigma Theta's members; as it is now less than 70 days before the election, Delta Sigma Theta may not be able to adjust all of their materials and programing before the November 2026 election.

62. For members of Delta Sigma Theta who rely on mail voting, including elderly members in Massachusetts and collegiate members who live far away during the school year from their permanent residence for voting, the Final Rule discourages mail voting because of the new risk that ballots won't be counted. For some of these individuals, this may discourage voting altogether, harming one of the central goals of the organization of increasing voter participation. It will also make the organization's voter education efforts around vote-by-mail less effective.

63. The U.S. Vote Foundation (U.S. Vote) provides nonpartisan voting tools, services, and election information for domestic voters and for overseas civilian and military voters through its website, which has pages tailored for domestic voters and for UOCAVA voters. Although the Final Rule purports to exempt UOCAVA voters from needing to appear on a state-specific list, it was published mere weeks before the election, and USPS's rushed plan to screen and refuse to deliver mail ballots to voters who do not appear on unprecedented lists will undoubtedly ensnare ballots meant for overseas voters.

64. And regardless of implementation, issuing the Final Rule this close to the election creates a great deal of confusion for overseas and military voters, some of whom will mistakenly believe they cannot vote by mail unless they appear on a state list. U.S. Vote is attempting to address this widespread voter confusion by updating its resources and messaging for these voters. But especially given the short time before the November election, it lacks the time and money to rectify this confusion for the overseas and military voters who rely on its tools. Reaching these voters is particularly challenging as many live in different time zones and are often disaffected with voting because of the consistent hurdles they face to register and vote.

65. Because of the Final Rule, U.S. Vote has decided not to encourage mail voting as it did in previous years. In prior election years, it ran campaigns that highlighted voting by mail,

emphasizing its flexibility and giving voters information on how to vote by mail. This year, U.S. Vote has declined to encourage voters to vote by mail in these campaigns or its regular communications to members, because of the risks to voters caused by USPS's unprecedented screening program and the risk that U.S. Vote will provide inaccurate information to its members.

66. Because of the Final Rule, U.S. Vote will have to update its resources directed at domestic voters. U.S. Vote provides state-by-state guides for all states and territories, as well as Voter Alerts, blogposts, personalized Voter Account dashboards, webpages based on different voter types, FAQ pages, and an interactive Voter Journey Map. All these resources, providing information on 50 states and additional territories, will need to be updated manually. This is expensive and labor intensive and will cost approximately $50,000 in website and contractor fees. This process will also take several months, meaning many of U.S. Vote's tools may not be updated in time for the 2026 election. As a result, U.S. Vote will take some of its tools, including the Voter Journey Map, offline until it can ensure the accuracy of the information provided. This harms the thousands of voters that rely on U.S. Vote's tools.

67. The Association of Americans Resident Overseas (AARO) must work to mitigate significant voter confusion stemming from the Final Rule and attempt to update its resources on an extremely short timeline. AARO serves voters who live abroad, including through its educational seminars, its email newsletter, and its website. Although the Final Rule purports not to apply to UOCAVA voters and other Americans residing abroad, many of these voters are rightfully confused about its scope. For example, voters have recently asked whether they should send their ballots through courier services instead of USPS. AARO will have to expend resources updating its website and other public-facing materials to address this voter confusion, which will be especially burdensome given the short timeline ahead of the 2026 midterm elections.

68. AARO's members will also be harmed. Although UOCAVA voters are purportedly exempt from the Final Rule, it will still inevitably disenfranchise Americans residing abroad, including AARO members, who are confused about whether it applies to them.. USPS promulgated the Final Rule only 74 days ahead of the November midterms, but it often takes weeks or months for election mail to reach overseas and military voters, and just as long for a ballot to return to the United States. These voters therefore require accurate information about how to cast a ballot by mail—a necessity for those outside the territory of the United States—far in advance of elections. Instead, the Final Rule injects uncertainty and chaos into this process.

## SUPPLEMENTAL CAUSES OF ACTION

### COUNT VII: Separation of Powers
### Against the President and USPS Defendants

69. Plaintiffs incorporate the allegations of the preceding paragraphs of this Supplemental Complaint, as well as the allegations in the original Complaint, as though fully set forth herein.

70. Private plaintiffs may sue to enjoin unconstitutional actions by state and federal officers. *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 327 (2015). This equitable cause of action reflects a long history of judicial review of illegal executive action. *Id.*; *see also* 39 U.S.C. § 409.

71. The Supreme Court has recognized that "whenever a separation-of-powers violation occurs, any aggrieved party with standing may file a constitutional challenge." *Collins v. Yellen*, 594 U.S. 220, 245 (2021). The Court has similarly recognized an implied private right of action directly under the Constitution to challenge governmental action on separation-of-powers grounds. *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 491 n.2 (2010).

72. The Final Rule cites the Executive Order as the basis for its promulgation and tracks the Order's requirements for delivery of mail ballots.

73. The Constitution vests authority to regulate federal elections with the states and Congress. *See* U.S. Const. art. 1, § 4. The Elections Clause operates as a default provision, vesting states with responsibility for the mechanics of congressional elections only so far as Congress declines to preempt state legislative choices. *Arizona v. Inter Tribal Council of Ariz., Inc.*, 570 U.S. 1, 9 (2013). Thus, when Congress does not expressly legislate in the elections context, state law governs.

74. The Final Rule is unconstitutional because neither the President nor USPS has the power to regulate elections, as the Constitution assigns the authority to regulate federal elections to "State legislatures 'primarily' and to Congress 'ultimately.'" *Watson v. Republican Nat'l Comm.*, 146 S. Ct. 2165, 2170 (2026) (citing The Federalist No. 59 at 362 (Alexander Hamilton) (C. Rossiter ed. 1961)).

75. The Final Rule governs the conditions under which USPS will transmit mail-in and absentee ballots, which constitutes a regulatory exercise over elections. The authority to regulate elections only belongs to the states and Congress, not the President or USPS Defendants, meaning the Final Rule itself violates separation of powers by impinging on the Elections Clause's allocation of authority.

76. In addition to the Elections Clause's grant of authority over federal elections to states and Congress, the Constitution vests Congress with power to "establish Post Offices and post Roads. *See* U.S. Const. art. I, § 8, cl. 7. Neither the President nor USPS Defendants have any constitutional authority over either domain. Nor is there authority to suggest that the Guarantee Clause grants the President or USPS Defendants any power to regulate elections, especially in

light of how that Clause confers authority upon Congress. *See* U.S. Const. art. IV, § 4; *see also* *Luther v. Borden*, 48 U.S. 1 (1849).

77. Neither the President nor USPS has been delegated by Congress any authority through statute.

78. Congress has expressed its will on the structure of the postal system through the Postal Reorganization Act, 39 U.S.C. § 101 *et seq.*, and on the administration of federal elections including through the National Voter Registration Act (NVRA), Help America Vote Act (HAVA), and UOCAVA. The President's direction of postal rulemaking on elections and USPS Defendants' Final Rule each contradicts these comprehensive legislative schemes and therefore represents the weakest possible form of executive action.

79. The Final Rule cites various provisions in Title 39, 18 U.S.C. § 3061(b); 52 U.S.C. §§ 10307, 20511 as the basis for the Final Rule's legal authority. But nothing in Title 39—or anywhere else in federal law—"specifically authorizes" USPS to decline to provide this type of mail service to some of its users.

80. The Final Rule, which springs from the Executive Order's directive to USPS, is beyond the constitutional authority of the President and therefore void. Officials who enforce an unconstitutional directive act beyond their own authority as well. USPS Defendants' implementation of the Final Rule constitutes action in excess of lawful authority and is subject to invalidation by this Court.

81. The Final Rule is also beyond the constitutional authority of the USPS Defendants and void. It violates separation of powers principles by usurping for USPS power explicitly provided to Congress and the States. The Final Rule seeks to interfere in elections administration

without the constitutional authority to do so. USPS Defendants' implementation of the Final Rule constitutes action in excess of lawful authority and is subject to invalidation by this Court.

**COUNT VIII: Non-Statutory Review of Unlawful Agency Action Against USPS Defendants (39 U.S.C. §§ 101, 403(a), 3001-08, 3703).**

82. Plaintiffs incorporate the allegations of the preceding paragraphs of this Supplemental Complaint, as well as the allegations in the original Complaint, as though fully set forth herein.

83. The Constitution's Postal Clause confers power on Congress "not merely [for] the designation of the routes over which the mail shall be carried" but also to take "all measures necessary to secure [mail's] safe and speedy transit, and the prompt delivery of its contents." *Ex parte Jackson*, 96 U.S. 727, 728 (1877). Congress exercised that power through the Postal Reorganization Act of 1970 to mandate universal service, prioritizing important mail such as ballots, limiting the types of nonmailable materials to a list of specific categories, and restricting the non-postal services USPS can provide.

84. The Final Rule violates these provisions and defies congressional intent. It directs USPS, as the Executive Order commands, not to transmit mail-in or absentee ballots from any governmental entity to an individual unless those individuals have been enrolled on a State-specific list. *See* 91 Fed. Reg. at 54991 (§§ 705.24.5.1, 705.24.5.3). It requires that all envelopes to mail and return ballots must meet certain design requirements. *Id.* at 54990–91 (§§ 705.24.3.1, 705.24.3.2). It establishes that ballots are presumptively undeliverable to a voter—unless the voter is on an approved list and the state has used envelopes that meet the design requirements—and mandates that USPS refuse to deliver them even though they are properly addressed, stamped, lawful, nonhazardous mail from a government entity. A postal official's "right to exclude letters, or to refuse to permit their delivery to persons addressed, must depend upon some law of Congress,

and if no such law exists, then he cannot exclude or refuse to deliver them." *Am. Sch. of Magnetic Healing v. McAnnulty*, 187 U.S. 94, 109 (1902). No such law exists here.

85. First, Congress requires USPS "to bind the Nation together" by providing "prompt, reliable, and efficient services to patrons in all areas and . . . render postal services to all communities" on equal footing. 39 U.S.C. § 101(a). USPS must also give "the highest consideration to the requirement for the most expeditious collection, transportation, and delivery of important letter mail," *id.* § 101(e), and its core function is to "receive, transmit, and deliver" the mail so as to "serve as nearly as practicable the entire population of the United States," *id.* § 403(a). The Final Rule violates this universal service mandate by requiring USPS to screen and seize mail ballots that do not meet certain mandates unrelated to its mission or operation. Nothing in Title 39—or anywhere else in federal law—specifically authorizes USPS to decline to provide this type of mail service in "all areas" or "to all communities." *Id.* § 101(a).

86. Second, Congress has created a detailed, exhaustive list of nonmailable materials, without any provision authorizing USPS to create additional categories. *See* 39 U.S.C. §§ 3001–3018. None of the provisions that permit USPS to refuse to transmit certain types of mail include mail ballots or anything remotely similar. By stating that USPS will refuse to transmit certain categories of mail ballots, however, the Final Rule acts contrary to the law and without congressional authorization.

87. Third, Congress has barred USPS from offering "nonpostal services," 39 U.S.C. § 404(e), defined as services beyond mail delivery and functions ancillary to delivery, *id.* § 102(5), except where the service is expressly authorized by law or was offered before January 1, 2006, and continued following review and approval of the Postal Regulatory Commission, *id.* § 404(e)(2). USPS may offer nonpostal services only if they "provide enhanced value to the

public," are revenue neutral, and receive approval from a majority of the Board of Governors. *Id.* § 3703(a)(1). The Final Rule violates those restrictions by assigning USPS a role in state election administration, including reviewing voter lists supplied by states, making appearance on those lists a condition to transmitting mail ballots, as well as mandating certain design requirements for envelopes to mail and return ballots, which are subject to USPS' review and feedback. None of these functions have been approved by the Board of Governors, and both constitute nonpostal services that will harm the public's interest in fair and open elections.

88. The Final Rule cites various federal criminal provisions regarding the delivery of mail or elections. 91 Fed. Reg. at 54990. However, none of these authorities displaces Congress's universal service mandate, nor do they give USPS (or the President) a broad power to create new categories of non-mailable materials or deviate from providing their core postal services. 18 U.S.C. § 1341 and § 1708 criminalize mail fraud and mail theft and destruction, respectively. 52 U.S.C. § 10307 and § 20511 prohibit interference with the right to vote and voter intimidation. And 52 U.S.C. § 10307—a provision of the Voting Rights Act—bars voting more than once in one election and making false statements in registering. These statutes do not grant USPS or anyone else the ability to decline to transmit certain ballots.

89. Rather than *authorizing* the Executive Order and Final Rule, applicable federal criminal provisions affirmatively *prohibit* USPS from effectuating it. A USPS employee who complies with the Executive Order and Final Rule by removing ballots the Rule deems non-complaint could face criminal liability under a suite of federal statutes governing interference with the mail, including laws that the Executive Order and Final Rule cite. Federal laws impose criminal liability on a postal official or employee who takes mail from a post office before delivery, 18 U.S.C. § 1708; "quits or deserts" the mail before it is delivered, *id.* § 1700; knowingly

"obstructs or retards" the passage of the mail, *id.* § 1701; takes a letter or package from a post office with the "design to obstruct" correspondence, *id.* § 1702; or unlawfully "detains [or] delays" any mail entrusted to them, *id.* § 1703. In addition to these criminal prohibitions, refusing to deliver valid absentee and mail-in ballots, as the Executive Order and Final Rule direct USPS officers to do, is conduct that interferes with the right to vote, and thus violates Section 11(a) of the Voting Rights Act, 52 U.S.C. § 10307(a), as described Count V of the original Complaint.

90. Any action that an agency takes outside the bounds of its statutory authority is ultra vires. *City of Providence v. Barr*, 954 F.3d 23, 31 (1st Cir. 2020). An agency's officers must always act in accordance with the law, and when an official acts unlawfully, "courts generally have jurisdiction to grant relief." *McAnnulty*, 187 U.S. at 108.

91. USPS's "actions are reviewable to determine whether it has acted in excess of its statutory authority," even when USPS's actions may not be reviewable under the Administrative Procedure Act. *See N. Air Cargo v. USPS*, 674 F.3d 852, 858 (D.C. Cir. 2012); *see also Aid Ass'n for Lutherans v. USPS*, 321 F.3d 1166, 1173 (D.C. Cir. 2003) (recognizing that statutes that preclude judicial review "do[] not repeal the review of ultra vires actions that was recognized long before, in *McAnnulty*" based on the ultra vires actions of an executive agency).

92. Judicial review is appropriate here to determine whether the USPS, as an agency, "has acted 'ultra vires'—that is, whether it has 'exceeded its statutory authority.'" *Mittleman v. Postal Regul. Comm'n*, 757 F.3d 300, 307 (D.C. Cir. 2014) (quoting *Aid Ass'n for Lutherans*, 321 F.3d at 1173).

93. The Final Rule, which springs from the Executive Order's directive to USPS, exceeds USPS's statutory authority and is therefore ultra vires and void. USPS Defendants'

implementation of the Final Rule therefore constitutes action in excess of lawful authority and is subject to invalidation by this Court.

**COUNT IX: Non-Statutory Review of Unlawful Agency Action Against USPS Defendants (39 U.S.C. §§ 401(2), 403(c))**

94. Plaintiffs incorporate the allegations of the preceding paragraphs of this Supplemental Complaint, as well as the allegations in the original Complaint, as though fully set forth herein.

95. In addition to the statutory violations identified in Count VIII, the Final Rule violates the USPS's obligation to provide services without "undue or unreasonable discrimination among users." 39 U.S.C. § 403(c). The Final Rule draws arbitrary lines among users of the mail without any possible justification. First, it sorts election offices—all presenting properly addressed, prepaid ballot mail—into those whose mailings USPS will accept and those whose mailings it will refuse, based solely on whether the office has satisfied envelope, barcode, and data-submission conditions found in no statute. Second, it sorts eligible voters, all entitled under state law to vote by mail, into those who will receive a ballot and those who will not, based on their election office's capacity to meet those conditions—a matter entirely outside the voter's control. And third, it mandates that eligible voters who do not appear on USPS's state-specific lists for whatever reason—including, e.g., an administrative error resulting from a hyphenated name or a recent move, or an inadvertent omission, which are also entirely outside the voter's control—may not receive a ballot through the mail. Nothing in Title 39 specifically authorizes any of these distinctions, and USPS has offered no explanation as to why they are due or reasonable. *Cf. GameFly, Inc. v. Postal Regul. Comm'n*, 704 F.3d 145, 148 (D.C. Cir. 2013).

96. The Final Rule also violates 39 U.S.C. § 401(2), which bars the USPS from promulgating regulations that are "inconsistent with this title" or not "necessary in the execution

of its functions under this title [or] such other functions as may be assigned to the Postal Service under any provisions of law outside of this title." Yet no federal statute, and certainly not the authorities cited in the Final Rule, authorizes USPS to have any "function[]" concerning lists of voters, a voting system, or any regulations of absentee ballots.

97. Any action that an agency takes outside the bounds of its statutory authority is ultra vires. *City of Providence*, 954 F.3d at 31. An agency's officers must always act in accordance with the law, and when an official acts unlawfully, courts generally have jurisdiction to grant relief. *McAnnulty*, 187 U.S. at 108. Judicial review is appropriate to determine whether USPS has acted outside its statutory authority. *See Mittleman*, 757 F.3d at 307. Beyond the inherent equitable authority recognized in *McAnnulty*, Congress has specifically provided federal courts with jurisdiction in actions brought against USPS. *See* 39 U.S.C. § 409. That statutory grant is an independent basis for this Court's jurisdiction over Plaintiffs' claims that USPS has exercised in excess of statutory authority and in an ultra vires manner.

98. The Final Rule, which springs from the Executive Order's directive to USPS, exceeds USPS's statutory authority and is therefore ultra vires and void. USPS Defendants' implementation of the Final Rule therefore constitutes action in excess of lawful authority and is subject to invalidation by this Court.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray that the Court:

A. Declare that the Executive Order is unlawful, as it was issued in violation of the constitutional separation of powers, and that the Final Rule is unlawful, because by implementing it, USPS is taking an action that violates the constitutional separation of powers, is outside the bounds of its statutory authority, and is ultra vires;

B. Enjoin Defendants from continuing to implement the Final Rule;

C. Award attorney's fees, costs, and expenses in accordance with law, including the Equal Access to Justice Act, 28 U.S.C. § 2412; and

D. Grant all such other and further relief as the Court may deem just and proper.

Dated: August 26, 2026

Respectfully submitted,

*/s/ Sophia Lin Lakin*

Sophia Lin Lakin*
Theresa J. Lee*
Davin Rosborough*
Ethan Herenstein*
Jonathan Topaz*
Ming Cheung*
William Hughes*
Clayton Pierce*
AMERICAN CIVIL LIBERTIES UNION FOUNDATION
125 Broad Street, 18th Floor
New York, NY 10004
(212) 549-2500
slakin@aclu.org
tlee@aclu.org
drosborough@aclu.org
eherenstein@aclu.org
jtopaz@aclu.org
mcheung@aclu.org
whughes@aclu.org
cpierce@aclu.org

Sarah Brannon*
Adriel I. Cepeda Derieux*
AMERICAN CIVIL LIBERTIES UNION FOUNDATION
915 15th Street NW
Washington, DC 20005
(202) 457-0800
sbrannon@aclu.org
acepedaderieux@aclu.org

Leah C. Aden*
Brenda Wright*
John S. Cusick*
NAACP LEGAL DEFENSE & EDUCATIONAL FUND, INC.
40 Rector Street, 5th Floor

Jessie J. Rossman (BBO #670685)
Suzanne Schlossberg (BBO #703914)
AMERICAN CIVIL LIBERTIES UNION FOUNDATION OF MASSACHUSETTS, INC.
One Center Plaza, Suite 850
Boston, MA 02108
(617) 482-3170
jrossman@aclum.org
sschlossberg@aclum.org

Eliza Sweren-Becker*
Wendy Weiser*
Andrew Garber*
BRENNAN CENTER FOR JUSTICE AT NYU SCHOOL OF LAW
120 Broadway, Suite 1750
New York, NY 10271
(646) 292-8310
sweren-beckere@brennan.law.nyu.edu
weiserw@brennan.law.nyu.edu
garbera@brennan.law.nyu.edu

Justin Lam*
BRENNAN CENTER FOR JUSTICE AT NYU School of Law
777 6th Street NW, Suite 1100
Washington, DC 20001
(202) 249-7190
lamju@brennan.law.nyu.edu

Niyati Shah*
Noah Baron*
Ejaz Baluch, Jr.*
ASIAN AMERICANS ADVANCING JUSTICE-AAJC
1620 L Street NW, Suite 1050
Washington, DC 20036

(202) 296-2300
nshah@advancingjustice-aajc.org
nbaron@advancingjustice-aajc.org
ebaluch@advancingjustice-aajc.org

Miranda Galindo*
LATINO JUSTICE PRLDEF
475 Riverside Drive, Suite 1901
New York, NY 10115
(212) 392-4752
mgalindo@latinojustice.org

New York, NY 10006
(212) 965-2200
laden@naacpldf.org
bwright@naacpldf.org
jcusick@naacpldf.org

I. Sara Rohani*
NAACP LEGAL DEFENSE &
EDUCATIONAL FUND, INC.
700 14th Street NW, Suite 600
Washington, DC 20005
(202) 682-1300
srohani@naacpldf.org

*Admitted pro hac vice*

*Counsel for Plaintiffs League of Women Voters of Massachusetts, League of Women Voters Lotte E. Scharfman Memorial Education Fund, League of Women Voters of the United States, League of Women Voters Education Fund, Association of Americans Resident Overseas, U.S. Vote Foundation, OCA-Asian Pacific American Advocates, and Delta Sigma Theta Sorority, Inc.*

**CERTIFICATE OF SERVICE**

I hereby certify that on August 26, 2026, a true copy of the above document was filed via the Court's CM/ECF system and that a copy will be sent automatically to all counsel of record.

August 26, 2026

/s/ *Sophia Lin Lakin*
Sophia Lin Lakin