**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| LEAGUE OF WOMEN VOTERS OF MASSACHUSETTS, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>DONALD J. TRUMP, in his official capacity as President of the United States, *et al.*,<br><br>Defendants. | Case No. 1:26-cv-11549-IT |
| STATE OF CALIFORNIA, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>UNITED STATES POSTAL SERVICE, *et al.*,<br><br>Defendants. | Case No. 1:26-cv-13917-IT |

**DEFENDANTS' COMBINED OPPOSITION TO PLAINTIFFS' MOTIONS FOR A TEMPORARY RESTRAINING ORDER**

## INTRODUCTION

These lawsuits, in their current form, are largely premised on the theory that the United States Postal Service (USPS) intends to seize control of the administration of federal elections. It does not. Plaintiffs' contrary narrative was seemingly formed months before the Final Rule was ever published, and it is impossible to square with the actual text of the actual Rule—which differs in material respects from the doomsday assumptions that animated Plaintiffs' earlier filings.

The Final Rule imposes modest informational requirements on senders of outbound federal ballot mailings. It creates standardized design and review requirements for federal ballot envelopes that have long been recommended by the Postal Service, and some of which are *already* in use in many States (including many of Plaintiffs here). It requires uploading the name-and-address information of intended recipients of ballot mail in an online portal, to improve internal visibility and processing—information that all election officials sending ballot mail necessarily already possess (or they couldn't send that mail in the first place). And critically, the Final Rule allows States—not the Postal Service—to identify which voters should receive ballots by mail, and makes no changes whatsoever to the roster of State residents who are or are not permitted or able to vote by mail. USPS will not scrutinize those decisions or alter that information in any way—instead leaving it entirely up to the States to accurately and lawfully identify its residents who are eligible to vote by mail. The Postal Service will not determine voter eligibility, ballot content, mailing or receipt deadlines, or ballot-counting procedures. The Rule does not displace a single State election law. And it need not and should not prevent a single voter from voting by mail.

These modest improvements and modernizations of the Postal Service's infrastructure for supporting this particularly sensitive category of mail are fully consistent with USPS's statutory and constitutional authority. As explained below, and as will be explained in greater detail in Defendants' preliminary-injunction opposition to be filed on or before 11:00 P.M. on Saturday, August 29, the Postal Service has long taken election-specific actions surrounding envelope design and processing, such as priority processing for ballot mail bearing the election mail logo. And the Postal Service has likewise relied on the same statutory authorities at issue here to adopt special

handling and conditions on acceptance for other types of mail that—like ballot mail—are both non-dangerous but particularly sensitive, or raise unique operational concerns. There is no material distinction between those prior actions and this one, at least when it comes to the legal authority of the Postal Service. Accordingly, Plaintiffs are unlikely to succeed on the merits, and Plaintiffs' motions for a temporary restraining order (TRO) should be denied.

Even if Plaintiffs could show a likelihood of success, however, the equities weigh strongly against the rushed entry of a TRO at this time, just days after the Postal Service's rule has taken effect. For one thing, the Supreme Court held just this week that, because appellate review in the ordinary course "would come too late for the 2026 midterms," an erroneous injunction would necessarily cause irreparable harm to the government. *Trump v. California*, No. 26A124, 2026 WL 2473573, at *4 (U.S. Aug. 24, 2026). And although Plaintiffs' filings emphasize their fears of last-minute confusion and chaos, they ignore the mirror-image problems and the risk of significant regulatory whiplash that is likely to result from this Court's hurried *granting* of their TRO motions—especially on the heels of the Supreme Court's stay and this Court's resulting vacatur of the previous court orders that had erroneously constrained the Postal Service's authority—before this Court has an opportunity to adjudicate the preliminary injunction next week.

Plaintiffs' motions for a temporary restraining order should be denied.

## **BACKGROUND**

Yesterday, the Postal Service published the Final Rule in the Federal Register. *See* U.S. Postal Service, *Ballot Mail for Federal Elections*, 91 Fed. Reg. 54,966 (Aug. 26, 2026). The Postal Service issued the rule pursuant to its rulemaking and operational authority in 39 U.S.C. §§ 401(2) and 404(a)(1). The rule amends USPS's Domestic Mail Manual to place modest reporting and design requirements on envelopes carrying federal ballot mail.

The Final Rule requires federal ballots transmitted through the U.S. Mail to be mailed in envelopes that include the official Election Mail logo, are automation compatible, and use unique barcodes that denote the item's status as federal ballot mail and its delivery point ZIP code. *See* 91 Fed. Reg. at 54,990-91. State and local election officials must submit their envelope designs

for review to ensure compliance with those requirements, and provide the Postal Service with certain information about the federal ballot mail they intend to send. *Id.* at 54,991. Specifically, the unique barcodes applied to each ballot's envelope, along with the name and address of the recipient and the State sending the ballot, must be uploaded to an online portal prior to presenting an outbound ballot mailing. *Id.* at 54,990. Election officials may continually update this information as many times as necessary. *Id.* at 54,991. When outbound federal ballot mail is presented for mailing, the Postal Service will match the barcode data to the portal data, to ensure compliance with the Rule's requirements. *Id.* at 54,990-91. All mailings that comply with these requirements will be accepted. USPS will not perform any verification of voter eligibility or the like; its role is limited to ensuring that the envelopes comply with the rule's envelope design requirements—as the rule emphasizes, "State election officials will thus retain full control over who is permitted to vote in federal elections in their state by U.S. mail." *Id.* at 54,969. On or near the date of the election, the Postal Service will also provide each State that used the U.S. Mail to transport ballots with a single list containing all the state's submissions about the ballots it sent. *Id.* at 54,993-94.

Several features of this Rule are not new: for years, the Postal Service has recommended that federal ballot mail use unique barcodes, be automation compatible, include the official Election Mail logo, and undergo mailpiece design review in advance of mailing. *See* U.S. Postal Service, *Official Election Mail Guide* (''Kit 600''); *Domestic Mail Manual* 703.8.0. This Rule simply turns these longstanding recommendations—which many of the Plaintiff States have already adopted, and some have long advocated for—into requirements. These requirements are only a baseline; "nothing in the rule prevents or discourages election officials from including envelope design elements required by state law," nor will the rule "create a single, uniform ballot envelope design across all states[.]" *Id.* at 54,978. And most importantly, States remain entirely free to run their own elections and manage their own voter rolls in any manner that is otherwise consistent with federal law, including by using (or not using) the U.S. mail for any part of their election process.

## LEGAL STANDARD

A preliminary injunction and (especially) a temporary restraining order "is an extraordinary and drastic remedy," and thus "should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (citation omitted). To warrant extraordinary injunctive relief, the movant must demonstrate "that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *see also Gillan v. Town of Carver*, 2025 WL 1836609, at *1 (D. Mass. July 3, 2025) (explaining that "[c]ourts apply the same standard in assessing motions for a temporary restraining order and motions for a preliminary injunction"). The third and fourth factors of the analysis—harm to others and the public interest—"merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009). In the case of a temporary restraining order, the equitable factors must be assessed specifically with respect to the time that will elapse before the Court has the chance to rule on a preliminary injunction.

## ARGUMENT

### I. An immediate TRO could exacerbate uncertainty and compliance difficulties, rather than prevent them.

**a.** On the equities, Plaintiffs' filings focus heavily on their fears of last-minute confusion and chaos in the leadup to the upcoming November 2026 elections. But those arguments overlook the risk of significant regulatory whiplash—and of even *further* compressed compliance timelines—that could result from the rapid entry of a TRO. Accordingly, whatever the Court ultimately decides about the merits, it should at least allow the parties to brief and argue this case on the expedited preliminary-injunction schedule it has already ordered—rather than materially altering the nationwide regulatory landscape for ballot mail via TRO.

If a TRO is issued now, but then either stayed on appeal or rescinded later upon the denial of Plaintiffs' preliminary-injunction motions, then both States *and* the Postal Service will be even more pressed for time in preparing for these requirements with respect to the November 2026

elections. By contrast, if the Court simply withholds judgment until the parties can brief and the Court can decide Plaintiffs' motions for a preliminary injunction—which will be fully briefed and argued in a matter of days—both States and the Postal Service will have more time to at least begin preparing for compliance.

To be sure, if Plaintiffs ultimately prevail, those preparatory steps may turn out to be wasted effort, at least for *this* election. But that outcome is far less harmful—*including to the Plaintiff States*—than the reverse scenario, in which preparation is further (and erroneously) delayed by additional injunctions, only to be restarted again even *closer* in time to the upcoming elections.

**b.** Although the procedural posture is admittedly now different, the Supreme Court's recent opinion in *California* also supports the government's position on the equities. In *California*, the Supreme Court concluded that "[t]he Government [was] likely to suffer irreparable harm without a stay." 2026 WL 2473573, at *4. As the Supreme Court explained, "[b]ecause reversal of the District Court's judgment" in the normal course of litigation "would come too late for the 2026 midterms, the District Court's errors deal[t] 'a serious setback' to the Executive's 'goals' while this litigation unfolds." *Id.* (quoting *Coleman v. Paccar Inc.*, 424 U.S. 1301, 1307 (1976) (Rehnquist, J., in chambers)); *id.* at *5 ("[T]hat injunction is likely to irreparably harm the Government if it remains in place while the appellate process runs its course."). And the Supreme Court likewise emphasized that this Court's prior injunction "meddle[d] in the workings of the Executive Branch, preventing it from even trying to lawfully implement the Order." *Id.* Notwithstanding the recent developments in this litigation—the most important of which was, in any event, already known to the Supreme Court, which is publication of a Final Rule—all those conclusions about irreparable harm to the government remain applicable today.

## II. Plaintiffs are not likely to succeed on the merits.

Given the extremely short time allotted to prepare this filing, the many issues collectively raised by the two separate filings from Plaintiffs, and the fact that the parties have not yet briefed any of these merits questions, Defendants have little choice but to offer only an abbreviated version of their merits arguments here. They thus reserve their right to respond more fully at later stages

of this litigation, including in this Saturday evening's preliminary-injunction opposition, two days from now. Nevertheless, the core of Defendants' submission on the merits is straightforward: this is ultimately a regulation of the U.S. mail, and a modest one at that—not a federal takeover of election administration by the Postal Service. That basic reality undermines virtually all of Plaintiffs' claims and illustrates why they are unlikely to succeed on the merits.

**A. The Final Rule is authorized by statute.**

**1.** Although federal-court litigation challenging significant government policies has become the norm in recent years, the Final Rule at issue here is not subject to the same form of review as most of those cases. That is because "the Postal Service is exempt from review under the Administrative Procedure Act." *Mittleman v. Postal Regul. Comm'n*, 757 F.3d 300, 305 (D.C. Cir. 2014) (citing 39 U.S.C. § 410(a)).

To be sure, "the absence of a cause of action for judicial review under the APA does not necessarily foreclose all judicial review." *Id.* at 307. "But while such review may be available, it is quite narrow," *id.*, for at least two reasons. One, "[i]t is available only to determine whether the agency has acted 'ultra vires'—that is, whether it has 'exceeded its statutory authority.'" *Id.* (quoting *Aid Ass'n for Lutherans v. USPS*, 321 F.3d 1166, 1173 (D.C. Cir. 2003)) (citing *Leedom v. Kyne*, 358 U.S. 184, 188 (1958) (asking whether the agency's action was "in excess of its delegated powers and contrary to a specific prohibition in the Act [that] is clear and mandatory")). And two, that sort of non-statutory ultra vires claim requires identification of an agency violation of "a specific prohibition" in a statute that "is clear and mandatory." *Leedom*, 358 U.S. at 188. In other words, as the Supreme Court put it last year, "a *Leedom v. Kyne* claim is essentially a Hail Mary pass—and in court as in football, the attempt rarely succeeds." *NRC v. Texas*, 605 U.S. 665, 681-82 (2025). Plaintiffs cannot satisfy that high standard.

For the most part, Plaintiffs do not even try to identify any "specific" or "mandatory" statutory provision that the Final Rule violates. Instead, they "basically dress up a typical statutory-authority argument as an ultra vires claim." *Id.* at 682. But "[e]ven if one were to disagree with

the [Postal Service's] conclusion" about the reach of its authority as articulated in the Final Rule, that sort of routine "statutory argument falls well shy of a meritorious *Leedom v. Kyne* claim." *Id.*

**2.** Whatever the appropriate standard of review, Congress authorized the Postal Service "to adopt, amend, and repeal such rules and regulations, not inconsistent with this title, as may be necessary in the execution of its functions under this title and such other functions as may be assigned to the Postal Service under any provisions of law outside of this title." *Id.* § 401(2). Congress further granted the Postal Service "all other powers incidental, necessary, or appropriate to the carrying on of its functions or the exercise of its specific powers." *Id.* § 401(10). And those specific powers include the power "to provide for the collection, handling, transportation, delivery, forwarding, returning, and holding of mail, and for the disposition of undeliverable mail." *Id.* § 404(a)(1). The Postal Service's general rulemaking powers plainly include at least *some* authority to impose reasonable requirements for envelope design and labeling and require mailers to provide basic information regarding particularly sensitive items. *See* 39 U.S.C. §§ 401-404.

Indeed, as explained in the Final Rule, *see* 91 Fed. Reg. at 54,974, the Postal Service has invoked these very authorities in the past—including where, as here, the type of mail in question is sensitive, but non-dangerous. For example, cremated human and animal remains must be transported through specific types of USPS-provided boxes, and must be trackable via barcode. *See Cremated Remains Packaging Requirements*, 90 Fed. Reg. 9843 (Feb 19, 2025) (implementing rules concerning the sending of cremated remains in specific types of USPS-provided boxes because the Postal Service understands such remains are "sensitive matter and believes this will improve visibility and enhance handling methods throughout processing and transportation"). Similarly, replica explosives—which, although not dangerous, also require special handling to prevent operational disruptions—rather than being prohibited from the mail altogether, must be mailed in certain ways, including in-person presentation to a retail counter and shipment via Registered Mail. *See Restricting the Mailing of Replica or Inert Explosives*, 75 Fed. Reg. 282 (Jan. 5, 2010) (noting that "[t]his process will ensure that packages containing these items remain separate and easily identifiable during the mailing process"). This Rule functions similarly, and for similar reasons—

although ballot mail does not present precisely the same operational issues as cremated remains or replica explosives, it is sensitive mail that raises unique operational considerations.

In the face of these broad grants of statutory authority over "the collection, handling, transportation, delivery, forwarding, returning, and holding of mail," 39 U.S.C. § 404(a)(1), Plaintiffs try to shift the focus away from the text, and instead to the context of elections. And so, Plaintiffs' arguments that the Postal Service lacks statutory authority here are largely premised on their repeated assertions that USPS doesn't have the power to regulate *elections*. But that argument fails to grapple with the very limited nature of the rule—which does not regulate elections at all.

Under the Rule, States can continue to mail ballots to whomever they wish whenever they wish; the rule does not regulate the form or content of the ballots themselves, the timeline for transmission of ballots, voter eligibility, vote-by-mail eligibility, or anything similar. It regulates only how States must design and label the envelopes they send via U.S. mail (should they elect to use the U.S. mail to send ballots). As the Rule itself makes clear, "[t]he Postal Service does not purport to alter the eligibility of any individual to vote under state or federal law." 91 Fed. Reg. 54,991. And both before and after this Rule, "[t]he Postal Service does not have any legal responsibility for management of state voter rolls or administration of federal elections within each state." *Id.* In other words, this is a regulation of the U.S. mail—not a regulation of elections.

Plaintiffs cannot seriously contend that the Postal Service is disabled from adopting *any* election-mail-specific rules, since their co-counsel and co-Plaintiffs have long advocated for and benefited from specific ballot-mail envelope design elements and the prioritization of such mail. *See NAACP v. USPS*, 2026 WL 1893762, at *1 (D.D.C. July 1, 2026); U.S. Postal Service, Kit 600: 2026-2027 Official Election Mail 4, https://about.usps.com/kits/kit600.pdf. If the Postal Service has no legal authority to make any rules specific to election-related mail—as seems to be Plaintiffs' theory—it is hard to understand how those longstanding efforts would be lawful.

Nor is the Postal Service legally obligated to turn a blind eye to the use of the mails to facilitate specific types of fraud. Consider, for example, a scenario in which retirement communities are repeatedly targeted for elder-abuse mail scams: there is no evident reason why the Postal

Service could not impose special design and registration rules for envelopes used to send solicitations to such locations. This Rule follows the same basic form, by acknowledging the indisputable reality that election-related mail is particularly sensitive, and that crimes relating to election mail are particularly important. *See* 91 Fed. Reg. at 54,969. And so, "[w]hether or not voter fraud is common or uncommon, the Postal Service has the legal authority to take the measures in this rule to facilitate enforcement of federal law[.]" *Id.*

**B. The Final Rule does not violate the Constitution.**

Under the Elections Clause, "[t]he Times, Places and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof; but the Congress may at any time by Law make or alter such Regulations, except as to the Places of chusing Senators." U.S. Const. art. I, § 4, cl. 1. And so, Plaintiffs' filings argue repeatedly that the President does not have any constitutional authority to directly regulate elections, on his own.

As explained above, the Final Rule does not regulate elections—States retain full control over the administration of their elections. But in any event, the Final Rule was not issued by the President, it was issued by the Postal Service—as a matter of the Postal Service's own judgment about how "it is appropriate to exercise *its* statutory authority" over the U.S. mail in order "to faithfully execute federal law and also to advance the Postal Service's operational interests[.]" 91 Fed. Reg. at 54,976 (emphasis added). And it is *also* undisputed that *Congress* does have the authority to regulate in this area—whether the Rule is conceived as a regulation of the U.S. Mail, or even if framed (incorrectly, in the government's view) as a regulation of elections. After all, all parties agree that *Congress* can regulate elections. So Plaintiffs' Elections Clause claim adds nothing to this case. If the Postal Service's rule is unauthorized by Congress, *but see supra*, then it is unlawful (without the need to address the Constitution at all). And if the Postal Service's rule is authorized by Congress, then that necessarily means there is no Elections Clause problem. After all, Plaintiffs do not even argue that Congress has unlawfully delegated its authority to the Postal Service—nor could they.

In any event, Plaintiffs' constitutional-authority objection proves far too much. Again, it is undisputed that the Postal Service, for example, *already* uses the Election Mail logo and takes certain extraordinary measures, every election cycle, to prioritize the timely delivery of election mail. Indeed, these Plaintiffs' co-counsel and co-Plaintiffs have filed lawsuits arguing that the Postal Service had not gone far *enough* in prioritizing election mail. *See supra* (citing *NAACP v. USPS*, 2026 WL 1893762, at *1). But if *any* election-specific regulation of the U.S. Mail violates the Constitution, all those prioritization efforts would have been equally unconstitutional—a highly unlikely result that illustrates the untenable nature of Plaintiffs' theory.

**C. Plaintiffs' remaining claims lack merit.**

That leaves a variety of miscellaneous claims from the *California* Plaintiffs, which are also unlikely to succeed on the merits.

**a.** Plaintiffs argue that the Postal Service has impermissibly created a new category of nonmailable matter, usurping the role of Congress, in violation of the APA.[1] And, to be sure, Congress has identified certain categories of nonmailable matter directly by statute. *See, e.g.*, 39 U.S.C. § 3001(a) (prohibiting the mailing of, for example, fraudulent representations, firearms, poisons and poisonous animals, explosives, diseases, ballistic knives, alcoholic beverages, some tobacco products, and many live animals).

But this is not a mailability rule; the Rule does not create a new category of "nonmailable matter" into which Ballot Mail as a class may generally fall. To the contrary, USPS hopes to mail as many lawful ballots as the States wish to send, no more and no less—and the Rule does not prohibit *any* ballots from being mailed. All outbound federal ballot mail that meets these modest requirements will be accepted, and then processed and delivered as before.

The Rule does, of course, place certain conditions on acceptance of federal ballot mailings—but that alone is not enough to create a new category of non-mailable matter. After all, the

[1] This is the only statutory claim in this case for which normal APA review applies. *See* 39 U.S.C. § 3001(m).

Postal Service could refuse to mail a heavy package if the customer failed to pay sufficient postage, but that does not mean that heavy packages are nonmailable. Similarly, if the Postal Service refused to deliver election mail from States to voters that was sent without any postage, that would not render unstamped election mail "nonmailable" or otherwise violate the statutory rules governing creation of categories of nonmailable matter. The same logic applies here.

**b.** Plaintiffs argue that the Postal service is now offering a "nonpostal service" in violation of 39 U.S.C. § 404(e), which prohibits the Postal Service from offering "any service that is not a postal service." But the requirements in the Final Rule are not "services" at all. As the Postal Regulatory Commission has explained (in an interpretation that the D.C. Circuit has upheld), "services" for purposes of 39 U.S.C. § 404(e) refer to ongoing commercial activities offered to the public for the purpose of financial gain. *USPS v. Postal Regul. Comm'n*, 599 F.3d 705, 708 (D.C. Cir. 2010). This is nothing of the sort.

Even if the Final Rule offers "services," they are not "nonpostal" services. 39 U.S.C. § 404(e). Rules for sending certain types of mail, through the mail, are about as "postal" as it gets. *See* 39 U.S.C. § 102(5) (the term "'postal service' refers to the delivery of letters, printed matter, or mailable packages, including acceptance, collection, sorting, transportation, or other functions ancillary thereto").

**c.** Plaintiffs argue that the Final Rule is an "undue or unreasonable discrimination among users of the mails," 39 U.S.C. 403(c), because it subjects ballot mail to more rigorous envelope-design, reporting, and verification requirements than certain other types of mail. This argument fails both at the threshold and on the merits.

First, in *New York v. Trump*, 181 F.4th 132, 137-42 (D.C. Cir. 2026), the D.C. Circuit correctly held that the Postal Regulatory Commission has exclusive jurisdiction over claims covered by 39 U.S.C. § 3662(a), which includes claims that the Postal Service acted in violation of 39 U.S.C. § 403(c). Plaintiffs' only response seems to be that sometimes the Postal Regulatory Commission might take "90 days" to make certain decisions. *California* TRO Br. at 19. But that is no basis for ignoring a straightforward limitation on the Court's subject-matter jurisdiction.

Second, 39 U.S.C. § 403(c) only prohibits discrimination "[i]n providing services and in establishing classifications, rates, and fees under this title," and the challenged requirements are none of those things. The Rule also applies to all ballot mailers equally—just like the rules about mailing replica explosives or cremated remains apply to mailers of those types of mail equally. For obvious reasons, Congress never said that all types of mail must always be treated identically. To the contrary, Congress provided expressly that "[i]t shall be the responsibility of the Postal Service . . . to provide types of mail service to meet the needs of different categories of mail and mail users." 39 U.S.C. § 403(b)(2). That is all it has done here.

**d.** Plaintiffs argue that the Postal Service was obligated to first seek an advisory opinion from the Postal Regulatory Commission before issuing this rule, under 39 U.S.C. § 3661. But as with Plaintiffs' Section 403(c) discrimination claims, that sort of claim is beyond the subject-matter jurisdiction of this Court. *See New York*, 181 F.4th at 137-42. Although Plaintiffs may bring that sort of challenge, they can only do so by complying with the administrative-review scheme set forth by Congress, *see* 39 U.S.C. § 3662, and then bringing their claims in the Court of Appeals in the first instance, *see id.* § 3663.

**e.** Plaintiffs argue that the Final Rule violates the Voting Rights Act, in particular the provision that provides that "[n]o person acting under color of law shall fail or refuse to permit any person to vote who is entitled to vote under any provision of chapters 103 to 107 of this title or is otherwise qualified to vote[.]" 52 U.S.C. § 10307(a). For starters, that provision of the Voting Rights Act is not judicially enforceable by a private right of action. *See Alexander v. Sandoval*, 532 U.S. 275, 286-87 (2001) ("Without [statutory authorization], a cause of action does not exist and courts may not create one, no matter how desirable that might be as a policy matter, or how compatible with the statute."); *see also Schilling v. Washburne*, 592 F. Supp. 3d 492, 499 (W.D. Va. 2022) (no private right of action to enforce 52 U.S.C. § 10307(b)).

Regardless, the Final Rule is entirely consistent with that provision of the Voting Rights Act. The Rule explains repeatedly that the names provided by each State will "be listed by and at

the discretion of election officials, and the Postal Service will not second-guess the states' submissions." 91 Fed. Reg. at 54,969. In other words, "State election officials will . . . retain full control over who is permitted to vote in federal elections in their state by U.S. mail." *Id.* So the Postal Service will never be "refus[ing] to permit" anyone to vote who is "otherwise qualified to vote" according to their own State election officials. 52 U.S.C. § 10307(a). The question of who can and cannot vote will be—both before and after the Rule—up to State election officials to decide.

**f.** Finally, the *California* Plaintiffs argue that the Postal Service has violated the Privacy Act. But injunctive relief is generally unavailable under the Privacy Act, except in limited circumstances that Plaintiffs do not even argue are applicable here. *See, e.g.*, *Sussman v. U.S. Marshals Serv.*, 494 F.3d 1106, 1122 (D.C. Cir. 2007) ("We have held that only monetary damages, not declaratory or injunctive relief, are available to § 552a(g)(1)(D) plaintiffs."). And organizations (rather than individuals) are not entitled to *any* relief under the Privacy Act. *See* 5 U.S.C. § 552a(g)(1)(D) (authorizing a cause of action for adversely affected "individuals"); *id.* § 552a(a)(2) (defining "individual" as "a citizen of the United States or an alien lawfully admitted for permanent residence.").

To be sure, in recent years, litigants have often tried (and sometimes succeeded) in evading these limitations by bringing APA claims predicated on alleged violations of the Privacy Act. *See, e.g.*, *Heritage Found. v. DOJ*, 2026 WL 1766549, at *3 (D.D.C. June 19, 2026) (noting that "the availability of injunctive relief under the APA" to remedy a Privacy Act violation "is an unsettled question with which other courts are actively wrestling"). The government's longstanding position is that this maneuver is inconsistent with Congress's judgments in the Privacy Act itself. *See, e.g.*, *Am. Fed'n of Tchrs. v. Bessent*, 152 F.4th 162, 175 (4th Cir. 2025) ("With its enumerated violations and details on jurisdiction, venue, and timing, the Privacy Act at least plausibly reflects Congress's intent to preclude suit under the APA in circumstances like those presented here."), *abrogated on other grounds*, 172 F.4th 361 (4th Cir. 2026). Regardless, that workaround is plainly inapplicable here, because the Postal Service is not subject to APA litigation in the first place. *See* 39 U.S.C. § 410(a). Plaintiffs' Privacy Act claims fail on threshold grounds.

Nor does the Final Rule reflect the "creat[ion] a surveillance program to track voting" that would violate the Privacy Act. *California* TRO Br. at 16. The Rule has nothing to do with "collecting records of voters' First Amendment activity." *Id.* So the Privacy Act claims would also fail on the merits.

## CONCLUSION

Plaintiffs' motions for a temporary restraining order should be denied.

Dated: August 27, 2026

Respectfully submitted,

BRETT A. SHUMATE
Assistant Attorney General
Civil Division

ERIC J. HAMILTON
Deputy Assistant Attorney General
Civil Division

JOSEPH E. BORSON
Assistant Branch Director
Federal Programs Branch

/s/ Stephen M. Pezzi
STEPHEN M. PEZZI
Chief Litigation Counsel (FL Bar 1041279)
MICHAEL S. POLITO
Trial Attorney (DC Bar 90041172)
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, NW
Washington, DC 20530
Telephone: (202) 305-8576
E-mail: stephen.pezzi@usdoj.gov