FILED
IN CLERKS OFFICE
2026 AUG 31 P 12:09
U.S. DISTRICT COURT
DISTRICT OF MASS.

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

**LEAGUE OF WOMEN VOTERS OF MASSACHUSETTS, et al.,**
Plaintiffs,

v.

**DONALD J. TRUMP, in his official capacity as President of the United States, et al.,**
Defendants.

Civil Action No. 1:26-cv-11549-IT

---

**BRIEF OF AMICUS CURIAE**
**BRANDON MICHAEL HAYES**
**PRESIDENT, NATURAL LAW INSTITUTE**

**REGARDING THE CONSTITUTIONAL FLOOR OF DEPRIVATION, THE DISTINCTION BETWEEN THE FRANCHISE AND VOTING MECHANISMS, VERIFICATION, AND ARTICLE III SEQUENCING**

---

## INTEREST OF AMICUS CURIAE

Brandon Michael Hayes submits this brief as amicus curiae in his individual capacity and appears pro se.

Mr. Hayes is President of the Natural Law Institute, an institute dedicated to the study of constitutional structure, lawful institutional design, adjudicative architecture, and the relationship between individual rights and governmental authority.

The Natural Law Institute studies questions concerning the proper allocation of authority, responsibility, accountability, and decision-making within legal and civic institutions. The matters addressed in this brief fall within those areas of study.

Amicus submits this brief to provide the Court with an independent analysis of the structural and constitutional principles implicated by the questions presented.

---

## STATEMENT REGARDING CONSENT, AUTHORSHIP, AND POSITION OF AMICUS

Amicus curiae Brandon Michael Hayes appears pro se.

No party or counsel for any party authored this brief in whole or in part. No person other than amicus contributed money intended to fund the preparation or submission of this brief.

Amicus submits this brief independently and expresses no position concerning any party beyond the legal and structural issues addressed herein.

---

## QUESTIONS PRESENTED

1. Whether alteration of a government-created voting mechanism must be treated as deprivation of the franchise without first determining the legal source of the mechanism, the circumstances of the affected voter, the lawful alternatives remaining available, and the actual burden imposed upon participation.
2. Whether constitutionally relevant analysis must distinguish remote-voting mechanisms necessary to preserve meaningful participation from generally available mail-voting mechanisms used where ordinary in-person participation remains reasonably available.
3. Whether election verification must be analyzed according to function—qualification, identity, attribution, custody, and reconciliation—rather than collapsed into either unrestricted access or governmental permission.
4. Whether, after the Court vacated the antecedent injunction under *Trump v. California* and Plaintiffs supplemented their complaint to challenge the Final Rule, Article III jurisdiction, constitutional merits, and remedial scope must remain separately established in adjudicating renewed equitable relief.

---

## INTRODUCTION

This case presents a problem of constitutional classification.

Whether mail-in voting is beneficial, convenient, efficient, or preferred by particular voters and organizations may inform legislative judgment and the practical measurement of burden. Those considerations do not, standing alone, establish constitutional deprivation.

The constitutional inquiry is more exact:

> **Whether a government-created mechanism for exercising a constitutional right can become legally indistinguishable from the right itself such that alteration of the mechanism constitutes deprivation.**

The Constitution protects the franchise.

It does not, by that fact alone, constitutionalize every administrative pathway through which a ballot may be cast.

Nor does recognition of the franchise render administrative mechanisms constitutionally insignificant. A mechanism may become indispensable to meaningful participation for a particular voter. Where removal of that mechanism leaves no adequate lawful means to vote, a procedural change may operate as deprivation.

The necessary inquiry therefore lies between two overbroad propositions:

**A voting mechanism is not the constitutional right merely because it facilitates the right.**

And:

**A voting mechanism cannot be dismissed as mere convenience where its loss functionally prevents an eligible citizen from voting.**

The Supreme Court has already supplied this distinction.

In **McDonald v. Board of Election Commissioners of Chicago, 394 U.S. 802 (1969)**, the Court declined to treat exclusion from an absentee-ballot statute as equivalent to denial of voting where the record did not establish that the affected voters were actually unable to vote by another means.

Five years later, in **O'Brien v. Skinner, 414 U.S. 524 (1974)**, the Court confronted the opposite condition. Qualified voters were physically unable to reach the polls and were denied any alternative means of voting. The restriction therefore operated as an effective denial of the franchise.

Together, those cases supply the distinction this controversy presently needs:

> **Loss of a voting mechanism and loss of the vote are different constitutional conditions until the facts make them the same.**

The present record contains materially different voters under the common description of persons who "rely" upon mail voting.

- Some are military or overseas voters.
- Some have disabilities, illness, advanced age, or physical circumstances making personal attendance difficult or impossible.
- Some reside far from polling locations or lack transportation.
- Some attend school away from their permanent residence.
- Some have employment or other obligations.
- Some use mail voting because it provides additional time or assistance.
- And some expressly use it because it is convenient.

Those circumstances cannot be constitutionalized as a single category merely by calling each person a "mail voter."

- The legal source of each pathway differs.
- The practical necessity differs.
- The remaining alternatives differ.
- The resulting burden differs.
- And therefore the constitutional consequence may differ.

The same separation is required when examining verification.

In-person voting and remote voting do not eliminate the same administrative uncertainties in the same manner. Physical presence permits identity, qualification, ballot issuance, voter action, and initial custody to occur within a comparatively compressed institutional environment.

Remote voting necessarily distributes those functions across time, location, transmission, records, attestations, identifiers, custody transitions, and reconciliation systems.

That fact neither condemns nor constitutionalizes mail voting.

It identifies the administrative work that must be performed.

The constitutional inquiry is whether a challenged requirement remains a mechanism for precisely identifying an existing legal condition or instead creates an additional governmental condition unrelated or disproportionate to that purpose.

A second constitutional floor arises on the judicial side.

Article III requires an actual case or controversy before federal judicial power becomes coercive. Standing, ripeness, merits, irreparable harm, and remedial scope therefore cannot be collapsed into one generalized sense of urgency.

The Supreme Court's intervening decision in **Trump v. California, No. 26A124, 609 U.S. ___ (Aug. 24, 2026)** directly addresses Section 3 of this same Executive Order. The Court held that

the antecedent presidential directive to initiate Postal Service rulemaking did not itself impose legal requirements outside the Executive Branch and rejected a jurisdictional analysis dependent upon predicting what proposed and final rules might eventually provide and whom they might harm.

On August 26, 2026, this Court applied that intervening guidance, granted Defendants' Motion to Reconsider [Doc. No. 196], and vacated the August 11 preliminary injunction, concluding that the Plaintiff Organizations were not likely to prevail as to ripeness without amending their complaint to account for the Final Rule. Plaintiffs thereafter filed a Supplemental Complaint [Doc. No. 205] and renewed their request for emergency equitable relief [Doc. No. 206].

The distinction is reciprocal.

> **The plaintiff must establish a constitutionally cognizable burden before remedy may be attached to the voting right.**
>
> **The judiciary must establish Article III authority before coercive judicial power may be attached to the governmental process.**

The Postal Service has now issued a Final Rule.

That development improves rather than frustrates judicial review. The Court now possesses an actual governmental object capable of classification according to text, authority, operation, affected voter, actual burden, and appropriate remedy.

The controversy can therefore be decided against what government has actually done rather than what either side anticipated government might do.

---

## SUMMARY OF ARGUMENT

The parties have presented substantial arguments concerning voting access, separation of powers, federalism, executive authority, Postal Service authority, election integrity, organizational standing, ripeness, and equitable relief.

Those arguments frequently operate upon different legal objects.

Plaintiffs emphasize the constitutional importance of voting, the reliance of citizens upon mail voting, organizational education burdens, and the constitutional allocation of election authority to the States and Congress.

Federal Defendants emphasize Article II responsibility, executive supervision, the nonfinal character of antecedent agency activity, and the absence of sufficiently concrete injury before implementation.

Intervenor-Defendants emphasize similar jurisdictional limits while defending governmental authority to investigate, verify, and administer lawful election-related functions.

Amici on both sides emphasize election administration, constitutional allocation of authority, voter access, public integrity, and practical operation.

Each position contains questions capable of lawful adjudication.

The difficulty arises when the questions are collapsed.

The following propositions must remain distinct:

1. **The right to vote is not identical to every mechanism by which a vote may be cast.**
2. **Loss of a mechanism can nevertheless become deprivation where no meaningful lawful alternative remains.**
3. **"Mail voting" is not one constitutional category. Federal absentee protections, state excuse-based absentee systems, no-excuse mail voting, and universal vote-by-mail systems arise from materially different legal architectures.**
4. **Verification and permission perform different governmental functions. Verification identifies an existing qualification. Permission creates an additional governmental condition.**
5. **Election integrity is a legitimate governmental interest even before completed fraud is demonstrated, but the authority exercised and burden imposed must still be lawful.**
6. **Possession of authority does not establish that every exercise of that authority is constitutional. A sensible mechanism imposed by an unauthorized actor remains vulnerable.**
7. **Conversely, absence of authority does not automatically establish that every downstream voter has been constitutionally deprived. Authority and injury remain separate predicates.**
8. **Article III jurisdiction precedes equitable intervention. Costs voluntarily or anticipatorily incurred in response to uncertain future governmental action cannot automatically convert that future action into a present constitutional controversy.**
9. **The issuance of the Final Rule supplies a concrete object for review and materially changes the proper judicial posture.**

The Court ought therefore employ a fixed constitutional sequence:

**Legal Right → Voting Pathway → Legal Source → Affected Voter → Remaining Alternative → Verification Function → Governmental Authority → Concrete Burden → Article III Jurisdiction → Constitutional Review → Proportionate Remedy**

That sequence allows access and integrity to coexist because neither is treated as a slogan capable of resolving the case by itself.

---

## ARGUMENT

### I. THE PARTIES ARE ADDRESSING RELATED QUESTIONS THROUGH DIFFERENT CONSTITUTIONAL FRAMES

The principal positions before the Court are not perfectly opposed because they do not always answer the same antecedent question.

Plaintiffs principally contend that the Constitution assigns federal-election regulation to the States and Congress, that Section 3 improperly inserts the Executive Branch and USPS into that allocation, and that voters and organizations suffer injury from uncertainty and threatened interference with mail voting.

Federal Defendants principally contend that the challenged directives initiate governmental processes rather than themselves impose final legal consequences, that Article III requires more concrete injury, and that executive actors must retain lawful room to examine and implement presidential directives.

Intervenor-Defendants similarly emphasize jurisdiction, executive authority, and the government's legitimate ability to administer election-integrity functions.

The Court's prior orders have addressed these positions through standing, ripeness, separation of powers, ultra vires doctrine, voting rights, irreparable harm, and equitable relief.

Those doctrines become easier to apply once the object of each inquiry is fixed.

Five objects require separation:

1. **the constitutional right;**
2. **the voting mechanism;**
3. **the verification function;**
4. **the governmental actor's authority; and**
5. **the injury supporting judicial power.**

A failure concerning one object does not automatically establish failure concerning the others.

- An unauthorized governmental actor may propose a mechanism that would not independently deprive a voter.
- A duly authorized governmental actor may impose a mechanism that does unconstitutionally burden voting.
- A voter may dislike or lose a procedural option while retaining constitutionally adequate access.
- Another voter may lose the same procedural option and thereby lose the practical ability to vote.
- A court may correctly identify a serious constitutional merits question while still lacking Article III jurisdiction to adjudicate it at a particular stage.

The constitutional decision tree must preserve those distinctions.

---

## II. SUPREME COURT PRECEDENT ALREADY DISTINGUISHES LOSS OF AN ABSENTEE MECHANISM FROM EFFECTIVE LOSS OF THE FRANCHISE

The right to vote is fundamental.

The right to vote by every particular method is not absolute.

**McDonald v. Board of Election Commissioners of Chicago, 394 U.S. 802 (1969),** supplies a direct example.

Illinois provided absentee voting to specified categories but not to the pretrial detainees challenging the statute. The Court refused to assume that denial of the absentee mechanism established denial of the vote itself because the record did not demonstrate that the plaintiffs were in fact absolutely prohibited from voting.

The Court therefore separated:

**the right to vote**

from:

**the claimed right to receive an absentee ballot.**

That distinction was not permanent or categorical.

**O'Brien v. Skinner, 414 U.S. 524 (1974),** demonstrates the opposite condition.

There, otherwise qualified voters were physically prevented from reaching the polls and were denied an alternative means of voting. In those circumstances, denial of absentee access effectively became denial of the franchise.

The same administrative mechanism therefore occupied two different constitutional positions depending upon surrounding facts.

That is the correct architecture here.

The constitutional question is not:

> Is mail voting constitutionally protected?

Nor:

> Is mail voting merely optional?

The proper inquiry is:

> **For this qualified voter, under this legal framework, does alteration of this voting pathway leave a meaningful lawful means of casting a vote?**

If yes, the loss remains principally a change of mechanism, subject to ordinary election-law burden analysis.

If no, the mechanism has become functionally necessary to preservation of the underlying right, and constitutional scrutiny correspondingly intensifies.

This principle accords with **Anderson v. Celebrezze, 460 U.S. 780 (1983),** and **Burdick v. Takushi, 504 U.S. 428 (1992).**

Burdick rejects the proposition that every burden upon voting triggers identical constitutional scrutiny. Courts instead examine the character and magnitude of the burden and weigh it against the precise governmental interests offered in justification.

Severe burdens require correspondingly weighty justification.

Reasonable and nondiscriminatory election regulations receive more deferential review.

That framework requires burden classification before constitutional result.

---

## III. "MAIL VOTING" MUST BE DISAGGREGATED BEFORE ITS ALTERATION CAN BE CLASSIFIED AS DEPRIVATION

The present record contains several materially different forms of reliance.

Those categories must not be merged merely because the same physical medium—mail—is involved.

### A. Federally protected military and overseas voting occupies a distinct legal category.

Congress enacted the Uniformed and Overseas Citizens Absentee Voting Act, 52 U.S.C. § 20301 et seq., requiring absentee-voting protections for specified military and overseas citizens.

Those voters therefore do not depend merely upon administrative preference.

Congress has created an affirmative statutory pathway designed to preserve the franchise where ordinary geographic participation may be impossible.

Any rule affecting that pathway must be reconciled with the existing federal protection.

### B. State excuse-based absentee voting serves voters whose circumstances materially interfere with ordinary attendance.

Numerous States preserve absentee voting for categories including absence, illness, disability, age, or other specified conditions.

The relevant constitutional inquiry is functional.

Where the qualifying condition makes ordinary participation practically unavailable, the absentee pathway may operate as the mechanism preserving meaningful access.

Its removal can therefore impose a substantially greater burden than the removal of the same mechanism from a voter possessing a reasonably available in-person alternative.

### C. No-excuse mail voting presents a different constitutional classification.

Many States permit an eligible voter to choose a mail ballot without establishing incapacity or another qualifying necessity.

That mechanism may be beneficial.

- It may increase participation.
- It may reduce some forms of voter burden.

- It may reflect a State's preferred election-administration architecture.

Those policy virtues do not themselves transform every continued use of the mechanism into a constitutional entitlement.

Where an eligible voter retains a meaningful, lawful, reasonably accessible alternative for exercising the franchise, alteration of the no-excuse mechanism must be analyzed according to the actual burden imposed rather than presumed to constitute deprivation.

**D. Universal vote-by-mail systems present their own reliance and transition questions.**

Some jurisdictions have structured substantial portions or the entirety of their election administration around mailed ballots.

Abrupt federal intervention into those systems may create material operational burdens independent of any individual constitutional entitlement to mail voting.

But the proper object of that inquiry is different.

The questions concern:

- state authority;
- transition burden;
- federalism;
- statutory conflict;
- election-administration reliance;
- and the practical effect upon voters.

Those matters must not be collapsed into the proposition that every citizen possesses an identical constitutional entitlement to the same voting modality.

---

## IV. THE COURT'S OWN RECORD DEMONSTRATES WHY THE RELIANCE CATEGORIES MUST BE SEPARATED

The Court's August 11, 2026 Memorandum and Order describes voters relying upon mail voting for materially different reasons.

The record includes voters who are:

- elderly;
- disabled;

- homebound;
- overseas;
- geographically remote;
- without transportation;
- attending college away from their residence;
- occupied by work or military obligations;
- seeking language assistance;
- and using mail voting because it is convenient.

Those circumstances must not enter constitutional analysis at the same point.

- A homebound voter physically unable to reach a polling place does not occupy the same deprivation posture as a voter who prefers mailing a ballot because doing so is easier.
- A servicemember overseas does not occupy the same statutory posture as an in-state voter choosing no-excuse mail voting.
- A college student hundreds of miles from a permanent voting residence may confront a materially different practical burden from a voter living near an operating polling location.
- A voter requiring language assistance may present a separate statutory or constitutional access question concerning whether meaningful assistance exists through alternative channels.

The common term "reliance" does not erase these distinctions.

The Court ought classify:

**necessity, practical burden, statutory protection, and remaining alternative**

before using reliance as evidence of constitutional deprivation.

---

## V. REMOTE VOTING DOES NOT ELIMINATE VERIFICATION; IT RELOCATES VERIFICATION INTO SUBSTITUTE ADMINISTRATIVE MECHANISMS

The present dispute is frequently framed as one between voter access and election integrity.

That binary is incomplete.

A constitutional election requires both lawful participation and reliable attribution of the ballot to the qualified voter.

The administrative problem is one of correspondence.

A voting system must preserve a reliable relationship among:

**Qualification → Identity → Authorization → Ballot → Attribution → Custody → Count**

In an ordinary in-person voting environment, several of those predicates occur within a relatively compressed setting.

- The person appears.
- Election officials identify the voter according to applicable law.
- Eligibility is confirmed.
- A ballot is issued.
- The vote is cast through the controlled voting process.
- Custody begins within the election environment.

Remote voting distributes those same functions across additional stages:

**registration → ballot request or issuance → transmission → receipt → voter execution → required identification or attestation → return transmission → custody → verification → reconciliation → count.**

That does not make remote voting inherently unlawful, but it does require that administrative mechanisms must perform work otherwise supplied through contemporaneous presence.

The proper constitutional inquiry is consequently not whether verification may occur.

Government must identify lawful voters and lawful ballots.

The question is whether a particular mechanism:

1. identifies an existing lawful qualification;
2. reasonably corresponds to the uncertainty being resolved;
3. is imposed by an actor possessing authority to impose it;
4. preserves meaningful access for eligible voters;
5. and avoids becoming an independent condition disconnected from the legal status it purports to verify.

---

## VI. VERIFICATION AND PERMISSION REMAIN CONSTITUTIONALLY DISTINCT

Verification asks:

> **Does the legally relevant condition exist?**

Permission asks:

> **Will government allow the individual to proceed notwithstanding the existence of the relevant legal condition?**

Election administration necessarily contains verification.

Citizenship, eligibility, registration, identity, district, ballot entitlement, and ballot attribution are facts that lawful election systems must identify.

But the existence of authority to verify does not establish authority to invent additional substantive qualifications.

This distinction protects both sides of the controversy.

A rule cannot be condemned merely because it adds verification.

Nor can a rule be sustained merely by calling a new permission condition "verification."

The Court ought therefore ask of each challenged requirement:

- What fact is the government attempting to verify?
- Is that fact legally relevant to eligibility or ballot administration?
- What uncertainty does the mechanism resolve?
- Does the mechanism actually correspond to that uncertainty?
- Does an existing mechanism already establish the same condition?
- What burden does duplication impose?
- What happens when the mechanism fails despite the voter's lawful qualification?
- What corrective process exists?
- Who possesses final authority to resolve an erroneous mismatch?
- Does the requirement identify a lawful condition or create a new one?

This functional inquiry is more durable than either generalized opposition to verification or generalized invocation of election integrity.

---

## VII. THE ABSENCE OF PROVED FRAUD IN THIS RECORD DOES NOT, BY ITSELF, RESOLVE THE LAWFUL SCOPE OF VERIFICATION

The Court has previously noted that the **record before it** contained no demonstration of illegal or fraudulent absentee voting sufficient to support the government's asserted public-interest position.

That observation is relevant to the evidentiary weight afforded a particular proposed burden.

It does not establish a constitutional rule that election safeguards become lawful only after the precise abuse they seek to prevent has already been demonstrated in the particular litigation.

Election administration is necessarily prospective.

The Supreme Court has recognized legitimate governmental interests in orderly elections, fraud prevention, accurate administration, and public confidence. See **Crawford v. Marion County Election Board, 553 U.S. 181 (2008)**; **Burdick, 504 U.S. 428.**

The stronger limiting principle is therefore proportional rather than categorical.

> **Preventative verification is a lawful governmental objective when exercised by a lawful actor through a mechanism reasonably related to an actual administrative uncertainty and proportionate to the burden imposed.**

That principle does not validate Section 3.

It identifies what would have to be established to validate any disputed verification mechanism.

The absence of demonstrated fraud may weaken the justification for a substantial burden.

It does not convert verification itself into an unlawful objective.

Likewise, an asserted integrity purpose cannot cure lack of constitutional or statutory authority.

Purpose and authority remain separate predicates.

---

## VIII. AUTHORITY MUST BE DETERMINED SEPARATELY FROM THE WISDOM OR FUNCTION OF THE MECHANISM

Plaintiffs raise a serious structural question concerning where federal election authority resides.

Article I, Section 4 assigns the Times, Places and Manner of congressional elections initially to state legislatures, subject to congressional alteration.

Congress has enacted extensive election statutes.

Congress has separately established and structured the United States Postal Service.

The President possesses Article II authority, including responsibility for faithful execution of federal law and supervision within the Executive Branch according to the constitutional and statutory structure Congress has created.

Those propositions must be reconciled rather than collapsed.

A verification mechanism can be administratively rational and still exceed the authority of the actor imposing it.

Conversely, identification of an authority defect does not establish that every affected voter has suffered identical constitutional injury.

The Court ought preserve the sequence:

1. **What is the governmental act?**
2. **Who performed it?**
3. **What authority supports that actor?**
4. **What legal condition does the act administer?**
5. **What burden does the act impose?**
6. **Upon whom?**
7. **What constitutional consequence follows?**

That order prevents constitutional merits from becoming an argument by label.

"Election integrity" cannot itself confer authority.

"Voting rights" cannot itself determine which actor possesses authority.

"Executive supervision" cannot itself create legislative power.

"Federalism" cannot itself establish individual deprivation.

Each proposition must do its own legal work.

---

## IX. ARTICLE III JURISDICTION PRECEDES EQUITABLE INTERVENTION

The same discipline applies to judicial power.

Before a federal court restrains governmental conduct, Article III requires a case or controversy capable of judicial resolution.

The sequence ought remain:

**Concrete Injury → Article III Jurisdiction → Merits → Equitable Necessity → Proportionate Remedy**

- Standing cannot be supplied by likelihood of success.
- Irreparable harm cannot create jurisdiction.
- Urgency cannot create constitutional judicial power.
- And remedial usefulness cannot retroactively supply an injury that was insufficiently concrete at the stage presented.

The Supreme Court's August 24, 2026 decision in **Trump v. California** directly addressed the same Executive Order and the same Section 3.

As to Section 3, the Court distinguished:

- the President's internal directive;
- proposed rulemaking;
- a possible final rule;
- implementation of that rule;
- and resulting injury.

The Court held that Article III did not permit the lower courts to stack those contingencies and treat predicted downstream harm as present injury.

That decision concerned State plaintiffs. Its sequencing principle has now been applied by this Court to the Plaintiff Organizations here.

On August 26, 2026, this Court granted Defendants' Motion to Reconsider [Doc. No. 196] and vacated the August 11 preliminary injunction. In light of **Trump v. California**, the Court concluded that the Plaintiff Organizations were not likely to prevail as to ripeness without amending their complaint to account for the Final Rule that had now issued.

The Court has therefore already supplied the necessary correction to the antecedent Article III posture.

The governing principle remains:

> **Courts must identify the actual governmental action causing the actual injury rather than compress an internal directive, anticipated rule, final rule, and downstream consequence into a single present event.**

The litigation has now advanced to the next stage of that sequence.

USPS has issued the Final Rule.

Plaintiffs have filed a Supplemental Complaint [Doc. No. 205] directed to that Rule and renewed their request for temporary and preliminary equitable relief [Doc. No. 206].

The Article III inquiry must therefore attach to the governmental action that now exists and to injuries traceable to that action.

The question is no longer whether anticipated rulemaking itself supplies a sufficiently concrete controversy.

The questions now are:

- **what the Final Rule requires,**
- **whom it actually affects,**
- **what concrete injury follows,**
- **and whether that injury supports the particular judicial relief requested.**

Article III remains antecedent, but its object has matured.

---

## X. ORGANIZATIONAL EDUCATION COSTS REQUIRE A DIRECT CAUSAL CONNECTION TO GOVERNMENTAL INJURY

The Plaintiff Organizations have asserted burdens involving:

- voter education;
- translation;
- training;
- voter-assistance materials;
- website information;
- volunteer preparation;
- and uncertainty concerning voting requirements.

Those activities may involve substantial work and expense.

The constitutional question is causation.

In **FDA v. Alliance for Hippocratic Medicine, 602 U.S. 367 (2024),** the Supreme Court rejected the proposition that an organization may establish Article III injury merely by expending resources in response to governmental action that does not otherwise injure the organization.

An organization may establish injury where governmental conduct directly impairs its existing operations.

Self-directed expenditures, however, do not independently convert an otherwise nonjusticiable governmental action into an Article III controversy.

That distinction mattered acutely in the antecedent posture of this case.

Before issuance of the Final Rule, the organizations' asserted preparation costs depended in material part upon uncertainty concerning what USPS might ultimately require. Expenditure responding to an unsettled future rule could not itself make the anticipated rule constitutionally present.

The posture has now changed.

The Court vacated the antecedent preliminary injunction on August 26 after concluding, in light of **Trump v. California**, that the Plaintiff Organizations were not likely to prevail as to ripeness without amending their complaint to account for the Final Rule.

Plaintiffs have now done so.

The issuance of the Final Rule permits the organizational-injury inquiry to become concrete.

The relevant distinction remains:

**Government directly impairs the organization's existing lawful operations**

versus:

**The organization elects to expend resources in response to governmental action without an independently cognizable impairment.**

That distinction can now be tested against an actual rule rather than anticipated policy.

The organizations can identify:

- what provision of the Final Rule requires a change in their activity;
- which existing operation is directly impaired;
- which educational or assistance materials actually must change;
- which voters actually face different requirements;
- which deadlines or procedures actually govern;
- what resources must actually be diverted;
- and what resulting injury is traceable to the challenged governmental requirement.

The Court can correspondingly distinguish expenditures caused by a concrete governmental obstruction from expenditures reflecting an organization's chosen response to the policy itself.

That is a materially superior Article III record.

The same maturation that cured the earlier speculative posture therefore sharpens the causation inquiry rather than eliminating it.

**Final Rule → Identifiable Requirement → Direct Organizational Effect → Concrete Injury**

Only after that correspondence is established does organizational expenditure perform the jurisdictional work attributed to it.

---

## XI. THE FINAL RULE CREATES THE CONCRETE GOVERNMENTAL OBJECT THAT THE PRIOR POSTURE LACKED

The Postal Service has now issued a Final Rule.

That development changes the proper object of adjudication.

Before the Final Rule, the controversy required prediction concerning:

- whether a rule would issue;
- what the rule would contain;
- how comments and review would alter it;
- when it would become operative;
- how States would respond;
- which voters would encounter its requirements;
- and whether resulting burdens would prevent lawful voting.

The Final Rule eliminates many of those contingencies.

The Court can now ask:

1. What does the Final Rule actually require?
2. What statutory authority does USPS invoke?
3. What provisions of the Executive Order remain operative within the rule?
4. Which States and voters are affected?
5. Which categories of absentee or mail voting are implicated?
6. Which voters possess meaningful alternative voting pathways?
7. Which voters lack such alternatives?
8. What verification function does each requirement perform?
9. Does the requirement identify an existing legal qualification or create a new condition?
10. What error-correction process exists?

11. What burden follows from implementation?
12. What governmental actor possesses authority for that burden?
13. What remedy corresponds to the proved injury?

That is adjudication against an actual governmental instrument.

The maturation of the administrative process ought therefore sharpen review rather than preserve earlier abstractions.

---

## XII. THE CONSTITUTIONAL FLOOR OF DEPRIVATION MUST BE MEASURED AGAINST MEANINGFUL PARTICIPATION, NOT PRESERVATION OF EVERY PROCEDURAL OPTION

The governing distinction can now be stated precisely.

A qualified citizen suffers the most serious constitutional burden when governmental action leaves no meaningful lawful pathway by which that citizen can exercise the franchise.

The burden is materially different where government modifies one pathway while preserving another reasonably accessible means of participation.

That does not make the lesser burden legally irrelevant.

Under **Anderson** and **Burdick**, lesser restrictions remain subject to constitutional examination.

But constitutional scrutiny must correspond to actual burden.

The Court ought therefore resist a constitutional ratchet under which:

- Government creates a mechanism.
- Citizens adopt the mechanism.
- Organizations build services around the mechanism.
- Reliance develops.
- The mechanism is then treated as constitutionally indistinguishable from the underlying right.

If that sequence alone constitutionalized procedure, administrative election law could move in only one direction.

- Every accommodation would become permanent.
- Every additional pathway would raise the constitutional floor.

- Every later modification would presumptively become deprivation.

The Constitution protects voting more durably by fixing the protected object at meaningful participation and measuring each mechanism according to the burden its alteration actually creates.

---

## XIII. THE SAME RULE PREVENTS GOVERNMENT FROM USING THE WORD "PROCEDURE" TO CONCEAL AN ACTUAL DEPRIVATION

The principle must operate reciprocally.

Government cannot avoid constitutional scrutiny merely by calling a requirement procedural.

If a new verification rule creates an obstacle that a lawfully qualified voter cannot reasonably satisfy, and no adequate alternative remains, the mechanism may functionally deny the franchise regardless of its administrative label.

Likewise, a system that repeatedly produces false mismatches without adequate correction may transform verification into exclusion.

The Court must therefore look to operation.

- A mechanism that asks a voter to establish an existing qualification through reliable, accessible evidence occupies one constitutional position.
- A mechanism that conditions voting upon an unrelated criterion occupies another.
- A mechanism that is theoretically available but practically impossible for a defined class of qualified voters may occupy yet another.

Classification must follow function and actual consequence.

---

## XIV. EQUITABLE RELIEF MUST FOLLOW THE INJURY ACTUALLY ESTABLISHED

Even after Article III jurisdiction exists and a constitutional violation is established, the scope of equitable relief remains a separate inquiry.

There is a material difference between:

- preventing rejection of a lawful ballot;

- preventing enforcement of an unlawful requirement against an affected voter;
- preserving a statutorily protected absentee pathway;
- correcting an invalid verification mechanism;
- enjoining application of an unlawful Final Rule;
- and preventing an executive agency from studying, proposing, completing, or publishing a rule at all.

Each remedy reaches a different governmental object.

The remedy ought correspond to the proved injury.

- If the constitutional defect concerns a requirement applied to military and overseas voters, relief can protect that pathway.
- If the defect concerns a particular erroneous verification list, relief can prevent reliance upon that list.
- If the defect concerns the legal authority of USPS to impose particular final requirements, the Court can address those requirements.
- If a voter retains a meaningful lawful alternative, the constitutional burden may support a different remedy from that appropriate for a voter who would otherwise be unable to vote.

The Court ought not use the breadth of the political controversy as a substitute for remedial fit.

---

## XV. ELECTION-TIMING PRINCIPLES FAVOR STABILITY, BUT STABILITY MUST FOLLOW LAWFUL CLASSIFICATION

Election cases present unusual timing problems.

Late changes can produce confusion, inconsistent administration, voter error, and institutional burden.

That concern is legitimate.

But timing cannot become a freestanding source of authority for either branch.

An executive actor cannot impose an otherwise unlawful rule merely because an election approaches.

A judicial actor cannot exercise otherwise unavailable Article III power merely because an election approaches.

The proper use of election-timing principles is remedial.

Once jurisdiction and legal entitlement are established, the Court may account for the practical danger of late alteration when determining appropriate relief.

That preserves electoral stability without allowing urgency to collapse the predicates necessary for judicial power.

---

## XVI. THE COURT OUGHT APPLY A SINGLE DECISIONAL SEQUENCE TO THE FINAL RULE AND ANY RENEWED REQUEST FOR RELIEF

Amicus respectfully proposes the following framework.

For each challenged provision and each materially affected voting category, the Court ought determine:

**1. THE RIGHT**

What constitutional, statutory, or state-law interest is being exercised?

**2. THE PATHWAY**

What voting mechanism is affected?

**3. THE SOURCE**

What legal authority created or protects that mechanism?

**4. THE VOTER**

What circumstances make the mechanism optional, useful, substantially important, or functionally necessary to the affected voter?

**5. THE ALTERNATIVE**

What meaningful lawful voting pathway remains if the challenged mechanism is altered?

**6. THE VERIFICATION FUNCTION**

What legal condition is the government attempting to identify?

**7. THE AUTHORITY**

Which governmental actor possesses authority to establish or administer that requirement?

**8. THE BURDEN**

What actual burden does the requirement impose upon exercise of the franchise?

**9. THE CORRECTION PATH**

What process exists for resolving erroneous exclusion, mismatch, lost custody, or administrative failure?

**10. ARTICLE III**

Has governmental action created a concrete, particularized, actual or sufficiently imminent injury?

**11. CONSTITUTIONAL REVIEW**

Under the character and magnitude of the burden, what level of justification is required under the governing election-law framework?

**12. REMEDY**

What relief corrects the established injury without exceeding the judicial power necessary to do so?

This sequence makes the competing positions commensurate.

- Plaintiffs' access concerns enter through the voter, alternative, burden, and correction inquiries.
- Defendants' authority and justiciability concerns enter through authority, concrete injury, and Article III.
- Election-integrity concerns enter through verification function and governmental justification.
- Federalism and separation-of-powers concerns enter through source and authority.

No interest disappears.

No interest is permitted to decide a question outside its lawful domain.

---

## XVII. THE COURT'S AUGUST 26 ORDER HAS NOW APPLIED THE INTERVENING ARTICLE III SEQUENCING RULE AND VACATED THE ANTECEDENT INJUNCTION

The procedural posture of this case materially changed on August 26, 2026.

The Court granted Defendants' Motion to Reconsider [Doc. No. 196] and vacated the August 11, 2026 preliminary injunction.

In doing so, the Court concluded that, in light of the Supreme Court's intervening decision in **Trump v. California**, the Plaintiff Organizations were not likely to prevail as to ripeness without amending their complaint to account for the issuance of the Final Rule.

That development resolves the principal sequencing defect associated with judicial review of the antecedent directive.

The controversy is no longer framed principally around predictions concerning:

- whether USPS would promulgate a rule;
- what that rule might require;
- which voters might be affected;
- what burdens might result;
- and what injury might eventually arise.

USPS has now issued the Final Rule.

The Court has vacated the injunction directed toward the earlier rulemaking posture.

And the Plaintiff Organizations have now supplemented their pleadings to challenge governmental action that actually exists.

The constitutional sequence has therefore matured from:

**Executive Directive → Anticipated Rulemaking → Predicted Injury**

into:

**Final Rule → Legal Requirement → Affected Voter → Concrete Burden → Judicial Review**

That transition matters.

The Supreme Court's intervention supplied the rule against collapsing antecedent governmental processes into completed injury.

The Court's August 26 order applied that principle to the posture previously before it.

The remaining controversy ought now be adjudicated against the Final Rule itself.

The Article III sequencing question therefore no longer performs the same work it did before issuance of the Final Rule.

The operative inquiry has moved forward.

The Court must now determine what the Final Rule actually does, who it actually affects, what authority supports it, what lawful voting pathways remain available, what verification functions it performs, what burdens it actually creates, and what relief corresponds to any injury established.

That is the posture for which the classificatory framework proposed by this amicus is designed.

---

## XVIII. THE SUPPLEMENTAL COMPLAINT AND RENEWED REQUEST FOR EMERGENCY RELIEF NOW PRESENT THE CONCRETE CLASSIFICATION QUESTIONS THIS AMICUS ADDRESSES

Immediately after the Court vacated the August 11 preliminary injunction, the Plaintiff Organizations filed a Supplemental Complaint [Doc. No. 205].

They then filed a renewed Emergency Motion for Temporary Restraining Order and Preliminary Injunction [Doc. No. 206], a supporting memorandum [Doc. No. 207], and additional declarations [Doc. No. 208].

The litigation has therefore moved directly from a dispute concerning anticipated governmental action into a dispute concerning an operative rule and asserted injuries arising from that rule.

That change narrows the proper inquiry.

The Court is no longer required to determine whether anticipated implementation might eventually produce a cognizable burden.

The Plaintiffs now possess the opportunity to identify the precise governmental provisions they challenge and the precise injuries they contend follow from those provisions.

The Court can correspondingly require the asserted injury and requested remedy to be tied to an actual legal requirement.

The renewed request for equitable relief ought therefore be examined provision by provision and voter category by voter category.

For each challenged aspect of the Final Rule, the Court ought determine:

- what legal condition the Rule regulates;
- what voting pathway is affected;
- what legal source created or protects that pathway;
- which voters are materially affected;
- whether the pathway is optional, substantially important, or functionally necessary to those voters;
- what meaningful lawful alternatives remain;
- what verification function the challenged requirement performs;
- whether the requirement verifies an existing qualification or creates an additional condition;
- which governmental actor possesses authority to impose the requirement;
- what concrete burden follows from implementation;
- what correction process exists if the mechanism produces error;
- and what relief is necessary to address any proved wrong.

These inquiries must remain separate even where several point toward the same ultimate disposition.

A plaintiff may establish Article III injury without establishing that every challenged requirement is unconstitutional.

A voter may establish substantial reliance upon mail voting without establishing that the particular pathway has become constitutionally indistinguishable from the franchise.

A verification requirement may serve a legitimate administrative purpose while exceeding the authority of the actor imposing it.

A governmental actor may possess authority to administer election-related functions while employing a mechanism whose burden is disproportionate to its legitimate purpose.

And a provision may be unlawful as applied to one category of voters without producing the same constitutional consequence for another.

The Final Rule therefore ought not be adjudicated as a single undifferentiated object merely because it arises from a common federal instrument.

The same is true of the Plaintiffs.

The record has previously included materially different forms of reliance upon mail voting, including military and overseas voting, disability and illness, geographic absence, educational or employment circumstances, transportation difficulties, and ordinary convenience.

Those categories must remain constitutionally distinct.

The Supplemental Complaint and renewed emergency motion provide the procedural vehicle through which those distinctions can now be tested against actual governmental action.

The Court ought require the renewed claim for equitable relief to identify the correspondence among:

**the challenged provision,**
**the affected voter,**
**the protected pathway,**
**the governmental authority,**
**the actual burden,**
**and the requested remedy.**

That correspondence is especially important in emergency election litigation.

Urgency may increase the practical importance of judicial action.

It does not reduce the need to identify precisely what legal injury the requested injunction would correct.

---

## XIX. THE AUGUST 26 POSTURE CONFIRMS THAT JURISDICTION, MERITS, AND REMEDY MUST REMAIN SEPARATE

The Court's August 26 order illustrates why constitutional adjudication benefits from fixed sequencing.

The prior injunction was vacated because the Article III posture existing before issuance of the Final Rule could no longer support the same preliminary-relief analysis after **Trump v. California**.

The Plaintiffs then amended their pleading to address the matured governmental action.

Those events demonstrate that:

**jurisdictional sufficiency can change as governmental action matures.**

But maturation of the controversy does not predetermine the constitutional merits.

A Final Rule may create a sufficiently concrete object for review while ultimately proving lawful.

It may create a sufficiently concrete controversy while particular provisions prove unlawful.

It may impose materially different burdens upon different classes of voters.

And it may support relief narrower than the relief originally sought against the antecedent rulemaking process.

The sequence must therefore remain:

**Final Rule → Concrete Injury → Article III Jurisdiction → Constitutional Classification → Merits → Equitable Necessity → Proportionate Remedy**

Each step performs independent legal work.

A sufficiently concrete injury opens the courthouse door.

It does not answer whether the Final Rule violates the Constitution or a statute.

A merits violation establishes legal error.

It does not determine that every provision of the Rule ought be enjoined against every person.

A showing of irreparable harm may justify equitable intervention.

It does not eliminate the requirement that the injunction correspond to the injury actually established.

The Court's reconsideration order therefore ought be understood as a successful correction of sequence, not as the conclusion of the constitutional inquiry.

The litigation has now reached the stage at which the substantive classification questions presented by this amicus become central.

---

**PROPOSED CORE HOLDING**

Amicus respectfully proposes the following rule:

> **A government-created voting mechanism does not become constitutionally identical to the franchise merely through adoption, familiarity, convenience, or organizational reliance. Constitutional burden must be measured according to the legal source of the pathway, the circumstances of the affected voter, the meaningful alternatives remaining, and the actual effect upon lawful participation. Where alteration of a mechanism leaves no meaningful lawful means for a qualified voter to participate, the mechanism's removal may function as deprivation. Where meaningful participation remains available, alteration of the mechanism must be evaluated according to the actual burden imposed and the governmental interests supporting it.**

And, as to verification and authority:

> **A governmental mechanism that determines whether an existing legal qualification is satisfied performs a verification function. A mechanism that imposes an additional substantive condition upon an otherwise qualified voter performs a different constitutional function. The lawfulness of either mechanism depends independently upon the authority of the actor imposing it, the legal condition being administered, the burden imposed, and the availability of meaningful correction where the mechanism produces error.**

And, as to judicial sequencing:

> **Article III jurisdiction must precede coercive equitable intervention. An antecedent executive directive, proposed rulemaking, final rule, implementation, and resulting injury are distinct governmental events and may not be collapsed merely because constitutional injury is anticipated. Once final governmental action exists and an asserted injury is pleaded against it, courts may examine that action directly and tailor relief to the concrete constitutional or statutory wrong established.**

---

## CONCLUSION

The procedural posture has now matured.

The Supreme Court supplied intervening Article III guidance.

This Court reconsidered its prior injunction in light of that guidance and vacated the restraint directed toward the antecedent rulemaking posture.

USPS has issued the Final Rule.

The Plaintiff Organizations have supplemented their complaint and renewed their request for emergency equitable relief.

The question now before the Court is correspondingly more concrete.

It is no longer necessary to adjudicate predicted governmental action.

The Court can adjudicate the governmental action that exists.

But concreteness does not eliminate classification.

The Final Rule still must be examined against the constitutional and statutory interests actually implicated.

The governing distinctions remain:

- The franchise is the protected right.
- Voting mechanisms administer access to that right.
- Some mechanisms remain optional.
- Some become practically indispensable to particular voters.
- Different forms of mail and absentee voting arise from different legal sources.
- Verification identifies legally relevant conditions.
- Permission creates additional conditions.
- Governmental purpose does not create governmental authority.
- Governmental authority does not eliminate constitutional limits.
- Article III jurisdiction does not predetermine constitutional merits.
- Constitutional error does not predetermine remedial breadth.
- And equitable relief must correspond to the injury actually established.

The Court ought therefore classify before it disposes.

For each challenged provision of the Final Rule and each materially affected voting category, the Court ought identify:

1. **the right;**
2. **the voting pathway;**
3. **the legal source of that pathway;**
4. **the affected voter;**

5. **the meaningful alternatives remaining;**
6. **the verification function;**
7. **the governmental authority;**
8. **the actual burden;**
9. **the correction mechanism;**
10. **the Article III injury;**
11. **the constitutional or statutory consequence;**
12. **and the remedy proportionate to the proved wrong.**

Applied in that sequence, constitutional administration does not require choosing access over integrity or integrity over access.

It requires precise administration of lawful participation.

The Court's August 26 reconsideration order has already restored the proper distinction between antecedent governmental process and final governmental action.

The remaining task is to preserve the same discipline in adjudicating the Final Rule itself.

Amicus respectfully submits that any renewed request for temporary or preliminary equitable relief ought therefore be evaluated against the Final Rule now issued, the provisions actually challenged, the voting pathways actually affected, the circumstances of the affected voters, the verification functions performed, the authority supporting each governmental act, the concrete burdens established, and the relief necessary to correct any demonstrated constitutional or statutory wrong.

Respectfully submitted,

**Brandon Michael Hayes**
President, Natural Law Institute
Pro Se
159 Indian Hill Street
West Newbury, Massachusetts 01985
(617) 438-2049
brandon@hayeshaus.com

Dated: August 28, 2026