# EXHIBIT A

# Exhibit 1

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| DSCC, *et al.*,<br><br>*Plaintiffs*,<br>v.<br><br>DONALD J. TRUMP, in his official capacity as President of the United States, *et al.*,<br><br>*Defendants*. | Civil Action No. 26-1114 (CJN) |
| LEAGUE OF UNITED LATIN AMERICAN CITIZENS, *et al.*,<br><br>*Plaintiffs*,<br>v.<br><br>EXECUTIVE OFFICE OF THE PRESIDENT, *et al.*,<br><br>*Defendants*. | Civil Action No. 26-1132 (CJN) |
| NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE, *et al.*,<br><br>*Plaintiffs*,<br>v.<br><br>DONALD J. TRUMP, in his official capacity as President of the United States, *et al.*,<br><br>*Defendants*. | Civil Action No. 26-1151 (CJN) |

**EXPERT DECLARATION OF TAMMY PATRICK, CERA**

**AUGUST 28, 2026**

# TABLE OF CONTENTS

**Pages**

I. Introduction & Assignment ........ 1

II. Qualifications & Background ........ 2

III. Previous Testimony ........ 4

IV. The Rule ........ 5

V. Summary of Opinions ........ 6

VI. Relevant Background on Administering Vote-by-Mail ........ 8

 A. The Extraordinary Complexity of Election Administration ........ 8

 B. Election Administration Authority and Funding ........ 8

VII. The Rule Conflicts with the 2026 Election Calendar and Cannot be Implemented Before the 2026 Election. ........ 13

VIII. The Rule's Ballot Envelope Requirements (24.3) Cannot Be Met by Many Election Offices Before the 2026 Election. ........ 18

IX. The Participation List and Ballot Portal Requirements (24.4) is Unprecedented and Unworkable for USPS and Election Offices. ........ 33

X. The Added Verification Requirements During Mail Induction (24.5) Are Unnecessary, Burdensome on Election Offices, and Will Delay Getting Ballots to Voters. ........ 39

XI. Conclusion ........ 45

XII. Appendix A: *Curriculum Vitae* ........ 46

XIII. Appendix B: Types of Mail Voting ........ 55

XIV. Appendix C: Ballot Service Type Identifier (STID) ........ 58

XV. Appendix D: Jurisdiction Size Specifications ........ 60

## I. Introduction & Assignment

1. My name is Tammy Patrick. For more than twenty years, I have served as an election administrator and expert on election administration, with expertise in election mail and the Postal Service's role in delivering ballots to and from voters. Since December 2022, I have served as Chief Programs Officer of the National Association of Election Officials, commonly known as Election Center, which has over 2,500 members in 47 states and commonwealths, the District of Columbia, and multiple U.S. Territories. In that role, I govern the association's standing committees, including its Postal Committee; manage electionline.org; and focus on relationship management with federal agencies, including the United States Postal Service (USPS), the United States Postal Inspection Service (USPIS), the United States Postal Office of Inspector General (USPS OIG), and the Federal Voting Assistance Program (FVAP), among others. I have been a featured speaker numerous times at the National Postal Forum (NPF), at Regional Postal Meetings, and have conducted training for USPIS and USPS OIG on election mail and administration.

2. I have been engaged by counsel for the Plaintiffs in *League of United Latin American Citizens, et al. v. Executive Office of the President, et al.*, No. 26-1132 (D.D.C.), to provide expert analysis and opinions on the USPS's new rule adding a new Section 705.24 to the Domestic Mail Manual (DMM) concerning the delivery of mail and absentee ballots (the "Rule"). I have been retained to provide the Court with relevant background on U.S. election administration and the administration of absentee/mail-in voting,[1] the effects of the Rule on state and local election

[1] In most of this report, I will refer to all "absentee voting" and "mail-in voting" as "voting by mail" or "mail voting" when discussing the general process, although those terms can imply different legal definitions and voter eligibility across the states. And I will generally refer to "absentee" and "mail-in" ballots as "mail ballots." The term "absentee" will be used in reference to specific statutes and states where voting by mail is limited.

offices and the voters they serve, and my opinions as to the feasibility of implementing the Rule in the 2026 General Election.

3. My opinions are based on my years of experience with both postal procedures and election administration, including my expertise on the current state of election administration across the United States, my ongoing, day-to-day engagement with election officials nationwide and my role as a liaison between USPS and election officials. I provide a comprehensive curriculum vitae and list of publications I authored in the past ten years in **Appendix A** and highlight below the experiences most pertinent to the issues I was asked to opine on. I will also draw upon comments submitted regarding the proposed rule by the National Association of State Election Directors (NASED), Carolina Lopez, the Executive Director of the Partnership for Large Jurisdictions (PLEJ) in her private capacity as an election expert, and Jeff Ellington, Chief Executive Officer of Runbeck Election Services.

4. I am being compensated at the rate of $750 per hour for my services in writing this report. My compensation is not contingent upon the outcome of this matter. The opinions I express herein are my own, and my compensation does not depend upon the contents of this report, any testimony I may provide, or the outcome of or any issues involving or related to this litigation.

## II. Qualifications & Background

5. For most of 2003-2014, I was the Federal Compliance Officer for the Maricopa County Elections Department in Arizona, one of the largest election jurisdictions in the country. During my tenure, I documented compliance with state and federal statutes and participated in numerous national programs related to election administration. I worked for Recorder Helen

Purcell when the *Purcell* Principle was established in 2006: the notion that election administrative change close to an election will cause voter confusion.[2]

6. In 2013, I was appointed by President Barack Obama as a Commissioner on the bipartisan Presidential Commission on Election Administration (PCEA), which held hearings on mail ballot processing, voter registration modernization, and security. We produced a report *The American Voting Experience* in January of 2014,[3] which is still used authoritatively today.

7. In 2014, I left Maricopa County to further the work of the PCEA at the Bipartisan Policy Center in Washington, D.C., where I produced the report *The New Reality of Voting by Mail*[4] and was the first non-postal employee to train postal operations teams in preparation for the 2016 election cycle. During this time, I collaborated to launch the website Electionmail.org.[5] The first of its kind, Electionmail.org allows election administrators to report issues and submit them directly into the Postal Service's resolution tracking system.

8. From 2017 through December 2022, I was the Senior Advisor at the Democracy Fund. As part of my role there, I advised three states (California, Michigan, and Virginia) as they implemented new mail voting laws and policies.

9. I have been a member of Election Center Postal Committee and have represented the organization on the USPS Mailers Technical Advisory Committee (MTAC) since 2010. This organization meets with USPS leadership, including the Postmaster General, on a quarterly basis.

---

[2] Adam Volle, *Purcell principle*, Brittanica, https://www.britannica.com/topic/Purcell-principle.
[3] Presidential Commission on Election Administration, *The American Voting Experience: Report and Recommendations of the Presidential Commission on Election Administration* (January 2014), https://www.eac.gov/sites/ default/files/eac_assets/1/6/Amer-Voting-Exper-final-draft-01-09-14-508.pdf.
[4] *The New Reality of Voting by Mail*, the-new-realities-of-voting-by-mail-2016.pdf.
[5] *Report Issues with Election Mail Processed by the USPS*, ElectionMail.org (retrieved April 13, 2025), https://electionmail.org/.

For 16 years, I have attended a majority of these meetings and participated in MTAC working groups as they relate to election mail. I aided in the creation of many election-related policies and practices in addition to creating Electionmail.org, such as establishing a process for the induction of ballot mail (i.e., presenting outbound ballot mail to USPS for delivery) when using marketing mail/standard mail;[6] creating the ballot Service Type Identification (STID) in postal Intelligent Mail barcode (IMb); and establishing an Election Mail Day at the National Postal Forum.

**III. Previous Testimony**

10. I have testified before various committees in the United States Senate and House of Representatives and numerous state legislatures at the request of members from both political parties, as well as the United States Commission on Civil Rights. I have testified on numerous election administration topics including election readiness, postal concerns, and election mail. My testimony before the Commission on Civil Rights addressed delivery disruption in Florida and the challenges of the delivery network serving the Alaskan Native population in Alaska.

11. In the past four years, I have testified as an expert at trial or deposition in *La Union del Pueblo Entero et al. v. State of Texas et al.* for the United States Department of Justice and for Smartmatic USA Corporation in *Smartmatic USA Corporation v. Fox Corporation, et al.*, *Smartmatic USA Corporation v. Michael J. Lindell and My Pillow, Inc.*, and *Smartmatic USA Corporation v. Newsmax Media, Inc.*

[6] Marketing Mail was previously known as Standard Mail at the time the process was established. Many jurisdictions mail at this class of service while receiving First Class treatment as established under the NVRA.

## IV. The Rule

12. Historically, ballots have been mailed out to voters by election officials, and the parameters election officials have had to satisfy have been those related to the class of service and pricing they select, like any other mailer.

13. The Rule completely departs from this historic practice by creating three new requirements in section 705.24 of the Domestic Mail Manual (DMM) that election officials now have to satisfy in order to mail out ballots to voters for federal elections.[7] USPS will refuse to accept and deliver ballots for any federal election (including general, run-off-and special elections) unless all the requirements are complied with.

14. First, section 24.3 sets new mandatory design requirements for both outbound *and* return[8] federal ballot envelopes: the Election Mail logo, a unique IMb, and Mail Design Analyst (MDA) review. Unless election officials meet these requirements, the Postal Service will not accept ballots for delivery.

15. Second, section 24.4 requires states delivering and receiving federal mail ballots through USPS to enroll every voter who will be sent a ballot on a Mail-In and Absentee Participation List ("Participation List"), submitted through a new Federal Mail Ballot Portal. It requires USPS to develop a new Federal Mail Ballot Portal ("Ballot Portal" or "Portal") to facilitate states' submission of voter lists, which must include for each voter their name, address, the unique IMbs on the outbound and return envelopes being sent to the voters, and the originating election office. The state's chief election official is generally required to provide this information to USPS at least 30 days before the federal election day, or by the date when ballots can begin to be mailed under

---

[7] Final Rule, Ballot Mail for Federal Elections ("Rule"), 91 Fed. Reg. at 54990 (2026), https://www.govinfo.gov/content/pkg/FR-2026-08-26/pdf/2026-17238.pdf.

[8] Outbound ballot mail envelopes contain ballots sent from election offices to voters. Return ballot mail envelopes contain ballots returned by voters to election offices.

state law, with allowable supplemental submissions to enroll more individuals or update information. On or around the day of the election, USPS will provide to the states a "Mail-In and Absentee Participant List" identifying the enrolled individuals to whom ballots were sent.

16. Third, section 24.5 mandates new verification procedures during the induction of outbound mailings that require postal employees to verify, before acceptance, that each mailing meets the design standards and each mail piece is addressed to a voter enrolled on the Participation List. Election officials will have to enter all outbound ballot mail at a Business Mail Entry Unit (BMEU) or a retail counter; they will no longer be able to send out ballots to voters by entering them into blue collection boxes, collection boxes in retail lobbies, or with their mail carrier.[9] Every mailpiece in every mailing, regardless of the number of ballots in the mailing, will need to be scanned to verify that they are going to enrolled voters.[10] And according to USPS, election officials will be required to segregate federal ballots from other types of ballots, such as primary ballots, UOCAVA ballots, or ballots for state and local elections alone.[11] Any mailing that includes a noncompliant mailpiece will not be accepted and the entire mailing will be rejected.

## V. Summary of Opinions

17. The Rule is unprecedented and upends the longstanding division of responsibility between election officials and USPS, in which election offices determine who is eligible to receive a mail ballot for the USPS to deliver. The Postal Service has never compiled or retained a national list of voters, required the chief election official from each state to take on an administrative

---

[9] Rule at 54981.
[10] *Id.*
[11] *Id.*

function in the mailing of ballots,[12] required documentation that the envelopes being used in ballot mailings have been approved by MDAs prior to acceptance of the mailing, or rejected mailings of ballots if proof of MDA approval is lacking. Nor does USPS have a Ballot Portal that has been sufficiently tested by election offices to comply with the list submission requirements, and changes to the state election management and voter registration systems necessary to comply with that requirement will disrupt their other functionalities.[13] Additionally, the Postal Service has never rejected entire mailings of ballots based on an issue with a single mail piece. And the Postal Service has never rejected ballot mailings based on requirements that other mail does not have to comport with, nor prohibited the collection of outbound ballots by mail carriers.

18. None of the Rule's requirements can feasibly be implemented before the November 3, 2026, General Election. Administration of the 2026 election is already well underway, with timelines, budgets, and staffing already set, many of which are unmovable or unchangeable.

19. Each requirement of the Rule will place new and heavy burdens on state and local election offices;[14] it will require many offices to change dedicated staffing, find additional funds in already constrained budgets, and procure resources, technology, and vendors which may not be available or that are subject to state procurement requirements.

---

[12] State election officials generally do not do the day-to-day administrative operation of voting by mail, and can lack statutory authority do to so.

[13] NASED Comments on the Proposed Rule ("NASED Comment"), at 3, https://www.nased.org/news/uspsnprmjuly2026 ("A last-minute change destabilizing just one of these modules could threaten the performance and security of voter registration databases, electronic pollbooks, district management, and other functions more broadly.").

[14] *Id.* ("Furthermore, the proposed rule makes states accountable for reporting the actions of local election officials, which would be a significant change: in nearly all states, local election officials do not work for state election officials, and many are independently elected constitutional officers themselves. Beyond the potential legal ramifications and structural challenge, there is a more practical concern - if local election officials must report into the Ballot Mail Portal, they must be trained on how to use it. States cannot be responsible for training local election officials on how to use a system they do not own or maintain.").

20. Attempting to implement the Rule in the 2026 election will result in rejected and delayed ballot mailings, disparate treatment of election offices and voters across and within states, and eligible voters losing the ability to exercise their right to vote by mail according to the laws of their state.

## VI. Relevant Background on Administering Vote-by-Mail

### A. The Extraordinary Complexity of Election Administration

21. All states have voters who vote by mail and who rely on USPS. Voting by mail has been common practice since the Civil War, and over the last thirty years, it has become a major voting channel (see **Appendix B** for additional background).

22. Election officials in most states must simultaneously run every election in three different ways: voting early by mail, voting early in-person , and voting in person on Election Day. The complexity of each of these tasks, and the required attention to detail is further compounded with overlapping election calendars: primary and general election functions, municipal and local elections overlap, special elections and run-offs. Election professionals plan for elections months in advance, often while simultaneously conducting another election, and closing out yet another.

23. Today, millions of Americans vote by mail and rely on the Postal Service to deliver their ballots. Foundational changes to any part of the process, particularly in an even-numbered year and without ample preparation time, testing, and funding, puts the entire process in jeopardy as officials and election professionals have to pivot from their existing responsibilities.

### B. Election Administration Authority and Funding

24. Election administration in the United States is more complicated than in other countries because it has a decentralized structure. Although there are a handful of federal laws, the

administration of any election—including vote by mail requirements, dates, and deadlines—rests on the states, and within them, thousands of election offices across the country.

25. There are more than 10,000 local election offices in the United States.[15] And every local election office is different in terms of how many voters they serve, how many staff they have, and what resources they have at their disposal.

26. Local election offices often operate with very limited staff compared to their volume of responsibilities. Since the 2020 election, many local election offices have also seen significant turnover of their election staff.

27. We know from research that more than a third of local election offices do not have even a single a full-time employee working on election tasks (**Figure 1**).[16] And 8% of our election offices serve 75% of the country's voters and 75% of the election offices are small, rural offices which serve just 8% of voters.[17] Adding additional administrative functions in the Rule will disproportionately burden small offices.

[15] Most Election Jurisdictions Have Small Populations, The Pew Charitable Trs. (Apr. 4, 2013), , https://www.pew.org/en/research-and-analysis/articles/2013/04/04/most-election-jurisdictions-have-small-populations.

[16] The 2024 EVIC Local Election Official Survey, Reed College Election Voting Information Center, https://evic.reed.edu/leo_survey_project/.

[17] *Id.*




**Figure 1**: *Local Election Official survey of full-time staff dedicated to election work.*

28. Some election officials are elected themselves with corresponding constitutional and statutory obligations, while others are appointed or hired public servants (**Figure 2**).[18] Authority over how elections are conducted can either be at the discretion of the local election official or dictated by state law or administrative directives.[19]

**Table 7.** Selection Type for LEO by Jurisdiction Size

| | Overall | 0 to 5,000 | 5,001 to 25,000 | 25,001 to 100,000 | 100,001 to 250,000 | > 250,000 |
|---|---|---|---|---|---|---|
| Elected | 57% | 64% | 54% | 36% | 32% | 18% |
| Appointed or Hired | 43% | 36% | 46% | 64% | 68% | 80% |

**Figure 2**: *Fifty-seven percent of our election officials are elected and that percentage is most prevalent in small, rural offices. More election officials are elected as the size of the jurisdiction decreases; our largest jurisdictions are staffed by appointed and hired officials.*

[18] Manson, et al., *Staffing the Stewards of Democracy: Gender, Race, and Representative Bureaucracy*, MPSA Annual Conference (2021), https://evic.reed.edu/wp-content/uploads/2022/11/Staffing-the-Stewards_MPSA2021.pdf.

[19] For instance, in Arizona the Secretary of State publishes the State Election Procedures Manual, which has the force and effect of law. Election Procedures Manual, https://azsos.gov/elections/about-elections/elections-procedures/epm.

29. Election administration in the U.S. is uniformly under-funded at the state and local level, and local election offices received less funding from federal and state governments than most people believe. I served as the Senior Advisor to the Edward Kennedy Institute on the United States Senate and the Robert Dole Institute of Politics' Bolstering Election Initiative.[20] In 2015, we published a report titled *Bolstering Funding and Practices for Resilient Elections Sustainable Funding and Models of Success at the State and Local Level*"[21] sharing the key points around disparity in state election funding support (**Figure 3**).




**Figure 3:** *NCSL map of state funding of the administration of elections.*

[20] Edward M. Kennedy Institute for the United States Senate, Bolstering Funding and Practices for Resilient Elections, https://emkinstitute.org/bolstering-elections/; *Dole and Kennedy Institutes publish landmark report on funding of election administration*, Robert J. Dole Institute of Politics (June 16, 2025), https://doleinstitute.org/news/dole-and-kennedy-institutes-publish-landmark-report-on-funding-of-election-administration/.

[21] Bolstering Funding and Practices for Resilient Elections, https://emkinstitute.org/bolstering-elections/.

While most states have some role in the support of elections, there are a handful of states that pay nothing to support the conduct of the election and just a few who mostly support it. Research by Charles Stewart of MIT demonstrates that local governments pay the bulk of election administration costs. Although the general public believe that the federal government funds election administration, the actual distribution is closer to 5% federal, 10% state, and 85% local (**Figure 4**).[22] They are not positioned to fund implementation of the Rule.




**Figure 4**: *Who pays for our elections? Local government shoulders the greatest burden, contrary to public understanding.*

An Auburn University study found that the average election office budget was a paltry 0.54% of the county's entire budget.[23] No election officials, at any level of government, have budgeted for implementation of the Rule.

30. State election administration operates in either "top-down" or "bottom-up" systems or a combination of the two depending on the election administration function. For example, a state may have a top-down voter registration system and a bottom-up election results reporting

---

22 *Id.* at 16-17.
23 *Id.* at 20.

structure. Consider voter registration as an example since the proposed rule contemplates new list production, maintenance, and distribution requirements. Federal laws[24] require that the states all maintain a statewide voter registration list. But how a voter gets on that list and who in the state maintains it varies by state. In a top-down system, the state creates and maintains the list and provides it to local officials for their use.[25] In a bottom-up system, the reverse is true. Local officials add and remove voters to a list housed but not otherwise administered by the state. These procedures are dictated by state laws and regulations.

31. Many voting by mail administrative functions are done at the local level. Local election offices are almost always responsible for processing mail ballot applications, preparing and transmitting mail ballot packets to voters (including via USPS), and receiving and processing mail ballots returned by voters. In a few states, the state officials design and print envelopes in bulk and distribute them to local election officials for assembly and mailing.[26]

## VII. The Rule Conflicts with the 2026 Election Calendar and Cannot Be Implemented Before the 2026 Election.

32. The infeasibility of the Rule for election officials is obvious when you consider the calendar and preparation for the 2026 general election next to the Rule's requirements and implementation.

---

[24] The National Voter Registration Act (NVRA) of 1993 and The Help America Vote Act (HAVA) of 2002.

[25] Automatic voter registration, used by about half of the states according to the National Conference of State Legislatures (NCSL), is an example of top-down voter registration function where the record is added by the state to the statewide system. Automatic Voter Registration, NCSL (Aug. 19, 2026), https://www.ncsl.org/elections-and-campaigns/automatic-voter-registration.

[26] For example, Massachusetts, Rhode Island, and Delaware are three states where the state plays a larger role in administration, mostly due to the smaller size of the state. Rhode Island and Delaware each have roughly 800,000 registered voters. In Delaware, state election officials order envelopes preprinted in bulk for the entire state with county-specific return addresses.

33. Preparation for the 2026 general election, on the part of both election offices and USPS, was already underway well before the Rule existed. At the start of the year, USPS distributed its 2026-2027 Kit 600 guidance for election officials, mailing one to each election office.[27] State election training and certification programs and drafting and finalization of procedures, manuals, and directives are complete or well underway for the November general election. Throughout this time, election offices are already actively preparing for the 2026 general election while finishing administration of recent primary elections, requiring a continuous stream of time-sensitive, deadline-driven tasks.

34. The resources for the 2026 election were also fixed months ago. State and local budgets for the 2026 cycle are set; government budgets are often set a year or more in advance. And most election offices have already designed, approved, and printed or ordered their ballot envelopes, as I discuss in Section VIII below.

35. USPS has done much of its preparation for the 2026 election as well, under its pre-Rule procedures. USPS employs more than 640,000 people and trains them for each federal election cycle through frequent virtual sessions and in-person training before the primary and the general election. That training for the 2026 general election began months ago. At the July MTAC meetings, USPS presented that it had completed thirty-two trainings as of July 29 (**Figure 5**), and that additional guidance on the existing pre-Rule election mail protocols was already scheduled to be completed in October (**Figure 6**). USPIS and the USPS OIG have already held their election-related training courses.

[27] 2026-2026 Kit 600, USPS, https://about.usps.com/kits/kit600.pdf.




**Figure 5**: *MTAC election mail presentation slide on training completed for the General Election, July 29th.*




**Figure 6**: *MTAC election mail presentation slide on training schedule for the General Election.*

36. Well into this intense election-year preparation, the Rule arrived. The Rule was first publicly released in final form late in the evening on Friday, August 21, 2026. USPS has said

August 21 is also the Rule's effective date, which leaves about 9.5 weeks and 48 working days before the November 3 election. November 3 is the final day of voting in the general election cycle, and voting starts as early as September 4 in at least one state.[28]

37. As of today (August 28, 2026), the infrastructure for the Rule and related guidance does not exist for election officials to begin to scrutinize, understand, and use. The Ballot Portal has not launched, and USPS has not published a date by which it will. The Rule says the Portal cannot become active until the System of Records (SOR) is effective, and that has not happened. USPS has not confirmed that it has completed building the Portal, tested it with end users, created the materials and technical specifications for election officials to use the Portal, and trained its employees (and retrained the thousands already trained on the old protocols). In my view, USPS is not equipped to implement the Rule ahead of the 2026 election.

38. What remains for election officials to do under the Rule is effectively impossible. With respect to the non-existent Portal, election officials must quickly understand USPS's still-non-existent technical specifications. Based on those specifications, they have to build technical infrastructure, develop new data management and transfer protocols, set up user authentications, and draft policies and training material—except none of this work can actually begin. Election offices must also redesign and reprint their ballot envelopes, complete MDA review, reprint their materials, set up new technical addressing systems, retrain their staff, and, for many, procure new technology and vendors. The Rule funds none of this, and the timeline for implementation (before November 2026) leaves no time for state and local governments to adjust their budgets.

39. The Rule is so complicated that many election officials have asked me if USPS will produce a new, separate instruction manual explaining exactly what officials must do to comply.

---

[28] North Carolina mails out their ballots 60 days before Election Day, September 4.

40. The election calendar will not wait. On September 4, 2026, North Carolina will be the first state to begin mailing ballots to voters—just eight days from the date of this report. Federal law, UOCAVA, will then require ballots military and overseas voters to be transmitted no later than 45 days before the election, September 19. Other states' initial mailing deadlines fall between September 4 and October16, 2026, and ballots continue to go out on a rolling basis until almost Election Day on November 3 as vote-by-mail applications and other ballot mail requests arrive. (**Figure 7**).




**Figure 7**: *2026 mailing calendar CEIR*

41. There is no real runway between the Rule's effective date and when the first ballots must be in the mail. For the 2026 election, it is shorter than the minimum 90-day runway the Rule itself contemplates in Section 24.2, which allows election officials to notify the Postal Service if

it intends to send mail ballots to voter via USPS at least 90 days before federal election day. That day, August 3, came and passed well before USPS released the Rule. USPS still did not exempt the 2026 election from its new requirements.

42. The Rule's application to the 2026 general election also contradicts USPS's current guidance. In the 2026-2027 Kit 600, USPS emphasizes the importance of planning mailings well in advance of an approaching election: "Planning your mailing in advance will help ensure that it goes out in a timely, efficient manner, *which is vital during election season*."[29] But the Rule requires a set of conditions and associated activities that makes vital advance preparation impossible for the mailings set to enter the mailstream in just a matter of days.

## VIII. The Rule's Ballot Envelope Requirements (24.3) Cannot Be Met by Many Election Offices Before the 2026 Election.

43. Section 24.3 includes the new requirements for ballot envelope design.

44. Section 24.3.1 requires federal outbound ballot envelopes (ballots mailed by election offices to voters) to: (a) include the official Election Mail logo, (a) be automation compatible, and (c) bear the voter's unique IMb, as created by the election office, with the Delivery Point ZIP Code embedded and a federal ballot mail Service Type Identifier (STID).

45. Section 24.3.2 imposes the same requirements on return ballot mail envelopes (ballots mailed returned by voters).

46. Both outbound and return envelopes "must be submitted to the Postal Service for mailpiece design review and feedback" by an MDA. Secs. 24.3.1 & 24.3.2.

---

[29] 2026-2027 Kit 600, https://about.usps.com/kits/kit600.pdf, at 6.

47. The Rule makes these envelope design requirements a mandatory condition of accepting and delivering outbound ballots to voters. Before an election office is allowed to submit information in the Ballot Portal required for acceptance and delivery, it must certify that both the outbound and return envelopes have undergone MDA review. *See* Sec. 24.4.2(f). When the outbound ballot packets are then presented for acceptance at a BMEU or retail counter, USPS officials must review the mailing "to evaluate whether the mailing meets the standards in 24.3.1." Sec. 24.5.1. And USPS will not accept or deliver outbound mailings that do not comply with these requirements. *See* Sec. 24.5.3(a) ("Mailings that do not comply with 24.5.1 and 24.5.2 will not be accepted and will be returned to the authorized ballot mailer.").

48. Election officials have known about many of the design practices noted in 24.3 of the Rule for some time. I have even spoken in support of IMbs (including the Ballot STID) and automation compatibility. But most local election offices have not adopted all of these practices for good reasons, including constrained budgets, limited staffing, inadequate equipment, and barriers in state law. Implementing any one of these requirements ahead of the 2026 midterms is virtually impossible for any given election office this time of year, as they will require additional testing, materials, training, and staffing, which election offices may not have the authority or ability to do or obtain weeks before an election.[30]

**A. Unique Intelligent Mail Barcodes**

49. The USPS Intelligent Mail Barcode (IMb) is the barcode that you see under the destination address on a mailpiece. It encodes information such as the mail class and service level,

[30] The Wisconsin Election Commission (WEC) redesigned their envelopes in 2023 and tested them prior to adoption, https://elections.wi.gov/sites/default/files/documents/Open%20Session%20Materials%20-%20August%204%202023.pdf.

the original mailer (via a USPS-assigned mailer ID), the destination routing code (the delivery-point ZIP derived from the address), and, potentially, a unique serial number (**Figure 8**). An IMb can be serialized so that it is unique to an individual mail piece (a "unique IMb"), or it can be more generic, identifying only the destination routing code (a "destination IMb"). Mail is not required to have an IMb unless the mailer seeks specific automation pricing.[31]




***Figure 8**: Intelligent Mail Barcode explainer with digit placeholder allocations.*

50. Not all mail has an IMb, and before the Rule, ballot envelopes were never required to have an IMb, let alone a unique IMb.[32]

51. As a result, IMb use varies across election jurisdictions. Some election offices do not use IMbs at all for outbound or return ballot envelopes. Some offices that use "unique" IMbs place them only on outbound envelopes, not return envelopes. Some election offices that do put IMbs on return envelopes use only "destination" IMbs, not unique IMbs due to cost constraints.[33]

---

[31] Intelligent Mail Barcode,USPS, https://postalpro.usps.com/mailing/intelligent-mail-barcode.
[32] Kit 600, which USPS produces every two years and sends to all election offices, contains no requirement for use of IMbs or any other Rule mandates. 2026-2025 Kit 600, https://about.usps.com/kits/kit600.pdf, at 8-10.
[33] Comment of King Couty, Washington, https://kingcounty.gov/en/dept/elections/about-us/news-and-media-resources/news-releases/july-2-2026.

The reality is that few local election offices—other than some of the largest, most well-resourced jurisdictions—are currently in compliance with the Rule's requirement to place unique IMbs on *both* outbound and return ballot envelopes.

52. Based on my work with a range of election offices over the decades, I am confident that jurisdictions that do not already place IMbs on both outbound and return envelopes will not feasibly be able to come into compliance for the 2026 election.

53. Many election offices have already designed, approved, and ordered or printed their mail ballot envelopes for the 2026 general election. Those offices cannot, at this late stage, identify and marshal the time, resources, and equipment necessary to redesign their envelopes, generate IMbs unique to each voters' ballot envelope, and still prepare and mail out ballots within the timeframes required by state law.

54. Compliance would not be as simple as generating and printing a barcode. Every impacted jurisdiction would need to be notified of the new requirements, redesign its envelopes to accommodate the addition of an IMb, submit them for MDA review and approval (discussed below), coordinate with printers and mail service providers, produce the new materials, destroy the old stock, write new procedures for the insertion of voter-specific return envelopes rather than generic ones, and update all training materials.

55. Election officials will struggle to comply with the IMb and ballot tracking requirements for many of the same reasons they will have difficulty with the Rule's other requirements: they lack infrastructure and technical support to do so.

56. Based on my work with many election jurisdictions, particularly small ones, I know that thousands of election officials do not currently have the capacity to print unique IMbs. Many manually compile their mailing materials, and some handwrite the voter's address on the

envelope and apply their return address with ink and a rubber stamp. On top of not being able to print unique IMbs, some do not have envelopes with the election mail logo or an automation-compatible design, as I discuss below.







**Figure 9**: *Johnson County, IA and Canton Township, MI post on social media their process for sending out absentee ballots*

57. The USPS's Rule discussion tries to address this issue by pointing to a free small business solution for generating IMbs, the Intelligent Mail for Small Business Tool ("IMsb Tool"), that USPS claims election officials can "easily" leverage.[34] But, as I have told USPS officials over the years, this tool is built for regular commercial mailers, not election officials. Whereas commercial mailers may be fluent in the tool, election officials trying to learn the tool for the first time in the limited days remaining before they have to begin mailing ballots for the 2026 election will come up against a steep learning curve—especially offices handwriting voter addresses and applying return addresses with an ink stamp. They will undoubtedly face difficulties with the

---

[34] Rule at 54978-79; USPS Postal Pro, Intelligent Mail for Small Business Mailers, https://postalpro.usps.com/mailing/imsb.

mechanics of creating an account, installing a specialized IMb font, and navigating the software generally.

58. For these offices, it is too late in the 2026 election cycle to acquire the technology necessary to comply with the IMb requirement. Their budgets do not include the necessary hardware, software, or staffing; the necessary educational materials to communicate the changes to voters; or the staff time required to develop new protocols, change their worker-training materials, answer additional voter inquiries, and update their websites.

59. The IMsb Tool is also for "small-volume" mailers, according to USPS in its discussion of the Rule.[35] It will not help the mid-size or large election offices with larger volumes of ballot mail that do not already use IMbs on outbound and return ballots. For those offices, a free tool will be insufficient; they will have to turn to election mail service providers (i.e., outside vendors) or specialized in-house equipment to generate and print IMbs. Those offices would still need to renegotiate vendor contracts and procure new specialized equipment to efficiently deploy printing the IMb on envelopes, and neither those contracts nor the necessary equipment could realistically be procured by all election offices this late in the 2026 election cycle.

60. Election mail service providers themselves have shared that the process of implementation takes time and thoughtful consideration.[36]

---

[35] Rule at 54979.

[36] There are service providers supporting ballot tracking such as Runbeck Election Services, Enhanced Voting, Ballot Scout, and Ballot Trax as well as other market service providers. In Jeff Ellington's comments from Runbeck Election Services, he states: "The election industry has made significant investments over the past decade in ballot tracking, mailpiece visibility, intelligent barcoding, and election security technologies. We believe the Postal Service has an opportunity to build upon this progress through collaboration with election officials, election technology providers, and election mail service providers.
RES welcomes the opportunity to participate in future discussions, pilot programs, and industry working groups to help develop practical and effective solutions that strengthen Election Mail

61. In my career as an election official and as a postal service liaison, I have never witnessed USPS impose a change with such a dramatic impact on election administration so close to an upcoming election. By way of contrast to the present circumstances, I worked heavily with USPS on the development of the Ballot Mail STID. As explained above, an IMb includes a STID, or a three-digit number identifying the mailpiece's class of service (marketing mail, first class, priority, etc.) and handling specifications (return service requested, forwarding protocols, etc.). At an Election Center meeting in April 2016, I met with postal leadership and discussed the need for an Ballot Mail STID for USPS to more easily know when they have automation-compatible ballots in their possession, as explained in a Bipartisan Policy Report I helped author called *New Reality of Voting By Mail*.[37] That effort took two years of MTAC working group meetings and iterative discussions on how many STIDs would be necessary, what they would be, testing of the equipment, and then training before Election Mail STIDs were launched in 2018 (**Appendix C**). Creating a Ballot STID at that time did not change how ballots were handled, it did not change the induction of the mail, it did not change the authorization process of tendering mailings—all of which the Rule calls for but with much less time and planning.[38]

62. Although the Rule mentions MTAC, to my knowledge there have not been any MTAC working groups formed nor participation by MTAC in the creation and implementation of the Rule.

**B. Automation Compatibility**

---

performance while minimizing burdens on election administrators." Comment of Jeff Ellington, CEO Runbeck Election Services, at 2.

[37] New Reality of Voting by Mail, Bipartisan Policy Center, the-new-realities-of-voting-by-mail-2016.pdf.

[38] In the discussion accompanying the Rule, USPS states that it will now create new separate STIDs for Federal Election Mail and non-Federal Election Mail because the Rule does not technically apply to non-federal elections.

63. Not all ballot envelopes can be made automation compatible.

64. Automation compatibility relies upon the mailpiece size, design, format, and components. When specific, lengthy language is required by law for a voter affidavit or signature oath on return envelopes, it can have implications on the envelope design which result in the postal equipment misreading the envelope—looping the envelope back to the voter rather than to the election official.[39] This language is often specified in statute or administrative code and can only be changed by those authorities.

65. Making envelopes automation compatible that are not already automation compatible would require re-design, which is a technical process. Many small election offices lack their own communications and design staff available to modify their materials or otherwise rely on other county departments and service providers who are subject to constraints on availability during a time when many are seeking services.

66. Some mail ballots must be printed as "flats," or mailpieces exceeding certain length, height, thickness, and weight limits (such as documents in large envelopes). Flats are distinct from "letters," which are smaller mailpieces in more standard size envelopes, often containing folded content.

67. Not all ballots mailed as flats are automation compatible or can otherwise readily be made automation compatible.

68. Braille mail ballots and large-print mail ballots for vision-impaired voters are often prepared as flats. In Maricopa County, I was responsible for preparing hundreds of Braille and large-print ballots as flats for mailing (**Figure 10**). These ballots have features, such as protrusions from binding, that prevent them from being made automation compatible. *See, e.g.*, DMM 6.0.

[39] Over the years managing electionmail.org, I saw dozens of examples of this.




**Figure 10:** *Large print and Braille ballots prepared for delivery to USPS for mailing to voters.*

69. Some election offices, such as those with more dated ballot tabulation machines, continue to transmit all their mail ballots to voters via USPS as flats, unfolded in larger envelopes, to decrease the risk of errors resulting from creases in folded ballots. A Missouri election official recently estimated that half of all counties in Missouri mail out their absentee ballots as flats.

70. Local election offices do not have the time, budget, or bandwidth to redesign Braille, large-print, and other ballots sent as flats to comply with the automation compatibility requirement of the Rule. For these offices, the Rule will ultimately require USPS to reject these mail ballots.

**C. Mailpiece Design Review**

71. Historically, USPS has only encouraged but not required election offices to submit their envelopes and materials to USPS for review by Mailpiece Design Analysts (MDAs).[40] And not all election jurisdictions have used MDA review before mailing outbound ballots to voters.[41]

72. As I understand it, the Rule now makes it mandatory for all election offices to submit their ballot envelopes and materials to an MDA for review for every election cycle. They must certify in the Portal, for each mailing, that any mail ballot envelopes being sent through USPS "have been submitted for review and that they have received feedback consistent with 24.3.1 and 24.3.2." Sec. 24.4.2(f). And if they don't, the election office will not be able to enter required information into the Portal for that mailing, and consequently USPS will not accept the mailing for delivery.

73. According to the USPS, MDAs provide advice and guidance on envelope design, provide assistance on envelope standards, and help construct mailings. But at the recent MTAC meeting, the National Association of Election Officials (NASED) Executive Director raised concerns about the variation across USPS MDAs in determining what comports with USPS mailing standards.

74. MDAs do not always provide consistent, accurate, or timely advice. For example, as NASED noted in its comment: "NASED recently received a forwarded email from a member in which a Mailpiece Design Analyst stated that elements of the NPRM are 'mandated' now and that the envelope – which had already been approved by a Mailpiece Design Analyst – did not meet USPS standard."[42] This was prior to USPS's adoption of the final rule. Incorrect

[40] 2026-2027 Kit 600, https://about.usps.com/kits/kit600.pdf, at 6.
[41] For example, no Connecticut municipality submits ballot envelopes to USPS for MDA review.
[42] NASED Comments at 4.

interpretation of the requirements and inconsistent MDA review causes delays and can impact the ability to get designs approved and produced. This will, in turn, cause cascading delays in ballot mailing Portal submissions, possible rejection, and could result in voters not being able to vote.

75. The Rule leaves many questions unanswered about how mandatory MDA review will work, each of which has associated policy and training implications for local election officials. As the NASED comments point out, Sections 24.3.1 and 24.3.2 of the Rule do not:

- "Provide an expected turnaround time for review by Mailpiece Design Analysts;
- Provide a guarantee that mailpieces reviewed by a Mailpiece Design Analyst will be automation compatible;
- Describe how election officials will prove their mailpieces were reviewed by a Mailpiece Design Analyst;
- Specify how recently a mailpiece must have been reviewed by a Mailpiece Design Analyst;
- Detail how election officials can appeal the determination of a Mailpiece Design Analyst or how to handle differing opinions among Mailpiece Design Analysts;
- Explain how Mailpiece Design Analysts will be trained to ensure their detailed understanding of the standards once they are finalized; or,
- Provide a detailed plan on how Mailpiece Design Analysts will manage and approve submissions from approximately 8,000 election jurisdictions simultaneously."[43]

76. At this extremely late stage in the election year, this lack of clarity will make it impossible for local election offices to conduct MDA review before the 2026 election.

77. My understanding is that many election offices that have already conducted MDA review for this year's election will now have to do it again. This year's Kit 600 "strongly recommends that all Election Mail envelopes, ***including previously approved designs***, be reviewed by

[43] *Id.* at 5.

an Mailpiece Design Analyst (MDA) ***each year prior to mail printing***."[44] The guidance accompanying the Rule states: "The envelope design must be reviewed each election cycle."[45]

78. There are only 40 MDAs nationwide, none to my knowledge dedicated to election mail alone.[46]

79. USPS estimates its turnaround time for MDA review to be two business days.[47] But election officials and service providers often budget at least a week for MDA review and approval in their timelines and planning, though it can take upwards of two weeks or more.

80. There are thousands of election administering jurisdictions, the majority of which will need to change their ballot design to comply with the IMb or other design requirements. Election offices nearly everywhere, as I discuss below, will have already designed, ordered and/or printed their ballots for the 2026 election, and for those who opted in, completed MDA review.

81. If even a fraction of election offices has to submit their new envelopes and materials to MDAs before the 2026 election, it would take weeks for USPS to work through the sudden volume. There are less than 10 weeks remaining before the election and only one week before September 4, when ballots first begin going out to voters.

82. The MDA review requirement the Rule contemplates simply cannot happen this year. If it is required, I am confident it will result in election officials not gaining access to the Ballot Portal (they will not be able to complete the attestation that the MDA review is complete), causing ballot mailings to be rejected and/or significantly delayed.

---

[44] 2026-2027 Kit 600, https://about.usps.com/kits/kit600.pdf, at 29.
[45] Rule at 54979.
[46] Transcript of EAC Standards Board Meeting, https://www.eac.gov/sites/default/files/2026-04/Standards_Board_2026_Annual_Meeting_Compiled_Rough_Transcript.pdf, at 23.
[47] Rule at 54979.

**D. Other Practical Barriers**

83. There are other practical barriers to coming into compliance with any of Section 24.3's new envelope design requirements before the 2026 election.

84. Redesigning and reordering envelopes for any reason is not feasible for a local election office this close to a general election. As I noted above, local election offices are primarily responsible for the administration of voting by mail, but ballot envelope design in some states is dictated by law or rule or otherwise conducted at the state level. For example, ballots in Wisconsin are designed by the state's election commission and local governments cannot change their envelopes to comply. The content and wording of ballot envelopes are also sometimes dictated by state law or statewide rules, regulations, or guidance.

85. Redesigning ballot envelopes is also very time intensive, and even small changes can prove complex to implement. In my experience, election officials usually engage in ballot redesign in odd-numbered years, off cycle from federal elections when ballot mail volume is highest, and consistent with USPS's guidance to plan early. Redesigning a ballot envelope days before mailing thousands of mail ballots is reckless and unheard of.

86. The infrastructure of service providers is not positioned to respond now with major changes for the 2026 election.[48] If a large portion of the election community had to replace their stock of envelopes for printing new designs and to comport with the rule, that would put tremendous stain on service providers' staff and the stock of available materials.[49] For those that need to

---

[48] In his comment on the proposed Rule, Jeff Ellington, Chief Executive Officer of Runbeck Election Services, called for USPS to "coordinate implementation timelines with federal election calendars to avoid introducing significant operational changes immediately preceding major election events." Jeff Ellington Comment.

[49] Kevin Collier, *Did we order enough envelopes? Vote-by-mail advocates worry time is running out to prepare* (April 23, 2020), https://www.nbcnews.com/politics/2020-election/did-we-order-enough-envelopes-vote-mail-advocates-worry-time-n1190571 ("Kevin Runbeck, CEO of

go to an envelope vendor, 4-8 weeks is the turnaround time. If most counties need to reproduce envelopes, that timeline could stretch to 12-16 weeks.[50] There are not a lot of envelope producers left in the U.S.[51]

87. Regardless of the size of jurisdiction, they order items in bulk to capitalize on volume discounts and plan to use the same materials, whenever possible, in multiple elections—from primary to general, special, municipal. No one has budgeted to redesign their mailpieces or to replace their current inventory in the final weeks before the first ballots mail. Stock being used for the general election was purchased months ago.[52] Election administrators do not have funds to replace materials in order to comply with the Rule.

88. Based on my personal conversations with dozens, if not hundreds, of election officials, I can say with a high level of confidence that a substantial number of election officials will not be able to comply with the envelope design requirements in Section 24.3 in time for the 2026 election.

89. And if election officials cannot comply with these requirements, as I read the Rule, USPS will not accept ballots for delivery. As I stated earlier, Section 24.5.3 expressly states that ballots that do not comply with Section 24.5.1 and 24.5.2 "will not be accepted and will be returned to the authorized mailer." And Section 24.5.1 in turn requires USPS to review all the outbound ballots and envelopes prepared by election officials to be sent to voters for compliance with the envelope design requirements in Section 24.3.1. I understand these provisions, read together, to

---

Runbeck Election Services, an election supply company that provides vote-by-mail services, cautioned that the diversity of ballot styles and sizes across the country means that corresponding custom envelope orders can produce "a chokepoint across the industry. . . . 'And if everybody waits until the last minute, manufacturers can't produce at the same time for everybody,' he said.").

[50] Jeff Ellington, President of Runbeck Election Services 8/3/2026

[51] *Id.*

[52] NASED Comment at 4.

require all outbound ballot envelopes to comply with Section 24.3.1. As I previously explained, many election offices cannot comply with that requirement for several reasons: some have already printed their envelopes for the 2026 election cycle, while others do not have the necessary technology, staffing, or budget necessary to produce compliant replacement envelopes. If election officials cannot mail absentee ballots because they have not complied with Section 24.3.1, the result is that voters will not receive their ballots and will be unable to vote by mail.

90. As I understand the Rule, USPS's refusal to accept outbound ballot mailings does not solely turn on whether the envelopes are compliant with Section 24.3.1's requirements. The Rule also makes an election official's ability to obtain a certification from a Mail Piece Design Analyst and, in turn, enroll voters in the Ballot Portal, a condition of acceptance. In other words, if the return envelopes do not comply with Section 24.3.2, then election officials will not be able to certify that their ballot mailings comply under Section 24.4.1(f). And as a result, election officials cannot enroll voters on the Mail Ballot Portal (see Section 24.4.1(f)), providing yet another reason why voters will not receive their mail ballots.

91. These complicated, interlocking requirements are themselves additional obstacles to compliance. The way that the Rule is written, noncompliance with either Sections 24.3.1 or 24.3.2 means that USPS will reject ballot mailings by election officials. But election officials no doubt will reasonably interpret the provisions differently. And those differing interpretations will lead some offices to make compliance decisions that USPS later rejects, resulting in delayed or unavailable ballot mailings.

92. I foresee disastrous consequences for the 2026 election if election offices cannot comply with these requirements. Hundreds of thousands of voters may never receive their ballots because USPS rejects ballot mailings sent in envelopes deemed noncompliant or because election

officials cannot obtain the proper certification from an MDA to be able to enroll voters in the Mail Ballot Portal.

## IX. The Participation List and Ballot Portal Requirements (24.4) are Unprecedented and Unworkable for USPS and Election Offices.

93. The List and Portal requirements are laid out in Section 24.4. Together, the provisions of Section 24.4 set up a new USPS enrollment for mail-in and absentee voting. Before an election office can send ballots through USPS, its staff must register for the Ballot Portal. Sec. 24.4.1. For each ballot mailing, portal users must upload the voter's name and mailing address, the unique IMbs for the outgoing ballot envelope and the return envelope, and the state where the election office is located. Sec. 24.4.2(b). They generally must do this at least 30 days before a federal election or by the first date that state law allows ballots to go out. Sec. 24.4.2(d). And officials cannot enroll voters unless they first certify that USPS has reviewed the state's ballot-mail materials and provided feedback showing that the outgoing and return envelopes are consistent with the Rule. Sec. 24.4.2(f). If that certification is incomplete, the Portal will not allow officials to enter voter information, meaning those voters cannot be added to the Participation List. Sec. 24.4.2(f). Voters must be enrolled on this list before election officials can send mail ballots through USPS.

94. This new system—where USPS will not accept mail ballots from election officials if voters are not on a list—is unprecedented. I am not aware of any comparable system that gives USPS so much power over whether election officials can use the mail to send out mail ballots. Nor am I aware of a prior federal government agency that has maintained a nationwide list identifying all the voters who will vote by mail in the United States. This Rule fundamentally changes that.

95. There is no federal requirement that states keep a centralized list of which voters have requested/cast mail-ballots in real time in the lead up to Election Day, and some states do not maintain such a list.[53] And in fact, in many states, election officials at the local level keep track of who is requesting mail in ballots and even then, the way that local officials track these requests is not uniform--some jurisdictions, particularly small ones, might use excel spreadsheets or keep tallies in word documents.

96. Requiring states to create and maintain a statewide list on an ongoing basis would be severely burdensome. In many states, state officials would need to coordinate continuously with local officials across hundreds of jurisdictions to collect voter information, ensure that it is in the required format, and submit it to USPS. Because ballot requests are usually made directly to local election offices rather than through a centralized state portal, this process will no doubt create delays in enrolling voters and, as a result, delays in mailing and receiving ballots.

97. For the small jurisdictions, the burden will be especially heavy. Small election offices often lack an IT department, or even IT staff; in some cases, they may share computers with other local government departments.

98. The privacy implications are tremendous as well. Access to voter data is governed by state law. But the proposed access to the data, as laid out in the July 17 Federal Register

[53] Arizona is one such state—county recorders are the statutory authority over early voting which includes voting by mail. They process applications, fulfill the requests, verify the signatures, update the voter's record, and then pass the ballots to the elections department for extraction and tabulation. Ballot tracking is done independently in Maricopa and Pima Counties while the state supports the smaller counties via vendor services. Arizona Secretary of State's Office, BallotTrax, https://trackmyballot.azsos.gov/voter/.

publication 2026-14508, 91 Fed. Reg. 44880 (July 17, 2026)[54] seems to disregard state privacy protections and federal protections as well.

99. By requiring states and USPS to create and maintain multiple ballot mailing lists, the Rule requires multiple agencies across multiple levels of government to coordinate, adding more steps and potential points of failure in the mail balloting process. In my view, this represents a dramatic shift in roles and responsibilities of USPS and election officials.

100. Moreover, statewide systems in some states do not contain absentee or vote-by-mail information in real time—they might reflect participation history after the fact as part of the voting record and canvass, because most of the implementation of mail voting processes, including sending out absentee or vote by mail ballots is run at the local level.[55] For this information system to function, local officials would need to report in real-time mail ballot applications, aggregate the information required under Section 24.4.2, and continually update these records so that every eligible vote by a mail voter is timely enrolled in a Participation List. That information in Section 24.4.2 would need to be standardized and transmitted in the format required by USPS—an infrastructure that many local jurisdictions do not currently have.

101. The Rule contemplates that "the chief election official of each state is responsible for authorizing the Ballot Portal Users for their state including political subdivisions thereof." Sec. 24.4.1. This will require the chief election officials to determine which local officials to authorize

[54] Privacy Act of 1974; System of Records, https://www.federalregister.gov/documents/2026/07/17/2026-14508/privacy-act-of-1974-system-of-records.

[55] For example, in Missouri the Secretary of State's website is emphatic that all requests are to go to the local election authority: "DO NOT SEND ABSENTEE BALLOT APPLICATIONS TO THE SECRETARY OF STATE'S OFFICE. ABSENTEE BALLOT APPLICATIONS MUST BE SENT TO THE APPROPRIATE LOCAL ELECTION AUTHORITY BY THE DEADLINE IN ORDER TO BE VALID." Missouri Secretary of State, https://www.sos.mo.gov/elections/goVoteMissouri/howtovote#absentee (emphasis not mine).

to register for and use the Portal, even though responsibility for mail voting is allocated differently across jurisdictions. In Arizona, for example, election administration responsibilities are divided at the county level between boards of supervisors and county recorders, with the precise allocation of duties varying by county. In Texas, some counties centralize vote by mail administration in an elections administrator's office, while others divide relevant functions among the county clerk and tax assessor collector. State election officials would therefore have to map these varying local structures, identify the officials with responsibility for each part of the mail ballot process, and authorize the appropriate individuals to submit information through the Portal. With the 2026 election so close, there is no time for a state's chief election official, who does not typically oversee each county's internal allocation of mail voting duties, to designate the right local staff for the Portal.[56]

102. In their comments on the proposed Rule, NASED expressed concerns I share about the burdens state election officials would face, particularly if state officials must modify, ahead of November, the existing voter registration databases (often the state's most comprehensive voter records) to store additional information about mail ballot voters and their ballots. As NASED pointed out, doing so would "require the state election office to update the voter registration database to permit storage of IMB data" which "would require a significant time investment from every local election office nationwide at a time they cannot afford it."[57]

[56] Comment of Carolina Lopez on Proposed Rule, Executive Director of PLJ, in her private capacity as an election expert ("Lopez Comment"), at 4 ("The proposed rule may also complicate state-local governance. It places responsibility on each state's chief election official to authorize Ballot Portal Users, including local election officials and mail service providers. In decentralized states, large counties may be operationally responsible for producing and mailing ballots, while the state controls portal authorization.").
[57] NASED Comment at 5-6.

103. The Rule further assumes that at the local level, all election offices have the daily capacity to update mailing lists and provide them to USPS prior to tendering the mail for delivery. This simply is not so. Not only are our election offices understaffed,[58] but they are also under-resourced and some lack the technological infrastructure needed to comply with Section 24.4. This part of the Rule would require them to continually update mail ballot lists so that voters are timely enrolled on the Participation List and USPS can deliver ballots to them.

104. Voters who need their ballot mailed to an address other than their residence, including college students, retirees and "snowbirds," traveling workers, and truck drivers, are especially vulnerable under this system because they may not know when or from where they will be requesting mail ballots. The same is true for voters who request mail ballots later in the election calendar. Before a ballot can be mailed, election officials would have to process the application, assemble and validate the information required for the Portal, enroll the voter on the Participation List, and resolve any technical, data, or envelope compliance problems. If officials are simultaneously trying to enroll thousands of voters, those additional steps will create a bottleneck when time is shortest. A voter whose request arrives near the relevant deadline will have too little time to be enrolled, receive the ballot, complete it, and return it by the state's deadline, much less to correct an error if the ballot packet or its delivery is rejected. That risk is particularly acute in states with later

---

[58] Anna Diaz, *Election Offices Need Staff*, IssueOne (Aug. 17, 2023), https://issueone.org/articles/election-offices-need-staff-colleges-universities/; *Oregon Election Offices Are Underfunded, Understaffed According to Report*, The Ashland Chronicle (Nov. 8, 2023), https://theashlandchronicle.com/oregon-election-offices-are-underfunded-understaffed-according-to-report/; Christina A. Cassidy, *Turnover has plaged local election offices since 2020. One swing state couty is trying to recover*, AP (Oct. 23, 2023), https://apnews.com/article/election-workers-turnover-threats-trump-2024-8497130b5bbeae503d8f675e3b809d4f; Georgia Lyon, *New report reveals alarming election officials turnover and offers solutions*, IssueOne (Feb. 3, 2026), https://issueone.org/press/new-report-reveals-alarming-election-official-turnover-and-offers-solutions/.

application deadlines and those that require completed ballots to be received by Election Day or shortly thereafter.

105. For more than a decade, USPS has advised voters to mail back their ballot at least one week before it is due, October 27, for the 2026 Midterm Election. Eight states have this same date, October 27, as the deadline to request a ballot if you want the ballot mailed (Alabama, Arkansas, Kansas, Maryland, Massachusetts, New Jersey, Ohio, and Pennsylvania).[59] Thirteen states allow for a mail ballot to be requested within one week before election day, which is after the timeframe by which USPS says the ballots should be mailed back: six of those states (Illinois, Maine, Delaware, Louisiana, Michigan, and Wisconsin) allow for requests up to the Friday before the election in at least some circumstances,[60] while six states (Connecticut, Minnesota, Montana, New Hampshire, South Dakota, and Wyoming) allow for voters to request an absentee, vote by mail ballot as late as the Monday before Tuesdays election.[61] Two states (Mississippi, and North Dakota) do not have a published deadline for requesting a ballot.[62] During the compressed time period of the final days of an election, the addition of any delays will assuredly translate into the prevention of eligible Americans from voting, particularly for voters residing in these twenty-four states. The creation and communication of the Participation List will be an ongoing effort throughout the remainder of the election calendar.

106. Many mail ballot voters may also need a replacement ballot after spoiling, losing, or not receiving the original ballot. Election systems must update quickly enough to show that the

---

[59] Table 5: Applying for an Absentee Ballot, Including Third-Party Registration Drives, National Conference of State Legislatures, https://www.ncsl.org/elections-and-campaigns/table-5-applying-for-an-absentee-ballot.
[60] *Id.*
[61] *Id.*
[62] *Id.*

original ballot has been canceled and a replacement is needed. As a result, the Portal could appear to show that the voter has received two ballots, or USPS could reject the replacement mailing if the IMb was entered into the Portal twice. Election officials may need to revisit the methods they use in assigning IMbs to the mailpieces because their current practice may now have rejection implications.

107. These additional points of failure highlight the need for thorough testing.[63] Election officials and USPS need time to test with end users how the Portal handles replacement ballots, spoiled ballots, canceled ballot records, duplicate or corrected IMbs, address changes, late requests, and other routine situations that occur throughout every election cycle. In my view, for all these reasons, the Rule cannot possibly be implemented before the November 2026 election.

## X. The Added Verification Requirements During Mail Induction (24.5) Are Unnecessary, Burdensome on Election Offices, and Will Delay Getting Ballots to Voters.

108. Under Section 24.5.2, all outbound mail ballots must be "verified by Postal Service employees when presented for acceptance." Section 24.5.2. In addition, all outbound mail ballots must be "entered at a facility that performs business mail acceptance functions or at Postal Service retail counter." Section 24.5.2. Another Section provides that mailings that do not comply with Section 24.5.2 "will not be accepted and will be returned to the authorized ballot mailer." Section

---

[63] Lopez Comment, at 3 ("Before any compliance date, USPS should publish complete technical specifications, including file formats, validation logic, authentication requirements, API or secure automated transfer options, bulk upload capacity, error reporting, audit logs, delegated vendor access, and procedures for correcting partial errors. USPS should also provide a test environment or pilot process well in advance of implementation so states, local jurisdictions, election management system providers, and mail vendors can test end-to-end workflows before live ballots are involved.").

24.5.3. The process where mailings are accepted at the counter or BMEU is called "induction of mail."

109. Typically, at induction USPS checks the mailing's documentation, postage, sorting, markings, and, where relevant, whether the contents qualify for the mail class or rate being claimed. The Rule adds additional steps to the verification process wherein the mail piece will be compared to the Participation List. If the voter is not listed, or is listed differently, the Postal Service employees can refuse to accept outbound ballots. Outbound ballots that are taken to regular counters (not BMEUs or retail counters) will not be accepted. This requirement places enormous burdens on local election officials of both rural jurisdictions that do not have nearby BMEU or retail counters and larger jurisdictions that mail thousands, even millions, of ballots at once.

110. Mandating that all ballots, regardless of the number of pieces being mailed, be tendered at a BMEU or a retail counter for scanning and acceptance will place an undue burden on our small offices who will no longer be able to transmit low-volume ballot mailings with their postal carriers.

111. Election officials in rural jurisdictions will be required to travel to either BMEUs or retail offices. For small offices with limited staff and resources, the time away from the office to comply with the new induction requirements may result in voters not being served, additional applications for vote by mail ballots not being processed as quickly, returned ballots not being verified in as timely a manner, and delayed preparations for Election Day. Depending on the distance to the nearest BMEU or retail counter site, staffing constraints, and acceptance success there can be significant additional pressures on the local officials and resulting in delays for the voter.

112. Although larger jurisdictions may have established vendor support or more staff to help with the necessary design and technology changes, they too will face challenges. Urban

election offices may have nearby BMEUs, but they will have greater difficulty adhering to the verification requirements due to the volume of voters and the constant changes in voter eligibility (voters turn eighteen, move, change parties, names, etc. daily). With a zero-tolerance threshold for acceptance ("mailings that do not comply with 24.5.2 will not be accepted"), even a single data error would jeopardize an entire mailing containing thousands, potentially millions, of individual ballots or mailpieces.

113. Importantly, the Rule is framed in terms of rejecting an entire defective mailing, not identifying and rejecting only individual noncompliance mailpieces. When an election official or their designated service provider tenders the mail to USPS, the entire group of mailpieces is referred to as "the mailing" comprised of individual mail pieces (i.e., the ballot mailing envelope packets). Voters submit ballot applications daily. The Rule requires that for a noncompliant mailing, the "user must address the error(s) before resubmitting the mailing."[64] I was an election administrator in Maricopa County, Arizona. At that time, we had more than a million voters on our permanent early voting list (PEVL)[65] who were part of the initial mailing on the first day allowed to mail under state law. Maricopa County now has 2.6 million voters who will be mailed on the first day for mailing out ballots. Under the Rule, if a single ballot packet is noncompliant or not on the Participation List that USPS is comparing it to, which may or may not be the most accurate list, then USPS can reject the entire mailing. This has the potential to create massive chaos and confusion, particularly if a single error can delay or prevent the delivery of thousands, even millions of otherwise valid ballot packets.

[64] Proposed ruling page 19, paragraph 2.
[65] The list is now referred to as the Active Early Voting List AEVL

114. During verification, once USPS identifies a mail piece that does not comply, the process will stop and the entire mailing will be returned to the election office. It may be the case that there are other errors in the mailing that would not be identified to be remedied until future verification attempts. With thousands, even millions of pieces being verified, it is anticipated that each one would trigger rejection of the mailing and require the entire process to start over. Currently, large commercial mailings have an allowance threshold for noncompliance. But the Rule does not follow this USPS standard.

115. For more than a decade, mail has been sent to USPS processing plants for cancellation/postmarking, scanning, and sorting; local retail offices have not traditionally had the ability to scan mailings. Now, all retail locations will need to have, at a minimum, hand-held scanning capacity. USPS's discussion accompanying the Rule states that "[s]canning a barcode generally takes less than a minute per mailpiece. Depending on how many barcodes are scanned, the verification process should take no more than a few hours for larger mailings, and potentially only a few minutes for smaller mailings."[66]

116. USPS also suggests that the election official or their authorized ballot mailer remain at the BMEU or retail office during the verification process.[67] But the Rule itself essentially requires it, to avoid abandoning custody of outbound ballot mailings because Section 24.5.3(c) states that USPS "assumes no responsibility for any outbound ballot mailing presented until it is accepted into the mail." USPS's commentary on the Rule also claims that even while ballots remain in its possession for verification, it does not consider them "in its custody . . . until [they] have been accepted."[68]

---

[66] Rule at 54981.
[67] *Id.*
[68] Rule at 54982.

117. The length of time it will take to induct mail under USPS's own scan time estimates, especially in jurisdictions with a high-volume initial mail drop, will create extraordinary problems for election officials and threaten the secure transfer of ballot custody as they enter the mailstream. I recently asked my former colleague in Maricopa County how many ballots they were mailing out on the first day of early voting this year, and he said 2.6 million pieces. If it took one minute to verify each piece in the mailing, it would take about 4.9 years of continuous scanning to verify the whole mailing. If it only took only a second to scan each mailpiece, it would take 30 days. Even if it took only one tenth of a second to scan each mailpiece, it would take a little over 72 hours.

118. To be clear, the Postal Service processes large volumes of mail every day across the network, but they are not validating each of those mailpieces against an additional list and retaining the mailing as a whole prior to accepting every piece. This will place an undue strain on the induction of the mail. At the recent MTAC meeting, mailers raised concerns about the missing "start-the-clock" scans during a presentation on "Mail Not in Measurement by Exclusion Reason."[69] The Rule will further exacerbate existing induction challenges and calls into question what will happen if ballot mailings are part of the missed data?

119. Rural retail Post Offices, like their election office counterparts, have limited staffing, space, and resource limitations. At these locations, postal employees will have to do a hand scan of each individual mailpiece as necessary for the verification process. This manual process will take much longer than larger, better equipped retail Post Offices that leverage scanning and sorting technology and will disproportionately impact small offices.

[69] The "start the clock" scan recognizes entry of a mailing into the mailstream, i.e., when the mailing was accepted by a postal service employee. July 29, 2026 Mailers Technical Advisory Committee meeting.

120. When USPS rejects and returns a mailing during induction, starting over is not trivial for an election office. It will be incredibly time-consuming. The election officials will have to identify the error and then, depending on the error, generate and assign new unique IMbs or resubmit the affected voter data to the Portal (which only authorized personnel will be able to do), reprint envelopes, reassemble ballot packets, and reschedule the mailings pickup or deliver to the acceptance unit. Each error in a mailing will be cause for rejection of the mailing when it is subsequently tendered. For example, if I have a mailing of 100 ballots and there are three issues, once the first problem mailpiece is identified, the mailing is rejected and subsequent issues not identified. The second problem would only be found upon the rejection of the mailing in the second verification attempt. The third problem only identified on the third attempt's verification process, etc.

121. Even if USPS changes its interpretation and only rejects single noncompliant mailpieces within a mailing, the verification procedures would still be extremely time-intensive, overwhelmingly burdensome on local election offices and USPS employees alike, and infeasible to implement in the 2026 election.

122. The Rule also places an additional burden on election officials before presenting mail for induction. USPS states that "[w]hen preparing Outbound Federal Ballot mailings, Authorized Ballot Mailers ***must segregate*** Outbound Federal Ballot Mail from other types of ballot mail, such as primary ballots, UOCAVA ballots, or ballots for state or local elections only. ***Comingling nonfederal ballot mail with Outbound Federal Ballot Mail may impact the verification process and could prevent or delay proper acceptance of mailings*** (emphasis added)."[70] This will be a major shift in how UOCAVA ballots are currently processed and organized by jurisdictions, many

[70] Rule at 54981.

of which do, in fact, comingle ballots. In my view, requiring election officials to change longstanding ballot mailing processes so close to UOCAVA mailing deadline (September 19 for all 50 states and the District of Columbia) is very ill advised because it increases the risk of administrative errors and the possibility that USPS will reject a mailing that contains both UOCAVA and regular vote by mail ballots.

## XI. Conclusion

123. I have reviewed the Rule and assessed its consequences based on my years of experience in election administration and more than a decade working with USPS on election mail-related issues and concerns. It is my expert opinion that election officials, their service providers, and USPS do not have sufficient time or resources to implement the Rule for the 2026 General election. Most importantly, I am of the opinion that full implementation of this Rule will cause confusion and irreparable harm to state election officials, local election officials, and voters.

124. I reserve the right to revise or supplement my opinions should additional information become available to me or if I am asked to perform further research or analysis.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge. Executed the 28th day of August 2026, in Chaptico, Maryland.

______________________________

**XII. Appendix A *Curriculum Vitae***


# TAMMY PATRICK, CERA

25560 Chaptico Overlook Way
POB 340
Chaptico, MD 20621

602-471-7878
tammy_patrick@ymail.com
@aztammyp


## Education:

- **1991** Purdue University, bachelor's degree in American studies, Minors in Political Science, History, English, Sociology, & Women's Studies
- **2007** Auburn University, Certified Election Registration Administrator (CERA)

## Election Experience-Employment

- **2024+** Chief Program Officer for the National Association of Election Officials (Election Center)
- **2026** Senior Advisor, Fair Vote
- **2024-2025** Research Oversight Committee MIT Election Data Science Lab (MEDSL)
- **2023-2025** Senior Advisor, Bolstering Elections Project, Edward Kennedy Institute & Robert Dole Institute
- **2022-2024** CEO of Programs for the National Association of Election Officials (Election Center)
- **2023-2024** Advisor, Article IV
- **2022-2023** Senior Advisor to the Reimagining Elections Project, Stanford University's d. school
- **2023-2024, 2026** Lecturer, Weber State Univ & Utah Lieutenant Governor's Election Certificate Program
- **2022** Carter Center Subject Matter Expert for Domestic Observation (General Election)
- **2017-2022** Senior Advisor to the Election team at the Democracy Fund
- **2016+** University of Minnesota Adjunct Professor, Humphrey School of Public Policy
- **2016-2026** Creation & oversight of electionmail.org
- **2016** Sonoma County, CA Pollworker Trainer on Language Assistance (General Election)
- **2014-2017** Democracy Project Fellow with the Bipartisan Policy Center
- **2003-2014** Federal Compliance Officer for Maricopa County Elections Department
  - Responsible for the Election Department's Voting Rights Act Section 5 submissions.
  - Oversaw voting assistance and materials in Braille, ASL, Spanish, and Tohono O'odham and organized the 2007 Native American Voter Outreach Summit.

## Election Experience—Awards & Recognition

- **2022** National Association of Election Officials (Election Center) Hall of Fame inductee
- **2013** Commissioner on the Presidential Commission on Election Administration, appointed by President Barack Obama
- **2016** USPS partner in the creation of ballot-specific Service Type IDs to improve the visibility of ballots in the mail stream
- **2016** National Association County Recorders Election Officials and Clerks Best Practices Award, "Disaster Recovery Plan"
- **2008** Arizona Disability Advocacy Coalition ADA Liberty Patriot Award
- **2008** National Association of Counties Achievement Award, "Maricopa County's Voter Assistance Website"
- **2007** Harvard Kennedy School of Government's Ash Institute Top 50 Innovations in Government, "Election Reporting System"
- **2007** Harvard Kennedy School of Government's Ash Institute Top 50 Innovations in Government Bright Ideas Award, "Election Reporting System"
- **2007** Election Center's Professional Practice Award, "Election Reporting System"
- **2007** National Association of Counties Achievement Award, "Election Reporting System"
- **2006** National Association of Counties Best in Category Award in the County Administration and Management Category, "Voter Language Assistance Proficiency Assurance Program"
- **2006** National Association of Counties Achievement Award, "Voter Assistance and Boardworker Enhancement Training Program"
- **2005** National Association of Counties Achievement Award, "Voter Assistance and Boardworker Enhancement Training Program"

125.

## Election Experience-Boards & Working Groups

### Current:

- **2025+** Council of State Governments Election Technology Initiative Advisory Council
- **2024+** Harvard University Executive Sessions on Election Administration
- **2019+** Protect Democracy National Task Force on Electoral Crisis
- **2019+** Journal of Election Administration, Research, & Practice Editorial Board
- **2017+** Election Center Security Task Force Member
- **2017+** Advisory Board for the MIT Election Data and Science Lab
- **2010+** United States Postal Service Mailers Technical Advisory Committee
- **2010+** Election Center Postal Committee
- **2005+** Election Center Legislative Committee

### Previous:

- **2024** Union of Concerned Scientists Election Science Task Force
- **2022-2024** Institute of Election Administration, Research, & Practice Advisory Counsel
- **2022-2023** University of Washington Evans School of Public Policy & Governance "Examining Disparities in Ballot Rejections" working group
- **2021-2022** Haas Jr. Foundation Working Group on Language Access

Case 1:26-cv-01159-CJN Document 57-1 Filed 09/02/26 Page 51 of 63

- **2021-2022** Microsoft Working Group on Vote by Mail Security
- **2020-2022** USPS Working Group #4 on Electionmail Visibility
- **2020** Virginia Commonwealth Task Force on 2020 Elections
- **2019-2025** National Vote at Home Circle of Advisors
- **2019-2021** University of Minnesota Humphrey School of Public Administration: Election program steering committee
- **2019-2021** State of Michigan Election Modernization Advisory Committee
- **2017-2021** State of California Task Force on Voter Choice Act
- **2017-2022** National States Geographic Information Council Circle of Advisors
- **2017-2025** Center for Civic Design Board of Advisors
- **2016-2022** State of Washington Postal Task Force
- **2016-2021** EAC Standards Board Postal Committee Advisor
- **2015-2025** National Voter Registration Day Steering Committee
- **2014-2025** Center for Technology in Civic Life Board of Directors
- **2014-2018** Council of State Governments Policy Working Group
- **2014-2015** Overseas Vote Foundation E2E VIV Project
- **2012-2019** IEEE/EAC/NIST Working Group on common data formats
- **2010-2018** Pew Advisory Board: creation of the Elections Performance Index (EPI)
- **2010-2012** Pew Advisory Board: creation of Electronic Registration Information Center (ERIC)
- **2007-2009** Election Assistance Commission's working group on Language Assistance for Unwritten Languages
- **2006-2009** Election Center's National Task Force on Education and Training

## Election Experience-Testimony & Legislation

- **2025** United States Commission on Civil Rights, Florida Advisory Committee on emergency preparedness
- **2024** Amicus Brief in Peterson, Toma v Fontes, Superior Court of the State of Arizona
- **2022+** Subject matter expert in litigation on voting systems, election administration, electionmail
- **2022** Amicus Brief in Lake v Hobbs, Superior Court of the State of Arizona
- **2022** United States Senate Rules Committee hearing, testified on the readiness and issues in the midterm elections.
- **2022-2024** United States Department of Justice, Civil Rights Division subject matter expert report on voter accessibility and vote by mail
- **2022+** National Conference of Commissioners on Uniform State Law's Election Law Committee observer
- **2022** Testified on Vote Center election model (Illinois)
- **2021** United States Senate, written testimony on John Lewis Voting Rights Act Reauthorization
- **2020** United States House of Representatives, Homeland Security Committee testified in hearing on absentee/voting by mail/electionmail.
- **2020** United States House of Representatives, House Administration Committee written testimony on absentee/voting by mail/electionmail.

- **2017** United States Commission on Civil Rights, Alaska Advisory Committee testified on postal concerns of Alaskan Natives and rural Alaska.
- **2016-2019** United States Department of Justice, Civil Rights Division subject matter expert report on voter accessibility and then settlement implementation support to jurisdiction
- **2015** United States Senate, Senate Rules Committee hearing on voter registration
- **2010** National Conference of Commissioners on Uniform State Law's Uniform Military and Overseas Voters Act active observer and contributor.
- **2008-2017** Testified in state legislatures on online voter registration (Florida, Ohio, Rhode Island, Wisconsin); consolidation of election dates (Kansas); professionalization of election administration (Connecticut), expansion of voting options and vote by mail administration (California), and post-election audits (Maryland).
- **2007** United States House of Representatives, Administration Elections Subcommittee, hearing on election audits

**Election Experience-Publications**

- **2025**
    - "How to Discern If Election Information Is Real" Chapter 10, *Elections and Information Disorder.* (October 2025)
    - "Bolstering Funding and Practices for Resilient Elections" Edward Kennedy Institute on the United States Senate & Robert Dole Institute on Politics. Editor, Introduction, and Conclusion. (June 2025) Bolstering-Funding-and-Practices-for-Resilient-Elections.pdf
- **2023**
    - "National Association of Election Officials: At the Center of Elections" *Journal of Election Administration Research & Practice* Volume 2, Issue 1. Co Authored with Joseph Gloria. (June 2023). https://www.electioncenter.org/login.php?continue=journal-of-election-administration-research-and-practice.php
    - "A New Year, A New Vision" electionlineWeekly (January 5, 2023) https://electionline.org/electionline-weekly/2023/01-05/
- **2022**
    - "State Conflicts, State Challenges" Constitutional Conversations, Center for Constitutional Design at the Sandra Day O'Connor School of Law at Arizona State University. (December 16, 2022) https://constitutionalconversations.substack.com/p/state-conflicts-state-challenges
    - "The State of Election Administration in 2022" Survey Brief Co-Authored with Dr. Paul Gronke and Dr. Paul Manson (November 2, 2022) https://democracyfund.org/idea/the-state-of-election-administration-in-2022/
    - "Philanthropy's Role in Elections: Supporting the Professionals on the Frontlines of Democracy" *Journal of Election Administration Research and Practice* Co-authored w Lindsay Daniels. (June 2022) https://www.electioncenter.org/journal-of-election-administration-research-and-practice.php
    - **"**Now Live: Democracy Fund's Language Access for Voters Summit Landing Page" electionlineWeekly (February 17th, 2022) Co-authored with Becky Stewart https://electionline.org/electionline-weekly/
    126.

- **2021**
  - "Language Access for Voters" electionlineWeekly (September 16, 2021) https://electionline.org/electionline-weekly/2021/09-16/
- **2020**
  - "Every Election Has a Story to Tell, Story of 2020 Still Being Written, but Some Chapters are Done" electionlineWeekly (November 19, 2020) https://electionline.org/electionline-weekly/2020/11-19/
  - "New Post Master General Issue Directive" electionlineWeekly (July 30, 2020) https://electionline.org/electionline-weekly/2020/07-30/#tab-2
  - "Election Day Command Centers: A National Snapshot" electionlineWeekly blog (March 12, 2020) https://electionline.org/electionline-weekly/2020/03-12/
- **2019 -2021**
  - "Knowing It's Right" series on post-election audits including "Part One: Practical Guide to Risk Limiting Audits" introduction, Democracy Fund https://democracyfund.org/idea/knowing-its-right-limiting-the-risk-of-certifying-elections/
- **2019**
  - "Building Terminology in the Field" Chapter 6 in *The Future of Election Administration* https://www.springerprofessional.de/en/the-future-of-election-administration/16853420
  - "Tammy's Blog: Incoming! Voter Registration Application Data" electionlineWeekly (December 5, 2019) https://electionline.org/electionline-weekly/2019/12-05/#tab-2
  - "Disaster Narrowly Averted: U.S. to Remain in the Universal Postal Union" electionlineWeekly blog (September 26, 2019) https://electionline.org/electionline-weekly/2019/09-26/
  - "Leave No Voter Behind: Implications of the U.S. Withdrawal from the Universal Postal Union" electionlineWeekly (August 1, 2019) https://electionline.org/electionline-weekly/2019/08-01/
  - "Knowing It's Right, Limiting the Risk of Certifying the Wrong Winner" electionlineWeekly (May 23, 2019) https://electionline.org/electionline-weekly/2019/05-23/
- **2018**
  - "Reflections on Election: Communication, Collaboration, and Commitment" electionlineWeekly (November 29, 2018) https://electionline.org/electionline-weekly/2018/11-29/
  - "Tammy's Blog: ADA Compliance at the Polls: What Everyone Needs to Know about Accessible Elections and Voters' Rights" electionlineWeekly (November 1, 2018) https://electionline.org/electionline-weekly/2018/11-01/#tab-2
  - "Tammy's Blog: My 2018 Summer Vacation" electionlineWeekly (October 11, 2018) https://electionline.org/electionline-weekly/2018/10-11/#tab-2
  - "An Opportunity to Make Every Vote Count" *Governing* Magazine (August 7, 2018)
  - "Increasing Trust in Elections: Democracy Fund's Election Validation Project" electionlineWeekly (May 31, 2018) https://electionline.org/electionline-weekly/2018/05-31/

- "National Postal Forum 2018: Who? What? Where? When? & Why?" electionlineWeekly May 17, 2018 https://electionline.org/electionline-weekly/2018/05-17/
- "Electionline.org Joins Democracy Fund" electionlineWeekly (January 4, 2018) Co-Authored with Stacey Scholl https://electionline.org/electionline-weekly/2018/01-04/

- **2017**
  - "You've Got Mail! Electionmail: Be Part of the Solution" electionlineWeekly, (February 9, 2017) https://electionline.org/electionline-weekly/2017/02-09/
  - "In Focus this Week Exit Interview: Helen Purcell" electionlineWeekly (January 26, 2017) https://electionline.org/electionline-weekly/2017/01-26/
- **2016**
  - "The New Realities in Election Mail" by the Bipartisan Policy Center https://bipartisanpolicy.org/report/voting-by-mail/
- **2015**
  - "Recommendations from the CSG Overseas Voting Initiative Policy Working Group" Council of State Governments, https://ovi.csg.org/wp-content/uploads/2019/08/CSG-OVI-Recommendations-Report-Updated.pdf
  - "Clarion Call: Voter Registration Modernization" in Council of State Government's *2015 Book of the States.*
  - "First Person Singular: Tammy Patrick, Traveling the Country, Listening to Election Folks and Some Music" electionlineWeekly (June 4, 2015)
  - "The Future of Voting: End-to-End Verifiable Internet Voting". Overseas Vote Foundation Report. (July 2015)
- **2014**
  - "American Voting Experience: Report and Recommendations of the Presidential Commission on Election Administration" (January 22, 2014) https://web.mit.edu/supportthevoter/www/files/2014/01/Amer-Voting-Exper-final-draft-01-09-14-508.pdf
- **2013**
  - "U.S. Elections Face a Crossroads on Rights and Technology" *Forbes* online (November 10, 2013) https://techonomy.com/u-s-elections-face-crossroads-rights-technology/
- **2012**
  - "Administrative Burden: Perspective of a Western County" in the *Public Administration Review* journal of the American Society of Public Administrators (Volume 72, Number 5) https://onlinelibrary.wiley.com/doi/10.1111/j.1540-6210.2012.02619.x

**Election Experience-Communications & Presentations Highlights**

- **Print News (Domestic):** Washington Post, New York Times, Los Angeles Times, Chicago Tribune, Boston Herald, USA Today, Huffington Post, Politico, Mother Jones, Wall Street Journal, AP, Reuters, Bloomberg News, Salon, Christian Science Monitor, Wired, Politifact, Axios, Snopes,
- **Print News (International):** London Times, Front Page (India), EuroZprávy (Czech), Agence French Presse, The Guardian

- **Magazines**: TIME, The Atlantic, People, Forbes, New Yorker, Newsweek, Sojourners, The Economist
- **Television (Domestic)**: Daily Show, 60Minutes, ABC, BBC, CBS This Morning & CBS Evening News, CNN, FOX, NBC, MSNBC, NY1, PBS News Hour (election expert for the 2020 Presidential Election & January 6th Congressional Hearings), Univision, Al Jazeera,
- **Television (International)**: TV Tokyo, CTV Canada, EFE Agencia, Globo TV Brazil, RTV1, Newsy, Iraqi Channel 8, M6 French TV, Global TV Canada, Skye News, Merit TV
- **Radio**: NPR, SRF Swiss National Radio, London Times Radio, BBC Radio, RFI (French Public Radio)
- **Podcasts: "**High Turnout, Wide Margins"; "Swamp Stories", Rural Broadcast; "Defending Ideas", Sutherland Institute; "The Middle with Jeremy Hobson", NPR;
- **2026 "**Redrawing the Rules? Mid-Decade Redistricting and the Future of Elections**"** panelist, Hoover's Center for Revitalizing American Institutions**,** Hoover Institute
- **2026 "**How We Could Vote: Ranked Choice, the Electoral College, and More" panelist, Harris School of Public Policy**,** University of Chicago
- **2025** "Obstacles and Opportunities in Achieving the Guiding Principles for Election Administration" panel, James A Baker, III Institute for Public Policy, Rice University
- **2025** Brookings Institute Anti-Corruption, Democracy and Security (ACDS) project roundtable speaker
- **2025** "Critical Issues Facing the Election Administration Workforce" panel, National Academy of Public Administration's Future of Democracy Summit
- **2025** "How Voting Has Changed: 25 Years After Bush v. Gore" NCSL Legislative Bootcamp panel moderator
- **2024** "Elections Update" Council on Governmental Ethics Laws (COGEL) Annual Conference
- **2024** "Lightening Talk on Election Funding" Bipartisan Policy Center 2024 Election Summit
- **2024** VoteBeat Civic News Company, Expert Elections Desk
- **2024** "Bolstering Elections" Edward Kennedy Institute & the Robert Dole Institute for Politics
- **2024** "Safeguarding Democracy: Protecting Elections and Election Workers." Georgetown McCort School of Public Policy
- **2024** "Principles for Trusted Elections" The Carter Center, the Gerald R. Ford Presidential Foundation
- **2024** Center for Christianity and Public Life Annual Conference
- **2024** "Election Technology in the US: Voting machines and beyond." International Foundation for Election Systems International Convening for the 2024 United States Presidential Election.
- **2023** "The Nuts & Bolts of Our Elections" Association of Former Members of Congress & The Kettering Foundation: Election Integrity Symposium
- **2023** "Elections Update" Council on Governmental Ethics Laws (COGEL)
- **2023** "National Association of Election Officials: At the Center of Elections" presentation to more than a dozen state associations

- **2023** “Accurate and Effective Elections Communications” NCSL Strong Elections, Strong State workshops
- **2022** VoteBeat, Expert Elections Desk
- **2022** “New preaching on electoral fraud and its implications for the integrity of elections” Regional Forum for the Americas Summit for Electoral Democracy
- **2021** “Electoral Reforms and Democracy” panelist, Global Forum on Democracy
- **2021** “Securing Democracy Through Election” panelist, Department of Homeland Security CISA Cybersecurity Summit
- **2020** VoteBeat, Expert Elections Desk
- **2020** International Foundation for Electoral Systems (IFES) “Virtual Tour of American Polling Locations”
- **2020** “Election Administration in 2020: the COVID-Era” American Press Institute
- **2020** “Elections in Time of Epidemic” Association of European Election Officials.
- **2020** “Ensuring Everyone Can Vote” 92Y
- **2019** “Democracy on a Deadline: Reporting on the Electoral Process” Poynter News University
- **2019** “How Can Election Challenges Faced by Native Americans be Overcome?” Carter Center Forum on Human Rights
- **2018** ProPublica ElectionLand, Expert Elections Desk
- **2018** “It’s Election Day in America” International Foundation for Electoral Systems (IFES)
- **2018** “Accuracy in Election Information: Focus on Florida, Georgia, & North Carolina” Poynter Disinformation Workshop
- **2016** ProPublica ElectionLand, Expert Elections Desk
- **2016** “Delivering Democracy” webinar presented at the National Postal Forum and Ms. Patrick became the only non-postal employee to present to their operational leadership team
- **2014** International Foundation for Electoral Systems (IFES) “The American Voting Experience: Report on the Presidential Commission on Election Administration”
- **2011** “UOCAVA Voter Trend Analysis and Risk Assessment” presented to the Technical Guidelines Development Committee at the National Institute of Science and Technology
- **2010+** Speaker, panelist, discussant, keynote at national conferences for Election Center, National Association of State Elections Directors, National Association of Secretaries of State, National Conference of State Legislatures, International Association of Government Officials, United States Election Assistance Commission, National Postal Forum, National Association of Presort Mailers, League of Women Voters, Common Cause, and dozens of state association conferences (AK, AZ, CA, CO, CT, FL, GA., IA, IL, KS, MD, MI, MO, NC, NH, NJ, NM, NV, OH, OR, PA, SC, TX, UT, VA, WA).

**Business Experience**

- **1998-2003** Century Link Communications
    - **2001-2003** Residential Services Call Center Manager
        - Managed team of 18-25 representatives
    - **1998-2001** Residential Services Sales/Customer Service Representative
        - President’s Club honoree each year representing top 1% of the company

- **1991-1998** For Bare Feet, Inc
  - **1994-1996** Production Floor Scheduler
  - **1992-1998** National Sales & Marketing
  - **1991-1998** Retail Outlet Manager

## XIII. Appendix B: Types of Mail Voting

According to the National Conference of State Legislatures (NCSL), and reflected in **Figure 11**[71] there is variation in state statutes over who can vote by mail and how those voters go about doing so:

> "*Twenty-nine states offer "no-excuse" absentee voting, which means that any voter can request and cast an absentee/mail ballot, no excuse or reason necessary.*
>
> *An additional eight states and Washington, D.C., conduct elections entirely by mail (California, Colorado, Hawaii, Nevada, Oregon, Utah, Vermont and Washington), which means voters do not need to request a ballot, and instead automatically receive one. With all-mail and no-excuse absentee states taken together, a total of 37 states and Washington, D.C., allow any voter to vote by absentee/mail ballot without an excuse.*
>
> *The remaining 13 states require a voter to provide an excuse to qualify for an absentee/mail ballot."*

The practical implication here is that for the twenty-nine states with no excuse (but an application requirement), and an additional thirteen states where the voter has to provide an excuse with their application, for a total of forty-two states that have administrative tasks around processing, authenticating, approving or rejecting vote by mail applications. This work is done at the local level, not by the state's chief election authority.

[71] National Conference of State Legislatures, Table 1: States with No-Excuse Absentee Voting, https://www.ncsl.org/elections-and-campaigns/table-1-states-with-no-excuse-absentee-voting.




**Figure 11**: *Landscape of vote by mail, absentee options per NCSL.*

Some states have permanent or automatic absentee lists. There are ten states which allow any voter to be on the automatic mailing list, an additional nine states allowing voters with permanent disabilities, and five states allowing for automatic mailing for all elections in a single year (thus, not requiring an application for every election).[72] (**Figure 12**)

[72] National Conference of State Legislatures, Table 3: States With Permanent Absentee Voting Lists, https://www.ncsl.org/elections-and-campaigns/table-3-states-with-permanent-absentee-voting-lists.




**Figure 12**: *Ability for a voter to be on a permanent absentee, mailed ballot list (all-mail states not included) per NCSL.*

Given the variation that currently exists in the administration of voting by mail across the United States, it is not only impractical but impossible to successfully implement the proposed rule without systemic interruption

# XIV. Appendix C: Ballot Service Type Identifier (STID)

## Ballot Mail Service Type Identifiers (STIDs)

**What is Election Mail?**
Any item mailed to or from authorized election officials that enables citizens to participate in the voting process — including ballots, voter registration cards, absentee voting applications, and polling place notifications.

**What is Ballot Mail?**
A type of Election Mail sent to or from an authorized election official containing a live ballot that may be used to cast a vote in an election.

**What is a Service Type Identifier (STID)?**
A unique three-digit code embedded in the Intelligent Mail® barcode (IMb®) that indicates the service type for an individual mailpiece. STIDs denote the mail class, address correction service (ACS™) option, and whether Informed Visibility® Mail Tracking and Reporting (IV®-MTR) is being utilized.

Click here to learn more about Election Mail and Ballot Mail.

The Ballot Mail STIDs listed below provide the ability to identify and track ballots throughout the mail network. **These STIDs are for use with live ballots only.** Other items considered Election Mail (e.g., sample ballots, voter registration cards, polling place notifications, etc.) should NOT use these STIDs. For other types of Election Mail refer to the First-Class Mail® Service STID Table on page 2 and USPS Marketing Mail® Service STID Table on page 4 on Postal Pro to determine which STID to use based on the address correction option and other desired services.

**Ballot Mail** (Effective January 21, 2024)

| Class of Mail | Address Correction Option | | | Basic or Nonautomation with IV-MTR* | Full-Service with IV-MTR* |
|---|---|---|---|---|---|
| **Election Officials to Voter (Outbound)** | | | | | |
| **First-Class Mail** | No Address Corrections – No Printed Endorsement | | | 715 | 720 |
| | Manual Address Corrections** | | | 716 | |
| | **OneCode ACS®** | **Forward Ballot** - Address Service Requested Opt 1 | | 717 | |
| | | **Forward Ballot** - Address Service Requested Opt 2 | | 718 | |
| | | **Return Ballot** - Return Service Requested Opt 2 | | 713 | |
| | **Full-Service ACS** | **Forward Ballot** - Address Service Requested Opt 1 | | | 722 |
| | | **Forward Ballot** - Address Service Requested Opt 2 | | | 723 |
| | | **Return Ballot** - Return Service Requested Opt 2 | | | 725 |
| **USPS Marketing Mail** | No Address Corrections – No Printed Endorsement | | | 735 | 741 |
| | Manual Address Corrections** | | | 736 | |
| | **OneCode ACS** | **Forward Ballot** - Address Service Requested Opt 1** | $ | 737 | |
| | | **Forward Ballot** - Address Service Requested Opt 2** | $ | 738 | |
| | | **Return Ballot** - Return Service Requested Opt 2** | $ | 714 | |
| | **Full-Service ACS** | **Forward Ballot** - Address Service Requested Opt 1** | $ | | 743 |
| | | **Forward Ballot** - Address Service Requested Opt 2** | $ | | 744 |
| | | **Return Ballot** - Return Service Requested Opt 2** | $ | | 746 |
| | **Traditional ACS** | **Return Ballot** - Return Service Requested Opt 2** | $ | 726 | |
| **Voter to Election Officials (Return or Inbound)** | | | | | |
| **First-Class Mail ***** | **First-Class Mail Reply** | | | 777 | |
| | **Business Reply Mail®** | | | 778 | |
| | **Permit Reply Mail** | | | 779 | |
| 🖨 | **UOCAVA** | | | 780 | |

$ Postage and fees are charged for undeliverable mail that is returned to sender.
* Informed Visibility Mail Tracking & Reporting
** Requires the printed text ancillary service endorsement. The option selected must not be printed with the endorsement.
*** Return Ballot Mail (i.e., ballots that voters return to election officials) is sent at First-Class Mail prices, unless a voter opts to pay for a premium service.

🖨 Uniformed and Overseas Citizens Absentee Voting Act voters use only. Absent overseas uniformed services voters, as defined in 52 U.S.C.§ 20304(d), may return absentee ballots from the following locations by using Priority Mail Express Label 11-DOD without prepaying postage: Overseas APO/FPO military locations; DPO locations; or Department of State (DOS) locations.

**IMPORTANT NOTE:** The Address Correction Option identified by the STID requesting ACS in the IMb on Ballot Mail will take precedence over a printed endorsement if there is a conflict. When a printed endorsement is required to receive ACS, as is for USPS Marketing Mail service, "ELECTRONIC SERVICE REQUESTED" must be printed.

**KEY RESOURCE:** Detailed descriptions of the various Ballot Mail STIDs can be found in Appendix A at https://postalpro.usps.com/node/461. For other types of Election Mail refer to pages 2 and 4 of the STID Table on Postal Pro at https://postalpro.usps.com/mailing/service-type-identifiers.

UNITED STATES POSTAL SERVICE®

©2024 United States Postal Service®. All Rights Reserved. The Eagle Logo is among the many trademarks of the U.S. Postal Service®.
Privacy Notice: For information regarding our privacy policies, visit usps.com/privacypolicy.

# How to Determine the Right Ballot Mail STID

## There are five primary aspects to consider:

1. **What direction is the ballot going?**
   There are two directions the ballot may be mailed:
   a. **Outbound:** From election officials to the voter.
   b. **Return (or inbound):** From the voter to election officials.
2. **Which class of mail is being used?**
   Ballot Mail STIDs differ depending on whether the ballots are mailed via First-Class Mail® or USPS Marketing Mail® service. We strongly recommend the use of First-Class Mail service for all ballots.
3. **Determine whether you want to receive Address Change Service (ACS™) information on the voter.**
   ACS is a post-mailing service that provides USPS with instructions on how to handle Undeliverable as Addressed (UAA) mail and provides you with electronic Change of Address (COA) information or the reason for non-delivery.
   a. **If you do not want to receive ACS data,** use No Address Corrections-No Printed Endorsement.
   b. **If you do want to receive ACS data**, decide how you want to receive it:
      - Manual Notice: Physical address correction notice PS Form 3547, *Notice to Mailer of Correction in Address*, will be provided to you with the voter's correct address information.
      - Electronic Notice:
        i. OneCode ACS® feature allows you to receive electronic or automated address corrections through the use of the Intelligent Mail® barcode (IMb®) when mailing a ballot using First-Class Mail or USPS Marketing Mail services.
        ii. Full-Service ACS offers an additional benefit for mail using the IMb that qualifies for Full-Service discount postage prices.
        iii. Traditional ACS allows you to receive address corrections in an electronic format when mailing a ballot in a letter- or flat-sized envelope. In addition to the IMb, your mailpieces will be identified with a Postal-supplied seven-character alpha identifier known as the ACS participant code and an optional keyline. A keyline is a unique code that allows you to either incorporate existing voter identifiers or create a new system that assists in locating the voter in your database.
4. **Do you want UAA Ballot Mail to be forwarded (if possible) or returned to you?**
   a. Forwarded - Mail is forwarded if possible or returned if forwarding is not possible.
      - Address Service Requested Option 1: A manual or electronic notice with the voter's new address information is provided for forwarded pieces and the address correction fee is charged. First-Class Mail mailpieces are forwarded or returned at no charge. USPS Marketing Mail mailpieces are charged an additional weighted fee for mail that must be returned.
      - Address Service Requested Option 2: An electronic notice is issued for either result. First-Class Mail mailpieces will be returned to you with reason for non-delivery attached to it without charge; however, a separate notice with the reason for non-delivery will be provided for a fee. USPS Marketing Mail mailpieces are charged an additional weighted fee for returns.

   b. Returned
      - Return Service Requested Option 2: The mailpiece is returned to you with the new address or reason for non-delivery. First-Class Mail mailpieces are returned at no charge. USPS Marketing Mail mailpieces are returned at either the single piece First-Class Mail or Priority Mail® price, depending on the weight.
5. **Do you meet the requirements to be a Full-Service Mailer? Review the qualifications on Postal Pro.**
   **a. If yes**, Full-Service with IV®-MTR STIDs will match your mailing goals.
   **b. If no**, Basic/Non-Automation with IV-MTR STIDs will match your mailing goals.

**Important Notes:**

Understand the postage and/or fees, if any, that will be associated with the use of each STID.

If you are using USPS Marketing Mail service or manual address corrections, please be aware that in order to have your mailpiece forwarded or returned to you, the mailpiece must contain the associated printed text ancillary service endorsement. This comes at an additional cost.

UNITED STATES POSTAL SERVICE®

©2024 United States Postal Service®. All Rights Reserved. The Eagle Logo is among the many trademarks of the U.S. Postal Service®. Privacy Notice: For information regarding our privacy policies, visit usps.com/privacypolicy.

## XV. Appendix D: Jurisdiction Size Specifications

Academics generally agree that there are five bands of voter registration populations that election offices serve, with the first two, from zero to twenty-five thousand often referred to as "small" jurisdictions, the middle category of twenty-five thousand and one voters to one-hundred thousand voters being "medium" sized jurisdictions, and those over one-hundred thousand voters referred to as "large" jurisdictions (**Figure 13**).[73]

| JURISDICTION SIZE | PERCENT OF LEOS | PERCENT OF VOTERS |
|---|---|---|
| Smallest (0 to 5,000) | 57% | 3% |
| Smaller (5,001 to 25,000) | 27% | 12% |
| Medium (25,001 to 100,000) | 11% | 19% |
| Larger (100,001 to 250,000) | 3% | 16% |
| Largest ( > 250,000) | 2% | 51% |

**Figure 13**: *This graphic from the Democracy Fund "Stewards of Democracy" report demonstrates the proportion of election officials across the spectrum of voting populations.*

[73] Democracy Fund, *Stewards of Democracy: The Views of American Local Election Officials*, https://democracyfund.org/wp-content/uploads/2020/06/2019_DemocracyFund_StewardsOfDemocracy.pdf.