# INTERVENOR-DEFENDANT MCCRAY
# EXHIBIT 2

*Secretary*
**U.S. Department of Homeland Security**
**Washington, DC 20528**

**Homeland Security**

September 2, 2026

The Honorable Todd Blanche
Attorney General
U.S. Department of Justice
950 Pennsylvania Ave NW
Washington, DC 20530

Dear Mr. Attorney General:

I want to congratulate you again on your confirmation earlier this month. It has been a pleasure working with you and your team on ongoing immigration enforcement. As the Secretary of Homeland Security, I am also tasked with protecting our nation's critical infrastructure—which includes our election systems and their security. The Department serves as the Sector Risk Management Agency for the election infrastructure subsector, which requires my team to identify vulnerabilities and risks to election systems.

The dedicated men and women of DHS work every day to protect election systems and recommend security measures to mitigate the consequences of compromise and the disruption of systems. In the course of that work, DHS identified several issues during my predecessor's tenure that resulted in referrals to the Department of Justice (DOJ). Due to the potential impact of the issues identified, I wanted to make sure that you are aware of these prior referrals.

First, we asked DOJ to determine if voting systems that count votes from barcodes and QR codes (Quick Response Codes) are compliant with Title III of the Help America Vote Act (HAVA) of 2002. HAVA has numerous voluntary voting system guidelines that states may adopt. However, there are several mandatory provisions, one of which is the requirement that any voting system used in a federal election must produce a voter-verifiable paper record with a manual audit capacity. (52 U.S.C. § 21081(a)(2)(B)). Because barcodes and QR codes are machine-readable encodings created to eliminate the need for human-readable text, they may not be suitable for voter verification or manual audits. DHS has identified some systems that are configured to disassociate programming of the printed text and the barcode, so the resulting paper record may not be a reliable record for a manual audit.[1]

President Trump's Executive Order (EO) 14248 instructed agencies to ensure that elections are being held in compliance with the federal laws that protect Americans' voting rights and guard against vote dilution by illegal voting, discrimination, and other forms of malfeasance and error. EO

---

[1] See CISA Report in which researchers noted, "[H]ackers could change the votes encoded in the barcode, without having physical access to the machines." (P. 4) https://www.whitehouse.gov/wp-content/uploads/2026/07/Vulnerabilities-in-Electronic-Voting-and-Ballot-Counting-Systems.zip

14248 also raised the issue of the security of voting systems that rely on barcodes and QR codes. Therefore, we asked DOJ to review our findings and make a determination regarding HAVA.

The second issue requires a bit more background information. Generally, we asked DOJ to review the legality of ongoing sharing of state motor vehicle data and voter registration data with several private non-profit non-governmental organizations (NGOs). We flagged concerns regarding potential violations of the Driver's Privacy Protection Act (DPPA), 18 U.S.C. §§ 2721–2725 through states' disclosure of sensitive state motor vehicle data for use in identifying and registering individuals who had previously declined to register to vote.

In September 2025, DHS representatives met with representatives from DOJ and discussed the public reporting available regarding this issue. By way of background, the Electronic Registration Information Center (ERIC) was created by Pew Charitable Trusts, in part, to facilitate access to comprehensive data in state motor vehicle databases. Marketed as a voter list maintenance organization[2], ERIC exposes millions of citizens' sensitive private data to unknown contractors, subcontractors, and agents[3] of ERIC—potentially in violation of the DPPA. In practice, it appears ERIC lobbies states to sign a contract that requires the disclosure of the private data of individuals who were not registered to vote and therefore certainly could not be in need of voter list maintenance. The data fields disclosed include Social Security numbers and driver's license numbers.

Prior to the 2020 election, ERIC shared that sensitive, protected motor vehicle data with at least one other private organization. The Center for Election Innovation and Research (CEIR) received over $70 million from the Chan Zuckerberg 501(c)(3) organization, which was used to provide grants to state election officials who agreed to turn over sensitive private data to CEIR. This sharing and resharing of Motor Vehicle Agency data among NGOs may not qualify as a permissible use of motor vehicle data identified in the DPPA. This category of data regarding potential voters is incredibly valuable to political parties and campaigns.

A primary function of ERIC appears to be identifying individuals who are potentially eligible to vote but who are currently unregistered. All eligible but unregistered (EBU) individuals identified in the state motor vehicle database are contacted and encouraged to register. The list of EBUs is created by comparing information from the statewide voter registration database to the list of all individuals in the state motor vehicle database.

According to publicly available reporting, in 2020, Pennsylvania's $13 million grant agreement from CEIR included the following terms: "Grantee agrees to cooperate with CEIR, including providing data, as CEIR reasonably requests."[4] The data requested included state motor vehicle data, originally shared with ERIC, to be used by CEIR to create the EBU lists for outreach. ERIC acknowledges that the EBU list is created using data that is protected by the DPPA.[5]

---

[2] https://restoration-news.com/eric-the-best-data-money-cant-buy-pt-1
[3] https://ericstates.org/wp-content/uploads/documents/ERIC-Bylaw-MA-FINAL.pdf
[4] https://verityvote.us/eric-sharing-data-with-zuckerburg-funded-ngo/
[5] https://ericstates.org/wp-content/uploads/documents/ERIC-Bylaw-MA-FINAL.pdf

The ERIC model contract requires states to share "all licensing or identification records from motor vehicles departments" at least every 60 days.[6] Despite the fact that the MVA data will be used to identify EBUs, the model contract prohibits states from sharing data related to citizenship. The ERIC model contract provides that "[u]nder no circumstances shall the Member transmit an individual's record where the record contains documentation or other information indicating that the individual is a non-citizen of the United States."[7]

This problem has direct implications for our efforts to prevent alien voting. In 2022, the ERIC EBU list included 30,000 non-citizens in the state of Colorado. These 30,000 non-citizens received invitations to register from the Colorado Secretary of State[8]. The state later identified the error and "appli[ed] several efforts to prevent or reject anyone not eligible to vote from registering."[9] We have serious concerns about the potential for alien registration across other states.

One of ERIC's purported benefits is its ability to identify deceased registrants. States may request a report[10] from ERIC which should include a list of individuals registered in the state who have died. The State of Georgia has been sharing DPPA-protected data with ERIC since 2019. However, when Georgia ran its state voter file through the Systematic Alien Verification for Entitlements (SAVE) system in 2026, my analysts at U.S. Citizenship and Immigration Services identified more than 42,000 deceased registrants on Georgia's state voter rolls.

In February of 2026, a citizen in Washington State discovered hundreds of ballots next to a dumpster[11] at a commercial mailbox rental business in Renton, Washington. In addition, the citizen discovered 550 ERIC "Eligible but Unregistered" voter registration postcards mailed to the same commercial address from the Secretary of State. In my view, this mass mailing of voter registration material to unvetted addresses is another indicator of the reckless use of DPPA-protected motor vehicle data that could potentially result in alien voter registration and alien voting.

ERIC claims that its use of MVA data is permitted under the government function exception. Relevant factual information previously discussed with DOJ representatives included:

- Congress specified 14 specific exceptions under which private MVA data may be lawfully disclosed. (18 U.S.C. § 2721).
- The National Voter Registration Act (NVRA) does require states to maintain accurate voter rolls by removing ineligible voters, but it does not appear to create a government function for proactively identifying eligible but unregistered individuals. (52 U.S.C. § 20507)
- The state MVA data sharing frequency required by the model contract potentially belies a government function because it appears that no function is being performed with the data at that frequency. Under the ERIC model contract, states must share motor vehicle data at least every 60 days, but ERIC only uses the MVA data to produce reports—if requested—once or twice a year.

---

[6] *Id.*
[7] *Id.*
[8] https://coloradosun.com/2022/10/10/colorado-30000-noncitizens-got-voter-registration-mailer/
[9] *Id.*
[10] Reports are not produced or provided by ERIC unless requested by the state.
[11] WA State Abandoned Box of Election Materials - More Data Analysis Shows Amazing Find is Bigger than Expected | Skagit County Republican Party

- Because Section 5 of the NVRA requires states to offer voter registration opportunities at state motor vehicle agencies, the vast majority of EBUs identified by ERIC are individuals who have already declined to register to vote when offered the opportunity to register.
- The founder of ERIC announced that the majority of individuals targeted as EBUs were the target for Democrat voter registration drives.[12]
- The founder of ERIC later announced that ERIC is the single most effective voter registration drive in history.[13]

ERIC officials claim that disclosure of the MVA data to CEIR was permitted under the research exception. Relevant factual information previously discussed with DOJ representatives included:

- It is my understanding that § 2721(b)(5) permits disclosure "[f]or use in research activities," but disclosure must strictly comply with three mandatory requirements: the personal information cannot be published, redisclosed, or used to contact individuals.
- In 2020, the ERIC model contract required states to "at a minimum, initiate contact with each and every eligible or possibly eligible citizen" identified on the EBU list.[14] Email communications received via a public records request in the state of Georgia show that CEIR was "coordinating ERIC EBU outreach" which was contacting each individual identified in the motor vehicle file.

I look forward to our continued collaboration as we support the President's America First agenda. Please don't hesitate to reach out if you have any questions as you review these referrals with your team.

Sincerely,

Markwayne Mullin
Secretary of Homeland Security

---

[12] https://archive.org/details/2011-07-14-e-1
[13] https://www.youtube.com/watch?v=Y5dJEYEB5qY&t=1310s
[14] https://web.archive.org/web/20200815035300/https://ericstates.org/wp-content/uploads/2020/02/ERIC_Bylaws_01-2020.pdf